**Appx1-2410**

**2026-1223**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**BTL INDUSTRIES, INC.,**
*Appellant*

**v.**

**INMODE LTD.,**
*Appellee*

**Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case No. IPR2024-00703**

---

### CORRECTED JOINT APPENDIX

---

Justin J. Oliver
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001

Michael P. Sandonato
Venable LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067

William A. Hector
Venable LLP
101 California Street, Suite 3800
San Francisco, CA 94111

Parker G. Zimmerman
Venable LLP
151 W 42nd Street, 49th Floor
New York, NY 10036

*Counsel for Appellee InMode Ltd.*

Seth R. Ogden
Nathan I. North
Patterson Intellectual Property
Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203

Dallin Glenn
BTL Industries, Inc.
362 Elm Street
Marlborough, MA 01752

*Counsel for Appellant BTL Industries,
Inc.*

Dated: August 12, 2026

# TABLE OF CONTENTS

**Page(s)**

**JUDGMENT**

Final Written Decision,
 Paper No. 29, filed October 1, 2025……………………...……..….Appx1-36

**PATENT**

U.S. Patent No. 8,961,511……………………………………….…...Appx37-57

**CERTIFIED LIST**

Notice Forwarding Certified List……………………………..…..Appx58-103

**PAPERS AND EXHIBITS FOR IPR2024-00703**

Petition for *Inter Partes* Review,
 Paper No. 2, filed July 2, 2021
 *Excerpt*…………………………….…………..…Appx111-123, Appx131-138,
 Appx145-153, Appx167-171, Appx177-178

Decision Granting Institution of *Inter Partes* Review
 Paper No. 6, filed October 2, 2024……………….………....Appx189-214

Patent Owner's Response
 Paper No. 12, filed January 22, 2025
 *Excerpt*………………………………………………………Appx281

Petitioner's Reply to Patent Owner's Response
 Paper No. 15, filed April 30, 2025
 *Excerpt*………………………………………Appx310-316, Appx321-333

Patent Owner's Sur-Reply to Petitioner's Reply
 Paper No. 20, filed June 11, 2025
 *Excerpt*………………………..……………….Appx354-361, Appx367-372

Corrected Patent Owner's Response
      Paper No. 22, filed July 1, 2025
         *Excerpt*……………………………………..Appx391-393, Appx398-404,
                               Appx413-435, Appx444-455

Record of Oral Hearing
      Paper No. 27, filed September 18, 2025………………………….Appx460-516

Petitioner's Notice of Appeal
      Paper No. 34, filed December 2, 2025………………...……......Appx517-521

Declaration of Joseph Berenholz, M.D.
      Exhibit 1003, filed April 10, 2024
         *Excerpt*……………………….Appx972-982, Appx989-990, Appx996-1000,
                    Appx1015-1020, Appx1029-1032, Appx1064-1065

CV of Joseph Berenholz, MD
      Exhibit 1004, filed April 10, 2024…………………...……Appx1070-1072

U.S. Patent No. 6,463,331
      Exhibit 1005, filed April 10, 2024…………………….......Appx1073-1096

U.S. Patent Publication No. 2004/0193238 A1
      Exhibit 1006, filed April 10, 2024………………….…Appx1097-1135

U.S. Patent No. 6,216,704
      Exhibit 1007, filed April 10, 2024………………….……Appx1136-1179

Designer vaginas Article by Debra Ollivier
      Exhibit 1008, filed April 10, 2024………………………..Appx1180-1183

Atlas of Human Anatomy, 4th Edition by Frank H. Netter, MD
      Exhibit 1015, filed April 10, 2024
         *Excerpt*……………………………………….……….Appx1467

Salon.com Salon Traffic & Audience Profile
      Exhibit 1023, filed April 10, 2024
         *Excerpt*…………………………………..……….Appx1547-1548

Temperature Controlled Radiofrequency for Vulvovaginal Laxity by Dr. Red. M. Alinsod
    Exhibit 1025, filed April 10, 2024
    *Excerpt*……………………………….....................……..Appx1596-1601

The EmBodyment of American Culture by Heinz Tschachler, Maureen Devine, Michael Draxlbauer
    Exhibit 1027, filed April 10, 2024
    *Excerpt*…………………………….....Appx1607-1611, Appx1618-1627

The Hydra's Tale, Imagining Disgust by Robert Rawdon Wilson
    Exhibit 1028, filed April 10, 2024
    *Excerpt*………………………….….…Appx1628-1631, Appx1648-1649,
                                        Appx1681, Appx1704

Salon.com Search (March 2001)
    Exhibit 1029, filed April 10, 2024……………………………….....Appx1709

Salon.com Advanced Search (November 2000)
    Exhibit 1030, filed April 10, 2024………………………..Appx1710-1711

Affidavit of Nathaniel E Frank-White
    Exhibit 1031, filed April 10, 2024
    *Excerpt*……………………………………………………Appx1712-1720

Dr. Denise Poulos Deposition Transcript
    Exhibit 1032, filed April 30, 2025
    *Excerpt*………………...….…Appx1746-1748, Appx1751-1761, Appx1806,
                            Appx1811, Appx1820-1824, Appx1861-1866

Taber's Medical Dictionary Definition of Erythema
    Exhibit 1034, filed April 30, 2025…………………...…………Appx1921

Declaration of Dr. Denise Poulos
    Exhibit 2001, filed January 22, 2025
    *Excerpt*…………….………….....................Appx2008-2013, Appx2035-2055,
                          Appx2067-2069, Appx2073-2076

iv

Dr. Joseph Berenholz Deposition Transcript
    Exhibit 2005, filed January 22, 2025
        *Excerpt*…………….....................….Appx2136-2138, Appx2144-2146,
                                           Appx2233-2242, Appx2259-2268


Cleveland Clinic Speculum Design
    Exhibit 2010, filed January 22, 2025
        *Excerpt*………………………………….………..Appx2350-2353

What are the Differences Between ThermiVa Radiofrequency and
FemiLift/MonaLisa/IntimaLase lasers for use in Aesthetic Vulvovaginal Therapies
Article by Dr. Red Alinsod
    Exhibit 2013, filed January 22, 2025
        *Excerpt*……………………………………………Appx2365-2370

Salon.com Wikipedia
    Exhibit 2015, filed January 22, 2025
        *Excerpt*…………………………………………….….Appx2385

Laxity of the Vaginal Introitus After Childbirth Article
    Exhibit 2017, filed January 22, 2025………………….Appx2396-2402

Radiofrequency Treatment of Vaginal Laxity after Vaginal Delivery Article
    Exhibit 2018, filed January 22, 2025………………..Appx2403-2410

Trials@uspto.gov
571-272-7822

Paper No. 29
Entered: October 1, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

BTL INDUSTRIES, INC.,
Petitioner,

v.

INMODE LTD.,
Patent Owner.

———————

IPR2024-00703
Patent 8,961,511 B2

———————

Before MEREDITH C. PETRAVICK, BENJAMIN D. M. WOOD, and HYUN J. JUNG, *Administrative Patent Judges*.

PETRAVICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

Appx1

IPR2024-00703
Patent 8,961,511 B2

## I.    INTRODUCTION

BTL Industries, Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 1–58 of U.S. Patent No. 8,961,511 B2 ("the '511 patent," Ex. 1001). Paper 2 ("Pet.").  InMode Ltd. ("Patent Owner") did not file a Preliminary Response, and, on October 2, 2024, we instituted this *inter partes* review as to all challenged claims and all grounds presented in the Petition.  Paper 6 ("Dec.").

After institution, Patent Owner filed a Response to the Petition.  Paper 12 ("PO Resp.").  Petitioner filed a Reply (Paper 15, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 20, "PO Sur-Reply").  An oral hearing was held on July 8, 2025 and a transcript appears in the record (Paper 27, "Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–58 of the '511 patent.  For the reasons discussed below, we determine Petitioner does not establish by a preponderance of the evidence that any of claims 1–58 are unpatentable.

### A.    Real Parties-in-Interest

Petitioner identifies itself, BTL Industries, Inc., as the real party-in-interest.  Pet. 73.

Patent Owner identifies itself, InMode Ltd., as the real party-in-interest.  Paper 4, 1.  Patent Owner avers that it is the owner of the '511 patent, as evidenced by the assignment accorded with the Office at Reel No. 064258, Frame No. 0525.  *Id.*; *see also* Ex. 3001 (assignment history abstract).

2

IPR2024-00703
Patent 8,961,511 B2

B. Background and Related Proceedings

The '511 patent was previously challenged by ThermiGen, LLC and Thermiaesthetics, LLC in IPR2018-00088 and IPR2018-00089 (jointly, "the ThermiGen IPRs"). These cases were terminated shortly after institution at the request of Petitioner ThermiGen, and then-Patent Owner, Viveve, Inc. *See* IPR2018-00088, Papers 10 (Ex. 1009), 12; IPR2018-00089, Papers 11 (Ex. 1010), 12.

Coincident with the ThermiGen IPRs, the '511 patent was then at issue in *Viveve, Inc. v. ThermiGen, LLC et al.*, Civil Action No. 2:16-cv-1189-JRG (E.D. Tex.) ("*Viveve*"), which also settled. *See, e.g.*, Ex. 1009, 2.

According to the parties here, the '511 patent is now at issue in *InMode Ltd. v. BTL Industries, Inc.*, Case No. 2:23-cv-08583 (C.D. Cal.), filed October 11, 2023. *See* Pet. 74, Paper 4, 1.

C. The '511 Specification

The '511 patent issued from U.S. Application No. 11/704,067, filed February 7, 2007, and claims the benefit of Provisional Application No. 60/743,247, filed on February 7, 2006. Ex. 1001, codes (21), (22), (60).

The patent pertains to the use of radiant energy to "treat[] a loose vagina and introitus" [1] via "corrective or restorative remodeling of the mucosal surfaces of the vagina, introitus, and vulva." Ex. 1001, code (57), 1:13–15, 2:17–21.

---

[1] The Specification defines "introitus" as "the opening of the vagina" (Ex. 1001, 2:3–4, 3:51).

3

IPR2024-00703
Patent 8,961,511 B2

According to the Specification:

> Embodiments of the invention include methods for remodeling a therapeutic zone of tissue within a target tissue of female genitalia. The target tissue lies immediately beneath the mucosal epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention does not include deeper tissue, such as endopelvic fascia.

*Id.* at 3:41–48.

The Specification describes "apparatus and methods for tightening tissue of the female genitalia by heating targeted connective tissue with radiant energy [typically radiofrequency (RF) energy], while cooling the mucosal epithelial surface over the target tissue to protect it from the heat." *Id.* at code (57), 4:4–13*; see also id.* at 2:25–28, 4:7–16, 13:16–19, claims 6, 33, 41, and 49 ("heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy"). According to the Specification, such tightening may be an immediate or near-immediate consequence of thermally denaturing tissue collagen, and/or the result of a longer-term healing response involving the deposition of new collagen by cells in the connective tissue. *Id.* at code (57), 4:14–16, 4:63–5:11, 12:39–49.

### D.    Illustrative Claims

Petitioner challenges claims 1–58 in this proceeding, of which claims 1, 35, 43, and 51 (reproduced below) are independent.  The independent

4

IPR2024-00703
Patent 8,961,511 B2

claims differ only with respect to the "wherein" clauses, shown below in italics.[2]

> 1. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
>> heating the target tissue, and
>>
>> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.*
>
> 35. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
>> heating the target tissue, and
>>
>> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.*
>
> 43. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
>> heating the target tissue, and

---

[2] The Petition applies a short-hand designation identifying elements of the independent claims. With respect to claim 1, for example, [1.P] refers to the preamble, [1.1] refers to the step of "heating the target tissue," [1.2] refers to "remodeling the therapeutic zone of target tissue," and [1.3] applies to the claim-specific "wherein" clause. *See* Pet. 25, 28, 32, 35.

IPR2024-00703
Patent 8,961,511 B2

> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion radiating outward from the introitus to Hart's line.*[3]

51. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

> heating the target tissue, and

> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a mucosal surface of the labia minora.*

Ex. 1001, 15:47–55, 17:11–21, 17:42–49, 18:21–28 (emphasis added).

### E.    Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 12):

| Ground | Claims | Basis | Reference(s) |
|:---:|:---|:---|:---:|
| 1 | 1–58 | § 103 | Edwards,[4] Mosher,[5] Ingle[6] |
| 2 | 43–58 | § 103 | Edwards, Mosher, Ingle, Ollivier[7] |

---

[3] The Specification defines "Hart's line" as the portion of the vulva "where mucosal epithelium gives way to skin on the outer surface of the labia minora," i.e., "the boundary where mucosal epithelium and labial skin meet" (*id.* at 3:49–54, 11:59–62).

[4] US 6,463,331 B1, issued Oct. 8, 2002.  Ex. 1005.

[5] US 2004/0193238 A1, published Sept. 30, 2004.  Ex. 1006.

[6] US 6,216,704 B1, issued Apr. 17, 2001.  Ex. 1007.

[7] Ollivier, D., "Designer Vaginas," Salon.com, accessed at https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html (Nov. 14, 2000).  Ex. 1008.

IPR2024-00703
Patent 8,961,511 B2

In support of its patentability challenges, Petitioner provides a Declaration of Dr. Joseph Berenholz, M.D. (Ex. 1003).  In support of its arguments, Patent Owner provides a Declaration of Dr. Denise Poulos.

## II.   ANALYSIS

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present.  *KSR*, 550 U.S. at 406.

7

IPR2024-00703
Patent 8,961,511 B2

"[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). But in analyzing the obviousness of a combination of prior art elements, it can also be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *Id.* at 418.

"[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). Moreover, a precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *KSR,* 550 U.S. at 418. Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (quotations and citations omitted).

8

IPR2024-00703
Patent 8,961,511 B2

A.    Person of Ordinary Skill in the Art

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner proposes that a person of ordinary skill in the art ("POSA") would be "a medical doctor . . . [with] at least three years of experience in the non-surgical treatment of uro-gynecological conditions and/or the non-surgical cosmetic treatment of female genital tissues." Pet. 6.

In the ThermiGen IPRs, the Board preliminarily determined that a POSA in the field of the '511 patent would have had "a medical degree plus at least two years of experience in a field such as gynecology, urogynecology, or plastic surgery involving female genital anatomy, with clinical experience in the application of radiant energy to female genital tissue." Ex. 1009, 8–9; Ex. 1011, 8. Patent Owner, here, urges us to adopt this definition of a POSA because Petitioner's proposed definition is an over-credentialed standard that few persons would satisfy at the relevant time. PO Resp. 12 (citing Ex. 2001 ¶¶ 35–39; Ex. 2005, 55:5–17, 57:17–58:19).

We apply Patent Owner's proposed definition, as it appears consistent with the field of the '511 patent and the prior art and is consistent with testimony of Dr. Poulos and the cross-examination testimony of Dr. Berenholz. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355, (Fed. Cir. 2001)

9

IPR2024-00703
Patent 8,961,511 B2

(the level of ordinary skill in the art may be reflected in the prior art itself);
Ex. 2001 ¶¶ 35–39; Ex. 2005, 55:5–17, 57:17–58:19. In our view, however,
Petitioner's proposed definition is not so different that our decision would
change if we were to apply Petitioner's proposed definition.

### B.    Claim Construction

The Board interprets claim terms in an *inter partes* review using the
same claim construction standard that is used to construe claims in a civil
action in federal district court. *See* 37 C.F.R. § 42.100(b)). In construing
claims, district courts give claims their ordinary and customary meaning,
which is "the meaning that the term would have to a person of ordinary skill
in the art in question at the time of the invention." *Phillips v. AWH Corp.*,
415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

With respect to the challenged claims, Petitioner asserts that "no claim
term requires construction—all terms should receive their ordinary and
customary meaning in view of the patent specification." Pet. 7 (citing
Ex. 1003 ¶ 61). Petitioner, however, does provide constructions of certain
claim terms made by the Board in the ThermiGen IPRs and by the court in
the *Viveve* litigation. Pet. 7–12.

Patent Owner provides explicit constructions for numerous claim
terms. PO Resp. 13–22.

In order for us to reach a decision, only the claim limitations
discussed below require explicit construction. *See Nidec Motor Corp. v.
Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. 2017)
(explaining that only those terms need be construed "that are in controversy,
and only to the extent necessary to resolve the controversy.").

IPR2024-00703
Patent 8,961,511 B2

> 1. "*heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus*"

The "wherein" clause of independent claim 1 specifies that heating includes "heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus."[8]

Petitioner states: "A POSA would have understood this treatment area includes heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (i.e., 3.5 cm from the introitus)." Pet. 35. According to Petitioner, "[t]he 'extending from the introitus inwardly' language of claim 1 describes the location and direction from which the claimed range of 1 cm to 3.5 cm is measured." Pet. Reply 16.

Patent Owner argues that the plain reading of the wherein clause requires the treating to begin at the introitus and extend at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. PO Sur-Reply 6–7; *see* PO Resp. 30–31.

Petitioner responds that Patent Owner's construction renders claim 26 superfluous. Pet. Reply 16. Claim 26 depends from claim 1 and recites "wherein remodeling comprises tightening the introitus." Patent Owner counters: "Whether claim 1's treatment area includes the introitus or instead begins immediately proximal to the introitus in the lower aspect of the vagina, claim 1 still requires treating at least the first centimeter into the vagina." PO Sur-Reply 7.

---

[8] The *Viveve* court did not construe this limitation. *See generally* Ex. 1024.

IPR2024-00703
Patent 8,961,511 B2

Patent Owner's argument are persuasive.  We agree with Patent Owner that a plain reading of the wherein clause requires the treating to begin at the introitus and extend at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.  This construction is consistent with the '511 patent's Specification, which states:

> In typical embodiments, the length of the energy delivery element is about 1  to about 3 cm in length, in other embodiments it may be as long as about 4 cm.  This is a length well adapted to treating the lower aspects of the vagina, wherein treatment by the method comprises contacting the vaginal epithelium in a region that *extends from the introitus inward to a position about 3 to 4 cm inward from the introitus*.  In some embodiments of the invention, the method can b[e] practiced with a single row of parallel contract sites immediately inside the introitus.  In other embodiments, the method may include deeper rows, or rows that overlap an initial row, while keeping the contact sites within the lower portion of the vagina.

Ex. 1001, 3:28–40 (emphasis added); *see also id.* at 14:47–57.  The '511 patent Specification also states:  "the portion of the vagina to be treated is a region *between the introitus and a position located no further than about 3 to about 4 cm inward from the introitus*."  *Id.* at 11:48–51 (emphasis added).

Given the plain language of claim 1, consistent with the '511 patent's Specification, we construe "*heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus*" to require heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

IPR2024-00703
Patent 8,961,511 B2

> 2.  *"heating a portion of the vagina circumferentially
> around its wall from 1 o'clock to 11 o'clock"*

The "wherein" clause of independent claim 35 specifies that "heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock."[9]

In the ThermiGen IPRs, the Board noted that "[w]hether 'heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock' requires heating substantially *all* of the wall 1 o'clock to 11 o'clock, . . . is a close question." Ex. 1009, 18.  At institution, we preliminarily adopted the construction from the ThermiGen IPRs[10], which is "heating at least one contact site in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall."  Paper 6, 14 (citing Ex. 1009, 18).

Petitioner asserts that the Board's preliminary construction is correct. Reply 17–18.  Petitioner argues that this construction is consistent with dependent claim 40, which recites "contacting the epithelium with a treatment tip at a [sic] one or more contact sites during a procedure."  Pet. 11 (citing *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that

---

[9] The *Viveve* court did not construe this limitation.  *See generally* Ex. 1024.

[10] The construction from the ThermiGen IPRs was made at the preliminary stage prior to institution using the broadest-reasonable-interpretation standard.  Ex. 1009, 9, 16–18.  Because the ThermiGen IPRs terminated due to settlement, the Board did not make a final construction based upon a full record developed during trial.

13

IPR2024-00703
Patent 8,961,511 B2

embodiment as well."). We note that Petitioner fails to point to any disclosure in the '511 patent that teaches heating circumferentially around the vagina's wall by contacting one site. *See* Pet. 11.

Patent Owner argues that this clause should be construed to require "heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." PO Resp. 20. According to Patent Owner, in order to heat *circumferentially*, multiple sites need to be treated as contiguously as possible around the vaginal wall. *Id.* at 21 (citing Ex. 2001 ¶¶ 71–72; Ex. 2005, 117:9–118:1). Patent Owner states that "[c]ontiguous sites includes multiple sites adjacent to each other." PO Resp. 21–22 (citing Ex. 2007, 250).

Patent Owner's arguments are persuasive. The plain language of claim 35 requires heating a portion of the vagina *circumferentially around* its wall from 1 o'clock to 11 o'clock. In order to heat "circumferentially around" the wall from 1 o'clock to 11 o'clock, multiple sites, and not just one site, of the arc between 1 o'clock to 11 o'clock must be treated. Ex. 2001 ¶¶ 71–72.

This is consistent with the '511 patent's Specification, which discloses heating substantially the entire 300 degree arc of vaginal wall from 1 o'clock to 11 o'clock, as shown in the embodiment illustrated in Figures 9A and 9B, reproduced side-by-side below.

14

IPR2024-00703
Patent 8,961,511 B2



FIG. 9A                    FIG. 9B

Figure 9A depicts a treatment area of a mucosal epithelium comprising multiple contact sites; Figure 9B is a representation of the treatment area as a mapping grid. Ex. 1001, 5:55–57. More particularly:

> FIG.9A is a schematic representation of a vagina 122, with the introitus 124 forming the entrance to the vagina. In a typical procedure, the treatment tip would contact various contact sites in the lower vagina, just inside the introitus. As shown in FIG.9A, an accumulated set of contact sites 102 that have been treated by the treatment tip, and they collectively comprise a treatment area on the vaginal epithelium.

*Id.* at 14:46–53. As illustrated in Figure 9B,

> the contact sites may be recorded on a grid 115, the completed grid thus being a mapped representation of the treatment area, which can be referred to during evaluation of the remodeling at some time point following the treatment. As shown, the treatment grid may contain reference points with respect to the circumferential location on the vagina, as provided, for example, by the clock dial scheme.

*Id.* at 14:62–15:3. The Specification explains:

> The circumference of the lower portion of an unfolded vagina, gently stretched as it is during the practice of this method, is approximately 12 cm. Accordingly, with a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an [sic] 300 degree arc of the circumference,

15

IPR2024-00703
Patent 8,961,511 B2

> between the 1 o'clock and 11 o'clock positions. These dimensional considerations underlie the rationale for an embodiment of the treatment wherein the surface of the energy delivery element has a curvature of about 30 degrees, each contact site accounting for about 10% of the 300 degree arc.

*Id.* at 14:35–45.

We acknowledge that dependent claim 40's recitation of "one or more contact sites" appears to conflict with our construction of claim 1. But, in this case, claim 40's recitation of *one* or more contacts sites conflicts with the plain language of claim 35 and would improperly read the requirement of heating circumferentially around the vagina's wall out of claim 35.

Given the plain language of claim 1, consistent with the '511 patent's Specification, we construe "*heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock*" to require heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall.

###### C.   Overview of Asserted References

###### 1. Overview of Edwards (Ex. 1005)

Edwards "provides a method and system for the curative treatment of female uro-genital disorders by application of radiofrequency (RF) energy to targeted tissues. Application of this energy is selectively applied so as to ablate, tighten, shrink or reshape the tissue and thereby correct an unwanted condition." Ex. 1005, 2:33–38. In targeting this energy, Edwards teaches that "[t]he physician determines optimal areas of treatment," and "create[s] a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." *Id.* at 13:14–16, 13:38–42. According to Edwards, "[r]emodeling

16

IPR2024-00703
Patent 8,961,511 B2

of the anterior wall treats incontinence," whereas "[r]emodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function."  Ex. 1005, 3:5–11, 13:14–23.

Edwards discloses system 400, reproduced below in Figure 4, for use in vaginal remodeling.  *See id.* at 3:25–27, 7:14–8:5, 13:12–14:4.



FIG. 4

Figure 4 shows system 400, including treatment element 410 (bottom portion, not labeled).  Treatment element 410 includes blade 420 and handle 430.  Ex. 1005, 7:18–28.  The blade includes a plurality of electrodes 423, a plurality of irrigating fluid delivery pores 425 "disposed to deliver cooling liquids so as to minimize thermal damage," and at least one thermocouple 424 to monitor temperature.  *Id.* at 7:18–28, 7:51–55, 7:66–8:5, 13:43–53.

17

IPR2024-00703
Patent 8,961,511 B2

Figure 9A of Edwards, reproduced below, describes a method employing the device shown in Figure 4.



Figure 9A illustrates a method for vaginal remodeling. *Id.* at 3:38–39. According to Edwards, "[A] speculum is inserted in the patient's vagina. The blades of the speculum are placed in an open position. The treatment element of system 400 is inserted into the vagina through the speculum." *Id.* at 13:43–46; *see generally, id.* at 13:12–14:4. Cooling fluid is delivered into the vagina through irrigating fluid delivery pores 425, and RF energy is delivered "to discrete areas of the vaginal wall." *Id.* at 13:54–56. "In a preferred embodiment, the blade 420 may be disengaged and relocked in

18

IPR2024-00703
Patent 8,961,511 B2

another position in the speculum, so as to deliv[er] energy to another area of the vagina." *Id.* at 13:60–62.

2.  Overview of Mosher (Ex. 1006)

Mosher discloses treatment of urinary incontinence by selectively heating and remodeling "collagenous tissues of the pelvic support tissue." *See, e.g.,* Ex. 1006, Abstract, ¶¶ 9, 45.  In this respect, Mosher discloses the introduction of a probe having "tissue-penetrating electrodes" into the vagina for "heating provided through . . . the vaginal wall." *Id.* at ¶¶ 9, 24–25, 54, Figs. 4B, C.

Mosher discloses Figures 6 and 6a as "illustrative non-invasive vaginal probes and a method for non-invasively treating endopelvic fascia using cooled [RF] electrodes." *Id.* ¶¶ 27, 58.  In one embodiment, "[a] non-invasive cooled electrode probe similar to that shown in FIGS. 6 and 6A heats tissue until the temperature sensing needle at 4.5 mm depth reaches a set point of 75 °C. at 185 seconds." *Id.* ¶ 85.  In one embodiment

> a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

*Id.* ¶ 74.

According to Mosher, "directing energy from a probe into collagenous tissues of the pelvic support system" may cause contraction of the collagenous tissue and/or structural stiffening related to scarring or healing. *Id.* ¶ 45.  In addition to the treatment of urinary incontinence, Mosher teaches that such methods "will find applications in a wide variety of therapies," and "may be directed to a variety of tissue structures [including]

19

IPR2024-00703
Patent 8,961,511 B2

. . . structures of the vagina," such as the lamina propria, a "dense connective tissue layer just under the epithelium." *Id.* ¶¶ 46, 48.

### 3. Overview of Ingle (Ex. 1007)

Ingle discloses devices and methods "for selectively heating and shrinking tissues, particularly for the noninvasive treatment of urinary incontinence and hernias, for cosmetic surgery, and the like." Ex. 1007, 1:18–23. Ingle's methods can "induc[e] controlled shrinkage or contraction of a support tissue of the body, typically being a collagenated tissue such as fascia, ligament, or the like" (*id.* at 11:8–11). "Tissue contraction results from controlled heating of the tissue by affecting the collagen molecules of the tissue." *Id.* at 11:25–26. Ingle posits that "[c]ontraction occurs as a result of heat-induced uncoiling and repositioning of the collagen B-pleated structure." *Id.* at 11:25–28.

Ingle teaches heating target tissues by application of RF or ultrasound energy. *See, e.g., id.* at 3:51–56, 5:10–13, 30–32, 8:53–65. This energy "heats fascia and other collagenated support tissues, causing them to contract without substantial necrosis of adjacent tissues." *Id.* at 2:58–61. To avoid such tissue damage, the energy is "preferably . . . applied through a large, cooled electrode having a substantially flat electrode surface. Such a cooled plate electrode is capable of directing electrical energy through an intermediate tissue and into fascia, while the cooled electrode surface prevents injury to the intermediate tissue." *Id.* at 2:61–67; *see id.* at 5:40–58.

Ingle provides guidance for times and temperatures suitable to achieve "significant tissue contraction . . . without substantial collateral tissue damage." *Id.* at 11:25–31. In a preferred embodiment, "the target tissue will

20

IPR2024-00703
Patent 8,961,511 B2

be raised to a temperature of about 60 nC[11] or more, while the intermediate tissue remains at or below a maximum safe temperature of about 45 nC." *Id.* at 8:41–44. Ingle further teaches that "[t]he temperature of the target tissue structure will . . . often be[] in the range from about 60 nC to 80 nC." *Id.* at 11:33–37.

According to Ingle, selective, temperature-mediated shrinkage of fascia may be used to treat a wide variety of conditions, "and may even be used in cosmetic procedures . . . to remove wrinkles by shrinking the collagenated skin tissues, or to lift sagging breasts by shrinking their support ligaments." *Id.* at 17:65–18:7. Exemplary target tissues, however, "include the urethral wall, the bladder neck, the bladder, the urethra, bladder suspension ligaments, the sphincter, pelvic ligaments, pelvic floor muscles, fascia, and the like." *Id.* at 11:14–17. In some embodiments energy is applied "to fascia . . . within the vagina" via an energy transmitting element on the distal end of a probe introduced into the vagina. *Id.* at 3:36–43. Fig. 11. In this aspect,

> The transmitting element is capable of transmitting sufficient heating energy through the vaginal wall to heat and contract the fascia. A cooling system is disposed adjacent to the transmitting element. The cooling system is capable of maintaining the vaginal wall adjacent the probe below a maximum safe temperature when the fascia is heated by the transmitting element.

---

[11] "nC" appears to be pervasive formatting error in Ingle, as published. We understand "nC" in Ingle to mean "°C". *See* Ex. 1007, 15:31 (referring to body temperature as "approximately 37 nC"), 15:5–39 and Figures 3A–E (illustrating exemplary temperature ranges, in °C); Ex. 1003 ¶ 80.

21

IPR2024-00703
Patent 8,961,511 B2

*Id.* at 3:43–50; *see also id.* at 3:51–58 ("[I]ntermediate tissue is cooled with the probe to avoid injuring the intermediate tissue when the target tissue is heated by the probe."), 4:4–10, 11:25–31, 15:65–16:4, 20:14–19.

### 4. Overview of Ollivier

Ollivier describes techniques for the cosmetic treatment of the vagina, vulva, and labia. *See generally* Ex. 1008. Ollivier describes, for example, the use of "Laser Vaginal Rejuvenation (LVR) to tighten [a patient's] vagina and 'enhance sexual gratification' and Designer Laser Vaginoplasty (DLV) to 'aesthetically modify' her labia." *Id.* at 1. Ollivier explains, "[b]y reconstructing the 'optimum structural architecture' of the vagina—namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body— … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." *Id.* With reference to advances in remodeling technology, Ollivier states that surgery for vaginal and labial "deformities" has "been around for 30 years. Lasers have even fallen out in favor. We have more sophisticated tools that do the same thing these days." *Id.* at 3.

### D. Ground 1: Asserted Obviousness in view of Edwards, Ingle, and Mosher

Petitioner challenges claims 1–58 as obvious in view of Edwards, Ingle, and Mosher. Pet. 22–67.

### 1. Claim 1

Claim 1 recites, "wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5

22

IPR2024-00703
Patent 8,961,511 B2

cm in from the introitus."  We construed this limitation to require heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.  *Supra* 12.

Petitioner contends and Patent Owner disputes that Edwards and Mosher teach this limitation.  Pet. 35–36; Pet. Reply 14–17; PO Resp. 29–39; PO Sur-Reply 8–11.

Petitioner first point's to Edwards's fourth embodiment and asserts that a "POSA . . . would have understood Edwards's teachings to include treatment near the opening of the vagina."  Pet. 35 (citing Ex. 1003 ¶ 122).

Patent Owner disagrees and responds that Edwards's device is not suitable for treating the area near the introitus because Edwards uses a speculum to reach deeper into vagina to treat the bladder neck region.  PO Resp. 30, 34–36.

Patent Owner's argument is persuasive.  Edwards's fourth embodiment for vaginal remodeling is depicted in its Figure 9.  Ex. 1005, 13:12–14:5, Fig. 9.  According to Edwards's "[r]emodeling both the anterior wall and the posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function."  *Id.* at 13:19–22.  The method includes inserting a speculum[12] into the vagina and the physician determining optimal treatment areas, that may include both the anterior wall or posterior wall of the vagina.  *Id.* at 13:38–42, Fig. 9, step 904.  In the fourth embodiment, the treatment blade is mated with the speculum.  *Id.* at 13:43–49, Fig. 9, steps 905–906.

---

[12] A speculum in a device that dilates a vagina.  Ex. 2001 ¶ 100.

23

IPR2024-00703
Patent 8,961,511 B2

Both parties' declarants agree that a treatment method that uses a speculum as in Edwards would likely be unsuitable for treating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. *See* Ex. 2005, 137:12–138:1; Ex. 2001 ¶¶ 101–103. Both declarants also agree that a speculum would need to be inserted into the vagina at least a few centimeters beyond the introitus to secure the speculum in the vagina. Ex. 2005, 137:12–138:1; Ex. 2001 ¶ 101. Edwards's treatment blade is mounted on the speculum so that the electrodes extend beyond the end of the speculum and, thus, the electrodes are positioned about 2 cm deeper into the vagina than the tip of the speculum. Ex. 2005, 132:25–133:16, 140:14–17; Ex. 2001 ¶ 101. Thus, Edwards treatment area is deeper in the vagina than the claimed treatment area. *See* Ex. 2005, 137:12–138:1, 140:14–17; Ex. 2001 ¶¶ 101–103.

In its Reply, Petitioner argues that Edwards's treatment method uses a speculum is irrelevant because "POSAs 'would have understood that in treating areas of the vaginal wall closer to the introitus, a physician would be able to complete the treatment without a speculum.'" Pet. Reply 20–21 (citing Ex. 1003 ¶¶ 69, 159).

Petitioner's argument is misplaced because the issue is whether Edwards discloses the claimed heating of the vagina from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus, not whether a POSA would have understood that Edwards's device could be used to meet this claim limitation.

Also in its Reply, Petitioner argues that Edwards teaches remodeling the anterior vaginal wall at area proximal and mid-urethra. Pet. Reply 14

24

IPR2024-00703
Patent 8,961,511 B2

(citing Ex. 1005, 13:14–23).  Petitioner contends that "[t]reating the vaginal wall adjacent to the mid-urethra is within the claimed region of 'from 1 cm to 3.5 cm in from the introitus.'"  Pet. Reply 14 (citing Ex. 1032, 65:11–77:7).

With respect to the fourth embodiment, Edwards states:  "Remodeling of the anterior wall treats incontinence based on bladder outlet hypermobility by increasing support for the bladder outlet, as well as the proximal and mid-urethra."  Ex. 1005, 13:16–19.  As Patent Owner points out, this statement does not describe the treatment area but the result of the treatment.  PO Sur-Reply 8–9 (citing Ex. 1032, 141:13–23).  As we found above, Edwards's fourth embodiment includes the use of a speculum, which would result in a treatment area outside the claimed treatment area.

The Petition next relies upon Mosher to teach focusing treatment near the opening of the vagina.  Pet. 35–36 (citing Ex. 1006 ¶¶ 58, 74, 75, Figs. 6, 6a); *see also* Pet. Reply 14–16.  Mosher teaches that in one embodiment

> a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

Ex. 1006 ¶ 74.  Petitioner asserts that "a POSITA would have understood that Mosher teaches treating a portion of the vagina extending from the introitus to 1.5 cm inwards, which falls within the claimed treatment area."  Pet. 36 (citing Ex. 1003 ¶ 124).

Patent Owner disagrees and argues that "Petitioner mistakenly reads the stated *size* of the treatment are to be a position of the treatment relative to the introitus."  PO Resp. 37.  According to Patent Owner, Mosher does not

IPR2024-00703
Patent 8,961,511 B2

explicitly state the location of the treatment area and, contrary to Petitioner's argument, "with the limited treatment length, a POSA would readily understand that the introitus is not treated." *Id.* at 37–38 (citing Ex. 2001 ¶ 107).

Patent Owner's arguments is persuasive. The cited portion of Mosher does not explicitly state the location of the treatment area. Ex. 1006 ¶ 74.

In it Reply, Petitioner additionally points to paragraph 54 of Mosher, which states: "Preferably, the location of the treatment volume of endopelvic fascia will be disposed along a length of the urethra between the bladder neck and the external meatus so as to avoid injuring nerves." Pet. Reply 14 (quoting Ex. 1006 ¶ 54). Petitioner argues that "[t]reating the vaginal wall adjacent to the mid-urethral region is within the claimed region of 'from 1 cm to 3.5 cm in from the introitus.'" Pet. Reply 14–16. This, however, does not teach the claimed area beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

The Petition fails to show that either Edwards or Mosher discloses heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

In its Reply, Petitioner argues that it would have been obvious to modify Edwards to treat the area beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. *See, e.g.*, Pet. Reply 2–4, 16–17 (citing Pet. 35). The Petition's argument is unpersuasive because it is conclusory and does not adequately address Edwards's use of a speculum. Pet. 35. The Petition includes no

26

IPR2024-00703
Patent 8,961,511 B2

persuasive explanation as to why it would have been obvious to modify Edwards to use the treatment blade without the speculum. *See* Pet. 22–24, 35–36.

We determine that Petitioner fails to meet its burden to show by a preponderance of the evidence that claim 1 is unpatentable over Edwards, Ingle, and Mosher.

### 2. Claim 35

Claim 35 recites "wherein the heating includes a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock." We construed this limitation to require heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall. *Supra* 14.

In the Petition, Petitioner first argues that Edwards expressly describes heating more than one contact site. Pet. 37–38 (citing Ex. 1005, 13:14–16, 13:38–42); *see also* Pet. Reply 18 (citing Ex. 1005, 3:5–13, 13:19–22). Describing its fourth embodiment, Edwards states:

> A method 900 is performed to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both. Remodeling of the anterior wall treats incontinence based on bladder outlet hypermobility by increasing support for the bladder outlet, as well as the proximal and mid-urethra. Remodeling both the anterior wall and the posterior wall provide circumferential vaginal tightening, resulting [in] physical and psychological improvement in the area of sexual function.

Ex. 1005, 13:14–22; *see also id.* at 3:5–13, 13:38–42.

As pointed out by Patent Owner and can be seen from the passage above, Edwards does not teach circumferentially heating the vaginal wall from 1 o'clock to 11 o'clock. PO Resp. 39–40, 42–43. Instead, as Patent

27

IPR2024-00703
Patent 8,961,511 B2

Owner further points out, it is likely that the "series of lesions" that Edwards discusses extend longitudinally because the lesions are caused by electrodes that extend along the length of the treatment blade. *Id.* at 42 (citing Ex. 1005, Fig. 4). In addition, Edwards's treatment uses a speculum, and Edwards's does not describe rotating the speculum. *See* Ex. 1005, 13:12–14:6; Ex. 2001 ¶¶ 114, 115, 117. The reference to circumferential vaginal tightening in the passage above is the result of creating a series lesions in the anterior vaginal wall and posterior vaginal wall. Ex. 1034, 141:3–23.

Petitioner next argues that "Based on Mosher's teachings of distributing the treatment volume along a lateral orientation, a POSA would have been motivated to treat more locations around the circumference of the vagina to expand the treatment area." Pet. 38 (referencing Ex. 1006 ¶ 74). Mosher states:

> To avoid injury to nerves in the bladder neck region while providing sufficient treatment volume along the endopelvic fascia, it may be advantageous to distribute the treatment volume along the patient's lateral orientation while limiting the length of treatment along the axis of the patient's urethra. . . . Such a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm.

Ex. 1006 ¶ 74.

As can be seen from the passage above, Mosher discloses a laterally elongate treatment region of about 25 mm (2.5 cm) and does not disclose heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall.

28

IPR2024-00703
Patent 8,961,511 B2

We determine that Petitioner fails to meet its burden to show by a preponderance of the evidence that claim 35 is unpatentable over Edwards, Ingle, and Mosher.

### 3. Claims 43 and 51

Claim 43 recites "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line." Claim 51 recites "wherein the heating includes heating a mucosal surface of the labia minora."

Petitioner acknowledges that none of Edwards, Mosher, and Ingle explicitly teaches heating a portion radiating outward from the introitus to Hart's line or a mucosal surface of the labia minora. Pet. 40–43; *see also* Pet. Reply 19–20. Petitioner points to general teachings of Edwards, Mosher, and Ingle that disclose treating a variety of tissues and argues that "[a] POSA would have known that treating the vulva is often done for cosmetic purposes." Pet. 41; *see also id.* at 42. Given this, Petitioner concludes that POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the areas recited in claims 43 and 51. Pet. 41 (citing Ex. 1003 ¶¶ 39–49, 91, 142), 42 (citing Ex. 1003 ¶¶ 91, 146, 136–143).

Patent Owner argues that Petitioner's proposed combination is based on impermissible hindsight because Edwards, Mosher, and Ingle disclose treating internal female genital tissue and Petitioner does not adequately explain why a POSA would be motivated to modify Edwards to treat external female genital tissue. PO Resp. 46–51.

29

IPR2024-00703
Patent 8,961,511 B2

Patent Owner's arguments are persuasive. None of Edwards, Mosher, or Ingle disclose treating external female genital tissue. The Petition argues that a POSA would have been motivated to apply, and have a reasonable expectation of success in doing so, the treatments of Edwards, Mosher, and Ingle to cosmetically enhance the areas recited by claims 43 and 51. Pet. 41–42; *see also* Pet. Reply 19–20. Edwards, Mosher, and Ingle, however, are focused on treating internal female genital tissue and do not explicitly disclose treating external female genital tissue recited in claims 43 and 51. *See generally* Exs. 1005–1007. The Petition does not adequately address the differences between treating internal versus external female genital tissue. *See, e.g.,* Ex. 2005, 34:22–35:12 (testimony of Dr. Berenholz indicating differences in temperature settings); Ex. 2001 ¶ 130. For example, Edwards's treatment method includes mating its treatment blade with a speculum, which would be used only with treatment of internal female genital tissue. Ex. 1005, 13:38–40, Fig. 9, step 904; Ex. 1005, 13:43–46; Ex. 2001 ¶ 129. The Petition includes no persuasive explanation as to why a POSA would have been motivated to modify Edwards to use the treatment blade without the speculum, so as to treat external tissue. *See* Pet. 22–24, 35–36.

An obviousness analysis must focus on what a person having ordinary skill in the art would have been *motivated* to do, rather than merely what such a person would have been *able* to do. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 n.4 (Fed. Cir. 2018); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). We determine that Petitioner failed to meet its burden to show by a preponderance of the evidence that claims 43 and 51 are unpatentable over Edwards, Ingle, and Mosher.

30

IPR2024-00703
Patent 8,961,511 B2

### 4. Claims 2–34, 36–42, 44–50, and 52–58

We determine that Petitioner failed to meet its burden to show by a preponderance of the evidence that claims 2–34, 36–42, 44–50, and 52–58, which depend from claims 1, 35, 43, or 51 are unpatentable over Edwards, Ingle, and Mosher. *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious.").

### E. Ground 2: Asserted Obviousness in view of Edwards, Ingle, Mosher, and Ollivier

Petitioner challenges claims 43–58 as obvious in view of Edwards, Ingle, and Mosher for the reasons set forth with respect to Ground 1, and further in view of Ollivier—"to the extent Patent Owner argues or the Board finds that [treatment of the vulval areas recited in the 'whereas' clauses of independent claims 43 and 51] was not within the general knowledge of a POSA." Pet. 67–68.

Patent Owner argues that the Petition fails to demonstrate that Ollivier is a printed publication because the Petition does not sufficiently show that Ollivier was accessible to the interested public. PO Resp. 60–62; PO Sur-Reply 24–25.

"A reference is deemed publicly available if it has been 'disseminated or otherwise made available to the extent that persons interested and ordinarily skill in the subject matter or art, exercising reasonable diligence, can locate it.'" *Telefonaktiebolaget LM Ericsson v. TCL Corp.*, 941 F.3d 1341, 1346 (Fed. Cir. 2019) (citing *Jazz Pharm., Inc. v. Amneal Pharm.,*

IPR2024-00703
Patent 8,961,511 B2

*LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018)).  Whether a reference is a "printed publication" is a "case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public."  *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004).  "If accessibility is proved, there is no requirement to show that particular members of the public actually received the information."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988).

The Petition contends that Ollivier is an article published on November 14, 2000 on Salon.com and that

> Ollivier was publicly accessible on Salon.com at least by January 24, 2001, EX1008; EX1031, 1-2, 7-9, because interested persons would have known of or been able to locate Salon.com, EX1023 (2.6 million unique visitors in December 2000); EX1031, 1-2, 4-6, and would have been able to locate Ollivier on Salon.com using, e.g., Salon.com's search functionality, EX1029, EX1030. Research aids confirm that Ollivier was publicly accessible before the '511 patent's critical date. EX1027, 3 (copyright 2003), 20-21 (citing Ollivier); EX1028, 2 (copyright 2002), 77 (citing Ollivier);

Pet. 12–13; *see also* Pet. Reply 22–23.  Petitioner provides Exhibits 1023, 1027, 1028, 1029, 1030, and 1031 to supports its assertion of public accessibility.

Ollivier is an article from Salon.com, which was archived on the Internet Archive by the Wayback Machine.  Ex. 1008; Ex. 1031.  Exhibit 1023 is a Salon.com webpage that provides "Salon Traffic & Audience Profile" statistics, including that "[i]n December 2000 Salon registered 2.60 million unique visitors."  Ex. 1023, 1.

Salon.com is described as a "politically progressive and liberal news and opinion website" that provides "provocative (if predictably liberal)

32

IPR2024-00703
Patent 8,961,511 B2

political commentary and lots of sex" and is not a medical or technical publication. Ex. 2015. The 2.6 million unique visitors statistic does not sufficiently relate to whether Salon.com was accessible to an interested POSA, who is medical doctor.

That the Wayback Machine electronically archived Ollivier does not, by itself, mean that Ollivier was sufficiently indexed on the Salon.com website or the Internet Archive. Nor does it reveal anything about the search capabilities of the Internet Archive, or why one with ordinary skill in the art would have even visited the Internet Archive to find anything. Petitioner does not provide any other persuasive evidence to show that an interested POSA would have independently known of Salon.com.

Exhibit 1029 and 1030 are webpages from Salon.com, archived by the Wayback Machine. Exhibit 1029 depicts a search webpage used to search Salon.com, and Exhibit 1030 is an advanced version of the search webpage. Neither webpage depicts a particular search that results in the Ollivier article. Exs. 1029, 1030. Even if an interested POSA would have known of Salon.com, we are not persuaded by Exhibits 1029 and 1030 that an interested POSA could have found Ollivier using Salon.com's search engine, for example, by entering a subject matter search.

Exhibit 1027 is an article titled "Venus Envy – Penis Envy: Aesthetic Autoplasty, Genital Reconstruction, and Erotic Embodiment" in a book titled "The EmBodyment of American Culture." Exhibit 1028 is a book titled "The Hydra's Tale: Imagining Disgust." Petitioner asserts that the books are research aides and points to citations of Ollivier in the books. Pet. 13. The Federal Circuit has recognized that the presence of a research aid may establish public accessibility. *Blue Calypso, LLC v. Groupon, Inc.*, 815

33

IPR2024-00703
Patent 8,961,511 B2

F.3d 1331, 1350 (Fed. Cir. 2106).  We are not persuaded, however, that the books are a research aid that is sufficient, without further explanation, to show public accessibility of Ollivier.  The Petition merely asserts that "Research aids confirm that Ollivier was publicly accessible before the '511 patent's critical date" (Pet. 13), but does not persuasively explain how the books were themselves publicly accessible to an interested POSA.  Pet. 13; *see also* Pet. Reply 22.

After considering all of Petitioner's evidence, we determine Petitioner fails to meet its burden to show that Ollivier was accessible to the interested public and is a printed publication that qualifies as prior art.  Petitioner, thus, fails to show that claims 43–58 would have been obvious over Edwards, Ingle, Mosher, and Ollivier.

## III.    CONCLUSION

We determine that Petitioner fails to establish by a preponderance of the evidence that claims 1–58 of the '511 patent are unpatentable.

In summary:

| Claims | 35 U.S.C. § | Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–58 | 103 | Edwards, Mosher, Ingle | | 1–58 |
| 43–58 | 103 | Edwards, Mosher, Ingle, Ollivier | | 43–58 |
| **Overall Outcome** | | | | 1–58 |

34

IPR2024-00703
Patent 8,961,511 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–58 of the '511 patent have not been shown by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.

35

IPR2024-00703
Patent 8,961,511 B2

PETITIONER:

Richard Bemben
Jennifer Chagnon
Rich Coller
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
rbemben-ptab@sternekessler.com
jchagnon-ptab@sternekessler.com
rcoller-ptab@sternekessler.com
cvira-ptab@sternekessler.com


PATENT OWNER:

Justin Oliver
michael sandonato
William Hector
VENABLE LLP
joliver@venable.com
msandonato@fchs.com
wahector@venable.com

36



US008961511B2

(12) **United States Patent**
Parmer

(10) **Patent No.:** **US 8,961,511 B2**
(45) **Date of Patent:** **Feb. 24, 2015**

(54) **VAGINAL REMODELING DEVICE AND METHODS**

(75) Inventor: **Jonathan B. Parmer**, Woodside, CA (US)

(73) Assignee: **Viveve, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1179 days.

(21) Appl. No.: **11/704,067**

(22) Filed: **Feb. 7, 2007**

(65) **Prior Publication Data**

US 2007/0233191 A1      Oct. 4, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/743,247, filed on Feb. 7, 2006.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A61B 18/12* | (2006.01) | |
| *A61B 18/18* | (2006.01) | |
| *A61N 7/02* | (2006.01) | |
| *A61B 18/14* | (2006.01) | |
| *A61B 18/00* | (2006.01) | |

(52) **U.S. Cl.**
CPC ......... *A61B 18/1485* (2013.01); *A61B 18/1206* (2013.01); *A61B 18/18* (2013.01); *A61B 2018/00023* (2013.01); *A61B 2018/00559* (2013.01); *A61B 2018/00702* (2013.01); *A61B 2018/00791* (2013.01); *A61B 2018/00875* (2013.01); *A61N 7/022* (2013.01)
USPC .................... **606/49**; 606/41; 607/138; 601/3

(58) **Field of Classification Search**
USPC ........................... 606/1–52; 607/50, 115, 138
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,326,529 A | 4/1982 | Doss et al. |
| 4,381,007 A | 4/1983 | Doss |
| 4,785,807 A | 11/1988 | Blanch |
| 4,785,828 A | 11/1988 | Maurer |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | H05-269144 A | 10/1993 |
| JP | H09-122141 A | 5/1997 |

(Continued)

OTHER PUBLICATIONS

Parmer et al.; U.S. Appl. No. 12/884,108 entitled "Vaginal remodeling device and methods," filed Sep. 16, 2010.

*Primary Examiner* — Ronald Hupczey, Jr.
(74) *Attorney, Agent, or Firm* — Shay Glenn LLP

(57) **ABSTRACT**

This invention relates generally to apparatus and methods for tightening tissue of the female genitalia by heating targeted connective tissue with radiant energy, while cooling the mucosal epithelial surface over the target tissue to protect it from the heat. Embodiments include a treatment tip that comprises both an energy delivery element and a cooling mechanism. As the treatment tip contacts the epithelial mucosa, the tip cools the mucosa by contact, and delivers energy thought the epithelium to the underlying tissue, thereby creating a reverse thermal gradient. The effect of the applied heat is to remodel genital tissue by tightening it. Such remodeling may include a tighter vagina and a tighter introitus. The tightening may be a consequence of thermal denaturation of collagen as well as a longer term healing response in the tissue that includes an increased deposition of collagen.

**58 Claims, 9 Drawing Sheets**



BTL EX1001
IPR2024-00703
U.S. Patent No. 8,961,511

US 8,961,511 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,907,589 | A | 3/1990 | Cosman |
| 4,920,978 | A | 5/1990 | Colvin |
| 4,976,709 | A | 12/1990 | Sand |
| 5,010,895 | A * | 4/1991 | Maurer et al. ................ 607/138 |
| 5,046,511 | A | 9/1991 | Maurer et al. |
| 5,143,063 | A | 9/1992 | Fellner |
| 5,160,334 | A | 11/1992 | Billings et al. |
| 5,230,349 | A | 7/1993 | Langberg |
| 5,242,440 | A | 9/1993 | Shippert |
| 5,301,692 | A | 4/1994 | Knowlton |
| 5,330,469 | A | 7/1994 | Fleenor |
| 5,334,193 | A | 8/1994 | Nardella |
| 5,348,554 | A | 9/1994 | Imran et al. |
| 5,443,470 | A * | 8/1995 | Stern et al. ...................... 607/98 |
| 5,450,293 | A | 9/1995 | Hoffman |
| 5,458,596 | A | 10/1995 | Lax et al. |
| 5,469,857 | A | 11/1995 | Laurent et al. |
| 5,569,242 | A | 10/1996 | Lax et al. |
| 5,660,836 | A | 8/1997 | Knowlton |
| 5,673,695 | A | 10/1997 | McGee et al. |
| 5,755,753 | A | 5/1998 | Knowlton |
| 5,765,567 | A | 6/1998 | Knowlton |
| 5,824,076 | A | 10/1998 | Knowlton |
| 5,836,990 | A | 11/1998 | Li |
| 5,871,524 | A | 2/1999 | Knowlton |
| 5,919,219 | A | 7/1999 | Knowlton |
| 5,937,863 | A | 8/1999 | Knowlton |
| 5,947,891 | A | 9/1999 | Morrison |
| 5,948,011 | A | 9/1999 | Knowlton |
| 5,951,550 | A | 9/1999 | Shirley et al. |
| 5,954,717 | A | 9/1999 | Behl et al. |
| 6,002,968 | A | 12/1999 | Edwards |
| 6,024,743 | A | 2/2000 | Edwards |
| 6,035,238 | A | 3/2000 | Ingle et al. |
| 6,044,847 | A | 4/2000 | Carter et al. |
| 6,081,749 | A | 6/2000 | Ingle et al. |
| 6,091,995 | A | 7/2000 | Ingle et al. |
| 6,139,569 | A | 10/2000 | Ingle et al. |
| 6,156,060 | A | 12/2000 | Roy et al. |
| 6,216,704 | B1 | 4/2001 | Ingle et al. |
| 6,236,891 | B1 | 5/2001 | Ingle et al. |
| 6,241,753 | B1 | 6/2001 | Knowlton |
| 6,277,116 | B1 | 8/2001 | Utley et al. |
| 6,283,987 | B1 | 9/2001 | Laird et al. |
| 6,292,700 | B1 | 9/2001 | Morrison et al. |
| 6,311,090 | B1 | 10/2001 | Knowlton |
| 6,322,584 | B2 | 11/2001 | Ingle et al. |
| 6,350,276 | B1 * | 2/2002 | Knowlton ..................... 607/104 |
| 6,377,854 | B1 | 4/2002 | Knowlton |
| 6,377,855 | B1 | 4/2002 | Knowlton |
| 6,381,497 | B1 | 4/2002 | Knowlton |
| 6,381,498 | B1 | 4/2002 | Knowlton |
| 6,387,380 | B1 | 5/2002 | Knowlton |
| 6,405,090 | B1 | 6/2002 | Knowlton |
| 6,413,255 | B1 | 7/2002 | Stern |
| 6,416,504 | B2 | 7/2002 | Mosel et al. |
| 6,425,912 | B1 | 7/2002 | Knowlton |
| 6,427,089 | B1 | 7/2002 | Knowlton |
| 6,430,446 | B1 | 8/2002 | Knowlton |
| 6,438,424 | B1 | 8/2002 | Knowlton |
| 6,453,202 | B1 | 9/2002 | Knowlton |
| 6,461,332 | B1 | 10/2002 | Mosel et al. |
| 6,461,378 | B1 | 10/2002 | Knowlton |
| 6,470,216 | B1 | 10/2002 | Knowlton |
| 6,478,791 | B1 | 11/2002 | Carter et al. |
| 6,480,746 | B1 | 11/2002 | Ingle et al. |
| 6,482,204 | B1 | 11/2002 | Lax et al. |
| 6,533,780 | B1 | 3/2003 | Laird et al. |
| 6,546,934 | B1 | 4/2003 | Ingle et al. |
| 6,558,381 | B2 | 5/2003 | Ingle |
| 6,569,160 | B1 | 5/2003 | Goldin |
| 6,572,639 | B1 | 6/2003 | Ingle et al. |
| 6,579,266 | B2 | 6/2003 | Mosel et al. |
| 6,587,731 | B1 | 7/2003 | Ingle et al. |
| 6,629,535 | B2 | 10/2003 | Ingle et al. |
| 6,685,623 | B2 | 2/2004 | Presthus et al. |
| 6,743,165 | B2 | 6/2004 | Mosel et al. |
| 6,749,624 | B2 | 6/2004 | Knowlton |
| 6,751,507 | B2 | 6/2004 | Morrison et al. |
| 6,772,013 | B1 | 8/2004 | Ingle et al. |
| 6,776,779 | B1 | 8/2004 | Roy et al. |
| 6,830,052 | B2 | 12/2004 | Carter et al. |
| 6,836,688 | B2 | 12/2004 | Ingle et al. |
| 6,840,954 | B2 | 1/2005 | Dietz et al. |
| 6,852,110 | B2 | 2/2005 | Roy et al. |
| 6,875,209 | B2 | 4/2005 | Zvuloni et al. |
| 6,879,858 | B1 | 4/2005 | Adams |
| 6,882,885 | B2 | 4/2005 | Levy et al. |
| 6,889,090 | B2 | 5/2005 | Kreindel |
| 6,976,492 | B2 | 12/2005 | Ingle et al. |
| 7,004,942 | B2 | 2/2006 | Laird et al. |
| 7,022,121 | B2 | 4/2006 | Stern et al. |
| 7,141,049 | B2 | 11/2006 | Stern et al. |
| 7,238,183 | B2 | 7/2007 | Kreindel |
| 7,294,127 | B2 | 11/2007 | Leung et al. |
| 7,998,137 | B2 | 8/2011 | Elkins et al. |
| 2002/0032441 | A1 | 3/2002 | Ingle et al. |
| 2002/0049483 | A1 | 4/2002 | Knowlton |
| 2002/0062142 | A1 | 5/2002 | Knowlton |
| 2002/0120260 | A1 | 8/2002 | Morris et al. |
| 2002/0151887 | A1 | 10/2002 | Stern et al. |
| 2002/0156471 | A1 | 10/2002 | Stern et al. |
| 2002/0183735 | A1 * | 12/2002 | Edwards et al. ................ 606/32 |
| 2003/0028180 | A1 | 2/2003 | Franco |
| 2003/0097162 | A1 | 5/2003 | Kreindel |
| 2003/0120326 | A1 | 6/2003 | Dietz et al. |
| 2003/0130575 | A1 | 7/2003 | Desai |
| 2003/0139740 | A1 | 7/2003 | Kreindel |
| 2003/0139790 | A1 | 7/2003 | Ingle et al. |
| 2003/0144576 | A1 | 7/2003 | Presthus et al. |
| 2003/0178032 | A1 | 9/2003 | Ingle et al. |
| 2003/0195593 | A1 | 10/2003 | Ingle et al. |
| 2003/0195604 | A1 | 10/2003 | Ingle et al. |
| 2003/0199866 | A1 | 10/2003 | Stern et al. |
| 2003/0212393 | A1 | 11/2003 | Knowlton et al. |
| 2003/0216728 | A1 | 11/2003 | Stern et al. |
| 2003/0216729 | A1 | 11/2003 | Marchitto et al. |
| 2003/0220635 | A1 | 11/2003 | Knowlton et al. |
| 2003/0236487 | A1 | 12/2003 | Knowlton |
| 2004/0000316 | A1 | 1/2004 | Knowlton et al. |
| 2004/0002704 | A1 | 1/2004 | Knowlton et al. |
| 2004/0002705 | A1 | 1/2004 | Knowlton et al. |
| 2004/0030332 | A1 | 2/2004 | Knowlton et al. |
| 2004/0034346 | A1 | 2/2004 | Stern et al. |
| 2004/0034400 | A1 | 2/2004 | Ingle et al. |
| 2004/0049251 | A1 | 3/2004 | Knowlton |
| 2004/0102824 | A1 | 5/2004 | Sharkey et al. |
| 2004/0111087 | A1 | 6/2004 | Stern et al. |
| 2004/0111136 | A1 | 6/2004 | Sharkey et al. |
| 2004/0111137 | A1 | 6/2004 | Shankey et al. |
| 2004/0127895 | A1 | 7/2004 | Flock et al. |
| 2004/0172291 | A1 | 9/2004 | Knowlton |
| 2004/0186535 | A1 | 9/2004 | Knowlton |
| 2004/0193238 | A1 * | 9/2004 | Mosher et al. .................. 607/99 |
| 2004/0206365 | A1 | 10/2004 | Knowlton |
| 2004/0210214 | A1 | 10/2004 | Knowlton |
| 2004/0210282 | A1 | 10/2004 | Flock et al. |
| 2004/0236177 | A1 | 11/2004 | Matlock |
| 2004/0236393 | A1 | 11/2004 | Ingle et al. |
| 2004/0249425 | A1 * | 12/2004 | Roy et al. ........................ 607/99 |
| 2004/0260368 | A1 | 12/2004 | Ingle et al. |
| 2004/0267336 | A1 | 12/2004 | Morrison et al. |
| 2005/0154433 | A1 | 7/2005 | Levy, Jr. et al. |
| 2005/0171582 | A1 | 8/2005 | Matlock |
| 2005/0171583 | A1 | 8/2005 | Mosher et al. |
| 2005/0187599 | A1 | 8/2005 | Sharkey et al. |
| 2005/0203399 | A1 | 9/2005 | Vaezy et al. |
| 2005/0288544 | A9 | 12/2005 | Matlock |
| 2005/0288680 | A1 | 12/2005 | Ingle et al. |
| 2006/0025837 | A1 | 2/2006 | Stern et al. |
| 2006/0047331 | A1 | 3/2006 | Lax et al. |
| 2006/0167533 | A1 | 7/2006 | Spraker et al. |
| 2007/0078502 | A1 | 4/2007 | Weber et al. |
| 2007/0083247 | A1 | 4/2007 | Wyeth et al. |

**US 8,961,511 B2**

Page 3

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0088413 | A1 | 4/2007 | Weber et al. |
| 2007/0093807 | A1 | 4/2007 | Baxter et al. |
| 2007/0106349 | A1 | 5/2007 | Karni et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H11-504828 A | 5/1999 |
| JP | 2002-238919 A | 8/2002 |
| JP | 2003503118 | 1/2003 |
| JP | 2006-187668 A | 7/2006 |

| | | | |
|---|---|---|---|
| WO | WO95/10981 | A1 | 4/1995 |
| WO | WO96/22739 | A1 | 8/1996 |
| WO | WO97/34534 | A1 | 9/1997 |
| WO | WO98/19613 | A1 | 5/1998 |
| WO | WO99/08614 | A1 | 2/1999 |
| WO | WO99/53853 | A1 | 10/1999 |
| WO | WO01/80723 | A2 | 11/2001 |
| WO | WO03/011158 | A1 | 2/2003 |
| WO | WO03/053355 | A2 | 7/2003 |
| WO | WO2006/033067 | A2 | 3/2006 |
| WO | WO2006/034357 | A2 | 3/2006 |
| WO | WO2006/105121 | A2 | 10/2006 |

* cited by examiner



**FIG. 1**



FIG. 2



*FIG. 3*



*FIG. 4*



*FIG. 5A*



*FIG. 5B*



*FIG. 5C*



*FIG. 6A*



*FIG. 6B*



*FIG. 7*



**FIG. 8**



**FIG. 9A**



**FIG. 9B**

US 8,961,511 B2

# 1
## VAGINAL REMODELING DEVICE AND METHODS

### RELATED APPLICATIONS

This patent application claims priority to U.S. Provisional Application No. 60/743,247, of Parmer, filed on Feb. 7, 2006, entitled "Vaginal rejuvenation treatment device and methods", the disclosure of which is incorporated by reference.

### FIELD OF THE INVENTION

This invention relates generally to a method and apparatus for remodeling tissue of the vagina and vulva, such as by the application of radiant energy.

### BACKGROUND

The vagina is made up of three layers, a mucosa of stratified squamous epithelial tissue, the submucosa or lamina propria containing vascularized connective tissue and a deeper muscularis, containing smooth muscle. Collagen molecules are produced by cells resident in the these tissues which synthesize three polypeptide chains that wrap around one another to form a triple helix. Collagen is a major type of fibrous protein that is a basic structural element of connective tissue, tendon, cartilage, and bone. Each of the collagen chains is approximately 1000 amino acid units in length, with glycine recurring regularly every third unit, and with proline and hydroxyproline recurring very frequently. Cross-linking occurs between the sides, not the ends, of collagen molecules and is coupled with the amino acid composition to give collagen its great strength. Collagen tissue tightening takes place in a direction parallel to an axis of collagen fibers.

The phenomenon of thermal contraction of collagen begins with a denaturation of the triple helix of the collagen molecule. Partial denaturation of collagen tissue results in a contraction of the collagen-rich spaces and provides a "tightening" effect on the overlaying tissue. Patents relevant to aspects of collagen denaturation and exploitation of this for medical or cosmetic purposes include U.S. Pat. No. 5,919, 219 to Knowlton for "Method for Controlled Contraction of Collagen Tissue Using RF Energy" and U.S. Pat. No. 5,755, 753 to Knowlton for "Method for Controlled Contraction of Collagen Tissue"; and U.S. Pat. No. 5,143,063 to Fellner for "Method of Removing Adipose Tissue".

Further patents and published patent applications include U.S. Pat. No. 6,350,276 to Knowlton for "Tissue Remodeling Apparatus Containing Cooling Fluid"; U.S. Pat. No. 6,387, 380 to Knowlton for "Apparatus for Controlled Contraction of Collagen Tissue"; U.S. Pat. No. 6,425,912 to Knowlton for "Method and Apparatus for Modifying Skin Surface and Soft Tissue Structure"; U.S. Pat. No. 6,453,202 to Knowlton for "Apparatus for Tissue Remodeling"; U.S. Pub 2002/0049483 to Knowlton for "Fluid Delivery Apparatus"; U.S. Pub 2003/ 0212393 to Knowlton for "Handpiece with RD Electrode and Non-Volatile Memory"; U.S. Pub 2003/0236487 to Knowlton for "Method for Treatment of Tissue with Feedback"; and U.S. Pub 2004/0000316 to Knowlton for "Methods for Creating Tissue Effect Utilizing Electromagnetic Energy and a Reverse Thermal Gradient".

The vaginal tissue of women is stretched during vaginal child birth; at least some of the effects of the stretching are permanent and many women have long term medical consequences. Some consequences include physical problems, such as uterine prolapse, cystoceles, urethroceles, enteroceles, rectoceles, stress urinary incontinence, bowel movement

# 2
problems, for which surgical options are available. Some consequences may include sexual aspects, as may follow from excessive loosening of the vagina and its opening, the introitus. Such loosening typically occurs with the first vaginal delivery, and the loosening tends to increase with subsequent vaginal deliveries. This effective of looseness in this region may include decreased pressure and friction during intercourse, and as a consequence, decreased sexual pleasure for women and their conjugal partners. Some surgical options can be exercised in an attempt to alleviate these problems, but surgical approaches can bring with them a risk of scarring that is entirely counterproductive with regard to the desired result. More generally, these surgical approaches are not highly popular because of the risks associated with an invasive procedure, in a sensitive area, especially when such procedures are considered medically optional.

There is a need for effective approaches to treating a loose vagina and introitus with a non-invasive procedure; accordingly, the object of the present invention to provide apparatus and method for corrective or restorative remodeling of the mucosal surfaces of the vagina, introitus, and vulva.

### SUMMARY OF THE INVENTION

Embodiments of the invention include an apparatus for remodeling target tissues, including the lamina propria and the muscularis, underlying the mucosal epithelium of a female genital tissue. The apparatus comprises a hand piece and a treatment tip, the hand piece further supported a by comprehensive upstream electronic system. Embodiments of the treatment tip comprise a connector portion, which connects the tip to the hand piece, a midsection, typically narrowed, and a distal portion that comprises an energy delivery element. The treatment tip further comprises a housing that defines an internal space. The internal space accommodates a cooling system, with a lumen for conveying a refrigerating fluid, and nozzles, which are adapted to spray refrigerant on to the internal side of the energy delivery element thereby cooling it, such the cooled, in turn, cooling a genital mucosal epithelial surface on contact.

The types of energy delivery element may include a radiofrequency, microwave, or ultrasound delivery embodiments. Some particular embodiments include capacitively coupled RF electrodes, which may by monopolar or bipolar. Monopolar RF electrode-based embodiments may comprise a conductive pad to serve as a return electrode. Bipolar RF-based embodiments may include one or more pairs of electrodes. The electrodes may further comprise thermal sensors that provide feedback control based on local temperature, and may further comprise EEROM chips that identify the treatment tip type or convey configuration parameters of the electrode to the hand piece, or to the larger electronic system.

The energy delivery element and the treatment tip as a whole are adapted to make optimal contact with the genital epithelial surface, when contact and capacitive coupling is occurring between the tip and an epithelial contact site. By optimal contact is meant a contact that best allows a delivery of energy into the target tissue that is broadly uniform across the surface of the contact site, notably without significant distortion along the edges of the contact site. Non-uniform delivery of energy does not serve the remodeling process well, and further may risk damage to the mucosal epithelium. These adaptive configurations include a sidemounted configuration of the energy delivery element, the face of the energy delivery element being substantially parallel with respect to the linear axis of the treatment tip. Other adaptive configurations include a narrowed mid-section of the tip

US 8,961,511 B2

3

proximal to the distal portion. This configuration allows the energy delivery element at the distal portion of the tip to project outward or forward from its surrounding support structure, thereby allowing the contact between the energy delivery element and the mucosal epithelium to be more accurate, deliberate, and visible, and for the level of contacting pressure to be better controlled by the physician.

Further, the dimensions and configuration of the energy delivery element are adapted to the optimize contact, particularly with the vaginal wall. The width of the energy delivery element is between 0.75 and 1.25 cm. Such a width is sufficient to engage the curved wall of the vagina in a manner that is sufficiently flat and parallel that the quality of contact across the face of the energy delivery element is substantially equal, without increased pressure, closer contact, or distortion along the edges of the element. Such a close contact allows for a uniform delivery of energy into the underlying target tissue. In some embodiments, the face of the energy delivery element is radially curved (with respect to the longitudinal axis of the tip) within the width of the element so as to create an arc of up to 30 degrees. Such curvature is also adapted to make parallel contact with the vaginal wall. An element of about 1 cm width, per embodiments of the invention, requires about 10 contact sites to radially treat a 300 degree arc inside a vagina, thus a 30 degree arc provides for a good fit against the curve of the vaginal wall and thereby provides a uniform delivery of energy into the target tissue.

In typical embodiments, the length of the energy delivery element is about 1 to about 3 cm in length, in other embodiments it may be as long as about 4 cm. This is a length well adapted to treating the lower aspect of the vagina, wherein treatment by the method comprises contacting the vaginal epithelium in a region that extends from the introitus inward to a position about 3 to 4 cm inward from the introitus. In some embodiments of the invention, the method can by practiced with a single row of parallel contact sites immediately inside the introitus. In other embodiments, the method may include deeper rows, or rows that overlap an initial row, while keeping the contact sites within the lower portion of the vagina.

Embodiments of the invention include methods for remodeling a therapeutic zone of tissue within a target tissue of female genitalia. The target tissue lies immediately beneath the mucosal epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention does not include deeper tissue, such as endopelvic fascia.

The anatomical areas of the female genitalia treated by embodiment of the invention include the vulva and the vagina, and the introitus, the opening of the vagina. The vulva includes tissue radiating outward from the introitus to Hart's line, where mucosal epithelium gives way to skin on the outer surface of the labia minora. With more specific regard to the vagina, embodiments of the method comprise treating the lower portion of the vagina, a portion extending from the introitus to a location from about 2 cm to about 4 cm inward from the introitus, in other embodiments the location may extends inward as far as about 6 cm. With regard to the circumference of the inner wall of the vagina, a clock-position reference scheme is helpful. The urethra lies next to the anterior wall of the vagina, the location of the vaginal wall nearest the urethra and urethral opening may be considered 12 o'clock. With this reference point, the target tissue of embodiments of the invention include the approximately 300 degree arc between 1 o'clock and 11 o'clock. Embodiments of the invention do not include treating the approximately 60 degree

4

arc between 11 o'clock and 10 o'clock because the practice of this invention is not directed toward tissue in the vicinity of the urethra.

Embodiments of the method include heating the target zone with radiant energy, typically radiofrequency (RF) energy, but other embodiments may use microwave or ultrasound energy. The method includes contacting the mucosal epithelium with a treatment tip that has an energy delivering element and a cooling mechanism. By delivering energy to the tissue while cooling the epithelial surface, a reverse thermal gradient is created. The RF energy penetrates through the cooled epithelium and into the underlying target tissue, and heats the tissue.

A zone of tissue that is heated within the target tissues to a threshold level, i.e., to a therapeutic temperature that causes remodeling is termed a therapeutic zone. Not all tissue within the target tissue necessarily reaches this threshold level of heat. In some cases, cooling from the treatment tip may penetrate into the target tissue, and in this situation, the presence of cooled tissue may have an effect on the therapeutic zone, by moving it deeper within the target tissue, for example, or by constraining its volume.

Energy delivered from the treatment tip may heat the target tissue to a temperature as high as about 80 degrees C. In some embodiments, therapeutic temperature may range between about 45 degrees C. and about 80 degrees C. In other embodiments, the therapeutic temperature may range between about 50 degrees C. and about 75 degrees C. In still other embodiments, the therapeutic temperature may range between about 55 degrees C. and about 70 degrees C. Heating is a process subject to feedback control during a treatment procedure, so as to keep the temperature within a predetermined temperature range. Feedback may be provided by one or more thermisters (thermal sensors) or impedance monitors. The treatment tip may cool the epithelium to a temperature between about 0 degrees C. and about 10 degrees C. A reverse thermal gradient, accordingly may be represented a low temperature of between about 0 degrees C. and about 10 degrees C. at the mucosal epithelium, and a high temperature of between 45 degrees C. and about 80 degrees C. in the target tissue. During a typical procedure, according to embodiments of the invention, any period of heating is accompanied by cooling; however cooling may also precede heating, and follow heating.

Methods of treatment comprise contacting the treatment tip to a contact site on the mucosal epithelium. The contact site conforms to the dimensions of the treating surface of the treatment tip. During the course of a single treatment, as for example would occur to a visit to a medical office, typically a plurality of contact sites are treated. During a procedure, a single contact site may be contacted multiple times. The summed total of mucosal contact sites comprises a treatment area. Such an area, comprising multiple contact sites may be recorded on a grid. The method may be applied on more than one occasion; a patient may return to her physician at a later date when the effects of a previous treatment may be evaluated and a treatment repeated. The treatment areas of the separate procedures may be the same, be different, or overlap.

Remodeling genital tissue, per embodiments of the invention may include heat-denaturing collagen within collagen-rich areas in the target tissues. Inasmuch as the overlaying mucosal epithelium is cooled by the method, it does not get heated, and is substantially unaffected by the method. Remodeling of target tissue within the therapeutic zone may occur substantially during the time when the tissue is being heated. Remodeling may also occur substantially after the heating has occurred, for example days or weeks later. Such remodeling comprises biological healing responses to the

Appx50

US 8,961,511 B2

5                                                              6

stress of heating, and such responses may include the deposition of new collagen. Whether by denaturation of existing collagen, or by later deposition of new collagen, the effect of remodeling on the tissue is generally one of tissue contraction or tightening. Thus, embodiments of invention comprise tightening the vagina and the introitus. The effect of vaginal childbirth on the vagina and introitus is a loosening of these tissues. Inasmuch as the method comprises tightening these tissues, the method has a rejuvenating effect in that it remodels the tissue toward the conformation it had prior to having experienced vaginal childbirth.

### INCORPORATION BY REFERENCE

All publications and patent applications identified herein are incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

### BRIEF DESCRIPTION OF THE DRAWINGS

The novel features of the invention are set forth with particularity in the appended claims. A better understanding of the features and advantages of the present invention will be obtained by reference to the following detailed description that sets forth illustrative embodiments, in which the principles of the invention are utilized, and the accompanying drawings.

FIG. 1 is a perspective view of an apparatus for applying radiant energy to the target tissue while cooling the epithelium in order to remodel genital tissue, shown are a hand piece and a connected treatment tip.

FIG. 2 is an exposed perspective view of a treatment tip embodiment.

FIG. 3 is an exposed side view of a treatment tip embodiment.

FIG. 4 is frontal cutaway view of the treatment tip, showing cooling nozzles that underlay the energy delivery element that contacts the epithelium

FIG. 5 shows frontal views of the treatment tip embodiments with (A) a single monopolar electrode, (B) a single bipolar of electrodes, and (C) multiple pairs of bipolar electrodes.

FIG. 6 shows front perspective views of two embodiments of a treatment tip, treatment side facing up, where FIG. 6A shows an electrode with a flat surface, and FIG. 6B shows an electrode with a curved surface.

FIG. 7 is a schematic view of female genitalia depicting the mucosal epithelial surfaces that overlay the target tissue, as well as an orienting clock to provide a circumferential reference scheme for the vagina wall.

FIG. 8 shows a treatment tip contacting a genital epithelial mucosal surface and the underlying target tissue including the lamina propria and the muscularis.

FIG. 9 depicts (FIG. 9A) a treatment area of a mucosal epithelium comprising multiple contact sites, and (FIG. 9B) a representation of the treatment area as a mapping grid.

### DETAILED DESCRIPTION OF THE INVENTION

Apparatus

Embodiments of the present invention include an apparatus and method for remodeling female genital tissue by applying heat to a target tissue underlying the surface mucosal epithelium, while cooling the surface epithelium itself. The apparatus and methods build on those of prior art such as those described by Knowlton, including US 2004/0000316, and

others cited in the background, all incorporated by this reference, but include novel features in the apparatus and methods that are configured and adapted to particulars of the female genital treatment site, the mucosal epithelium contacted by the present apparatus, and the underlying target tissue that is remodeled according to aspects of the invention. FIG. 1 shows an apparatus 1, which comprises a hand piece 2 and a treatment tip 10. The hand piece 2 is adapted to be held by an operator, such as a physician, and may include connections to a larger supporting system (not shown), or, in some embodiments, it may be operable as self-sufficient independent device. FIG. 1 shows the connector portion 15 of the shaft of the treatment tip, the narrow midsection 24, and the distal portion 28, which includes the energy delivery element 30.

FIGS. 2-5 provide various views of the treatment tip. FIG. 2 provides an exposed view from a perspective proximal to the tip, FIG. 3 is an exposed view from a side perspective, and FIG. 4 is a frontal view directed toward the energy delivery element, exposed so as to reveal the nozzles directly below the energy delivery element. FIG. 5 shows embodiments of the treatment tip that vary with respect to the type of energy delivery element (i.e., radiofrequency electrodes, variously monopolar, a bipolar pair, and multiple biopolar pairs). The treatment tip 10, depicted in greater detail in FIGS. 2-5 includes a housing 26, a connector portion 15, and an energy delivery element 30, which receives input through wire 31 (FIG. 3). The treatment tip as a whole is designed as a quick connect/disconnect unit with respect to its attachment to the base hand piece 2. The connection of the treatment tip 10 to the hand piece 2 is by way of the connector portion 15 of the treatment tip. The housing 26 defines an interior space 29 which extends forward from the connector portion 15 to the distal end 28 of the treatment tip. The energy delivery element 30 is side-mounted with respect to the linear axis of the tip, configured to face outward on a side on the distal portion 28 of the tip. By a side-mount, or by mounted so as to face a side of the treatment tip, it is meant that the energy delivery element 30 is configured to be approximately parallel to the linear axis of the shaft 20.

Between the connector portion 15 and the distal portion 28 of the tip is narrowed mid-section mid-portion 24, such narrowing or tapering on the same side as that which the energy delivery element 30 faces (narrowing may occur generally in the midsection 24, but embodiments typically include the narrowing at least on the same side as the energy delivery element). The side-mounted configuration of the energy delivery element 30 and the tapered section 24 of the tip both are adapted to optimize the contact of the energy delivery element to the epithelial surfaces of the female genitalia, in particular to those of the vagina. Details of the female genitalia are described further below. For the purpose of describing the advantage of a side placement 22 and the tapered section 21 of the shaft, of the canal-like aspect of vagina and entry into it with an instrument that engages the side of the canal are considered. An elongate structure best suited for entry into the vagina, and to make a substantially flat or surface-to-surface parallel contact with the side of the vagina, a side mounted energy delivery unit is advantageous. An advantage conferred by parallel contact is that contact pressure is distributed equally across the contact area, with no pressure biased against any side of the contact site. With such a uniformly pressured contact occurring, so too is energy uniformly directed to underlying target tissue. The narrow mid-section 24 of the shaft further provides a functional advantage to the tip 10 in that it allows the energy delivery element 30 at the distal portion 28 of the tip to project forward from the body of the shaft, such projection allowing the

US 8,961,511 B2

7

physician operating the apparatus to make contact to epithelium with appropriate pressure, to make the contact more discrete, to make the contacting flat, and to better visualize the contact.

The overall length of the treatment tip 10, from the base of the connector portion 15 to the foremost point of the distal portion 28 is designed such that the side mounted energy delivery element 30 reaches the innermost region of the vagina that is treated by the tip. Accordingly, embodiments of the tip may have an overall length of between about 2.75 inches and 4.25 inches. Particular embodiments have an overall length of between about 3 inches and about 4 inches. Still more embodiments have an overall length of between about 3.25 inches and about 3.75 inches. This overall length is appropriate for providing the treatment tip access the lower portion of a gently unfolded vagina.

The energy delivery element 30 also has dimensions advantageously adapted to making appropriately flat contact with the vaginal wall. The width of the element, an RF electrode in typical embodiments, in some embodiments is between about 0.7 cm and about 1.3 cm. In other embodiments, the width is between about 0.8 cm and about 1.2 cm. In still other embodiments, the width is between about 0.9 cm and about 1.1 cm. In some embodiments, the length of the energy delivery element 30 is between about 2 and about 3 cm. In other embodiments, the length is between about 2.25 cm and about 2.75 cm. The constraints on the length are related to the advantageous aspect of being able to make contact at particular sites on the mucosal epithelium, to avoid contact with other sites, deeper in the vagina, where it is not desired to make contact, and generally to make contact discretely and efficiently at the desired treatment area. The method of treatment typically comprises treating the vagina at a point no deeper than about 3.5 cm in from the introitus. The constraints on the width of the energy delivery element related, as described above, to the desirability of being able to make a substantially flat contact with the inner aspect of a curved surface. By constraining the width of the contact site, an increased pressure or closeness of contact that could occur along lengthwise edges is minimized.

In embodiments depicted to this point, the energy delivery element has had a flat configuration. FIG. 6 shows another embodiment of the treatment tip 10, where the energy delivery element 30 takes a curvilinear form. In other embodiments the energy delivery element comprises a curved surface such it includes a curvature radially with respect to the linear axis while remaining parallel to the linear axis, the form representing an arc of a cylinder. FIG. 6A shows a treatment tip embodiment where the energy delivery element is flat, while the embodiment in FIG. 6B has a curved surface, the curve being radial with respect to the linear axis of the tip. The arc of the curvature may be as large as approximately 30 degrees. Some embodiments may include a curvature of about 30 degrees. This 30 degrees of curvature is adapted to fit the curvature of the vaginal wall.

Accordingly, various configurational and dimensional aspects of the treatment tip 10 and the energy delivery element 30 are advantageous for the method of remodeling genital tissue. These features are particularly suited for treating the vaginal wall, but also are appropriate for treating mucosal epithelial surfaces of female genitalia outside the vagina. As described above, these features include (1) the side-facing orientation of the energy delivery element with respect to the linear axis of the treatment tip and its shaft, (2) the overall length of the treatment tip from its proximal end to the distal end, (3) the narrow portion 24 of the tip which allows the energy delivery element to project forward from a

8

background structure, rather than being in contiguous plane with surrounding structure, (4) the surface dimensions of the energy delivery element, particularly the width, which allow for substantially flat contact with the vaginal wall in the case of a flat energy delivery element 30, and (5) in the case of embodiment with a curved energy delivery element, a particularly close fit between the energy delivery element and the vaginal wall is achievable. All such enumerated features contribute to a uniformly-distributed contact between the energy delivery surface and the mucosal epithelium, such uniform fit diminishes the likelihood of edge-biased contact that could harm the epithelium, and affirmatively promotes uniform distribution of energy across the area of site where the energy delivery element contacts the epithelium and through which energy radiates into the underlying target tissue. Uniformity in flux across a surface area promotes an advantageous uniformity, consistency, and predictability in the remodeling response. Further, and equally important, small variation in flux also minimizes occurrence of damage, either to the epithelium or the target tissue, that can occur when large excursions in energy flux include, as they inevitably do, areas which receive high rates of energy flux.

As seen in FIGS. 2 and 3, the interior space 29 of the tip accommodates a cooling system to cool the energy delivery element, which comprises a cooling lumen 54 for conveying cooling fluid 52 to nozzles 56. The cooling fluid typically comprises a refrigerant, as exemplified by 1,1,1,2-tetrafluoroethane (R 134A), which is stored in a reservoir (not shown) under pressure, and conveyed through a lumen 54 to nozzles 56. The nozzles are configured within the interior space 29 in the distal portion 28 or the tip 10 under the inner surface of the energy delivery element 30. On release of the refrigerant from the nozzles, it sprays onto the interior surface and cools the element as the refrigerant undergoes a liquid to gas transition. The exterior surface of the energy delivery element, when in contact with an epithelial mucosal surface as during the practice of method embodiments of the invention, cools the epithelial surface upon such contact. This surface cooling prevents the build up of heat on the mucosal surface, the energy being delivered by the delivery element passes through the mucosal surface and into the underlying tissue targeted by the invention, which is then heated.

The energy delivery element 30 may be any of an RF electrode, a microwave emitter, or an ultrasound emitter. Embodiments that include an RF electrode will be described in some detail. The RF electrode, in some embodiments, is a capacitive electrode, which capacitively couples to the mucosal epithelium. The RF electrode, without limiting the scope of the invention, may have a thickness in the range of about 0.01 to about 1.0 mm.

The RF electrode 30 has a conductive portion 35 facing the interior space 29 within the treatment tip, and a dielectric portion 36 facing the exterior of the tip. Conductive portion 35 comprises a metal, exemplary metals including copper, gold, silver, and aluminum. Dielectric portion 36 may comprise a variety of different materials including, by way of example, polyimide, Teflon (RTM) and the like, silicon nitride, polysilanes, polysilazanes, polyimides, Kapton and other polymers, antenna dielectrics and other dielectric materials well known in the art. Other exemplary dielectric materials include polymers such as polyester, silicon, sapphire, diamond, zirconium-toughened alumina (ZTA), alumina and the like. Dielectric portion 36 covers the conductive portion 35, and is disposed between conductive portion 35 and the patient's tissue during treatment. In another embodiment, RF electrode 30 is made of a composite material, including but not limited to gold-plated copper, copper-polyimide, silicon/

US 8,961,511 B2

9                                                                              10

silicon-nitride and the like. In one embodiment, conductive portion **35** adheres to dielectric portion **36** which can be a substrate with a thickness, by way of example and without limitation, of about 0.001". This embodiment is similar to a standard flex circuit board material commercially available in the electronics industry. In this embodiment, dielectric portion **36** is in contact with the mucosal epithelium, and the conductive portion **35** is separated from the mucosal epithelium.

Generally, RF electrodes **30** can be either monopolar or bipolar. In the monopolar mode, RF current flows through body tissue from a return electrode which can be in a form of a conductive pad applied to another portion of the patient's body. FIG. **5** shows various embodiments of electrodes from a facing perspective, for example FIG. **5A** shows a tip with a monopolar pair of electrodes, FIG. **5B** shows a bipolar pair, and FIG. **5C** shows a tip with multiple bipolar pairs. Additionally, the electrode may be equipped with an integrated EEROM (Electrically Erasable Read Only Memory, also known as EEPROM) programmable memory chip at any suitable location within the treatment tip (not shown). Such a chip may provide identifying information or other information about the operational status or configuration parameters of the RF electrode to the system, such parameters may include, by way of example, the type and size of the electrode, the number of times the energy delivery element has been fired, and the like. Additionally, thermisters (thermal sensors) **38** (shown in FIG. **4**) may be provided at each corner of an RF electrode, or otherwise in close proximity to the electrode, to provide feedback to the system on the temperature at their location.

In some embodiments, the treatment tip as a whole is designed as a single-use disposable component, while the hand piece **2** is typically a reusable instrument. The single-use and disposable aspects of treatment tip **10** are in accord with its designated use in a single procedure, in the context of a female patient having a procedure, per embodiments of the method further described below, in a medical setting. Accordingly, the entirety of construction and components of the treatment tip retain their integrity through sterilization procedures, and the tip is typically packaged singly in a container or a wrap that preserves the sterile integrity of the tip until such time when it is unwrapped and connected to the hand piece **2** in preparation for a treatment procedure. Embodiments of the treatment tip **10** are modular in that they have a common connector portion **12** but may have variations in the shaft portion **20** and energy delivery elements **30** and cooling mechanism components, such as the fluid **52** or nozzles **56**.
Electronic Support System for the Apparatus

The apparatus **1** is included in a larger electronic system (not shown) with features well known in the art. Embodiments comprise a power source, an RF power source in typical embodiments; it feeds energy to an RF power generator and power flows therefrom to RF electrodes **30**. A multiplexer measures current, voltage and temperature, at the thermal sensors **38** associated with to each RF electrode **30**. The multiplexer is driven by a controller, which can be a digital or analog controller, or a computer with software. When controller is a computer it can include a CPU coupled through a system bus. On the system there may also be a keyboard, disk drive, or other non volatile memory systems, a display, and other peripherals, as are well known in the art. Also coupled to the bus may be a program memory and a data memory.

An operator interface includes operator controls and a display. The controller can be coupled to different types of imaging systems including ultrasonic, thermal sensors **38**, and impedance monitors **39**. Current and voltage are used to calculate impedance. A diagnostic phase can be initially run to determine the level of treatment activity. This can be done through ultrasound as well as other means. Diagnostics can be performed both before and after treatment.

Thermal sensors **38** measure voltage and current as delivered to the desired treatment site; the output for these sensors is used by a controller to control the delivery of RF power, which can also control temperature and power. An operator set level of power and/or temperature may be determined to provide operating limits that will not be exceeded. The controller maintains the set level under changing conditions. The amount of RF energy delivered controls the amount of power. A profile of power delivered can be incorporated in the controller, as well as a preset amount of energy to be delivered. Feedback control can be based on monitoring of impedance, temperature, or other indicators, and occurs either at the controller or at RF generator, if it incorporates a controller. For impedance measurement, this can be achieved by supplying a small amount of non therapeutic RF energy. Voltage and current are then measured to confirm electrical contact.

Circuitry, software and feedback to controller result in full process control and are used to change power, the duty cycle, monopolar or bipolar energy delivery, flow rate and pressure, and can also determine when the process is completed through time, temperature and/or impedance. These process variables can be controlled and varied in accordance with tissue temperature, as monitored at multiple sites on contacting exterior surface **34**, as well as by monitoring impedance to current flow at each RF electrode **30**, indicating changes in current carrying capability of the tissue during the process. Further, a controller can provide multiplexing, monitor circuit continuity, and determine which RF electrode **30** is activated.

Thermal sensors **38** can be thermistors, which have a resistance that varies with temperature. An analog amplifier can be a conventional differential amplifier circuit for use with thermistors and transducers. The output of the analog amplifier is sequentially connected by an analog multiplexer to the input of an analog digital converter. The output of the amplifier is a voltage, which represents the respective sensed temperatures. The digitized amplifier output voltages are supplied by analog to digital converter to a microprocessor, which calculates the temperature or impedance of the tissue. In some embodiments, the microprocessor can be a type 6800, however, any suitable microprocessor or general purpose digital or analog computer can be used to calculate impedance or temperature. The microprocessor sequentially receives and stores digital representations of impedance and temperature. Each digital value received by the microprocessor corresponds to different temperatures and impedances.

Calculated temperature and impedance values can be indicated on a display. Alternatively, or in addition to the numerical indication of temperature or impedance, calculated impedance or temperature values can be compared by the microprocessor with temperature and impedance limits. When the values exceed predetermined temperature or impedance values a warning can be given on the display and additionally, the delivery of RF energy to its respective electrode can be decreased or multiplexed to another electrode. A control signal from the microprocessor can reduce the power level by the RF generator, or de-energize the power delivered to any particular electrode. The controller **68** receives and stores the digital values that represent temperatures and impedances sent. Calculated surface temperatures and impedances can be forwarded by the controller to the display. If desired, the calculated surface temperature of the vaginal mucosal tissue layer is compared with a temperature limit and

US 8,961,511 B2

11

a warning signal can be sent to the display. Similarly, a control signal can be sent to the RF power source when temperature or impedance values exceed a predetermined level.

Methods

Embodiments of the invention provide a non-surgical method and apparatus for remodeling the tissues of the female genitalia by applying heat to a target tissue underlying the surface mucosal epithelium, while cooling the surface epithelium itself. Typically, the tissues are those of women who have had one or more vaginal births, and whose tissues have been stretched by giving birth. In particular, the target tissues (FIG. **8**) are the connective tissue layers such as the lamina propria or submocosa **102** and the muscularis **104** underlying the mucosal epithelium **100** of genital tissues. Particular features or areas of genital tissue (FIG. **7**) having an epithelial surface include the vulva and the vagina **112**, and the introitus **114**, the entrance to the vagina and a demarcation between the internal and external genitalia.

The heating of target tissue, per embodiments of this invention includes raising the temperature of the target tissue to as high as 80 degree C. Temperature is raised to a level that is therapeutic, i.e., to a temperature that causes remodeling, as described herein. That portion of the target tissue which attains the therapeutic temperature, for a sufficient time, is termed the therapeutic zone within the target tissue. The therapeutic temperature, in some cases may be only as high as 45 degrees C., or as high as 80 degrees C. The inventive method, therefore includes heating target tissue to as high as 80 degrees C. Per embodiments of the invention, target tissue may be heated to a temperature between about 45 degrees C. and about 80 degrees C. In other embodiments, the target tissue temperature may be heated to a temperature between about 50 degrees C. and about 75 degrees C. In still other embodiments, the target tissue may be heated to a temperature between about 55 degrees C. and about 70 degrees.

The vagina is a fibromuscular tube, lined with stratified squamous epithelium, that connects the external and internal organs of the female reproductive system. The vagina runs obliquely upwards and backwards at an angle of about 45 degrees between the bladder in front and the rectum and anus behind. In an adult female the anterior wall is about 7.5 cm long and the posterior wall is about 9 cm long. The difference in length is due to the angle of insertion of the cervix through the anterior wall. More particularly with regard to the vagina, embodiments of the invention comprise remodeling the lower portion of the vagina, the lower portion representing, the lower being that portion immediately inward from the introitus. Thus, according to embodiments of the invention, the portion of the vagina to be treated is a region between the introitus and a position located no further than about 3 to about 4 cm inward from the introitus. With regard to the circumferential aspects of the vagina, locations along the circumference of the vaginal wall may be assigned a clock position (see reference clock dial **136**, in FIG. **7**) such that the circumferential point closest to the urethra is at 12 o'clock. Using this orientation, embodiments of the invention comprise treating and remodeling the vagina over the 300 degree circumferential arc from about 1 o'clock to about 11 o'clock.

The mucosal epithelium of vulvar tissue outside the vagina and the introitus includes the labia minora, or that portion of the vulva extending outward from the introitus to Hart's line, the boundary where mucosal epithelium and labial skin meet (FIG. **7**). The mucosal epithelium and the skin, while contiguous, are embryologically and histologically distinct. The portion of the female genitalia that are covered by epithelium is also substantially defined by the bounds of the vestibule, which extends outward or down from the hymenal ring at the

12

top of the vagina, radially beyond the introitus, including the portion of labia minora located within Hart's line **120**. The target tissue of embodiments of this invention include the connective tissue underlying these mucosal epithelial surfaces of the genitalia which, progressing down from the epithelial surface, are known as the lamina propria **102** and the muscularis **104** (FIG. **8**), respectively (see, for example, Netter, Atlas of Human Anatomy, 4th edition, Saunders, 2006). The lamina propria includes a mixture of cells types that populate connective tissue, such as fibroblasts, and the muscularis is a layer of smooth muscle. Collagen is secreted or deposited into the extracellular space in these tissues by cells such as fibroblasts. These described target tissue layers below the epithelium overlay deeper tissues, including endopelvic fascia, which are not a target tissue for embodiments of the present invention.

The remodeling of the connective tissue underlying the mucosal epithelial surfaces does not substantially affect the epithelium itself. The method and apparatus, as provided by embodiments of the invention are non-invasive and substantially non ablative of genital issue. The nature of the engagement between the apparatus and genital tissue is that of contacting a treatment tip to an epithelial surface of the genital tissue. Through such contact, the apparatus delivers heat to underlying tissue, while preventing the heating of the surface epithelium by cooling it.

In a particular embodiment, the invention provides a method and apparatus for remodeling vulvar and vaginal target tissue through the use of a radiofrequency (RF) energy source **30** (see the energy delivery element of FIGS. **1-5**) through the vaginal or vulvar mucosal epithelial tissue and to the respective underlying layers that are the target tissue of embodiments of the invention. Other embodiments may make use of other forms of energy, such as microwave or ultrasound. Impedance through mucosal epithelium is lower than that of skin, thus less energy is required to cause heating than would be required were skin being treated rather than mucosal epithelium.

The application of energy to the underlying connective tissue creates heat in the targeted tissue, and the heat is understood to have an immediate or nearly immediate effect of denaturing or partially-denaturing collagen in the tissue, this denaturation of collagen being a factor in the tissue remodeling. In other embodiments of the invention, the application of heat to the connective tissue during a treatment procedure is understood to result in a subsequent depositing of new or nascent collagen by cells of the connective tissue, as part of a biological process that may take place over the course of weeks or months following the procedure.

As provided by embodiments of the invention, remodeling of genital tissue, whether by denaturation of collagen in the tissue, or by subsequent deposition of new collagen in the tissue, results in a tightening of genital tissue, particularly that of the vagina and the introitus. A consequence of the heating of the target tissue may include a melting or denaturing of preexisting collagen in the tissue, which may reduce or compact the volume occupied by the collagen, the effect of which is to tighten surrounding tissue A longer term biological consequence of the heating may include a healing process in which there is an increase in the rate of cellular production and deposition into the extracellular space. Both types of responses, the near-immediate response of pre-existing collagen, and the longer term increased amount of collagen are understood to contribute to an overall tightening of the target tissue.

The tightening of tissue is such that the remodeled genitalia assumes a rejuvenated form, a conformation of the genitalia

Appx54

US 8,961,511 B2

13 | 14

as they were before having being stretched by vaginal birth. Remodeling of genital tissue, as practiced by embodiments of this invention, may be understood variously as contracting or tightening of tissue, this may apply to the vulva, the vagina, and the introitus. Genitalia rejuvenated by practice of embodiments of the invention, by virtue of the greater tightness of the remodeled vagina and introitus, for example, provide for increased pressure and friction during sexual intercourse, and accordingly may provide greater sexual satisfaction for a woman with such remodeled genitalia and for her sexual partner.

Embodiments of the invention provide a method and apparatus for creating a reverse thermal gradient that utilizes one or more RF electrodes 30, to convey energy that manifests as heat in the target tissue, and a mechanism to cool the epithelial surface above the targeted underlying layers. A purpose of cooling the epithelial surface is to protect it from potentially damaging effects of excess heat that would accumulate in the absence of cooling. The epithelial surface is thus a conduit for energy passing through to underlying layers, but the energy does not manifest in the form of increased temperature at the epithelial surface. As such, the epithelium itself is not damaged or substantially modified by the method. Such protection from heating may derive both from the heat-sink aspect of a cooled body, as well as an increase in tissue impedance that is associated with cooled tissue.

In some embodiments, the cooling mechanism of the apparatus includes a lumen 54 adapted to accommodate a cooling fluid conveyed to nozzles 56, which cool the energy delivery element 30 of treatment tip 10 of the apparatus. Embodiments of the method thus provide for contacting a contact site on a genital epithelial surface, the tip having the capability both to cool the surface epithelium and to heat the underlying tissue. The cooling fluid cools the treatment tip of the apparatus, as provided by embodiments of the invention; in turn, the surface of the cooled treatment tip cools the surface of the mucosal epithelium that the treatment tip contacts. As provided by embodiments of the invention, the epithelial surface may be cooled to a temperature range of about 0 degrees C. to about 10 degrees C. As energy from the tip passes through the mucosal epithelial surface, the underlying soft tissue may be heated to a temperature range of about 45 degrees C. to about 80 degrees C. Thus, a reverse thermal gradient is created, with a lower temperature at the mucosal epithelium, and a higher temperature in the underlying tissue.

In some embodiments the method includes feedback control mechanisms to control the heating such that temperature does not exceed a predetermined level. As provided by embodiments of the apparatus, the feedback is provided to RF delivery by thermal or impedance sensors. In other embodiments, the method may be controlled by delivering a predetermined total of amount of energy. In some embodiments the method may be controlled by delivering an amount of energy within a predetermined amount of time.

More specifically within the target tissue of the invention, a treatment zone may be defined, where the heat is particularly focused, or where the heat reaches a threshold temperature sufficient to cause remodeling. Such a treatment zone may be centered at a particular depth below the epithelium, and the treatment zone may have a particular range of depth, it may, for example be broadly distributed across the full range of the lamina propria and muscularis, or it may occupy a relatively flat zone. In some embodiments of the invention, cooling is allowed to proceed into the target tissue itself, below the epithelial surface, to form a cold-protected tissue zone. The cooling of a portion of the target tissue may have an effect on the therapeutic zone, such that the depth and range of the therapeutic zone may be modulated or shifted with respect to where it would be absent such cooling of a portion of the target tissue. If cooling penetrates to a given level in the target tissue to create a cold-protected zone, for example, the therapeutic zone may be pushed deeper into the target tissue. Further, lower temperature in general tends to contain the dissemination of heat, thus focusing the therapeutic zone into a narrower range of depth.

In typical embodiments of the invention, the method provides for surface cooling coincident with the time that heat is being delivered to underlying tissue. In some embodiments, in addition to cooling the surface while heating the underlying tissue, the method includes a period of cooling before the application of heat. In other embodiments, the method includes a period of cooling after the application of heat. In still other embodiments, the method includes cooling both before and after the application of heat.

As shown in FIG. 8, a treatment tip 10 of the apparatus contacts a contact site 102 on the genital epithelium 100, and such contact creating a site on the epithelium corresponding to the surface area within the outline of the profile of the treatment tip. FIG. 8 shows the distal end 28 of the tip, with the energy delivery element 30 (shown by dotted lines) facing toward the mucosal epithelium. Also shown below the contact site 102 (with dotted lines) are target tissue layers, the lamina propria 104 and the muscularis 106. In typical embodiments of the invention, the method includes making contact with the epithelium, delivering energy, and then moving the treatment tip to another contact site, and delivering energy there. A procedure, such as would take place in a visit to a medical office, would typically include a radial sequence of contacting the epithelium within the vagina and/or contacting other sites outside the vagina. During the same procedure, the treatment tip may be returned to the same contact point multiple times. The circumference of the lower portion of an unfolded vagina, gently stretched as it is during the practice of this method, is approximately 12 cm. Accordingly, with a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an 300 degree arc of the circumference, between the 1 o'clock and 11 o'clock positions. These dimensional considerations underlie the rationale for an embodiment of the treatment wherein the surface of the energy delivery element has a curvature of about 30 degrees, each contact site accounting for about 10% of the 300 degree arc.

FIG. 9A is a schematic representation of a vagina 122, with the introitus 124 forming the entrance to the vagina. In a typical procedure, the treatment tip would contact various contact sites in the lower vagina, just inside the introitus. As shown in FIG. 9A, an accumulated set of contact sites 102 that have been treated by the treatment tip, and they collectively comprise a treatment area on the vaginal epithelium. In some embodiments of the method, a single radial row of sites is contacted, as shown in FIG. 9A. In other embodiments, one or more further rows could be included in a procedure, extending further into the vagina, so long as the treatment area remains in the lower portion of the vagina. Contact sites, per embodiments of the invention may include regions outside of the vagina, but within the bounds of Hart's line. Outside of the vagina, the treatment area will develop with a flatter aspect, in contrast to the inner radial configuration characteristic of the vaginal contact sites. As further provided by embodiments of the method and shown FIG. 9B, the contact sites may be recorded on a grid 115, the completed grid thus being a mapped representation of the treatment area, which can be referred to during evaluation of the remodeling at some time point following the treatment. As shown, the treatment grid

US 8,961,511 B2

15

may contain reference points with respect to the circumferential location on the vagina, as provided, for example, by the clock dial scheme.

As summarized above, a given treatment area will be treated during a single procedure during an office visit. The method further includes repetitions of such procedures, typically on another day, when the effects of the previous procedure may be evaluated. From such evaluation, judgment may be made with regard to re-treating a particular previously-treated area, or proceeding to treat other areas. Thus, as provided by embodiments of the method, one or more procedures during follow-up visits may variously include treating the same treatment area, treating an entirely different treatment area, or treating an overlapping treatment area, partially the same as previous area, and partially different.

Other variations of treatment tip design and associated methods can be employed to achieve the objectives of the invention without departing from the scope of the invention, as will be appreciated by those skilled in the art. The shape and dimensions of the tip can also be adjusted, as desired, to enhance the effectiveness of the treatment taking into consideration physiological and anatomical information. While various embodiments of the present invention have been shown and described herein, it will be obvious to those skilled in the art that such embodiments are provided by way of example only. Although the description has offered the theory that collagen denaturation underlies the remodeling of tissue brought about by practicing the invention, and theory has also been offered that tissue remodeling may occur as a result of the deposition of collagen by connective tissue at a time after the inventive procedure has been performed. Some theory has also been offered to explain the nature of the protection afforded to the mucosal epithelium by cooling it. Such theories has been offered to simply as possible theories of how the invention works and as an aid in describing the invention, however, it should be understood that such theories and interpretation do not bind or limit the claims with regard to tissue remodeling brought about by the practice of the invention. Numerous variations, changes, and substitutions will now occur to those skilled in the art without departing from the invention. It should be understood that various alternatives to the embodiments of the invention described herein may be employed in practicing the invention. It is intended that the scope of the invention, methods and structures within the scope of the invention includes equivalents.

What is claimed is:

1. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.

2. The method of claim 1, wherein heating the target tissue comprises heating it to a temperature between 45 degrees C. and 80 degrees C.

3. The method of claim 1, wherein heating the target tissue comprises heating it to a temperature between 50 degrees C. and 75 degrees C.

4. The method of claim 1, wherein heating the target tissue comprises heating it to a temperature between 55 degrees C. and 70 degrees C.

5. The method of claim 1, wherein heating comprises delivering energy by contacting the epithelium with a treatment tip, the tip including an energy delivery element.

16

6. The method of claim 5, wherein the energy includes any of radiofrequency energy, microwave energy, or ultrasound energy.

7. The method of claim 1, wherein the heating is controlled by a feedback control, such that temperature does not go higher than a predetermined temperature.

8. The method of claim 7, wherein the feedback control is provided by one or more thermal sensors.

9. The method of claim 1, wherein the method further comprises cooling the epithelium.

10. The method of claim 9, wherein cooling is by contacting the epithelium with a treatment tip, the tip including a cooling mechanism.

11. The method of claim 9, wherein cooling the epithelium comprises cooling it to a temperature between 0 degrees C. and 10 degrees C.

12. The method of claim 9, wherein the method further comprises cooling of at least some of the target tissue, the cooling of the target tissue having an effect on the therapeutic zone.

13. The method of claim 9, wherein the cooling precedes the heating, and continues during the heating.

14. The method of claim 9, wherein the cooling is during the heating, and continues after heating.

15. The method of claim 9, wherein the combination of cooling the epithelium and heating the target tissue creates a reverse thermal gradient from the epithelium to the target tissue.

16. The method of claim 15, wherein the reverse thermal gradient ranges from a low temperature of 0 degrees C. to 10 degrees C. at the epithelium to a high temperature of 45 degrees C. to 80 degrees C. in the underlying target tissue.

17. The method of claim 1, wherein the method comprises contacting the epithelium with a treatment tip at a one or more contact sites during a procedure, the tip comprising an energy delivery element adapted to heat the target tissue.

18. The method of claim 17, wherein the method is performed during a procedure, and wherein the contacting of any one or more contact sites is repeated one or more times during a procedure.

19. The method of claim 17, wherein the method includes contacting the tip to the epithelium at a plurality of contact sites during a procedure, moving the tip from site to site, the combined contact sites comprising a treatment area.

20. The method of claim 19, wherein any one of the contact sites is contacted one or more times during a procedure.

21. The method of claim 19, the method further comprising repeating the procedure one or more times.

22. The method of claim 21, wherein the treatment areas of the one or more procedures may be any of the same treatment area, different treatment areas, or overlapping treatment areas.

23. The method of claim 1, wherein the target tissue heating includes heating submucosa and muscularis below a mucosal epithelium.

24. The method of claim 1, wherein the heating does not modify a mucosal epithelium of the genital tissue.

25. The method of claim 1, wherein remodeling comprises contracting target tissue.

26. The method of claim 1, wherein remodeling comprises tightening the introitus.

27. The method of claim 1, wherein remodeling comprises tightening the vagina.

28. The method of claim 1, wherein remodeling comprises denaturing collagen.

29. The method of claim 1, wherein remodeling comprises tightening collagen-rich sites in the target tissue.

US 8,961,511 B2

**17**

30. The method of claim **1**, wherein at least some of the remodeling occurs during the heating.

31. The method of claim **1**, wherein at least some of the remodeling occurs after the heating.

32. The method of claim **31**, wherein the remodeling after the heating is by a depositing of collagen in the target tissue.

33. The method of claim **1**, wherein heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy.

34. The method of claim **1**, wherein heating comprises delivering energy by ultrasound energy.

35. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.

36. The method of claim **35**, wherein heating the target tissue comprises heating it to a temperature between 45 degrees C. and 80 degrees C.

37. The method of claim **35**, wherein heating comprises delivering energy by contacting the epithelium with a treatment tip, the tip including an energy delivery element.

38. The method of claim **35**, wherein the heating is controlled by a feedback control, such that temperature does not go higher than a predetermined temperature.

39. The method of claim **35**, wherein the method further comprises cooling the epithelium.

40. The method of claim **35**, wherein the method comprises contacting the epithelium with a treatment tip at a one or more contact sites during a procedure, the tip comprising an energy delivery element adapted to heat the target tissue.

41. The method of claim **35**, wherein heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy.

42. The method of claim **35**, wherein heating comprises delivering energy by ultrasound energy.

43. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes heating a portion radiating outward from the introitus to Hart's line.

**18**

44. The method of claim **43**, wherein heating the target tissue comprises heating it to a temperature between 45 degrees C. and 80 degrees C.

45. The method of claim **43**, wherein heating comprises delivering energy by contacting the epithelium with a treatment tip, the tip including an energy delivery element.

46. The method of claim **43**, wherein the heating is controlled by a feedback control, such that temperature does not go higher than a predetermined temperature.

47. The method of claim **43**, wherein the method further comprises cooling the epithelium.

48. The method of claim **43**, wherein the method comprises contacting the epithelium with a treatment tip at a one or more contact sites during a procedure, the tip comprising an energy delivery element adapted to heat the target tissue.

49. The method of claim **43**, wherein heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy.

50. The method of claim **43**, wherein heating comprises delivering energy by ultrasound energy.

51. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes heating a mucosal surface of the labia minora.

52. The method of claim **51**, wherein heating the target tissue comprises heating it to a temperature between 45 degrees C. and 80 degrees C.

53. The method of claim **51**, wherein heating comprises delivering energy by contacting the epithelium with a treatment tip, the tip including an energy delivery element.

54. The method of claim **51**, wherein the heating is controlled by a feedback control, such that temperature does not go higher than a predetermined temperature.

55. The method of claim **51**, wherein the method further comprises cooling the epithelium.

56. The method of claim **51**, wherein the method comprises contacting the epithelium with a treatment tip at a one or more contact sites during a procedure, the tip comprising an energy delivery element adapted to heat the target tissue.

57. The method of claim **51**, wherein heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy.

58. The method of claim **51**, wherein heating comprises delivering energy by ultrasound energy.

\*    \*    \*    \*    \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**BTL INDUSTRIES, INC.,**
**Petitioner/Appellant,**                                    **Appeal No. 2026-1223**
**v.**

**INMODE LTD.,**
**Patent Owner/Appellee.**

**Proceeding No.: IPR2024-00703**

## NOTICE FORWARDING CERTIFIED LIST

Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed by Petitioner on December 2, 2025, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes* Review proceeding. Pursuant to 35 U.S.C. § 143, Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

Date: January 13, 2026     By: *Huyen H. Nguyen*
                              Huyen H. Nguyen
                              Paralegal Specialist
                              Mail Stop 8; P.O. Box 1450
                              Alexandria, VA 22313-1450
                              Huyen.Nguyen1@uspto.gov
                              571-272-9035

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, by electronic mail, on counsel for the Appellant and Appellee on this 13th day of January, 2026, as follows:

| FOR APPELLANT | FOR APPELLEE |
|---|---|
| Seth R. Ogden<br>Nathan I. North<br>Dallin Glenn<br>PATTERSON INTELLECTUAL PROPERTY LAW, P.C.<br>sro@iplawgroup.com<br>nin@iplawgroup.com<br>glennd@btlnet.com | William A. Hector<br>Michael P. Sandonato<br>Justin J. Oliver<br>Parker G. Zimmerman<br>VENABLE LLP<br>wahector@venable.com<br>msandonato@venable.com<br>joliver@venable.com<br>pgzimmerman@venable.com |

By: _Huyen H. Nguyen_
Huyen H. Nguyen
Paralegal Specialist
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
Huyen.Nguyen1@uspto.gov
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**January 13, 2026**
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**BTL INDUSTRIES, INC.,**
**Petitioner,**

**v.**

**INMODE LTD.,**
**Patent Owner.**

———————

**Case IPR2024-00703**
**U. S. Patent No. 8,961,511 B2**

———————

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Huyen H. Nguyen*
*Certifying Officer*



Appx60

**Prosecution History for IPR2024-00703**

| Date | Document |
|---|---|
| 04/10/2024 | Petition for *Inter Partes* Review of U.S. Patent No. 8,961,511 |
| 04/10/2024 | Petitioner's Power of Attorney |
| 04/16/2024 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 06/27/2024 | Patent Owner's Mandatory Notices |
| 06/27/2024 | Patent Owner's Power of Attorney |
| 10/02/2024 | Decision - Institution of *Inter Partes* Review |
| 10/08/2024 | Scheduling Order |
| 11/22/2024 | Notice of Stipulation of Modified Due Dates 1-3 |
| 12/06/2024 | Patent Owner's Notice of Deposition of Joseph Berenholz, M.D. |
| 01/07/2025 | Patent Owner's Amended Notice of Deposition of Joseph Berenholz, M.D. |
| 01/09/2025 | Notice of Stipulation of Modified Due Dates, 1-3,5, and 6 |
| 01/22/2025 | Patent Owner's Response |
| 01/29/2025 | Petitioner's Objections to Evidence |
| 03/19/2025 | Petitioner's Notice of Deposition of Dr. Denise Poulos |
| 04/30/2025 | Petitioner's Reply |
| 05/22/2025 | Petitioner's Request for Oral Argument |
| 05/22/2025 | Patent Owner's Request for Oral Argument |
| 05/27/2025 | Panel Change Order |
| 06/09/2025 | Order Setting Oral Argument |
| 06/11/2025 | Patent Owner's Sur-Reply |
| 06/18/2025 | Patent Owner's Updated Mandatory Notices |
| 07/01/2025 | Patent Owner's Corrected Response |
| 07/03/2025 | Petitioner's Updated Exhibit List |
| 07/07/2025 | Petitioner's Updated Exhibit List |
| 07/07/2025 | Patent Owner's Updated Exhibit List |
| 09/18/2025 | Order re Related Matters Updates [EXPUNGED] |
| 09/18/2025 | Oral Hearing Transcript |
| 09/19/2025 | Order re Related Matters Updates |
| 10/01/2025 | Final Written Decision |

1

2

| Date | Document |
|------|----------|
| 12/01/2025 | Power of Attorney [EXPUNGED] |
| 12/01/2025 | Mandatory Notice [EXPUNGED] |
| 12/02/2025 | Petitioner's Updated Power of Attorney |
| 12/02/2025 | Petitioner's Updated Mandatory Notices |
| 12/02/2025 | Petitioner's Notice of Appeal to U.S. Court of Appeals for the Federal Circuit |

Trials@uspto.gov                                                                Paper No. 29
571-272-7822                                                    Entered: October 1, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BTL INDUSTRIES, INC.,
Petitioner,

v.

INMODE LTD.,
Patent Owner.

_____

IPR2024-00703
Patent 8,961,511 B2

_____

Before MEREDITH C. PETRAVICK, BENJAMIN D. M. WOOD, and
HYUN J. JUNG, *Administrative Patent Judges*.

PETRAVICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2024-00703
Patent 8,961,511 B2

## I.     INTRODUCTION

BTL Industries, Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 1–58 of U.S. Patent No. 8,961,511 B2 ("the '511 patent," Ex. 1001). Paper 2 ("Pet.").  InMode Ltd. ("Patent Owner") did not file a Preliminary Response, and, on October 2, 2024, we instituted this *inter partes* review as to all challenged claims and all grounds presented in the Petition.  Paper 6 ("Dec.").

After institution, Patent Owner filed a Response to the Petition.  Paper 12 ("PO Resp.").  Petitioner filed a Reply (Paper 15, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 20, "PO Sur-Reply").  An oral hearing was held on July 8, 2025 and a transcript appears in the record (Paper 27, "Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–58 of the '511 patent.  For the reasons discussed below, we determine Petitioner does not establish by a preponderance of the evidence that any of claims 1–58 are unpatentable.

A.     Real Parties-in-Interest

Petitioner identifies itself, BTL Industries, Inc., as the real party-in-interest.  Pet. 73.

Patent Owner identifies itself, InMode Ltd., as the real party-in-interest.  Paper 4, 1.  Patent Owner avers that it is the owner of the '511 patent, as evidenced by the assignment accorded with the Office at Reel No. 064258, Frame No. 0525.  *Id.*; *see also* Ex. 3001 (assignment history abstract).

IPR2024-00703
Patent 8,961,511 B2

B.      Background and Related Proceedings

The '511 patent was previously challenged by ThermiGen, LLC and Thermiaesthetics, LLC in IPR2018-00088 and IPR2018-00089 (jointly, "the ThermiGen IPRs").  These cases were terminated shortly after institution at the request of Petitioner ThermiGen, and then-Patent Owner, Viveve, Inc. *See* IPR2018-00088, Papers 10 (Ex. 1009), 12; IPR2018-00089, Papers 11 (Ex. 1010), 12.

Coincident with the ThermiGen IPRs, the '511 patent was then at issue in *Viveve, Inc. v. ThermiGen, LLC et al.*, Civil Action No. 2:16-cv-1189-JRG (E.D. Tex.) ("*Viveve*"), which also settled.  *See, e.g.*, Ex. 1009, 2.

According to the parties here, the '511 patent is now at issue in *InMode Ltd. v. BTL Industries, Inc.*, Case No. 2:23-cv-08583 (C.D. Cal.), filed October 11, 2023.  *See* Pet. 74, Paper 4, 1.

C.      The '511 Specification

The '511 patent issued from U.S. Application No. 11/704,067, filed February 7, 2007, and claims the benefit of Provisional Application No. 60/743,247, filed on February 7, 2006.  Ex. 1001, codes (21), (22), (60).

The patent pertains to the use of radiant energy to "treat[] a loose vagina and introitus"[1] via "corrective or restorative remodeling of the mucosal surfaces of the vagina, introitus, and vulva."  Ex. 1001, code (57), 1:13–15, 2:17–21.

---

[1] The Specification defines "introitus" as "the opening of the vagina" (Ex. 1001, 2:3–4, 3:51).

3

IPR2024-00703
Patent 8,961,511 B2

According to the Specification:

> Embodiments of the invention include methods for remodeling a therapeutic zone of tissue within a target tissue of female genitalia. The target tissue lies immediately beneath the mucosal epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention does not include deeper tissue, such as endopelvic fascia.

*Id.* at 3:41–48.

The Specification describes "apparatus and methods for tightening tissue of the female genitalia by heating targeted connective tissue with radiant energy [typically radiofrequency (RF) energy], while cooling the mucosal epithelial surface over the target tissue to protect it from the heat." *Id.* at code (57), 4:4–13*; see also id.* at 2:25–28, 4:7–16, 13:16–19, claims 6, 33, 41, and 49 ("heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy"). According to the Specification, such tightening may be an immediate or near-immediate consequence of thermally denaturing tissue collagen, and/or the result of a longer-term healing response involving the deposition of new collagen by cells in the connective tissue. *Id.* at code (57), 4:14–16, 4:63–5:11, 12:39–49.

### D.   Illustrative Claims

Petitioner challenges claims 1–58 in this proceeding, of which claims 1, 35, 43, and 51 (reproduced below) are independent. The independent

4

IPR2024-00703
Patent 8,961,511 B2

claims differ only with respect to the "wherein" clauses, shown below in italics.[2]

> 1. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
> > heating the target tissue, and
> >
> > remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.*
>
> 35. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
> > heating the target tissue, and
> >
> > remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.*
>
> 43. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
> > heating the target tissue, and

---

[2] The Petition applies a short-hand designation identifying elements of the independent claims. With respect to claim 1, for example, [1.P] refers to the preamble, [1.1] refers to the step of "heating the target tissue," [1.2] refers to "remodeling the therapeutic zone of target tissue," and [1.3] applies to the claim-specific "wherein" clause. *See* Pet. 25, 28, 32, 35.

IPR2024-00703
Patent 8,961,511 B2

> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion radiating outward from the introitus to Hart's line.*[3]

> 51. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

> heating the target tissue, and

> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a mucosal surface of the labia minora.*

Ex. 1001, 15:47–55, 17:11–21, 17:42–49, 18:21–28 (emphasis added).

E.    Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 12):

| Ground | Claims | Basis | Reference(s) |
|--------|--------|-------|--------------|
| 1 | 1–58 | § 103 | Edwards,[4] Mosher,[5] Ingle[6] |
| 2 | 43–58 | § 103 | Edwards, Mosher, Ingle, Ollivier[7] |

---

[3] The Specification defines "Hart's line" as the portion of the vulva "where mucosal epithelium gives way to skin on the outer surface of the labia minora," i.e., "the boundary where mucosal epithelium and labial skin meet" (*id.* at 3:49–54, 11:59–62).

[4] US 6,463,331 B1, issued Oct. 8, 2002.  Ex. 1005.

[5] US 2004/0193238 A1, published Sept. 30, 2004.  Ex. 1006.

[6] US 6,216,704 B1, issued Apr. 17, 2001.  Ex. 1007.

[7] Ollivier, D., "Designer Vaginas," Salon.com, accessed at https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html (Nov. 14, 2000).  Ex. 1008.

6

IPR2024-00703
Patent 8,961,511 B2

In support of its patentability challenges, Petitioner provides a Declaration of Dr. Joseph Berenholz, M.D. (Ex. 1003).  In support of its arguments, Patent Owner provides a Declaration of Dr. Denise Poulos.

## II.    ANALYSIS

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present.  *KSR*, 550 U.S. at 406.

7

IPR2024-00703
Patent 8,961,511 B2

"[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). But in analyzing the obviousness of a combination of prior art elements, it can also be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *Id.* at 418.

"[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). Moreover, a precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *KSR,* 550 U.S. at 418. Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (quotations and citations omitted).

IPR2024-00703
Patent 8,961,511 B2

A.     Person of Ordinary Skill in the Art

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner proposes that a person of ordinary skill in the art ("POSA") would be "a medical doctor . . . [with] at least three years of experience in the non-surgical treatment of uro-gynecological conditions and/or the non-surgical cosmetic treatment of female genital tissues."  Pet. 6.

 In the ThermiGen IPRs, the Board preliminarily determined that a POSA in the field of the '511 patent would have had "a medical degree plus at least two years of experience in a field such as gynecology, urogynecology, or plastic surgery involving female genital anatomy, with clinical experience in the application of radiant energy to female genital tissue." Ex. 1009, 8–9; Ex. 1011, 8.  Patent Owner, here, urges us to adopt this definition of a POSA because Petitioner's proposed definition is an over-credentialed standard that few persons would satisfy at the relevant time.  PO Resp. 12 (citing Ex. 2001 ¶¶ 35–39; Ex. 2005, 55:5–17, 57:17–58:19).

We apply Patent Owner's proposed definition, as it appears consistent with the field of the '511 patent and the prior art and is consistent with testimony of Dr. Poulos and the cross-examination testimony of Dr. Berenholz. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355, (Fed. Cir. 2001)

IPR2024-00703
Patent 8,961,511 B2

(the level of ordinary skill in the art may be reflected in the prior art itself); Ex. 2001 ¶¶ 35–39; Ex. 2005, 55:5–17, 57:17–58:19.  In our view, however, Petitioner's proposed definition is not so different that our decision would change if we were to apply Petitioner's proposed definition.

B.    Claim Construction

The Board interprets claim terms in an *inter partes* review using the same claim construction standard that is used to construe claims in a civil action in federal district court.  *See* 37 C.F.R. § 42.100(b)).  In construing claims, district courts give claims their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

With respect to the challenged claims, Petitioner asserts that "no claim term requires construction—all terms should receive their ordinary and customary meaning in view of the patent specification."  Pet. 7 (citing Ex. 1003 ¶ 61).  Petitioner, however, does provide constructions of certain claim terms made by the Board in the ThermiGen IPRs and by the court in the *Viveve* litigation.  Pet. 7–12.

Patent Owner provides explicit constructions for numerous claim terms.  PO Resp. 13–22.

In order for us to reach a decision, only the claim limitations discussed below require explicit construction.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. 2017) (explaining that only those terms need be construed "that are in controversy, and only to the extent necessary to resolve the controversy.").

10

IPR2024-00703
Patent 8,961,511 B2

> 1. *"heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"*

The "wherein" clause of independent claim 1 specifies that heating includes "heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus."[8]

Petitioner states: "A POSA would have understood this treatment area includes heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (i.e., 3.5 cm from the introitus)." Pet. 35. According to Petitioner, "[t]he 'extending from the introitus inwardly' language of claim 1 describes the location and direction from which the claimed range of 1 cm to 3.5 cm is measured." Pet. Reply 16.

Patent Owner argues that the plain reading of the wherein clause requires the treating to begin at the introitus and extend at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. PO Sur-Reply 6–7; *see* PO Resp. 30–31.

Petitioner responds that Patent Owner's construction renders claim 26 superfluous. Pet. Reply 16. Claim 26 depends from claim 1 and recites "wherein remodeling comprises tightening the introitus." Patent Owner counters: "Whether claim 1's treatment area includes the introitus or instead begins immediately proximal to the introitus in the lower aspect of the vagina, claim 1 still requires treating at least the first centimeter into the vagina." PO Sur-Reply 7.

---

[8] The *Viveve* court did not construe this limitation. *See generally* Ex. 1024.

IPR2024-00703
Patent 8,961,511 B2

Patent Owner's argument are persuasive.  We agree with Patent Owner that a plain reading of the wherein clause requires the treating to begin at the introitus and extend at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.  This construction is consistent with the '511 patent's Specification, which states:

> In typical embodiments, the length of the energy delivery element is about 1 to about 3 cm in length, in other embodiments it may be as long as about 4 cm.  This is a length well adapted to treating the lower aspects of the vagina, wherein treatment by the method comprises contacting the vaginal epithelium in a region that *extends from the introitus inward to a position about 3 to 4 cm inward from the introitus*.  In some embodiments of the invention, the method can b[e] practiced with a single row of parallel contract sites immediately inside the introitus.  In other embodiments, the method may include deeper rows, or rows that overlap an initial row, while keeping the contact sites within the lower portion of the vagina.

Ex. 1001, 3:28–40 (emphasis added); *see also id.* at 14:47–57.  The '511 patent Specification also states:  "the portion of the vagina to be treated is a region *between the introitus and a position located no further than about 3 to about 4 cm inward from the introitus*."  *Id.* at 11:48–51 (emphasis added).

Given the plain language of claim 1, consistent with the '511 patent's Specification, we construe "*heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus*" to require heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

IPR2024-00703
Patent 8,961,511 B2

> 2. "*heating a portion of the vagina circumferentially
> around its wall from 1 o'clock to 11 o'clock*"

The "wherein" clause of independent claim 35 specifies that "heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock."[9]

In the ThermiGen IPRs, the Board noted that "[w]hether 'heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock' requires heating substantially *all* of the wall 1 o'clock to 11 o'clock, . . . is a close question." Ex. 1009, 18. At institution, we preliminarily adopted the construction from the ThermiGen IPRs[10], which is "heating at least one contact site in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." Paper 6, 14 (citing Ex. 1009, 18).

Petitioner asserts that the Board's preliminary construction is correct. Reply 17–18. Petitioner argues that this construction is consistent with dependent claim 40, which recites "contacting the epithelium with a treatment tip at a [sic] one or more contact sites during a procedure." Pet. 11 (citing *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that

---

[9] The *Viveve* court did not construe this limitation. *See generally* Ex. 1024.

[10] The construction from the ThermiGen IPRs was made at the preliminary stage prior to institution using the broadest-reasonable-interpretation standard. Ex. 1009, 9, 16–18. Because the ThermiGen IPRs terminated due to settlement, the Board did not make a final construction based upon a full record developed during trial.

IPR2024-00703
Patent 8,961,511 B2

embodiment as well."). We note that Petitioner fails to point to any disclosure in the '511 patent that teaches heating circumferentially around the vagina's wall by contacting one site. *See* Pet. 11.

Patent Owner argues that this clause should be construed to require "heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." PO Resp. 20. According to Patent Owner, in order to heat *circumferentially*, multiple sites need to be treated as contiguously as possible around the vaginal wall. *Id.* at 21 (citing Ex. 2001 ¶¶ 71–72; Ex. 2005, 117:9–118:1). Patent Owner states that "[c]ontiguous sites includes multiple sites adjacent to each other." PO Resp. 21–22 (citing Ex. 2007, 250).

Patent Owner's arguments are persuasive. The plain language of claim 35 requires heating a portion of the vagina *circumferentially around* its wall from 1 o'clock to 11 o'clock. In order to heat "circumferentially around" the wall from 1 o'clock to 11 o'clock, multiple sites, and not just one site, of the arc between 1 o'clock to 11 o'clock must be treated. Ex. 2001 ¶¶ 71–72.

This is consistent with the '511 patent's Specification, which discloses heating substantially the entire 300 degree arc of vaginal wall from 1 o'clock to 11 o'clock, as shown in the embodiment illustrated in Figures 9A and 9B, reproduced side-by-side below.

14

IPR2024-00703
Patent 8,961,511 B2



FIG. 9A

FIG. 9B

Figure 9A depicts a treatment area of a mucosal epithelium comprising multiple contact sites; Figure 9B is a representation of the treatment area as a mapping grid. Ex. 1001, 5:55–57. More particularly:

> FIG.9A is a schematic representation of a vagina 122, with the introitus 124 forming the entrance to the vagina. In a typical procedure, the treatment tip would contact various contact sites in the lower vagina, just inside the introitus. As shown in FIG.9A, an accumulated set of contact sites 102 that have been treated by the treatment tip, and they collectively comprise a treatment area on the vaginal epithelium.

Id. at 14:46–53. As illustrated in Figure 9B,

> the contact sites may be recorded on a grid 115, the completed grid thus being a mapped representation of the treatment area, which can be referred to during evaluation of the remodeling at some time point following the treatment. As shown, the treatment grid may contain reference points with respect to the circumferential location on the vagina, as provided, for example, by the clock dial scheme.

Id. at 14:62–15:3. The Specification explains:

> The circumference of the lower portion of an unfolded vagina, gently stretched as it is during the practice of this method, is approximately 12 cm. Accordingly, with a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an [sic] 300 degree arc of the circumference,

15

IPR2024-00703
Patent 8,961,511 B2

> between the 1 o'clock and 11 o'clock positions. These dimensional considerations underlie the rationale for an embodiment of the treatment wherein the surface of the energy delivery element has a curvature of about 30 degrees, each contact site accounting for about 10% of the 300 degree arc.

*Id.* at 14:35–45.

We acknowledge that dependent claim 40's recitation of "one or more contact sites" appears to conflict with our construction of claim 1. But, in this case, claim 40's recitation of *one* or more contacts sites conflicts with the plain language of claim 35 and would improperly read the requirement of heating circumferentially around the vagina's wall out of claim 35.

Given the plain language of claim 1, consistent with the '511 patent's Specification, we construe "*heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock*" to require heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall.

### C. Overview of Asserted References
#### 1. Overview of Edwards (Ex. 1005)

Edwards "provides a method and system for the curative treatment of female uro-genital disorders by application of radiofrequency (RF) energy to targeted tissues. Application of this energy is selectively applied so as to ablate, tighten, shrink or reshape the tissue and thereby correct an unwanted condition." Ex. 1005, 2:33–38. In targeting this energy, Edwards teaches that "[t]he physician determines optimal areas of treatment," and "create[s] a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." *Id.* at 13:14–16, 13:38–42. According to Edwards, "[r]emodeling

16

IPR2024-00703
Patent 8,961,511 B2

of the anterior wall treats incontinence," whereas "[r]emodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function."  Ex. 1005, 3:5–11, 13:14–23.

Edwards discloses system 400, reproduced below in Figure 4, for use in vaginal remodeling.  *See id.* at 3:25–27, 7:14–8:5, 13:12–14:4.



FIG. 4

Figure 4 shows system 400, including treatment element 410 (bottom portion, not labeled).  Treatment element 410 includes blade 420 and handle 430.  Ex. 1005, 7:18–28.  The blade includes a plurality of electrodes 423, a plurality of irrigating fluid delivery pores 425 "disposed to deliver cooling liquids so as to minimize thermal damage," and at least one thermocouple 424 to monitor temperature.  *Id.* at 7:18–28, 7:51–55, 7:66–8:5, 13:43–53.

17

IPR2024-00703
Patent 8,961,511 B2

Figure 9A of Edwards, reproduced below, describes a method employing the device shown in Figure 4.



Figure 9A illustrates a method for vaginal remodeling. *Id.* at 3:38–39. According to Edwards, "[A] speculum is inserted in the patient's vagina. The blades of the speculum are placed in an open position. The treatment element of system 400 is inserted into the vagina through the speculum." *Id.* at 13:43–46; *see generally, id.* at 13:12–14:4. Cooling fluid is delivered into the vagina through irrigating fluid delivery pores 425, and RF energy is delivered "to discrete areas of the vaginal wall." *Id.* at 13:54–56. "In a preferred embodiment, the blade 420 may be disengaged and relocked in

18

IPR2024-00703
Patent 8,961,511 B2

another position in the speculum, so as to deliv[er] energy to another area of the vagina." *Id.* at 13:60–62.

## 2. Overview of Mosher (Ex. 1006)

Mosher discloses treatment of urinary incontinence by selectively heating and remodeling "collagenous tissues of the pelvic support tissue." *See, e.g.,* Ex. 1006, Abstract, ¶¶ 9, 45. In this respect, Mosher discloses the introduction of a probe having "tissue-penetrating electrodes" into the vagina for "heating provided through . . . the vaginal wall." *Id.* at ¶¶ 9, 24–25, 54, Figs. 4B, C.

Mosher discloses Figures 6 and 6a as "illustrative non-invasive vaginal probes and a method for non-invasively treating endopelvic fascia using cooled [RF] electrodes." *Id.* ¶¶ 27, 58. In one embodiment, "[a] non-invasive cooled electrode probe similar to that shown in FIGS. 6 and 6A heats tissue until the temperature sensing needle at 4.5 mm depth reaches a set point of 75 °C. at 185 seconds." *Id.* ¶ 85. In one embodiment

> a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

*Id.* ¶ 74.

According to Mosher, "directing energy from a probe into collagenous tissues of the pelvic support system" may cause contraction of the collagenous tissue and/or structural stiffening related to scarring or healing. *Id.* ¶ 45. In addition to the treatment of urinary incontinence, Mosher teaches that such methods "will find applications in a wide variety of therapies," and "may be directed to a variety of tissue structures [including]

19

IPR2024-00703
Patent 8,961,511 B2

. . . structures of the vagina," such as the lamina propria, a "dense connective tissue layer just under the epithelium." *Id.* ¶¶ 46, 48.

### 3.  Overview of Ingle (Ex. 1007)

Ingle discloses devices and methods "for selectively heating and shrinking tissues, particularly for the noninvasive treatment of urinary incontinence and hernias, for cosmetic surgery, and the like." Ex. 1007, 1:18–23.  Ingle's methods can "induc[e] controlled shrinkage or contraction of a support tissue of the body, typically being a collagenated tissue such as fascia, ligament, or the like" (*id.* at 11:8–11).  "Tissue contraction results from controlled heating of the tissue by affecting the collagen molecules of the tissue." *Id.* at 11:25–26.  Ingle posits that "[c]ontraction occurs as a result of heat-induced uncoiling and repositioning of the collagen B-pleated structure." *Id.* at 11:25–28.

Ingle teaches heating target tissues by application of RF or ultrasound energy. *See, e.g., id.* at 3:51–56, 5:10–13, 30–32, 8:53–65.  This energy "heats fascia and other collagenated support tissues, causing them to contract without substantial necrosis of adjacent tissues." *Id.* at 2:58–61.  To avoid such tissue damage, the energy is "preferably . . . applied through a large, cooled electrode having a substantially flat electrode surface. Such a cooled plate electrode is capable of directing electrical energy through an intermediate tissue and into fascia, while the cooled electrode surface prevents injury to the intermediate tissue." *Id.* at 2:61–67; *see id.* at 5:40–58.

Ingle provides guidance for times and temperatures suitable to achieve "significant tissue contraction . . . without substantial collateral tissue damage." *Id.* at 11:25–31.  In a preferred embodiment, "the target tissue will

IPR2024-00703
Patent 8,961,511 B2

be raised to a temperature of about 60 nC[11] or more, while the intermediate tissue remains at or below a maximum safe temperature of about 45 nC." *Id.* at 8:41–44. Ingle further teaches that "[t]he temperature of the target tissue structure will . . . often be[] in the range from about 60 nC to 80 nC." *Id.* at 11:33–37.

According to Ingle, selective, temperature-mediated shrinkage of fascia may be used to treat a wide variety of conditions, "and may even be used in cosmetic procedures . . . to remove wrinkles by shrinking the collagenated skin tissues, or to lift sagging breasts by shrinking their support ligaments." *Id.* at 17:65–18:7. Exemplary target tissues, however, "include the urethral wall, the bladder neck, the bladder, the urethra, bladder suspension ligaments, the sphincter, pelvic ligaments, pelvic floor muscles, fascia, and the like." *Id.* at 11:14–17. In some embodiments energy is applied "to fascia . . . within the vagina" via an energy transmitting element on the distal end of a probe introduced into the vagina. *Id.* at 3:36–43. Fig. 11. In this aspect,

> The transmitting element is capable of transmitting sufficient heating energy through the vaginal wall to heat and contract the fascia. A cooling system is disposed adjacent to the transmitting element. The cooling system is capable of maintaining the vaginal wall adjacent the probe below a maximum safe temperature when the fascia is heated by the transmitting element.

---

[11] "nC" appears to be pervasive formatting error in Ingle, as published. We understand "nC" in Ingle to mean "°C". *See* Ex. 1007, 15:31 (referring to body temperature as "approximately 37 nC"), 15:5–39 and Figures 3A–E (illustrating exemplary temperature ranges, in °C); Ex. 1003 ¶ 80.

21

IPR2024-00703
Patent 8,961,511 B2

*Id.* at 3:43–50; *see also id.* at 3:51–58 ("[I]ntermediate tissue is cooled with the probe to avoid injuring the intermediate tissue when the target tissue is heated by the probe."), 4:4–10, 11:25–31, 15:65–16:4, 20:14–19.

4. Overview of Ollivier

Ollivier describes techniques for the cosmetic treatment of the vagina, vulva, and labia. *See generally* Ex. 1008. Ollivier describes, for example, the use of "Laser Vaginal Rejuvenation (LVR) to tighten [a patient's] vagina and 'enhance sexual gratification' and Designer Laser Vaginoplasty (DLV) to 'aesthetically modify' her labia." *Id.* at 1. Ollivier explains, "[b]y reconstructing the 'optimum structural architecture' of the vagina—namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body— … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." *Id.* With reference to advances in remodeling technology, Ollivier states that surgery for vaginal and labial "deformities" has "been around for 30 years. Lasers have even fallen out in favor. We have more sophisticated tools that do the same thing these days." *Id.* at 3.

D.    Ground 1: Asserted Obviousness in view of Edwards, Ingle, and Mosher

Petitioner challenges claims 1–58 as obvious in view of Edwards, Ingle, and Mosher. Pet. 22–67.

1. Claim 1

Claim 1 recites, "wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5

22

Appx84

IPR2024-00703
Patent 8,961,511 B2

cm in from the introitus."  We construed this limitation to require heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.  *Supra* 12.

Petitioner contends and Patent Owner disputes that Edwards and Mosher teach this limitation.  Pet. 35–36; Pet. Reply 14–17; PO Resp. 29–39; PO Sur-Reply 8–11.

Petitioner first point's to Edwards's fourth embodiment and asserts that a "POSA . . . would have understood Edwards's teachings to include treatment near the opening of the vagina."  Pet. 35 (citing Ex. 1003 ¶ 122).

Patent Owner disagrees and responds that Edwards's device is not suitable for treating the area near the introitus because Edwards uses a speculum to reach deeper into vagina to treat the bladder neck region.  PO Resp. 30, 34–36.

Patent Owner's argument is persuasive.  Edwards's fourth embodiment for vaginal remodeling is depicted in its Figure 9.  Ex. 1005, 13:12–14:5, Fig. 9.  According to Edwards's "[r]emodeling both the anterior wall and the posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function."  *Id.* at 13:19–22.  The method includes inserting a speculum[12] into the vagina and the physician determining optimal treatment areas, that may include both the anterior wall or posterior wall of the vagina.  *Id.* at 13:38–42, Fig. 9, step 904.  In the fourth embodiment, the treatment blade is mated with the speculum.  *Id.* at 13:43–49, Fig. 9, steps 905–906.

---

[12] A speculum in a device that dilates a vagina.  Ex. 2001 ¶ 100.

23

IPR2024-00703
Patent 8,961,511 B2

Both parties' declarants agree that a treatment method that uses a speculum as in Edwards would likely be unsuitable for treating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. *See* Ex. 2005, 137:12–138:1; Ex. 2001 ¶¶ 101–103. Both declarants also agree that a speculum would need to be inserted into the vagina at least a few centimeters beyond the introitus to secure the speculum in the vagina. Ex. 2005, 137:12–138:1; Ex. 2001 ¶ 101. Edwards's treatment blade is mounted on the speculum so that the electrodes extend beyond the end of the speculum and, thus, the electrodes are positioned about 2 cm deeper into the vagina than the tip of the speculum. Ex. 2005, 132:25–133:16, 140:14–17; Ex. 2001 ¶ 101. Thus, Edwards treatment area is deeper in the vagina than the claimed treatment area. *See* Ex. 2005, 137:12–138:1, 140:14–17; Ex. 2001 ¶¶ 101–103.

In its Reply, Petitioner argues that Edwards's treatment method uses a speculum is irrelevant because "POSAs 'would have understood that in treating areas of the vaginal wall closer to the introitus, a physician would be able to complete the treatment without a speculum.'" Pet. Reply 20–21 (citing Ex. 1003 ¶¶ 69, 159).

Petitioner's argument is misplaced because the issue is whether Edwards discloses the claimed heating of the vagina from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus, not whether a POSA would have understood that Edwards's device could be used to meet this claim limitation.

Also in its Reply, Petitioner argues that Edwards teaches remodeling the anterior vaginal wall at area proximal and mid-urethra. Pet. Reply 14

24

IPR2024-00703
Patent 8,961,511 B2

(citing Ex. 1005, 13:14–23). Petitioner contends that "[t]reating the vaginal wall adjacent to the mid-urethra is within the claimed region of 'from 1 cm to 3.5 cm in from the introitus.'" Pet. Reply 14 (citing Ex. 1032, 65:11–77:7).

With respect to the fourth embodiment, Edwards states: "Remodeling of the anterior wall treats incontinence based on bladder outlet hypermobility by increasing support for the bladder outlet, as well as the proximal and mid-urethra." Ex. 1005, 13:16–19. As Patent Owner points out, this statement does not describe the treatment area but the result of the treatment. PO Sur-Reply 8–9 (citing Ex. 1032, 141:13–23). As we found above, Edwards's fourth embodiment includes the use of a speculum, which would result in a treatment area outside the claimed treatment area.

The Petition next relies upon Mosher to teach focusing treatment near the opening of the vagina. Pet. 35–36 (citing Ex. 1006 ¶¶ 58, 74, 75, Figs. 6, 6a); *see also* Pet. Reply 14–16. Mosher teaches that in one embodiment

> a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

Ex. 1006 ¶ 74. Petitioner asserts that "a POSITA would have understood that Mosher teaches treating a portion of the vagina extending from the introitus to 1.5 cm inwards, which falls within the claimed treatment area." Pet. 36 (citing Ex. 1003 ¶ 124).

Patent Owner disagrees and argues that "Petitioner mistakenly reads the stated *size* of the treatment are to be a position of the treatment relative to the introitus." PO Resp. 37. According to Patent Owner, Mosher does not

25

IPR2024-00703
Patent 8,961,511 B2

explicitly state the location of the treatment area and, contrary to Petitioner's argument, "with the limited treatment length, a POSA would readily understand that the introitus is not treated." *Id.* at 37–38 (citing Ex. 2001 ¶ 107).

Patent Owner's arguments is persuasive. The cited portion of Mosher does not explicitly state the location of the treatment area. Ex. 1006 ¶ 74.

In it Reply, Petitioner additionally points to paragraph 54 of Mosher, which states: "Preferably, the location of the treatment volume of endopelvic fascia will be disposed along a length of the urethra between the bladder neck and the external meatus so as to avoid injuring nerves." Pet. Reply 14 (quoting Ex. 1006 ¶ 54). Petitioner argues that "[t]reating the vaginal wall adjacent to the mid-urethral region is within the claimed region of 'from 1 cm to 3.5 cm in from the introitus.'" Pet. Reply 14–16. This, however, does not teach the claimed area beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

The Petition fails to show that either Edwards or Mosher discloses heating a portion of the vagina beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus.

In its Reply, Petitioner argues that it would have been obvious to modify Edwards to treat the area beginning at the introitus and extending at least the first centimeter into the vagina and up to 3.5 cm in from the introitus. *See, e.g.*, Pet. Reply 2–4, 16–17 (citing Pet. 35). The Petition's argument is unpersuasive because it is conclusory and does not adequately address Edwards's use of a speculum. Pet. 35. The Petition includes no

26

IPR2024-00703
Patent 8,961,511 B2

persuasive explanation as to why it would have been obvious to modify
Edwards to use the treatment blade without the speculum. *See* Pet. 22–24,
35–36.

We determine that Petitioner fails to meet its burden to show by a
preponderance of the evidence that claim 1 is unpatentable over Edwards,
Ingle, and Mosher.

### 2. Claim 35

Claim 35 recites "wherein the heating includes a portion of the vagina
circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the
aspect closest to the urethra is at 12 o'clock." We construed this limitation
to require heating multiple, contiguous contact sites in the 300 degree arc
extending from 1 o'clock to 11 o'clock along the vaginal wall. *Supra* 14.

In the Petition, Petitioner first argues that Edwards expressly describes
heating more than one contact site. Pet. 37–38 (citing Ex. 1005, 13:14–16,
13:38–42); *see also* Pet. Reply 18 (citing Ex. 1005, 3:5–13, 13:19–22).
Describing its fourth embodiment, Edwards states:

> A method 900 is performed to create a series of lesions in either
> the anterior vaginal wall, the posterior vaginal wall or both.
> Remodeling of the anterior wall treats incontinence based on
> bladder outlet hypermobility by increasing support for the
> bladder outlet, as well as the proximal and mid-urethra.
> Remodeling both the anterior wall and the posterior wall provide
> circumferential vaginal tightening, resulting [in] physical and
> psychological improvement in the area of sexual function.

Ex. 1005, 13:14–22; *see also id.* at 3:5–13, 13:38–42.

As pointed out by Patent Owner and can be seen from the passage
above, Edwards does not teach circumferentially heating the vaginal wall
from 1 o'clock to 11 o'clock. PO Resp. 39–40, 42–43. Instead, as Patent

27

IPR2024-00703
Patent 8,961,511 B2

Owner further points out, it is likely that the "series of lesions" that Edwards discusses extend longitudinally because the lesions are caused by electrodes that extend along the length of the treatment blade. *Id.* at 42 (citing Ex. 1005, Fig. 4). In addition, Edwards's treatment uses a speculum, and Edwards's does not describe rotating the speculum. *See* Ex. 1005, 13:12–14:6; Ex. 2001 ¶¶ 114, 115, 117. The reference to circumferential vaginal tightening in the passage above is the result of creating a series lesions in the anterior vaginal wall and posterior vaginal wall. Ex. 1034, 141:3–23.

Petitioner next argues that "Based on Mosher's teachings of distributing the treatment volume along a lateral orientation, a POSA would have been motivated to treat more locations around the circumference of the vagina to expand the treatment area." Pet. 38 (referencing Ex. 1006 ¶ 74). Mosher states:

> To avoid injury to nerves in the bladder neck region while providing sufficient treatment volume along the endopelvic fascia, it may be advantageous to distribute the treatment volume along the patient's lateral orientation while limiting the length of treatment along the axis of the patient's urethra. . . . Such a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm.

Ex. 1006 ¶ 74.

As can be seen from the passage above, Mosher discloses a laterally elongate treatment region of about 25 mm (2.5 cm) and does not disclose heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall.

IPR2024-00703
Patent 8,961,511 B2

We determine that Petitioner fails to meet its burden to show by a preponderance of the evidence that claim 35 is unpatentable over Edwards, Ingle, and Mosher.

### 3. Claims 43 and 51

Claim 43 recites "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line." Claim 51 recites "wherein the heating includes heating a mucosal surface of the labia minora."

Petitioner acknowledges that none of Edwards, Mosher, and Ingle explicitly teaches heating a portion radiating outward from the introitus to Hart's line or a mucosal surface of the labia minora. Pet. 40–43; *see also* Pet. Reply 19–20. Petitioner points to general teachings of Edwards, Mosher, and Ingle that disclose treating a variety of tissues and argues that "[a] POSA would have known that treating the vulva is often done for cosmetic purposes." Pet. 41; *see also id.* at 42. Given this, Petitioner concludes that POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the areas recited in claims 43 and 51. Pet. 41 (citing Ex. 1003 ¶¶ 39–49, 91, 142), 42 (citing Ex. 1003 ¶¶ 91, 146, 136–143).

Patent Owner argues that Petitioner's proposed combination is based on impermissible hindsight because Edwards, Mosher, and Ingle disclose treating internal female genital tissue and Petitioner does not adequately explain why a POSA would be motivated to modify Edwards to treat external female genital tissue. PO Resp. 46–51.

29

IPR2024-00703
Patent 8,961,511 B2

Patent Owner's arguments are persuasive. None of Edwards, Mosher, or Ingle disclose treating external female genital tissue. The Petition argues that a POSA would have been motivated to apply, and have a reasonable expectation of success in doing so, the treatments of Edwards, Mosher, and Ingle to cosmetically enhance the areas recited by claims 43 and 51. Pet. 41–42; *see also* Pet. Reply 19–20. Edwards, Mosher, and Ingle, however, are focused on treating internal female genital tissue and do not explicitly disclose treating external female genital tissue recited in claims 43 and 51. *See generally* Exs. 1005–1007. The Petition does not adequately address the differences between treating internal versus external female genital tissue. *See, e.g.,* Ex. 2005, 34:22–35:12 (testimony of Dr. Berenholz indicating differences in temperature settings); Ex. 2001 ¶ 130. For example, Edwards's treatment method includes mating its treatment blade with a speculum, which would be used only with treatment of internal female genital tissue. Ex. 1005, 13:38–40, Fig. 9, step 904; Ex. 1005, 13:43–46; Ex. 2001 ¶ 129. The Petition includes no persuasive explanation as to why a POSA would have been motivated to modify Edwards to use the treatment blade without the speculum, so as to treat external tissue. *See* Pet. 22–24, 35–36.

An obviousness analysis must focus on what a person having ordinary skill in the art would have been *motivated* to do, rather than merely what such a person would have been *able* to do. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 n.4 (Fed. Cir. 2018); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). We determine that Petitioner failed to meet its burden to show by a preponderance of the evidence that claims 43 and 51 are unpatentable over Edwards, Ingle, and Mosher.

30

IPR2024-00703
Patent 8,961,511 B2

4. Claims 2–34, 36–42, 44–50, and 52–58

We determine that Petitioner failed to meet its burden to show by a preponderance of the evidence that claims 2–34, 36–42, 44–50, and 52–58, which depend from claims 1, 35, 43, or 51 are unpatentable over Edwards, Ingle, and Mosher. *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious.").

E.    Ground 2: Asserted Obviousness in view of Edwards, Ingle, Mosher, and Ollivier

Petitioner challenges claims 43–58 as obvious in view of Edwards, Ingle, and Mosher for the reasons set forth with respect to Ground 1, and further in view of Ollivier—"to the extent Patent Owner argues or the Board finds that [treatment of the vulval areas recited in the 'whereas' clauses of independent claims 43 and 51] was not within the general knowledge of a POSA." Pet. 67–68.

Patent Owner argues that the Petition fails to demonstrate that Ollivier is a printed publication because the Petition does not sufficiently show that Ollivier was accessible to the interested public. PO Resp. 60–62; PO Sur-Reply 24–25.

"A reference is deemed publicly available if it has been 'disseminated or otherwise made available to the extent that persons interested and ordinarily skill in the subject matter or art, exercising reasonable diligence, can locate it.'" *Telefonaktiebolaget LM Ericsson v. TCL Corp.*, 941 F.3d 1341, 1346 (Fed. Cir. 2019) (citing *Jazz Pharm., Inc. v. Amneal Pharm.,*

31

IPR2024-00703
Patent 8,961,511 B2

*LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018)). Whether a reference is a "printed publication" is a "case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "If accessibility is proved, there is no requirement to show that particular members of the public actually received the information." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988).

The Petition contends that Ollivier is an article published on November 14, 2000 on Salon.com and that

> Ollivier was publicly accessible on Salon.com at least by January 24, 2001, EX1008; EX1031, 1-2, 7-9, because interested persons would have known of or been able to locate Salon.com, EX1023 (2.6 million unique visitors in December 2000); EX1031, 1-2, 4-6, and would have been able to locate Ollivier on Salon.com using, e.g., Salon.com's search functionality, EX1029, EX1030. Research aids confirm that Ollivier was publicly accessible before the '511 patent's critical date. EX1027, 3 (copyright 2003), 20-21 (citing Ollivier); EX1028, 2 (copyright 2002), 77 (citing Ollivier);

Pet. 12–13; *see also* Pet. Reply 22–23. Petitioner provides Exhibits 1023, 1027, 1028, 1029, 1030, and 1031 to supports its assertion of public accessibility.

Ollivier is an article from Salon.com, which was archived on the Internet Archive by the Wayback Machine. Ex. 1008; Ex. 1031. Exhibit 1023 is a Salon.com webpage that provides "Salon Traffic & Audience Profile" statistics, including that "[i]n December 2000 Salon registered 2.60 million unique visitors." Ex. 1023, 1.

Salon.com is described as a "politically progressive and liberal news and opinion website" that provides "provocative (if predictably liberal)

32

IPR2024-00703
Patent 8,961,511 B2

political commentary and lots of sex" and is not a medical or technical publication.  Ex. 2015.  The 2.6 million unique visitors statistic does not sufficiently relate to whether Salon.com was accessible to an interested POSA, who is medical doctor.

That the Wayback Machine electronically archived Ollivier does not, by itself, mean that Ollivier was sufficiently indexed on the Salon.com website or the Internet Archive.  Nor does it reveal anything about the search capabilities of the Internet Archive, or why one with ordinary skill in the art would have even visited the Internet Archive to find anything.  Petitioner does not provide any other persuasive evidence to show that an interested POSA would have independently known of Salon.com.

Exhibit 1029 and 1030 are webpages from Salon.com, archived by the Wayback Machine.  Exhibit 1029 depicts a search webpage used to search Salon.com, and Exhibit 1030 is an advanced version of the search webpage.  Neither webpage depicts a particular search that results in the Ollivier article.  Exs. 1029, 1030.  Even if an interested POSA would have known of Salon.com, we are not persuaded by Exhibits 1029 and 1030 that an interested POSA could have found Ollivier using Salon.com's search engine, for example, by entering a subject matter search.

Exhibit 1027 is an article titled "Venus Envy – Penis Envy: Aesthetic Autoplasty, Genital Reconstruction, and Erotic Embodiment" in a book titled "The EmBodyment of American Culture."  Exhibit 1028 is a book titled "The Hydra's Tale: Imagining Disgust."  Petitioner asserts that the books are research aides and points to citations of Ollivier in the books.  Pet. 13.  The Federal Circuit has recognized that the presence of a research aid may establish public accessibility.  *Blue Calypso, LLC v. Groupon, Inc.*, 815

33

IPR2024-00703
Patent 8,961,511 B2

F.3d 1331, 1350 (Fed. Cir. 2106).  We are not persuaded, however, that the books are a research aid that is sufficient, without further explanation, to show public accessibility of Ollivier.  The Petition merely asserts that "Research aids confirm that Ollivier was publicly accessible before the '511 patent's critical date" (Pet. 13), but does not persuasively explain how the books were themselves publicly accessible to an interested POSA.  Pet. 13; *see also* Pet. Reply 22.

After considering all of Petitioner's evidence, we determine Petitioner fails to meet its burden to show that Ollivier was accessible to the interested public and is a printed publication that qualifies as prior art.  Petitioner, thus, fails to show that claims 43–58 would have been obvious over Edwards, Ingle, Mosher, and Ollivier.

## III.   CONCLUSION

We determine that Petitioner fails to establish by a preponderance of the evidence that claims 1–58 of the '511 patent are unpatentable.

In summary:

| Claims | 35 U.S.C. § | Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–58 | 103 | Edwards, Mosher, Ingle | | 1–58 |
| 43–58 | 103 | Edwards, Mosher, Ingle, Ollivier | | 43–58 |
| **Overall Outcome** | | | | 1–58 |

34

IPR2024-00703
Patent 8,961,511 B2

## IV.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–58 of the '511 patent have not been shown by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.

35

IPR2024-00703
Patent 8,961,511 B2

PETITIONER:

Richard Bemben
Jennifer Chagnon
Rich Coller
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
rbemben-ptab@sternekessler.com
jchagnon-ptab@sternekessler.com
rcoller-ptab@sternekessler.com
cvira-ptab@sternekessler.com


PATENT OWNER:

Justin Oliver
michael sandonato
William Hector
VENABLE LLP
joliver@venable.com
msandonato@fchs.com
wahector@venable.com

36

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BTL INDUSTRIES, INC.
Petitioner

v.

INMODE LTD.,
Patent Owner

_____

Case IPR2024-00703
U.S. Patent No. 8,961,511

_____

**PETITIONER'S NOTICE OF APPEAL**

via PTAB P-TACTS
Patent Trial and Appeal Board

via E-Mail
Director of the United States Patent and Trademark Office
efileSO@uspto.gov

via CM/ECF
United States Court of Appeals for the Federal Circuit

Appx99

## INTRODUCTION

BTL Industries, Inc.'s ("Petitioner's") appeal stems from the Patent Trial and Appeal Board's Final Written Decision, entered on October 1, 2025 (Paper 29, "Final Written Decision") in the above-captioned inter partes review of U.S. Patent No. 8,961,511 ("'511 patent").

## PETITIONER'S APPEAL

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319, 5 U.S.C. §§ 701-706, 28 U.S.C. § 1295(a)(4)(A), and in accordance with 37 C.F.R. §§ 90.2(a), 90.3(a), and Federal Circuit Rule 15(a)(1), notice is hereby given that Petitioner appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision and all prior and interlocutory rulings related thereto or subsumed therein. This notice is timely filed within 63 days of the Final Written Decision.

## PETITIONER'S ISSUES ON APPEAL

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Petitioner states that the issues for appeal include, but are not limited to: (i) the Board's Final Written Decision determining that Petitioner did not establish by a preponderance of the evidence that claims 1-58 of the '511 patent are unpatentable and (ii) any finding or determination supporting or related to the aforementioned issues, including claim constructions, as well as all other issues decided adversely to Petitioner in any order, decision, ruling, phone conference decision, and/or opinion.

2

Simultaneously with this submission, Petitioner is filing a true and correct copy of this Notice of Appeal with the Director of the United States Patent and Trademark Office and a true and correct copy of the same, along with the required docketing fee, with the Clerk of the United States Court of Appeals for the Federal Circuit as set forth in accompanying Certificate of Filing.

Dated: December 2, 2025                    Respectfully submitted,

                                           /s/ Seth R. Ogden
                                           Seth R. Ogden, Reg. No. 65,168
                                           Patterson Intellectual Property Law, P.C.
                                           1600 Division Street, Suite 500
                                           Nashville, TN 37203
                                           (615) 242-2400
                                           sro@iplawgroup.com

                                           *Attorney for Petitioner*

## CERTIFICATION OF FILING

The undersigned certifies that, along with electronically filed through PTAB P-TACTS, a true and correct copy of the above-captioned **PETITIONER'S NOTICE OF APPEAL** is being filed with the Director via email on December 2, 2025, at the following email address:

Director of the United States Patent and Trademark Office
efileSO@uspto.gov

The undersigned also hereby certifies that a true and correct copy of the above-captioned **PETITIONER'S NOTICE OF APPEAL** and the filing fee is being filed via CM/ECF with the Clerk's Office of the United States Court of Appeals for the Federal Circuit on December 2, 2025.

Dated: December 2, 2025

Respectfully submitted,

*/s/ Seth R. Ogden*
Seth R. Ogden, Reg. No. 65,168
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400
sro@iplawgroup.com

*Attorney for Petitioner*

4
Appx102

## CERTIFICATION OF SERVICE

I certify that the above-captioned **PETITIONER'S NOTICE OF APPEAL** was served in its entirety on December 2, 2025, upon the following parties via electronic mail:

William A. Hector (Lead Counsel)
Michael P. Sandonato (Back-up Counsel)
Justin J. Oliver (Back-up Counsel)
Venable LLP
wahector@venable.com
msandonato@venable.com
joliver@venable.com

Dated: December 2, 2025

Respectfully submitted,

*/s/ Seth R. Ogden*

Seth R. Ogden, Reg. No. 65,168
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400
sro@iplawgroup.com

*Attorney for Petitioner*

## I.    INTRODUCTION

BTL Industries, Inc. ("Petitioner") requests *inter partes* review and cancellation of claims 1-58 of U.S. Patent No. 8,961,511 ("the '511 patent"; EX1001), assigned to InMode Ltd. ("Patent Owner").

At the time of the '511 patent, it was well known that collagen-rich tissue could be "remodeled" by heating the tissue, which causes the collagen to denature. Collagen denaturing was known to cause a tightening effect. Tightening tissues of the female genital region, for both therapeutic and cosmetic reasons, was also known to be beneficial. The '511 patent adds nothing new to the art, simply claiming heating and remodeling collagen-rich tissues of the female genital region, specifically the vulva, introitus, and vagina tissue.

As supported by the declaration of Dr. Joseph Berenholz (EX1003), an expert in the field of treating uro-gynecological conditions, the asserted references confirm that the claimed methods were known. Dependent claims recite specific process details—e.g., treatment temperatures or cooling adjacent tissue to avoid damage thereto—or particular results—e.g., tightening tissue or denaturing collagen—all of which also were known.

In fact, the Board has recognized the likelihood that these claims are obvious, previously instituting review on similar grounds. However, the Board did

not reach a final written decision due to the prior parties' settlement. The Board should similarly consider Petitioner's challenges here.

Discretionary considerations also favor institution. Petitioner has not previously challenged the '511 patent, which Patent Owner has asserted against Petitioner in co-pending litigation. This co-pending litigation is in its very early stages; BTL, the defendant in that action, has not yet answered.

Accordingly, the Board should institute review and invalidate all claims of the '511 patent.

## II.   TECHNOLOGY BACKGROUND AND ANATOMY OVERVIEW

Collagen is prevalent in the human body. At the time of the '511 patent, it was known that collagen-rich tissue could be "remodeled" by heating the tissue, which causes a collagen denaturing effect. EX1003, ¶¶39-43. These treatments resulted in the tightening of tissue, and were known to be used, for example, for the cosmetic treatment of loose skin on the face and other areas of the body. EX1003, ¶¶44-48. Collagen also is found in tissues of the female urogenital system. EX1003, ¶¶34, 39. The use of collagen remodeling techniques for therapeutic and/or cosmetic treatment of these tissues also was known. EX1003, ¶49.

The vagina is an elastic, muscular tube that extends from the cervix, which connects the vagina to the uterus, to the vaginal opening, called the introitus.

EX1003, ¶¶32-33. The vulva is the female genital structure external to the vaginal opening, including the vulvar vestibule and the labia. EX1003, ¶¶37-38. The vagina and portions of the vulva are lined by a layer of stratified squamous epithelium, known as the vaginal mucosa. EX1003, ¶¶34-36. Under the vaginal mucosa is a layer of tissue known as the lamina propria, or submucosa, which is rich in elastic fibers such as collagen. *Id.* Beneath the lamina propria is a layer of smooth muscle known as the muscularis. *Id.*

The '511 patent claims "method[s] for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue." EX1001, 15:47-18:48. There is nothing new about using a known collagen remodeling technique on a collagen-rich area of the body known to benefit from such remodeling treatments. EX1003, ¶¶57, 32-49.

## III.  THE '511 PATENT

### A.  Summary

The '511 patent relates to methods for tightening tissue of the female genitalia using radiant energy. EX1001, Abstract; EX1003, ¶¶50-57. The patent purports to solve certain problems related to stretched vaginal tissue—occurring, for example, during childbirth—by providing "effective approaches to treating a

loose vagina and introitus with a non-invasive procedure." EX1001, 2:17-18, 5:5-11. The patent describes:

> Embodiments of the invention include methods for remodeling a therapeutic zone of tissue within a target tissue of female genitalia. The target tissue lies immediately beneath the mucosal epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention does not include deeper tissue, such as endopelvic fascia.

EX1001, 3:41-48. The patent's method of remodeling tissue includes "applying heat to a target tissue underlying the surface mucosal epithelium, while cooling the surface epithelium itself." EX1001, 11:5-14.

The patent discloses that the target tissue is heated to a therapeutic temperature, which it describes as a temperature that causes remodeling. EX1001, 11:19-23. The "portion of the target tissue which attains the therapeutic temperature, for a sufficient time, is termed the therapeutic zone within the target tissue." EX1001, 11:23-29. Tissue remodeling may include "heat-denaturing collagen within collagen-rich areas in the target tissues" or "biological healing responses to the stress of heating, [which] may include the deposition of new collagen." EX1001, 4:58-5:2. In either case, "the effect of remodeling on the tissue is generally one of tissue contraction or tightening." EX1001, 5:2-5, 12:39-65.

Cooling the epithelium protects it from damage and prevents remodeling of the epithelium. EX1001, 13:13-26.

The "target tissue" is illustrated in Figure 8:



FIG. 8

EX1001, FIG. 8 (annotated).

During treatment, energy delivery element 30 of treatment tip 10 contacts the epithelium 100 at contact site 102. EX1001, 14:18-24, 2:53-62, 8:8-15. Layers of target tissue underlying the epithelium, including lamina propria 104 and muscularis 106, are shown below the contact site. EX1001, 14:24-29.

According to the '511 patent, its methods provide "for corrective or restorative remodeling" of tissues of the vagina, introitus, and vulva. EX1001, 2:17-21. The disclosed embodiments, however, merely describe previously known methods for remodeling female genital tissues using radiant energy. EX1001, 4:4-

13; EX1003, ¶57. Each independent claim is directed to a "method for remodeling a therapeutic zone within a target tissue" including "heating the target tissue, and remodeling the therapeutic zone of target tissue." *See* EX1001, 15:46-18:48. The independent claims differ in the particular area to which the heating is applied. *Id.*

### B.    Level of Ordinary Skill in Art

A person of ordinary skill in the art ("POSA") at the time the '511 patent was filed would have been a medical doctor and would have had at least three years of experience in the non-surgical treatment of uro-gynecological conditions and/or the non-surgical cosmetic treatment of female genital tissues. EX1003, ¶¶58-60.

### C.    Prosecution History and Litigation History

During prosecution, the Examiner's rejections and Applicant's amendments focused on narrowing the target of the claimed method from "female genital tissue" to "at least one of vulva, introitus and vagina tissue." *See* EX1002, 0079-0094, 0115-0126, 0135-0151, 0165-0174, 0198-0214, 0234-0244, 0260-0266, 0295-0306. The Notice of Allowance identified the "specific areas of treatment set forth in [the] independent claims" as not being disclosed in the prior art ("Knowlton," EX1013), which teaches treating cervical tissue. EX1002, 0312-0318.

Case IPR2024-00703
U.S. Patent No. 8,961,511

The '511 patent was involved in a prior proceeding in District Court, *Viveve, Inc. v. Thermigen LLC*, 2:16-cv-01189 (EDTX) ("*Viveve*"), which settled. The patent was also involved in IPR2018-00088 and IPR2018-00089, in which the Board instituted review, but which settled before final written decisions. Petitioner was not involved in any of these prior proceedings.

## IV.    CLAIM CONSTRUCTION

In an IPR, a claim is "construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)," i.e., the *Phillips* standard. 37 C.F.R. §42.100(b). Any prior claim construction determinations in a civil action are to be considered. *Id.*

Here, no claim term requires construction—all terms should receive their ordinary and customary meaning in view of the patent specification. EX1003, ¶61. Certain claim terms were construed in prior proceedings involving the '511 patent, namely in *Viveve* and in the May 2018 Institution Decisions in the prior IPRs, where the Board preliminarily construed certain terms under the broadest-reasonable-interpretation standard.

Petitioner demonstrates how the art satisfies the claims under the ordinary and customary meaning and under the prior constructions. EX1003, ¶¶61-62. Thus, it is unnecessary to expressly construe any terms for purposes of this IPR. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed.

Cir. 2017) (Only those terms need be construed "that are in controversy, and only to the extent necessary to resolve the controversy."). Nevertheless, a discussion of the prior constructions is provided for the Board's convenience.

### A. "target tissue"

Each independent claim recites a "target tissue," a therapeutic zone that is the subject of the claimed remodeling. In construing the preamble, the *Viveve* Court determined "that the 'target tissue' includes, but is not limited to, 'tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue.'" EX1024, 21-28.

In the prior IPRs, the Board preliminarily construed "target tissue" as "tissue immediately beneath the mucosal epithelium of genital tissues exclusive of deeper tissues, such as the endopelvic fascia." EX1009, 10-12; EX1011, 10-11. The Board's prior construction was based on statements in the specification that endopelvic fascia was not a target tissue for embodiments of the invention. EX1009, 10-11 (citing EX1001, 3:41-47, 12:2-13); EX1011, 10-11 (same).

Although the claimed "target tissue" does not include the endopelvic fascia under the Board's prior construction, the claims do not prohibit heating or treating *other areas in addition to* the target tissue, including the endopelvic fascia. Because the claims' preambles recite the transition "comprising," the claims are open-ended. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed.

Cir. 2005); *Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). Accordingly, prior art that discloses treating the claimed "target tissue" (in the manner required by the respective claims) as well as treating other areas (e.g., the endopelvic fascia) satisfies the claims under this construction. Indeed, the '511 patent does not discourage treating other tissue, and in fact does not even discourage treating the endopelvic fascia. Rather, the specification merely states without further elaboration that "deeper tissues, including endopelvic fascia, … are not a target tissue for embodiments of the present invention." EX1001, 12:13-16.

### B.    "heating"

Each independent claim recites "heating the target tissue." In the prior IPRs, the Board preliminarily construed "heating" as "raising the temperature of target tissue to no more than about 80 degrees C."[1] EX1009, 12-14; EX1011, 11-14. This construction is generally consistent with the patent specification, which discloses: "Energy delivered from the treatment tip may heat the target tissue to a

---

[1] The Board rejected Patent Owner's argument that the "heating" step requires "heating without damaging the mucosal epithelial surface." EX1010, 9-11; EX1012, 9-12; EX1009, 12-14; EX1011, 11-14.

temperature as high as about 80 degrees C." EX1001, 4:23-24; EX1001, 11:19-21

("[H]eating of target tissue, per embodiments of this invention includes raising the temperature of the target tissue to as high as 80 degree C."). In *Viveve*, the court construed the "heating" step as "heating the tissue underlying the epithelium to a temperature that is higher than the temperature of the epithelium." EX1024, 7-14.

## C.    "remodeling the therapeutic zone of target tissue"

Each independent claim recites "remodeling the therapeutic zone of target tissue." The *Viveve* court construed this term as "causing a zone of tissue within the target tissue to tighten or contract by heating the zone of tissue to a therapeutic temperature." EX1024, 14-21. Similarly, in the prior IPRs, the Board preliminarily construed the "remodeling" step as "the result of raising the temperature of target tissue to no more than about 80 degrees C without substantially affecting the epithelium overlying the target tissue, wherein that result includes a tightening or contraction of the target tissue." EX1009, 14-16; EX1011, 14-15. Both of these constructions, wherein the remodeling step simply refers to the *result* of the heating step, are generally consistent with the patent specification, which explains that "[r]emodeling of genital tissue, as practiced by embodiments of this invention,

*may be understood variously as contracting or tightening of tissue.*" EX1001,

13:2-5.[2]

### D. "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock"

Independent claim 35 recites that the heating includes "heating a portion of

the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." This

term was not construed in *Viveve*. In the prior IPR, Patent Owner argued that this

claim element requires heating *substantially the entire 300 degree arc* of vaginal

wall from 1 o'clock to 11 o'clock. EX1010, 14-16. The Board preliminarily

construed "heating a portion of the vagina circumferentially around its wall from 1

o'clock to 11 o'clock" as "heating *at least one contact site in the 300 degree arc*

extending from 1 o'clock to 11 o'clock along the vaginal wall." EX1009, 18. The

Board's prior construction is consistent with dependent claim 40, which recites

"contacting the epithelium with a treatment tip at a [sic] *one or more contact sites*

during a procedure." *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380

(Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that

depends from it, so if a dependent claim reads on a particular embodiment of the

claimed invention, the corresponding independent claim must cover that

embodiment as well.").

---

[2] Emphasis added unless otherwise noted.

As discussed below, Petitioner demonstrates how the art teaches all of these previously construed elements under their ordinary and customary meaning and under the various prior constructions. Thus, it is unnecessary to construe these terms to resolve this IPR.

## V.    IDENTIFICATION OF THE CHALLENGE (37 C.F.R. § 42.104(B))

Petitioner requests IPR based on the following grounds:

| Ground | 35 U.S.C. | Claims | References |
|--------|-----------|--------|------------|
| 1 | §103(a) | 1-58 | Edwards, Mosher, and Ingle |
| 2 | §103(a) | 43-58 | Edwards, Mosher, Ingle, and Ollivier |

U.S. Patent No. 6,463,331 ("Edwards," EX1005) issued October 8, 2002, and qualifies as prior art under 35 U.S.C. §102(b).

U.S. Publication No. 2004/0193238 ("Mosher," EX1006) published September 30, 2004, and qualifies as prior art under 35 U.S.C. §102(b).

U.S. Patent No. 6,216,704 ("Ingle," EX1007) issued April 17, 2001, and qualifies as prior art under 35 U.S.C. §102(b).

"Designer Vaginas" article, authored by Debra Ollivier, published on November 14, 2000 on Salon.com ("Ollivier," EX1011), and qualifies as prior art under 35 U.S.C. §102(b). Ollivier was publicly accessible on Salon.com at least by January 24, 2001, EX1008; EX1031, 1-2, 7-9, because interested persons would have known of or been able to locate Salon.com, EX1023 (2.6 million unique

visitors in December 2000); EX1031, 1-2, 4-6, and would have been able to locate

Ollivier on Salon.com using, e.g., Salon.com's search functionality, EX1029,

EX1030. Research aids confirm that Ollivier was publicly accessible before the

'511 patent's critical date. EX1027, 3 (copyright 2003), 20-21 (citing Ollivier);

EX1028, 2 (copyright 2002), 77 (citing Ollivier); *Blue Calypso, LLC v. Groupon,*

*Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016) ("the presence of a 'research aid' can

also establish public accessibility").

## VI.    OVERVIEW OF THE PRIOR ART

Each prior-art reference is analogous art: it is in the same field as and is

reasonably pertinent to the problems of the '511 patent. EX1003, ¶63.

### A.    Edwards

Edwards discloses a method for treatment of female uro-genital disorders by

application of therapeutic energy, such as RF energy, to targeted tissues. EX1005,

2:34-36. This energy is "selectively applied so as to ablate, tighten, shrink or

reshape the tissue and thereby correct an unwanted condition." EX1005, 2:37-39.

For example, Edwards teaches "circumferential tightening of the vaginal wall may

provide physical and psychological improvement in the area of sexual function."

EX1005, 3:5-13.

*Id.* Further, the "maximum safe tissue temperature to prevent injury" is "typically … about 45 nC." *Id.*

Figures 3A-3E illustrate the temperature profile of the tissue at certain points of the treatment method: Figure 3A—standard body temperature, prior to application of cooling or heating energy; Figure 3B—after pre-cooling of the tissue; Figure 3C—after heat is applied to achieve a temperature at or above a treatment temperature in target zone 32; Figure 3D—after heating is stopped and continued cooling has reduced the entire tissue to below the maximum safe tissue temperature; and Figure 3E—return to standard body temperature. EX1007, 15:27-16:15. Ingle recognizes that this temperature profile can also be achieved with a probe structure engaging a single tissue surface. EX1007, 21:65-22:1. *See* EX1003, ¶¶75-81,

### D.    Ollivier

Ollivier describes techniques for the cosmetic treatment of the vagina and vulva, and more specifically the labia. *See generally* EX1008. Ollivier describes using "Laser Vaginal Rejuvenation (LVR) to tighten [a patient's] vagina and 'enhance sexual gratification' and Designer Laser Vaginoplasty (DLV) to 'aesthetically modify' her labia." EX1008, 0001. Ollivier explains, "[b]y reconstructing the 'optimum structural architecture' of the vagina—namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and

external vaginal diameter (introitus) and the perineal body— … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." *Id. See* EX1003, ¶82.

## VII.    GROUND 1: THE COMBINATION OF EDWARDS, MOSHER, AND INGLE RENDERS OBVIOUS CLAIMS 1-58.

Claims 1-58 would have been obvious over Edwards, Mosher, and Ingle. EX1003, ¶¶91-271.

### A.    A POSA would have been motivated to combine Edwards, Mosher, and Ingle with a reasonable expectation of success.

Edwards, Mosher, and Ingle are all directed to methods for the non-invasive treatment of female uro-genital conditions, for therapeutic and/or cosmetic reasons. In each method, a treatment device provides radiant energy, such as RF energy, to and through the vaginal wall, thereby heating underlying target tissue. This heating results in remodeling or tightening of the target tissue. Each of these references also describes using cooling during treatment to minimize or prevent damage to the mucosal epithelium. A POSA would have understood that regardless of the specific device used, methods of treatment using radiant energy all have the same end result—remodeling collagen-rich tissue. EX1003, ¶84. Thus, a POSA would have relied upon Edward, Mosher, and Ingle for their teachings of treatment methods and rationales, and would have further understood that the relevance of

- 22 -

these teachings would not have been limited to the specific device(s) disclosed in each reference. *Id.*

A POSA would have been motivated to combine these references, and would have had a reasonable expectation of success in doing so, because they all relate to methods of using radiant energy, such as RF energy, to treat uro-genital conditions by tightening and/or shrinking tissue. EX1003, ¶85. Edwards provides general teachings of a non-invasive treatment method, but does not provide details of the treatment parameters (e.g., treatment time and temperature) or the specific physiological mechanism of action (e.g., how the tightening occurs). *Id.* In considering methods of treatment using radiant energy, a POSA would have looked to Mosher and Ingle, which also describe methods of treatment using radiant energy, for specific details regarding treatment parameters and techniques. *Id.* Mosher and Ingle also discuss details of the natural physiological mechanism of action that occurs in collagen when heated using radiant energy. *Id.*

Applying the treatment details provided in Mosher and Ingle to the treatment method taught in Edwards is simply combining prior-art elements according to known methods to yield predictable results. EX1003, ¶¶86-87. Similarly, the combination is merely applying known techniques (Mosher/Ingle's treatment methods) to a known method ready for improvement (Edward's treatment method) to yield the predictable result of tightening via collagen denaturation. *Id.* Further

still, the '511 patent acknowledges that loose vaginal or vulval tissue was a known problem facing women at the time. EX1001, 1:62-2:21. Each of Edwards, Mosher, and Ingle teaches using their method for tightening such tissues, thus a POSA would have looked to them for solving this known problem. EX1003, ¶88.

A POSA further would have had reasonable expectation of success in combining these references because they all apply known thermal dynamics principles to the treatment of tissue using radiant energy. EX1003, ¶89. A POSA would have understood that the treatment parameters and techniques disclosed in Mosher/Ingle could be applied to Edwards's method to result in collagen denaturation and tissue tightening. EX1003, ¶90.

## B. Independent Claims

The independent claims all recite a similar method for remodeling tissue of the vulva, introitus, or vagina. Each independent claim includes the same preamble, heating step, and remodeling step, varying only in the final "wherein" clause that defines a particular area subject to heating (i.e., area of treatment) for that claim. Using radiant energy such as RF to remodel tissues generally, and more particularly to remodel tissue in the vaginal region, was well known in the art before the '511 patent. EX1003, ¶¶91, 44-49. Further, as Dr. Berenholz confirms, a POSA would have understood that the tissues in the vaginal region, i.e., vulva, introitus, and vagina tissue, would have similar responses to treatment with radiant

energy such as RF, namely remodeling of the tissue by, for example, shrinkage of collagen. EX1003, ¶¶91, 39-43. In this context, the vaginal region is not a large area, and a POSA would have recognized that there are limited areas of treatment to choose from within that region. EX1003, ¶91. As Edwards confirms, it would have been within the skill of a POSA to determine the optimal area of treatment for a particular patient based on the desired outcome (e.g., treating incontinence, improving sexual function, etc.). EX1005, 13:40-42; EX1003, ¶91. The asserted combination renders obvious the method of treatment and the treatment areas recited in each independent claim.

### 1. Claim 1

**a. [1.P] A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue**

To the extent limiting,[4] the combination of Edwards, Mosher, and Ingle teaches the preamble. EX1003, ¶¶92-98.

---

[4] The *Viveve* court found the preamble limiting "to the extent that it requires 'the target tissue' to include 'tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus, and vagina tissue.'" EX1024, 23-26.

Edwards discloses "a method … for the curative treatment of female uro-genital disorders by application of radiofrequency (RF) energy to targeted tissues. Application of this energy is selectively applied so as to ablate, tighten, shrink or reshape the tissue and thereby correct an unwanted condition." EX1005, 2:34-39. Edwards's fourth embodiment discloses a method for "vaginal remodeling." EX1005, 13:12-23. RF energy is delivered to the anterior and/or posterior regions of the vaginal wall. EX1005, 13:12-23, 3:6-9. This treatment "has the effect of tightening of vaginal walls so as to increase support of the bladder outlet, proximal and mid-urethra," thereby treating incontinence, and "circumferential tightening of the vaginal wall may provide physical and psychological improvement in the area of sexual function." EX1005, 3:9-13, 13:14-23.

Like Edwards, Mosher discloses methods of treatment, e.g., of incontinence, via tissue remodeling achieved by applying RF energy to and through the vaginal wall. EX1006, ¶45. Mosher provides additional details of the physiological mechanism of tissue remodeling, describing "heat[ing] target tissue to temperatures and for time periods which effect[s] a contraction of the collagen within the target tissue and/or enhance[s] stiffening of the support provided by these structures. The supporting collagenous tissues, immediately and/or upon healing, thereby contribute to continence." EX1006, ¶¶55, 66.

Mosher also identifies "target tissue" for such RF treatment. Specific embodiments target the endopelvic fascia, but Mosher's treatment method expressly "may be directed at a variety of tissue structures" including "structures of the vagina (including: vagino-uterine fascia, lamina propria—the dense connective tissue layer just under the epithelium … )." EX1006, ¶48. In fact, Mosher describes that in certain instances the endopelvic fascia may be damaged or missing, and thus "support of the genitourinary tract is instead provided by a variety of fascial layers, muscular tissues, ligaments and/or tendons within the pelvis." *Id.* A POSA would have understood Mosher's methods would equally apply to these other disclosed tissue structures, such as the lamina propria. EX1003, ¶95. The '511 patent expressly identifies the lamina propria as an example of target tissue. EX1001, 2:25-28. A POSA would have understood that, like Mosher, treatment in Edwards also could target lamina propria underlying the epithelium, and would have been motivated to apply Mosher's known techniques to Edwards's method. EX1003, ¶95.

Like Edwards and Mosher, Ingle discloses methods of treatment, e.g., of incontinence, via tissue remodeling achieved by applying RF energy. EX1007, 3:11-25, 11:8-17. In particular, Ingle discloses "a probe for applying energy to fascia from within the vagina of a patient body. The fascia is separated from the vagina by a vaginal wall." EX1007, 3:36-39. Energy from the probe "heats fascia

and other collagenated support tissues, causing them to contract without substantial necrosis of adjacent tissues." *Id.*, 2:59-61. A POSA would have understood that, like Ingle, treatment in Edwards targets collagenated support underlying the epithelium. EX1003, ¶96.

As discussed in more detail for element [1.2], a POSA would have understood that the "therapeutic zone" is simply the area of the target tissue that is remodeled. Section VII.B.1.c; EX1003, ¶97.

### b.    [1.1] heating the target tissue

As discussed for the preamble, Edwards, Mosher, and Ingle teach methods for vaginal remodeling, including remodeling a therapeutic zone within a target tissue, as claimed. Section VII.B.1.a. The asserted combination renders obvious the heating step, both using its ordinary and customary meaning and under the Board's prior preliminary construction. Section IV.B; EX1003, ¶¶99-111.

Edwards teaches "delivery of RF energy to discrete areas of the vaginal wall." EX1005, 13:54-56, FIG. 9 (step 908), 2:34-39. The '511 patent confirms the claimed "heating" encompasses "delivering energy by … radiofrequency energy," as in Edwards. EX1001, claim 33. Edwards also uses cooling fluid "to minimize thermal damage to tissues," EX1005, 4:59-61, confirming that the RF energy in Edwards acts to heat tissue. EX1003, ¶100.

> **d.      [1.3] wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.**

The combination of Edwards and Mosher teaches heating this claimed treatment area. EX1003, ¶¶120-125. A POSA would have understood this treatment area includes heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (i.e., 3.5 cm from the introitus). EX1003, ¶120.

Edwards teaches performing its method "to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both. … Remodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting physical and psychological improvement in the area of sexual function." EX1005, 13:14-22. A POSA, based on Edwards's teachings of improvement of sexual function, would have understood Edwards's teachings to include treatment near the opening of the vagina. EX1003, ¶122.

Mosher further provides motivation to focus treatment nearer the opening of the vagina, in order to avoid damage to nerves in the bladder neck region and in the antero-lateral vaginal wall. EX1006, ¶74; EX1003, ¶123. Mosher describes the safety advantages of using an "enhanced treatment width" or "laterally elongate treatment region," including when performing treatment with non-invasive vaginal probe 54. EX1006, ¶¶58, 74, 75, FIGs. 6, 6A. Mosher describes the preferred

treatment region as "significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm." EX1006, ¶74. Despite the reference to "urethral length" in this description, a POSA would have understood this treatment region to apply to non-invasive treatment within the vagina. *Id.*; EX1003, ¶¶123-124. Indeed, Mosher describes several electrode configurations for its vaginal probe 54 to provide this "enhanced treatment width." EX1006, ¶75; EX1003, ¶¶123-124.

A POSA would have understood Mosher's treatment length of about 15 mm (1.5 cm) refers to the length of the treatment region extending into the vagina. EX1003, ¶124. Thus, a POSA would have understood that Mosher teaches treating a portion of the vagina extending from the introitus to 1.5 cm inward, which falls within the claimed treatment area. *Id.*

Thus, the asserted combination renders obvious claim 1.

### 2.   Claim 35

Independent claim 35 recites a "method for remodeling a therapeutic zone within a target tissue" and includes the same "heating" and "remodeling" steps recited in claim 1. As in claim 1, the combination of Edwards, Mosher, and Ingle renders obvious elements [35.P], [35.1], and [35.2]. Sections VII.B.1.a-VII.B.1.c; EX1003, ¶¶126-135, 92-119.

Element [35.3] recites that "*the heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.*" *See, e.g.*, EX1001, 14:29-15:3 (describing this embodiment).

Edwards discloses this treatment area. EX1003, ¶129. Edwards discloses that its "method 900 is performed to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." EX1005, 13:14-16. A POSA would have understood that the "anterior vaginal wall" comprises the area from 9:00 through 12:00 to 3:00 on the '511 patent's reference clock dial 136, and the "posterior vaginal wall" comprises the area from 3:00 through 6:00 to 9:00 on the reference clock dial. EX1003, ¶129. Treatment of any portion of the 300 degree arc of the vaginal wall from 1 o'clock to 11 o'clock is sufficient to teach element [35.3] under the Board's prior construction. A POSA would have understood that treating any portion of the posterior wall would necessarily fall within the recited 300 degree arc, and thus Edwards teaches this element. *Id.*

Edwards also teaches treating the entire vaginal circumference, which would include heating along the entire 300 degree arc under the Patent Owner's previously proposed construction (*see* Section IV.D). Edwards recognizes that a "physician determines optimal areas of treatment. These may include the anterior wall, the posterior wall *or both*." EX1005, 13:38-42. Based on Edwards teaching

that "[r]emodeling both the anterior wall and posterior wall provide *circumferential vaginal wall tightening*, resulting physical and psychological improvement in the area of sexual function," EX1005, 13:16-22, a POSA would have been motivated to treat the vagina circumferentially, including the entire 300 degree arc between 1 o'clock to 11 o'clock. EX1003, ¶130.

Additionally, Mosher teaches that "it may be advantageous to distribute the treatment volume *along the patient's lateral orientation* while limiting the length of treatment along the axis of the patient's urethra. … Such a laterally elongate treatment region … will preferably be significantly wider (along the medial-lateral orientation) than its urethral length." EX1006, ¶74. Based on Mosher's teachings of distributing the treatment volume along a lateral orientation, a POSA would have been motivated to treat more locations around the circumference of the vagina to expand the treatment area. EX1003, ¶130.

Claim 35 does not require that the heating be limited to only the 1-to-11-o'clock area; rather, it recites that the heating "includes" this area. EX1001, 17:17-21. *Gillette*, 405 F.3d at 1371; *Invitrogen*, 327 F.3d at 1368. Further, the '511 patent provides no discussion of the criticality of avoiding treatment in the 60 degree arc between 11 o'clock and 1 o'clock treatment area, instead simply stating that "[e]mbodiments of the invention do not include treating the approximately 60 degree arc between 11 o'clock and 1 o'clock because the practice of this invention

is not directed toward tissue in the vicinity of the urethra." EX1001, 3:66-4:3; EX1003, ¶133.

But even if claim 35 was so limited, Mosher provides an express suggestion to avoid treatment in the 60 degree arc between 11 o'clock and 1 o'clock. Mosher teaches that the "treatment volume will preferably be separated from a urethra of a patient by at least about 1 cm to inhibit injury to nerves along the urethra," where the treatment volume is "offset laterally from the urethra to a right side of the patient" and "another treatment volume [is] similarly offset laterally from the urethra to a left side of the patient." EX1006, ¶11. As confirmed by the '511 patent, the distance between 12 o'clock and 1 o'clock, for example, is approximately 1 cm. EX1001, 14:37-40 ("[W]ith a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an 300 degree arc of the circumference, between the 1 o'clock and 11 o'clock positions."); EX1003, ¶133. In combination with Edwards's teaching to provide "circumferential vaginal wall tightening," a POSA would have been motivated to provide treatment to only the *300 degree arc of the circumference, between the 1 o'clock and 11 o'clock positions*, thereby providing a maximum treatment area for circumferential tightening, while also limiting potential injury to nerves along the urethra. EX1003, ¶134.

Thus, the asserted combination renders obvious claim 35.

Case IPR2024-00703
U.S. Patent No. 8,961,511

### 3.     Claim 43

Independent claim 43 recites a "method for remodeling a therapeutic zone within a target tissue" and includes the same "heating" and "remodeling" steps recited in claim 1. As in claim 1, the combination of Edwards, Mosher, and Ingle renders obvious elements [43.P], [43.1], and [43.2]. Sections VII.B.1.a-VII.B.1.c; EX1003, ¶¶136-143, 92-119.

Element [43.3] recites that "*the heating includes heating a portion radiating outward from the introitus to Hart's line.*" The asserted combination renders obvious element [43.3]. A POSA would have understood this treatment area includes the part of the vulva known as the vulval vestibule, which includes a mucosal epithelium. EX1003, ¶¶138, 37-38. This is consistent with the '511 patent, which describes that the "vulva includes tissue radiating outward from the introitus to Hart's line, where mucosal epithelium gives way to skin on the outer surface of the labia minora." EX1001, 3:51-54.

Edwards, Mosher, and Ingle each disclose heating a variety of tissues, revealing that it was known that RF treatment is widely beneficial. EX1003, ¶¶139-140. For example, Edwards describes four embodiments applying RF energy to different targeted tissues: interior of the uterus, urethral sphincter muscle, submucosal bladder outlet musculature, and vaginal wall. EX1005, 2:34-3:13.

Likewise, Mosher provides a long list of tissue structures appropriate for treatment with its methods. EX1006, ¶48.

Ingle also teaches that a "wide variety of alternative conditions may also be treated" using Ingle's methods for "selectively heating and shrinking tissues." EX1007, 1:18-23, 17:65-18:1. "[S]elective shrinkage of fascia … may even be used in cosmetic procedures … to remove wrinkles by shrinking the collagenated skin tissues, or to lift sagging breasts by shrinking their support ligaments." EX1007, 18:1-7, 1:18-23 (Ingle's methods may be used "for cosmetic surgery."). As confirmed by Ingle, a POSA would have known that radiant energy treatments were previously used to treat other tissues, e.g., face, breasts, for cosmetic purposes. EX1003, ¶141.

A POSA would have known that treating the vulva is often done for cosmetic purposes. EX1003, ¶¶142, 49. In view of all of this, a POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the area recited in claim 43. EX1003, ¶¶142, 39-49, 91. A POSA would have had a reasonable expectation of success in doing so because that area comprises similar mucosal epithelium, with the same underlying collagen-rich layers, as described in Edwards, Mosher, and Ingle. EX1003, ¶142.

Thus, the asserted combination renders obvious claim 43.

### 4.    Claim 51

Independent claim 51 recites a "method for remodeling a therapeutic zone within a target tissue" and includes the same "heating" and "remodeling" steps recited in claim 1. As in claim 1, the combination of Edwards, Mosher, and Ingle renders obvious elements [51.P], [51.1], and [51.2]. Sections VII.B.1.a-VII.B.1.c; EX1003, ¶¶144-147, 92-119.

Element [51.3] recites that "*the heating includes heating a mucosal surface of the labia minora.*" The asserted combination renders obvious element [51.3]. A POSA would have understood element [51.3] to refer to inner surfaces or lining of the labia minora, in that it requires the treated surface to be mucosal epithelium. EX1003, ¶¶145, 37-38. The labia minora are part of the vulva adjacent the vulval vestibule. *Id.*

As discussed for claim 43, a POSA would have known that radiant energy treatments were previously used for cosmetic treatment of other tissue, e.g., face, breasts. EX1003, ¶¶146, 136-143. A POSA also would have known that treating the vulva (including the labia) was often done for cosmetic purposes. *Id.* Thus, a POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the area recited in claim 51. EX1003, ¶¶146, 136-143, 91. A POSA would have had a reasonable expectation of success in doing so because that area comprises similar mucosal epithelium, with the same

underlying collagen-rich layers, as described in Edwards, Mosher, and Ingle. EX1003, ¶146.

Thus, the asserted combination renders obvious claim 51.

## C.    Dependent Claims

As discussed below, the asserted combination renders obvious each of the dependent claims.

### 1.    Claims 2, 36, 44, and 52

These claims recite: "*heating [the target tissue] to a temperature between 45 degrees C. and 80 degrees C.*" Mosher and Ingle teach heating the tissue to the claimed temperature range. EX1003, ¶¶148-152, 99-106.

A POSA would have understood the appropriate temperatures to which the target tissue would be heated to achieve remodeling. EX1003, ¶¶149, 39-43; Section VII.B.1.b. Further, Mosher teaches a treatment temperature of "at least 70°." EX1006, ¶65. Ingle discloses heating "fascia and other collagenated tissues … to a temperature range of … *preferably between about 60 nC and 80 nC,*" which results in the tissue contracting. EX1007, 12:64-13:2, 11:32-38.

As here, an overlap in the claimed ranges and those disclosed by the prior art demonstrates obviousness. *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020) (affirming Board's obviousness conclusion). "[S]uch an overlap creates a presumption of obviousness, and … the burden of production falls upon



EX1007, FIG. 3C.

### 13.    Claims 17, 40, 48, and 56

These claims further recite: "*contacting the epithelium with a treatment tip at a one or more contact sites during a procedure, the tip comprising an energy delivery element adapted to heat the target tissue.*"

Edwards, Mosher, and Ingle teach *contacting the epithelium with a treatment tip, the tip including an energy delivery element. See* Section VII.C.3; EX1003, ¶¶210, 214, 158-161. The devices in the prior art are *adapted to heat the target tissue*, using RF or other radiant energy. *See* Section VII.B.1.b; EX1003, ¶¶210, 214, 100-111. The claims recite "contacting … *one or more* contact sites," meaning a single contact site suffices to satisfy this element.

Further, a POSA would have understood that to treat the target tissue using the device of Edwards or Mosher, multiple sites must be contacted. EX1003, ¶¶210-214, 44-49. This is confirmed by Edwards and Mosher, which discuss moving the device to treat multiple areas. Edwards teaches that "blade 420 may be disengaged and relocked into another position in the speculum, so as *to deliv[er] energy to another area of the vagina*." EX1005, 13:60-62. Mosher teaches

"*heat[ing] a treatment surface with* a 'paint' tip *movement* pattern." EX1006, ¶71, claim 19, FIG. 12A.

### 14.    Claim 18

Claim 18 recites: "*the method is performed during a procedure,*" and *"the contacting of any one or more contact sites is repeated one or more times during a procedure.*"

Edwards, Mosher, and Ingle teach *contacting one or more contract sites*. *See* Section VII.C.13. A POSA also would have understood that during a procedure, a physician would often contact multiple contact sites in order to treat a larger area of tissue. EX1003, ¶¶215-220, 44-49.

Ingle discloses that "the electrode may be energized for 15 secs. and turned off for 15 secs. repeatedly during a heating session," thus teaching that *contacting of any one or more contact sites is repeated one or more times during a procedure.* EX1007, 7:25-29. Mosher teaches "heat[ing] a treatment surface with a 'paint' tip movement pattern as shown in FIG. 12A …. Arrow 37 indicates a tip movement pattern of five passes in the treatment zone." EX1006, ¶71, claim 19, FIG. 12A. At the disclosed "tip movement speeds of about 0.4 cm/sec. for a treatment of 140 seconds and tip movement speeds of about 1.1 cm/sec. for a treatment period of 90 seconds," the tip travels a total distance of 56 cm and 99 cm, respectively, along a

14 cm path. EX1006, ¶71, FIG. 12A. A POSA would have understood this to teach

repeating contact at the sites several times during the procedure. EX1003, ¶218.



FIG. 12A

EX1006, FIG. 12A.

A POSA would also have understood that it was typical to contact each

particular contact site more than once during a procedure because moving the

device allows for more even distribution of the thermal energy resulting in a more

uniform effect on the tissue. EX1003, ¶219.

### 15.    Claim 19

Claim 19 further recites: "*contacting the tip to the epithelium at a plurality*

*of contact sites during a procedure, moving the tip from site to site, the combined*

*contact sites comprising a treatment area.*"

The combination of Edwards, Mosher, and Ingle teaches *contacting the tip*

*to the epithelium at a plurality of contact sites during a procedure*, as well as

*moving the tip from site to site. See* Sections VII.C.3, VII.C.13; EX1003, ¶¶221-225, 158-161, 210-213.

A POSA would have understood that contacting a plurality of contact sites would create a *combined treatment area* comprised of the target tissue treated at each contact site. EX1003, ¶222. Edwards teaches contacting both the anterior wall and posterior wall to provide a combined treatment area resulting in circumferential vaginal tightening. EX1005, 13:14-22; EX1003, ¶223. Edwards also teaches that "the blade 420 may be disengaged and relocked into another position in the speculum, so as to deliv[er] energy to another area of the vagina." EX1005, 13:60-62. Mosher teaches contacting the tip to a plurality of contact sites and recognizes that total treatment volume is dependent on the speed of tip movement. *See* EX1006, ¶¶13, 71, FIG. 12A; EX1003, ¶224.

### 16.    Claim 20

Claim 20 recites: "*any one of the contact sites is contacted one or more times during a procedure.*"

As discussed for claim 18, *see* Section VII.C.14, the asserted combination renders obvious repeating contact at one or more contact sites. EX1003, ¶¶226-227, 216-219.

### 17. Claim 21

Claim 21 further recites: "*repeating the procedure one or more times.*"

Claim 21 does not specify whether "the procedure" is claim 17's procedure in which "one or more contact sites" are contacted or claim 19's procedure in which "a plurality of contact sites" are contacted. Either way, claim 21 is rendered obvious by the asserted combination for the same reasons as claims 18 and 19. Sections VII.C.14, VII.C.15; EX1003, ¶¶228-230, 216-219, 222-224.

Additionally, Mosher teaches that its techniques are "effective for controllably and *repeatably enhancing* the structural support of a wide variety of fascia and other collagenous tissues." EX1006, ¶46. A POSA would have understood that the treatment procedure could be repeated to treat additional areas or provide further treatment results. EX1003, ¶¶229, 44-49; *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009) ("[R]epetition of a known procedure until success is achieved … would have been obvious as a matter of common sense."); *In re Harza*, 274 F.2d 669, 671 (C.C.P.A. 1960) ("[T]he mere duplication of parts has no patentable significance unless a new and unexpected result is produced ….").

**28.    Claims 34, 42, 50, and 58**

These claims recite: "*heating comprises delivering energy by ultrasound energy*." Edwards and Ingle each teaches delivering energy by *ultrasound energy*. *See* Section VII.C.4; EX1003, ¶¶269-270.

## VIII. GROUND 2: THE COMBINATION OF EDWARDS, MOSHER, INGLE, AND OLLIVIER RENDERS OBVIOUS CLAIMS 43-58.

Claims 43-58 would have been obvious in view of Edwards, Mosher, Ingle, and Ollivier. EX1003, ¶¶271-277.

As discussed above for Ground 1, a POSA would have known that treating the vulva, including areas specifically recited in claims 43 and 51, is often done for cosmetic purposes. To the extent Patent Owner argues or the Board finds that this was not within the general knowledge of a POSA, it would have been obvious in view of Ollivier's teachings. EX1003, ¶272.

Ollivier teaches that "by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." EX1008, 0001. Ollivier describes techniques to not only tighten the vagina and introitus, but also to "aesthetically modify" the labia. *Id.*

A POSA would have been motivated to use the treatment method of the Edwards-Mosher-Ingle combination, which teaches treating at least the vagina and

introitus, to also treat the vulvar vestibule and labia minora in order to achieve the desired aesthetic modification expressly described in Ollivier. EX1003, ¶274. Ollivier teaches using earlier laser techniques to provide cosmetic treatment to these vulvar tissues, as recited in claims 43 and 51, and adds that lasers have "fallen out of favor" and there are "more sophisticated tools that do the same thing." EX1008, 0003. And as discussed above for Ground 1, it was known to use RF treatments to tighten other tissue areas for both therapeutic and cosmetic purposes. EX1007, 1:18-23, 18:1-7; EX1003, ¶¶44-51, 84-90. A POSA would have had a reasonable expectation of success in doing so because the vulval region comprises similar mucosal epithelium, with the same underlying collagen-rich layers as the vagina. EX1003, ¶275.

Accordingly, claims 43 and 51 would have been obvious over the combination of Edwards, Mosher, Ingle, and Ollivier. Dependent claims 44-50 and 52-58 further would have been obvious for the same reasons as discussed above in Ground 1.

## IX. SECONDARY CONSIDERATIONS DO NOT DEMONSTRATE NON-OBVIOUSNESS.

In the prior IPRs, Patent Owner argued that "industry praise of RF treatment of the vulva, introitus, and vagina tissue" weighed against obviousness. EX1010, 43-45; EX1012, 28-30. Institution should not be denied on the basis of these alleged secondary considerations. The Federal Circuit has held that "[i]n evaluating

Trials@uspto.gov                                                        Paper No. 6
571-272-7822                                          Entered: October 2, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BTL INDUSTRIES, INC.,
Petitioner,

v.

INMODE LTD.,
Patent Owner.

_____

IPR2024-00703
Patent 8,961,511 B2

_____

Before MEREDITH C. PETRAVICK, HYUN J. JUNG, and
ROBERT A. POLLOCK, *Administrative Patent Judges*.

POLLOCK, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2024-00703
Patent 8,961,511 B2

# I.    INTRODUCTION

BTL Industries, Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 1–58 of U.S. Patent No. 8,961,511 B2 ("the '511 patent," Ex. 1001). Paper 2 ("Pet."). InMode Ltd. ("Patent Owner") did not file a Preliminary Response.

We review the Petition and accompanying evidence under 35 U.S.C. § 314. An *inter partes* review may not be instituted unless "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Further, a decision to institute may not do so on fewer than all claims challenged in the petition. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018); 37 C.F.R. § 42.108(a).

After considering the evidence and arguments presented in the Petition, we determine that Petitioner demonstrates a reasonable likelihood of prevailing in showing that at least one of the challenged claims of the '511 patent is unpatentable. Accordingly, we institute an *inter partes* review as to all the challenged claims of the '511 patent on all the grounds of unpatentability set forth in the Petition.

## A.    Real Parties-in-Interest

Petitioner identifies itself, BTL Industries, Inc., as the real party-in-interest. Pet. 73. Patent Owner identifies only itself, InMode Ltd., as the real party-in-interest. Paper 4, 1. Patent Owner avers that it is the owner of the '511 patent, as evidenced by the assignment accorded with the Office at Reel No. 064258, Frame No. 0525. *Id.*; *see also* Ex. 3001 (assignment history abstract).

IPR2024-00703
Patent 8,961,511 B2

B.    Background and Related Proceedings

The '511 patent was previously challenged by ThermiGen, LLC and Thermiaesthetics, LLC in IPR2018-00088 and IPR2018-00089 (jointly, "the ThermiGen IPRs"). These cases were terminated shortly after institution at the request of Petitioner ThermiGen, and then-Patent Owner, Viveve, Inc. *See* IPR2018-00088, Papers 10 (Ex. 1009), 12; IPR2018-00089, Papers 11 (Ex. 1010), 12. Coincident with the ThermiGen IPRs, the '511 patent was then at issue in *Viveve, Inc. v. ThermiGen, LLC et al.*, Civil Action No. 2:16-cv-1189-JRG (E.D. Tex.) ("*Viveve*"), which also settled. *See, e.g.*, Ex. 1009, 2.

According to the parties here, the '511 patent is now at issue in *InMode Ltd. v. BTL Industries, Inc.*, Case No. 2:23-cv-08583 (C.D. Cal.), filed October 11, 2023. *See* Pet. 74, Paper 4, 1.

C.    The '511 Specification

The '511 patent issued to Jonathan B. Parmer from U.S. Application No. 11/704,067, filed February 7, 2007, and claiming the benefit of Provisional Application No. 60/743,247, filed on February 7, 2006. The patent pertains to the use of radiant energy to "treat[] a loose vagina and introitus" [1] via "corrective or restorative remodeling of the mucosal surfaces of the vagina, introitus, and vulva." Ex. 1001, Abstract, 1:13–15, 2:17–21. According to the Specification:

> Embodiments of the invention include methods for remodeling a therapeutic zone of tissue within a target tissue of female genitalia. The target tissue lies immediately beneath the mucosal

---

[1] The Specification defines "introitus" as "the opening of the vagina" (Ex. 1001, 2:3–4, 3:51).

3

IPR2024-00703
Patent 8,961,511 B2

> epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention does not include deeper tissue, such as endopelvic fascia.

*Id.* at 3:41–48.

The Specification describes "apparatus and methods for tightening tissue of the female genitalia by heating targeted connective tissue with radiant energy [typically radiofrequency (RF) energy], while cooling the mucosal epithelial surface over the target tissue to protect it from the heat." *Id.* Abstract, 4:4–13*; see also id.* at 2:25–28, 4:7–16, 13:16–19, claims 6, 33, 41, and 49 ("heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound energy"). According to the Specification, such tightening may be an immediate or near-immediate consequence of thermally denaturing tissue collagen, and/or the result of a longer-term healing response involving the deposition of new collagen by cells in the connective tissue. *Id.* Abstract, 4:14–16, 4:63–5:11, 12:39–49.

D.    Prosecution History of the '511 patent

During prosecution, the Examiner repeatedly rejected claims as anticipated and/or obvious in view of Knowlton,[2] which is cited as background in the '511 patent and incorporated therein by reference. Ex. 1001, 1:47–49, 5:65–26:6 (referencing Knowlton); Ex. 1002, 0079–0094, 0135–0151, 0198–0214, 0260–0266 (Office Actions); *see also id.* at 0115–0126, 0165–0174, 0234–0244, 0295–0306 (Applicant responses and amendments);

---

[2] US 6,350,276 B1, issued Feb. 26, 2002. Ex. 1013.

IPR2024-00703
Patent 8,961,511 B2

Knowlton discloses a fluid-cooled apparatus comprising RF electrodes to "appl[y] a mechanical force in combination with the delivery of energy to the skin surface and underlying soft tissue structure, to remodel collagen both esthetically and functionally with minimal thermal damage including cell necrosis." Ex. 1013, Abstract, 13:9–13; 15:25–28. In one embodiment, Knowlton discloses treating pre-term cervical dilation by applying RF energy to tighten the dilated cervix. *See, e.g.*, *id.* at 13:35–47 ("The incorporated energy delivery device 18 contracts the native matrix and induces scar collagen. The dilated cervical OS is tightened and the entire cervix is strengthened.").

The Examiner asserted, for example, that,

> Knowlton discloses a method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying a mucosal epithelium of female genital tissue (as in the embodiment of figures 13–14 describing the treatment of cervix, see col. 13; 35–37), the method comprising heating the target tissue and remodeling the therapeutic zone of target tissue.

Ex. 1002, 82.

To address rejections over Knowlton, applicant amended claim 1 (the only independent method claim then pending) to recite "remodeling a therapeutic zone including at least one of vulva, introitus or vagina" and argued that Knowlton does not disclose treating these tissues. *Id.* at 0165–0174. Applicant subsequently also amended claim 1 to require that "the heating includes heating a portion of the vagina extending from the introitus

5

IPR2024-00703
Patent 8,961,511 B2

inwardly to a location from 1 cm to 3.5 cm in from the introitus," thereby excluding the cervix.[3] *Id.* at 235.

In allowing the claims to issue, the Examiner explained that "Knowlton fails to contemplate the specific areas of treatment set forth in [the] independent claims . . . . No other reference has been found which discloses, fairly suggests or makes obvious this area of treatment whether taken alone or in combination with the Knowlton reference." Ex. 1002, 317 (Notice of Allowance).

### E.    Illustrative Claims

Petitioner challenges claims 1–58 in this proceeding, of which claims 1, 35, 43 and 51 (reproduced below) are independent. The independent claims differ only with respect to the "wherein" clauses, shown below in italics.[4]

> 1. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:
>
> heating the target tissue, and
>
> remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina*

---

[3] In addition to the amendments of claim 1, Applicant re-drafted certain dependent claims in independent format, which subsequently issued as claims 35, 43, and 51. *See id.* at 238.

[4] The Petition applies a short-hand designation identifying elements of the independent claims. With respect to claim 1, for example, [1.P] refers to the preamble, [1.1] refers to the step of "heating the target tissue," [1.2] refers to "remodeling the therapeutic zone of target tissue," and [1.3] applies to the claim-specific "wherein" clause. *See* Pet. 25, 28, 32, 35.

IPR2024-00703
Patent 8,961,511 B2

*extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.*

35. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.*

43. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a portion radiating outward from the introitus to Hart's line.*[5]

51. A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes *heating a mucosal surface of the labia minora.*

---

[5] The Specification defines "Hart's line" as the portion of the vulva "where mucosal epithelium gives way to skin on the outer surface of the labia minora," i.e., "the boundary where mucosal epithelium and labial skin meet" (*id.* at 3:49–54, 11:59–62).

7

IPR2024-00703
Patent 8,961,511 B2

F.    Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 12):

| Ground | Claims | Basis | Reference(s) |
|:---:|:---:|:---|:---|
| 1 | 1–58 | § 103 | Edwards,[6] Mosher,[7] Ingle[8] |
| 2 | 43–58 | § 103 | Edwards, Mosher, Ingle, Ollivier[9] |

In support of its patentability challenges, Petitioner relies on the Declaration of Dr. Joseph Berenholz, M.D. (Ex. 1003).

## II.    ANALYSIS

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

---

[6] US 6,463,331 B1, issued Oct. 8, 2002. Ex. 1005.

[7] US 2004/0193238 A1, published Sept. 30, 2004. Ex. 1006.

[8] US 6,216,704 B1, issued Apr. 17, 2001. Ex. 1007.

[9] Ollivier, D., "Designer Vaginas," Salon.com, accessed at https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html (Nov. 14, 2000). Ex. 1008.

IPR2024-00703
Patent 8,961,511 B2

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present. *KSR*, 550 U.S. at 406.

"[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). But in analyzing the obviousness of a combination of prior art elements, it can also be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *Id.* at 418.

"[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). Moreover, a precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *KSR*, 550 U.S. at 418. Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in

9

IPR2024-00703
Patent 8,961,511 B2

the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (quotations and citations omitted).

A.    Person of Ordinary Skill in the Art

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

In the ThermiGen IPRs, the panel preliminarily determined that one of ordinary skill in the art in the field of the '511 patent would have had "a medical degree plus at least two years of experience in a field such as gynecology, urogynecology, or plastic surgery involving female genital anatomy, with clinical experience in the application of radiant energy to female genital tissue." Ex. 1009, 8–9; Ex. 1010, 8. Petitioner here proposes a similar definition, specifically, "a medical doctor . . . [with] at least three years of experience in the non-surgical treatment of uro-gynecological conditions and/or the non-surgical cosmetic treatment of female genital tissues." Pet. 6.

10

IPR2024-00703
Patent 8,961,511 B2

Absent evidence or argument to the contrary, we apply Petitioner's proposed definition, as it appears consistent with the prior art and is supported by the presently unopposed testimony of Dr. Berenholz. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355, (Fed. Cir. 2001) (the level of ordinary skill in the art may be reflected in the prior art itself); Ex. 1003 ¶¶ 28–31, 58–60.

### B.      Claim Construction

The Board interprets claim terms in an *inter partes* review using the same claim construction standard that is used to construe claims in a civil action in federal district court. *See* 37 C.F.R. § 42.100(b)). In construing claims, district courts give claims their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

With respect to the challenged claims, Petitioner asserts that "no claim term requires construction—all terms should receive their ordinary and customary meaning in view of the patent specification." Pet. 7 (citing Ex. 1003 ¶ 61). Accordingly, Petitioner contends that formal constructions are unnecessary. *Id.* (citing *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. 2017) (explaining that only those terms need be construed "that are in controversy, and only to the extent necessary to resolve the controversy.")).

Petitioner, nevertheless, succinctly reviews the preliminary construction of certain terms of the '511 patent claims in the ThermiGen IPRs, and the construction by the District Court in *Viveve. See* Pet. 8–11. We note first that, whereas these two sets of prior constructions may differ in

IPR2024-00703
Patent 8,961,511 B2

focus or scope, we do not view them as in conflict. And although the preliminary constructions in the ThermiGen IPRs were conducted under the then-applicable broadest-reasonable-interpretation (BRI) standard, we are not presently aware of any reason that those definitions would differ under the *Phillips* standard, and we provisionally apply them here for clarity. And while we recognize that the *Viveve* constructions are not binding on this proceeding, the district court's definitions are instructive and generally complementary to ThermiGen IPR constructions. Accordingly, we also provisionally apply them here for clarity. Although none of these terms are presently in dispute, we find it useful to clarify the meanings we apply at this stage of the proceeding. The parties are, of course, welcome to address the construction of any claim term at trial.

        We summarize those constructions below.

      1. *"target tissue"*

Each independent claim before us recites "method[s] for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue." Addressing this language, the Board in the ThermiGen IPRs preliminarily construed "target tissue" as "tissue immediately beneath the mucosal epithelium of genital tissues exclusive of deeper tissues, such as the endopelvic fascia," but indicated that the "comprising" language of the preambles were permissive of heating or treating *non*-target tissue such as the endopelvic fascia. Ex. 1009, 10–12; Ex. 1011, 10–11. The *Viveve* court similarly found that "The preamble [of the independent claims] limits the claims by requiring the target tissue to include tissue underlying an epithelium of female genital

12

IPR2024-00703
Patent 8,961,511 B2

tissue that includes at least one of vulva, introitus and vagina tissue."
Ex. 1024, 21–28.

While we do not disagree with the definition articulated by the *Viveve* court, we find it sufficient to preliminarily adopt the definition set forth in the ThermiGen IPRs. *See* Ex. 1009, 12.

### 2. "*heating*"

All independent claims of the '511 patent recite the step "heating the target tissue." The Board in the ThermiGen IPRs preliminarily construed "heating" in this phrase as "raising the temperature of target tissue to no more than about 80 degrees C," and expressly rejected the prior Patent Owner's argument that the heating step requires "heating without damaging the mucosal epithelial surface." Ex. 1009, 9–14; Ex. 1011, 11–14. The *Viveve* court provided an arguably broader construction of the "heating" step as meaning, "heating the tissue underlying the epithelium to a temperature that is higher than the temperature of the epithelium." Ex. 1024, 7–14.

Again, while we do not disagree with the definition articulated by the *Viveve* court, we preliminarily adopt the definition set forth in the ThermiGen IPRs which, in accord with the Specification, expressly defines an upper limit "of about 80 degrees C." *See* Ex. 1009, 14 (citing Ex. 1001, 4:34–40, 11:21–23, 11:25–29).

### 3. "*remodeling the therapeutic zone of target tissue*"

Each independent claim recites the step of "remodeling the therapeutic zone of target tissue." The Board in the ThermiGen IPRs preliminarily construed this "remodeling" as "the result of raising the temperature of target tissue to no more than about 80 degrees C without substantially affecting the epithelium overlying the target tissue, wherein

13

IPR2024-00703
Patent 8,961,511 B2

that result includes a tightening or contraction of the target tissue." Ex. 1009, 14–16; Ex. 1011, 14–15. The *Viveve* court similarly, if more succinctly, construed this term as "causing a zone of tissue within the target tissue to tighten or contract by heating the zone of tissue to a therapeutic temperature." Ex. 1024, 14–21.

Although we find both constructions reasonable, for simplicity, we provisionally adopt the *Viveve* court's construction of this term.

### 4. "*heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock*"

The unique "wherein" clause of independent claim 35 specifies that "heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." The Board in the ThermiGen IPRs preliminarily construed "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock," as "heating at least one contact site in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." Ex. 1009, 18. The *Viveve* court did not reach this term. *See generally* Ex. 1024. For the purpose of institution, we provisionally adopt the Board's construction in the ThermiGen IPRs.

### C.    Overview of Asserted References

#### 1.  Overview of Edwards (Ex. 1005)

Edwards "provides a method and system for the curative treatment of female uro-genital disorders by application of radiofrequency (RF) energy to targeted tissues. Application of this energy is selectively applied so as to ablate, tighten, shrink or reshape the tissue and thereby correct an unwanted condition." Ex. 1005, 2:33–38. In targeting this energy, Edwards teaches that "[t]he physician determines optimal areas of treatment," and "create[s] a

14

IPR2024-00703
Patent 8,961,511 B2

series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." *Id.* at 13:14–16, 13:38–42. According to Edwards, "[r]emodeling of the anterior wall treats incontinence," whereas "[r]emodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function." Ex. 1005, 3:5–11, 13:14–23.

Edwards discloses system 400, reproduced below in Figure 4, for use in vaginal remodeling. *See id.* at 3:25–27, 7:14–8:5, 13:12–14:4.



FIG. 4

Figure 4 shows system 400, including treatment element 410 (bottom portion, not labeled). Treatment element 410 includes blade 420 and handle 430. Ex. 1005, 7:18–28. The blade includes a plurality of electrodes 423, a plurality of irrigating fluid delivery pores 425 "disposed to deliver cooling liquids so as to minimize thermal damage," and at least one thermocouple 424 to monitor temperature. *Id.* at 7:18–28, 7:51–55, 7:66–8:5, 13:43–53.

IPR2024-00703
Patent 8,961,511 B2

Figure 9A of Edwards, reproduced below, describes a method employing the device shown in Figure 4.



Figure 9A illustrates a method for vaginal remodeling. *Id.* at 3:38–39. According to Edwards, "[A] speculum is inserted in the patient's vagina. The blades of the speculum are placed in an open position. The treatment element of system 400 is inserted into the vagina through the speculum." *Id.* at 13:43–46; *see generally, id.* at 13:12–14:4. Cooling fluid is delivered into the vagina through irrigating fluid delivery pores 425, and RF energy is delivered "to discrete areas of the vaginal wall." *Id.* at 13:54–56. "In a preferred embodiment, the blade 420 may be disengaged and relocked in

16

IPR2024-00703
Patent 8,961,511 B2

another position in the speculum, so as to deliv[er] energy to another area of the vagina." *Id.* at 13:60–62.

### 2. Overview of Mosher (Ex. 1006)

Mosher discloses treatment of urinary incontinence by selectively heating and remodeling "collagenous tissues of the pelvic support tissue." *See, e.g.,* Ex. 1006, Abstract, ¶¶ 9, 45. In this respect, Mosher discloses the introduction of a probe having "tissue-penetrating electrodes" into the vagina for "heating provided through . . . the vaginal wall." *Id.* at ¶¶ 9, 24–25, 54, Figs. 4B, C.

Mosher discloses figures 6 and 6a as "illustrative non-invasive vaginal probes and a method for non-invasively treating endopelvic fascia using cooled [RF] electrodes." *Id.* ¶¶ 27, 58. In one embodiment, "[a] non-invasive cooled electrode probe similar to that shown in FIGS. 6 and 6A heats tissue until the temperature sensing needle at 4.5 mm depth reaches a set point of 75 °C. at 185 seconds." *Id.* ¶ 85. In one embodiment

> a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

*Id.* ¶ 74.

According to Mosher, "directing energy from a probe into collagenous tissues of the pelvic support system" may cause contraction of the collagenous tissue and/or structural stiffening related to scarring or healing. *Id.* ¶ 45. In addition to the treatment of urinary incontinence, Mosher teaches that such methods "will find applications in a wide variety of therapies," and "may be directed to a variety of tissue structures [including] . . . structures of

17

IPR2024-00703
Patent 8,961,511 B2

the vagina," such as the lamina propria, a "dense connective tissue layer just under the epithelium." *Id.* ¶¶ 46, 48.

### 3. Overview of Ingle (Ex. 1007)

Ingle discloses devices and methods "for selectively heating and shrinking tissues, particularly for the noninvasive treatment of urinary incontinence and hernias, for cosmetic surgery, and the like." Ex. 1007, 1:18–23. Ingle's methods can "induc[e] controlled shrinkage or contraction of a support tissue of the body, typically being a collagenated tissue such as fascia, ligament, or the like" (*id.* at 11:8–11). "Tissue contraction results from controlled heating of the tissue by affecting the collagen molecules of the tissue." *Id.* at 11:25–26. Ingle posits that "[c]ontraction occurs as a result of heat-induced uncoiling and repositioning of the collagen B-pleated structure." *Id.* at 11:25–28.

Ingle teaches heating target tissues by application of RF or ultrasound energy. *See, e.g., id.* at 3:51–56, 5:10–13, 30–32, 8:53–65. This energy "heats fascia and other collagenated support tissues, causing them to contract without substantial necrosis of adjacent tissues." *Id.* at 2:58–61. To avoid such tissue damage, the energy is "preferably . . . applied through a large, cooled electrode having a substantially flat electrode surface. Such a cooled plate electrode is capable of directing electrical energy through an intermediate tissue and into fascia, while the cooled electrode surface prevents injury to the intermediate tissue." *Id.* at 2:61–67; *see id.* at 5:40–58.

Ingle provides guidance for times and temperatures suitable to achieve "significant tissue contraction . . . without substantial collateral tissue damage." *Id.* at 11:25–31. In a preferred embodiment, "the target tissue will

18

IPR2024-00703
Patent 8,961,511 B2

be raised to a temperature of about 60 nC[10] or more, while the intermediate tissue remains at or below a maximum safe temperature of about 45 nC." *Id.* at 8:41–44. Ingle further teaches that "[t]he temperature of the target tissue structure will . . . often be[] in the range from about 60 nC to 80 nC." *Id.* at 11:33–37.

According to Ingle, selective, temperature-mediated shrinkage of fascia may be used to treat a wide variety of conditions, "and may even be used in cosmetic procedures . . . to remove wrinkles by shrinking the collagenated skin tissues, or to lift sagging breasts by shrinking their support ligaments." *Id.* at 17:65–18:7. Exemplary target tissues, however, "include the urethral wall, the bladder neck, the bladder, the urethra, bladder suspension ligaments, the sphincter, pelvic ligaments, pelvic floor muscles, fascia, and the like." *Id.* at 11:14–17. In some embodiments energy is applied "to fascia . . . within the vagina" via an energy transmitting element on the distal end of a probe introduced into the vagina. *Id.* at 3:36–43. Fig. 11. In this aspect,

> The transmitting element is capable of transmitting sufficient heating energy through the vaginal wall to heat and contract the fascia. A cooling system is disposed adjacent to the transmitting element. The cooling system is capable of maintaining the vaginal wall adjacent the probe below a maximum safe temperature when the fascia is heated by the transmitting element.

---

[10] "nC" appears to be pervasive formatting error in Ingle, as published. We understand "nC" in Ingle to mean ""°C". *See* Ex. 1007, 15:31 (referring to body temperature as "approximately 37 nC"), 15:5–39 and Figures 3A–E (illustrating exemplary temperature ranges, in °C); Ex. 1003 ¶ 80.

19

IPR2024-00703
Patent 8,961,511 B2

*Id.* at 3:43–50; *see also id.* at 3:51–58 ("[I]ntermediate tissue is cooled with the probe to avoid injuring the intermediate tissue when the target tissue is heated by the probe."), 4:4–10, 11:25–31, 15:65–16:4, 20:14–19.

### 4. Overview of Ollivier

Ollivier describes techniques for the cosmetic treatment of the vagina, vulva, and labia. *See generally* Ex. 1008. Ollivier describes, for example, the use of "Laser Vaginal Rejuvenation (LVR) to tighten [a patient's] vagina and 'enhance sexual gratification' and Designer Laser Vaginoplasty (DLV) to 'aesthetically modify' her labia." *Id.* at 1. Ollivier explains, "[b]y reconstructing the 'optimum structural architecture' of the vagina—namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body— … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." *Id.* With reference to advances in remodeling technology, Ollivier states that, surgery for vaginal and labial "deformities" has "been around for 30 years. Lasers have even fallen out in favor. We have more sophisticated tools that do the same thing these days." *Id.* at 3.

D.   Ground 1: Asserted Obviousness in view of Edwards, Ingle, and Mosher

For Ground 1, Petitioner challenges claims 1–58 as obvious in view of Edwards, Ingle, and Mosher. Pet. 28–67. As noted above, Patent Owner did not file a Preliminary Response. Accordingly, Petitioner's assertions—and the testimony of its declarant—are presently unopposed. For the purpose of institution, we focus on claim 1.

As a general matter, Petitioner contends that one of ordinary skill in the art would have been motivated to combine the teachings of Edwards,

IPR2024-00703
Patent 8,961,511 B2

Mosher, and Ingle with a reasonable expectation of success of arriving at the claimed invention because 1) "loose vaginal or vulval tissue was a known problem facing women at the time," 2) "Edwards, Mosher, and Ingle are all directed to methods for the non-invasive treatment of female uro-genital conditions, for therapeutic and/or cosmetic reasons," and 3) each of the cited references teaches the application of radiant energy, including RF, to heat and denature collagen, thereby tightening and remodeling the affected tissues. *See generally*, Pet. 22–24; Ex. 1003 ¶¶ 84–91.

More specifically, Petitioner relies on Edwards as providing general teachings of a non-invasive treatment using RF energy, and looks to Mosher and Ingle for details regarding parameters, techniques, and the physiological mechanism underlying heat-mediated collagen remodeling of female genital tissue. *See* Pet. 23. According to Petitioner, the asserted "combination is merely applying known techniques (Mosher/Ingle's treatment methods) to a known method ready for improvement (Edward's treatment method) to yield the predictable result of tightening via collagen denaturation." *Id.*

With respect to the details of Ground 1, Petitioner presents an element-by-element comparison of claim 1 to the combined teachings of the asserted references, which is supported by the testimony of Dr. Berenholz. Pet. 25–36 (citing Ex. 1003 ¶¶ 99–124). We note, in particular, Petitioner's arguments and evidence regarding the "wherein" clause of claim 1, element [1.3], which requires that "the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus." *Id.* at 35–36.

According to Petitioner, one of ordinary skill in the art would have understood that the combination of Edwards and Mosher teaches heating the

21

IPR2024-00703
Patent 8,961,511 B2

anatomical region of element [1.3] because "Edwards teaches performing its method "to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both. … Remodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function." Pet. 35 (citing Ex. 1005, 13:14–22). Relying on the testimony of Dr. Berenholz, Petitioner contends that one of ordinary skill in the art "would have understood Edwards's teachings to include treatment near the opening of the vagina." *Id.* (citing Ex. 1003 ¶ 122).

According to Petitioner, "Mosher further provides motivation to focus treatment nearer the opening of the vagina, in order to avoid damage to nerves in the bladder neck region and in the antero-lateral vaginal wall." *Id.* (citing Ex. 1006, ¶¶ 58, 74, 75, Figs. 6, 6A; Ex. 1003 ¶ 123). Petitioner argues that

> Mosher describes the preferred treatment region as "significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15mm." EX1006, ¶74. Despite the reference to "urethral length" in this description, a POSA would have understood this treatment region to apply to non-invasive treatment within the vagina. *Id.*; EX1003, ¶¶123-124. Indeed, Mosher describes several electrode configurations for its vaginal probe 54 to provide this "enhanced treatment width." EX1006, ¶75; EX1003, ¶¶123-124.

*Id.* at 35–36. Further relying on the testimony of Dr. Berenholz, Petitioner contends that one of ordinary skill in the art "would have understood Mosher's treatment length of about 15 mm (1.5 cm) refers to the length of the treatment region extending into the vagina." *Id.* at 36 (citing Ex. 1003 ¶ 124). Petitioner thus concludes that one of ordinary skill in the "would

IPR2024-00703
Patent 8,961,511 B2

have understood that Mosher teaches treating a portion of the vagina extending from the introitus to 1.5 cm inward, which falls within the claimed treatment area." *Id.* (citing Ex. 1003 ¶ 124).

We find Petitioner's arguments and Dr. Berenholz's testimony reasonable in light of the present—and presently uncontested—record.

E.    Ground 2: Asserted Obviousness in view of Edwards, Ingle, Mosher, and Ollivier

For Ground 2, Petitioner challenges claims 43–58 as obvious in view of Edwards, Ingle, and Mosher for the reasons set forth with respect to Ground 1, and further in view of Ollivier—"to the extent Patent Owner argues or the Board finds that [treatment of the vulval areas recited in the 'whereas' clauses of independent claims 43 and 51] was not within the general knowledge of a POSA." Pet. 67–68. In particular, Petitioner argues that Ollivier describes techniques to not only tighten the vagina and introitus for the relief of incontinence and increased sexual satisfaction, but also to "esthetically modify" the labia. Pet. 67. Petitioner, thus, contends that one of ordinary skill in the art " would have been motivated to use the treatment method of the Edwards-Mosher-Ingle combination, which teaches treating at least the vagina and introitus, to also treat the vulvar vestibule and labia minora in order to achieve the desired aesthetic modification expressly described in Ollivier." *Id.* at 67–68 (citing Ex. 1003 ¶ 274). Petitioner reasons that:

> Ollivier teaches using earlier laser techniques to provide cosmetic treatment to these vulvar tissues, as recited in claims 43 and 51, and adds that lasers have "fallen out of favor" and there are "more sophisticated tools that do the same thing." EX1008, 0003. And as discussed above for Ground 1, it was known to use RF treatments to tighten other tissue areas for both therapeutic

23

IPR2024-00703
Patent 8,961,511 B2

and cosmetic purposes. EX1007, 1:18-23, 18:1-7; EX1003, ¶¶44-51, 84-90. A POSA would have had a reasonable expectation of success in doing so because the vulval region comprises similar mucosal epithelium, with the same underlying collagen-rich layers as the vagina. EX1003, ¶275.

*Id.* at 68.

While we find Petitioner's arguments for Ground 1 sufficient for the purpose of institution, its further arguments with respect to Ollivier appear to underscore that one of ordinary skill in art would have applied the teachings of Edwards, Mosher and Ingle to the treatment of the labial tissues encompassed by the language of independent claims 43 and 51. We would, nevertheless, re-evaluate any question of unpatentability of the challenged claims on the fuller record adduced at trial.

## III.    CONCLUSION

After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least one challenged claim of the '511 Patent is unpatentable. In particular, because Petitioner has demonstrated a reasonable likelihood that at least one claim is rendered obvious by the combination of Edwards, Ingle, and Mosher, we institute *inter partes* review on Ground 1.

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or the construction of any claim term. Thus, our view with regard to any conclusion reached in the foregoing could change upon consideration of Patent Owner's merits response and completion of the record.

24

IPR2024-00703
Patent 8,961,511 B2

In keeping with our mission of resolving patentability disputes in a just, speedy, and inexpensive manner, we exercise our discretion to institute *inter partes* review as set forth in the following Order.

## IV.    ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–58 of the '511 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '511 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

25

IPR2024-00703
Patent 8,961,511 B2

PETITIONER:

Richard M. Bemben
Jennifer Meyer Chagnon
Richard D. Coller, III
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
rbembenPTAB@sternekessler.com
jchagnon-PTAB@sternekessler.com
rcollerPTAB@sternekessler.com
cvira-PTAB@sternekessler.com
PTAB@sternekessler.com


PATENT OWNER:

Justin J. Oliver
Michael P. Sandonato
William A. Hector
VENABLE LLP
joliver@venable.com
msandonato@venable.com
wahector@venable.com
InMode-BTL-IPR@venable.com

26

As established above, the introitus is the opening of the vagina at the body's exterior. As also established above, (i) the treatment area in Edwards (related to the bladder neck position) is not at or near the introitus and (ii) Edwards' speculum device would not permit its electrodes to contact the introitus when positioned in the patient. *See* supraSections IV.A, IV.D. Indeed, because Edwards teaches using an RF applicator in combination with a speculum for entry into the vagina, Edwards is not treating the introitus and, consequently, there is nothing to suggest that its treatment would have any effect on the introitus. *Id*., EX2001, ¶¶155.

Moreover, Petitioner does not explain how a POSA would modify Edwards' device and/or treatment to affect the introitus. Nor does Petitioner cite to Mosher or Ingle for this element. Therefore, in view of the above, Petitioner has not met its burden in establishing that Edwards, Mosher, and Ingle render obvious claim 26. EX2001, ¶156.

### J. The Combination does not render obvious claims 2-34, 36-42, 44-50, and 52-58

Claims 2-34, 36-42, 44-50, and 52-58 ultimately depend from independent claims 1, 35, 43, and 51 and accordingly are not rendered obvious by the combination of Edwards, Ingle, and Mosher for at least the same reasons discussed above for the independent claims. EX2001, ¶157.

- 59 -

demonstrates that she did not understand the proper scope of the claims or of the prior art. The Board should credit Dr. Berenholz over Dr. Poulos, and find the claims unpatentable.

## II. THE '511 PATENT MERELY CLAIMS APPLYING KNOWN TREATMENT TECHNIQUES TO ANATOMICAL REGIONS KNOWN TO AFFECT THE DESIRED RESULT.

It was well-known before the priority date of the '511 patent that vaginal tissue stretches during childbirth, which could lead to medical and sexual issues. EX1001, 1:62-2:16; EX1032, 102:1-103:14. One known issue was "decreased sexual pleasure for women" caused by "excessive loosening of the vagina and its opening, the introitus." EX1001, 2:1-9. POSAs would have known that a loose vagina and introitus may lead to decreased sexual pleasure, as Dr. Poulos admits. EX1032, 103:15-19. Loose tissue of the labia was also known to cause other issues, including "pain with certain activities" or a patient may "simply be … uncomfortable with the appearance of the labia." EX1032, 23:17-24:7.

It also was known that treating loose vaginal tissue (including its opening) may alleviate the negative effects thereof, including decreased sexual pleasure. EX1001, 1:62-2:16; EX1032, 102:1-103:25 ("Q· Is it fair to say that the person of skill in the art would have understood that tightening a vagina introitus may lead to enhanced sexual pleasure?  … ·A· Yes."). InMode admits as much: "Prior to the '511 patent, some doctors used invasive techniques, such as surgery" "to restore

genital tissue, which can be altered over time (and during childbirth) resulting in decreased sexual pleasure." POR, 7. Indeed, Dr. Poulos has performed labiaplasties, i.e., a "surgical procedure to change the shape and/or size of the labia," "[s]ince [her] residency, which ended in 1992." EX1032, 23:17-24:10.

There also was patient demand for procedures to improve both the external appearance of the vagina and sexual function. EX1003, ¶¶49, 82, 142, 272; EX1032, 23:17-24:10, 90:1-12; EX1008. Dr. Berenholz testified, and Dr. Poulos agreed, that by February 2006 it was known to "perform[] Laser Vaginal Rejuvenation ('LVR') to *tighten vaginal support tissue and the outer third of the vagina, including the introitus, vulva*, and the perineal body, *both for cosmetic purposes and to improve sexual function*." EX1003, ¶49[1]; EX1032, 90:1-12, 139:1-6, 23:17-24:10. That Salon.com—a "news and opinion website," POR, 61 (quoting EX2015)—ran a feature article on this topic confirms that vaginal-rejuvenation procedures were known even outside of medical circles. *See* EX1008.

The '511 patent's background discussion confirms using collagen denaturation to cause tissue "tightening" was a known technique, useful for medical and cosmetic purposes. EX1001, 1:35-61. Dr. Poulos agreed. EX1032, 102:1-103:14. Dr. Berenholz describes several prior-art treatments for tightening

---

[1] Emphasis added throughout unless noted.

collagen-rich tissue. EX1003, ¶¶44-49; *see also* EX1032, 88:3-91:6 (generally

agreeing with Dr. Berenholz, with limited exceptions based on lack of personal

knowledge of certain devices).

The '511 patent does *not* purport to have invented methods of restoring

genital tissue to increase sexual pleasure. Rather, the alleged improvement of the

'511 patent was merely using admittedly known techniques (i.e., RF tightening of

collagen-rich tissue) to tighten the vagina, introitus, and vulva non-invasively.

EX1001, 2:17-21. This is the classic case of applying a known technique to a

known method ready for improvement to yield predictable results. *KSR Int'l Co. v.

Teleflex Inc.*, 550 U.S. 398, 417 (2007); Pet., 23-24; EX1003, ¶¶88-89. Nothing

about the '511 patent's claimed methods was new.

## III. INMODE'S ATTEMPT TO IMPERMISSIBLY NARROW THE CLAIM SCOPE SHOULD BE REJECTED.

The '511 patent broadly claims methods of remodeling target tissue

underlying an epithelium of female genital tissue comprising at least one of vulva,

introitus, and vagina tissue. But InMode improperly attempts to narrow the claims

and to read in limitations from the specification, including: (i) requiring a

particular device to perform the method, (ii) requiring treatment of a particular

medical condition, (iii) prohibiting heating or treating tissue *in addition* to the

recited "target tissue," and (iv) requiring "remodeling" or "heating" without

substantially affecting the epithelium overlying the target tissue. The record does

not support InMode's narrow reading. Regardless, even under InMode's constructions, BTL demonstrated that the claims were obvious.

InMode cites Dr. Poulos's declaration to support its narrow reading of the claims. POR, 13-22. But her opinions on claim scope should be given no weight because she admitted on cross-examination that she simply used constructions provided by counsel:

> Q: … All of the claim constructions that you have in Section 6 of your declaration, starting on page 24.
> A: Yes.
> Q: They were provided to you by counsel?
> A: Yes.

EX1032, 56:13-57:14. Further, despite claiming to rely on "the constructions from the ThermiGen IPR," EX2001, ¶54, Dr. Poulos appeared to be unfamiliar with those constructions and how they were determined. EX1032, 54:11-17 ("Q: … are you talking about the board's constructions in the Decision to Institute in Exhibit 1009 [IPR2018-00088]? A: I believe so."), 55:10-56:5 (unfamiliar with BRI and that the prior constructions were under BRI); *see generally* EX1032, 53:5-57:13.

InMode accuses BTL of "vacillat[ing] between constructions." POR, 13. Not true. BTL applies the plain and ordinary meaning. Pet., 7. But recognizing that InMode had previously presented narrower constructions, BTL demonstrates unpatentability of the claims under both the plain and ordinary meaning and under

InMode's artificially narrow constructions. *See* Pet., 7-12.

### A. The claimed methods are agnostic regarding the particular device used.

InMode's attempts to distinguish the claims from the prior art often focus on the specific devices discussed in the prior art. For example, InMode argues "the Edwards device would not provide for treatment of the area from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus," because "the speculum dilates the introitus and moves it out of the way so that deeper structures of the vagina can be treated." POR, 36.

InMode's arguments are not commensurate with the claims' scope. The claims are directed to "*method[s]* for remodeling a therapeutic zone within a target tissue." The claims do not recite any particular device. EX1032, 127:18-129:3 (testifying the independent claims do not recite what device performs the method). Dr. Poulos's deposition testimony confirms, however, that she improperly reads the '511 patent's disclosed *device* into the claims:

> Q· Claim 1 is just describing the method, correct?
> A· I read it to be the method that would be *using the device described by the patent*.

EX1032, 128:17-20.

This is improper. *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("[A] particular embodiment appearing in the written

description may not be read into a claim when the claim language is broader than the embodiment."). The claims here simply do not require any particular device. "[A] method claim which is not tied to a particular device … must be interpreted to cover any process that performs the method steps." *Schumer v. Lab'y Comput. Sys., Inc.*, 308 F.3d 1304, 1312 (Fed. Cir. 2002).

> **B.** **The claimed methods do not require treatment of a particular medical condition.**

InMode also attempts to distinguish the prior art based on the references' alleged focus on treating SUI. POR., 1. These arguments ignore the claims' broad scope. Dr. Poulos admitted the claims do not require treatment of any particular medical condition. EX1032, 126:22-127:12. Regardless, the prior-art teachings are not limited to treatment of SUI, but also include, e.g., treatment for sexual function and cosmetic purposes. Pet., 13-24; *see infra*.

> **C.** **The claimed methods do not prohibit heating or remodeling other tissues *in addition to* the recited "target tissue."**

InMode contends "target tissue" should be construed to mean "tissue immediately beneath the mucosal epithelium of genital tissues exclusive of deeper tissue, such as endopelvic fascia." POR, 14-17. BTL agrees that the claimed target tissue does not include endopelvic fascia. But it is also true that the claims do not *prohibit* heating or treating other areas in addition to the target tissue, including endopelvic fascia. *See* Pet., 8-9; DI, 12. Dr. Poulos confirmed the '511 patent does

not say that "it's prohibited or forbidden to treat other regions" beyond the intended treatment depth. EX1032, 111:6-15; *see also id.*, 131:2-132:4 (incorrectly assuming that other tissue could not be heated because the claim is silent).

### D.    The claimed methods do not require "remodeling" or "heating" *without substantially affecting the epithelium overlying the target tissue.*

InMode contends "the 'remodeling' term should be construed to recite 'without substantially affecting the epithelium overlying the target tissue.'" POR, 17-19. Again, InMode improperly narrows the claims.

Cooling is the *only* method disclosed in the specification for attempting to protect the epithelium, but cooling is not required by the independent claims. EX1032, 124:16-125:13 (confirming independent claims do not mention cooling). The recitation of cooling in several dependent claims, including claims 9-16, 39, 47, and 55, confirms it is *not* required by the independent claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Even the dependent claims reciting cooling are silent as to what effect, if any, the heating has on the epithelium. Regardless, the prior art teaches the claimed "remodeling" even under InMode's improperly narrow construction. Pet., 25-34; *see infra*.

**C.      The Edwards-Mosher-Ingle combination teaches each of the claimed treatment areas.**

The Edwards-Mosher-Ingle combination further demonstrates the claimed treatment areas were obvious.

**1.      The combination discloses or renders obvious each of the claimed treatment areas.**

The independent claims differ only in the specific area of "female genital tissue" being heated (i.e., the treatment area). EX1032, 120:25-123:17. Edwards teaches applying RF energy to the vaginal wall. Pet., 13-16, 22-25. InMode does not dispute this, but argues Edwards teaches treating the *wrong portion* of the vagina. POR, 23-25. InMode improperly focuses on Edward's treatment of incontinence at the bladder neck, while ignoring other teachings, such as incontinence treatment at the mid-urethral region and treatment for sexual function via circumferential vaginal wall tightening.

Further, InMode agrees that POSAs were highly trained physicians. POR, 11-12; EX1003, ¶¶58-60; EX2001, ¶¶35-39. Here, both the problem (i.e., sexual and aesthetic problems caused by loose vaginal tissue) and solution (i.e., treating loose vaginal tissue to improve sexual function and enhance appearance) were known. *See* Section II. Determining the specific treatment area, depending on the condition/needs of a particular patient and the desired result, was a simple exercise of professional judgment. EX1003, ¶91; EX1005, 13:40-41 ("The physician

determines optimal areas of treatment."); EX1032, 29:5-30:19 (physician uses professional judgment). The Edwards-Mosher-Ingle combination teaches each of the claimed treatment areas.

**Claim 1** recites "heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus."

InMode focuses on the SUI teachings of Edwards, but Edwards teaches SUI can be treated by remodeling the anterior vaginal wall at areas "increasing support for the bladder outlet, *as well as the proximal and mid-urethra*." EX1005, 13:14-23; *see also* EX1006, ¶¶46, 54 (Mosher preferably treating "*along a length of the urethra* between the bladder neck and the external meatus …").

Treating the vaginal wall adjacent to the mid-urethra is within the claimed region of "from 1 cm to 3.5 cm in from the introitus." Dr. Poulos's annotations below show the location of the mid-urethral region, as well as the distal and proximal ends of the vaginal canal and urethra, and the mid-vaginal canal. EX1032, 65:11-77:7.

Case IPR2024-00703
U.S. Patent No. 8,961,511



EX1032, Exhibit 2.

The distance between the proximal and distal ends of the vaginal canal is about 9 cm. EX1032, 68:12-15; EX1003, ¶33; EX1001, 11:36-44. The distance between the proximal and distal ends of the urethra is about 4 cm. EX1032, 71:9-12. Dr. Poulos testified the mid-urethral region is approximately 2.5 cm from the introitus (relative to the vaginal canal), confirming Edwards's treatment of the vaginal wall adjacent the mid-urethra is within the claimed area of the vaginal

canal.[4] EX1032, 76:20-24.

InMode argues treatment for SUI is at the bladder neck, which is 4 cm from the introitus and therefore is not within the claimed treatment area. POR, 31-34. However, as noted above, Edwards's teachings are *not* limited to treating near the bladder neck or even to treating SUI.

InMode also contends BTL misunderstands the claim language, and newly proposes the following construction: "treating of at least the introitus and the first 1 cm of the vagina (up to 3.5 cm in from the introitus)." POR, 30-31. The "extending from the introitus inwardly" language of claim 1 describes the location and direction from which the claimed range of 1 cm to 3.5 cm is measured, under BTL's correct construction. InMode's construction renders claim 26 superfluous, and thus should not be adopted.

Regardless, the Petition explained, a "POSA, based on Edwards's teachings of improvement of sexual function, would have understood Edwards's teachings to include *treatment near the opening of the vagina*," i.e., at the introitus. Pet., 35;

---

[4] Also, even under InMode's interpretation of Mosher, *see* POR, 33, 37, where the length of the treatment area is 15 mm and starts at the bladder neck, treatment would extend into the claimed region (i.e., treatment would occur between 2.5 cm and 4 cm from the introitus).

EX1003, ¶¶122, 250. As Drs. Berenholz and Poulos confirmed, it was well-known that treating in and around the introitus improved sexual function. EX1003, ¶49; EX1032, 90:1-12, 102:1-103:25, 139:1-6, 23:17-24:10; Section II. Thus, Edwards teaches or suggests claim 1's treatment area under InMode's construction, as well. POR, 30-31.

**Claim 26** depends from claim 1 and recites "wherein remodeling comprises tightening the introitus."

Again, it was well-known to treat the introitus to improve sexual function. EX1003, ¶49; EX1032, 90:1-12, 102:1-103:25, 139:1-6, 23:17-24:10. And Edwards teaches "circumferential tightening" for treating sexual function, which a POSA would have understood included treating the introitus. Pet., 35; EX1005, 3:11-13, 13:19-22; EX1003, ¶¶122, 249-250.[5]

**Claim 35** recites "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock."

The Board's preliminary construction of claim 35's treatment area— "heating at least one contact site in the 300 degree arc extending from 1 o'clock to

---

[5] InMode's arguments for claim 26 are directed to alleged deficiencies specific to Edwards's device and motivation to modify, which are discussed below.

11 o'clock along the vaginal wall"—is correct, and Edwards discloses "circumferential tightening of the vaginal wall" including by applying RF energy "to the anterior and posterior regions of the vaginal wall." Pet., 11, 37; EX1005, 3:5-13, 13:19-22; DI, 14. Even if the claim required more than one contact site (it does not), Edwards expressly describes "*circumferential* vaginal wall tightening," which according to Dr. Poulos requires tightening more than one location. EX2001, ¶71.

Further, Edwards teaches this element under Dr. Poulos's construction, which is "heating multiple contiguous contact sites in the 300 degree arc." EX2001, ¶73. Dr. Poulos opined each "contact site" "covers 10% of the 300 degree arc" between 1 o'clock and 11 o'clock of the vagina, EX2001, ¶70, meaning that each 30 degree arc (e.g., between 1 o'clock and 2 o'clock) is a "contact site." Dr. Poulos also opined the posterior vaginal wall is "from around 5 o'clock to 7 o'clock," EX2001, ¶72, which (according to her logic) is at least two contact sites.[6] Edwards's teaching of treating the posterior wall would thus satisfy even Dr. Poulos's construction, which the Board should not adopt.

---

[6] BTL does not agree that the "posterior wall" of the vagina is so limited. *See, e.g.*, EX1032, 77:10-80:24, Exhibit 3 (Dr. Poulos's annotations showing the vagina is rectangular and anterior/posterior walls are longer).

**Claim 43** recites "heating a portion radiating outward from the introitus to Hart's line." **Claim 51** recites "heating a mucosal surface of the labia minora."

Both claims 43 and 51 recite treatment areas external of the introitus, i.e., the vulva. A POSA would have been motivated, both by Edwards's teaching to use RF treatment to improve sexual function (by circumferential tightening within the vagina) and Ingle's teaching to use RF for cosmetic purposes, to treat these external vulva areas as claimed. Pet., 40-43. Treating these external vulva areas, both to improve sexual function and for cosmetic purposes using other techniques was known. *See* Section II; *also* EX1003, ¶¶142, 146; EX1032, 23:16-24:10 (confirming treatment of the labia both to improve sexual function and for cosmetic reasons was known), 90:1-12.

InMode contends a "POSA would not have understood how to apply the treatments of SUI references to the external introitus to Hart's line region" because different treatment times and temperatures may be required, and tissue response may differ internally versus externally. POR, 49. But the cited art provides no less guidance on these issues than the '511 patent itself. *See In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) ("[T]hat [an] appellant did not provide the type of detail in his specification that he now argues is necessary in prior art references supports" finding that "one skilled in the art would have known how to implement the features."); *see also Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 902 (Fed.

Cir. 2018). For example, the '511 patent does not provide different implementation details of the claim 1 or 35 embodiments than it does for the claim 43 or 51 embodiments. Further, the treatment areas recited in claims 43 and 51 are mucosal tissue, just like internal vaginal mucosa. EX1003, ¶¶34, 38; EX1032, 85:7-86:4 (agreeing with Dr. Berenholz's testimony). A POSA would have understood the treatments of Edwards, Mosher, and Ingle to apply equally to the collagen-rich tissue in these areas. Pet., 41; EX1003, ¶142.

### 2.    InMode's other arguments fail.

**The prior art is not limited to treatment of SUI**, as InMode alleges. POR, 23, 37-38, 46-47. In particular, the fourth embodiment of Edwards, relied on in the Petition, teaches "vaginal remodeling" and that "circumferential tightening of the vaginal wall may provide physical and psychological improvement in the area of sexual function." EX1005, 3:5-13, 3:25-27. Likewise, Mosher teaches "applications in a *wide variety of therapies*," EX1006, ¶46, and Ingle teaches "techniques for selectively heating and shrinking tissues, particularly for the noninvasive treatment of urinary incontinence and hernias, *for cosmetic surgery, and the like*." EX1007, 1:20-24.

**Edwards's speculum is irrelevant; the claims are agnostic regarding the treatment device.** InMode argues Edwards's device is not suitable for treating near the introitus because a speculum is required. According to InMode, Edwards's

speculum: (1) would result in treatment too far into the vagina, POR, 34-37, 58-59; (2) would not be rotated or moved within the patient, POR, 41-43; and (3) is used to treat internally, POR, 49. However, the claims are agnostic regarding the device. *See* Section III.A.

POSAs "would have understood that in treating areas of the vaginal wall closer to the introitus, a physician would be able to complete the treatment without a speculum." EX1003, ¶¶69, 159; *see also* EX1032, 37:14-20, 39:6-13. As Dr. Poulos acknowledged, Edwards does not say the treatment element cannot be used without a speculum. EX1032, 144:17-23. She also acknowledged there are different types and sizes of speculums, Edwards does not specify which is used, and physicians exercise professional judgment in determining whether treatment requires a speculum. EX1032, 25:22-30:19, 32:2-33:7, 36:15-37:9, 143:8-144:2; EX2010, 4-5 (describing speculums of different types and sizes).

**A POSA would have been motivated to make the proposed combination.** InMode argues BTL "fails to articulate a credible reason" to make the proposed combination. POR, 38-39; *see also* POR, 45-46, 49-50, 59. But InMode focuses only on the Petition's discussion regarding each individual area of treatment, *e.g.*, POR, 38 (quoting Pet., 35), and ignores the earlier motivation-to-combine discussion. Pet., 22-25. Mosher and Ingle provide details of treatment parameters and the physiological mechanism of action to supplement Edwards's teaching of a

non-invasive vaginal treatment method that lacks such details. *Id.*; EX1003, ¶¶84-85. Applying Mosher's and Ingle's treatment details to Edwards's treatment method is simply combining prior-art elements according to known methods to yield predictable results. EX1003, ¶¶86-90; *KSR*, 550 U.S. at 416-17. Further, POSAs would have recognized there are limited areas of treatment within the vaginal region, and it would have been within a POSA's skill to determine the optimal area of treatment for a particular patient based on the desired outcome. EX1003, ¶91; EX1005, 13:40-42.

## V.    GROUND II: EDWARDS-MOSHER-INGLE-OLLIVIER

The Edwards-Mosher-Ingle-Ollivier combination renders obvious claims 43-58. InMode argues Ollivier is not a prior-art printed publication and is not enabling. Both arguments fail.

### A.    Ollivier is a prior-art printed publication

InMode contends Ollivier is not a printed publication. POR, 61-62. The Petition provided evidence that Ollivier was publicly available, including via Salon.com's search functionality and additional research aids. Pet., 12-13. The search pages show Salon.com includes categories such as "Health" and "Sex," further indicating the relevance of the website to a POSA. EX1029.

InMode faults Dr. Berenholz for not being personally aware of this article prior to his work on this Petition. POR, 61. But that is not the standard. Rather, a

POSA is a legal fiction—"a hypothetical person who is presumed to have known the relevant art at the relevant time." MPEP § 2141(II)(C). "If accessibility is proved, there is no requirement to show that particular members of the public actually received the information." *Jazz Pharms., Inc. v. Amneal Pharms., LLC,* 895 F.3d 1347, 1356 (Fed. Cir. 2018).

Regardless, BTL relies on Ollivier simply as confirmation of a POSA's knowledge—that there were well-known techniques used to treat the vulva/labia for improving sexual function and for cosmetic reasons. EX1003, ¶¶49, 82, 142, 272; EX1032, 23:17-24:10, 90:1-12, 139:1-6. That an example was discussed in an article on a layman's website is further proof that such treatment techniques were known.

**B.    Ollivier is enabling for the teachings relied on in the Petition.**

InMode also argues Ollivier is not enabling because it does not provide specifics of the LVR treatment. POR, 62-64. "[A] prior art reference asserted under § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry." *Raytheon Techs. Corp. v. Gen. Elec. Co.,* 993 F.3d 1374, 1380 (Fed. Cir. 2021). BTL relies on Ollivier not for the specifics of the LVR treatment, but to teach the existence of prior techniques for treating both the vagina and portions external of the introitus (both for improving sexual function and cosmetically). Pet., 67. Armed with this

knowledge, a POSA would have been motivated to use the Edwards-Mosher-Ingle treatment method also to treat the external vulvar vestibule and labia minora. Pet., 67-68.

## VI.    INMODE HAS NOT ESTABLISHED NEXUS WITH ITS OBJECTIVE-INDICIA EVIDENCE.

InMode has not made a sufficient showing of nexus to support its contention that objective indicia support non-obviousness of claims 1, 26, and 35. POR, 68-71. InMode relies on the presumption of nexus. POR, 69 (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016)). "A presumption of nexus requires *both* that the product embodies the invention and is coextensive with it." *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1211-12 (Fed. Cir. 2023). InMode does not even allege, let alone show, that the Viveve device is coextensive with claims 1, 26, and 35. This is fatal to the objective-indicia arguments. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) ("The patentee bears the burden of showing that a nexus exists.").

The Viveve device is *not* coextensive with claims 1, 26, or 35. "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature … that materially impacts the product's functionality." *Id*. at 1375. In other words, where "there are one or more features not claimed … that materially impact the functionality of the [product], … nexus may not be presumed." *Id*. at 1376.

Dr. Poulos admits the independent claims of the '511 patent do not require

cooling the epithelium. EX1032, 124:2-126:9; *see also* EX1001, 16:9-28, 17:31-32 (dependent claims specifically reciting cooling). But the studies InMode cites indicate that a critical feature to the (alleged) success of the Viveve device is using cryogenic cooling to prevent tissue damage. EX2017, 776-777 ("The [Viveve] RF device … provides a nonablative approach to creating heat within the submucosal layer of vaginal tissue *while keeping the surface cooled. … [T]he integrated cryogen* is delivered to the inside of the treatment tip to cool and protect the surface tissue."); EX2018, 6 (similar). Dr. Poulos confirmed a POSA would have understood "in the absence of cooling, the surface could potentially be damaged." EX1032, 115:1-5. Because claims 1, 26, and 35 do not require cooling, they are not coextensive with the Viveve device and there can be no presumption of nexus.

## VII. THE BOARD SHOULD CREDIT DR. BERENHOLZ OVER DR. POULOS.

The Board should credit Dr. Berenholz's testimony over that of Dr. Poulos because his practice actually includes performing the types of remodeling contemplated by the '511 patent whereas Dr. Poulos testified she chose *not* to offer those procedures in her practice (instead focusing on treating incontinence and other medical conditions). EX1003, ¶¶7-8, 60; EX1032, 19:16-21:23. InMode argues Dr. Berenholz's testimony should be given little weight. POR, 71-72. But InMode mischaracterizes Dr. Berenholz's testimony and holds him to a high standard of understanding legal concepts not required for a technical expert.

*Viveve* litigation and the *ThermiGen* IPR and concluded that the "constructions from the *ThermiGen* IPR should be adopted" with modifications. EX2001, ¶54. That Dr. Poulos was not conversant in legal standards is irrelevant where she understood the constructions and applied the correct standard. EX2001, ¶19; 37 C.F.R § 42.100(b) (2020).

## III.   GROUND 1: EDWARDS, MOSHER, AND INGLE FAIL TO TEACH THE CLAIMED METHODS

### A.   The Edwards-Mosher-Ingle combination fails to teach the treatment areas of claims 1, 26, 35, 43 and 51

The Petition fails to identify any disclosure in Edwards, Mosher, or Ingle teaching the specific treatment areas of the independent claims. Petitioner now attempts to fill the gaps through unsupported (and incorrect) attorney argument. Reply, 13.

#### 1.   The Combination fails to teach Claim 1's treatment area of "a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"

Petitioner misquotes Edwards and Mosher to suggest that the references teach heating the vaginal wall from the introitus inward to 1 to 3.5 cm from the introitus. First, for Edwards, Petitioner for the first time relies on the statement that "remodeling of the anterior wall treats incontinence … by increasing support for the bladder outlet, as well as the proximal and mid-urethra." Reply, 14; EX1005,

- 8 -

13:14-19. However, this passage of Edwards describes the ***result*** of the remodeling

the bladder neck area, which has the effect of increasing support for the bladder

neck, proximal urethra, and mid-urethra. It in no way describes the treatment area,

as Dr. Poulos confirmed. EX1032, 141:13-23 ("describes treating at the bladder

neck, which ***may provide support at different parts of the vagina***"). Petitioner's

expert offered no response to Dr. Poulos on this point, and Petitioner opted not to

question her on it.

Second, Petitioner mischaracterizes the requirement of claim 1 in arguing

that the prior art teaches a treatment that falls "within the claimed area of the

vaginal canal." Reply, 15-16, 16 n.4. As explained above, claim 1 does not recite a

range that covers merely the treatment of any portion of the vaginal canal between

the introitus to 3.5 cm in from the introitus. Claim 1 requires treating ***from*** the

introitus ***to a location*** 1 to 3.5 cm, such that at least the first centimeter of the

vagina and up to 3.5 cm is treated. Petitioner makes no showing that the prior art

treats this initial part of the vagina. Instead, Petitioner argues (incorrectly) that,

e.g., Edwards's and Mosher's bladder neck treatments may reach to a point within

3.5 cm of the introitus. Reply, 15-16.

Third, the Reply for the first time argues that Mosher discloses treatment of

the endopelvic fascia distal from the bladder neck toward the "external meatus."

- 9 -

Reply, 14 (citing EX1006, ¶¶46, 54). But this contradicts Petitioner's expert testimony that the endopelvic fascia is located at and supports the bladder neck. EX2005, 79:24-81:7. Again, Petitioner declined to have its expert opine further on this issue or to question Dr. Poulos on the matter. EX1032, 3, Index at 19 (neither listing Mosher).

Finally, Petitioner misrepresents Dr. Poulos's testimony to contend that it was known that treating in and around the introitus would improve sexual function. Reply, 17. But the testimony Petitioner cites pertains to laser vaginal rejuvenation ("LVR") treatment of the introitus and vulva, not heating techniques. *Id.* (citing EX1032, 90:1-12). And Petitioner ignores Dr. Poulos testimony that she "cannot agree that these [LVR] technologies were well known in the field of urogynecology." EX1032, 89:23-24. Indeed, both experts agree that LVR treatments were kept confidential, required execution of an NDA, and payment of thousands of dollars to learn about the treatment. POR, 61-64; EX2001, ¶¶163-164; EX2005, 162:3-6, 162:23-163:4, 165:23-166:1. Notably, Petitioner has not provided any reference detailing the LVR procedure. While these and Petitioner's other cites to Dr. Poulos's testimony on this point suggest that surgical techniques were performed on the vagina, the '511 patent makes clear that "surgical

- 10 -

approaches are not highly popular because of the risks associated with an invasive procedure, in a sensitive area." EX1001, 2:13-16.

### 2. The Combination fails to teach Claim 26's treatment of "tightening the introitus"

Petitioner's Reply admits that Edwards, Mosher, and Ingle do not explicitly disclose this limitation, and so tries to stretch Edwards and a POSA's knowledge to get there. *See* Reply, 17 (exclusively relying on a POSA's understanding for this claim); POR, 58-59. Those efforts fail because Edwards treatment of the bladder neck would not tighten the introitus. EX2001, ¶155. Further, Edwards' speculum-based RF device inhibits treatment of the introitus. POR, 59; EX2001, ¶155. Petitioner never explains how a POSA would modify Edwards (either the device or the technique) to tighten the introitus. And Petitioner makes no arguments regarding Mosher or Ingle at all.

### 3. The Combination fails to teach Claim 35's treatment of heating "circumferentially around its wall from 1 o'clock to 11 o'clock"

Petitioner does not rebut InMode's evidence that Edwards' speculum-treatment blade is not moved while inside the patient, thereby inhibiting circumferential treatment. *Compare* POR, 41-42 (citing EX2001, ¶114) *with* Reply, 17-18. Petitioner also does not dispute InMode's evidence that the "series of lesions" in Edwards extend along the length of the device (as opposed to

- 11 -

extending circumferentially). *Compare* POR, 42-43 (citing EX2001, ¶116) *with*

Reply, 17-18. Nor does Petitioner dispute that Mosher fails to remedy the

deficiencies of Edwards. *Compare* POR, 43-45 *with* Reply, 17-18.

Instead, Petitioner now presents unsupported attorney argument that

Edwards teaches heating multiple contiguous contact sites in the 300 degree arc

from 1 o'clock to 11 o'clock. Reply, 18. Petitioner's argument is based on a

misrepresentation of Edwards statement that "[r]emodeling ***both*** the anterior wall

and posterior wall provide circumferential vaginal wall tightening." EX1005,

13:19-20 (emphasis added). Once again, Petitioner improperly focuses on the

purported ***result*** of Edwards rather than the taught treatment. *Compare id.*

("***provide*** circumferential vaginal wall tightening") *with* Claim 35 ("***heating*** … the

vagina circumferentially"). The unrebutted expert evidence shows that a POSA

would not understand this statement in Edwards to describe "heating a portion of

the vagina circumferentially" as required by claim 35. *See* EX1034, 141:3-23.

Again, Petitioner declined to have its expert opine on this issue or to further

question Dr. Poulos on the matter after she clearly articulated that while Edwards

uses the phrase "circumferential tightening," she disagrees that treating the anterior

and posterior walls would "caus[e] circumferential vaginal wall tightening." *Id.* As

Dr. Poulos testified, Edwards's effect would be akin to "mak[ing] the elastic

- 12 -

tighter on just … two non-contiguous locations (e.g., sites) around the elastic waistline" of sweatpants, and "no circumferential tightening of the wa[ist] band would occur." EX2001, ¶71.

> **4.      The Combination fails to teach claim 43 and 51's treatment areas of "heating a portion radiating outward from the introitus to Hart's line" and "heating a mucosal surface of the labia minora"**

The Combination does not suggest the vulva treatment areas required by claims 43 and 51. Petitioner points to InMode's expert testimony to reiterate the '511 patent specification's concession that "surgical options" existed for treatment of vulvar structures. Reply, 19. But Petitioner ignores the specification's guidance that surgical options were associated with "a risk of scarring." EX1001, 2:11-16. These surgical options therefore fall outside the scope of the '511 patent's claims, which are directed to procedures that do not substantially affect the mucosal epithelium. *Id.*, 2:9-12; EX2001, ¶43; EX1009, 15. Petitioner also cites to Dr. Poulos's testimony that LVR treatments were performed. Reply, 19. As discussed above, however, both experts agree the treatment was kept secret. POR, 62-63; *supra* Section III.A.1.

Attempting to minimize the effect of different treatment times and temperatures required for internal (e.g., SUI) and external (e.g., LVR) treatments, Petitioner's Reply also walks back its own expert's testimony that "tissue response

- 13 -

is different externally and in terms of tolerability versus vaginal heating" such that there is "almost no discomfort with internal, whereas external, there seems to be more sensitivity." EX2005, 35:8-22. But Petitioner does not dispute that a POSA could not use the same procedure and technique for internal and external treatments. *Compare* POR, 49 *with* Reply, 19-20. Petitioner's legal citations in support of its attempt to minimize this difference in internal treatments and vulva treatments are inapposite. *In re Epstein* addressed whether a POSA "would have concluded that the reference disclosures would have been enabling." 32 F.3d 1559, 1568 (Fed. Cir. 1994). And *Paice LLC v. Ford Motor Co.* found that disclosure of "road load torque, rather than engine output torque" was sufficient to anticipate a claim element requiring engine output torque. 881 F.3d 894, 901 (Fed. Cir. 2018). Here, the combination does not disclose vulva treatments at all, let alone an enabling disclosure, as in *Epstein*. Nor does the combination describe another form of vulva treatment that could be equated to external treatments described in claims 43 and 51, as in *Paice*.

Also, Petitioner does not dispute that the '511 patent acknowledges multiple references describing cosmetic treatment or that Petitioner's arguments for these claims are rooted in hindsight bias. *Compare* POR, 47-48 *with* Reply, 19-20. Ultimately, Petitioner seems to argue that any disclosure of RF treatments external

- 14 -

to the vagina, such as Ingle's "cosmetic procedures" and treatment of "sagging breasts" (EX1007, 18:1-7, 1:18-23), teaches treatment of any body part using RF in any way. Such a broad reading has no basis and contradicts Petitioner's expert's admission that Ingle does not disclose "heating tissue for sexual function." EX2005, 153:3-6.

### B.    Mosher's and Ingle's catch all phrases do not teach "heating the target tissue" (all claims)

None of Petitioner's references disclose heating the "tissue immediately beneath the mucosal epithelium" (the lamina propria and muscularis). Instead, Petitioner contends that Mosher's and Ingle's catch-all references to a "wide variety of fascia and other collagenous tissues" (EX1006, ¶46) and "other collagenated support tissues" (EX1007, 2:59-63, 15:8-11), respectively, meet the "heating the target tissue" element. Reply, 9-10. But the Federal Circuit has repeatedly found laundry list recitations insufficient. POR, 28 (collecting cases). Mosher and Ingle's disclosures do not even include the specific tissues required by the claims; rather they vaguely reference treatment of a "wide variety" and "other" collagenous tissues.  EX1006, ¶46; EX1007, 2:59-63, 15:8-11. As Dr. Poulos testified, these vague references do "not provide any detail as to how its techniques would be adapted—if at all—to treat any of these other tissues." EX2001, ¶86. Petitioner has provided no contravening evidence.

- 15 -

Yet, Petitioner argues that a POSA would modify Edwards, Mosher, and Ingle to treat sexual dysfunction. But none of the references discloses the treatment areas recited in the independent claims.

### 3.    Edwards' speculum prohibits treatment of the introitus and circumferentially around the vaginal wall

The relied upon embodiment of Edwards uses speculum-mounted electrodes to heat the vagina. EX1005, 7:16-33. Petitioner's Reply introduces a new, unsupported argument that a POSA would be able treat the introitus without a speculum. Reply, 21. Even if the Board were to entertain this new and unsupported argument, Petitioner would still have "needed to present evidence and argument that a person of ordinary skill would have been motivated to operate [Edwards] in a manner that satisfied the [claim 1, 26, and 35 treatment area] limitation[s]." *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1363 (Fed. Cir. 2018). Petitioner has no evidence on this point. Instead, Petitioner misrepresents Dr. Poulos's repeated testimony that Edwards "only describes using [the treatment element] with the speculum." EX1032, 144:3-9, 144:10-16 (same), 144:17-23 (same); Reply, 21. Petitioner further posits that Edwards could be referring to a pediatric or other speculum. Reply, 21 (citing EX1032, 32:2-33:7 (Petitioner's counsel questioning Dr. Poulos whether a "pediatric speculum" is used on adults)). However, Dr. Poulos testified that the different size speculums do "not really"

- 21 -

"allow a physician to view different parts of the vaginal canal." EX1032, 33:19-22. In other words, use of a pediatric speculum would still prevent treating tissue near the introitus. Dr. Poulos's testimony on this point is unrebutted.

### 4. Petitioner does not rebut InMode's motivation to combine arguments

Petitioner's Reply restates the Petition's motivation to combine section. Reply, 21-22. But Petitioner fails to rebut any of InMode's points demonstrating no motivation to combine the Edwards, Ingle, and Mosher references to arrive at the elements of the independent claims. POR, 38-39, 45-46, 48-50, 59.

## IV.  GROUND 2: PETITIONER'S COMBINATION OF EDWARDS, MOSHER, INGLE, AND OLLIVIER FAILS

Petitioner does not address InMode's evidence that the combination of Edwards, Mosher, Ingle, and Ollivier does not teach the specific treatment areas of claim 43 and claim 51. POR, 64-66. Nor does Petitioner address InMode's evidence that there would be no motivation to combine theses references. POR, 66-68. Petitioner also (i) ignores the secrecy of the treatments alluded to in Ollivier, (ii) glosses over Ollivier's complete lack of technical detail, and (iii) disregards printed publication accessibility jurisprudence pertaining to Ollivier.

### 1. Ollivier's described treatments were not known to a POSA

Petitioner contends throughout its Reply that it was known to "perform[] [LVR] to tighten vaginal" tissue. *E.g.*, Reply, 3. Petitioner's only support for this

- 22 -

Appx368

proposition is the Ollivier reference. But Ollivier does nothing more than report on a technique that the author believed a lone doctor to be performing. It does not assert that the technique was publicly known, provides no details on that technique, and both experts agree that the treatments alluded to in Ollivier were kept secret subject to an NDA and a fee of $10,000. POR, 62-63; EX2005, 162:17-22.

### 2.    Ollivier does not enable the claim 43 and 51 treatment areas

Petitioner apparently only relies on Ollivier to suggest that treating external vaginal and vulval tissue existed.  But that *something* may have existed and the scope of the knowledge of a POSA are distinct issues. The technique was maintained as a secret to all in the field but those who paid the high fee and signed an NDA. POR, 62-63. Petitioner makes no argument that a POSA would have had the guarded knowledge or that the treatment technique was in the public domain.

Because Ollivier fails to describe the secret treatment, it fails to enable a POSA to use the undisclosed details to modify any known treatment. *See Raytheon Techs. Corp. v. GE*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) (explaining that while prior art "does not necessarily have to enable its own disclosure," it still must "furnish the motivation to combine, and be combined with, another reference in which that limitation is enabled" or "supply claim elements enabled by other prior art or evidence of record").

- 23 -

### 3. Ollivier is not a qualifying printed publication

Petitioner's citation to the Wayback Machine's record of Ollivier existing on the Internet falls short. Reply, 22 (citing EX1029); Pet., 12-13. Petitioner provides no evidence that the Ollivier article was indexed to be searchable or that Salon.com would be a source with which a POSA would have been familiar. Nor does Petitioner provide "a satisfactory showing that [Ollivier] has been disseminated or otherwise made available to the extent that … [a POSA] exercising reasonable diligence, c[ould] locate it." *SRI Int'l, Inc. v. Internet Sec. Sys.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008). It was Petitioner's burden to establish that Ollivier "was made 'sufficiently accessible to the public ***interested in the art***' before the critical date." *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012); *see also First Solar, Inc. v. Rovshan Sade*, IPR2023-00827, Paper 13 at 18 (P.T.A.B. Nov. 16, 2023) ("there was no evidence that the ordinarily skilled artisan would know of Wattsun or its web address."); *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) ("public accessibility requires more than technical accessibility"). Instead, Petitioner seems to believe that its mere existence is enough. The case law establishes it is not.

Petitioner's reliance on *Jazz Pharms., Inc. v. Amneal Pharms., LLC* is inapt because that case involved medical prior art references posted on an FDA website,

- 24 -

not a non-medical, political, gossip website as is the case here. 895 F.3d 1347, 1356 (Fed. Cir. 2018). Neither party's expert was even aware of Salon.com until this case. EX2005, 158:5-12; EX2001, ¶162. Thus, Petitioner has not met its burden.

## V.    <u>**OBJECTIVE INDICIA**</u>

Petitioner contends that InMode relies on an improper presumption of a nexus and did not show that the Viveve device described in the Millheiser and Sekeguchi studies is coextensive with claims 1, 26, and 35. Both arguments are unavailing.

To begin, Petitioner fails to address the permissible presumption set forth in *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016). Regardless, Petitioner's single challenge is that cooling is a "critical" feature of the Sekeguchi and Millheiser studies. Reply, 24-25. Neither reference indicates cooling is critical. Moreover, InMode's mapping accords with the *ThermiGen* IPR construction requiring "remodeling … without substantially affecting the epithelium overlying the target tissue" and the *Viveve* construction requiring protection of the epithelium. EX1009, 14-16; EX1024, 10-11. As discussed above in Section II.A, heating and remodeling without substantially affecting the epithelium can be achieved by various techniques (e.g., cooling, the use of gel, adjusting energies

- 25 -

used, etc.). EX2001, ¶141; POR, 53. The Sekeguchi and Millheiser studies use multiple of these modalities including "coupling fluid" (i.e., gel) and cooling. EX2017, 777; EX2018, 3. This is sufficient. InMode is "not require[d] … to produce objective evidence of nonobviousness for every potential embodiment of the claim." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013).

Moreover, cooling is explicitly recited in claims 9-16 and 39. *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well.")

For these reasons, InMode has demonstrated that the studies are "reasonably commensurate with the scope of the claims." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).

## VI.   PETITIONER'S ATTEMPTS TO DISCOUNT DR. POULOS'S TESTIMONY ARE UNAVAILING

Petitioner's attempts to downplay the credibility of Dr. Poulos's testimony fall flat. Petitioner's complaint that Dr. Poulos testified that she does not offer the procedures contemplated by the '511 patent is irrelevant. Neither party has proposed a definition of a POSA that requires experience with these treatments. Pet., 6; POR, 11-12. Indeed, that would be impossible because these novel

- 26 -

As discussed in more detail below, the SUI treatments at issue are directed to treating the bladder neck, deeper in the body than the treatments at issue in the present claims. As also discussed in more detail below, the Petition misses these important anatomical distinctions.

### B.    '511 Patent

The '511 patent claims recite methods of remodeling tissue underlying a surface layer of female genital tissue, by heating specific areas of tissue around, the vulva, the vagina, and the introitus (the opening of the vagina), to a therapeutic temperature. EX1001, claims 1, 35, 43, and 51. In most claims, the claimed treatment locations are close to or outside of the opening of the vagina. EX2001, ¶43. The '511 patent methods aim to restore genital tissue, which can be altered over time (and during childbirth) resulting in decreased sexual pleasure. EX1001, 2:4-9; EX2001, ¶43. Prior to the '511 patent, some doctors used invasive techniques, such as surgery, to treat these issues, but these approaches often caused scarring, resulted in damage, and required lengthy recovery. EX1001, 2:9-12; EX2001, ¶43. The inventive techniques of the '511 patent overcame the problems of prior techniques by providing non-invasive procedures for restorative care of certain female genital tissue that did not (i) require surgical incisions, (ii) cause

- 7 -

thermal damage to the epithelium, or (iii) result in patient down time. EX2001, ¶43.

The '511 patent claims methods for remodeling the target tissue underlying the female genital epithelial surface by heating that tissue. EX1001, claims 1, 35, 43, 51. The target tissue of the embodiments of the '511 patent are the tissues that lie immediately beneath the mucosal epithelium. EX1001, 3:41-48; EX2001, ¶44. RF energy heats and denatures collagen located in the collagen-rich lamina propria, resulting in a contraction of the collagen spaces thereby creating a tightening effect. EX1001, 1:19-39; EX2001, ¶44. As discussed below regarding claim construction, the '511 patent makes clear that its embodiments exclude deeper tissue (e.g., endopelvic fascia), which is a target in SUI treatments discussed below. EX1001, 3:47-48; EX2001, ¶44.

While some invasive surgical techniques (e.g., using lasers, ablative RF, and scalpels) were previously used to treat conditions in the female genitalia, Petitioner's expert, Dr. Berenholz, acknowledged that invasive techniques would ablate and "destroy the surface" of the tissue and "[d]efinitely" cause undesirable scarring, and could lead to malpractice claims. EX2005, 28:10-29:11, 94:3-15, 157:6-13; EX2001, ¶45.

- 8 -

The '511 patent uses heating without ablation to remodel the female genitalia.  As addressed during prosecution (discussed below), applying such treatments to the anatomical areas at issue in the present claims was not known prior to the '511 patent. EX2001, ¶46.

## C.    Prosecution History of the '511 Patent

During prosecution of the application that issued as the '511 patent, the examiner issued a rejection in view of U.S. Patent No. 6,350,276 ("Knowlton"). EX1002, 82 ("Knowlton discloses a method for remodeling a therapeutic zone within a target tissue …."). However, Knowlton's treatments were specifically related to "modifying *skin* surfaces and underlying tissue" including the cervix among other body parts—not the claimed female genital tissue.  EX1013, 1:16-29, 6:49-57, 13:35-37; EX2001, ¶47.

The independent claims were amended to specify heating of specific areas of female genital tissue, including introitus (claims 1 and 43), vagina (claim 35), and vulva (claim 51). EX1002, 234-244. In the Notice of Allowance, the Examiner explained "Knowlton fails to contemplate the specific areas of treatment set forth in independent claims [1, 35, 42, and 51]. No other reference has been found which discloses, suggests or makes obvious this area of treatment." EX1002, 317; EX2001, ¶48. Thus, the Examiner recognized that even though it was known to

- 9 -

(Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent[.]").

## A.    "target tissue"

All claims of the '511 patent recite "method[s] for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue." EX1001, claims 1, 35, 43, 51. The ThermiGen panel construed "target tissue" as "tissue immediately beneath the mucosal epithelium of genital tissues exclusive of deeper tissue, such as endopelvic fascia." EX1009, 12. In support of this construction, the ThermiGen IPR panel explained:

> [o]n the present record, we agree with Patent Owner that the passages identified in the Specification comprise a "clear and unmistakable" disclaimer of the scope of target tissue. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). We also note that there is no evidence in the record that the term "target tissue" has an ordinary and customary meaning in the art to which the '511 patent pertains that encompasses the endopelvic fascia.

*Id.*, 11. The Board should adopt ThermiGen Board construction of "target tissue." EX2001, ¶¶55-56.

- 14 -

Petitioner contends that the "comprising" term indicates that target tissue is permissive of heating or treating non-target tissue such as endopelvic fascia. Pet., 8-9. But that argument fails to address the Board's prior findings and the intrinsic record. The specification explicitly defines the term target tissue: "The target tissue lies immediately beneath the mucosal epithelium of genital tissues, and includes the lamina propria, a connective tissue that includes collagen in the extracellular space, and the muscularis, which includes smooth muscle. The target zone of embodiments of the invention ***does not include deeper tissue, such as endopelvic fascia***." EX1001, 3:43-48[1]; EX2001, ¶57

The specification expands on the definition of target tissue, explaining:

The target tissue of embodiments of this invention include the connective tissue underlying these mucosal epithelial surfaces of the genitalia which, progressing down from the epithelial surface, are known as the lamina propria 102 and the muscularis 104 (FIG. 8), respectively (see, for example, Netter, Atlas of Human Anatomy, 4th edition, Saunders, 2006). The lamina propria includes a mixture of cell types that populate connective tissue, such as fibroblasts, and the muscularis is a layer of smooth muscle. … ***These described target tissue layers below the***

---

[1] Emphasis added throughout.

- 15 -

> *epithelium overlay deeper tissues, including endopelvic fascia,*
> *which are not a target tissue for embodiments of the present*
> *invention.*

EX1001, 12:2-16; EX2001, ¶58. When the specification describes the features of the "present invention" as a whole, this description limits the scope of the invention. Thus, the specification makes clear that the "described target tissue layers" include the tissues adjacent the mucosal epithelium, such as the lamina propria and that the deeper tissues including the endopelvic fascia are excluded. EX2001, ¶59. Where, as here, "the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent[.]" *SciMed*, 242 F.3d at 1341; *see Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006).

Petitioner's proposed claim construction for this term improperly encompasses the deeper tissues underlying the epithelial mucosal, such as the endopelvic fascia, which the Board previously rejected. EX2001, ¶60; EX1009, 10-12. Because the Board's construction "cannot be divorced from the specification and the record evidence," *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015), and in view of the explicit definition of this term in the specification, "target tissue" should be construed to mean "tissue

- 16 -

immediately beneath the mucosal epithelium of genital tissues exclusive of deeper tissue, such as endopelvic fascia."

### B.    "remodeling"

This panel should adopt the ThermiGen IPR construction of "remodeling the therapeutic zone of target tissue" defined as "the result of raising the temperature of target tissue to no more than about 80 degrees C *without substantially affecting the epithelium overlying the target tissue*, wherein that result includes a tightening or contraction of the target tissue." EX1009, 14-16; EX1011, 14-15. This construction aligns with the Board's preliminary construction of the "heating" term (i.e., adopting the temperature limit of 80 degrees C), as discussed below. Importantly, the ThermiGen IPR construction also captures the '511 patent's requirement for avoiding surface damage. EX2001, ¶61; EX1001, 12:17-21.

In the ThermiGen IPR, the Board found that the "[s]pecification makes clear [] that 'remodeling of the connective tissue underlying the mucosal epithelial surfaces does not substantially affect the epithelium itself. The method and apparatus, as provided by embodiments of the invention are non-invasive and substantially non[-]ablative of genital tissue.'" EX1009, 15 (citing EX1001, 12:17–21).  This construction finds ample support throughout the intrinsic record. EX2001, ¶62.

- 17 -

The '511 patent is clear the claimed method is performed without "damaging" or "substantially affecting the epithelium overlying the target tissue." The Abstract states that "[t]his invention relates … [to] tightening tissue of the female genitalia by heating targeted connective tissue with radiant energy, while cooling the mucosal epithelial surface over the target tissue to protect it from the heat." EX1001, Abstract. The specification clearly states that "[t]he method and apparatus, as provided by embodiments of the invention are *non-invasive and substantially non ablative of genital [t]issue*." EX1001, 12:19-21; 13:19-23 ("[t]he epithelial surface is [] a conduit for energy passing through to underlying layers, but the energy does not manifest in the form of increased temperature at the epithelial surface. As such, *the epithelium itself is not damaged or substantially modified by the method*."); EX2001, ¶62.

This panel's Institution Decision provisionally adopts the *Viveve* court construction (Paper 6, 14).  But the *Viveve* court's "remodeling" construction does not capture the non-ablative aspect ("without substantially affecting the epithelium overlying the target tissue") of the claimed invention, which **both** the *Viveve* court and the panel in the ThermiGen IPR acknowledged. Specifically, the *Viveve* court agreed that the invention requires this understanding, but incorporated the understanding into its "heating" construction. EX1024, 11-12. For its "heating"

- 18 -

construction, the *Viveve* court found that "the intrinsic evidence indicates that a critical aspect of the invention is the manner in which the target tissue is heated. Specifically, the intrinsic evidence indicates that maintaining the epithelium at a temperature lower than the underlying tissue is important *to **ensure that the epithelium is not damaged or substantially modified by the method**.*" EX1024, 10-11.  To ensure that the claims properly recite this "critical aspect of the invention" the "remodeling" term should be construed to recite "without substantially affecting the epithelium overlying the target tissue," as adopted by the panel in the ThermiGen IPR. EX1009, 14-16; EX1011, 14-15; EX2001, ¶¶63-64.

Alternatively, should the Board's construction of remodeling not include the requirement "without substantially affecting the epithelium overlying the target tissue," that requirement should be included in the Board's construction of heating as explained below. EX2001, ¶65.

### C.    "heating"

This Board's Institution Decision adopts the definition of "heating" in the *ThermiGen* IPRs, which construed "heating" as "raising the temperature of target tissue to no more than about 80 degrees C."  EX1009, 14.  Patent Owner does not contest this construction to the extent that the Board also adopts the ThermiGen IPR construction for the "remodeling" term.

- 19 -

As noted above, should the Board adopt the *Viveve* court construction of "remodeling," the heating term should be construed as "raising the temperature of target tissue to no more than about 80 degrees C without substantially affecting the epithelium overlying the target tissue," so as to include the patent's requirement for avoiding surface damage.  EX1001, Abstract; 2:56-62; 8:8-15; 12:17-21; EX2001, ¶¶66-67.  This construction aligns with the *Viveve* district-identified "critical aspect of the invention … ensur[ing] that the epithelium is not damaged or substantially modified by the method." EX1024, 10-11.

**D.    "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock"**

Independent claim 35 recites "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock," which should be construed as "heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." In the ThermiGen IPRs, the panel acknowledged that this is a "close question" and then, as a preliminarily construction, accepted Petitioner's definition of "heating *at least one contact* site in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." EX1009, 18.  That preliminary decision was based on expert testimony from only one side. On the present record, the meaning of "circumferentially" requires more.  EX2001, ¶68.

- 20 -

second electrode surface which can be aligned substantially parallel to the first electrode surface, with the tissue positioned therebetween." EX1007, 4:33-37; EX2001 ¶88. Ingle explains that "the electrodes will generally be mechanically coupled to each other, ideally using a clamp structure which allows the target tissue to be compressed between the electrode surfaces." EX1007, 7:54-61, 8:24-27 ("clamping a target"); EX2001 ¶88.

While Ingle generically discusses several tissue structures that may be responsible in some manner for control of urination, Ingle's embodiments are drawn to treatment of the endopelvic fascia adjacent the bladder wall. *See* EX1007, Figs. 6, 11, 12, 12K, 13, 14:63-67; EX2001 ¶89. As shown in Figure 6, "the endopelvic fascia will preferably be disposed between the electrodes of the urethral probe 44 and the vaginal probe 42." EX1007, 18:46-50, 29:66-67, 30:1-2.

Ingle's embodiments differ from the '511 patent and the other references in that they require a parallel electrode on the opposite side of the vaginal wall, inserted into another orifice, which limits the regions of the vaginal wall available for treatment. EX2001 ¶90.

> **D.    Claim 1: The Combination does not render obvious "wherein the heating includes heating a portion of the vagina extending from**

- 29 -

**the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"**

The Petition relies only on Edwards and Mosher for this claim element. Pet., 35-36. Petitioner essentially argues that because Edwards and Mosher teach treating *a* portion of the vagina, they must teach treating *the* portion of the vagina most proximal to the introitus. Pet., 35-36. Not so. Not only do they not teach treating the portion of the vagina most proximal to the introitus, but both references specifically target a different part of the vagina in order to affect the bladder neck—a structure located deeper than the claimed treatment location. EX2005, 126:2-23. Further, Edwards's device is simply not suitable for treating the introitus. EX2001, ¶91. Therefore, the combination fails to suggest treating the portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus. EX2001, ¶91.

As an initial matter, Petitioner's arguments are based on a fundamental misunderstanding of the claim language. Petitioner states that "[a] POSA would have understood this treatment area includes heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (i.e., 3.5 cm from the introitus)." Pet., 35. This reading of the claim language is illogical, as the plain reading of the subject claim limitation requires

- 30 -

the treating of at least the introitus and the first 1 cm of the vagina (up to 3.5 cm in from the introitus). EX2001, 92.

As explained above, the introitus is the external opening of the vagina at the distal end of the vagina. *Supra* Section II.A. The primary structures targeted to treat SUI, as in Edwards and Mosher, are the bladder neck and supportive tissues, which are located at the proximal end of the urethra. *Supra* Section II.A; EX1005, 2:1-5 ("bladder[]neck"); EX1006, ¶¶[0006], [0046]; EX2001, ¶93. Petitioner's expert agreed. EX2005, 126:2-23 (Edwards and Mosher address SUI by "strengthening the tissues surrounding … [the bladder] neck.") Therefore, when treating a patient for SUI, a POSA would understand that one would treat the proximal portion of the vaginal canal, which is not near the introitus. *Supra* Section II.A; EX2001, ¶93.

As established above, the bladder neck—the focal treatment location for the type of RF-based SUI treatments described in Edwards and Mosher—***starts*** at the proximal end of the urethra, which extends about 4 cm into the body. EX2001, ¶94; EX2003, 2072 ("about 4 cm long passing from the bladder … opening in the vestibule of the vagina."); EX2004, 1672. The bladder neck treatment is provided through the vaginal wall, which does not run perfectly parallel to the urethra, given that it curves away from the urethra, as can be seen below. EX2001, ¶94.

- 31 -



EX1015, Plate 360 (annotated).

- 32 -



EX2009.

Thus, to treat the bladder neck through the vaginal wall, a POSA would have understood that the treatment position would be approximately 4 cm, or more, into the vagina, given the curvature away from the urethra, to affect the bladder neck (particularly given Edward's electrode arrangement). EX2001, ¶95.

- 33 -

Accordingly, Edwards, which is directed to SUI treatments, would not suggest to a POSA treating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus (the opening of the vagina). EX2001, ¶96. Indeed, Edwards treats the posterior and anterior vaginal walls opposite the ***bladder outlet***. EX1005, Fig. 8A ("proximate to the bladder outlet"), 3:9-11, 6:20, 11:48-53; EX2001 ¶96. A POSA would not understand these treatment areas to be within 3.5 cm of the introitus.  EX2001, ¶¶96-97.

Moreover, Edwards device would not be suitable for treating the claimed anatomical structure, as its treatment position would be too deep to meet the claim limitation. EX2001, ¶97. As shown below, the Edwards device includes "a speculum [] inserted in the patient's vagina." EX1005, 13:38-44. Blade 420, which has the treating electrode at a distal end thereof, "is inserted into the vagina through the speculum." *Id*. Because blade 420 is passed through the speculum, the electrodes on the blade treat the anterior or posterior vaginal walls *deeper* into the vagina (i.e., away from the vaginal opening) relative to the tip of the speculum. EX2001 ¶98.

- 34 -



FIG. 4

EX1005, FIG. 4 (annotated).

For context, a speculum is a device that dilates a vagina. EX2001 ¶100. In Edwards, blade 420 is not used until it mounted on the speculum, which has already been inserted into a vagina. *See* EX1005, Figs. 9A-9B; EX2001, ¶100; EX2005, 128:7-18, 132:1-12, 132:25-133:6. As shown in Figure 4, "[t]he blade 420 includes mating features 421, a spring-loaded pin detail 422, a plurality of relatively flat electrodes 423 and a plurality of irrigating fluid delivery pores 425. The mating features 421 are constructed to engage with features in the speculum following simple positioning of the speculum within the vagina. The spring-loaded pin detail 422 *locks the blade 420 into the correct position in the inserted speculum.*" EX1005, 7:26-33, 13:43-46; EX2001, ¶100. Edwards only ever

- 35 -

discloses that the blade 420 is locked into position with the speculum during delivery of RF energy to the vaginal wall. *See* EX1005, 13:43-62; EX2001, ¶100.

Both experts also agree that, when blade 420 mates with the speculum, the electrodes would extend beyond the end of the speculum, such that the electrodes would be positioned about 2 cm deeper into the vagina than the tip of the speculum. EX2005, 132:25-133:16, 140:14-17; EX2001, ¶101. Furthermore, a POSA would have understood that when inserting a speculum into the vaginal canal, it would need to be inserted at least a few centimeters beyond the introitus in order to properly engage with the tissue and prevent the speculum from falling out. EX2005, 137:12-138:1; EX2001, ¶101. While the experts disagreed on expected depth (2.5 cm for Petitioner and 5 cm for Patent Owner's expert), both estimates result in Edwards' failing to meet the claim limitation, with Petitioner's expert estimate placing treatment at 4.5 cm away from the introitus and Patent Owner's expert placing it 7 cm away from the introitus. EX2005, 137:12-138:1, 140:14-17; EX2001, ¶¶101-103

Thus, the Edwards device would not provide for treatment of the area from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus. EX2001, ¶104. In fact, the speculum dilates the introitus and moves it out of the way so that deeper structures of the vagina can be treated. EX2001, ¶104.

- 36 -

Mosher does not remedy the deficiencies of Edwards. Mosher is directed to treating the endopelvic fascia for treating incontinence, which supports and is located adjacent to the bladder. EX2001, ¶105. Mosher explains that "[t]o avoid injury to nerves in the *bladder neck* region while providing sufficient treatment volume along the endopelvic fascia, it may be advantageous to distribute the treatment volume along the patient's *lateral* orientation while *limiting the length of treatment along the axis of the patient's urethra*." EX1006, ¶[0074]. To achieve this, Mosher explains that the *size* of the treatment patch is wider than it is long, "ideally having a width of about 25 mm and a length of about 15 mm." *Id*. Petitioner mistakenly reads that stated *size* of the treatment area to be a position of the treatment relative to the introitus. Pet., 35-36. That understanding is simply wrong. EX2001, ¶¶105-106.

A POSA would not understand this disclosure to reference the region from vagina from the introitus to 3.5 cm inward. EX2001, ¶106. While Mosher describes a treatment area with a specific size (25 mm x 15 mm), it does not explicitly state the location of treatment area. EX2001, ¶106; EX1006, ¶[0074]. However, as discussed above, both experts agree that the treatment area for SUI is at the bladder neck, which is not near the introitus. EX2001, 106. Moreover, Mosher explicitly states that that the rationale for its treatment area is to *avoid*

- 37 -

extending along the urethra. EX1006, ¶[0074]. Under Petitioner's interpretation of Mosher, the treatment area would be along the urethra to the exclusion of the bladder neck, given the anatomical relationship of the structure discussed above. Indeed, with the limited treatment length, a POSA would readily understand that the introitus is not treated, as the introitus is spaced more than about 4 cm, from the bladder neck. EX2001, ¶107. Thus, Mosher fails to suggest the claim limitation.

Petitioner does not rely upon Ingle for this claim element. Pet., 35-36. In any event, Ingle suffers from the same deficiencies because it is directed to treating incontinence at the bladder, as opposed to treating the introitus. EX1007, 17:30-34, Figs. 6, 11, 12, 12K, and 13; EX2001, ¶108.

Finally, Petitioner fails to articulate a credible reason for why a POSA would have made the proposed combination. EX2001, ¶109. Petitioner provides only a conclusory statement, without any argument as to why a POSA "would have been motivated to make the combinations or modifications of prior art to arrive at the claimed invention." *InTouch Techs., Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). The Petition states that "Mosher further provides motivation to focus treatment nearer the opening of the vagina, in order to avoid damage to nerves in the bladder neck region and in the antero-lateral vaginal wall." Pet., 35. In addition to being incorrect, this falls far short because Petitioner in no

- 38 -

way "articulates how [Edwards and Mosher] could be combined, which combination(s) of elements in [Edwards and Mosher] could yield a predictable result, or how any specific combination would operate or read on [heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus]." *ActiveVideo*, 694 F.3d at 1327-28. In particular, it gives no basis or context for "nearer the opening" other than as a misunderstanding of Mosher's treatment dimensions.

Accordingly, the proposed combination does not render obvious "wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus," as recited in claim 1.

> **E.** **Claim 35: The Combination does not render obvious "wherein the heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock"**

Edwards does not suggest heating the vagina *circumferentially* around its wall from 1 o'clock to 11 o'clock, as required by claim 35. Edwards discloses "creat[ing] a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." EX1005, 13:14-16, 13:54-56. Neither of these treatment areas meet the claim limitation because the described treatment would, at best,

- 39 -

provide single contact treatments that extend in a series longitudinally and not in a circumferential direction in the claimed region.

As shown in FIG. 7 of the '511 patent below, the vaginal wall is oval-shaped. EX1001, FIG. 7; EX2001, ¶112. As shown in the '511 patent (Fig. 7), the anterior and posterior vaginal walls are smaller compared to the lateral vaginal walls. EX2001 ¶112.



EX1001, FIG. 7 (annotated). Nothing in Edwards suggests that its treatment of the anterior wall would be in the claimed region of 1 o'clock to 11 o'clock. EX2001, ¶113. And Edwards potential treatment of the posterior vaginal wall does not extend circumferentially for several reasons.

- 40 -

First, Edwards does not describe (and a POSA would not expect) that the speculum and treatment blade would be rotated within the patient. EX2001, ¶114. As discussed above with reference to Edward FIGS. 4 and 9, the "speculum is inserted in the patient's vagina" to treat "the posterior wall."  EX1005, 13:38-44; EX2001, ¶114.  Blade 420, which has the treatment electrodes, is positioned only after the speculum is in place and is locked in place on the speculum. EX1005, 13:43-49; EX2001, ¶114. Edwards does not describe the speculum being rotated or moved once engaged in place. EX2001, ¶114. Moreover, a POSA would understand that conventional positioning of the speculum is to place the bills against the anterior and posterior vaginal walls. EX2001 ¶117. The conventional position of a speculum can be seen in the diagram below:

- 41 -



EX2010, 2. Further, the patient's leg would be in the way of the speculum's rotation, and it would not make sense to rotate the speculum when using irrigation fluids like those described in the Edwards treatment. EX2001, ¶115.

Second, Edwards does not disclose treatments extending in any circumferential direction along the posterior wall. While the Petition refers to a "series of lesions," those lesions are caused by the electrodes 423 extending along the **length** of the device, as can be seen on blade 420 itself. Pet., 37 (quoting EX1005, 13:14-16); EX1005, Fig. 4 (electrodes 423). This suggests a series of point treatments along the length of the bladder neck, at least because that is the

- 42 -

Appx426

distribution of electrodes and there is no realistic option to rotate the speculum laterally. EX2001, ¶116.



FIG. 4

EX1005, Fig. 4 (annotated). Thus, Edwards' disclosure of treating the posterior wall describes treatment of a point on the vagina wall and does not teach heating "circumferentially … from 1 o'clock to 11 o'clock," as required by claim 35, under any reasonable claim construction. EX2001, ¶117

Mosher does not remedy the deficiencies of Edwards. Like Edwards, Mosher discloses treatment directed towards the endopelvic fascia, i.e., the anterior vaginal wall, at the bladder neck, which is above the vaginal wall between 11 o'clock and 1 o'clock. EX1006, Abstract, ¶[0009]; EX2001, ¶118. Petitioner reasons that because Mosher discloses "distribut[ing] the treatment volume along the patient's

- 43 -

lateral orientation," a POSA would be motivated to treat around the circumference of the vagina. Pet., 38 (citing EX1006, ¶[0074]). This significantly mischaracterizes Mosher.

Mosher is clear on its meaning of lateral treatment—namely, that the lateral dimension of the treatment area is greater than the length of the treatment area. EX1006, ¶[0074]. However, Mosher makes clear that this arrangement is achieved through treatment of an area up to 2.5 cm wide, as compared to the 1.5 cm length of the area. EX1006, ¶[0074]. EX2001, ¶119.But Mosher's limited anterior treatment does not suggest a circumferential treatment in the 1 o'clock to 11 o'clock span. Pet., 67; EX2001, ¶120. At best, a POSA would understand Mosher to potentially hit an insignificant spot inside of the claimed range (e.g., an insignificant spot at 11 o'clock or 1 o'clock), which would not qualify as a *circumferential* portion. EX2001, ¶120. Thus, Mosher does not suggest "heating a portion of the vagina circumferentially" from 1 o'clock and 11 o'clock, as required by claim 35 and Petitioner offers no argument as to why Mosher would be modified in this respect. EX2001, ¶120.

Moreover, Mosher does not "provide an express suggestion to avoid treatment in the 60 degree arc between 11 o'clock and 1 o'clock," as Petitioner suggests. Pet., 39. Petitioner cites to paragraph [0011] of Mosher describing a

- 44 -

"probe body directly access[ing] the treatment volume … using *tissue-penetrating electrodes*." EX1006, ¶[0011]. This disclosure of Mosher describes an embodiment where a needle penetrates tissue to directly heat the fascia, and in that case, the "treatment volume will preferably be separated from a urethra of a patient by at least about 1 cm to inhibit injury to nerves along the urethra" that is from being punctured by the tissue penetrating electrode. *Id.*; EX2001, ¶121. But Mosher does not disclose avoiding the bladder neck when applying RF through the vaginal wall. EX2001, ¶121.

Petitioner does not rely upon Ingle for this claim element. Pet., 36-39. In any event, Ingle fails for similar reasons as Mosher. Like Mosher, Ingle discloses treatment directed toward the endopelvic fascia between the bladder neck and the vagina, i.e., the region of the vaginal wall corresponding to the region from 1 o'clock to 11 o'clock. EX1007, 18:46-50; EX2001, ¶122.

Finally, Petitioner fails to sufficiently articulate a specific reason for why a POSA would be motivated to combine Edwards, Mosher, and Ingle to arrive at the specific limitations of claim 35. Petitioner relies on Mosher's statement of a treatment volume "offset laterally from the urethra to a right side of the patient" and "another treatment volume [is] similarly offset laterally from the urethra to a left side of the patient." Pet., 39 (citing EX1006, ¶[0011]). However, as confirmed

- 45 -

by the same paragraph, the offset is needed because the embodiment "us[es] tissue penetrating electrodes having active electrode surfaces that extend from the tissue engaging surface by a distance within a range of about 0 to about 8 mm." EX1006, ¶[0011]. EX2001, 123. The embodiment of Edwards Petitioner relies upon has no "tissue penetrating electrodes" so there would be no need to consider such an offset. EX2001, 123.

Therefore, the combination of Edwards, Mosher, and Ingle fails to render obvious claim 35.

### F.    Claim 43: The Combination does not render obvious "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line"

The combination of Edwards, Ingle, and Mosher does not render obvious "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line."

As explained above, the Hart's line is exterior to the introitus (as well as to the opening of the urethra). EX2001, ¶126. As also discussed above, Edwards, Mosher, and Ingle are all directed to treating female SUI, which a POSA would understand (and the references teach) involves treating at the bladder neck and associated structures. EX1005, 2:34-3:9; EX1006 ¶[0006], [0046]; EX2005, 126:2-23; EX2001, ¶126. Petitioner does not appear to dispute this. Pet. 40.  Mosher and

- 46 -

Ingle disclose heating the anterior vaginal wall adjacent to the bladder to strength and stiffen the endopelvic fascia. EX1006, Abstract, ¶¶[0009], [0058]; EX1007, 2:51-53, 2:59-60. These internal tissues are deeper than the claimed external target tissue between the introitus and Hart's line. EX2001, ¶126. None of these references suggest heating vulva tissue extending from the introitus to the Hart's line.

While Ingle mentions in passing "cosmetic procedures" and treatment of "sagging breasts" (EX1007, 18:1-7, 1:18-23), the same would not suggest to a POSA treating a "portion radiating outward from the introitus to Hart's line." EX2001, ¶127. On this point, Petitioner oversimplifies the issue and applies hindsight bias, by asserting in a conclusory manner that "a POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the area." Pet., 41. First, the '511 patent acknowledges multiple known references describing use of RF for cosmetic treatments. EX1001, 1:35-61. And the Examiner allowed the claims of the '511 patent over Knowlton and other references describing use of RF treatment for cosmetic procedures. EX1002, 317; EX1013, 6:58-65. The fact that RF treatments were used for cosmetic applications does not render obvious any cosmetic treatment at any anatomical location. *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d

- 47 -

1019, 1026 (Fed. Cir. 2017) ("it does not necessarily follow from prior-art disclosures of … general desirability … that a person of ordinary skill would have been motivated to [achieve the claimed invention].")

Second, the Federal Circuit has recognized that hindsight bias results when one focuses "on what a skilled artisan would have been *able* to do, rather than what a skilled artisan would have been *motivated* to do at the time of the invention." *Polaris Indus. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068 (Fed. Cir. 2018). Here, Petitioner uses hindsight to argue that passing references to cosmetic treatments elsewhere in the body, such as the face and breasts, would have motivated a POSA to perform a specific procedure to female genital tissue not suggested by the references. Pet., 41. Indeed, Petitioner's expert confirmed that "all over [one's] body," such as the breasts, are squamus epithelium as opposed to mucosal epithelium, which would be found in the claimed treatment site. EX2005, 155:18-20; *see also* EX2001, ¶128.  Squamus epithelium requires "different protocols" as compared to mucosal epithelium. EX2005, 155:21-156:7.; *see also* EX2001, ¶128. Also, the genital region radiating outward from the introitus to Hart's line is irrelevant to the common issue that these references were trying to solve: SUI. EX2001, ¶128. A POSA would have understood that heating the region radiating

- 48 -

outward from the introitus to Hart's line would provide no improvement of SUI inasmuch as Hart's line is even beyond the exit of the urethra. EX2001, ¶128.

Moreover, Petitioner's expert acknowledged that there would different RF settings, differing times, different use in treating vaginal canal structure versus "external structures" because "tissue response is different externally and in terms of tolerability versus vaginal heating." EX2005, 34:22-35:12; EX2001 ¶130. A POSA would not have understood how to apply the treatments of SUI references to the external introitus to Hart's line region. EX2001 ¶130.Further, the Petition fails to explain how the treatment would be accomplished. As discussed above, Edwards teaches an applicator that mates with a speculum. By definition, this procedure must take place *interior* to the vagina, not *external* to the vagina, extending from the introitus to the Hart's line. EX1005, 13:43-46; EX2001, ¶129. The Petition does not adequately offer any modification to Edwards to accomplish the claimed method. Petitioner's conclusory statement that "a POSA would have been motivated to apply the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the area recited in claim 43" (Pet., 41) in no way "articulates how [Edwards, Mosher, and Ingle] could be combined, which combination(s) of elements in [Edwards, Mosher, and Ingle] could yield a predictable result, or how any specific combination would operate or read on [heating a portion radiating

- 49 -

outward from the introitus to Hart's line]." *ActiveVideo*, 694 F.3d at 1327-28.

Notably, the only recitation of Hart's line in the relevant portion of the Petition is Petitioner's quotation of the claims and specification of the '511 patent. Pet., 40; EX2001, ¶129. Therefore, Petitioner has not met its burden in establishing that the combination of Edwards, Mosher, and Ingle render obvious "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line," as recited in claim 43.

### G.    Claim 51: The Combination does not render obvious "wherein the heating includes heating a mucosal surface of the labia minora"

The combination of Edwards, Ingle, and Mosher does not render obvious "wherein the heating includes heating a mucosal surface of the labia minora."  As explained above, the labia minora is exterior to the introitus.

As addressed above with respect to claim 43, none of the applied references suggest heating a mucosal surface of the labia minora. For claim 51, Petitioner presents the same arguments addressed above with respect to claim 43. Pet., 42. Thus, the application of the references against claim 51 equally fail because the labia minora is also external to the vaginal canal, and the Petition does not establish how (or why) a POSITA would modify Edwards to treat outside the canal. EX2001, ¶133.

- 50 -

Thus, the Petition fails to establish that Edwards, Mosher, and Ingle render obvious "wherein the heating includes heating a mucosal surface of the labia minora," as recited in claim 51.

### H.    All Independent Claims: The Combination does not render obvious "remodeling the therapeutic zone of target tissue"

The combination of Edwards, Mosher, and Ingle does not render obvious "remodeling the therapeutic zone of target tissue" as recited in each independent claim. Edwards discloses creating "lesions" in and ablating the vaginal wall, which would "substantially affecting the epithelium" and ablate the tissues underlying the epithelium. EX1005, 13:14-16; EX2001, ¶135. Mosher and Ingle also do not teach this element because they only credibly disclose remodeling of the endopelvic fascia, which is excluded deeper tissue, and do not describe remodeling of the "tissue immediately beneath the mucosal epithelium," as required by the Board's construction. EX2001, ¶135. As noted above, the intrinsic record establishes (and the ThermiGen IPR panel and *Viveve* district court agreed) that the claimed invention, as recited in each claim, requires that the treatment occur "without substantially affecting the epithelium overlying the target tissue." EX1009, 15-16; EX1024, 10 ("critical aspect of the invention is the manner in which the target tissue is heated… [which] is important to ensure that the epithelium is not damaged or substantially modified by the method."); *see also*

- 51 -

## V.    GROUND 2: PETITIONER'S COMBINATION OF EDWARDS, MOSHER, INGLE, AND OLLIVIER FAILS

For the reasons articulated above and with respect to claims 43 and 51, the combination of Edwards, Mosher, and Ingle does not render obvious the challenged claims because none of the references disclose "heating a portion radiating outward from the introitus to Hart's line" or "heating a mucosal surface of the labia minora."  Indeed, Edwards, Mosher, and Ingle do not disclose treating outside of the vaginal canal. *See* EX2001 ¶159.  Likely recognizing this deficiency of Ground 1, Petitioner relies upon Ollivier for Ground 2. However, Ollivier does not suggest the relevant claim features and, more fundamentally, is not an enabling disclosure. EX2001, ¶159.

In its conclusory five-paragraph argument, Petitioner appears to rely simply on the idea that Ollivier mentions cosmetic treatments to vulvar tissues to suggest modifications to the references in Ground 1. The argument fails for multiple reasons: (1) Ollivier was not sufficiently accessible to the public interested in the art; (2) Ollivier's high-level discussion reporting that one doctor was conducting (undisclosed) laser treatments does not provide a sufficient, enabling disclosure; (3) Ollivier never mentions the target tissues of claims 43 and 51; and (4) Petitioner has not sufficiently explained how the references would be combined.

- 60 -

Appx444

### A.    Ollivier is not an enabling reference or qualifying printed publication

Ollivier appears to be an article entitled "Designer vaginas" that purportedly appeared on a website called Salon.com. Salon.com is described as a "politically progressive and liberal news and opinion website" that provides "provocative (if predictably liberal) political commentary and lots of sex." EX2015. Salon.com is not a medical or technical publication. The author does not have a medical or technical background. EX1008, 1; EX2011. EX2001, ¶¶160-161

First, Petitioner has not demonstrated that Ollivier "was made 'sufficiently accessible to the public interested in the art' before the critical date." *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012). Indeed, Petitioner provides no evidence that a medical doctor as of 2006 would access or be aware of Salon.com, let alone the Ollivier article. In fact, Petitioner's own expert testified during his deposition that he was "not aware of Salon.com *until two minutes ago*." EX2005, 158:5-12 ("Q. Are you aware of the Salon.com website? A. Not at all."). Dr. Berenholz further testified, that he was not aware of any doctors that read Salon.com. *Id.*; EX2001, ¶162. InMode's expert was also unaware of Salon.com before this case. Notably, the Petition asserts that "interested persons would have known of or been able to locate Salon.com," and that the article could be located using "Salon.com's search functionality." Pet. 12-

- 61 -

13. But Petitioner's expert contradicts that unsupported assertion. Moreover, whether a person could search for the article at Salon.com's website is irrelevant if an "interested researcher" would not have known of that website or have been drawn to its content in the first place. *See Verified, Inc.*, 698 F.3d at1380-81. Nor has Petitioner established what search, if any, would have resulted in the article being found (*see* EX1029) or how the cited to "Audience Profile" (*see* EX1023) would capture the relevant population at issue.

Second, regarding enablement, Petitioner's expert admits that Ollivier does not provide any specifics regarding the procedure or laser being used. EX2005, 160:6-10 (acknowledging that he obtained knowledge of the procedure through personal experience because he "was trained by Dr. Matlock"); EX2001, ¶163 *Raytheon Techs. Corp. v. GE*, 993 F.3d 1374, 1381 (Fed. Cir. 2021) ("reference must necessarily enable the relied-upon portion of its own disclosure"). Ollivier is an article that merely indicates that there was a single doctor—Dr. Matlock—performing an invasive procedure using laser to cut away tissue, with no real description of the actual procedure. EX1008.

As to the actual treatment alluded to in Ollivier, Petitioner's expert's understanding of the procedure was not obtained through Ollivier's disclosure, but through training with Dr. Matlock. Moreover, for the training, Dr. Matlock

- 62 -

required participating doctors to sign a non-disclosure agreement, as the procedure was kept secret. EX2005, 162:3-6 (agreeing that Dr. Matlock "keeps the specifics ... of the treatment confidential"), 162:23-163:4 (describing Dr. Matlock's "contract about … not divulging treatment, surgical techniques, et cetera. ... it was confidential."), 165:23-166:1 (Dr. Matlock's procedures still confidential). InMode's expert confirms that Dr. Matlock still requires a non-disclosure agreement to explain the procedure.  EX2001, ¶164.

Due to the secrecy of the procedure, Ollivier reports on Dr. Matlock's treatments at a high-level, referring to, e.g., "Laser Vaginal Rejuvenation." EX1008, 1, 2 (stating that Dr. Matlock has not "published any scientific material relating to his work"). Ollivier makes reference to Dr. Matlock's "antiseptic trimmings and surgical prunings of a trusty laser" to remove tissues, without providing any details on the procedure. EX1008, 1. The reference "trimmings" and "surgical pruning" suggests only that Matlock is using a surgical laser instead of a scalpel to surgically remove tissue. EX2001, ¶ 165. Indeed, Ollivier identifies the risks associated with laser vaginal surgery, including "hemorrhage, infection, loss of sensitivity, lingering pain from nerve damage," which are associated with invasive procedures. EX1008, 2; EX2001, ¶ 165. As established above, the remodeling techniques of the '511 patent are non-invasive procedures intended to

- 63 -

avoid these effects. EX1001, 2:9-16 ("surgical approaches are not highly popular because of the risks associated with an invasive procedure, in a sensitive area, especially when such procedures are considered medically optional."); EX2001, ¶166. Given the invasive procedure suggested by Ollivier and the lack of details, because the treatment was maintained as a secret, there is no enabling disclosure of a treatment to be combined with the other references.

**B. Claims 43 and 51 are not obvious in view of Edwards, Mosher, Ingle, and Ollivier**

**1. Claim 43: Edwards, Mosher, Ingle, and Ollivier do not render obvious "heating a portion radiating outward from the introitus to Hart's line"**

Ollivier does not describe heating between the introitus and Hart's line. Ollivier vaguely describes invasive surgical techniques where "labia [are] modified, vulvae reconfigured," and labium are "trim[ed] back." EX1008, 1. But Ollivier does not teach or suggest treatment of the portion of the vagina from introitus to the Hart's line, nor does Ollivier disclose treating in an area "radiating outward" from the introitus. Rather, in the treatment described by Ollivier, portions of external vaginal tissue are removed entirely, which may even remove the Hart's line. EX1008, 1; EX2001, ¶167. Thus, there is no suggestion of the specific treatment claimed. Indeed, a POSA reading Ollivier would not know to

- 64 -

heat target tissue underlying a portion of the vulva radiating outward from the introitus to the Hart's line. EX2001, ¶167.

More fundamentally, Petitioner fails to explain how Ollivier's vague description of vaginas "being redesigned, labia modified, vulvae reconfigured," using an undisclosed type of laser, to cut away vaginal tissue would suggest to a POSA how the RF techniques of the SUI references could be used to treat the region "radiating outward from the introitus to Hart's line." EX2001, ¶168. Petitioner provides no disclosure regarding how the SUI references could be used to perform the "antiseptic trimmings and surgical prunings" of the laser described in Ollivier. EX1008, 1; EX2001, ¶168. Indeed, as Petitioner's expert admits, the laser treatments of Ollivier "us[e] a laser as a scalpel" to "sculpt[]" and "cut" the tissue, while RF treatments like in the SUI treatments do not. EX2005, 31:16-21, 159:24-160:5; EX2001, ¶168.

### 2. Claim 51: Edwards, Mosher, Ingle, and Ollivier do not render obvious "heating a mucosal surface of the labia minora"

Ollivier also does not disclose heating a mucosal surface of the labia minora. Rather, Ollivier vaguely describes invasive surgical techniques where "labia [are] modified" or "trimm[ed] back." EX1008, 1. From the little that can be discerned of the treatment alluded to in Ollivier, portions of external vaginal tissue are

- 65 -

removed entirely.  EX1008, 1; EX2001, ¶169.  The '511 patent is clear that these "surgical approaches" are associated with "a risk of scarring that is entirely counterproductive with regard to the desired result."  EX1001, 2:13-16; EX2001, ¶169.  Further, Ollivier does not describe treating the "mucosal surface of the labia minora," as opposed to the labia majora.

As with claim 43, Petitioner also fails to explain how Ollivier's vague description lasers cutting away vaginal tissue would suggest to a POSA how the RF techniques of the SUI references could be used to treat the region "mucosal surface of the labia minora.".  EX2001, ¶170.

### 3.    Claims 43 and 51: No motivation to combine Ollivier with Edwards, Mosher, and Ingle

There is no motivation to combine the laser surgical procedures referenced in Ollivier with the SUI procedures of Edwards, Mosher, and Ingle (the "SUI references"). For one, Ollivier identifies the risks associated with laser vaginal surgery, including "hemorrhage, infection, loss of sensitivity, lingering pain from nerve damage." EX1008, 2. And Petitioner's expert acknowledges that these side effects can occur with laser surgical techniques. EX2001, ¶171; EX2025, 163:19-13.

Also, Ollivier acknowledges that others in the field did not even believe Dr. Matlock's procedure was safe or effective. Indeed, Ollivier quotes another medical

- 66 -

Appx450

doctor who explains that the procedure "''is a way of preying on vulnerable women.'" EX1008, 2 ("''Run away. Run away. Run away.'"). EX2001, ¶172

Moreover, a doctor treating SUI (which is generally focused on strengthening the internal support for the bladder region) would not look to methods for improving the look of exterior genitalia or treating "true genital 'deformities'." EX1008, 6-7; EX2001, ¶173. Treating external genitalia has no effect on SUI. EX2001, ¶173.

Petitioner also provides no explanation as to how the SUI references would be modified to incorporate the vague teachings of Ollivier. Indeed, the Edwards energy applicator is a blade that mates with a speculum, thus confirming it is intended for internal usage. EX1005, 13:38-42, FIG. 4; EX2001, ¶174. Similarly, Mosher discloses "vaginal probes" with "needle mounted temperature sensors." EX1006, ¶[0058]. Likewise, Ingle discloses "clamping a target tissue between a plurality of electrode surfaces…" for example, by placing one electrode surface in the vagina and a second electrode surface in the rectum. EX1007, 8:24-27. Petitioner does not explain how these applicators would be modified to treat the external vulva tissues.

Finally, Dr. Matlock was allegedly advertising and performing ablative laser treatments on the vagina since at least the late nineties. EX1008, 1-2. Yet, prior to

- 67 -

the present invention, no one suggested the specific non-invasive procedures, on specific anatomical structures, claimed in the '511 patent. EX2001, ¶175

### C. The Combination of Edwards, Ingle, Mosher, and Ollivier does not render obvious claims 2-34, 36-42, 44-50, and 52-58

Claims 2-34, 36-42, 44-50, and 52-58 ultimately depend from independent claims 1, 35, 43, and 51 and accordingly are not rendered obvious by the combination of Edwards, Ingle, Mosher, and Ollivier for at least the same reasons discussed above for the independent claims. EX2001, ¶176

## VI. OBJECTIVE INDICIA

While he is now attacking the '511 patent, Dr. Berenholz's former employer, Thermi, and mentor, Dr. Alinsod, recently praised the '511 patent treatments as "landmark." EX1025, 18; EX1004, 2; EX2005, 44:12-20. Specifically, Dr. Alinsod and Thermi published a paper in which Dr. Alinsod describes a study of Viveve's (the original assignee of the '511 patent) treatment as a "landmark study" that reported "notable improvement to sexual function." EX1025, 18, 21. The "landmark study" describes treatments corresponding to claims 1, 26, and 35, as discussed below. *See* EX2018; EX2001, ¶177. Dr. Alinsod's paper also praises a second study of Viveve's device and treatment, which device and treatment also corresponds to claims 1, 26, and 35. EX1025, 18, 21; EX2017.

- 68 -

Appx452

"[I]ndustry praise … provides probative and cogent evidence that one of ordinary skill in the art would not have reasonably expected" the claimed invention. *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013). "[T]here is presumption of nexus … when the patentee shows that the asserted objective evidence is tied to the a specific product and that product 'is the invention disclosed an claimed.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016).

Here, claim 1 recites "heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus." EX1001, claim 1. Claim 26 recites "tightening the introitus." EX1001, claim 26. Claim 35 recites "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." EX1001, claim 35. Both of the studies praised by Dr. Alinsod describe heating and remodeling vaginal tissue by applying an RF "treatment tip … to the mucosal surface of the vaginal *introitus* starting at the hymenal ring and [treating] the entire area *from the 1:00 o'clock to 11:00 o'clock position* … with RF energy pulses."  EX2018, 3; EX2017, 777; EX2001, ¶179. Moreover, the specific device being used was the Viveve device. EX2018, 3 (left column); EX2017, 776-77. The treatment was performed to heat tissue "beneath the surface" and while using cryogen so as not to affect the surface tissue. EX2018,

- 69 -

3 (right column); EX2017, 779, 780 ("nonablative"); EX2001, ¶179. Also, the treatment area extended from the hymenal ring (which forms a portion of circumference of the introitus) to about 1.6 cm from the introitus. EX2001, ¶179; EX2018, 3 (describing a 20 cm$^2$ treatment area over a 12 cm circumference (left column)). This treatment is commensurate in scope with the treatment of claim 1— "introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"—and claim 26—"tightening the introitus."  EX2001, ¶179; EX1001, claims 1, 26.  Also treating the area from "the 1:00 o'clock to 11:00 o'clock position … moving the tip in a clockwise direction" is commensurate in scope with claim 35's treatment of "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." EX2018, 3 (right column); EX2017, 777; EX1001, claim 35; EX2001, ¶179.  These treatment areas in claims 1 and 35 were the "specific areas of treatment" that the Examiner identified as novel and non-obvious during prosecution of the '511 patent.  EX1002, 317.

Dr. Alinsod even performed his own study that provided "confirmation" of the studies of the Viveve treatment and concluded that such evidence "is a boon to successful treatment and may represent a key advance in the emerging field of vulvovaginal rejuvenation." EX1025, 21 (also praising the lack of "downtime" or "risks" to the patients); EX2001, ¶180. Dr. Alinsod contrasted this benefit to prior

- 70 -

treatments that resulted in significant patient downtime. EX2013, 3, 5, 6. This praise from Dr. Alinsod, who Petitioner's expert described as "a very good physician," regarding the specific treatments of the '511 patent claims 1, 26, and 35 forms a strong objective indicium of non-obviousness. EX2005, 42:23-44:3.

## VII.  PETITIONER'S EXPERT'S DECLARATION SHOULD BE GIVEN LITTLE WEIGHT

According to the declaration, the expert supposedly, "[i]n formulating [his] opinions, [he] … considered the viewpoint of a person of ordinary skill in the art" and "relied on [his] education, background, and experience." EX1003, ¶3-4.

However, Dr. Berenholz testified that he did not prepare his declaration. Instead, "[i]t was drafted by the attorneys who represent [him]." EX2005, 166:24-167:5. Not only did Dr. Berenholz not prepare his declaration, but he did not edit or change "any portion of the declaration." *Id*., 168:18-20. Dr. Berenholz further testified that he did not even know what his contribution to the declaration was. *Id*., 167:19-168:4 ("I'm not sure where [my expertise in thermal energy and non-invasive vaginal rejuvenation] was utilized in the declaration."). Dr. Berenholz also did not know where the Ollivier reference, which Petitioner relies on as the basis for Ground 2, came from. *Id*., 157:24-158:11.

Additionally, despite both of Petitioner's grounds being based on obviousness combinations, Dr. Berenholz did not even know what the doctrine of

- 71 -

Trials@uspto.gov
571-272-7822

Paper No. 27
Entered:  September 18, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BTL INDUSTRIES, INC.,
Petitioner,

v.

INMODE LTD.,
Patent Owner.

_____

IPR2024-00703
Patent 8,961,511 B2

_____

Record of Oral Hearing
Held:  July 8, 2025

_____

Before MEREDITH C. PETRAVICK, BENJAMIN D. M. WOOD, and
HYUN J. JUNG, *Administrative Patent Judges.*

IPR2024-00703
Patent 8,961,511 B2


APPEARANCES:

ON BEHALF OF THE PETITIONER:

    RICHARD BEMBEN, ESQ.
    Sterne, Kessler, Goldstein & Fox, PLLC
    101 K Street NW
    10th Floor
    Washington, D.C.  20005
    (202) 772-8549
    rbemben-ptb@sternekessler.com

    JENNIFER CHAGNON, ESQ.
    jchagnon-ptab@sternekessler.com


ON BEHALF OF THE PATENT OWNER:

    WILLIAM HECTOR, ESQ.
    Venable, LLP
    101California Street
    Suite 3800
    San Francisco, CA  94111
    (415) 653-3755
    wahector@venable.com

    MICHAEL SANDONATO, ESQ.
    msandonato@fchs.com


       The above-entitled matter came on for hearing on Tuesday, July 8, 2025, commencing at 9:00 a.m., via video teleconference.

2

IPR2024-00703
Patent 8,961,511 B2

P R O C E E D I N G S

- - - - -

JUDGE PETRAVICK: Good morning. This is Judge Petravick. I just want to make sure everybody can hear me. If you could, give me a thumbs up. Great, thank you. We're here today for oral arguments in IPR2024-00703 in the matter of BTL Industries, Inc. v. InMode LTD. With me on the panel today is Judge Jung and Judge Wood. If we could know who's here from the Petitioner.

MR. BEMBEN: This is Richard Bemben of Sterne, Kessler on behalf of the Petitioner, BTL Industries. And with me today is Jennifer Chagnon, as well as Stephanie Nguyen from BTL.

JUDGE PETRAVICK: Thank you. And who is here from the Patent Owner?

MR. HECTOR: This is Bill Hector of the Venable Law Firm here on behalf of the Patent Owner, InMode. And also in the audience is Michael Sandonato, also of the Venable Law Firm.

JUDGE PETRAVICK: Great, thank you. Today, we have the Judges in the hearing rooms and the parties on video conference, so that we ask that you mute yourselves when you are not speaking. That would be very helpful. The Judges do have your papers and the entire record on the screens in front of them, and we will also be able to see any demonstratives that you share on the screens in front of us. I believe, from your view, you can also see the clock in the hearing room.

MR. BEMBEN: Correct.

JUDGE PETRAVICK: Is that correct?

MR. HECTOR: Correct.

IPR2024-00703
Patent 8,961,511 B2

JUDGE PETRAVICK: All right. Each party has been given 60 minutes of oral argument time. I will set the clock at 60 minutes when you begin to speak. Whenever you've finished your argument in chief, what remains will be for your rebuttal. With that, I believe we can begin. Petitioner, you may begin when you're ready.

MR. BEMBEN: Just one -- thank you, Your Honor. One question for you. Would you prefer that I share --

JUDGE PETRAVICK: Sure.

MR. BEMBEN: -- demonstratives on the screen or just speak to the demonstrative number while you have demonstratives on your screen?

JUDGE PETRAVICK: Sure. You can share the demonstratives on the screen. If that, for some reason, fails or doesn't show up, we also have copies and if you could refer to these slides by number, that would be great.

MR. BEMBEN: Okay. Let me get that set up. Can you see my screen? Or can you see the slides here?

JUDGE PETRAVICK: Yes. Yes, we can. We can see your screen.

MR. BEMBEN: Okay, thank you very much. I'm ready to begin.

JUDGE PETRAVICK: Thank you.

MR. BEMBEN: And I'd like to reserve 15 minutes for rebuttal. So, good morning, Your Honors, and may it please the Board. The evidence in this case demonstrates that the claims of the '511 patent would have been obvious. The claims are directed to methods for remodeling certain regions of the vagina by applying heat to tissue underlying the epithelium.

IPR2024-00703
Patent 8,961,511 B2

By February 2006, persons of skill in the art knew three key things. First, they knew of the sexual and aesthetic problems caused by loose vaginal tissue. Second, they knew that applying heat to collagen-rich tissue produces a tightening effect. And third, they knew that training loose vaginal tissue, including the vaginal canal, introitus, and vulva, that that would improve sexual function and enhance appearance.

So the specific problem addressed by the '511 patent was known. The treatment method in physiological response were known and the anatomical locations to treat in order to address the problem was known. This is also a case in which the level of skill is high. Now, there is some disagreement about the exact credentials, but the parties agree that a person of ordinary skill in the art would've had a medical degree, as well as clinical experience with non-surgical treatment with female vaginal tissue.

This person of high skill armed with the knowledge, as well as the expressed teachings and suggestions of the prior art reference, would have found the claims obvious. Faced with the strength of this invalidity case, InMode resorts to some pretty familiar tactics. They tend to limit the scope of the claims by reading in limitations that are not required. They tend to limit the scope of the prior art, arguing that the prior art only addresses incontinence, which is untrue.

And they also simply ignore arguments or evidence that are unfavorable, such as with respect to Ground 2, the Ollivier reference. They continue to argue that that is not publicly accessible, but we have provided research aids, which they have simply failed to address, and research aids in the form of Exhibits 1027 and 1028, which show that this reference was publicly accessible and was being cited by other publications.

IPR2024-00703
Patent 8,961,511 B2

InMode's tactics fail. This is a quintessential KSR type obviousness case. With that, I'm going to move to the agenda. And to that, I plan to talk about the -- I'm going to skip over the instituted grounds, the independent claims. Those are just there for reference, but I'd like to discuss the level of ordinary skill and the state of the art, which I just mentioned, and talk about the scope of the claims and the prior art before jumping into Grounds 1 and 2. And if there's time and there's interest, talk about secondary considerations.

Before I go through any of those sections, I wanted to open it up to the panel and welcome you to direct me to what you think are the most critical issues. If you'd like me to continue with my presentation, I'd be happy to do so, but if there's a critical issue, please direct me there and we can talk about it now.

JUDGE PETRAVICK: I would like to talk about claim scope.

MR. BEMBEN: Sure. Okay.

JUDGE PETRAVICK: Focusing on exactly what the independent claims require. We could start with Claim 1, the wherein clause. I believe the parties are reading that cause differently. Would you please tell us how you read --

MR. BEMBEN: Yes.

JUDGE PETRAVICK: -- the wherein clause in Claim 1 and where you find support in the spec or in the other claims, or how you're reading that?

MR. BEMBEN: Sure. So I have Slide 5 up. This is showing independent Claim 1 and the wherein clause that you're referring to is shown in red text. And that states, wherein the heating includes a portion -- heating

IPR2024-00703
Patent 8,961,511 B2

a portion of the vagina, extending from the introitus inwardly, to the location from 1 cm to 3.5 cm in from the introitus.

Now, with respect to -- the first thing I want to say about claim construction, it is our position and has been our position throughout this proceeding that the claim terms should be given the plain and ordinary meaning, and that regardless of the construction that you adopt -- there's been a lot of prior constructions, a lot of arguments from Patent Owner in prior proceedings -- but regardless of the construction that you adopt, that the prior art teaches and renders obvious these claim limitations. So I just wanted to say that right off the bat.

With respect to limitation 1.3, I believe you're referring to the parties are taking a slightly different views than how this claim term should be construed. Petitioner, BTL, our position is that the area -- the portion that is being treated is within the range of 1 cm to 3.5 cm inward from the introitus. The reason -- the way that we're reading the claim is that the language that the portion extends from the introitus inwardly, that is describing the direction and the location of this being treated is between 1 cm and 5 cm in that direction from the introitus.

Now, we understand that InMode has taken a different position. Their reading is that the treatment location begins at the introitus and extends or ends at some location between 1 cm and 3.5 cm in. That is the dispute. And like I said, we covered both of them in our papers in our petition, but that is the basic dispute between the parties. And so we believe that the plain language of the claim dictates that a treatment location is between 1 cm and 3.5 cm, and that's, as I mentioned, just the fact that the language extending from the introitus inwardly as describing the direction --

IPR2024-00703
Patent 8,961,511 B2

orienting you as far as direction, but the actual portion that's being treated is the location from 1 to 3.5 cm.

JUDGE PETRAVICK:  And what's that based upon?

MR. BEMBEN:  The plain language of the claim specification.

JUDGE PETRAVICK:  So let me ask you a question.  Looking at the spec -- I believe it's in Column 11 -- it talks about -- gives sort of the same range, but it goes to 0.4 cm.  And it says at column 11, line 48 , it says, thus, according to embodiments of the invention, the portion of the vagina to be treated is a region between the introitus and a position located no further than about 3 cm to about 4 cm inward from the introitus.  Is that a quote that corresponds to that limitation?

And based on the specification, it seems like what the claim is trying to capture is the lower portion of the vagina, and since people have different lengths of vaginas, they're trying to capture a range of the lower portions from the introitus to the position located no further than about 3 cm.  Can you tell me whether you agree or not that this portion of the specification sort of supports Patent Owner's reading or doesn't support Patent Owner's reading of that limitation and why or why not?

MR. BEMBEN:  Sure.  So I think that the portion of Column 11 that you just read, it supports both, quite frankly.  I think that it's vague.  It doesn't describe the specific area or range that's treated.  It says that this -- the invention is seeking to, as you just mentioned, treat the lower portion of the vagina, but then when we get to the claim limitations, they specifically describe specific locations or specific treatment areas.

And so I don't think that this is dispositive of one or the other interpretation of this limitation, limitation 1.3, because the range under our

IPR2024-00703
Patent 8,961,511 B2

interpretation, 1 cm to 3.5 cm would be -- if the treatment area had to be within that location, is also the lower portion of the vagina. Patent Owner's construction is the lower portion of the vagina, would start at the introitus and move within the range that's described in Column 11, as well.

And so I don't think it's dispositive as to either of those constructions, but maybe more to the point, I think that the -- regardless of the construction that is adopted by the panel, it is taught by prior art references and if you'd like me to move to that discussion, I can move to that discussion now.

JUDGE PETRAVICK: Not quite yet. You know --

MR. BEMBEN: Okay.

JUDGE PETRAVICK: -- the first step of the analysis is figuring out what the claim actually requires. So in the papers, you point to Claim 26 --

MR. BEMBEN: Yes.

JUDGE PETRAVICK: -- as showing that that can't include the -- Claim 1 doesn't include the introitus. But Claim 1 is directed to the remodeling instead of the heating portion, so it doesn't quite correspond to that — heating includes the introitus or not in treating the introitus. Can you explain to me how your argument about Claim 26 affects that limitation?

MR. BEMBEN: Sure. And so let me start by just addressing one of the things you just said about heating and remodeling. In the patent itself -- I'm going to turn to Slide 34 -- the remodeling is the result of the heating, and so in order to remodel a location, it really needs to be heated. And we have here on Slide 34 a quote -- or a portion of the '511 patent that just says, a zone of tissue that is heated within the target tissues to a

IPR2024-00703
Patent 8,961,511 B2

threshold level, i.e. to a therapeutic temperature that causes remodeling is termed a therapeutic zone.

And so my point here is just that although Claim 26 refers to remodeling or maybe other claims refer to remodeling, in order to remodel that area, it needs to be heated. And so the way we read Claim 26, dependent Claim 26, is that it requires the introitus in order to remodel the introitus. And from a claim differentiation standpoint with limitation 1.3 that we're discussing -- I'll go back up to Claim 1 on Slide 5 -- we believe that that demonstrates that the introitus is already covered by Claim 26, heating the introitus, and so limitation 1.3 should mean something different. Again, our position is that the prior art teaches under either of the constructions, whether it's Patent Owner's construction or Petitioner's construction, but that is our claim differentiation position with respect to Claim 26.

JUDGE PETRAVICK: And one more question. I know that in the prosecution history, the limitations were added after a rejection. The claims were amended to specify the locations. Was this limitation amended again after it was added or was that the end of the prosecution history?

MR. BEMBEN: So I'd have to go back and doublecheck. My recollection of the prosecution history, Your Honor, is that it was not amended again. There were several limitations that I believe were in dependent claims that the Examiner identified as allowable. Those dependent claims were rewritten in independent form, which led to the allowance without further discussion of the specific locations or -- yeah, the specific locations that were required by the wherein clauses in the independent claims.

IPR2024-00703
Patent 8,961,511 B2

JUDGE PETRAVICK:  Thank you.  Could we talk about Claim 35 now and the wherein clause in that claim?

MR. BEMBEN:  Yes, Your Honor.

JUDGE PETRAVICK:  I believe there's --

MR. BEMBEN:  So --

JUDGE PETRAVICK:  -- a dispute about how much of this portion has to be heated or treated, and if I am -- and maybe you could confirm for me that your position is that only one point within this arc that is described has to be heated.

MR. BEMBEN:  So, yes, Your Honor.  So I'm turning to Slide 6 and this shows the operative language in red.  Our position is -- so there was some discussion about what is a point versus which is a contact site and we -- okay, so I don't think that our position is just that it's one point needs to be treated, but that a contact site within this range from 1:00 o'clock to 11:00 o'clock needs to be treated.

And when a contact site is described in the patent, a 30 degree arc.  This is in the patent, Column 14, line 41 through 45 -- it describes that the region from -- the region of the vagina from 1:00 o'clock to 11:00 o'clock, where the urethra is at 12:00, that that's about a 300 degree arc and that a contact point or a contact site that they describe being treated within that, is about 30 degrees.  And so it's our position that it doesn't -- the claim limitation 35.3 does not require heating the entire arc.  It requires heating a portion of that arc and a contact site is sufficient.

And I also mentioned that it appears that Patent Owner's construction, which is heating multiple contiguous contact sites into 300-degree arc is similar.  Heating multiple means two or more contiguous

11
Appx470

IPR2024-00703
Patent 8,961,511 B2

contact sites, so that would be about 60 degrees within that arc of 300 degrees.  This is on the POR on page 22 of their construction.

And so just to kind of summarize, our position is not that the entire arc from 1:00 o'clock to 11:00 o'clock needs to be treated.  It's a portion of that and the portion could be about 30 degrees and -- but I'll say just like I said in the prior discussion of Claim 1, though, is that we have covered all the interpretations in our papers recognizing that there are prior constructions and prior arguments, whether it's heating a portion or heating the entire arc between 1:00 o'clock and 11:00 o'clock.  We have shown that that is obvious, but we do believe that the correct instruction is that it's a portion within that arc, not the entire arc.

JUDGE PETRAVICK:  And what supports your position in the specification?

MR. BEMBEN:  Yeah.  So I think that one of the portions is what I just mentioned, Column 14, lines 41 through 45, and the discussion around Column 14, line -- Column 14, kind of starting at around line 18 through 45 describes the contact site and specifically, with respect to lines 37 through 45 of Column 14, describes a contact site and contacting different portions within that arc.  And then we also believe that the plain language of Claim 35, element .3, which says, a portion is heated of that arc supports the construction that we're presenting.

JUDGE PETRAVICK:  So in the specification when it describes this device, it really is just sort of the contact portion of the device does not match the whole width of the vagina or the portion of the vagina that's going to be heated.  It always contacts points within there.  It depends on how -- depending on how many points you put in there is how much you cover of

12
Appx471

IPR2024-00703
Patent 8,961,511 B2

the vagina; is that correct?

MR. BEMBEN: I believe I understood your question, Your Honor, and I believe that is correct, that the device that's described in the '511 patent, which is not part of the claims, but the only device it had -- it is a device that provides contact points. It's not something that would treat -- that has, for example, like contact points all the way around that would treat all at once, if that's what you're asking. So in order to treat circumferentially, you would need to treat multiple contact points, as described in the '511 patent.

JUDGE PETRAVICK: Thank you. That's the questions I have about the claim construction, so if you want to move on to the prior art, that would be fine with us, or if you want to tell us something else, that would be fine, too.

MR. BEMBEN: Thank you, Your Honor. And just to clarify, when I say contact points with respect to the '511 patent, the '511 patent is talking about a contact point that is 30 degrees, for example, and that contact point would satisfy, based on our construction, Claim 35.3, but it is just a contact point or a contact site, I should say.

Okay. With that, so as I mentioned, I want to -- I jumped to Slide 10 because we do believe that this is a case -- maybe one of the rarer cases or unique case in which the level of skill in the art is very instructive. And so on Slide 10, we have kind of juxtaposed Dr. Berenholz's testimony about who he believes a person of skill in the art should be, versus Dr. Poulos' definition. Kind of the bottom line is that regardless of the definition that you adopt, the parties do seem to agree that this person of skill in the art has a medical degree, has experience with non-surgical cosmetic treatment.

IPR2024-00703
Patent 8,961,511 B2

And I want to draw your attention to Dr. Poulos' testimony, the very last sentence that's highlighted.  According to them, the person of skill in the art has clinical experience in the application of radiant energy to female genital tissue.  So this person is very highly skilled, and we have a situation in which -- I'm going to move to Slide 11 -- the problem was known, as I mentioned, you have loose vaginal tissue causes certain medical and sexual problems.  Slide 11 talks about -- it shows the background of the patent, it acknowledges this problem.

On Slide 12, we have admission from Dr. Poulos that a loose vagina and the introitus, specifically, may lead to decreased sexual pleasure.  She was asked that question.  She said that is correct.  As I mentioned in my opening, moving to Slide 13, the physiological response was known, this is collagen denaturation, applying heat would denature the collagen and cause a tightening effect.

I'm going to skip to Slide 16.  This is important also that the experts are agreeing here on Slide 16 that it was known to use radiant energy to heat and tighten collagen tissue, so the physiological effect was known, the delivery mechanism was known.  And on Slide 17, what we have is again, the experts agreeing that the devices that we're employing RF energy were in use by the critical date in 2006.  So again, the mechanism for delivering the effect, the tightening effect, was known.

And then finally, it was also known the specific areas to treat.  So it was known to treat the introitus.  This is on Slide 18.  This is an admission from Dr. Poulos, that tightening the vaginal introitus may lead to sexual pleasure.  It was known to treat also the vulva, which is the external portion of the vagina, including the labia minora.  This is on Slide 19.  Of course, so

IPR2024-00703
Patent 8,961,511 B2

we have testimony with respect to both Dr. Berenholz and Dr. Poulos agreeing that 2006 clinicians were using laser vaginal rejuvenation to treat certain areas, introitus, vulva, in particular.  And what this demonstrates is just that those locations were known.  We're not relying on vaginal laser rejuvenation in our papers or in our combinations.

This is particularly important for Ground 2, which introduced the Ollivier reference.  Just to kind of level set, we are not relying on laser techniques.  We are relying on delivery of radiant energy in the form of RF or ultrasound, or other forms that are described in the references.  However, the point of this is just that these areas to treat were known, and that includes the labia minora, which is Slide 20.

So that's the backdrop that we come at the claims in the prior art, and so with that, I want to talk a little bit more about the scope of the claims and the prior art.

The first thing that I want to mention -- and this is on Slide 22 -- is that during the cross-examination, Dr. Poulos, she acknowledged that her claim constructions were simply provided by InMode's Counsel.  So this is essentially her adopting attorney argument.  The claims -- this is important -- the claims do not require treatment with a particular device.

I'm on Slide 23 now, and Dr. Poulos, she was improperly reading the device into the claims.  We asked her specifically, Claim 1 is just describing a method, correct?  And she testified, I read it to be a method that would be using the device described in the patent.  We submit that that's the incorrect way to be viewing these method claims.  The specific devices described in the patent is not part of the claims.

Also, very importantly here, I'm moving to Slide 24.  The claims

15

IPR2024-00703
Patent 8,961,511 B2

don't require treatment of a particular medical condition.  There's quite a bit of argument from Patent Owner that the references only are directed to stress urinary incontinence, SUI.  First of all, that simply isn't the case.  The prior art references expressly acknowledge that they can be used outside of that field.  Some describe using them to treat other types of medical problems, but it's also just that there's nothing in the claims that limit the scope of the claims to specifically treating sexual functionality or problems with sexual functionality.

Another point that has been disputed, but it seems that the parties agree right now -- at least we can ask InMode's Counsel -- but is that there's a discussion about treating the target tissue.  What is the target tissue?  And it's always been our position that the target tissue is the tissue underlying the epithelium, but that the claims are not limited or do not prevent heating other tissues, such as endopelvic fascia.

It seems -- and I'm on Slide 25 on the right-hand side -- that there's an agreement now.  This -- I'm looking at the surreply at 5 -- InMode's surreply where they say, InMode's position is not about prohibiting anything and it's further about what needs to be heated.  Seems that we're agreeing on this point, just simply that the claims don't prohibit heating deeper tissues, such as endopelvic fascia.  With that --

JUDGE PETRAVICK:  Counsel, and there's not a dispute between the parties that the prior art shows heating targeted tissue.  The dispute rests upon where that tissue is located?

MR. BEMBEN:  That's correct, Your Honor.  I don't think that there's a dispute that its target tissue.  There is -- I believe that there is some dispute.  I'll allow InMode to answer this question, but there is some dispute

IPR2024-00703
Patent 8,961,511 B2

that the target tissue is the type of tissue that is described in the '511 patent and I can get to -- let's see -- I believe that they are arguing that Mosher -- sorry -- that Edwards, Mosher, and Ingle, they don't teach treating the lamina propria which is specifically described in Mosher.

I'm on Slide 33. Mosher does teach specifically treating the lamina propria. Mosher talks about treating the endopelvic fascia, but in this paragraph 48 on the right-hand side, if you -- it's a very long paragraph. We're only able to capture part of it, but it explains that there's some situations after childbirth in which the endopelvic fascia is no longer present, and so it's necessary to treat other areas and other structures in that area. And one of those structures of the vagina that would be treated includes the lamina propria, which Mosher says is the dense connective tissue layer underneath the epithelium.

So we submit that there is no dispute or there should be no dispute that the target tissue is the same tissue that's being treated in the '511 patent. I believe that InMode has a different position on that, but that is our position.

JUDGE PETRAVICK: Thank you.

MR. BEMBEN: So just with respect to heating, I'll just go jump back up to Slide 32. So as I mentioned, we do believe that the heating step that's recited in all of the independent claim is captured or is taught by the prior art. We also believe that the remodeling step -- I'm going to move to Slide 35 -- is also taught. And so remodeling -- the limitation that's recited in independent claim elements 1.2, 35.2, 43.2, and 51.2 is remodeling the therapeutic zone of the target tissue, and we have expressed teachings in Edwards with respect to remodeling. Mosher talks about remodeling, as well, and Ingle has similar teachings. And so we don't think there's any

IPR2024-00703
Patent 8,961,511 B2

dispute that there is remodeling that takes place.

The dispute around heating and remodeling seems to be whether heating needs to be -- whether either of the steps, heating or remodeling has to be done without substantially affecting the epithelium. InMode is attempting to read that limitation into one of the two steps, heating or remodeling.

And so we addressed that claim construction, which we think is incorrect, under the remodeling step. I'm moving to Slide 36. We believe that even if you adopt the construction, which we think is incorrect, that the remodeling has to be conducted without substantially affecting the epithelium, that that is clearly and squarely taught by the prior art references. Edwards, Ingle, and Mosher all teach that you would use cooling in order to avoid thermal damage to the surface. Mosher -- I'm looking at Slide 36 -- Mosher, paragraph 58. It teaches specifically that you could use pre-cooling to inhibit heating of intervening tissue to a temperature causing surface lesions within the vagina.

One of the disputes that InMode raises is that Edward's embodiment 4, the embodiment that we are relying on, talks about causing lesions -- not ablative lesions -- but lesions to the surface. In combination with Mosher, Mosher teaches a pre-cooling step, which would have avoided even those lesions by using cooling. So we believe that this -- the remodeling even under InMode's narrow construction is taught by the prior art references.

Kind of just on this point of claim construction now, with respect to what does -- whether heating or remodeling requires the limitation that the heating or remodeling is done without substantially affecting the

IPR2024-00703
Patent 8,961,511 B2

epithelium -- we think that you should adopt the construction that you provided in the preliminary construction and the decision on institution, and also the construction of the Viveve court, which was conducted after a Markman.

First, the fact that InMode can't decide whether this requirement should be part of heating or remodeling kind of demonstrates that it should be part of either of them. And second, we believe that the only discussion of protecting the epithelium in the patent -- if we look at the intrinsic record -- is methods and mechanisms for cooling.

Now, there are dependent claims that are directed to cooling. And so it's -- cooling is not a part of the independent claims. And we'll note that even those dependent claims talk about cooling do not have a requirement that the epithelium is not substantially affected. And so we don't think that this limitation that the epithelium isn't substantially affected should be part of the heating or remodeling steps. It simply something that they're trying to read in. But in the event, it is pretty clearly taught by the prior art references. If there are no questions on that point, I think I'll move to the treatment locations. Okay.

If we could, let's move to Slide 40 and just kind of level set, again. This is Dr. Berenholz's testimony about that a person of ordinary skill in the art would've exercised their judgment -- their professional judgment -- to determine optimal treatment area based on the desired outcome. Again, a person of skill in the art is a physician or a person with a medical degree, as well as clinical experience with the specific types of treatment.

What Dr. Berenholz says in paragraph 91 of his declaration is that the vagina region is not a large area, and a person of ordinary skill in the art

IPR2024-00703
Patent 8,961,511 B2

would have recognized that there's limited areas to treat, to choose from, and depending on what you're treating, if you're treating incontinence, if you're treating sexual functionality, a person of skill in the art would've known where to treat. It would also be treated based on the anatomy of the patient.

So a person skilled in the art, these locations were well within what they would have known to do and where they would have known to treat. Let me move to Slide 41. And this is specifically of a limitation, Judge Petravick, that we were talking about, limitation 1.3, and we believe that this is taught by the prior art references, as well as supporting testimony from Dr. Berenholz.

To start with, on Slide 41, we have discussion in Edwards that talks about remodeling the anterior and posterior wall of the vagina to provide circumferential tightening. Dr. Berenholz, in paragraph 122 of his declaration, explains that a person of ordinary skill in the art would've understood, based on this teaching, that in order to achieve improvements in sexual function, the treatment must be near or include the opening of the vagina, which is the introitus and that first portion, the lower portion of the vagina.

Now, Mosher provides additional support, explaining that -- in this paragraph 74 of Mosher -- again, it's a long paragraph and so we didn't have the whole thing, but it's talking about protecting the nerves around the bladder neck of the urethra. Again, Mosher is treating through the vaginal canal, but it's treating certain portions along the urethra, which I'll show in a second.

But what Mosher says is that you'd want to be treating away from the bladder neck in order to avoid damaging nerves in that area, and talks

20

IPR2024-00703
Patent 8,961,511 B2

about a treatment length of 15 millimeters, which is 1.5 cm.  What Dr. Berenholz explained is that a person of skill in the art reading this discussion of Mosher would have been motivated and understood that heating a portion of the vagina, extending from the introitus, inwardly to a location of about 1.5 cm, would have been known.

And so this is what I was talking about before where that range, from the introitus to 1.5 cm, that covers BTL's construction of limitation 1.3, where the treatment location has to be between 1 cm and 3.5 cm.  It also covers InMode's construction where the treatment location has to be between the introitus and 1 cm into the lower portion of the vaginal canal.

JUDGE PETRAVICK:  Mr. Bemben?

MR. BEMBEN:  Yes, Your Honor.

JUDGE PETRAVICK:  Patent Owner is arguing that Edwards can't treat the introitus because there's a speculum in the way.

MR. BEMBEN:  That is -- yes, ma'am.

JUDGE PETRAVICK:  If one of ordinary skill in the art was going to modify Edwards or use Edwards device to treat other areas, why would the speculum still be there?  It seems to me that in Edwards, the speculum is there because they're treating deeper areas, and that if you were going to modify it in a 103 and use it to treat other areas that were known to need treatment, would this speculum stay if it was no longer needed?

MR. BEMBEN:  So the answer to that question is no, Your Honor. I'm going to move to Slide 50.  So that's exactly correct.  That's what Dr. Berenholz testified, that we have, on Slide 50, paragraph 69 of Dr. Berenholz's declaration, he explains that a person of ordinary skill in the art would have also understood that treating areas closer to the introitus, that the

IPR2024-00703
Patent 8,961,511 B2

physician would be able to complete this treatment without using the speculum. This is, again, something that is well within the judgment of a physician based on the anatomy and the location that's being treated, and whether to use a speculum.

JUDGE PETRAVICK: So if we were to agree that it would be obvious or would it have been obvious to use the device on other areas that need to be -- that are known to -- need this treatment, then would we need to reach the issue of what Mosher teaches as to centimeters or not centimeters?

MR. BEMBEN: I don't believe you would, Your Honor. I believe that -- I mean, I think Mosher piles on the teachings and Mosher provides motivation for moving away from the bladder neck and moving to different locations. It gives you -- tells you why a physician would be thinking through those things and would be doing that. For example, to be avoiding damaging nerves in that area. But I think that you're absolutely right that if you agree that a person of skill in the art, this physician, would know when and when not to use a speculum and could use Edwards' device to treat locations, you don't need to reach Mosher's teachings.

I'll also mention that in Slide 49, Dr. Poulos, she agreed that whether or not a physician that uses a speculum, particularly with respect to treating the introitus, that's something that they would know how to do. What we asked her is, if a person of ordinary skill in the art wanted to treat the opening of the vagina, which I believe is called the introitus, would they use a speculum. She said, again, it depends on the patient's anatomy, but usually no. So she's confirming that persons of skill in the art knew when and when not to use a speculum, depending on the anatomy of the location that's being treated.

IPR2024-00703
Patent 8,961,511 B2

Okay.  We talked a little bit about the circumferential limitation and I'm just going to move to Slide 44 to discuss that a little bit.  This is -- what we have here is a pretty straightforward teaching from Edwards that talks about remodeling both the anterior wall and the posterior wall, and again, our position is that if you treat, for example, the posterior wall, that that would be various contact sites along the posterior wall in order to perform and provide the circumferential tightening that's described in Edwards.  A person of skill in the art would have known.  This is testimony from Dr. Berenholz and would have been motivated to treat the vagina circumferentially to achieve this tightening.

I'm going to move to -- now I'm at 43.3.  And so just to kind of level set, this is about where the treatment area is.  What the claim requires is heating a portion radiating outward from the introitus to Hart's line.  This is -- the location is described in the patent and it seems like there's an agreement between Dr. Berenholz and Poulos where this is.  This is a portion of the vulvar vestibule.  This is part of the external genital that would be treated, but it has the same type of mucosal epithelium with rich collagen tissue underneath.

Similarly, with respect to limitation 51.3 -- I'm now on Slide 46 -- this is just explaining where the labia minora is.  Again, this is external portion of the vagina, but part of that has a mucosal surface that has the collagen-rich tissue, as well.  And so what we have explained in our papers is that based on the teachings in the prior art -- sorry, I'm at Slide 48 -- teachings in the prior art about extending and providing treatment of other areas.  Ingle talks about treatment for cosmetic surgery, providing techniques for selectively heating and shrinking tissues.  Edwards talks

IPR2024-00703
Patent 8,961,511 B2

about tightening, shrinking, reshaping tissue to correct unwanted conditions. This is all about extending the teachings from -- that are directed to inside the vaginal canal to treatment outside tissues that have similar make up and similar physiology.

If there are no questions with respect to those limitations, I'll mention that I'm going to move to Slide 53. This is the Ollivier reference. And so just in case there's any doubt in the Board's mind about whether these areas -- the external portion that's described in 43.3 or the labia minora, the portion of the labia minora that's described in 51.3 -- these would have been well known to treat. The Ollivier reference, we're not relying on it, again, for any teachings other than the fact that it was known that the external vagina and labia minora were portions that physicians were treating, that there was demand for treatment in those areas to correct both sexual functionality, as well as cosmetic reasons.

As I mentioned, Ollivier is printed publication. I'm moving to Slide 54. There was search functionality. Slide 55, as I mentioned before, there were research aids that provided citations to this reference, showing that it was publicly available and that other people had access to this website, Salon.com.

Absent any questions there, I'll move to secondary considerations. InMode is arguing that there are secondary considerations with respect to Claims 1, 26 and 35, specifically. Those are the claims that they argued. They didn't argue any other claims. What they argued is that there is a presumption of nexus, which requires both that the product embodies the invention and is co-extensive with it; however, on Slide 58, InMode has failed to establish this co-extensivity feature. The device is not co-extensive

IPR2024-00703
Patent 8,961,511 B2

because it doesn't have -- Claims 1, 26 and 35 don't have the critical cooling feature that is described in the article.

And what I'll say about secondary considerations is even if you assume that there is a nexus to this article, the analysis for obviousness is a weighing of all the (INDISCERNIBLE) factors and you have to consider them all together and weight them.  Even if you find this article probative to some extent of non-obviousness, it certainly does not outweigh -- it certainly should not outweigh the very strong showing that these claims would have been obvious under the other (INDISCERNIBLE) factors.  And so with that, unless there are any questions, Your Honor, I'll reserve the remaining portion of my time for rebuttal.

JUDGE PETRAVICK:  I have no more questions.

JUDGE WOOD:  No, thank you.

JUDGE PETRAVICK:  No, no more questions from the panel. We have about 17 minutes and 45 seconds left for you.

MR. BEMBEN:  Thank you, Your Honor.

MR. HECTOR:  All right.  I'm going to attempt to share my slides here.

JUDGE PETRAVICK:  Thank you.

MR. HECTOR:  I just want to confirm that the Court can just see the slides shared.

JUDGE PETRAVICK:  Yes, we can see the slides.

MR. HECTOR:  Okay, great.  May it please the Board.  Bill Hector on behalf of the Patent Owner.  And like Petitioner had also asked for rebuttal time of about 10 minutes, just to kind of lay things out.  I'd like to start by turning the Board's attention to Slide 2.

IPR2024-00703
Patent 8,961,511 B2

So the invention of the '511 patent are treatments for specific regions of female genital tissue, to improve the condition called vaginal laxity. The '511 patent treatments are inventive because they are non-invasive. That is they're not ablative and do not damage or substantially affect the surface layer of the mucosal epithelium. And the '511 patent treatments are also inventive because they apply to very specific regions within the female genital anatomy to improve this condition of vaginal laxity.

And as the Board is aware, Petitioner relies on references directed to an entirely different condition, stress urinary incontinence, which is a condition affecting the urinary system and particularly, the bladder outlet. To make this distinction a little bit more clear, I'd like to just briefly provide an overview of the anatomy to orient.

There are two main systems that are at issue here with regard to -- I'm referring to Slide 3 and this is an excerpt from EX 1015 at plate 360. Broadly, you have the reproductive system, which includes the vulva, the external vagina structures, and the vagina. And then you also have the urinary system, which includes the bladder. At the bottom of the bladder is a feature called a bladder neck, which is connected to the urethra, which carries urine out of the body.

And as I mentioned, the '511 patents are treated -- are focused on treating at the distal end of the vaginal canal. The prior art deals with the opposite end of the vaginal canal -- the proximal end -- located at the bladder neck, to address this issue of stress urinary incontinence. As the Board knows, these claims have dimensional requirements, each one of them, as to where the treatments are applied. And a critical aspect of this

26

IPR2024-00703
Patent 8,961,511 B2

case is that Petitioner's references are outside of those claimed areas.

I'd like to turn next to claim construction, and specifically, to Slide 13. And this was the first claim construction term that was addressed in Petitioner's argument and this is with regard to Claim 1 and the treatment area of heating a portion of the vagina extending from the introitus inwardly to a location 1 cm to 3.5 cm in from the introitus.

Now, from our perspective, this claim is pretty clear. It's a simple claim that is requiring heating a portion of the vagina from point A, the introitus, to a location, point B, a location 1 cm to 3.5 cm in from the introitus. Petitioner's interpretation, on the other hand, is that we should start at potentially point B and go to point C, but this ignores the from language, from the introitus inwardly to a location 1 cm to 3.5 cm in from the introitus.

JUDGE PETRAVICK: Counsel?

MR. HECTOR: Particularly -- sure. Yes.

JUDGE PETRAVICK: I have a question about how you're reading this claim limitation. The way you read the claim limitation, doesn't it make the fact that there's a 1 cm in there sort of unnecessary? Wouldn't what you're arguing is encompassed by, it would be the same as going from the introitus to 3.5 cm instead of --

MR. HECTOR: With --

JUDGE PETRAVICK: Why do we have the 1 cm in there if that's what's being read?

MR. HECTOR: We actually view this a little bit differently, that the critical point is actually the region from point A to point B to 1 cm. So in order to meet this claim, you must at least treat from the introitus to 1 cm,

IPR2024-00703
Patent 8,961,511 B2

and then --

JUDGE PETRAVICK:  So then why does it include the language about the 3.5 cm if that's not what's necessary?

MR. HECTOR:  I would assume it includes that language to account for varying sizes of anatomy across various patients, but I think our interpretation -- and I think as you pointed out during Petitioner's argument -- aligns with multiple portions of the intrinsic record.  I think you pointed to, for example, the '511 patent at Column 11, 48, and this idea of treating the portion of -- it's focused on treating the lower aspect of the vagina -- the lower aspect of vagina being the introitus to 1 cm at least.  You know, we're really focused on the introitus here, the lower aspect of the vagina.

And the language I think you pointed to -- pointed Petitioner to was treating from the introitus to a position no further than about 3 cm to 4 cm inward.  There's also language in Column 3, for example, 30 to 34, as well as Column 3, 54 to 59.  Also, for example, at Column 3, 54 to 59 discusses treating a portion extending from the introitus to a location 2 cm to 4 cm in.  So I think that the 1 cm to 3.5 cm is to account for the varying sizes of the female anatomy, but the critical aspect from our perspective to meet this claim is that you have to treat from point A, the introitus, to 1 cm in.

JUDGE PETRAVICK:  So if I treat between 1 cm and 3.5 cm, that does not read on the claim?

MR. HECTOR:  No.  From our perspective, you would need to treat, yeah, at least introitus to 1 cm.  I guess if you were treating at 1 cm -- maybe you're treating in the introitus to 1 cm.

JUDGE PETRAVICK:  So it must treat between the introitus and 1

IPR2024-00703
Patent 8,961,511 B2

cm, and the reason that the 3.5 is in there is no further than 3.5 is how you would read that?

MR. HECTOR: That's correct, yeah. And I think you raised the issue of Claim 26 and the additional limitation remodeling comprises tightening the introitus, and I think you key onto the distinction there that the dispute -- the portion we're discussing in Claim 1 regards -- is related to where the heating is applied, and Claim 26 merely provides that you must heat that region in such a way that you would cause tightening of the introitus. So we think that there's no claim differentiation overlap there.

I'd like to turn next to Slide 15 and discuss the circumferentially around the vaginal wall element from 1:00 o'clock to 11:00 o'clock that's in Claim 35. And our construction is that you should have to heat multiple contiguous contact sites in the 300-degree arc, extending from 1:00 o'clock to 11:00 o'clock. And just to be clear, the contact sites that we're referring to here are contact sites on the vaginal wall. This is not a contact site on the treatment device itself. You could have a very large electrode that treats in the 300 degree arc and meet this by meeting multiple contiguous contact sites.

We'll turn next to Slide 16. Our proposed construction finds ample support in the '511 patent specification, and I believe in a section that Petitioner pointed to discusses the treating of 10 contact sites allows completion of a 300 degree arc of the circumference to get this circumferential treatment. So, you know -- and I think the prior ThermiGen panel additionally discussed that the heating of the vaginal wall should be over a defined arc. And most optimally, over the multiple contiguous contact sites in the 300-degree arc.

IPR2024-00703
Patent 8,961,511 B2

And just a final point on Claim 35, both experts agree that you'd want to have as many close to contiguous contact sites as possible. Dr. Berenholz, BTL's expert, testified to that, and Dr. Poulos agreed on that point.

I'd like to turn briefly back to Slide 10 and just quickly discuss the target tissue element. I think we're in agreement there. Through the briefing, I think we've found agreement on that, that in order to either heat or remodel the target tissue, you must treat the tissue immediately beneath the mucosal epithelium. That is you must treat the lamina propria and muscularis, but it's permissive to treat the endopelvic fascia, but the critical distinction there from our perspective is that you cannot meet the claims heating and remodeling the target tissue with just treating the endopelvic fascia.

I'd like to speak briefly about the heating and remodeling construction. Petitioner made the -- and turning specifically to Slide 11 -- Petitioner made the point that InMode can't decide whether this 'without substantially affecting the epithelium element' should be in the heating or remodeling. That's not the case. We're simply dealing with the prior context where in the Viveve court, this notion of not substantially affecting the epithelium was embodied in the heating construction, whereas in the prior ThermiGen construction, it was embodied in the -- or included in is probably a better word -- in the remodeling construction, and we think that the intrinsic record supports that it should be included in the remodeling construction, as following the ThermiGen IPR.

Turning to Slide 12, we've provided in our briefing substantial citations to the specification, repeatedly talking about protecting the mucosal

IPR2024-00703
Patent 8,961,511 B2

epithelium providing non-uniform heating that avoids risk of damage to the epithelium. Column 12, 17 to 21, the treatment should be non-invasive. And we've also provided testimony from our expert, as well as identifying the ThermiGen IPR's finding of clear teaching and the Viveve court's finding that this is a critical aspect. And in the reply, as we noted several points, Petitioner did not -- elected not to put forward a reply declaration to rebut any of those points.

With that, I'd like to turn to the specific grounds and direct the Court's attention to Slide 21, which is directed to Claim 1 under Ground 1 of Petitioner's petition. And from our perspective, we feel that the proposed combination of Edwards, Mosher, and Ingle fails to teach the required treatment area of introitus inward to 1 cm to 3.5 cm for several reasons.

For one, Edwards is focused on treating at the bladder outlet. You see this quote at Column 620, also in the fourth embodiment description, it discusses that 16 to 19 treating bladder outlet hypermobility. And as I think you eluded to during Petitioner's presentation, the Edwards device also inhibits treatment at the introitus, which is required by Claim 1.

JUDGE PETRAVICK: Counsel, your argument is very focused on Edwards' reference individually, as opposed to looking at the combination as a whole. And it's a 103 with a proposed sort of combination. Why wouldn't one of ordinary skill in the art, if they wanted to use this device on other locations to treat other similar tissues, use the speculum? Like why wouldn't that be an obvious modification? I mean, one of ordinary skill in the art is not an automaton.

MR. HECTOR: I think that idea which Petitioner raises that for the first time in its reply, that the blade can be used separate from the

31

IPR2024-00703
Patent 8,961,511 B2

speculum failed for several reasons. First of all, it's nowhere in their petition. It's based on attorney arguing and not supported by any sort of evidence. But moreover, there's no teaching or suggestion of any of the references to remove the blade from the speculum. The Edwards patent is clearly teaching a treatment further into the vaginal canal that requires a speculum and what is treated is not the claimed area. And what BTL is propose is something entirely different from Edwards, and this is classic hindsight bias, kind of deconstructing and redesigning --

JUDGE PETRAVICK: Well --

MR. HECTOR: -- Edwards.

JUDGE PETRAVICK: -- Counsel -- Counsel --

MR. HECTOR: Sure.

JUDGE PETRAVICK: -- I mean, you keep focusing on the stress incontinence, but as Petitioner points out clearly, Edwards talks about that it could also be used for cosmetic and sexual functions, too. I mean, that is suggested flat out in Edwards. So why, if somebody of one of ordinary skill in the art, having that suggestion from Edwards itself, there seems to be evidence that treating these particular areas was known to be treated with other types of treatments in order to have this desired result of remodeling the vagina in those certain locations.

Why wouldn't somebody -- why wouldn't a POSITA have found it obvious to use the same device, which apparently is better because it doesn't cause harm, those harms -- to do something that's very similar to very similar tissue, but in other locations. Specifically, since we know that it is being used on tissue in the vagina. I mean --

MR. HECTOR: Sure. So --

IPR2024-00703
Patent 8,961,511 B2

JUDGE PETRAVICK:  -- I don't think somebody would look -- a POSITA would look at the speculum and say, oh now I can't  -- that would prevent me from finding this obvious.

MR. HECTOR:  Well, I guess first of all, there's no description of not using the speculum, and in addition, the fourth embodiment of Edwards makes passing reference to improvements of sexual function, but it's really focused on also this issue of treating hypermobility at the bladder outlet.  So from our perspective, it would be a leap for -- and basically a reengineering of Edwards to remove it from -- remove the blade from the speculum. There's no notion in Edwards that one would want to do that.  Edwards is providing these treatments for bladder outlet, hypermobility, which are located at the bladder outlet on the --

JUDGE PETRAVICK:  I mean --

MR. HECTOR:  -- posterior and anterior wall.

JUDGE PETRAVICK:  Counsel, it does seem to be that there's plenty of evidence in this record to show that treatment for incontinence by tightening the vagina is also the same type of treatment used for this cosmetic thing and the sexual function.  So I have to say that I would look for something more if I was going to find for you that it wouldn't be obvious. What I'm asking you for is there something else, other than what you're telling me is that the speculum would be in the way, which sort of suggests further that one of ordinary skill in the art would have removed it, given that they are a medical doctor.

MR. HECTOR:  Yeah.  Well, I think he raises the issue that Edwards does not provide an invasive treatment.  As we'll get to at a point later, Edwards, from our perspective, and it is clearly supported by the

33

IPR2024-00703
Patent 8,961,511 B2

record, is an ablative treatment. So it's describing an ablative treatment that is in line with what the background of the '511 patent describes as the prior art surgical methods, which came with risk of scarring and downtime. So from our perspective, there would be necessarily the motivation to modify Edwards in the manner you're setting forth. And maybe it would be helpful to kind of go through some of those -- the kind of background facts that --

JUDGE PETRAVICK: Well --

MR. HECTOR: -- Petitioner has started with. Yeah.

JUDGE PETRAVICK: I mean, is there any criticality to these certain locations? It seems that the modification is taking what Edwards already does. We're not modifying the treatment, but we're using them in other areas. So the fact that there is some sort of -- Edwards for embodiment 6 says lesion -- doesn't seem to stop it from being used where it is used. Why wouldn't somebody also use it in other places? I mean, the motivation seems to be sort of a known treatment to be used in one location to do tightening. There are other locations that are known to need tightening. Why, under KSR, would that not be obvious?

MR. HECTOR: Because I think you get to a slippery slope type argument there and I think that's kind of the punchline of the Petitioner's position on this. They point to all these conditions that were purportedly known or acknowledged in the background section of the '511 patent as being purportedly known, vaginal laxity, doing surgical treatments to decrease (sic) pleasure, but the innovation and the point of novelty of the '511 patent over the prior art during prosecution was the recitation of these particular areas, and with respect to Claim 1, it's the introitus to 1 cm, and you don't have Edwards treating at that location.

34
Appx493

IPR2024-00703
Patent 8,961,511 B2

And the prosecution -- during original prosecution, you -- the primary reference was Knowlton, which was treating at the uterus, which is also in the vaginal canal. And the prosecution there found it not to be obvious. So I think by presenting these various facts that were purportedly known kind of creates a false backdrop to this. But importantly, what Dr. Poulos in the '511 patent itself acknowledges were not known -- that it was not known to treat vaginal laxity or treat the introitus with a non-invasive procedure. That's at Column 2, lines 17 to 18, and it's further -- Dr. Poulos said -- testified that it wasn't known that RF could be used to improve sexual function. So that's the -- you would have to make that leap in order to -- a person of ordinary skill in the art would have to make that leap to come up with the particular treatment areas, which is the point of novelty of the '511 patent and we think that --

JUDGE PETRAVICK: So my question is, is that we're talking about obviousness, not novelty here.

MR. HECTOR: Yeah.

JUDGE PETRAVICK: Right? And I mean, the facts are very important in that, and the fact that we know from other references that it was known to tighten those areas seems to be the missing fact in the leap.

MR. HECTOR: But I think the --

JUDGE PETRAVICK: I mean --

MR. HECTOR: -- key there --

JUDGE PETRAVICK: -- you have to agree -- I mean, you do agree that it was known to tighten these areas in order to remodel the vagina to treat cosmetics and sexual function. It might have been used with a different treatment type, but it was known that those areas needed to be

IPR2024-00703
Patent 8,961,511 B2

tightened.

MR. HECTOR: But that's the -- so the things that were known that were surgical treatments that came with risks of downtime there, required anesthesia in a very sensitive area. This is not a procedure that you would likely want to go like subject yourself to is what the '511 patent background acknowledges. But what the '511 patent background also makes clear is this, the idea of the non-ablative, non-substantially -- treatments that don't substantially effective the mucosal epithelium to treat the introitus and vaginal laxity were not known. So that's the leap there you need to make.

And I guess in regards to your point on novelty, I'm not sure during the prosecution history, it may have been a combination of Knowlton and other references, so I may have spoken out of turn there, whether that was obviousness or novelty, but I'd have to take a look at that.

JUDGE PETRAVICK: But Knowlton is not at issue here. It's not a basis of the grounds.

MR. HECTOR: No, but I was just using that as a comparison to the analysis that happened during original prosecution. Okay. So I'd like to -- unless you had further questions on that?

JUDGE PETRAVICK: I do not.

MR. HECTOR: We can move -- okay, great. So in the reply, the Petitioner puts forth this belated theory that, pointing to portions of Edwards that describes the result of heating, but not the actual treatment itself, and that the result of the heating may provide support at proximal and mid-urethra, but Dr. Poulos' testimony was clear that this is -- that Edwards describes treating at the bladder neck, but it may provide support for other portions.

IPR2024-00703
Patent 8,961,511 B2

I'd like to turn to Slide 24 and specifically, the Mosher reference. Mosher is clear repeatedly throughout that it is treating the endopelvic fascia, which Dr. Berenholz testified is located at the bladder neck, as shown in this quote here at EX 2005; 79. And in addition, Dr. Poulos testified at paragraph 105 that the endopelvic fascia is also adjacent to the bladder. So it's clear from the record that Mosher's treatments are at the bladder neck.

Turning to Slide 25, Petitioner cites and discussed during the presentation this portion of a 25 x 15 mm, in paragraph 74 of Mosher. This is just basically defining the shape of a square, where the treatment may have occurred, but it doesn't provide any location within the vaginal canal itself, let alone any location relative to the introitus, so it doesn't demonstrate that Mosher was treating in the introitus region.

A couple things. So, Petitioner -- turning to 26 -- Petitioner does not dispute that Edwards' speculum inhibits treating the introitus and in addition Petitioner fails to specifically say how a POSA would modify Edwards or that there was a motivation to do so.

I'd like to turn next to Slide 29, and specifically, Claim 35. And for this element, Petitioner, again, relies on Edwards' fourth embodiment, which describes providing RF energy to the anterior and/or posterior regions of the vaginal wall. And this argument doesn't meet the claim elements for several reasons. First of all, the anterior wall is outside of the claimed treatment area. That's within the 11:00 o'clock to 1:00 o'clock region. And second, the posterior wall provides treatments at discrete points due to the fact that Edwards' treatment is applied through a speculum that is placed into the vagina.

Turning to Slide 30, in the reply, Edwards -- or Petitioner, again,

IPR2024-00703
Patent 8,961,511 B2

points to the results of the Edwards disclosure, but not the actual treatment in the statement with regard to embodiment 4 that remodeling both the anterior and posterior wall may provide circumferential vaginal wall tightening, but Edwards doesn't explicitly describe heating in a circumferential manner.  And in effect, with regard to the Edwards description, it doesn't suggest that the blade is moved in any way.  It's held in place by the speculum and to the extent there are a series of lesions, those would be extended longitudinally because the speculum is never moved within the vaginal canal.

I'd like to turn briefly to the external treatments and direct the Board's attention to Slide 33.  The key point here, and I think Petitioner acknowledges this, that none of the Edwards, Mosher, and Ingle references discuss any sort of treatment in the external genital area, and I think emblematic of that is the fact that the Petitioner's only recitation of the Hart's line are quoting to the '511 patent itself.  There's no disclosure in any of Edwards, Mosher, Ingle, or Ollivier of the Hart's line -- of treating the Hart's line.  And Petitioner does not dispute that the references are treating at the bladder neck..

Again, Petitioner improperly focuses on what a POSA would have been able to do, rather than what they would've been motivated to do.  And there would be no motivation based on -- and I think Petitioner pointed to there's passing references in Ingle to cosmetic surgery or Edwards' references to treating unwanted conditions. These fall well short of any sort of providing a motivation for a POSA to take the treatments of Edwards, Ingle, and Mosher, which are well inside the vaginal canal and somehow modify those to treat the external tissue structures.

IPR2024-00703
Patent 8,961,511 B2

JUDGE PETRAVICK:  Counsel?

MR. HECTOR:  Yes.

JUDGE PETRAVICK:  Counsel, there's teachings in those references that the device could be used on other tissues.  They're not specific, but it does suggest that you could use the device on other tissues.  In your -- the background section of your own Patent Owner's response, you cite a reference, Exhibit 2013.  Exhibit 2013 tells us that in 2005 it was known that you would want to tighten vulvar structures to get tightening of the labia and the internal vaginal skin.  Why isn't it within one of ordinary skill in the art to know that -- which structures would need tightening?

MR. HECTOR:  Well, I think for one -- I'm not sure -- was that argument raised in Petitioner's papers?

JUDGE PETRAVICK:  You provided this evidence.  It came from you.  I'm looking at the --

MR. HECTOR:  Yeah.

JUDGE PETRAVICK:  -- evidence you provided.

MR. HECTOR:  Okay.  Sorry, that was EX 2013?

JUDGE PETRAVICK:  Yes.  It's cited --

MR. HECTOR:  Okay.

JUDGE PETRAVICK:  -- in the background of your -- when you were telling me about the background of the procedures in your --

MR. HECTOR:  Okay, yeah.  I --

JUDGE PETRAVICK:  -- Patent Owner's response.

MR. HECTOR:  Okay, great.  Sorry, it just took me a second there to orient.

JUDGE PETRAVICK:  It's okay.

IPR2024-00703
Patent 8,961,511 B2

MR. HECTOR:  So EX 2013 is an article from Dr. Alinsod regarding the prior surgical approaches that were performed at the time, and that article goes into grave detail about all of the blisters and burns and nasty side effects that would be associated with surgical techniques applied to the external structures.  And the background of the '511 patent itself also acknowledges that those prior surgical techniques came with this risk of scarring and other nasty side effects.

JUDGE PETRAVICK:  But it also tells us directly what one of ordinary skill in the art would know, that certain areas of the vagina need tightening, and it tells us that those areas include the vulva and the labia, which would be the external portions, that those are in need of tightening.  So why wouldn't that be within the knowledge of one of ordinary skill in the art it says in 2005 --

MR. HECTOR:  The --

JUDGE PETRAVICK:  -- that those are the portions that need tightening -- that are tightened by other procedures?

MR. HECTOR:  Yeah.  I mean, Dr. Poulos testified herself that labiaplasties were performed since the early '90s, but yet no one came forward with -- and actually disclosed these particular treatments in the manner described in the '511 patent, despite labiaplasties being performed since at least the 90s and maybe earlier.  So you have decades of time where these surgical techniques were used and no one until the '511 patent came along -- came to define these specific areas of treatment.

And then also, returning back to that EX 2013, the Alinsod article, Dr. Alinsod is the same doctor who described treatments aligning directly with the claims of the '511 patent that landmark years after the '511 patent

IPR2024-00703
Patent 8,961,511 B2

was filed.  So, the notion that the surgical approaches were known, I think it was also known that those surgical approaches came with this risk of scarring that was counterproductive and --

JUDGE PETRAVICK:  But Counsel, the issue is --

MR. HECTOR:  Yes.

JUDGE PETRAVICK:  The issue is not whether the previous devices or lasers were -- created scarring.  You told me in the prosecution history the point of novelty that was added to these claims was the location and where the device was used, but this article and sort of the testimony you've pointed to tells us that tightening in these locations was known.

MR. HECTOR:  But it was known --

JUDGE PETRAVICK:  I mean, are you --

MR. HECTOR:  Yeah.

JUDGE PETRAVICK:  Do you agree with me that it was own maybe with using other surgical procedures, that tightening was needed in these locations?  The vulva and the external -- the labia.

MR. HECTOR:  I think if it says that in the Alinsod article.  But yeah, I think the key there is that those procedures were also known to have these side effects.  And in addition, there was no specificity known in the public art as to how to perform these procedures and I think that's why the Petitioner has come forward with Ollivier.  There's no -- we do have testimony from Dr. Poulos saying that she did perform labiaplasties, but the only specific evidence they've come forward with -- the Petitioner has come forward with is this vague article from Dr. Ollivier describing external treatments with absolutely no specificity --

JUDGE PETRAVICK:  Well, I'm looking at the evidence that you

IPR2024-00703
Patent 8,961,511 B2

provided to me about where these previous procedures were performed, and that's in the vulva and the labia, and the internal vaginal skin.  Those are the areas that we are -- that's claimed.

MR. HECTOR:  Yeah.  I think just the distinction there is that those treatments were performed in a highly invasive manner, whereas, the improvement here in the '511 patent is performing these treatments in a non-invasive manner in these specific locations and no one had done that until the '511 patent.  I mean, I think the background acknowledges that there were surgical approaches that existed before.

JUDGE PETRAVICK:  All right, thank you.

MR. HECTOR:  And yeah, turning to Slide 34, I mean, Dr. Poulos, some of her concessions regarding this were related to the Ollivier reference, which we'll get to in a little bit further down the road.  Just looking at the time.  I'd like to briefly address this issue of remodeling the target tissue. Can you still see my slides hopefully?

JUDGE PETRAVICK:  Oh, yes, we can.  Thank you.

MR. HECTOR:  Okay, great.  And specifically, with regard to Slide 37, as we set forth there's no dispute as to target tissue and we think that the proper construction -- remodeling is that it must treat the tissue without substantially affecting the epithelium.  And from Patent Owner's perspective, the Edwards, Mosher, and Ingle combination does not meet the remodeling the target tissue element for several reasons.

For one, Edwards' ablates and creates lesions in the target tissue. The tissue immediately below the mucosal epithelium, and then Mosher and Ingle actually cool the target tissue and are focused on remodeling endopelvic fascia. Turning to Slide 38, it's clear from Edwards itself that it's

IPR2024-00703
Patent 8,961,511 B2

creating ablative lesions in the --

JUDGE PETRAVICK:  Counsel, it's not flipping the slides as you're --

MR. HECTOR:  Oh, it's not?

JUDGE PETRAVICK:  -- talking.  No.

MR. HECTOR:  Oh, sorry.  I'm turning now to Slide 38.  Is that what you see?

JUDGE PETRAVICK:  Yes.

JUDGE WOOD:  Yes.

JUDGE PETRAVICK:  Thank you.

MR. HECTOR:  Okay.  Yes, in turning to Slide 38, the Edwards description is clear that the lesions created in the vaginal wall are ablative and this is -- finds support in Edwards, Column 3, 5 to 9, which describes the only difference between the fourth embodiment, which involves treating of the vaginal wall and the other embodiments, is that RF energy is delivered to the anterior and posterior regions of the wall.

It's clear that just like the other embodiments, the fourth embodiment is ablative and that's also evidenced by the fact that the advantage of Edwards that it requires only local or regional anesthesia, which would be necessary if you're creating ablating lesions in that sensitive area.  So from our perspective, Edwards does not meet the remodeling the target tissue because it's ablating the target tissue.

Turning to Slide 40, Petitioner points to passages describing irrigating cooling fluid in Edwards, but it's clear from the description and the testimony of Dr. Poulos that this is -- the cooling fluid is to protect against collateral damage to associated structures, so what Edwards is really

IPR2024-00703
Patent 8,961,511 B2

describing is you're ablating the actual tissue that the electrodes are in contact with and then running cooling fluid through to prevent collateral thermal damage.

But regardless, turning to Slide 41, Petitioner's expert testified that a lesion would be a thermal injury of some kind that Edwards is substantially affecting the mucosal epithelium.  Turning briefly to Mosher, Mosher describes actually treating the endopelvic fascia and cooling the intermediate tissues.  In other words, cooling the tissues contemplated by the '511 patent, the target tissues contemplated by the '511 patent, the lamina propria and muscularis.

Petitioner points to various -- turning to Slide 43 -- of these laundry list passages in Edwards that list a whole slew of anatomical structures, including the lamina propria, but Mosher provides no specificity as to how any of those structures would be heated.  All of Edwards -- oh, sorry -- of Mosher's description is related to treating the endopelvic fascia. And Ingle also does not -- also cools the intermediate tissue, the tissue immediately below the mucosal epithelium and fails to meet this element for the same way as Mosher.

I'd like to turn now to Ground 2 and specifically, the Ollivier reference.  And with respect to Slide 49, the Ollivier reference failed for several reasons.  It's not (INDISCERNIBLE), it's not a valid printed publication, and it does not teach or suggest the claimed treatment regions.

Ollivier, as the Board is likely aware, is a Salon.com article that vaguely describes what one doctor was supposedly -- treatments that one doctor was supposedly performing.  But Ollivier is clear that those treatments are not documented anywhere, in any journal, peer reviewed

IPR2024-00703
Patent 8,961,511 B2

study. It makes clear that the details of the treatment were not provided within the article itself, and the Ollivier article itself actually has quotes from other doctors talking about run, run away from this Dr. Matlock's treatment.

Turning briefly to Slide 50, both experts in this case were clear that the alluded to technique in the Ollivier reference was kept confidential. You were required to sign an NDA, pay a hefty fee to study with Dr. Matlock. There's no showing that the treatments within Ollivier were described with any specificity or that they were well known.

Just turning briefly to printed publication. It's telling here that neither of the experts had ever heard of Salon.com until this case. In fact, Dr. Berenholz learned about it during his deposition and Petitioner's evidence from the way back Wayback machine is insufficient.

Turning to Slide 53, there's just no evidence that Ollivier was indexed. There's no evidence that a person of ordinary skill, a doctor practicing in these areas, would have been familiar with Salon.com, and there's no evidence that Ollivier was sufficiently accessible to the public interest in the art.

And in addition, I think Dr. Berenholz's testimony brings forth kind of the distinction with Ollivier and makes it clear that Ollivier is describing this laser that's being used to cut, shrink, and ablate tissue. These are procedures that require surgery, lots of down time, which are in stark contrast to the non-ablative -- substantially non-ablative to the mucosal epithelium treatments provided by the RF device contemplated by the '511 patent.

I'd like to turn just briefly to secondary considerations, and just to set the stage here a little bit. So the evidence that we have put forward are

45

IPR2024-00703
Patent 8,961,511 B2

two studies that were published well after the filing of the '511 patent called the Sekiguchi and Millheiser studies, and Dr. Berenholz, BTL's expert, described these studies as landmark studies.  I think Petitioner challenged the fact that we have maybe not shown that these studies were co-extensive. I'd like to just speak to that briefly.  We've gone well beyond showing that the Sekiguchi and Millheiser studies are reasonably commensurate with the scope of the claims.

For one, the treatments are non-ablative as repeatedly described in the claims and specifications of the '511 patents.  The treatments use cooling and gel to protect the epithelium.  The treatments are located at the introitus to 1.6 cm directly within the Claim 1 treatment region.  These studies also discuss the effects of tightening the introitus, directly in line with Claim 26. The studies also describe in great detail treating around the entire circumference from 1:00 o'clock to 11:00 o'clock, as required by Claim 35.

And ultimately, InMode is not required to produce objective evidence of non-obviousness of every potential embodiment of the claim. That's the Rambus v. Rea decision, but Petitioner's one challenge is that the studies discuss cooling, but cooling is only one of the ways to not substantially effect the epithelium.

Dr. Poulos testified that you could also use gels, which the Sekiguchi and Millheiser studies discuss.  You could also use movement, uniform heating, which is described as protecting against substantial damage in Column 2, lines 52 to 63 of the patent.  And I think more importantly, neither of these studies states that cooling is a critical feature and again, using the Rambus decision as a guide, you don't need to show objective indicia aligns with every embodiment of the claims, but we've put forth a

IPR2024-00703
Patent 8,961,511 B2

strong showing that it's coextensive with Claims 1, 26, and 35.

So for those reasons, we believe that there's a strong showing of secondary indicia of non-obviousness in the form of enabling.  And in addition, this study was published by Dr. Alinsod and ThermiGen, and ThermiGen also took a license to the '511 patent well into litigation, which is a further indicia of non-obviousness.  Unless the Board has any further questions, I'd like to reserve the rest of my time.

JUDGE PETRAVICK:  I do not.

JUDGE WOOD:  No, thank you.

JUDGE PETRAVICK:  So you have about 10 minutes and 20 seconds left of your time.

MR. HECTOR:  Thank you.

JUDGE PETRAVICK:  So we'll hear from Petitioner, again, but please give me a minute to reset the clock.  I'm just going to round that up to 18 minutes and we'll also round up Petitioner's time.  You can begin when you're ready.

MR. BEMBEN:  Sure.  I'll start by addressing some of the points that InMode's Counsel just made.  So with respect to secondary considerations, there argument for nexus was that they're entitled to a presumption of nexus.  That's on page 69 of the Patent Owner response.  This argument that they're entitled to nexus or that there's a nexus for other reasons or under something less than the presumption is new in the Patent Owner's surreply.  Also, just to remind the Board that they argued the presumption of nexus only for Claims 1, 26, and 35; there were no other claims that were argued under the secondary considerations.

With respect to the arguments that Counsel just made regarding

IPR2024-00703
Patent 8,961,511 B2

public availability and enablement of Ollivier, enablement -- that argument is simply a red herring. We're not relying on any of the treatment that's described there. The only thing that we're relying on Ollivier for is the locations, which would be treated and were known to be treated.

It does not matter that neither of the physicians, the experts in this case, knew of Salon.com. That is not the test for whether a reference is publicly available. That test is provided by the Blue Calypso case, which explains that if persons of ordinary skill or they're interested in the art, exercising reasonable diligence could've found it, that is the test for determining whether something is publicly accessible. And I'll reiterate what I said in my opening is that you heard a number of reasons from opposing Counsel why they believe that the reference is not publicly available. They did not address the research aids that we discussed with respect to -- I'm going to move to Slide 55 of our presentation.

Again, Blue Calypso instructs that research aids demonstrate public availability. Here we have two articles that predate the patent, 2003 on the left-hand side -- it's really hard to see, but it's 2002 on the right-hand side. These publications we're citing to the Ollivier document. This document was publicly available, and it teaches treatment locations. Nothing else is needed.

Kind of taking a step back, and I think Your Honors alluded to it a bit, is that InMode is arguing the referencing individually. We heard a lot about Edwards doesn't teach this, Edwards doesn't teach that, which we disagree with, but we just want to reiterate, the combination is based on Edwards, Mosher, and Ingle. And so, for example, there was discussion about limitation 1.3 and I'm going to go to Slide 43.

IPR2024-00703
Patent 8,961,511 B2

This is an exhibit from Dr. Poulos' deposition. It's also an exhibit in Netter, which is an anatomy textbook, and just to discuss a little bit about the references and what they teach. So as I mentioned before, Mosher in paragraph 48 expressly teaches that there are situations in which the endopelvic fascia is not present anymore because of childbirth and that specifically teaches treating structures of the vagina, including the lamina propria, which is the dense connective tissue just underneath the epithelium.

Now, in paragraph 54, Mosher also teaches preferably the location of the treatment volume is disclosed along the length of the urethra between the bladder neck and the external meatus. Again, that's through the vaginal canal, but treating those regions. And what we have on Slide 43 is Dr. Poulos, InMode's expert's own annotations of this figure.

On the right-hand side, annotation in red are the annotations of the vaginal canal on the left-hand side are annotations of the urethra. Starting kind of going clockwise, she labeled the proximal portion in red of the vaginal canal, the mid-portion and the distal portion, which is also known as the introitus. Continuing clockwise, we have in blue, the distal portion of the urethra, the mid-urethra, as well as the proximal portion of the urethra, which is close to the bladder neck.

Now, treating the area along the length of the urethra, from the bladder neck to the external meatus, if you look at where that treatment location would be with respect to the corresponding location in the vaginal canal, that is from the introitus, up through about the mid portion of the vaginal canal. That would certainly be within the first centimeter, introitus to 1 cm, that is described in element 1.3.

With respect to element 35.3, InMode argued that treating the

IPR2024-00703
Patent 8,961,511 B2

posterior wall would not meet that limitation. This is the circumferential limitation. Here, I'm going to go to the deposition transcript of Dr. Poulos. This is another exhibit from Netter that was attached. This is Exhibit 1032 at page 197. And what this is showing is the inferior view of the vaginal canal. This is -- the patient would be lying with their belly button pointing upwards, you see the rectum below, the vagina, and then the urethra above, and Dr. Poulos labeled the anterior wall, the lateral walls, and the posterior wall -- A, L, and P of the vagina. As you see, the posterior wall is a large portion of the bottom part of the vagina that would include multiple contact sites if you're treating that location, as Edwards teaches.

Now, I want to reiterate our point above. There was some discussion about claim construction and about different claim terms and what they mean. Our position is that the prior art renders obvious the claims under any of the proposed constructions, and this kind of dovetails with InMode's argument that we didn't provide a reply declaration.

Just because we didn't provide a reply declaration does not mean that InMode's evidence is unrebutted. No reply declaration was necessary because Dr. Berenholz's original declaration covered the proposed constructions and arguments that InMode made here. We knew this because of the ThermiGen dispute -- the prior ThermiGen dispute at the Board, and also the Viveve litigation. We knew what the proposed constructions would be, we anticipated them. We also knew what some of their arguments would be and anticipated them, and Dr. Berenholz's testimony does rebut those arguments that they presented here.

Additionally, a reply declaration wasn't necessary because Dr. Poulos made key admissions on cross-examination. We encourage you to

50

IPR2024-00703
Patent 8,961,511 B2

look at her deposition transcript.  This is Exhibit 1032, starting at page 84, line 20 through 91-6.  We walked her through the background, all the paragraphs in the background section of Dr. Berenholz's declaration, describing the state of the art, and there was much agreement with respect to what was known, treatment locations, types of treatments during that -- or in her testimony.

There were a few minor disagreements where she talked about she didn't know about a particular device that Dr. Berenholz was talking about, but for the most part, she agreed with the state of the art, what was known. She admitted that the problem was known.  She admitted that it was known to treat the introitus, the vulva, and the labia for cosmetic purposes, and she acknowledged that doctors exercise judgment when determining whether to use a speculum or not.  For all those reasons, all those admissions, it was unnecessary to provide a reply declaration, but those positions are rebutted. InMode's positions are rebutted.

InMode also argued that we did not provide a motivation to combine Edwards, Ingle, and Mosher.  That is simply untrue.  The petition at 23 through 24, it discusses motivation to combine and reasonable expectation of success.  It explains it very similar to the way that Judge Petravick characterized it, talking about applying a known treatment to known portions that were ready for improvement.

And what we have said in there is that it's the combination of Edwards provides specific -- general teachings with respect to treating collagenated tissue, doesn't provide specifics such as the time and temperature, which are kind of important for some of the dependent claims, but also some of the treatment locations and the specific tissues that would

IPR2024-00703
Patent 8,961,511 B2

be treated, as well as the physiological response, which is described in great detail in some of the other prior art references. And so for that reason, it's not a novelty rejection we're talking about. It's obviousness based on the combination of those three references.

Moving to Slide 36 of our presentation, I just want to reiterate something. This is with respect to InMode's argument about the lesions and lesions in Edwards. As I mentioned, we're not relying solely on Edwards' teachings. Mosher, as we have on the right-hand side, paragraph 58, talks about pre-cooling and that pre-cooling can inhibit heating of the intervening tissue to temperature causing surface lesions within the vagina. The combination of the references would have taught -- to the extent that not substantially affecting the epithelium is required, which we do not believe it is, but to the extent that it is, the references clearly cover protecting the epithelium, the intermediate tissue, as well as just taking a step back. A person of ordinary skill in the art is a physician that has experience using these types of treatments. That person would know to prevent damage to other areas when you're performing cosmetic surgeries or treatments that are intended to improve sexual functionality. You'd be trying to protect those areas as all of the references discuss.

Unless there are any questions, just to wrap up, as I began the presentation, what has come out here is that, again, by February 2006, which is the earliest possible priority date, persons of skill in the art knew about the problem, they knew about the treatment methods and the physiological response, and they knew of the anatomical locations to treat in order to address those problems. Dr. Berenholz testified that the vagina is a small region. A person of skill -- a highly skilled person would know where to

IPR2024-00703
Patent 8,961,511 B2

treat, would exercise their judgment based on the patient's desired outcome, as well as the patient's anatomy.  This is a clear cut, quintessential KSR type obviousness case.  We ask that you find the claims obvious.  I have nothing further, Your Honors.

JUDGE PETRAVICK:  Thank you.  Are there any other questions for Petitioner?

JUDGE WOOD:  No, thank you.

JUDGE PETRAVICK:  We have no more questions.  Thank you.  So Patent Owner, you have -- I'm going to give you 11 minutes.  Round up.

MR. HECTOR:  Thank you very much.  May it please the Board.  Just to respond to a few of those points in turn.  I think one of the first arguments that Petitioner made in the rebuttal was that Olivier somehow defines the locations where the treatments occurred.  Olivier does not suggest treating in the introitus to Hart's line.  It doesn't use that term, nor does it discuss the mucosal surface of the labia minora.  In fact, it's a surgical technique that would be just removing entire swaths of tissue.  So we disagree that Olivier actually treats those locations.

Next, turning to this idea related to the heating and remodeling portion that -- Petitioner made the point that Mosher somehow provides the particular structures and tissue structures that should be heated.  You know, as I stated in my opening presentation, Mosher does address -- it does list a slew of tissues, including the lamina propria, but Mosher only discusses -- it just provides this list, but it doesn't provide any sort of guidance on how a physician would necessarily apply heat to those structures.

The only tissue structure that Mosher discusses in detail is the endopelvic fascia and I think Petitioner alluded to the fact that maybe a

IPR2024-00703
Patent 8,961,511 B2

doctor would know to prevent damage, but there's a lot more that goes into it than just knowing to prevent damages, knowing particularly how to heat to avoid affecting those particular structures, and Mosher provides no guidance on how to heat and avoid potential damage to the lamina propria or any other structures.  In fact, Mosher describes cooling those structures along with Ingle and Edwards itself ablates through those structures.

Regarding motivation to combine, Petitioner argues that we did not respond to their motivation to combine.  In fact, it's a bit of the opposite. We provided specific points demonstrating why there would be no motivation to combine Edwards, Ingle, and Mosher, for example, in our Patent Owner response at 38, 39, 45, 46, 48 to 50, and 59, and the Petitioner did not respond to any of those in its reply.

That gets to the point of the Petitioner's decision to not submit a reply declaration, and I think this is critical for several reasons.  For one, the decision to decide not to submit a reply declaration is a decision the Petitioner made, but it's critical here because in multiple places, Petitioner puts forth new arguments in its reply that are not supported by its expert declaration.  Mainly, Petitioner made the argument with regard to Mosher and specifically to Claim 1 of Mosher -- let me get there -- and this idea of Claim 1 of Mosher treating the elements of -- or treating the treatment area of the introitus inwardly from 1 cm to 3.5 cm.

In its reply and as represented on BTL Slide 42, the Petitioner put forth this new argument that this passage described in the urethral meatus somehow would denote treatment in the range denoted by Claim 1 introitus to 1 cm to 3.5 cm.  You know, this is a new argument in the reply, it's pure attorney argument.

IPR2024-00703
Patent 8,961,511 B2

The Petitioner's expert in no way discussed this in his opening declaration and it's still -- the argument is still defective on its face because Dr. Berenholz testified that Mosher is treating at the endopelvic fascia and the endopelvic fascia is located at the bladder neck, and that specific paragraph of Mosher at 54, including the language regarding the urethral meatus, discusses treatment of the endopelvic fascia and Dr. Poulos also made that clear, that the endopelvic fascia is located at the bladder neck.

And in addition to that, this occurs in several places where the Petitioner introduced new arguments in its reply that were not supported by any sort of expert testimony because it elected not to submit a reply declaration.  So it's not -- I think there is a significant distinction there.  And in addition, another reason the Petitioner said they didn't submit a reply declaration is they supposedly got key admissions from Dr. Poulos, citing to, I believe, 84, line 20 to 91, line 6 of her deposition testimony.  All of those purported admissions were Dr. Poulos acknowledging things that were described in the background section of the '511 patent or that LVR treatments were practiced by at least one doctor.  Those are not new admissions that somehow changed the face of the case or made it unnecessary to submit a reply declaration.  That's just simply not the -- those are not key admissions in any way.  They're just acknowledging what was already in the record.

And I think that gets to the fundamental point also that we were discussing earlier here.  You know, ultimately, the '511 patent and BTL comes forth with this evidence of lots of things that they would say were purportedly known before the '511 patent and we've discussed a lot of those today, treating for vaginal laxity, tightening via collagen denaturation, that

IPR2024-00703
Patent 8,961,511 B2

one doctor was performing LVR, that surgical techniques were performed to treat the various vaginal structures.

It's one thing to know that some of these certain areas may need tightening, as performed by surgical approaches, but it's another thing -- and this is the invention of the '511 patent -- is how to do that in a non-destructive way, in a way that doesn't require downtime or the risks of scarring associated with this prior art -- potential prior art techniques.  And the key distinction here, again, is that the '511 patent acknowledges that treating vaginal laxity and then treating the introitus with a non-invasive procedure was not known and it was not known that RF energy could be used to improve sexual function by treating these specific areas defined in Claims 1, 26, 35, 43, and 51.

So for those reasons, we think that both Grounds 1 and Grounds 2 fail to prove that those claims are obvious, and the patentability of all '511 patent claims should be withheld.  Unless you have any further questions, that concludes my presentation.

JUDGE PETRAVICK:  We have no further questions.  I want to thank you for coming here today and providing us with this information.  We have a lot to consider.  We are adjourned.

(Whereupon, the above-entitled matter went off the record at 10:59 a.m.)

IPR2024-00703
Patent 8,961,511 B2

PETITIONER:

Richard Bemben
Jennifer Chagnon
Rich Coller
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
rbemben-ptab@sternekessler.com
jchagnon-ptab@sternekessler.com
rcoller-ptab@sternekessler.com
cvira-ptab@sternekessler.com

PATENT OWNER:

Justin Oliver
Michael Sandonato
William Hector
VENABLE LLP
joliver@venable.com
msandonato@fchs.com
wahector@venable.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BTL INDUSTRIES, INC.
Petitioner

v.

INMODE LTD.,
Patent Owner

———————————

Case IPR2024-00703
U.S. Patent No. 8,961,511

———————————

**PETITIONER'S NOTICE OF APPEAL**

via PTAB P-TACTS
Patent Trial and Appeal Board

via E-Mail
Director of the United States Patent and Trademark Office
efileSO@uspto.gov

via CM/ECF
United States Court of Appeals for the Federal Circuit

## INTRODUCTION

BTL Industries, Inc.'s ("Petitioner's") appeal stems from the Patent Trial and Appeal Board's Final Written Decision, entered on October 1, 2025 (Paper 29, "Final Written Decision") in the above-captioned inter partes review of U.S. Patent No. 8,961,511 ("'511 patent").

## PETITIONER'S APPEAL

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319, 5 U.S.C. §§ 701-706, 28 U.S.C. § 1295(a)(4)(A), and in accordance with 37 C.F.R. §§ 90.2(a), 90.3(a), and Federal Circuit Rule 15(a)(1), notice is hereby given that Petitioner appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision and all prior and interlocutory rulings related thereto or subsumed therein. This notice is timely filed within 63 days of the Final Written Decision.

## PETITIONER'S ISSUES ON APPEAL

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Petitioner states that the issues for appeal include, but are not limited to: (i) the Board's Final Written Decision determining that Petitioner did not establish by a preponderance of the evidence that claims 1-58 of the '511 patent are unpatentable and (ii) any finding or determination supporting or related to the aforementioned issues, including claim constructions, as well as all other issues decided adversely to Petitioner in any order, decision, ruling, phone conference decision, and/or opinion.

Case IPR2024-00703
U.S. Patent No. 8,961,511

Simultaneously with this submission, Petitioner is filing a true and correct copy of this Notice of Appeal with the Director of the United States Patent and Trademark Office and a true and correct copy of the same, along with the required docketing fee, with the Clerk of the United States Court of Appeals for the Federal Circuit as set forth in accompanying Certificate of Filing.

Dated: December 2, 2025              Respectfully submitted,

*/s/ Seth R. Ogden*
Seth R. Ogden, Reg. No. 65,168
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400
sro@iplawgroup.com

*Attorney for Petitioner*

Case IPR2024-00703
U.S. Patent No. 8,961,511

## CERTIFICATION OF FILING

The undersigned certifies that, along with electronically filed through PTAB P-TACTS, a true and correct copy of the above-captioned **PETITIONER'S NOTICE OF APPEAL** is being filed with the Director via email on December 2, 2025, at the following email address:

Director of the United States Patent and Trademark Office
efileSO@uspto.gov

The undersigned also hereby certifies that a true and correct copy of the above-captioned **PETITIONER'S NOTICE OF APPEAL** and the filing fee is being filed via CM/ECF with the Clerk's Office of the United States Court of Appeals for the Federal Circuit on December 2, 2025.

Dated: December 2, 2025

Respectfully submitted,

/s/ Seth R. Ogden
Seth R. Ogden, Reg. No. 65,168
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400
sro@iplawgroup.com

*Attorney for Petitioner*

4
Appx520

Case IPR2024-00703
U.S. Patent No. 8,961,511

## CERTIFICATION OF SERVICE

I certify that the above-captioned **PETITIONER'S NOTICE OF APPEAL** was served in its entirety on December 2, 2025, upon the following parties via electronic mail:

William A. Hector (Lead Counsel)
Michael P. Sandonato (Back-up Counsel)
Justin J. Oliver (Back-up Counsel)
Venable LLP
wahector@venable.com
msandonato@venable.com
joliver@venable.com

Dated: December 2, 2025

Respectfully submitted,

*/s/ Seth R. Ogden*

Seth R. Ogden, Reg. No. 65,168
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400
sro@iplawgroup.com

*Attorney for Petitioner*

## VI.    BACKGROUND CONCEPTS AND TECHNOLOGIES

### A.    Anatomy of Female Urogenital System

32.    The female urogenital system consists of all the organs involved in the formation and release of urine and reproduction. It includes kidneys, ureters, bladder, urethra, uterus, ovaries, fallopian tubes, vagina, and vulva.

33.    The vagina is an elastic, muscular tube that extends from the cervix, which connects the vagina to the uterus, to the vaginal opening, called the introitus. EX1001, 2:3–4 ("…the vagina and its opening, the introitus."). The '511 patent describes the vagina as follows, which is consistent with the knowledge of a POSA:

> The vagina is a fibromuscular tube, lined with stratified squamous epithelium, that connects the external and internal organs of the female reproductive system. The vagina runs obliquely upwards and backwards at an angle of about 45 degrees between the bladder in front and the rectum and anus behind. In an adult female the anterior wall is about 7.5 cm long and the posterior wall is about 9 cm long. The difference in length is due to the angle of insertion of the cervix through the anterior wall.

EX1001, 11:36–44.

34.    The vagina is lined on its inside wall by a layer of stratified squamous epithelium. *See* EX1017, 147 (Section 9.2). The vaginal epithelium, also known as the vaginal mucosa, does not contain keratin and is similar to the inner lining of the

mouth and esophagus as opposed to the surface epithelium found on the outside of the human body. *See* EX1017, 147 (Section 9.2). Under the vaginal mucosa is a layer of tissue known as the lamina propria, or submucosa, which is rich in elastic fibers such as collagen and provides a foundation for the epithelium above. *See* EX1017, 147 (Section 9.2); EX1001, 3:43–47. Beneath the lamina propria is a layer of smooth muscle known as the muscularis, and beneath that is the adventitia, a layer of fibrous connective tissue that anchors the vagina to the surrounding structures. *See* EX1017, 147-148 (Section 9.2, Figure 9.2).



EX1017, FIG. 9.2 (annotated).

35.    Immediately anterior to the vagina, adjacent to the anterior vaginal wall, is the urethra, which largely runs parallel to the vagina. Posterior to the vagina and adjacent to the posterior vaginal wall, lies the rectum. *See* EX1015, Plate 356.



EX1015, Plate 356 (annotated).

36.    The vagina is held in place by connective tissue known as the endopelvic fascia, or pubocervical fascia, which "may define a hammock-like structure which extends laterally between the left and right arcus tendinous fasciae pelvic (ATFP)." EX1006, ¶47; *see* EX1015, Plate 372.

- 15 -
Appx974



EX1015, Plate 372 (annotated).

37.    The vulva consists of the female genital structure external to the vaginal opening, known as the introitus, and comprises the mons pubis, labia majora, the labia minora, the clitoris, and the vestibule. *See* EX1015, Plate 377.



EX1015, Plate 377 (annotated).

- 16 -

38.     The area of the vulva between the labia minora is known as the vestibule. The outer edge of the vestibule is demarcated by an imaginary boundary, known as Hart's line, and marks the transition between the smooth, non-keratinized epithelium of the vestibule and the keratinized skin of the labia minora. Within the vestibule itself are the introitus and the external opening of the urethra—the urethral meatus. *See* EX1015, Plate 377.

## B.     Collagen Remodeling

39.     The background of the '511 patent describes the nature and role of collagen as follows, which is consistent with the understanding of a POSA in February 2006:

> Collagen molecules are produced by cells resident in these tissues which synthesize three polypeptide chains that wrap around one another to form a triple helix. Collagen is a major type of fibrous protein that is a basic structural element of connective tissue, tendon, cartilage, and bone. Each of the collagen chains is approximately 1000 amino acid units in length, with glycine recurring regularly every third unit, and with proline and hydroxyproline recurring very frequently. Cross-linking occurs between the sides, not the ends, of collagen molecules and is coupled with the amino acid composition to give collagen its great strength. Collagen tissue tightening takes place in the direction parallel to an axis of collagen fibers.

EX1001, 1:22–34. Collagen is mostly found in connective tissue throughout the body, including the tissues of the female urogenital system, and specifically in the tissues underlying the epithelia of the vagina, introitus, and labia minora.

40.    By the time of the invention in February 2006[1], it was well-known that the triple helix structure of collagen chains are held together by hydrogen bonds. *See* EX1018, 180; EX1016, 180. These molecules then aggregate and organize themselves into fibers caused by intermolecular cross-links, which imparts tensile strength and the elastic properties associated with collagen. *See* EX1018, 180. However, when collagen fibers are heated, the intramolecular hydrogen bonds are broken and the long triple-helical strands unwind—a process known as denaturation—to produce a "gel" of randomly oriented molecules, essentially shortening the fibers. *See* EX1018, 180; EX1016, 180. Because the heat-stable, intermolecular cross-links are maintained, the shortening of the fibers causes an increase in the elastic properties of the collagen. *See* EX1018, 180. This

---

[1] Although Sadick (EX1018) was published in 2008, it is a summary and review of studies that, for the most part, were published in, or before, 2006. Therefore, a POSA would have been aware of these techniques and results at the time of the invention. The general mechanism of collagen tissue remodeling also was recognized, for example, in Goldberg (EX1016).

causes an immediately noticeable tightening effect in the tissue. *See* EX1016, 180; EX1021, 639.

41.    The denaturation of collagen molecules triggers the body's normal healing response wherein the tissue emit extracellular signals that induce new collagen deposition and fibroplasia—the formation of new collagen molecules and fibers. *See* EX1018, 180, 182; EX1021, 639. This process is known is remodeling, and the formation of new collagen fibers re-establishes the tensile strength and elasticity of the tissue, resulting in long-term tightening of the tissue. EX1018, 180.

42.    A POSA would have known that collagen denatures based on a combination of the temperature that it raised to—treatment temperature—and how long it is held at that temperature—treatment time. *See* EX1018, 180; EX1019. A POSA would have understood that they could control either parameter, and that lower treatment temperatures would require longer treatment times and *vice versa*. *See, e.g.*, EX1006, ¶¶64–65, 71, 73, FIGS. 8A, 14, 15. A POSA would have also known that the temperature at which collagen shrinkage occurs is often quoted as 65°C in the literature, but that collagen denaturation is a function of temperature and time, among other things. *See* EX1018, 180 (citing articles from 1999, 2000, and 2003); *see also* EX1020, 87 (citing to seven studies dated 1998–2006 and indicating that "[t]he reported range of temperatures causing collagen shrinkage varies from 60 to 80°C.").

43.    A POSA would have known that collagen contraction occurs at a variety of time-temperature combinations rather than at a specific temperature, but that shrinkage could be obtained with treatment times of several seconds at temperatures of 60°C to 65°C. *See* EX1018, 180 (citing articles from 1999, 2000, and 2003). Furthermore, a POSA would have known that as treatment temperatures increase towards the boiling point of water (100°C), cells and tissue in the human body begin to experience permanent damage, *see* EX1020, 91, and thus treatment at such elevated temperatures, such as 80°C and above, should be avoided.

**C.    Prior Art Treatments of Female Urogenital Tissue Using Radiant Energy**

44.    The use of radiant energy to treat and tighten collagen-rich tissue generally was well known by February 2006. *See* EX1018, 180; EX1016, 180–181; EX1021, 638–639. As discussed above, radiant energy was known to heat the collagen within the tissue, causing denaturation and remodeling, and resulting in the tightening of the tissue. Two prevalent methods at the time involved the use of light and radiofrequency ("RF")-based technologies as the source of the radiant energy. *See* EX1018, 180; EX1016, 180; EX1021, 638–639.

45.    Initially, ablative treatments—where the outermost layer of skin or tissue is removed in conjunction with heating of the lower layers of tissue—with $CO_2$ or erbium-doped yttrium aluminum garnet (Er:YAG) lasers were shown to be effective at causing collagen contraction and remodeling. *See* EX1018, 181;

EX1016, 180. Ablative treatments were commonly used in treating facial and neck skin, where collagen contraction and remodeling can tighten the skin and reduce wrinkles. *See* EX1018, 181. However, they often came with adverse side effects due to the ablative nature of the laser technology, such as infection, changes in skin color, scarring, dermatitis, and long recovery times. *See* EX1018, 181.

46.     To combat these side effects, devices that use non-ablative lasers and/or less-focused light were developed. *See* EX1018, 181; EX1016, 180–181. These therapies did not damage the outermost tissue layer and instead focused their energy directly on the lower, collagen-containing layers. *See* EX1018, 181; EX1016, 180–181. Devices such as the Titan[2] used broad-spectrum infrared light to heat the lower layers of tissue beneath the skin. In order to further reduce unwanted side effects, treatments were performed in multi-second cycles and spread throughout multiple sessions across weeks or months. *See* EX1018, 181. This strategy of delivering repeated, lower levels of energy helped to reduce unwanted tissue damage and minimize patient discomfort. *See* EX1018, 181. Going one step further, the Titan device also used a cooling head to protect the

---

[2] Although the studies cited by Sadick (EX1018) in relation to the Titan system are from 2006–2007, the system has been used by clinicians for skin tightening as early as July 2005. *See*, *e.g.*, EX1022.

outermost skin layer from heat damage. *See* EX1018, 181. Similar to ablative lasers, these non-ablative laser devices were also frequently used in treating the facial and neck skin of patients. *See* EX1018, 181.

47.     As an alternative to non-ablative light-based systems, devices employing RF energy were also in use at the time of the invention. *See* EX1018, 181; EX1016, 180–181. Using these devices, most of the heating occurs in the tissue beneath the electrode, to depths greater than those achieved with lasers and light sources. *See* EX1018, 182; EX1016, 180.

48.     An exemplary system that used RF energy to tighten collagen in the skin was the ThermaCool device. Like the light-based systems, it also employed a mechanism to cool the outer layer, creating a thermal gradient in which the deeper tissue received the most intense heat without affecting the skin surface. *See* EX1018, 182; EX1016, 180. The initial protocol for treating patients was a single pass at the highest energy that the patients could tolerate. *See* EX1018, 182. However, similar to when using light-energy, clinicians found that using multiple passes at lower energies would result in less pain during the treatment and overall better results. *See* EX1018, 182. In addition to treating facial and neck skin like their light-based counterparts, RF-energy systems such as the ThermaCool were also used to treat other areas of the body, such as the legs (including the upper thigh and knee areas) and abdomen. *See* EX1021, 641. The skin-tightening and

wrinkle-reducing effects that were observed in the facial and neck regions were replicated in these new treatment areas as well. *See* EX1021, 641.

49.　By February 2006, the use of these technologies was also well known in the field of urogynecology. Based on a modification of a decades-old, traditional gynecological surgery for stress urinary incontinence, clinicians also performed Laser Vaginal Rejuvenation ("LVR") to tighten vaginal support tissue and the outer third of the vagina, including the introitus, vulva, and the perineal body, both for cosmetic purposes and to improve sexual function. *See* EX1008, 0001. And even as early as November 2000, some clinicians began to feel that lasers have fallen out of favor and were turning to more sophisticated tools to replace lasers in these procedures. *See* EX1008, 0003. These more sophisticated tools would have included broad-spectrum light and RF-based technologies, as discussed above.

## VII.　THE '511 PATENT

### A.　Overview of the '511 Patent

50.　The '511 patent claims a method for remodeling female genital tissue by heating it. EX1001, Abstract, 5:61–64. The '511 patent purports to solve certain problems related to stretched vaginal tissue, which can occur for example during childbirth, by providing "effective approaches to treating a loose vagina and introitus with a non-invasive procedure." EX1001, 2:17–18.

13:50–53 (FIG. 9A, step 907, begin fluid delivery), 13:63–67 (FIG. 9A, step 909, stop fluid delivery).

67.    Edwards teaches that "[t]he physician determines optimal areas of treatment," which can include the anterior vaginal wall, the posterior vaginal wall, or both, depending on the desired result of treatment. EX1005, 13:14–16, 13:40–42. In particular, Edwards describes that "[r]emodeling of the anterior wall treats incontinence," and "[r]emodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting [in] physical and psychological improvement in the area of sexual function." EX1005, 13:16–23.

68.    Edwards also discloses "a device that can be used for vaginal remodeling," shown below in Fig. 4. EX1005, 7:15.



**FIG. 4**

EX1005, FIG. 4

69.    Treatment element 410 of Edwards includes a blade 420 and a handle 430. EX1005, 7:18–28. The blade includes a plurality of electrodes 423 and a

- 30 -

plurality of irrigating fluid delivery pores 425. EX1005, 7:26–28. In performing the method of Figure 9, the distal end of the treatment element 410, i.e., the blade 420 with electrodes 423, is inserted into the vagina. EX1005, 7:18–19, 13:42–43. The electrodes 423 deliver energy (RF or other types of therapeutic energy), and each electrode includes at least one thermocouple 434 used to constantly monitor the temperature. EX1005, 7:37–47. Edwards describes its treatment device as being used with a speculum. EX1005, 13:38–62. A POSA would have understood that, not only could the "blade 420 … be disengaged and relocked into another position on the speculum," EX1005, 13:61–62, but also the speculum itself could be rotated to a different position. A POSA also would have understood that in treating areas of the vaginal wall closer to the introitus, a physician would be able to complete the treatment without a speculum.

### B.    Mosher

70.    Mosher discloses methods for treating incontinence by heating collagenous support tissue for a sufficient time to effect substantial collagenous tissue shrinkage. EX1006, ¶9, Abstract. Mosher expressly recognizes, however, that its techniques "will find applications in *a wide variety of therapies*," EX1006,

'aesthetically modify' her labia." EX1008, 0001. As described in Ollivier, "[b]y reconstructing the 'optimum structural architecture' of the vagina – namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body – … women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification." EX1008, 0001.

## IX.    THE COMBINATION OF EDWARDS, MOSHER, AND INGLE RENDERS OBVIOUS CLAIMS 1–58

83.    In my opinion, claims 1–58 would have been obvious in view of the combination of Edwards, Mosher, and Ingle.

### A.    A POSA would have been motivated to combine Edwards, Mosher, and Ingle with a reasonable expectation of success.

84.    As I discuss above, Edwards, Mosher, and Ingle are all directed to methods for the non-invasive treatment of female uro-genital conditions, for therapeutic and/or cosmetic reasons. In each method, a non-invasive treatment device provides radiant energy, such as RF energy, to and through the vaginal wall, thereby heating underlying target tissue. This heating results in remodeling or tightening of the target tissue. Each of these references also describes using cooling during treatment to minimize or prevent damage to the mucosal epithelium. A POSA would have understood that regardless of the specific device used, methods of treatment using radiant energy all have the same end result, namely remodeling

collagen-rich tissue. Thus, a POSA would have relied upon Edward, Mosher, and Ingle for their teachings of treatment methods and rationales, and would have further understood that the relevance of these teachings would not have been limited to the specific device(s) disclosed in each reference.

85.    A POSA would have been motivated to combine these references, and would have had a reasonable expectation of success in doing so, because they all relate to methods of using radiant energy, such as RF energy, to treat uro-genital conditions by tightening and/or shrinking tissue. Edwards provides general teachings of a non-invasive treatment method, but does not provide details of the treatment parameters (*e.g.*, treatment time and temperature) or the specific physiological mechanism of action (*e.g.*, how the tightening occurs). In considering methods of treatment using radiant energy, including RF energy, a POSA would have looked to Mosher and Ingle, which also describe methods of treatment using radiant energy, including RF energy, for more specific details regarding treatment parameters and techniques. Mosher and Ingle also discuss details of the natural physiological mechanism of action that occurs in the collagen when heated using radiant energy, such as RF energy.

86.    Applying the treatment details provided in Mosher and Ingle to the treatment method taught in Edwards is simply combining prior art elements according to known methods to yield predictable results. Similarly, the

combination is merely applying known techniques (Mosher/Ingle's treatment methods) to a known method ready for improvement (Edward's treatment method) to yield the predictable result of tightening via collagen denaturation.

87.    In particular, Edwards describes a method for vaginal remodeling in order to treat incontinence or to provide improvement in sexual function. EX1005, 13:12-23. In Edwards's method, RF energy is applied to the vaginal wall while delivering cooling fluid to minimize tissue damage. EX1005, 7:14-42. Mosher describes that in order to effect substantial collagenous tissue shrinkage, i.e., remodeling, tissues must be heated for sufficient time and at a sufficient temperature. EX1006, ¶9. A POSA would have looked to Mosher and applied these treatment details to Edwards's treatment method in order to obtain the desired result of vaginal remodeling described in Edwards. Ingle also teaches how to use cooling along with RF treatment for particular times and at particular temperatures in order to control which tissue reaches the treatment temperature and which tissue is protected from treatment. EX1007, Abstract, 11:25-31. A POSA would have looked to Ingle and applied these treatment details to Edwards's treatment method in order to obtain the desired result of vaginal remodeling described in Edwards, without damaging other tissue.

88.    Further still, the '511 patent acknowledges that loose vaginal or vulval tissue was a known problem facing women at the time. EX1001, 1:62-2:21. I agree

that it was a known problem that vaginal tissue is stretched during childbirth, and that this could result in both medical issues and cosmetic concerns. Each of Edwards, Mosher, and Ingle teaches using their method for tightening such tissues, thus a POSA would have looked to these references for solving this known problem. For example, Edwards teaches methods for treating female uro-genital disorders by selectively applying RF energy to tighten, shrink, or reshape tissue in order to correct an unwanted condition. EX1005, 2:34-39. Edwards teaches that its methods can be used for vaginal remodeling in order to treat incontinence or to provide "physical and psychological improvement in the area of sexual function." EX1005, 13:12-23. Similarly, Mosher teaches methods for treating incontinence by effecting collagenous tissue shrinkage. EX1006, ¶9. Ingle also teaches using its methods for "controlled shrinkage or contraction of a support tissue of the body," to treat various conditions, such as incontinence, or to provide cosmetic treatment of loose tissue. EX1007, 11:8-11, 17:65-18:7.

89. A POSA further would have had reasonable expectation of success in combining these references, because they all apply known thermal dynamics principles to the treatment of tissue using radiant energy. As described in Goldberg, using RF energy to heat tissue while cooling the surface tissue (as described in each of Edwards, Mosher, and Ingle), results in a "reverse thermal gradient characterized by a higher tissue temperature in the deeper dermis than in

the epidermis and upper dermis." EX1016, 180. This was known to result in heat-induced collagen contraction due to denaturation of the collagen. EX1016, 180. Each of Edwards, Mosher, and Ingle applies this known principle in its treatment methods.

90.     For this reason, a POSA would also have understood that the treatment parameters and techniques disclosed in Mosher/Ingle could be applied to Edwards's method to result in collagen denaturation and tissue tightening. A POSA would have generally known the range of treatment times and temperatures that could be applied without hurting the patient. And, a POSA would have reasonably expected that applying the times and temperatures described in Mosher and Ingle would have successfully resulted in collagen denaturation and tissue tightening.

### B.    Independent Claims

91.     The independent claims all recite a similar method for remodeling tissue of the vulva, introitus, or vagina. Using radiant energy such as RF to remodel tissues generally, and more particularly to remodel tissue in the vaginal region, was well-known in the art before the '511 patent. *See* Section VI.C. Further, a POSA would have understood that the tissues in the vaginal region, *i.e.*, vulva, introitus, and vagina tissue, would have similar responses to treatment with radiant energy such as RF, namely remodeling of the tissue by, for example,

d.     **[1.3] wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.**

120.    As previously explained, the vagina is an elastic, muscular tube with one end at the cervix leading into the uterus and the other end terminating at the vagina's external opening, also known as the introitus. *See* Section VI.A. A POSA would have understood this claim element as heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (*i.e.*, 3.5 cm from the introitus). In my opinion, the combination of Edwards and Mosher teaches heating this claimed treatment area.

121.    Edwards teaches performing its method "to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both. Remodeling of the anterior wall treats incontinence based on bladder outlet hypermobility by increasing support for the bladder outlet, as well as the proximal and mid-urethra. Remodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting physical and psychological improvement in the area of sexual function." EX1005, 13:14–22.

122.    A POSA, based on Edwards's teachings of improvement of sexual function, would have understood Edwards's teachings to include treatment near the opening of the vagina. Specifically, Edwards teaches "circumferential tightening of the vaginal wall" to "provide physical and physiological improvement in the area

of sexual function." EX1005, 3:11–13. A POSA would have understood that in order to achieve these improvements of sexual function, the treatment area must include the region near the opening of the vagina. *See, e.g.*, EX1008, 0001.

123.    Although Edwards does not expressly disclose the distance between the treatment area and the opening of the vagina, Mosher further confirms that a POSA would have been motivated to focus treatment nearer the opening of the vagina, in order to avoid damage to nerves in the bladder neck region and in the antero-lateral vaginal wall. EX1006, ¶74. For example, Mosher describes using non-invasive vaginal probe 54 to provide treatment. EX1006, ¶¶58, 75, FIGS. 6, 6A. Mosher describes the safety advantages of using an "enhanced treatment width" or "laterally elongate treatment region," including when performing treatment with non-invasive vaginal probe 54. EX1006, ¶¶74, 75. Mosher describes the preferred treatment region as "significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm." EX1006, ¶74. Despite the reference to "urethral length" in this description, a POSA would have understood this treatment region to apply to non-invasive treatment within the vagina, because it is discussed in relation to using a non-invasive vaginal probe device. Indeed, Mosher describes several electrode configurations for its vaginal probe 54 to provide this "enhanced treatment width." EX1006, ¶75.

124. Mosher discloses that it would be beneficial to have a treatment region having "a length about 15 mm," or about 1.5 cm. EX1006, ¶74. Mosher teaches that it is beneficial to "limit the length of the treatment along the axis of the patient's urethra," in order to "minimize exposure of the bladder neck and antero-lateral vaginal wall nerves to RF energy." EX1006, ¶74. In the case of performing treatment with a vaginal probe, a POSA would have understood Mosher's treatment length of about 15 mm (1.5 cm) to refer to the length of the treatment region extending along the vagina. A POSA would have understood that the vaginal axis largely runs parallel to the urethral axis. *See* EX1007, FIG. 6. A POSA would have thus understood Mosher's teaching of a 1.5 cm treatment length as a teaching to focus treatment on the area around the opening of the vagina. Therefore, a POSA would have been motivated to focus heating on the portion of the vagina extending from the introitus inwardly to a location of about 1.5 cm in order to avoid treatment too close to the bladder neck and other nerves.

125. It is therefore my opinion that the combination of Edwards, Mosher, and Ingle teaches *the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.*

### 2.    Claim 35

126. Similar to claim 1, claim 35 is directed to a "*method for remodeling a therapeutic zone within a target tissue*" and includes the same "*heating the target*

*tissue*" and "*remodeling the therapeutic zone of target tissue*" steps found in claim 1. For the same reasons I discuss above, it is my opinion that the combination of Edwards, Mosher, and Ingle teaches elements [35.P], [35.1], and [35.2]. *See* Sections IX.B.1.a–IX.B.1.c.

127.   The only difference is that element [35.3] further recites that "*the heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.*"

128.   I have been informed by Petitioner's counsel that in a prior proceeding this element was construed as: "heating at least one contact site in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall." In my opinion, the combination of Edwards and Mosher teaches element [35.3] under this construction.

129.   Edward teaches that its disclosed method "create[s] a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." EX1005, 13:14–16. A POSA would have understood that the "anterior vaginal wall" is the portion of the wall closest to the urethra and corresponds to semicircle formed between 9 o'clock and 3 o'clock, passing through 12 o'clock on the '511 patent's reference clock dial found in Figure 7. A POSA would have also understood that the "posterior vaginal wall" corresponds to the complementary semicircle formed

between 3 o'clock and 9 o'clock, passing through 6 o'clock on the reference clock dial. A POSA would have understood that treating any portion of the posterior wall would necessarily fall within the recited 300 degree arc. Thus, by teaching treatment of the posterior wall, Edwards teaches heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.

130.   I have also been informed by Petitioner's counsel that Patent Owner previously argued that the claims require heating along the entire 300 degree arc. Edwards teaches that a physician may treat both the anterior and posterior walls (encompassing the full 360 degrees on the reference clock). Based on Edwards teaching that "[r]emodeling both the anterior wall and posterior wall provide *circumferential vaginal wall tightening*, resulting physical and psychological improvement in the area of sexual function," EX1005, 13:16–22, a POSA would have been motivated to treat the vagina circumferentially, including the entire 300 degree arc between 1 o'clock to 11 o'clock.

131.   Additionally, Mosher teaches that "it may be advantageous to distribute the treatment volume *along the patient's lateral orientation* while limiting the length of treatment along the axis of the patient's urethra. … Such a laterally elongate treatment region … will preferably be significantly wider (along the medial-lateral orientation) than its urethral length." EX1006, ¶74. Based on

Mosher's teachings of distributing the treatment volume along a lateral orientation, a POSA would have further been motivated to treat more locations around the circumference of the vagina, in order to expand the treatment area.

132.   Thus, it is my opinion that the combination of Edwards and Mosher teaches heating along the entire 300 degree arc.

133.   I have been informed by Petitioner's counsel that the claims of the '511 patent do not require the exclusion of treatment in the 60 degree arc between 11 o'clock and 1 o'clock. Mosher, however, suggests it may be beneficial to avoid this region. Mosher teaches that the "treatment volume will preferably be separated from a urethra of a patient by at least about 1 cm to inhibit injury to nerves along the urethra," where the treatment volume is "offset laterally from the urethra to a right side of the patient" and "another treatment volume [is] similarly offset laterally from the urethra to a left side of the patient." EX1006, ¶11. A POSA would have understood that a 1 cm offset from each side of the urethra would equate to approximately 11 o'clock and 1 o'clock on the reference clock. This is also confirmed by the '511 patent, as it discloses that "with a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an 300 degree arc of the circumference, between the 1 o'clock and 11 o'clock positions." EX1001, 14:37–40. Given a treatment tip of about 1 cm in width, 10 contact sites would equate to roughly 10 cm as the length of the 300 degree arc of the

## 2.    Claims 3 and 4

153.    Claim 3 recites: "*wherein heating the target tissue comprises heating it to a temperature between 50 degrees C. and 75 degrees C.*"

154.    Claim 4 recites: "*wherein heating the target tissue comprises heating it to a temperature between 55 degrees C. and 70 degrees C.*"

155.    As indicated previously, Mosher, discloses that "it is generally desirable to subject the treatment volume to temperatures of at least 70° C." in order "to effect significant, repeatable tissue shrinkage." EX1006, ¶65. Ingle also teaches that to cause collagenated tissue to contract, the tissue should be heated to a temperature that is "preferably between about 60 nC and 80 nC." EX1007, 12:64–13:2. In my opinion, Mosher and Ingle teach heating the target tissue *to a temperature that is between 50 and 75 ℃.*

156.    Thus, in my opinion, the combination of Edwards, Mosher, and Ingle teaches claims 3 and 4.

## 3.    Claims 5, 37, 45, and 53

157.    Claims 5, 37, 45, and 53 depend from claims 3, 35, 43, and 51, respectively. Claims 5, 37, 45, and 53 recite: "*wherein heating comprises delivering energy by contacting the epithelium with a treatment tip, the tip including an energy delivery element.*" In my opinion, each of Edwards, Mosher, and Ingle teaches the recited element.

158.    Edwards discloses a method for vaginal remodeling that uses a device containing a "treatment element 410 that includes a blade 420 and a handle 430." EX1005, 7:20–21, FIG. 4. Although "treatment element 410" is not labeled in Figure 4, a POSA would have understood that the depicted device is the treatment element as it is comprised of the elements 420 and 430.



FIG. 4

EX1005, FIG. 4 (excerpt) (annotated).

159.    Edwards also discloses "[t]he blade 420 of the system 400 is inserted into the vagina" and "RF energy [is delivered] to discrete areas of the vaginal wall." EX1005, 13:43–44, 13:56–56, FIG. 9A (step 908). Additionally, Edwards discloses that the blade includes a "plurality of relatively flat electrodes 423" which are "disposed to deliver RF energy." EX1005, 7:26–39. A POSA would have understood the blade to be *a treatment tip*, and the RF electrodes to be *an energy delivery element*. Edwards teaches a method involving inserting a speculum into the vagina, inserting the *treatment tip* into the vagina through the speculum, and then locking the *treatment tip* into place though "mating features 421" and a "spring-loaded pin detail 422." EX1005, 13:43–49. A POSA would have understood that by using the device as illustrated in the manner described, the

*treatment tip* would end up *contacting the epithelium*. This is confirmed by the teaching that in order "to deliver energy to another area of the vagina," the *treatment tip* should "be disengaged and relocked into another position in the speculum." EX1005, 13:60–63. As discussed above, the device of Edwards also could be used without a speculum.

160. Likewise, Mosher's disclosed method also uses a device containing the recited elements. Mosher teaches "a vaginal probe body 54 includes a plurality of electrodes 56" that allows for "RF current" to be transmitted through them. EX1006, ¶58. A POSA would have understood that the end of the vaginal probe that includes the plurality of electrodes is *a treatment tip* because it is this portion of the probe that is used to provide treatment. A POSA also would have understood the plurality of RF electrodes are *an energy delivery element*. Mosher also discloses that the electrodes contain a "relatively flat tissue-engaging electrode surface," which a POSA would understand to mean that the *treatment tip* is *contacting the epithelium*. EX1006, ¶58.

161. In Ingle's disclosed method, a "vaginal probe 42" is used to heat the target tissue by "RF energy selectively directed through the segments of electrode 12." EX1007, 20:14–17, FIG. 11. A POSA would have understood the distal portion of the vaginal probe to be *a treatment tip*, and the RF directing electrodes to be *an energy delivery element*. Like in Mosher, the electrodes in Ingle are

"substantially flat" and "engagable against the intermediate tissue." EX1007, 3:13–16. Even more expressly, Ingle discloses that its method "comprises coupling an electrode of a probe to the tissue surface." EX1007, 7:19–20. Therefore, the *treatment tip* disclosed by Ingle is also *contacting the epithelium*.



EX1007, FIG. 11 (annotated).

162.    Thus, in my opinion, the combination of Edwards, Mosher, and Ingle teaches claims 5, 37, 45, and 53.

### 4.    Claims 6, 33, 41, 49, and 57

163.    Claim 6 depends from claim 5, and claims 33, 41, 49, and 57 depend from claims 1, 35, 43, and 51, respectively. Claim 6 recites: "*wherein the energy includes any of radiofrequency energy, microwave energy, or ultrasound energy.*" Claims 33, 41, 49, and 57 similarly recite: "*wherein heating comprises delivering energy by any of: radiofrequency energy, microwave energy, or ultrasound*

263. A POSA's understanding is confirmed by Mosher, who teaches that "RF heating will typically induce collagen shrinkage," which a POSA would understand as the immediate shortening of collagen fibers. EX1006, ¶66. Mosher additionally confirms that "[w]ithin the first 24 hours of the heating treatment," the RF heating will "provid[e] increased stiffness through tissue remodeling resulting from the healing process," which a POSA would understand as delayed remodeling caused by fibroplasia and new collagen deposits. EX1006, ¶66; *see also* EX1006, ¶55 (discussing that the collagenous tissues subject to RF energy provide support "immediately and/or upon healing"), ¶64, FIG. 8A.

264. Thus, in my opinion, the combination of Edwards, Mosher, and Ingle teaches claims 30 and 31.

### 27. Claim 32

265. Claim 32 depends from claim 31, and recites: "*wherein the remodeling after the heating is by a depositing of collagen in the target tissue.*" In my opinion, Mosher teaches the recited element.

266. As discussed above, a POSA would have known that heating collagen-containing tissues causes remodeling, which results from new collagen deposition. *See* Section VI.B. A POSA would have recognized this collagen deposition as part of the normal tissue healing process.

267. A POSA's understanding of collagen remodeling is confirmed by Mosher, who teaches that heating collagen-containing tissue "provid[es] increased stiffness through tissue remodeling resulting from the healing process. Within the first 24 hours of the heating treatment, fibroblasts will move in to begin repair. Over about two weeks, type III collagen will replace the denatured collagen." EX1006, ¶66. A POSA would have understood that type III collagen replacing denatured collagen is the same as *depositing of collagen in the target tissue*.

268. Thus, in my opinion, the combination of Edwards, Mosher, and Ingle teaches claim 32.

### 28. Claims 34, 42, 50, and 58

269. Claims 34, 42, 50, and 58 depend from claim 1, 35, 43, and 51, respectively. Claims 34, 42, 50, and 58 recite: "*wherein heating comprises delivering energy by ultrasound energy*." As discussed above for claim 6, Edwards and Ingle each disclose the recited element. *See* Section 162.

270. Thus, in my opinion, the combination of Edwards, Mosher, and Ingle teaches claims 34, 42, 50, and 58.

## X. THE COMBINATION OF EDWARDS, MOSHER, INGLE, AND OLLIVIER RENDERS OBVIOUS CLAIMS 43–58

271. In my opinion, claims 43-58 would have been obvious in view Edwards, Mosher, Ingle, and Ollivier.



## MICHIGAN CENTER *for* *Women's* HEALTH
### JOSEPH BERENHOLZ, MD

## Joseph Berenholz, MD

30445 Northwestern Hwy., Ste. 100, Farmington Hills, MI 48334
May 2019 - Present
Diplomate, American Board of Obstetrics and Gynecology 1992
(248) 865-0426 - *jberenholz@jberenholz.com*

---

*PROFESSIONAL EXPERIENCE*

**Medical Director**

Michigan Center for Women's Health

**Medical Director**

Brilliance Medical Spa
30445 Northwestern Hwy., Ste. 140, Farmington Hills, MI 48334

2016-2018

**Senior Partner**

Michigan Institute of Obstetrics and Gynecology
30445 Northwestern Hwy., Ste. 140, Farmington Hills, MI 48334

Dec 2012 - May 2019

**Senior Partner**

Better Women's Care
29425 Northwestern Hwy., Ste. 200, Southfield, MI 48034

Jan 2004 - Dec 2012

BTL EX1004
IPR2024-00703
U.S. Patent No. 8,961,511

# MICHIGAN CENTER for
## Women's HEALTH
### JOSEPH BERENHOLZ, MD

**Founder & Medical Director**

Laser Vaginal Rejuvenation Institute of Michigan

2001-2017


*ROLES AND HONORS*

**OB/GYN Spokesperson**

Medical Advisory Board - BTL Corporation, Prague, Czechia

2014 - Present


**Medical Director/ North America**

UROSPOT Canada, London, ON

2020 - Present


*SPEAKING ENGAGEMENTS*

Luminary Speaker for ThermiGen Corporation, Austin, TX   (2015-2018)

Lead Speaker for Ultrafemme 360 / N. America - BTL Corporation

Glaxo, Smith, Kline - National Speaker


*SOCIETIES AND MEMBERSHIPS*

American Society for Laser Medicine & Surgery (ASLMS)
American Board of Obstetrics & Gynecology (ABOG)
Michigan State Medical Society (MSMS)
The Global Exchange of Cosmetic Gynecology (Invitation Only)
Oakland County Medical Board


30445 Northwestern Highway, Suite 100, Farmington Hills, MI 48334
Phone: 248-865-0426  Fax: 248-865-0430
jberenholz@jberenholz.com
Appx1071



# MICHIGAN CENTER *for* *Women's* HEALTH

### JOSEPH BERENHOLZ, MD

*INSTITUTIONAL PRIVILEGES*

Surgeon's Choice Hospital, Southfield, MI
Surgeon's Choice Hospital, Macomb Center, MI
Oakland Primary Services, Director of Gynecology Services, Pontiac, MI (April 2014-2016)

*RESIDENCIES*

OB/GYN Residency, Providence Hospital, Southfield, MI (1981-85)
Surgery (Transitional General Surgical Year), Mt. Carmel Mercy Hospital (1979-80)
Internship, Deaconess Hospital, St. Louis, MO (1978-79)

*EDUCATION*

Medical School, Autonomous University of Guadalajara, Mexico (1974-78)
Dermatology Research Assistant, University of Michigan Cntr. under Dr. Richard Voorheis (1973-74)
Bachelor of Science, University of Michigan (1968-73)

*PUBLISHED PAPERS*

Berenholz J, Alinsod R, Samuels. "High Intensity Electromagnetic Wave Therapy for the Treatment of Incontinence." Laser Surg Med, 2019. DOI: 10.1022 (ISSN) 1096-9101.

"Safety and Efficacy on a Non-Invasive High Intensity Focused Electromagnetic Field (HIFEM) Device for Treatment of Urinary Incontinence and Enhancement of Quality of Life."

"The High Intensity Electromagnetic Wave Therapy Has on Sexual Dysfunction & Incontinence". Presented to ASLMS 2021.

30445 Northwestern Highway, Suite 100, Farmington Hills, MI 48334
Phone: 248-865-0426  Fax: 248-865-0430
jberenholz@jberenholz.com



US006463331B1

## (12) United States Patent
Edwards

(10) Patent No.: **US 6,463,331 B1**
(45) **Date of Patent:** **Oct. 8, 2002**

(54) **APPLICATION OF ENERGY AND SUBSTANCES IN THE TREATMENT OF URO-GENITAL DISORDERS**

(75) Inventor: **Stuart D. Edwards**, Portola Valley, CA (US)

(73) Assignee: **Novasys Medical, Inc.**, Newark, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/539,264**

(22) Filed: **Mar. 30, 2000**

### Related U.S. Application Data

(60) Provisional application No. 60/130,405, filed on Apr. 19, 1999.

(51) **Int. Cl.**$^7$ ................................. **A61B 18/18**
(52) **U.S. Cl.** .......................... **607/101**; 607/102; 606/29
(58) **Field of Search** .......................... 607/96, 98, 99, 607/101, 102, 104, 105, 113, 115, 116; 606/41–50, 13, 14, 15, 27–29

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

5,549,644 A * 8/1996 Lundquist et al. ............ 604/22

| | | | |
|---|---|---|---|
| 5,558,673 A | | 9/1996 | Edwards et al. .............. 606/41 |
| 5,575,788 A | | 11/1996 | Baker et al. .................. 606/41 |
| 5,588,960 A | | 12/1996 | Edwards et al. .............. 604/20 |
| 5,630,794 A | | 5/1997 | Lax et al. ..................... 604/22 |
| 5,800,482 A | * | 9/1998 | Pomeranz et al. .......... 607/101 |
| 5,800,484 A | * | 9/1998 | Gough et al. ................. 606/41 |
| 5,873,877 A | * | 2/1999 | McGaffigan et al. .......... 606/41 |
| 5,882,346 A | * | 3/1999 | Pomeranz et al. .......... 604/500 |
| 6,056,747 A | * | 5/2000 | Saadat et al. ............... 606/50 |
| 6,216,027 B1 | * | 4/2001 | Willis et al. ............... 600/424 |

#### OTHER PUBLICATIONS

US 5,401,172, 3/1995, Perkins (withdrawn)*

* cited by examiner

*Primary Examiner*—Roy D. Gibson
(74) *Attorney, Agent, or Firm*—Fish & Neave; Nicola A. Pisano

(57) **ABSTRACT**

This invention provides a method and system for the curative treatment of female uro-genital disorders. One aspect of the invention is that it allows the gynecologist to coagulate the entire endometrium and upper layers of the myometrium in one short procedure that can be performed in a physician's office or other outpatient setting, using local or regional anesthesia. A second aspect of the invention is that it can be used to tighten the urethral sphincter and bladder outlet.

**42 Claims, 13 Drawing Sheets**



BTL EX1005
IPR2024-00703
U.S. Patent No. 8,961,511



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



601 — The patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as betadine or benzalkonium chloride.

602 — The external genitalia may be pretreated with a topical anesthetic before insertion of the distal tip 111. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated.

603 — The electric connector 530 is coupled to a radio frequency generator or other source of therapeutic energy.

604 — Inflation or fluid infusion apparatus is coupled to the fluid input port 535. a pump or other apparatus may be coupled to the fluid output port 540. In this way, cooling fluids and pharmacological agents may be administered.

605 — The distal tip 111 is lubricated. the distal tip 111 is introduced into the vagina, through the cervix and into the uterus. In a preferred embodiment, insertion may be facilitated by the use of a speculum, introducer tube and other apparatus.

606 — The treatment element 110 is positioned within the uterus so as to be in optimal contact with the tissue to be treated.

607 — The fluid input port 535 is manipulated so as to begin infusing a cooling fluid to the irrigation port 112.

608 — The electrode control element 525 is manipulated so as to extend the electrodes 113 into the targeted uterine tissue. The electrodes 113 penetrate the mucosal tissue lining and enter more deeply into the underlying smooth muscle of the uterus. As the saline irrigation flows, radiofrequency energy is delivered through the electrodes 113, creating areas of ablative lesions within the interior of the uterus.

TO FIG. 6B

FIG. 6A



FROM FIG. 6A

609 — The fluid output port 540 is manipulated so as to apply suction and remove excess fluids.

610 — The electrodes 113 are deactivated and drawn back into the treatment element 110.

611 — The treatment element 110 is withdrawn from the uterus through the cervix and vagina. Other apparatus may be used to facilitate removal.

FIG. 6B

Appx1080



701 — The patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as betadine or benzalkonium chloride.

702 — The area surrounding the urinary meatus may be pretreated with a topical anesthetic before insertion of the distal tip 215. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated.

703 — The electric connector 530 is coupled to a radio frequency generator or other source of therapeutic energy.

704 — Inflation or fluid infusion apparatus is coupled to the fluid input port 535. a pump or other apparatus may be coupled to the fluid output port 540. In this way, cooling fluids and pharmacological agents may be administered.

705 — The treatment element 210 and shaft 510 are housed in the introducer 235 and sheath 240. In other preferred embodiments, the introducer 235 and sheath 240 are not used. This step is optional.

706 — The distal tip 215 and exterior portion of the introducer 235 are lubricated. The distal tip 215 is introduced into the urethral meatus in an upward and backward direction, in much the same way a foley catheter is introduced. The choice of lubricant is responsive to judgments by medical personnel. The introducer 235 and sheath 240 are passed into the urethra as a single unit.

707 — The introducer 235 is removed, leaving the sheath 240 in place. A hemoseal within the sheath 240 prevents the leakage of urine or irrigating fluids out through the sheath 240. In embodiments that do not use the introducer 235 or sheath 240, this step does not take place.

TO FIG. 7B

FIG. 7A



FIG. 7B



**801** — The patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as betadine or benzalkonium chloride.

**802** — The area surrounding the urinary meatus may be pretreated with a topical anesthetic before insertion of the distal tip 315. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated.

**803** — The electric connector 530 is coupled to a radiofrequency generator or other source of therapeutic energy.

**804** — Inflation or fluid infusion apparatus is coupled to the inflation control port 545. A pump or other apparatus may be coupled to the fluid output port 540. In this way, cooling fluids and pharmacological agents may be circulated through the multiporous irrigation balloon 320.

**805** — The treatment element 310 and shaft 510 are housed in the introducer 335 and sheath 340.

**806** — The distal tip 315 and exterior portion of the introducer 335 are lubricated. The distal tip 315 is introduced into the urethral meatus in an upward and backward direction, in much the same way a foley catheter is introduced. The choice of lubricant is responsive to judgments by medical personnel. The introducer 335 and sheath 340 are passed through the urethra and into the bladder as a single unit.

**807** — The introducer 335 is removed, leaving the sheath 340 in place. A hemoseal within the sheath 340 prevents the leakage of urine or irrigating fluids out through the sheath 340.

**808** — The physician checks the position of the treatment element 310. In a preferred embodiment, the treatment element 310 is positioned in the interior of the bladder, so as to be relatively proximate to the bladder outlet.

TO FIG. 8B

FIG. 8A

Appx1083



FIG. 8B



FIG. 9A

FROM FIG. 9A

910 — The retractable lock pin 431 is manipulated so as to release the spring-loaded pin detail 422 from the speculum. The blade 420 is withdrawn from the vagina. The speculum is closed and removed.

# FIG. 9B

US 6,463,331 B1

**1**

## APPLICATION OF ENERGY AND SUBSTANCES IN THE TREATMENT OF URO-GENITAL DISORDERS

### INCORPORATED DISCLOSURES

This application claims the priority of U.S. Provisional Application No. 60/130405, Express Mail Mailing number EJ651971575US, filed on Apr. 19, 1999.

This invention is submitted in the name of the following inventor:

| Inventor | Citizenship | Residence Address |
|---|---|---|
| Stuart D. Edwards | United States | 658 Westridge Drive Portola Valley, CA 94028 |

The assignee is Genesis Medical Technologies, a California corporation having an office in Sunnyvale, Calif.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to treating menorrhagia, female urinary incontinence and other related uro-genital conditions.

2. Related Art

Female uro-genital tract disorders include menorrhagia (excessive uterine bleeding) and urinary incontinence. Although both menorrhagia and urinary incontinence cause much embarrassment, they frequently remain untreated.

Causes of menorrhagia include disorders within the uterus itself such as fibroids, and (more rarely) endometrial cancer. When a specific cause cannot be identified, the condition is termed dysfunctional uterine bleeding.

Causes of female urinary incontinence include disturbances in the complex interplay of anatomic structures that control continence such as hypermobility or intrinsic sphincteric deficiency. Hypermobility is a lack of anatomic stability caused primarily by weak surrounding tissue; intrinsic sphincteric deficiency is the inability of the urinary sphincter muscles to function properly as a valve or otherwise.

The known art of treating female uro-genital disorders includes a variety of different treatments. Treatments for menorrhagia include drug therapy, dilation and curettage (D & C), hysterectomy, myomectomy and hysteroscopic resection of the endometrium. Treatments for female incontinence include both maintenance measures (for example, diapers, pharmaceutical remedies, foley catheters, behavioral therapy and vaginal pessaries) and surgical treatments.

A first drawback to treatment of female uro-genital disorders involves the risks associated with the known art of surgical treatment of menorrhagia. Surgical approaches to the treatment of menorrhagia can be highly invasive, ineffective or high-risk procedures. In addition to causing sterility, procedures such as hysterectomy have a high complication rate, lengthy recovery time and place the patient at increased risk for osteoporosis. Procedures such as dilation and curettage are fertility-sparing, but are ineffective for removal of submucosal fibroids. Techniques such as hysteroscopic resection of the endometrium with ablation devices such as the electrode loop, the rollerball and the laser are highly technical and have only been adopted by a small number of highly trained gynecological surgeons.

A second drawback to the known art of treating female uro-genital disorders involves risks and inefficacy of surgical treatments of female urinary incontinence. Many of these treatments aim to (1) elevate and ensure support of the urethrovesical junction or (2) provide additional support to the bladderneck and associated structures by introducing bulking agents, foreign bodies and other substances. Most surgical treatments suffer from many of the same problems as do treatments of menorrhagia. Surgical treatment is not generally appropriate for all types of incontinence; it is particularly inappropriate for urge or mixed incontinence. Lastly, the support provided by bulking agents, foreign bodies and other substances tends to be very short term; such agents degrade and get absorbed into surrounding tissues, requiring retreatment.

A third drawback to the known art of treating female uro-genital disorders involves the relative inefficacy of maintenance approaches to urinary incontinence. These treatments all aim to provide a technique to help the patient deal with the condition and minimize lifestyle problems associated with incontinence. While these treatments may allow a patient to achieve a short-term measure of control, they do not remedy the underlying defect.

Accordingly, it would be advantageous to provide a method and system for treatment of female uro-genital disorders that is curative, easy to learn, requires only local or regional anesthesia, does not induce side effects and is not subject to drawbacks of the known art. This advantage is achieved in embodiments of an invention in which radiofrequency (RF) energy is applied to uro-genital tissues so as to cause shrinkage and remodeling, reshaping, bulking and other treatment effects.

### SUMMARY OF THE INVENTION

This invention provides a method and system for the curative treatment of female uro-genital disorders by application of radiofrequency (RF) energy to targeted tissues. Application of this energy is selectively applied so as to ablate, tighten, shrink or reshape the tissue and thereby correct an unwanted condition.

A first embodiment of the invention involves using a radiofrequency generator and disposable treatment unit to deliver radiofrequency energy to the interior of the uterus, enabling a gynecologist or other medical personnel to coagulate the entire endometrium and upper layers of the myometrium in one short procedure that can be performed in a physician's office or other outpatient setting using local or regional anesthesia.

A second embodiment of the invention involves using a radiofrequency generator and a disposable treatment unit bearing two to four relatively small needle electrodes. The electrodes are positioned in the middle third of the urethra and energy is applied, causing shrinkage of the circular external urethral sphincter muscle. The tiny sites of treated muscle resorb, remodel and shrink in the weeks that follow treatment, causing a circumferential tightening of the urethral sphincter muscle. This treatment is curative of stress urinary incontinence that is, at least in part, secondary to sphincter muscle deficiency.

A third embodiment of the invention also involves using a radiofrequency generator and a treatment unit bearing two to four relatively small U-shaped electrodes. This treatment unit includes an irrigation balloon that is immediately proximate to the U-shaped electrodes. As saline irrigation cools and protects the bladder muscosa, RF energy is delivered to the submucosal bladder outlet musculature and connective tissue. The tiny sites of treated muscle resorb, remodel and shrink in the weeks that follow treatment, causing a circum-

US 6,463,331 B1

3

ferential tightening of the bladder outlet and a subsequent improvement in urinary continence via both decreased bladder outlet mobility and increased proximal urethra filling pressures.

A fourth embodiment of the invention also involves using a radiofrequency generator. The difference between this embodiment and the other embodiments is that the RF energy is delivered to the anterior and posterior regions of the vaginal wall. This has the effect of tightening of vaginal walls so as to increase support of the bladder outlet, proximal and mid-urethra. Moreover, circumferential tightening of the vaginal wall may provide physical and psychological improvement in the area of sexual function.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing a first embodiment of the distal end of a system that can be used for intrauterine ablation.

FIG. 2 is a block diagram showing a second embodiment of the distal end of a system that can be used for urethral remodeling.

FIG. 3 is a block diagram showing a third embodiment of the distal end of a system that can be used for remodeling the bladder outlet.

FIG. 4 is a block diagram showing a fourth embodiment of the distal end of a system that can be used for vaginal remodeling.

FIG. 5 is a block diagram showing the proximal end of systems for intrauterine ablation, urethral remodeling and bladder outlet remodeling.

FIG. 6 is a process flow diagram showing method for using a first embodiment for intrauterine ablation.

FIG. 7 is a process flow diagram showing a method for using a second embodiment for urethral remodeling.

FIG. 8 is a process flow diagram showing a method for using a third embodiment for remodeling the bladder outlet.

FIG. 9 is a process flow diagram showing a method for using a fourth embodiment for vaginal remodeling.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the following description, a preferred embodiment of the invention is described with regard to preferred process steps and data structures. Those skilled in the art would recognize, after perusal of this application, that embodiments of the invention can be implemented using circuitry or other structures adapted to particular process steps and data structures, and that implementation of the process steps and data structures described herein would not require undue experimentation or further invention.

System Elements

FIG. 1 is a block diagram showing a first embodiment of the distal end of a system that can be used for intrauterine ablation.

A system 100 includes a treatment element 110, a shaft and a control apparatus. The treatment element 110 is mounted on the most distal end of the shaft in such a way that the treatment element 110 and shaft form one contiguous piece. This figure is restricted to describing the treatment element 110. The shaft and control apparatus are described in greater detail in FIG. 5.

The treatment element 110 includes a distal tip 111, an irrigation port 112, one or more electrodes 113 and a plurality of lumens 115 (not shown).

The distal tip 111 is composed of a long, relatively narrow tubular element composed of relatively stiff, biologically

4

non-reactive plastic that is disposed for insertion into a uterus via the vagina and cervix. In a preferred embodiment, the distal tip 111 is an extension of the shaft 510 (described supra).

The irrigation port 112 is located at the most distal end of the distal tip 111. A variety of liquids can be administered through the irrigation port 112, including cooling liquids such as saline, Ringers or water, and pharmacological agents such as antibiotics, anti-inflammatories, anti-spasmodics and anesthetics.

In a preferred embodiment, suction can also be applied via the irrigation port 112 so as to remove fluids or to cause the interior of the uterus to be more closely conformed to the treatment element 110.

The electrodes 113 include needle-like tips mounted either at the very end of the distal tip 111 or placed equidistantly from each other around the exterior diameter of the distal tip 111. Each electrode 113 also includes a thermocouple 114 so that the temperature of each electrode 113 can be monitored separately.

In a preferred embodiment, the electrodes 113 are disposed to deliver RF 2 energy to the interior of a uterus. In other embodiments, the electrodes 113 may be disposed to deliver microwave, laser, ELF (extremely low frequency) or other therapeutic energies.

The lumens 115 are disposed to control the electrodes 113, transmit the RF energy or channel the fluids to the irrigation port 112. All of the lumens 115 traverse the entire length of the shaft. They terminate at the treatment element 110 either at an electrode 113, a thermocouple 114 or the irrigation port 112.

FIG. 2 is a block diagram showing a second embodiment of the distal end of a system that can be used for urethral remodeling.

A system 200 includes a treatment element 210, a shaft and a control apparatus. The treatment element 210 is mounted on the most distal end of the shaft in such a way that the treatment element 210 and shaft form one contiguous unit. This figure is restricted to describing the treatment element 210. The shaft and control apparatus are described in greater detail in FIG. 5.

The treatment element 210 includes a distal tip 215, a sponge 220, a set of electrodes 225 and a plurality of lumens 230 (not shown) Depending upon the judgment of the physician, the treatment element 310 can be used in conjunction with the introducer 235 and sheath 240.

The distal tip 215 is mounted on the distal terminus of the shaft and control assembly (described supra). In a preferred embodiment, the distal tip 215 is composed of relatively stiff, biologically inert material that is disposed so as to be inserted into a urethra.

The sponge 220 is mounted on the proximal end of the distal tip 215. Although the relative length of the sponge 220 is comparable to the length of the distal tip 215, the non-compressed total diameter of the sponge 220 is approximately twice the diameter of the distal tip 215. In a preferred embodiment, the sponge 220 is disposed to be filled with saline or other cooling liquids that are delivered to the sponge 220 through one or more of the lumens 230. This cooling fluid serves to minimize thermal damage to tissues when the electrodes 225 are deployed. Delivery of other fluids, such as drug solutions may also be achieved using the sponge 220.

The electrodes 225 are take the form of very slightly arced needles that are approximately three fourths the total length of the distal tip 215. The electrodes 225 are positioned so they emerge from the middle section of the sponge 220 with

US 6,463,331 B1

**5**

each electrode **225** being relatively equidistant to the others around the exterior diameter of the sponge **220**. The electrodes **225** emerge from the sponge at a **45** degree angle thereto, with the distal end of the electrodes **225** pointed in the general direction of the distal tip **215**. The proximal end of each electrode **225** is coupled to a lumen **230** that is disposed to conduct radiofrequency or other types of energy to the electrode **225**. The distal end of each electrode **225** is somewhat beveled so as to facilitate piercing the tissue. In a preferred embodiment, the system **200** includes four such electrodes; however, a greater or lesser number of electrodes are also possible.

Each electrode **225** includes at least one thermocouple **226**. The thermo-couple **226** continuously measures the temperatures of each individual electrode **115**. This constant temperature monitoring, combined with a computerized control algorithm allows each electrode **225** to be monitored separately in order to achieve safe and effective treatment temperatures. Any electrode **225** exceeding temperature safety limits can be immediately disengaged without aborting the entire procedure.

The plurality of lumens **230** traverse the entire length of the catheter from the control apparatus to the treatment element **210**. Some of these lumens **230** can be disposed to deliver a variety of drugs, such as antibiotics, anesthetics and other pharmaceutical agents as deemed appropriate by the physician. Other lumens **230** are disposed to deliver cooling fluids such as saline, Ringers, sterile water or other solutions deemed appropriate by the physician. Still other lumens **230** are disposed to deliver energy to the electrodes **225**. In a preferred embodiment, radiofrequency energy is used; however the lumens **230** of other embodiments may be used to deliver microwave, ultrasound, extremely low frequency (ELF), electromagnetic, laser and other forms of therapeutic energy.

The introducer **235** can be used in conjunction with the treatment element **210** and sheath **240**. Use of the introducer **235** and sheath **240** is entirely optional. The introducer **235** a relatively long hollow tube made from a disposable, biologically nonreactive material. The overall diameter of the introducer **225** is such that it can be easily passed into a urethra. The interior diameter is such that the sheath **240** and treatment element **210** may be disposed to fit snugly inside the introducer **235**.

The sheath **240** is a tube which is deployed inside the introducer **235**. A hemoseal **241** forms within the sheath **240**, thereby preventing the passage of urine, pus, cooling fluids or other substances out through the sheath **240**.

In a preferred embodiment, the introducer **235** and sheath **240** are passed into the urethra as a single unit (that is, with the sheath **240** contained inside the introducer **235**) through the urethra. The introducer **235** is removed, leaving the sheath **240** in place. The treatment unit **210** is inserted into and through the sheath **240**, which is then pulled back several centimeters into the proximal urethra so that the treatment element **210** may be deployed. Following treatment, the treatment element **210** is drawn into the sheath **240** and removed from the urethra.

FIG. **3** is a block diagram showing a third embodiment of the distal end of a device that can be used for remodeling of the bladder outlet.

A system **300** includes a treatment element **310**, a shaft and a control apparatus. Similar to systems **100** and **200**, the treatment element **310** is mounted on the most distal end of the shaft in such a manner that the shaft and treatment element **310** form one contiguous unit. This figure is restricted to describing the treatment element **310**. The shaft and control apparatus are described in greater detail in FIG. **5**.

**6**

The treatment element **310** includes a distal tip **315**, an irrigation balloon **320**, a set of U-shaped electrodes **325** and a plurality of lumens **330**. The treatment element **310** is used in conjunction with the introducer **335** and sheath **340**.

The distal tip **315** is mounted on the distal terminus of the catheter and control assembly (described supra). In a preferred embodiment, the distal tip **310** is composed of relatively stiff, biologically inert material that is disposed so as to be inserted into a urethra.

The irrigation balloon **320** is composed of microporous, transparent, biologically inert material. The distal end of the irrigation balloon **320** is fused with the proximal end of the distal tip **315**; the proximal end of the irrigation balloon **320** is fused with the body of the shaft, immediately adjacent to the distal end of the U-shaped electrodes **325**. The over length of the balloon **320** is approximately three times as long as the distal tip **315**; the inflated diameter is approximately one and a half time the total length of the distal tip **315**. In a preferred embodiment, the irrigation balloon **320** is disposed to provide a cooling surface and deliver cooling liquids to the bladder outlet and adjacent tissues.

Other preferred embodiments of the irrigation balloon **320** also include an external mapping electrode network **321** (not shown) that aids in the identification of nervous pathways responsible for the "urge sensation" and the involuntary detrussor muscle contractions that define urge urinary incontinence. Once identified, these pathways can be subsequently modified using nerve ablation techniques.

The set of U-shaped electrodes **325** are mounted on the shaft almost immediately proximate to the irrigation balloon **320**. The proximal end of each U-shaped electrode **320** is coupled to a lumen **325**; the distal end each U-shaped electrode **320** terminates in a beveled tip, with the beveled side facing away from the shaft in such a way that the hooked end can be easily deployed in the tissue of a bladder outlet. In a preferred embodiment, two—four U-shaped electrodes **325** are used. Other embodiments may deploy different arrays and different numbers of electrodes **325**.

Each U-shaped electrode **325** includes at least one thermocouple **326**. The thermocouple **326** continuously measures the temperatures of each individual electrode **325**. This constant temperature monitoring, combined with a computerized control algorithm allows each U-shaped electrode **325** to be monitored separately in order to achieve safe and effective treatment temperatures. Any U-shaped electrode **325** exceeding temperature safety limits can be immediately disengaged without aborting the entire procedure.

The plurality of lumens **330** traverse the entire length of the shaft and terminate at the treatment element **310**. Some of these lumens **330** can be disposed to deliver a variety of drugs, such as antibiotics, anesthetics and other pharmaceutical agents as deemed appropriate by the physician. Other lumens **330** are disposed to deliver cool fluids such as saline, Ringers, sterile water or other solutions deemed appropriate by the physician. Still other lumens **330** are disposed to deliver energy to the electrodes **325**. In a preferred embodiment, radiofrequency energy is used; however, in other embodiments, the lumens **330** may be used to deliver microwave, ultrasound, extremely low frequency (ELF), electromagnetic, laser and other forms of therapeutic energy.

The introducer **335** is used in conjunction with the treatment element **310** and sheath **340**. The indroducer **335** a relatively long hollow tube made from a disposable, biologically nonreactive material. The overall diameter of the introducer **225** is such that it can be easily passed into a bladder. The interior diameter is such that the sheath **340** and treatment element may be disposed to fit snugly inside the introducer **335**.

US 6,463,331 B1

7

The sheath 340 is a tube which is deployed inside the introducer 335. A hemoseal forms within the sheath 340, thereby preventing the passage of urine, pus, cooling fluids or other substances out through the sheath 340.

In a preferred embodiment, the introducer 335 and sheath 340 are passed into the bladder as a single unit (that is, with the sheath 330 contained inside the introducer 335) through the urethra. The introducer 335 is removed, leaving the sheath 340 in place. The treatment unit 310 and catheter are inserted into and through the sheath 340, which is then pulled back several centimeters into the proximal urethra so that the treatment element 310 may be deployed. Following treatment, the treatment element 310 is drawn into the sheath 340 and removed from the urethra.

FIG. 4 is a block diagram showing a fourth embodiment of a device that can be used for vaginal remodeling.

A system 400 includes a treatment element 410. The proximal end of the treatment element 410 is coupled to an RF generator. The distal end of the treatment element 410 is inserted into a vagina using a speculum.

The treatment element 410 includes a blade 420 and a handle 430 composed of relatively hard, biologically non-reactive plastic. In a preferred embodiment the blade 420 and handle 430 form a single contiguous unit. A plurality of lumens 440 (not shown) traverse the interior length of the blade 420 and handle 430.

The blade 420 includes mating features 421, a spring-loaded pin detail 422, a plurality of relatively flat electrodes 423 and a plurality of irrigating fluid delivery pores 425.

The mating features 421 are constructed to engage with features in the speculum following simple positioning of the speculum within the vagina.

The spring loaded pin detail 422 locks the blade 420 into the correct position in the inserted speculum.

The plurality relatively flat electrodes 423 are each coupled to one or more of a series of lumens 440 that traverse the entire interior of the treatment unit 410 and terminate at the energy port 432 on the handle 430. In a preferred embodiment, these electrodes 423 are disposed to deliver RF energy. However, in other embodiments the electrodes 423 may also deliver microwave energy, ELF (extremely low frequency energy), laser and other forms of therapeutic energy.

Each electrode 423 includes at least one thermocouple 424 that is used to monitor the temperature of each electrode 423. This constant temperature monitoring, combined with a computerized control algorithm, is utilized to independently control the electrodes 423. If one of the electrodes 423 exceeds temperature safety limits, that particular one of the electrodes 423 can be disengaged without aborting the entire procedure.

The irrigating fluid delivery pores 425 are also coupled to some of the plurality of lumens 440 and are disposed to deliver cooling liquids so as to minimize thermal damage.

The handle 430 includes a retractable lock pin 431, an energy port 432 and two irrigating fluid ports 433.

The retractable lock pin 431 controls the spring-loaded pin detail 422 so that when the retractable lock pin 431 is engaged, it causes spring-loaded pin detail 422 to become locked into position in the speculum.

The energy port 432 is located at the proximal end of the handle 430 and is disposed to be coupled to an RF generator or other energy source. The energy port 432 is coupled to the proximal end of the plurality of lumens 440 that run through the interior of the handle 430 and blade 420 terminating a t the electrodes or cooling liquid ports 425.

The irrigating fluid delivery port 433 is disposed to deliver irrigating fluids, drugs and other liquids such as may

8

be deemed appropriate. The fluids are introduced through one of the irrigating fluid delivery port 433 through the lumens 440 to the irrigating fluid delivery pores 425. The fluids are removed from the body through the other irrigating fluid delivery port 433.

FIG. 5 is a block diagram showing the proximal end of devices for intrauterine ablation, urethral remodeling and, bladder outlet remodeling.

A system 500 is used to control the delivery of energy and fluids through the first, second and third embodiments described infra (that is devices for intrauterine ablation, urethral remodeling and, bladder outlet remodelling).

A system 500 includes a shaft 510 and control apparatus 515. The control apparatus 515 houses all the elements needed to control the treatment element 110, treatment element 210 or treatment element 310. As such, the control apparatus 515 includes a handle 520, a electrode control element 525, an electric connector 530, a fluid input port 535, a fluid output port 540 and an inflation control port 545.

The shaft 510 is a relatively long tubular element, coupled on the distal end to treatment element 110, treatment element 210 or treatment element 310, and coupled on the proximal end to the control apparatus 515. The shaft 510 is comprised of relatively hard plastic and is disposed to house lumens 130, lumens 230 or lumens 340, which traverse the entire length of the shaft 510.

The electrode control element 525 is mounted on the most distal portion of the control apparatus 525 immediately adjacent and contiguous with the handle 520. The electrode control element 525 is coupled to proximal end of some of the lumens 130, lumens 230 or lumens 340. As such, the electrode control element 525 can be used to activate or deactivate electrodes includes in systems 100, 200 or 300. These electrodes can be controlled either individually or in combination.

The electric connector 530 is mounted on the most proximal end of the control apparatus 525. As such, it is coupled to the most proximal end of some of the lumens 130, 230 or 330 that traverse the interior of the shaft 510 and handle 520. In a preferred embodiment, the electric connector 530 is disposed to be connected to an RF generator. In other embodiments, the electric connector 530 can be disposed to be connected to a generator of microwaves, ELF, laser or other therapeutic energy.

The fluid input port 535 is mounted immediately between the electric connector 530 and the fluid output port 540 on the top portion of the control apparatus 525. The proximal end of some of the lumens 130, lumens 230 or lumens 340 terminate at the fluid input port 525.

In a preferred embodiment, the fluid input port 525 is disposed to be coupled to a source of irrigating fluid, cooling liquids or pharmaceutical liquids. Substances that can be introduced through the fluid input port 525 include sterile saline, sterile water, Ringers, antibiotic solutions, local or regional anesthetics and other agents.

Fluid output port 540 is immediately adjacent to the fluid input port 535. The interior portion of the fluid output port 540 is coupled to some of the lumens 130, 230 or 330.

In a preferred embodiment the fluid output port 530 may be coupled to a pump or other apparatus to remove fluids.

The inflation control port 545 is used with the system 300 for remodelling the bladder outlet. The inflation control port 545 is situated adjacent to the electric connector 530 on the bottom side of the control apparatus 525. The interior of the inflation control port 525 is coupled to some of the lumens 330 that terminate in the irrigation balloon 320. Positive or negative pressure may be applied to the inflation control port 525 so as to inflate or deflate the irrigation balloon 320.

US 6,463,331 B1

9

**Method of Use**

FIG. 6 is a process flow diagram showing method for using a first embodiment for intrauterine ablation.

A method **600** is performed to shrink discrete portions of the interior of a uterus, causing ablation of portions of the smooth muscle, so as to cause an improvement in menorrhagia and relate uterine conditions. Sterile technique is used throughout the procedure.

At a flow point **601**, the patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as Betadine or benzalkonium chloride. The position of the patient and choice of cleansing agent are responsive to judgments by the physician.

In a step **602**, the external genitalia may be pretreated with a topical anesthetic before insertion of the distal tip **111**. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated. The choice of topical anesthetic or other pharmacological agent are responsive to the judgments of the physician.

At a step **603**, the electric connector **530** is coupled to a radio frequency generator or other source of therapeutic energy.

At a step **604**, inflation or fluid infusion apparatus is coupled to the fluid input port **535**. A pump or other apparatus may be coupled to the fluid output port **540**. In this way, cooling fluids and pharmacological agents may be administered.

At a step **605**, the distal tip **111** is lubricated. The distal tip **111** is introduced into the vagina, through the cervix and into the uterus. In a preferred embodiment, insertion may be facilitated by the use of a speculum, introducer tube and other apparatus. The choice of lubricant and additional apparatus is responsive to judgments by medical personnel.

At a step **606**, the treatment element **110** is positioned within the uterus so as to be in optimal contact with the tissue to be treated.

In a step **607**, the fluid input port **535** is manipulated so as to begin infusing a cooling fluid to the irrigation port **112**. In a preferred embodiment, the cooling fluid may include sterile water, saline or glycerin. This cooling fluid lowers the relative temperature of the targeted tissues and prevents collateral thermal damage of the uterine walls and associated tissues. In alternative embodiments, other devices may be coupled to the fluid input port **535** to chill the cooling fluid or cause sonic cooling, gas expansion, magnetic cooling or others cooling methodologies. Other substances such lubricants, anesthetics, anti-spasmodics, anti-inflammatories, antiobiotics or other agents as deemed appropriate by the judgment of medical personal may also be administered via the fluid input port **535**. The choice of cooling fluid or methodology or pharmaceutical substances is responsive to judgments by medical personnel.

In a step **608**, the electrode control element **525** is manipulated so as to extend the electrodes **113** into the targeted uterine tissue. The electrodes **113** penetrate the mucosal (surface) tissue lining and enter more deeply into the underlying smooth muscle of the uterus. As the saline irrigation flows, radiofrequency energy is delivered through the electrodes **113**, creating areas of ablative lesions within the interior of the uterus. During this step, the temperatures of the electrodes **113** are monitored. If necessary, the radiofrequency energy supply to any electrode **113** can be discontinued.

In a preferred embodiment, the position of the treatment element **110** can be altered so and the physician may repeat

10

the treatment sequence so as to selectively ablate other areas in the interior of the uterus.

This treatment causes the affected area to shrink and be relatively strengthened, so as to relieve menorrhagia and other related uterine disorders. The tiny sites of treated muscle will ultimately resorb, remodel and shrink over the ensuing weeks.

In a step **609**, the fluid output port **540** is manipulated so as to apply suction and remove excess fluids.

In a step **610**, the electrodes **113** are deactivated and drawn back into the treatment element **110**.

In a step **611**, the treatment element **110** is withdrawn from the uterus through the cervix and vagina. Other apparatus may be used to facilitate removal.

FIG. 7 is a process flow diagram showing a method for using a second embodiment for urethral remodeling.

A method **700** is performed to shrink the circular, external urethral sphincter muscle, so as to cause an improvement in its relative ability to retain urine. Sterile technique is used throughout the procedure.

At a flow point **701**, the patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as Betadine or benzalkonium chloride. The position of the patient and the choice of cleansing agent are responsive to judgments of the physician.

At a step **702**, the area surrounding the urinary meatus may be pretreated with a topical anesthetic before insertion of the distal tip **215**. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated. The choice of topical anesthetic and other drugs is responsive to judgments by the physician.

At a step **703**, the electric connector **530** is coupled to a radio frequency generator or other source of therapeutic energy.

At a step **704**, inflation or fluid infusion apparatus is coupled to the fluid input port **535**. A pump or other apparatus may be coupled to the fluid output port **540**. In this way, cooling fluids and pharmacological agents may be administered.

In a step **705**, the treatment element **210** and shaft **510** are housed in the introducer **235** and sheath **240**. In other preferred embodiments, the introducer **235** and sheath **240** are not used. This step is optional.

At a step **706**, the distal tip **215** and exterior portion of the introducer **235** are lubricated. The distal tip **215** is introduced into the urethral meatus in an upward and backward direction, in much the same way a foley catheter is introduced. The choice of lubricant is responsive to judgments by medical personnel. The introducer **235** and sheath **240** are passed into the urethra as a single unit.

In other preferred embodiments, the introducer **235** and sheath **240** are not used. In these embodiments, the distal tip **215** is lubricated and introduced without the use of additional apparatus.

In a step **707**, the introducer **235** is removed, leaving the sheath **240** in place. A hemoseal within the sheath **240** prevents the leakage of urine or irrigating fluids out through the sheath **240**. In embodiments that do not use the introducer **235** or sheath **240**, this step does not take place.

In a step **708**, the physician checks the position of the treatment element **210**. In a preferred embodiment, the treatment element **210** is positioned within the middle third of the urethra (based on simple urethral length measured determined prior using a scaled foley catheter).

US 6,463,331 B1

11

In a step **709**, the fluid input port **535** is manipulated so as to begin infusing a cooling fluid to the sponge **220**. In a preferred embodiment, the cooling fluid may include sterile water, saline or glycerin. This cooling fluid lowers the relative temperature of the targeted tissues and prevents collateral thermal damage to the urethral wall and associated structures. In alternative embodiments, other devices may be coupled to the fluid input port **535** to chill the cooling fluid or cause sonic cooling, gas expansion, magnetic cooling or others cooling methodologies. Other substances such as lubricants, anesthetics, anti-spasmodics, anti-inflammatories, antibiotics or other agents as deemed appropriate by the judgment of medical personal may also be administered via the fluid input port **535**. The choice of cooling fluid or methodology or pharmaceutical substances is responsive to judgments by medical personnel.

In a step **710**, the electrode control element **525** is manipulated so as to extend the needle electrodes **225** into the targeted tissue. The needle electrodes **225** penetrate the mucosal (surface) tissue lining and enter more deeply into the underlying urethra sphincter musculature. As the saline irritation flows, radiofrequency energy is delivered through the electrodes **225**, creating four areas of ablative lesions within the sphincter muscle. During this step, the temperatures of the electrodes **225** is monitored. If necessary, the radiofrequency energy supply to any electrode **225** can be discontinued.

In a preferred embodiment, the position of the treatment element **210** can be altered so and the physician may repeat the treatment sequence within the urethral sphincter so as to create more areas of ablation lesions within the muscle.

This treatment causes the affected area to shrink and be relatively strengthened, so as to better retain urine. The tiny sites of treated muscle will ultimately resorb, remodel and shrink over the ensuing weeks, resulting in circumferential tightening of the urethral sphincter muscle and a subsequent improvement in urinary continence.

In a step **711**, the fluid output port **540** is manipulated so as to apply suction and remove excess fluids.

In a step **712**, the electrodes **225** are deactivated and drawn back into the treatment element **210**. If a sheath **240** was used, it is restored to its original position.

In a step **713**, the treatment element **210** and sheath **240** (if used) are withdrawn from the urethra.

FIG. 8 is a process flow diagram showing a method for using a third embodiment for remodeling of the bladder outlet.

A method **800** is performed to reduce the size of the bladder outlet (the base of the bladder), resulting in decreased mobility during episodes of increased intra-abdominal pressure and increased resistance to the passage of urine into the proximal urethra during such episodes, thereby reducing urinary incontinence.

At a flow point **801**, the patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as Betadine, or benzalkonium chloride. The positioning of the patient and choice of cleansing agent are responsive to the judgment of the physician.

At a step **802**, the area surrounding the urinary meatus may be pretreated with a topical anesthetic before insertion of the distal tip **315**. Depending upon the circumstances, a muscle relaxant or short term tranquilizer may be indicated. The choice of pharmaceutical agents to be used are responsive to judgments by the physician.

12

In a flow point **803**, the electric connector **530** is coupled to a radiofrequency generator or other source of therapeutic energy.

In a flow point **804**, inflation or fluid infusion apparatus is coupled to the inflation control port **545**. A pump or other apparatus may be coupled to the fluid output port **540**. In this way, cooling fluids and pharmacological agents may be circulated through the multiporous irrigation balloon **320**.

In a step **805**, the treatment element **310** and shaft **510** are housed in the introducer **335** and sheath **340**.

At a step **806**, the distal tip **315** and exterior portion of the introducer **335** are lubricated. The distal tip **315** is introduced into the urethral meatus in an upward and backward direction, in much the same way a foley catheter is introduced. The choice of lubricant is responsive to judgments by medical personnel. The introducer **335** and sheath **340** are passed through the urethra and into the bladder as a single unit.

In a step **807**, the introducer **335** is removed, leaving the sheath **340** in place. A hemoseal within the sheath **340** prevents the leakage of urine or irrigating fluids out through the sheath **340**.

In a step **808**, the physician checks the position of the treatment element **310**. In a preferred embodiment, the treatment element **310** is positioned in the interior of the bladder, so as to be relatively proximate to the bladder outlet. The depth of insertion is determined by prior measurements obtained using a scaled foley catheter.

In a step **809**, the inflation control port **535** is manipulated so as to begin infusing a cooling fluid to the to the irrigation balloon **320**. As the balloon inflates, the fluid cools and protects the mucosal surfaces in the bladder.

In a step **810**, sheath **340** is pulled back several centimeters into the proximal urethra so that the electrodes may be deployed at the bladder outlet. In a preferred embodiment, the exposed U-shaped electrodes **325** become ensnared in the tissue comprising the interior of the bladder outlet.

In a step **811**, the U-shaped electrodes **325** penetrate the mucosal (surface) tissue lining of the bladder outlet and enter more deeply into the underlying musculature. As the saline irritation flows, radiofrequency energy is delivered through the U-shaped electrodes **325**, creating four areas of ablative lesions within the muscle. During this step, the temperatures of individual electrodes **325** are monitored. If necessary, the radiofrequency energy supply to any individual electrode **325** can be discontinued.

In a preferred embodiment, the position of the treatment element **310** can be altered so and the physician may repeat the treatment sequence within the bladder so as to create more areas of ablation lesions within the muscle.

In another preferred embodiment, the external mapping electrode network **321** may be engaged to identify nerves associated with the urge to urinate. Radiofrequency energy may be directed at these areas so as to ablate the identified nerves.

In another preferred embodiment, bulking agents, foreign bodies and other substances, such as organic microspheres, collagens, silicone, PVC and other organic breathable and unbreathable polymers are exuded from selected electrodes **325** into tissues comprising the bladder outlet. The type of microspheres and bulking substances and the locations where they are exuded are responsive to judgment by medical personnel. These substances can be used to strengthen these structures so as to prevent incontinence caused by stress.

These treatments cause the affected area to shrink and be relatively strengthened, so as to better retain urine. The tiny

US 6,463,331 B1

13

sites of treated muscle will ultimately resorb, remodel and shrink over the ensuing weeks, resulting in circumferential tightening of the urethral sphincter muscle and a subsequent improvement in urinary continence

In a step 811, the inflation control port and/or the fluid output fluid output port 540 are manipulated so as to apply suction, deflate the irrigation balloon 320 and remove excess fluids.

In a step 812, the sheath 340 is restored to its original position.

In a step 813, the treatment element 310 and sheath 340 are withdrawn from the urethra.

FIG. 9 is a process flow diagram showing a method for using a fourth embodiment for vaginal remodeling.

A method 900 is performed to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both. Remodeling of the anterior wall treats incontinence based on bladder outlet hypermobility by increasing support for the bladder outlet, as well as the proximal and mid-urethra. Remodeling both the anterior wall and posterior wall provide circumferential vaginal wall tightening, resulting physical and psychological improvement in the area of sexual function. The method 900 is performed using sterile technique.

At a flow point 901, the patient has voided and is positioned on a treatment table, in an appropriate position such as horizontal, jackknife or lithotomy. The patient's external genitalia and surrounding anatomy are cleansed with an appropriate agent such as Betadine, or benzalkonium chloride. The positioning of the patient and choice of cleansing agent are responsive to the judgment of the physician.

In a step 902, the energy port 432 is coupled to an RF generator or other source of therapeutic energy.

In a step 903, the irrigating fluid ports 433 are coupled to a source of irrigating fluid, a pump, a drug delivery apparatus or other equipment. The choice of fluid and apparatus is responsive to judgments on the part of the physician.

In a step 904, a speculum is inserted in the patient's vagina. The blades of the speculum are placed in an open position. The physician determines optimal areas of treatment. These may include the anterior wall, the posterior wall or both.

In a step 905, the blade 420 of the system 400 is inserted into the vagina through the speculum. The handle 430 is manipulated so as to cause the mating features 421 to engaged with the speculum.

In a step 906, the retractable lock pin 431 is retracted, so as to cause the spring-loaded pin detail 422 to become locked into position in the speculum.

In a step 907, at least one of the irrigating fluid ports 433 is engaged so as to delivery cooling fluid into the vagina through the irrigating fluid delivery pores 425. The other port 433 may be engaged so as to remove fluid.

In a step 908, the energy port 432 is manipulated so as to cause delivery of RF energy to discrete areas of the vaginal wall.

In alternative embodiments, other forms of energy may be delivered, such as microwave, laser, ELF (extremely low frequency) and other therapeutic energies.

In a preferred embodiment, the blade 420 may be disengaged and relocked into another position in the speculum, so as to delivry energy to another area of the vagina.

In a step 909, one of the irrigating fluid ports 433 is manipulated so as to stop the flow of cooling fluid or other substances into the vagina. The other irrigating fluid port 433 is manipulated so as to remove excess fluid from the vagina.

14

In a step 910, retractable lock pin 431 is manipulated so as to release the spring-loaded pin detail 422 from the speculum. The blade 420 is withdrawn from the vagina. The speculum is closed and removed.

Alternative Embodiments

Although preferred embodiments are disclosed herein, many variations are possible which remain within the concept, scope, and spirit of the invention, and these variations would become clear to those skilled in the art after perusal of this application.

What is claimed is:

1. An apparatus for treating female incontinence by remodeling tissue surrounding a patient's urethra, comprising:

a plurality of electrodes adapted to deliver energy to urethral tissue;

means for individually controlling each electrode of said plurality of electrodes; and

means for delivering fluids in the vicinity of said plurality of electrodes, said means for delivering fluids comprising a sponge.

2. An apparatus as in claim 1, wherein said plurality of electrodes are needle shaped.

3. An apparatus as in claim 1, wherein said plurality of electrodes is disposed to deliver radio frequency energy.

4. An apparatus as in claim 1, wherein said plurality of electrodes are disposed to deliver microwave energy.

5. An apparatus as in claim 1, wherein said plurality of electrodes are disposed to deliver laser energy.

6. An apparatus as in claim 1, wherein said plurality of electrodes are disposed to deliver extremely low frequency energy.

7. An apparatus as in claim 1, wherein said plurality of electrodes are two to four in number.

8. An apparatus as in claim 1, wherein said plurality of electrodes are engaged to penetrate the muscosal tissue so as to become embedded in the muscle wall.

9. Apparatus as in claim 1, wherein each electrode of said plurality of electrodes also includes a thermocouple.

10. Apparatus as in claim 1, wherein said means for controlling includes a means for adjusting said electrodes so that said electrodes protrude at different distances so as to be deployed at different depths in a targeted tissue.

11. Apparatus as in claim 1, wherein said means for controlling includes a means for adjusting the temperature of each electrode.

12. Apparatus as in claim 1, wherein said electrodes are situated so as to emerge at an angle from said means for delivering fluids with the tip of said electrodes splayed out in a distal orientation, said angle ranging from ten to one hundred and seventy degrees.

13. An apparatus as in claim 1, wherein said electrodes are situated so as to emerge at an angle from said means for delivering fluids with the tip of said electrodes splayed out in a distal orientation, said angle ranging from ten to one hundred and seventy degrees and wherein said electrodes are longitudinally staggered along the length of said means for delivering.

14. Apparatus as in claim 1, wherein said means for delivering is disposed to deliver cooling liquids to a portion of the urethral muscosa.

15. Apparatus as in claim 1, wherein said means for delivering is disposed to deliver pharmaceutical agents to a portion of the urethral mucosa.

16. A method for treating female urinary incontinence comprising:

inserting a treatment element including a plurality of electrodes and a sponge into a urethra;

US 6,463,331 B1

15

deploying the plurality of electrodes so as to penetrate the urethral mucosa and penetrate into the underlying muscle; and

delivering energy so as to create a pattern of lesions within the urethral sphincter that remodels the sphincter.

17. A method as in claim 16, including a step for:

infusing said sponge with cooling fluids.

18. A method as in claim 16, wherein the step for inserting is performed using an introducer and sheath.

19. A method as in claim 16, wherein said step for inserting includes inserting the treatment element into the middle third of a urethra.

20. A method as in claim 16, wherein said step for infusing the sponge also include the step of infusing said sponge with pharmacological agents and drugs.

21. A method as in claim 16, wherein said step for delivering energy includes delivery of RF energy, microwave energy, laser energy or other extremely low frequency energy.

22. A method as in claim 16, includes steps for removing said treatment element from the urethra.

23. Apparatus for treating female incontinence by remodeling the urethral wall, the apparatus comprising:

an elongated shaft having a distal region;

a plurality of electrodes disposed in the distal region, the plurality of electrodes movable from a retracted position disposed within the elongated shaft to a deployed position extending from the distal region; and

a sponge disposed in the distal region to deliver fluids to the urethral wall in the vicinity of the plurality of electrodes.

24. The apparatus of claim 23, wherein each one of the plurality of electrodes comprises a curved needle.

25. The apparatus of claim 23, wherein the plurality of electrodes includes between two and four electrodes.

26. The apparatus of claim 23, wherein the plurality of electrodes are configured to penetrate the muscosal tissue in the deployed position.

27. The apparatus of claim 23, wherein each electrode of the plurality of electrodes further comprises a thermocouple.

28. The apparatus of claim 23 further comprising means for individually controlling each one of the plurality of electrodes.

29. The apparatus of claim 28, wherein the means for controlling further comprises means for adjusting the extent to which each one of the electrodes extend from the elongated shaft in the deployed position.

30. The apparatus of claim 23, wherein the means for controlling further comprises means for adjusting a temperature of each one of the plurality of electrodes.

16

31. The apparatus of claim 23, wherein the plurality of electrodes extend through the sponge in the deployed state.

32. The apparatus of claim 23, wherein the plurality of electrodes are longitudinally staggered along the distal region.

33. The apparatus of claim 23, wherein the sponge is adapted to deliver a cooling liquid to a portion of the urethral muscosa.

34. The apparatus of claim 23, wherein the sponge is adapted to deliver pharmaceutical agents to a portion of the urethral muscosa.

35. A method for treating female incontinence comprising:

providing a treatment device comprising a shaft having a distal region, a plurality of electrodes disposed in the distal region, and a sponge for delivering fluids in the vicinity of the plurality of electrodes;

inserting the distal region of the treatment device into a patient's urethra;

moving the plurality of electrodes to a deployed position, wherein the plurality of electrodes penetrate the urethral mucosa and extend into tissue surrounding the urethra;

infusing a cooling fluid to the urethral mucosa through the sponge; and

delivering energy to the plurality of electrodes to create a pattern of lesions in the tissue surrounding the urethra.

36. The method of claim 35 wherein inserting the distal region comprises inserting the distal region using an introducer sheath.

37. The method of claim 36 wherein inserting the distal region comprises inserting the distal region into a middle third of the urethra.

38. The method of claim 36 further comprising infusing a pharmacological agent or drug to the urethral mucosa through the sponge.

39. The method of claim 36 wherein delivering energy to the plurality of electrodes comprises delivering RF energy.

40. The method of claim 36 wherein each one of the plurality of electrodes further comprises a thermocouple, the method further comprising monitoring a temperature of each one of the plurality of electrodes.

41. The method of claim 40 further comprising, during delivery of energy to the plurality of electrodes, adjusting the temperature of each one of the plurality of electrodes.

42. The method of claim 36 wherein moving the plurality of electrodes to the deployed position further comprises individually adjusting an extent to which each one of the plurality of electrodes laterally extends from the shaft.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 6,463,331 B1                                    Page 1 of 2
DATED : October 8, 2002
INVENTOR(S) : Edwards

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Drawings,
Figure 6A, Box 604, Sheet 6 of 13, replace "535.a" with -- 535.A --
Figure 6A, Box 605, Sheet 6 of 13, replace "lubricated. the" with -- lubricated. The --
Figure 7A, Box 704, Sheet 8 of 13, replace "535.a" with -- 535.A --
Figure 7B, Box 709, Sheet 9 of 13, replace "glycerin. this" with -- glycerin. This --
Figure 8B, Box 811, Sheet 11 of 13, replace "irritation" with -- irrigation --

Column 2,
Line 64, replace "muscosa" with -- mucosa --

Column 4,
Line 22, replace "RF 2 energy" with -- RF energy --
Line 44, replace "(not shown) Depending" with -- (not shown). Depending --
Line 64, replace "225 are take" with -- 225 take --

Column 5,
Line 13, replace "thermo-couple" with -- thermocouple --

Column 6,
Line 35, replace "two-four" with -- two - four --
Line 61, replace "indroducer" with -- introducer --

Column 7,
Line 54, replace "43 1" with -- 431 --
Line 64, replace "a t" with -- at --

Column 8,
Line 32, replace "includes" with -- included --

Column 9,
Line 7, replace "relate" with -- related --
Lines 63-64, replace "radiof-requency" with -- radio-frequency --

Column 11,
Line 10, replace "others" with -- other --
Line 10, add -- as -- after "such"
Line 22, replace "irritation" with -- irrigation --

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.   : 6,463,331 B1                                    Page 2 of 2
DATED        : October 8, 2002
INVENTOR(S)  : Edwards

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 13,
Line 4, replace "continence" with -- continence. --
Lines 5-6, delete second instance of "fluid output"
Lines 20-21, insert -- in -- between "resulting" and "physical"
Line 51, replace "delivery" with -- deliver --
Line 62, replace "delivry" with -- deliver --

Column 14,
Line 35, replace "muscosal" with -- mucosal --
Line 60, replace "muscoca" with -- mucosa --

Column 15,
Line 15, replace "include" with -- includes --
Line 21, replace "includes" with -- including --
Line 39, replace "muscosal" with -- mucosal --
Line 48, replace "extend" with -- extends --

Column 16,
Line 2, replace "extend" with -- extends --
Lines 8 and 11, replace "muscosa" with -- mucosa --
Line 22, replace "penetrate" with -- penetrates --
Line 23, replace "extend" with -- extends --

Signed and Sealed this

Twenty-ninth Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*



US 20040193238A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0193238 A1**

Mosher et al. (43) **Pub. Date:** **Sep. 30, 2004**

(54) **NON-SURGICAL INCONTINENCE TREATMENT SYSTEM AND METHOD**

(75) Inventors: **Oren A. Mosher**, Castro Valley, CA (US); **Carine Hoarau**, Pleasant Hill, CA (US); **Abdul M. Tayeb**, San Leandro, CA (US); **George L. Matlock**, Pleasanton, CA (US); **Daniel D. Merrick**, Dublin, CA (US); **Terry E. Spraker**, Portola Valley, CA (US)

Correspondence Address:
**TOWNSEND AND TOWNSEND AND CREW, LLP**
**TWO EMBARCADERO CENTER**
**EIGHTH FLOOR**
**SAN FRANCISCO, CA 94111-3834 (US)**

(73) Assignees: **SURx, Inc., a Corporation of Delaware**, Livermore, CA; **Solarant Medical, Inc.**, Livermore, CA

(21) Appl. No.: **10/759,732**

(22) Filed: **Jan. 15, 2004**

**Related U.S. Application Data**

(60) Provisional application No. 60/440,711, filed on Jan. 16, 2003.

**Publication Classification**

(51) Int. Cl.$^7$ ................................ **A61F 7/00**; A61F 7/12
(52) U.S. Cl. ............................................. **607/99**; 607/113

(57) **ABSTRACT**

Devices, systems, and methods can treat incontinence by heating between about 100 and about 800 cubic millimeters of endopelvic fascia for sufficient time to effect substantial collagenous tissue shrinkage. A probe body may directly engage the endopelvic fascia, or may be separated from the endopelvic fascia, heating through (for example) the vaginal wall. In either case, tissue-penetrating electrodes may be inserted from the probe body so as to heat the endopelvic fascia.



BTL EX1006
IPR2024-00703
U.S. Patent No. 8,961,511



## FIG. 1



## FIG. 2



FIG. 3A



FIG. 3B



FIG. 3C

Case: 26-1223    Document: 24    Page: 374    Filed: 08/12/2026



## FIG. 4A



## FIG. 4B

Case: 26-1223    Document: 24    Page: 375    Filed: 08/12/2026



## FIG. 4C



## FIG. 4D

Patent Application Publication   Sep. 30, 2004   Sheet 5 of 27        US 2004/0193238 A1



FIG. 5A



FIG. 5B



FIG. 6



FIG. 6A



FIG. 7A



FIG. 7B

FIG. 7C

Case: 26-1223    Document: 24    Page: 380    Filed: 08/12/2026



FIG. 7D

Appx1106

Case: 26-1223    Document: 24    Page: 381    Filed: 08/12/2026



FIG. 7E

FIG. 7F

FIG. 7G

Patent Application Publication  Sep. 30, 2004  Sheet 11 of 27    US 2004/0193238 A1



FIG. 7H



FIG. 7I

## Other Thermal Effects on "Tissue"

| Time (Seconds) | Necrosis ($^\circ$C) |
|---|---|
| 1 | 54.3 |
| 10 | 51.5 |
| 25 | 50.5 |
| 50 | 50 |
| 75 | 49 |
| 100 | 48.3 |

### FIG. 8B

## Collagenated Tissue Mean Shrinkage 65°C, 70°C, 75°C, 80°C, and 85°C



### FIG. 8A



1μm

## FIG. 9



## FIG. 10A



FIG. 10B



FIG. 10C



FIG. 11



FIG. 12D

FIG. 12C



FIG. 12A



FIG. 12B



FIG. 13A

Case: 26-1223     Document: 24     Page: 391     Filed: 08/12/2026

Appx1117



FIG. 13B



FIG. 14



FIG. 15

Patent Application Publication   Sep. 30, 2004   Sheet 23 of 27      US 2004/0193238 A1



FIG. 16A

FIG. 16B

FIG. 16C

FIG. 16D



FIG. 17

Case: 26-1223    Document: 24    Page: 396    Filed: 08/12/2026



FIG. 18C



FIG. 18A



FIG. 18B

FIG. 19B





FIG. 19A

Appx1122



**FIG. 20A**



**FIG. 20B**



**FIG. 20C**



**FIG. 20D**



FIG. 21A

FIG. 21B

FIG. 21C

FIG. 22A

FIG. 22B



FIG. 23

US 2004/0193238 A1 — Sep. 30, 2004

1

# NON-SURGICAL INCONTINENCE TREATMENT SYSTEM AND METHOD

## CROSS-REFERENCES TO RELATED APPLICATIONS

[0001] This application claims the benefit priority from U.S. Provisional Patent Application No. 60/440,711, filed Jan. 16, 2003, the full disclosure of which is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention generally relates to medical devices, methods, and systems, particularly for the treatment of urinary incontinence.

[0004] Urinary incontinence arises in both men and women with varying degrees of severity, and from different causes. In men, the condition frequently occurs as a result of prostatectomies which result in mechanical damage to the urinary sphincter. In women, the condition typically arises after pregnancy when musculoskeletal damage has occurred as a result of inelastic stretching of the structures supporting the genitourinary tract. Specifically, pregnancy can result in inelastic stretching of the pelvic floor, the external sphincter, and the tissue structures which support the bladder, urethra, and bladder neck region. In each of these cases, urinary leakage typically occurs when a patient's abdominal pressure increases as a result of stress, e.g., coughing, sneezing, laughing, exercise, or the like.

[0005] Treatment of urinary incontinence can take a variety of forms. Most simply, the patient can wear absorptive devices or clothing, which is often sufficient for minor leakage events. Alternatively or additionally, patients may undertake exercises intended to strengthen the muscles in the pelvic region, or may attempt a behavior modification intended to reduce the incidence of urinary leakage.

[0006] In cases where such non-interventional approaches are inadequate or unacceptable, the patient may undergo surgery to correct the problem. A wide variety of procedures have been developed to correct urinary incontinence in women. Several of these procedures are specifically intended to support the bladder neck region. For example, sutures, straps or other artificial structures are often looped around the bladder neck and affixed to the pelvis, the endopelvic fascia, the ligaments which support the bladder, or the like. Other procedures involve surgical injections of bulking agents, inflatable balloons, or other elements to mechanically support the bladder neck.

[0007] In work done related to the present invention, it has been proposed to treat urinary incontinence by selectively remodeling a portion of the pelvic support tissue, often so as to reposition the bladder and/or urogenital tract. U.S. Pat. No. 6,091,995 generally describes laparoscopic and other minimally invasive devices, methods, and systems for shrinking tissues, particularly for treatment of incontinence. U.S. Pat. No. 6,216,704, describes noninvasive devices, methods, and systems for shrinking of tissues, often by cooling a surface of an intermediate tissue and directing energy through the cooled intermediate tissue to the target tissue so as to effect shrinkage. U.S. Pat. No. 6,156,060, is directed to static devices and methods to shrink tissues for

incontinence. Finally, U.S. Pat. No. 6,292,700 describes an endopelvic fascia treatment for incontinence in which a strength of a collagenous tissue increases, optionally without collagenous tissue contraction. Each of these patents is assigned to the present assignee, and their full disclosures are incorporated herein by reference.

[0008] While these recent proposals for treatment of incontinence represent significant advancements in the art, treatment of incontinence and other conditions related to insufficient collagenous pelvic tissue support could benefit from still further advances.

## BRIEF SUMMARY OF THE INVENTION

[0009] The present invention provides improved devices, systems, and method for treating incontinence. The invention will often heat volumes of collagenous support tissue such as the endopelvic fascia, the volumes typically being between about 100 and about 800 cubic millimeters. These volumes of tissues can be heated for sufficient time to effect substantial collagenous tissue shrinkage, for example, by heating the volume to a temperature of about 70° C. or more for about 30 seconds or more. Alternative treatments may heat the volume to about 65° C. or more for about 100 seconds or more, or to about 75° C. or more for about 10 seconds or more. Such heating may induce necrosis, but the heating will often be limited to inhibit ablation so that the tissue, after healing, provides continence promoting support. In some embodiments, a probe body may directly engage the endopelvic fascia, such as by introducing an endoscopic probe into the body adjacent the endopelvic fascia, or by surgically displacing a flap from the vaginal wall. Alternatively, the probe body may be separated from the endopelvic fascia, with heating provided through (for example) the vaginal wall. In either case, tissue-penetrating electrodes may be used to heat the endopelvic fascia.

[0010] In a first aspect, the invention provides a method for treating incontinence. The method comprises aligning a probe body with a collagenous pelvic tissue. A treatment volume of at least 100 cubic millimeters (often being at least 300 cubic millimeters) of the collagenous tissue is heated using the probe. The heating may optionally be performed so that the treatment volume is heated to a temperature of at least about 70° C. for a time of at least about 30 seconds. An intermediate tissue may (but need not) be disposed between the probe and target tissue, and/or heating may be effected using tissue-penetrating electrodes. Moreover, applying a dwell time after the desired heating temperature is achieved may also serve to increase treatment tissue volume as discussed in more detail below.

[0011] When an intermediate tissue is disposed between the probe body and the treatment volume, the treatment volume generally will be separated from the aligned probe body by a distance within a range of about 2 to about 8 mm, optionally being disposed throughout a range of at least 2 to about 4 mm from a vaginal wall surface engaged by the aligned probe. When the probe body directly accesses the treatment volume, treatment may extend to the probe body, for example, by using tissue-penetrating electrodes having active electrode surfaces that extend from the tissue-engaging surface by a distance within a range of about 0 to about 8 mm. The treatment volume will preferably be separated from a urethra of a patient by at least about 1 cm to inhibit

injury to nerves along the urethra, with the treatment volume preferably being offset laterally from the urethra to a right side of the patient (for example). In such embodiments, the method may further comprise heating another treatment volume similarly offset laterally from the urethra to a left side of the patient. The treatment volume may have a length orientation extending proximally-distally along the urethra, a depth orientation extending between the collagenous tissue and the probe body, and a medial-lateral width orientation, the width of the treatment volume being greater than the length of the treatment volume, so that the treatment volume is elongated along the medial-lateral orientation of the patient. Alternatively, the length of the treatment volume may be greater than the width of the treatment volume in some embodiments.

[0012] The position of the treatment volume may be registered along an axis of the urethra with reference to a guide body disposed within the urethra. The treatment volume may, in some embodiments, be registered with reference to a bone of the patient, optionally with reference to a pelvic bone as can be identified with tactile examination through the vaginal wall, by a bone-receiving registration indentation of the probe, or the like.

[0013] Preferably, heating is performed so as to inhibit necrosis of any intermediate tissue, optionally while cooling the intermediate tissue. In other embodiments, heating may be performed without cooling of the intermediate tissue, for example, by advancing a plurality of tissue-penetrating electrodes from the probe body into the treatment volume and applying electrical potential to the tissue-penetrating electrodes. Electrically insulating a proximal portion of the tissue-penetrating electrodes from the intermediate tissue may inhibit necrosis of the intermediate tissue. Still further, heating may be performed by tip movement of at least a pair of electrodes supported by the probe body. In such an embodiment, the treatment volume may increase as the tip movement speed decreases.

[0014] In another aspect, the invention provides a system for treating incontinence of a patient having a collagenous pelvic tissue. The system comprises a probe body alignable with the collagenous pelvic tissue, optionally so that an intermediate tissue is disposed therebetween. At least one energy delivery element is supported by the probe body. The at least one energy delivery element is capable of heating, from the aligned probe body, a treatment volume of at least 100 cubic millimeters of the collagenous tissue to a temperature of at least 70° C. for a time of at least 30 seconds so that the collagenous pelvic tissue contributes to continence.

[0015] The system may further comprise at least one cooling element supported by the probe body so as to provide cooling of the intermediate tissue while heating the treatment volume. In such a cooled electrode embodiment, the at least one energy delivery element may comprise a plurality of electrodes. The electrodes may take on a variety of shapes, sizes, spacings, and numbers. In some cases the electrodes may have a width of at least 20 mm and a length of less than 8 mm. Alternatively, the at least one energy delivery element may simply comprise energizing a distal or proximal pair of electrodes on a probe body that carries a plurality of electrodes. Still further, the at least one energy delivery element may comprise a pair of elongated electrodes.

[0016] The at least one energy delivery element may also comprise an array of tissue-penetrating elements. The tissue-penetrating elements may similarly take on a variety of shapes, sizes, spacings, and numbers. For example, the tissue-penetrating element may comprise needle electrodes having diameters in a range from about 0.035 inch to about 0.125 inch. The tissue-penetrating elements may also comprise any one of blade electrodes, planar electrodes, C shaped electrodes, corkscrew shaped electrodes, or tissue-penetrating electrode tips. The tissue-penetrating elements may comprise an array from two to twenty tissue-penetrating electrodes, wherein such elements may extend from a tissue-engaging surface by a distance within a range from about 0 to about 8 mm. Still further, the tissue-penetrating elements may be formed from shape memory alloy or like deformable materials so as to be expandable.

[0017] Generally, that at least one energy delivery element heats the treatment volume of collagenous tissue by the application of bipolar radio frequency energy. However, it will be appreciated that alternative energy sources and/or monopolar operation may be utilized as well by any of the devices and methods described herein. Further, a guide body may be disposable within a urethra so as to register a position of the treatment volume along an axis of the urethra. Typically, the guide body comprises axial position indicators or electromagnetic transmitters as discussed in more detail below.

[0018] In a further aspect of the invention, another method for treating incontinence is provided. A probe body is aligned with a collagenous pelvic tissue. A plurality of tissue-penetrating electrodes as discussed above are advanced into the collagenous tissue from the aligned probe body. A treatment volume of at least 300 cubic millimeters of the collagenous tissue is heated using the aligned probe. The heating is performed so that the treatment volume is heated to a temperature of at least 70° C. for a time of at least 30 seconds.

[0019] In a still further aspect of the invention, another system for treating incontinence of a patient having a collagenous pelvic tissue is provided. The system comprises a probe body alignable with the collagenous pelvic tissue and a plurality of tissue-penetrating electrodes supported by the probe body. The electrodes are capable of heating, from the aligned probe body, a treatment volume of at least 300 cubic millimeters of the collagenous tissue to a temperature of at least 70° C. for a time of at least 30 seconds so that the collagenous pelvic tissue contributes to continence. Such a system may further incorporate at least one cooling element supported by the probe so as to provide cooling of the tissue while heating the treatment volume with the tissue-penetrating elements.

[0020] A further understanding of the nature and advantages of the present invention will become apparent by reference to the remaining portions of the specification and drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

[0021] The following drawings should be read with reference to the detailed description. Like numbers in different drawings refer to like elements. The drawings, which are not necessarily to scale, illustratively depict embodiments of the present invention and are not intended to limit the scope of the invention.

US 2004/0193238 A1 Sep. 30, 2004

3

[0022] **FIG. 1** illustrates pelvic support tissues which may be targeted for treatment using the system and methods of the present invention.

[0023] **FIG. 2** illustrates a method for accessing endopelvic fascia for direct treatment.

[0024] FIGS. **3A-3C** illustrate a probe having tissue-penetrating electrodes for treatment of incontinence.

[0025] FIGS. **4A-4D** illustrate a method for using the probe of FIGS. **3A-3C** for treatment of incontinence.

[0026] **FIGS. 5A and 5B** illustrate probes and methods for treating incontinence by surgically accessing endopelvic fascia.

[0027] **FIGS. 6 and 6A** illustrate non-invasive vaginal probes and a method for non-invasively treating endopelvic fascia using cooled electrodes.

[0028] FIGS. **7A-7I** illustrate urethral guides to assist in registration of the treatment probe with a target volume of collagenous tissue.

[0029] **FIGS. 8A and 8B** illustrate shrinkage and necrosis effects of heating on tissue.

[0030] **FIG. 9** illustrates a target collagenous tissue structure.

[0031] FIGS. **10A-10C** illustrate in vitro and in vivo treatment temperature studies and the temperatures resulting from use of a non-invasive treatment probe similar to that of **FIGS. 6 and 6A**.

[0032] **FIG. 11** graphically illustrates maximum tissue temperatures of tissue heated using a non-invasive probe similar to that of **FIGS. 6 and 6A**.

[0033] FIGS. **12A-12D** illustrate tissue heating studies using a surgical probe similar to that of **FIGS. 5A and 5B**.

[0034] **FIGS. 13A and 13B** graphically illustrate tissue temperatures of tissue heated with a surgical probe per the studies of FIGS. **12A-12B**.

[0035] **FIG. 14** illustrates treatment volumes of a tissue heated to various temperatures using surgical probes.

[0036] **FIG. 15** graphically illustrates the different volumes of the tissues which can be heated to 70° with different probes and/or different treatment settings.

[0037] **FIG. 16A-16D** illustrate a variety of cooled electrode configurations for vaginal probes and associated treatment regions produced thereby.

[0038] **FIG. 17** illustrates a probe having tissue-penetrating electrodes for treating target volumes directly or through an intermediate tissue.

[0039] FIGS. **18A-18C** illustrate an alternative probe having tissue-penetrating planar electrodes for direct surgical treatments of the endopelvic fascia.

[0040] **FIG. 19A and 19B** illustrate an alternative probe having tissue-penetrating needle electrodes for non-surgical treatments of the endopelvic fascia.

[0041] FIGS. **20A-20D** illustrate further alternative probes having tissue-penetrating electrodes.

[0042] FIGS. **21A-21C** illustrate still further alternative tissue-penetrating electrode structures.

[0043] **FIGS. 22A and 22B** illustrate a tissue-penetrating electrode extending from a probe body having a cooled surface electrode.

[0044] **FIG. 23** illustrates the development of treatment volume at a temperature of above 70° C. as a function of dwell time.

DETAILED DESCRIPTION OF THE
INVENTION

[0045] The present invention generally provides methods, devices, and systems which enhance the structural support provided by a body's tissues, particularly for treatment of incontinence. The techniques of the invention generally involve directing energy from a probe into collagenous tissues of the pelvic support system. The energy will often cause contraction of the collagenous tissue. In some embodiments, the formation of scar tissue and/or the healing process may cause structural stiffening of the tissue.

[0046] As the techniques of the present invention will be effective for controllably and repeatably enhancing the structural support of a wide variety of fascia and other collagenous tissues throughout the body, they will find applications in a wide variety of therapies. The most immediate application of the invention will be to enhance a tissue system's support of the urethra and bladder neck so as to contribute to urinary continence, often without having to resort to sutures, slings, fasteners, or other artificial support structures. In many embodiments, these treatments will be performed so as to inhibit ablation of the target collagenous tissues. As used herein, the term "ablation" of a tissue means that the tissue is substantially removed and/or the function of the tissue is substantially destroyed. Hence, although tissue necrosis may occur, and while the structural strength of a tissue may initially decrease immediately after treatment, the treated tissue will generally continue to provide at least some structural support and the structural strength will often increase during the healing process.

[0047] The tissues of the pelvic support system generally maintain the position of the genitourinary tract, and particularly the position of urinary bladder B, urethra U, and the bladder neck coupling these structures as illustrated in **FIG. 1**. In general, endopelvic fascia EF may define a hammock-like structure which extends laterally between the left and right arcus tendineus fasciae pelvis (ATFP). These tendon structures may extend substantially between the anterior and posterior portions of the pelvis, so that the endopelvic fascia EF at least partially defines the pelvic floor.

[0048] The fascial tissue of the pelvic floor may comprise tissues referred to under different names by surgeons of different disciplines, and possibly even by different practitioners within a specialty. In fact, some surgeons may assign a collagenous support structure of the endopelvic fascia one name when viewed from a superior approach, and a different name when viewed from an inferior approach. Some of the endopelvic fascia may comprise two collagenous layers with a thin muscular layer therebetween, or may comprise a single collagenous layer. The hammock-like endopelvic fascia described herein may be damaged or missing, particularly after pregnancy, so that the support of the geni-

tourinary tract is instead provided by a variety of fascial layers, muscular tissues, ligaments, and/or tendons within the pelvis. Hence, the treatment of the present invention may be directed at a variety of tissue structures defining the pelvic floor and/or diaphragm (including: anterior sacro-coccygeal ligament; arcus tendineus fasciae pelvis ATFP, the white line of the pelvis; fasciae of the obturator internus muscle; the arcus tendineus levator ani or "picket fence" to the iliococcygeus portion of the levator ani muscle; bulb-ocavemosus muscle; ischiocavemosus muscle; urethrovaginal sphincter; m. compressor urethrae muscle; and m. sphincter urethrovaginal muscle which replaces deep perineal muscle); structures of the bladder and urethra (including: urethrovesical fascia; detrusor muscle; and the pubo-coccygeus muscle which relaxes to open the bladder neck, initiating micturation); structures of the vagina (including: vagino-uterine fascia, lamina propria—the dense connective tissue layer just under the epithelium; pubo-urethral or puboprostatic ligaments; pubo-vesicle ligament and posterior pubo-urethral or puboprostatic ligament; pub-ovesicle muscle, a smooth muscle that is integrated with the pubovesicle ligament; and pubocervical fascia which attaches to the ATFP); structures of the uterus (including: round ligament; sacrouterine ligament; and broad ligament); and structures of the bowel (including: rectal fascia and mackenrodt's ligament).

[0049] When the endopelvic fascia has excessive length or stretches excessively under a load, the fluid pressure within the bladder advances into the bladder neck and down the urethra more readily. Leakage may result in part because the endopelvic fascia allows the bladder, bladder neck, and/or urethra to drop below its desired position, at which fluid pressure within the bladder may actually help to seal the bladder neck. Stretching of the endopelvic fascia may also alter the timing of pressure pulse transmission to the urethra.

[0050] When a continent woman coughs, the pressure in the urethra will often increase more than one-tenth of a second prior to the increase in bladder pressure. In women with stress incontinence, the bladder pressure may rise first. For a continent woman having endopelvic fascia which stretches much less under the influence of a pressure pulse, the time delay between initiation of the pressure pulse and transferring sufficient force to urethra U to effect closure may therefore be significantly less. By treating the endopelvic fascia to decrease its length and/or increase its stiffness, the descent time of the pelvic viscera during a cough will be shorter than an untreated, excessively long and/or excessively elastic tissue.

[0051] Referring now to **FIG. 2**, the endopelvic fascia may be treated non-surgically or it may be accessed for direct treatment in a variety of ways. **FIG. 2** illustrates one method for accessing surface S of endopelvic fascia EF transvaginally, by forming and displacing a flap F from the vaginal wall VW with the assistance of a weighted speculum WS as depicted by arrow **8**.

[0052] Referring now to FIGS. **3A-3C**, a heat applying probe **10** comprises a probe body having a sheath component **12** and an electrical rod component **14**. The electrode rod **14** is reciprocatably mounted in a lumen of sheath **12** so that a distal electrode array **16** on the rod **14** may be retracted and extended into and from the distal end **18** of sheath **12**. A proximal handle **20** is provided on the sheath, and a proximal connector **22** is provided on the electrode rod component **14**. Electrode array **16**, as illustrated, may optionally include four individual tissue-penetrating electrode tips **24**, with each tip having a sharpened distal end suitable for penetrating into tissue, particularly for transmucosal penetration through the vaginal wall and into the tissue structures which support the urethra, urinary sphincter, bladder neck, and the like. In other embodiments, between two and twenty tissue-penetrating electrodes might be used as shown in **FIG. 3B**. It will be appreciated that the above depictions are for illustrative purposes only and do not necessarily reflect the actual shape, size, or dimensions of the probe **10**. This applies to all depictions hereinafter.

[0053] Electrode tips **24** are sufficiently resilient so they will be radially contracted when rod **14** is withdrawn proximally into sheath **18**. Electrode tips **24** will resiliently expand from the sheath when the electrode rod component **14** is advanced distally after sheath **18** is positioned near the target site, as discussed in more detail below. As illustrated, electrode tips **24** are commonly connected to a single plug in connector **22**. Thus, probe **10** may be suitable for monopolar operation. Multiple electrode tips **24** may alternatively be connected through separate, isolated conductors within rod **14** and further be connected through multiple pins in connector **22**. Thus, probe **10** could be readily adapted for bipolar operation. Usually, all components of the probe will be insulated other than the electrode tips **24**. Alternatively, some other portion of rod **14** or sheath **12** could be formed from an electrically conductive material and utilized as a common or indifferent electrode so that the probe could be utilized in a bipolar manner. In still further alternatives, multiple insulated and conductive areas may be used, with the specific configuration optionally depending on the relationship of the electrodes to the probe itself, so that more than one return electrode might be employed. A variety of such modifications would be possible with the basic probe design.

[0054] Referring now to FIGS. **4A-4D**, use of probe **10** for contracting tissue ligaments, fascia, and other collagenous tissues which support the urethra and/or bladder neck will be described. Initially, the treating physician manually examines the vagina V to locate the region within the vagina adjacent the target region of the endopelvic fascia. Probe **10** is then introduced into the vagina as shown by **FIG. 4B**. Conveniently, the physician may manually locate the probe, again by feeling the region of the endopelvic fascia which is to be targeted for treatment. Specifically, the physician may identify the treatment region as a portion of the endopelvic fascia laterally offset (to the patient's right or left) from the urethra, ideally with the treatment region being separated from the urethra by at least one centimeter. Identifying the location of the urethra may be facilitated by the use of a guide body extending into or through the urethra, as described in co-pending U.S. patent application Ser. No. 10/301,561, filed Nov. 20, 2002, and entitled Incontinence Treatment with Urethral Guide (Attorney Docket No. 17761-002610), the full disclosure of which is incorporated herein by reference. Positioning of the target region along the axis of the urethra may be facilitated by identifying the axial position of pubic bone PB using finger F and/or by an axial location indicator of the urethral guide. Preferably, the location of the treatment volume of endopelvic fascia will be disposed along a length of the urethra between the bladder neck and the external meatus so as to avoid injuring nerves

5

(which might otherwise have deleterious impacts on urge incontinence and the like) while still enhancing the structural support sufficiently to inhibit leakage.

[0055] After sheath 12 of probe 10 is properly positioned, the rod component 14 will be distally advanced so that electrode tips 24 penetrate into the tissue which supports the urethra as shown in FIG. 4C. The physician will continue to use a finger F to hold the probe against the vaginal wall to facilitate penetration of the electrode tips 24. RF energy can then be applied through the probe in order to heat the target tissue to temperatures and for time periods which effect a contraction of the collagen within the target tissue and/or enhance stiffening of the support provided by these structures. The supporting collagenous tissues, immediately and/or upon healing, thereby contribute to continence.

[0056] Referring now to FIG. 5A, a direct probe 42 may be suitable for laparoscopic use and/or use through a transvaginal incision. With reference to FIGS. 5A and 5B, a method for using direct probe 42 for directly heating endopelvic fascia EF via a laparoscopic approach can be understood. Direct probe 42 includes a shaft 44 supporting an electrode pair 36 relative to handle 46. A variety of electrode pair configurations might be used, as more fully described in co-pending U.S. patent application Ser. No. 08/910,370, the disclosure of which is also incorporated by reference. Preferably, a port 48 will be disposed adjacent and/or between electrodes 36 to allow a small amount of irrigation flow before and/or during the treatment. The irrigation flow may comprise a conductive fluid such as saline or a non-conductive fluid, and will ideally be sufficient to avoid accumulation of residue on the electrode pair surfaces. Suitable flow rates will often be in range from about 0.5 cc/min to about 2.0 cc/min.

[0057] Direct probe 42 will may optionally be used in a laparoscope procedure using a superior approach, typically under the direction of a laparoscope 50 inserted near the patient's mid-line (for example, adjacent the belly button). Handle 46 is manipulated so as to "paint" bipolar electrode 36 across the endopelvic fascia surface until the target region has been sufficiently heated. Alternative surgical methods for use of related probes may access the endopelvic fascia using an inferior approach, preferably with a small transvaginal incision as illustrated in FIG. 2.

[0058] FIGS. 6 and 6A illustrate alternative cooled electrode vaginal probes for indirect treatment of tissue to inhibit incontinence through an intervening or intermediate tissue, which may comprise a spared zone or safety zone where tissue necrosis is inhibited. In these embodiments, a vaginal probe body 54 includes a plurality of electrodes 56 which are cooled by fluid conduits 58. The fluid conduits cool the intervening or intermediate tissue between probe body 54 and the endopelvic fascia EF, such as the vaginal wall VW as seen in FIG. 6. The probe body between electrodes 56 also cools the intervening tissue. Once the intervening tissue of the vaginal wall VW (and optionally, the urethra, bladder neck, and bladder) are cooled sufficiently, RF current is transmitted between the electrodes of the probe body to heat the endopelvic fascia. Advantageously, the pre-cooling can inhibit heating of the intervening tissue to a temperature causing surface lesions within the vagina. Feedback on the pre-cooling and heating temperatures may be provided by needle-mounted temperature sensors 62 which may option-

ally be reciprocatably advancable from probe body 54 through a sensor port 64. A relatively flat tissue-engaging electrode surface helps direct electrical current flux 60 toward the endopelvic fascia, while electrically insulating film disposed over at least a portion of electrodes 56 near an adjacent electrode may inhibit edge-induced flux concentration. Exemplary cooled electrode structures are described in more detail in U.S. Pat. No. 6,283,987 entitled Ribbed Electrodes and Methods for Their Use (Attorney Docket No. 17761-00710US), the full disclosure of which is incorporated herein by reference. As can be understood by comparison of FIGS. 6 and 6A, the electrodes may extend axially along a length of the probe body, or may each have a conductive surface which is elongated in the lateral orientation, with probe bodies having more than two electrodes preferably utilizing bipolar RF energy between alternating pairs of the electrodes.

[0059] FIGS. 7A-7I schematically illustrate alternative urethral guides to assist in registration of the probe treatment body relative to a target tissue. Urethral guides 70a, 70b, 70c, and 70d (collectively, urethral guides 70) may generally assist in tactile location of the urethral axis so as to facilitate separating the treatment zone laterally from the urethra. Urethral guides 70 may also include axial position indicators to help locate the treatment zone along the urethral axis. For example, urethral guide 70a includes a distal balloon 72 for identifying an axial position of the bladder or bladder neck, and a proximal positioning surface 74 for engaging the external meatus EM of the patient. A first elongate body of urethral guide 70a is axially coupled to balloon 72, and a second body 76 of guide 70a is coupled to positioning surface 74. A position indicator 78 of the body 76 facilitates reading an indicia of position from the first elongate body, allowing the overall length between bladder B and the external meatus EM to be readily identified. This facilitates identification of the midpoint of the urethra, urinary sphincter, and the like. The urethral guide body may include a balloon-fill lumen, a bladder draining lumen, temperature and/or pressure sensors, transmitter cables, and the like.

[0060] Referring to FIGS. 7B-7C, once the axial position of the centroid or sphincter for the urethra is identified, it may be possible to generate a palpatatable marker for axial registration of the treatment zone as shown. Specifically, a radially distensible urethral guide tube 80 may house first and second actuation rods 82, 84, with the second rod here being in the form of a tube in which the first rod is disposed. Distal bodies at the distal ends of the first and second actuation rods 82, 84 expand the distendable tube when aligned as illustrated in FIG. 7C. Expanded portion 86 may be identified by finger F of the physician through the vaginal wall.

[0061] More sophisticated axial and/or lateral registration systems may be included in the urethral guide and/or treatment probe as schematically illustrated in FIG. 7D. In this embodiment, distal and proximal electromagnetic transmitters or coils 71, 73 may be sensed by sensors or receivers 75 of the treatment probe, or vice versa. For example, a plurality of transmitters 71, 73 are positioned on the urethral guide 70c within the patient body and four Hall effect sensors 75 are positioned on the right and left sides of the treatment probe tip 77. By individually triangulating distances between the transmitters 71, 73 and sensors 75 using the Hall effect, the relative lateral and axial positioning of

the treatment probe and urethra may be identified. In particular, the information from the Hall effect sensors **75** may be transmitted to amplifiers and subject to signal processing, as depicted by block **67**, for information display, as depicted by block **69**. Alternatively, as the sensors can be much smaller than the transmitters, the sensors may be supported by the urethral guide while the transmitters are supported by the vaginal probe. These structures may be more fully understood with reference to U.S. patent application Ser. No. 10/301,561 (Attorney Docket 017761-002610), previously incorporated herein by reference.

[0062] Still more complex urethral guide measurement mechanisms may also be provided, including those having separately moveable threaded bodies for positioning of transmitters, sensors, and the like. FIGS. **7E-7I** illustrate such an embodiment. The urethral guide **70***d* and adjustable magnetic assembly **79** are provided with a series of measurement graduations **81**. The urethral guide **70***d* is inserted, the bladder B is drained, the balloon **72** is inflated, and the urethral guide **70***d* and balloon **72** are pulled proximally to contact the bladder neck, as illustrated in **FIGS. 7E and 7F**. The magnetic assembly **79** is initially pulled in a proximal direction so it is not in contact with the external meatus EM. The graduation **81** on the urethral guide **70***d* closest to the external meatus EM is then read to provide the urethral length. The magnetic assembly **79** is then advanced distally until the separate set of graduations **81** on the magnetic assembly **79** match the measured urethral length reading. This mechanism includes adjusting screws with thread ratios such that advancing the magnetic assembly **79** to this graduation will place the electromagnetic transmitter or coil **83** in the desired position. The Hall effect sensors or receivers **85** mounted in the probe handle **87** will bracket the single disk or doughnut shaped magnet **83**, as shown in **FIGS. 7E and 7F**. This bracketing allows for the treatment zone to be centered approximately around the middle of the urethra for heating by electrodes **89** on the probe tip **77**. In this embodiment, lateral positioning may be achieved by palpation of the urethral guide **70***d* by using a finger of the F of the physician.

[0063] **FIG. 7E** illustrates treatment of a patient's left side by positioning two Hall effect sensors **85** on the left side of the probe handle **87**. **FIG. 7F** illustrates treatment of a patient's right side with positioning of two Hall effect sensors **85** on the right side of the probe handle **87**. FIGS. **7G-7I** illustrate exploded views of the adjustable magnetic holder **79** and electromagnetic transmitter **83** around the urethral guide **70***d* and outside the patient body. Such placement of the electromagnetic transmitter **83** provides several advantages. For example, the size of the electromagnetic transmitter **83** is no longer constrained by the size of the urethral guide as it is positioned outside the body. As such, a larger electromagnetic transmitter **83** may in turn be utilized to allow for enhanced signal detection. Moreover, placement of the electromagnetic transmitter **83** outside the patient body further allows for a smaller urethral guide profile which in turn adds to patient comfort and allows for more complete bladder draining. As best seen in **FIGS. 7H and 7I**, a V shaped transparent plastic flap, flange, or pointer **91** may be coupled to the electromagnetic transmitter **83** so that a physician may visually align the probe **87, 77** with the urethral guide **70**d. In particular, a pair of lines **93** on the flap **91** center the electromagnetic transmitter **83** and may be visually aligned with the two Hall effect sensors **85** on the

probe handle **87** by approximately ¼ of an inch or less correct positioning. Moreover, the flap **91** also provides both distal and proximal positioning into the patient body.

[0064] Referring now to FIGS. **8A-8B**, effects of heating on collagenous tissues are shown. As can be understood with reference to **FIG. 8A**, to obtain a significant percentage of shrinkage in a relatively short treatment time, it is generally advantageous to heat tissues to temperatures of about 70° C. or more. As can be understood with reference to **FIG. 8B**, heating tissues to temperatures of even 65° C. would result in necrosis in a short time period. Hence, by comparing **FIGS. 8A and 8B**, it will be understood that to effect significant heat-induced shrinkage, both the heated tissue and adjoining tissues will exhibit at least some necrosis. Once again, even though necrosis does occur, the collagenous tissue will not necessarily be "ablated" as it will remain at the treatment site and the collagenous tissue will retain its structural support function.

[0065] Necrosis will extend beyond the tissue undergoing shrinkage due to the diffusion of heat. As the necrosis sensitivity of the tissue is significantly more dependent on the temperature than on the time for which it is heated, it may be advantageous to (as practicable) limit treatment temperatures toward the lower possible temperatures from which sufficient tissue shrinkage can be provided. While this may require a treatment time of at least 10 seconds, preferably of at least 20 seconds, and typically of at least about 30 seconds, the size of the tissue region subjected to necrosis-inducing temperatures will often be less than if higher treatment temperatures are used. Hence, to effect significant, repeatable tissue shrinkage, it is generally desirable to subject the treatment volume to temperatures of at least 70° C. for a time of about 30 seconds or more.

[0066] **FIG. 9** illustrates the 2-D orientation of collagen fibers in the deep fascia, a preferred target tissue for incontinence treatments. The structure of tissues between a vaginal treatment probe and this deep fascia collagen of the endopelvic fascia includes typically about 0.04 mm of epithelium along the surface of the vaginal wall. Below the epithelium is between 0.04 mm and 0.7 mm of submucosa, typically comprising loosely packed thin collagen fibers. Below the submucosa lies a layer of superficial fascia, at a depth of between 0.7 mm to about 2.0 mm. This superficial fascia contains much smaller collagen bundles which are loosely packed and appear interlacing. The deep fascia illustrated in **FIG. 9** typically lies throughout a depth of between about 2.0 and 4.0 mm, and includes larger, elongated collagen bundles having a distinct horizontal or 2-D distribution. This deep fascia provides an exemplary target for greater heat-induced changes, including contraction or shrinkage, stiffening, and/or the like. RF heating will typically induce collagen shrinkage so as to provide physical elevation of the urethra by shrinkage of the endopelvic fascia. RF heating may also decrease the compliance of the endopelvic fascia to intra-abdominal pressures, providing increased stiffness through tissue remodeling resulting from the healing process. Within the first 24 hours of the heating treatment, fibroblasts will move in to begin repair. Over about two weeks, type III collagen will replace the denatured collagen, initially providing only a decreased tissue stiffness or low tensile strength. Within 8-12 weeks, the percentage of

7

type I collagen will increase relative to the amount of type III collagen resulting in a return to about 85% of the original stiffness.

[0067] Referring now to FIGS. 10A-10C, a temperature study was performed to determine actual treatment temperatures induced by a non-invasive treatment probe 54 similar to that shown in FIGS. 6 and 6A. A linear array of sensing needles 90 was advanced into a model tissue 92 at a series of different depths 94 from a treatment surface 96. Each of the needles of array 90 carried a temperature sensor 98 (TC1 . . . TC16), such as a thermocouple or the like, near the distal end of the needle. The needles were advanced at the selected depth from surface 96, and the probe 54 was aligned with electrodes 56 in engagement with tissue surface 96 such that the temperature sensors 98 were distributed along the center line of the probe and electrodes. This allowed a measurement profile of the tissue temperature to be taken at the selected depth along the treatment volume centerline.

[0068] The temperatures for the electrodes with the needles disposed at a depth of 5 mm are provided in FIG. 10B. The probe needle temperature indicated in FIG. 10B was taken by a probe-supported temperature sensor 62, as illustrated and described above with reference to FIGS. 6 and 6A. This needle was used in a feedback loop to control the RF energy applied by the probe, as explained in application Ser. No. 10/102596, filed on Mar. 19, 2002 and incorporated herein by reference. The sensing needles were then removed and inserted in a new tissue sample at the next depth 94, allowing a full profile of the tissue temperature along the target volume center line to be taken from a series of such tests.

[0069] In vitro and in vivo treatment temperatures were also taken with needle-supported thermocouples 98 inserted to locations offset laterally and/or axially from the electrodes 56, as illustrated in FIG. 10C. A comparison of in vitro tests and in vivo (from animal studies) temperatures indicated that in vitro temperature rise is slightly higher than in living tissue, and provides a good model which may be used as an upper bound for in vivo temperature results. The offset temperature sensors illustrated in FIG. 10C were positioned at depths 94 of 4 and 10 mm. Probe 54 makes use of cooling prior to and during RF energy application, and all measurement locations were maintained at or below standard tissue temperatures at the offset locations. Hence, these studies indicate there is no tissue heating beyond the footprint of probe 54, and lateral heat dispersion can be well controlled for the non-invasive application of RF energy using a cooled electrode non-invasive applicator.

[0070] Referring now to FIG. 11, the temperature profile along the center line of a non-invasive, cooled electrode vaginal probe is graphically illustrated at varying depths from the probe/tissue interface. While potentially effective for some patients, the quantity of tissue heated above 70° C. is somewhat limited, being about 12 cubic millimeters in this study. This volume was a result of a treatment method which ends heating as soon as tissue temperature reached 70° C. This limited treatment volume nonetheless provided a cured/improved effectiveness rate, at six months after treatment, of over 50%.

[0071] Referring now to FIG. 12B, additional tissue heating studies were performed using a surgical direct contact probe 42A, as shown in FIGS. 12C and 12D, similar to that described above regarding FIGS. 5A and B. Probe 42a was used to heat a treatment surface with a "paint" tip movement pattern as shown in FIG. 12A, using tip movement speeds of about 0.4 cm/sec. for a treatment of 140 seconds and tip movement speeds of about 1.1 cm/sec. for a treatment period of 90 seconds. Arrow 37 indicates a tip movement pattern of five passes in the treatment zone. Using a temperature sensor needle array similar to that shown above in FIG. 10A, treatment temperatures at different depths were measured along and beyond the longitudinal and width or short axis of the treatment region, with the temperature results being graphically illustrated in FIGS. 13A and 13B. The resultant treatment volumes for different temperatures are illustrated in FIG. 14, showing that the total treatment volume heated to 70° C. or greater was over 300 cubic millimeters when the slower tip movement was used, and about 150 cubic millimeters when the faster tip movement speeds were applied for a treatment time of 30 seconds.

[0072] Direct contact treatments were performed on patients suffering from urinary stress incontinence using laparoscopic and transvaginal approaches, as described above. The treatments generally involved direct access and treatment of the endopelvic fascia to both the right and left of the urethra using the treatments described above with reference to FIGS. 12A-13B. For these tests, about 75 to 80% or more of the patients were cured and/or improved as compared to prior to the treatments.

[0073] Referring now to FIG. 15, a graphic comparison of the treatment volumes for the cooled-electrode vaginal probe treatments and transvaginal direct access treatments are shown, along with rough dimensions of the treatment volumes in millimeters. Treatment volume 110 graphically illustrates the volume of tissue that will be heated above 70° C. per the non-invasive treatment probe study described in FIGS. 10A-11, while direct treatment volume 112 illustrates the volume of tissue that will be heated above 70° C. when the tissue is accessed using the transvaginal approach of FIG. 2. Treatment volume 114 illustrates the volume of tissue which will be heated above 70° C. when a similar non-invasive treatment is applied, but for a greater time with the treatment temperature maintained using the feedback loop from the probe-supported temperature sensing needle. Enhanced non-invasive volume 116 illustrates the volume of tissue which may be treated using the treatment probe from the studies of FIGS. 10A-11 when the treatment probe feedback temperature is increased to 85° C., and the treatment is maintained at that temperature for over 240 seconds. The total volume of tissue treated to temperatures above 70° C. for a time of greater than 30 seconds in effecting enhanced treatment volume 116 is over 900 cubic millimeters, so that non-invasive probes 54 are capable of treating sufficient endopelvic fascia to provide efficacy. Once again, each of the treatment volumes illustrated in FIG. 15 would often be applied on a first side of the patient's endopelvic fascia, with a similar treatment volume disposed on the opposed side of the endopelvic fascia relative to the urethra.

[0074] To avoid injury to nerves in the bladder neck region while providing sufficient treatment volume along the endopelvic fascia, it may be advantageous to distribute the treatment volume along the patient's lateral orientation while limiting the length of treatment along the axis of the patient's urethra. This may minimize exposure of the bladder neck and antero-lateral vaginal wall nerves to RF energy.

8

Such a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25 mm and a length of about 15 mm. Treatment depths will preferably be at least about 2 mm, optionally being as much as 6 mm.

[0075]  To provide the enhanced treatment width with a cooled-electrode vaginal probe **54**, a variety of electrode **56** configurations might be employed as illustrated in FIGS. **16A-16D**. Such non-invasive probes may have electrodes having lateral widths relative to an axis of the probe of greater than 20 mm, with at least one (and often all) of the individual electrodes having a length of less than 8 mm as illustrated in **FIGS. 16B and 16D**. Three or more electrodes may be included, with the inner electrode(s) optionally being narrower than the outer electrodes so as to generate a laterally elongate treatment zone **55**. In some embodiments, a single pair of electrodes may be used, as seen in the "proximal heating only" embodiment of **FIG. 16A**. Optionally, only a distal pair of electrodes may be used for heating. **FIGS. 16B and 16D** illustrate more compact positioning of the electrodes **56** as compared to **FIGS. 16A and 16C**. Moreover, **FIG. 16B** shows 3 mm wings.

[0076]  Still further alternative non-surgical probes might be employed to produce the desired treatment volumes. Referring now to **FIG. 17, a** distal portion of a needle probe **120** includes an array of needles **122** that can be advanced laterally relative to a probe and/or insertion axis **126** from a probe body **124**. Body **124** generally defines a probe axis and has a size and shape suitable for axial insertion into the vagina. Probe **120** may optionally be finger supported rather than having an elongate handle **128** for manipulation and positioning. Needles **122** may have distal ends **130** suitable for penetrating tissue, and a proximal portion adjacent probe body **124** when the needles are in the extended position. The proximal portion may be electrically insulating, while at least a portion of the needle distal of the proximal portion is electrically conductive for transmitting RF energy, often in a bipolar mode between needles. Monopolar needle array of probes may also be used, as described above.

[0077]  To facilitate penetrating the vaginal wall and placement of the distal conductive portion via needles within the target tissue, needles **122**, the needle deployment mechanism, or body **124** may include a needle penetration depth verifier. For example, where vacuum ports may be disposed in body **124** along the tissue-engaging surface so as to promote engagement between the probe body **124** and the intermediate tissue when needles **122** are advanced, similar to the arrangement described in U.S. Pat. No. 6,325,798, the full disclosure of which is incorporated herein by reference. Optionally, to verify the insertion depth, needles **122** may have three positions relative to probe body **124**. In a first position, the needles are disposed within the probe for probe positioning. In the second position, needles **122** and the proximal insulated portion of the needles extend from the probe body such that the needles are properly positioned for treatment of the desired treatment volume when the tissue engages the adjacent surface of probe **124**. In the third position, needles **122** may extend significantly beyond this desired treatment needle depth. Advantageously, after the probe is inserted in position with the needles in the stowed position, they can be advanced to the extended position while the probe body **124** is held substantially against the

intermediate tissue. Once the needles are fully extended into the tissue, even if advancement of the needles has pulled a portion of the intermediate tissue surface away from probe body **124**, retracting of the needles **122** back part way into the probe body to ensure that the intermediate tissue surface firmly engages the probe body around needles **122**, and the needles are positioned at the desired depth within the intermediate and target tissues. This overextension and partial retraction of the needles was described for deployment of a temperature sensing needle in U.S. patent application Ser. No. 10/211,973, as filed on Aug. 1, 2002, the full disclosure of which is incorporated herein by reference.

[0078]  FIGS. **18A-18**C illustrate side, end, and top views of an alternative treatment probe **140** having a probe body **142** supporting a plurality of planar or blade electrodes **144**. Planar electrodes can be, but are not necessarily perfectly flat. These electrode structures may have major surfaces coupled by at least one edge, which may optionally be sharpened to function as a blade during insertion. Electrodes **144** are used as tissue-penetrating electrodes that may range in length from 2 to 10 mm, and are shown in **FIG. 18B** having lengths of about 3 mm. Directly engaging probe body **140** against the endopelvic fascia and pressing electrodes **144** into this target tissue would allow treatment by energizing the electrodes with bipolar (or monopolar) RF energy as described above. Bipolar energy might be driven between offset parallel planar electrodes, and a portion of the electrodes (such as the edges of the electrodes and/or the outer surface of the electrodes) may be insulated to limit edge-induced heat concentration, heat beyond the probe body footprint, and the like. While flat planar electrodes are shown, similar embodiments with curved electrodes may also make use of similar structures.

[0079]  When used with a transvaginal incision such as that illustrated in **FIG. 2**, the proximal portion of electrodes **144** need not be insulated. Alternatively, particularly when the electrodes are used to penetrate through the intervening vaginal wall and into the endopelvic fascia, a proximal portion of the electrodes may be insulated, with the electrodes preferably having a three-position mechanism to help ensure accurate depth of the energized electrode portion. Such embodiments may include insulating material along at least the portion of electrodes **144** adjacent probe body **142**, the insulated portion often extending a distance of between 1 and 5 mm from the probe body, typically extending at least about 2 mm from the probe body. As in each of the probes, a temperature sensor such as thermocouple may be disposed between bipolar tissue-penetrating needles or attached to an insulated portion of the tissue-penetrating electrode. Applying bipolar RF potential between the offset pairs of planar electrodes should promote even heating of the target tissue disposed therebetween.

[0080]  **FIGS. 19A and 19B** illustrate a side and top view of a needle array probe **150** having a body **152** from which an array of (16 gauge) needles **154** can extend. In this embodiment, a surface supported by a platen **156** of probe body **152** may be disposed at three positions relative to needles **154** so as to provide the variable needle extension configurations described above. The platen may be coupled to the remainder of the probe with a three-position cam arrangement, (optionally similar to a ball-point pen retracting system) or the like. At a packaged position **155**, the needles are disposed within the probe body, with the tissue-

engaging surface of platen **156** is positioned at or beyond distal ends of the needles so that the probe may be handled and positioned safely. At a treatment position **157**, needles **154** extend about 5 to 6 mm beyond the platen. At this treatment position **157**, 3 to 4 mm of the needles adjacent the tissue-engaging surface of the platen and probe body are insulated, while about 2 mm of needles **154** adjacent the needle distal ends are conductive and energized for heating tissue. This allows a good safety zone to avoid lesions and burning of the tissue surface engaged by the probe body. The platen at a maximum penetration position **159** allows the needles to extend well beyond the treatment position into the tissue, helping to avoid gaps between the probe body and intervening tissue when the needles are retracted to the treatment position as described above.

[0081] In some embodiments, the tissue-penetrating electrodes may include heat extractors to avoid tissue ablation adjacent the electrodes. Such tissue ablation may result in separation of the electrode surface from the tissue, increasing impedance and effectively ending treatment prematurely. Optionally, the needles may have an internal flow path or port for delivery of cooled saline, deionized water, or the like to an interior surface of the needle. This cooling fluid may be directed toward the distal portion of an internal lumen within the needle near the sharpened tip, but may not inject saline into the tissue. In other embodiments, a conductive fluid such as saline may be delivered through the needle and into the adjoining tissue, either for use as a cooling fluid or as a "wet electrode" to expand the effective treatment size. Cooling may optionally be effected by cryogenic cooling of the probe body and/or electrodes. As illustrated in **FIG. 21**C, expandable electrodes formed of a deformable material such as a shape-memory alloy may expand during heating so as to follow the tissue as it recedes adjacent to the electrode surface. In the exemplary embodiment, a two part electrode **180** is pulled together **182** when cold for insertion. Heating of the tissue and electrode **180** causes a shape memory alloy of the electrode to expand **184** against the tissue so as to maintain contact with the tissue.

[0082] Appropriate sizes, spacings, and numbers of tissue-penetrating electrodes may be determined from experiments similar to those noted above. A wide variety of probe configurations might be employed. A probe **156** illustrated in **FIG. 20D** may heat a target region having a length of 15 mm and a width of 25 mm with an array of 6 planar electrodes **158**, each active electrode being roughly 7 mm by 2-8 mm (optionally being 2 or 6.5 mm) by 0.25 mm. The pairs of electrodes can be spaced by about 10 mm, and may be capable of providing a treatment volume of 633 cubic millimeters heated to at least 70 C for at least 30 seconds. As illustrated in **FIG. 20B, a** probe **160** having 0.125" OD needle electrodes **162** spaced at 12 mm might instead produce a treatment volume of 712 cubic millimeters when heating the same region. Needles having smaller diameters will generally be in closer pairs. The probe **164** of **FIG. 20C** has smaller 20 gauge (0.035" OD) needles **166**, and may include **12** electrodes separated by 5 mm to generate the same region in two separate treatments (at least one middle electrode optionally being used as return electrode for two adjacent electrodes, with the middle electrode optionally being slightly larger to accommodate the greater current density), while a probe **168** of **FIG. 20A** having 16 gauge (0.065" OD) needles **170** may include 8 electrodes spaced at 8 mm.

[0083] Still further tissue-penetrating electrode configuration alternatives are possible. Along with vacuum systems and over-insertion/retraction arrangements to verify insertion depth, "C" shaped needles or corkscrew-shaped needles might also be employed. As illustrated in **FIGS. 21A and B**, "C" shaped curved electrodes **172** (or inwardly angled straight penetrating electrodes) may be advanced distally from a probe body **174** into a tissue **176** so that distal portions of an electrode pair are closer than proximal electrode portions. This allows treatment volumes **178** to be heated while inhibiting injury to an intervening tissue, optionally without insulating the proximal electrodes, due to the higher proximal impedance from the greater separation. To inhibit tissue ablation or desiccation adjacent tissue-penetrating electrodes, rotating the needle, vibrating the needle, or slowly advancing the needle if an impedance rise is observed during treatment may be beneficial.

[0084] Combinations of elements from the above probes can also be used. For example, as shown in **FIG. 22A and 22B**, one or more tissue-penetrating electrode needles (16 gauge) **186** may extend from a probe body surface **188** having one or more cooled surface electrodes **190**. As shown, needle **186** may have an insulated proximal portion **192** comprising a PE, PI, or epoxy coating or alternatively be coupled to a small insulator ring to achieve electrical isolation. The surface electrodes **190** (and optionally, penetrating electrodes) may be cooled cryogenically, with cooled fluid or the like. Where the tissue-penetrating electrode **186** is both electrically isolated from and thermally coupled to the cooled surface electrode **190**, ablation of tissue adjacent the penetrating electrode surface may be inhibited by a lower penetrating electrode surface temperature. Such surface electrodes **190** may also be used to reduce the number of tissue-penetrating electrodes **186** for a given treatment volume.

[0085] Referring now to **FIG. 23**, the development of treatment volume at a temperature of above 70° C. (left legend) as a function of dwell time is graphically illustrated. A non-invasive cooled electrode probe similar to that shown in **FIGS. 6 and 6A** heats tissue until the temperature sensing needle at 4.5 mm depth reaches a set point of 75° C. at 185 seconds. Following this set point, the RF energy is lowered and a dwell time of 45 seconds in maintained. The RF energy is then turned off at 230 seconds. The heat then remains for about 15 seconds after this point, to about 245 seconds. If the RF energy was turned off at the set point 185 seconds (i.e., no dwell time), the treatment volume of tissue above 70° C. between about 170 and 200 seconds would have been less than 70 cubic millimeters. In contrast, as shown in **FIG. 23**, the treatment volume of tissue above 70° C. between about 215 and 245 seconds is greater than 300 cubic millimeters, a four-fold increase over heating with no dwell period. Hence, dwell periods may play an important role in achieving increased treatment tissue volume.

[0086] Although certain exemplary embodiments and methods have been described in some detail, for clarity of understanding and by way of example, it will be apparent from the foregoing disclosure to those skilled in the art that variations, modifications, changes, and adaptations of such embodiments and methods may be made without departing from the true spirit and scope of the invention. Therefore, the above description should not be taken as limiting the scope of the invention which is defined by the appended claims.

US 2004/0193238 A1                                                                                      Sep. 30, 2004

10

What is claimed is:

1. A method for treating incontinence, the method comprising:

aligning a probe body with a collagenous pelvic tissue;

heating a treatment volume of at least 100 cubic millimeters of the collagenous tissue using the aligned probe body.

2. The method of claim 1, wherein the treatment volume is separated from a urethra by at least about 1 cm.

3. The method of claim 2, wherein the treatment volume is offset laterally from the urethra to a right side or left side.

4. The method of claim 2, wherein the treatment volume comprises at least 300 cubic millimeters of collagenous tissue, wherein the heating is performed so that the treatment volume is heated to a temperature of at least 70° C. for a time of at least 30 seconds, wherein the treatment volume is offset laterally from the urethra to a right side of a patient, and further comprising heating another treatment volume offset laterally from the urethra to a left side of the patient, the other treatment volume comprising at least 300 cubic millimeters of collagenous tissue and heated to at least 70° C. for at least 30 seconds.

5. The method of claim 1, wherein the treatment volume is heated to at least about 65° C. for at least about 100 seconds.

6. The method of claim 1, wherein the treatment volume is heated to at least about 75° C. for at least about 10 seconds.

7. The method of claim 1, further comprising applying a dwell time after a desired heating temperature is achieved so as to increase treatment tissue volume.

8. The method of claim 1, wherein the treatment volume has a length orientation extending along a urethra, a depth orientation extending between the collagenous tissue and the probe body, and a width that is greater than the length of the treatment volume.

9. The method of claim 1, wherein the treatment volume has a length orientation extending along a urethra, a depth orientation extending between the collagenous tissue and the probe body, and a width that is less than the length of the treatment volume.

10. The method of claim 1, further comprising registering a position of the treatment volume along an axis of the urethra with reference to a guide body disposed within the urethra.

11. The method of claim 1, further comprising registering a position of the treatment volume with reference to bone.

12. The method of claim 1, wherein the probe is aligned so that an intermediate tissue is disposed between the probe body and the treatment volume.

13. The method of claim 12, wherein the treatment volume comprises tissue separated from the aligned probe body by a distance within a range of about 2 to 8 mm.

14. The method of claim 12, wherein the treatment volume comprises tissue separated from the aligned probe body by a distance within a range of about 2 to 4 mm.

15. The method of claim 12, wherein the heating is performed so as to inhibit necrosis of the intermediate tissue.

16. The method of claim 15, wherein the heating is performed while cooling the intermediate tissue.

17. The method of claim 15, wherein the heating is performed without cooling of the intermediate tissue.

18. The method of claim 17, wherein the heating is performed by advancing a plurality of tissue-penetrating electrodes from the probe body into the treatment volume and applying electrical potential to the tissue-penetrating electrodes.

19. The method of claim 1, wherein the heating is performed by tip movement of at least a pair of electrodes supported by the probe body.

20. The method of claim 19, wherein the treatment volume increases as the tip movement speed decreases.

21. The method of claim 1, wherein the treatment volume comprises at least 300 cubic millimeters of collagenous tissue.

22. The method of claim 1, wherein the treatment volume comprises between about 100 cubic millimeters and about 800 cubic millimeters of collagenous tissue.

23. A system for treating incontinence of a patient having a collagenous pelvic tissue, the system comprising:

a probe body alignable with the collagenous pelvic tissue so that an intermediate tissue is disposed therebetween;

at least one energy delivery element supported by the probe body, the at least one energy delivery element capable of heating, from the aligned probe body, a treatment volume of at least 300 cubic millimeters of the collagenous tissue to a temperature of at least 70° C. for a time of at least 30 seconds so that the collagenous pelvic tissue contributes to continence.

24. The system of claim 23, further comprising at least one cooling element supported by the probe body so as to provide cooling of the intermediate tissue while heating the treatment volume.

25. The system of claim 24, wherein the at least one energy delivery element comprises a plurality of electrodes.

26. The system of claim 25, wherein the electrodes have a width of at least 20 mm and a length of less than 8 mm.

27. The system of claim 24, wherein the at least one energy delivery element comprises a distal or proximal pair of electrodes on the probe body.

28. The system of claim 24, wherein the at least one energy delivery element comprises a pair of elongated electrodes.

29. The system of claim 23, wherein the at least one energy delivery element comprises a plurality of tissue-penetrating elements.

30. The system of claim 29, wherein the tissue-penetrating elements comprise needle electrodes, blade electrodes, planar electrodes, C shaped electrodes, corkscrew shaped electrodes, or tissue-penetrating electrode tips.

31. The system of claim 29, wherein the tissue-penetrating elements comprise an array of two to twenty tissue-penetrating electrodes.

32. The system of claim 29, wherein the tissue-penetrating elements extend from a tissue-engaging surface by a distance within a range from about 0 to about 8 mm.

33. The system of claim 29, wherein the tissue-penetrating elements have a diameter in a range from about 0.035 inch to about 0.125 inch.

34. The system of claim 29, wherein proximal portions of the tissue-penetrating elements are electrically insulated.

35. The system of claim 29, wherein the tissue-penetrating elements comprise expandable electrodes.

US 2004/0193238 A1

Sep. 30, 2004

11

36. The system of claim 23, further comprising a guide body disposable within a urethra so as to register a position of the treatment volume along an axis of the urethra.

37. The system of claim 36, wherein the guide body further comprises axial position indicators or electromagnetic transmitters.

38. The system of claim 23, wherein the treatment volume comprises tissue separated from the aligned probe body by a distance within a range of about 2 to 8 mm.

39. The system of claim 23, wherein the treatment volume is separated from a urethra by at least about 1 cm.

40. The system of claim 39, wherein the treatment volume is offset laterally from the urethra to a right side or left side.

41. The system of claim 23, wherein the treatment volume has a length orientation extending along a urethra, a depth orientation extending between the collagenous tissue and the probe body, and a width that is greater than the length of the treatment volume.

42. The system of claim 23, wherein the treatment volume has a length orientation extending along a urethra, a depth orientation extending between the collagenous tissue and the probe body, and a width that is less than the length of the treatment volume.

43. The system of claim 23, wherein the treatment volume comprises between about 300 cubic millimeters and about 800 cubic millimeters of collagenous tissue.

44. The system of claim 23, wherein the at least one energy delivery element heats the treatment volume of tissue by the application of bipolar radio frequency energy.

45. A method for treating incontinence, the method comprising:

aligning a probe body with a collagenous pelvic tissue;

advancing a plurality of tissue-penetrating electrodes into the collagenous tissue from the aligned probe body; and

heating a treatment volume of at least 300 cubic millimeters of the collagenous tissue using the aligned probe, wherein the heating is performed so that the treatment volume is heated to a temperature of at least 70° C. for a time of at least 30 seconds.

46. A system for treating incontinence of a patient having a collagenous pelvic tissue, the system comprising:

a probe body alignable with the collagenous pelvic tissue;

a plurality of tissue-penetrating electrodes supported by the probe body, the electrodes capable of heating, from the aligned probe body, a treatment volume of at least 300 cubic millimeters of the collagenous tissue to a temperature of at least 70° C. for a time of at least 30 seconds so that the collagenous pelvic tissue contributes to continence.

47. The system of claim 46, further comprising at least one cooling element supported by the probe body so as to provide cooling of intermediate tissue while heating the treatment volume.

*    *    *    *    *

US006216704B1

# (12) United States Patent

Ingle et al.

(10) Patent No.: **US 6,216,704 B1**

(45) Date of Patent: **Apr. 17, 2001**

(54) **NONINVASIVE DEVICES, METHODS, AND SYSTEMS FOR SHRINKING OF TISSUES**

(75) Inventors: **Frank Ingle**, Palo Alto; **Garry L. Carter**, Pleasanton; **Robert J. Laird**, Richmond; **John P. Claude**, San Carlos; **Paul Do**, San Jose; **Brian J. Mosel**, Dublin, all of CA (US)

(73) Assignee: **SURx, Inc.**, Pleasanton, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/133,496**

(22) Filed: **Aug. 12, 1998**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 08/910,775, filed on Aug. 13, 1997, which is a continuation-in-part of application No. 08/910,369, filed on Aug. 13, 1997, now Pat. No. 6,035,238, which is a continuation-in-part of application 08/910,371, filed on Aug. 13, 1997, now Pat. No. 6,081,749.

(60) Provisional application No. 60/071,418, filed on Jan. 14, 1998, provisional application No. 60/071,419, filed on Jan. 14, 1998, provisional application No. 60/071,422, filed on Jan. 14, 1998, and provisional application No. 60/071,323, filed on Jan. 14, 1998.

(51) Int. Cl.$^7$ .......................................... **A61B 19/00**

(52) U.S. Cl. ............................. **128/898**; 606/41; 607/102; 607/105

(58) Field of Search .......................... 606/41, 42, 45–50; 607/101–105, 138; 128/898

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,679,561 | 7/1987 | Doss . |
| 5,003,991 | 4/1991 | Takayama et al. . |
| 5,314,456 | 5/1994 | Maurer et al. . |
| 5,314,466 | 5/1994 | Stern et al. . |
| 5,330,518 | * 7/1994 | Neilson et al. ..................... 607/101 |
| 5,348,554 | * 9/1994 | Imran et al. ..................... 606/41 |
| 5,370,675 | 12/1994 | Edwards et al. . |
| 5,385,544 | 1/1995 | Edwards et al. . |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 96/00041 | 1/1996 | (WO) . |
| WO 96/00042 | 1/1996 | (WO) . |
| WO 96/34568 | 11/1996 | (WO) . |
| WO 97/24992 | 7/1997 | (WO) . |
| WO 97/43970 | 11/1997 | (WO) . |
| WO 97/43971 | 11/1997 | (WO) . |
| WO 98/05286 | 2/1998 | (WO) . |
| WO 98/05380 | 2/1998 | (WO) . |
| WO 98/38936 | 9/1998 | (WO) . |
| WO 99/16502 | 4/1999 | (WO) . |

#### OTHER PUBLICATIONS

Linda J. Hayes et al., "Prediction of Transient Temperature Fields and Cumulative Tissue Destruction for Radio Frequency Heating of a Tumor" *Med. Phys.* 12:6 (Nov./Dec. 1995) pp. 684–692.

*Primary Examiner*—Michael Peffley

(74) *Attorney, Agent, or Firm*—Townsend Townsend & Crew LLP; Nena Bains, Esq.

(57) **ABSTRACT**

The invention provides improved devices, methods, and systems for shrinking of collagenous tissues, particularly for treating urinary incontinence in a noninvasive manner by directing energy to a patient's own support tissues. This energy heats fascia and other collagenous support tissues, causing them to contract. Pre-cooling and/or pre-heating may induce a temperature difference between the target tissue and the intermediate tissue prior to initiating RF heating. This allows the dimensions of tissue reaching the treatment temperature to be controlled and/or minimized, the dimensions of protected intermediate tissue to be maximized, and the like.

**9 Claims, 24 Drawing Sheets**



BTL EX1007

IPR2024-00703

U.S. Patent No. 8,961,511

## US 6,216,704 B1
Page 2

| U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|
| 5,405,346 | 4/1995 | Grundy et al. . | |
| 5,417,208 | 5/1995 | Winkler . | |
| 5,458,596 * | 10/1995 | Lax et al. | 606/31 |
| 5,480,417 | 1/1996 | Hascoet et al. . | |
| 5,496,312 | 3/1996 | Klicek . | |
| 5,514,130 | 5/1996 | Baker . | |
| 5,540,679 | 7/1996 | Fram et al. . | |
| 5,545,137 * | 8/1996 | Rudie et al. | 604/96 |
| 5,649,973 | 7/1997 | Tierney et al. . | |
| 5,697,281 | 12/1997 | Eggers et al. . | |
| 5,746,224 * | 5/1998 | Edwards | 128/898 |
| 5,755,753 | 5/1998 | Knowlton . | |
| 5,769,879 | 6/1998 | Richards et al. . | |
| 5,792,140 | 8/1998 | Tu et al. . | |
| 5,807,395 * | 9/1998 | Mulier et al. | 606/41 |
| 5,810,847 | 9/1998 | Laufer et al. . | |
| 5,871,524 | 2/1999 | Knowlton . | |
| 5,895,417 | 4/1999 | Pomeranz et al. . | |
| 5,919,219 | 7/1999 | Knowlton . | |
| 5,948,011 | 9/1999 | Knowlton . | |
| 5,957,920 * | 9/1999 | Baker | 606/33 |
| 6,015,407 | 1/2000 | Rieb et al. . | |

* cited by examiner



FIG. 1



FIG. 2



FIG. 2A



*FIG. 2B*



*FIG. 2C*



*FIG. 2D*



*FIG. 2E*



*FIG. 2F*



*FIG. 3*

*FIG. 3A*

*FIG. 3B*

*FIG. 3C*

*FIG. 3D*

*FIG. 3E*



*FIG. 4*
PRIOR ART



*FIG. 4A*
PRIOR ART



*FIG. 4B*
PRIOR ART



*FIG. 4C*
PRIOR ART



*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8A*



*FIG. 8B*



*FIG. 9*

**U.S. Patent**　　　**Apr. 17, 2001**　　　**Sheet 8 of 24**　　　**US 6,216,704 B1**



FIG. 10



FIG. 11



*FIG. 12*



*FIG. 12A*



*FIG. 12B*



*FIG. 12C*



*FIG. 12D*



*FIG. 12Di*



*FIG. 12Dii*



*FIG. 12E*

*FIG. 12F*



*FIG. 12G*



*FIG. 12H*



*FIG. 12I*



*FIG. 12J*



*FIG. 12K*



*FIG. 12L*



*FIG. 13*



*FIG. 13A*



*FIG. 13B*



*FIG. 13C*



*FIG. 13D*



*FIG. 13E*



*FIG. 13F*



*FIG. 13G*



*FIG. 13H*



*FIG. 13I*



*FIG. 13J*



*FIG. 13K*



*FIG. 13L*



*FIG. 13M*



*FIG. 14*



FIG. 15



FIG. 16A



FIG. 16B



*FIG. 16C*



*FIG. 17A*



*FIG. 17B*



*FIG. 18A*



*FIG. 18B*



*FIG. 18C*

US 6,216,704 B1

**1**

## NONINVASIVE DEVICES, METHODS, AND SYSTEMS FOR SHRINKING OF TISSUES

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of and claims the benefit of priority from U.S. patent application Ser. Nos. 08/910,775, 08/910,369 (now U.S. Pat. No. 6,035,238), and 08/910,371 (now U.S. Pat. No. 6,081,749), all filed Aug. 13, 1997, and U.S. Provisional Patent Application Nos. 60/071,418, 60/071,419, 60/071,422, and 60/071,323, all filed Jan. 14, 1998, the full disclosures of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention generally relates to medical devices, methods, and systems. More specifically, the present invention provides techniques for selectively heating and shrinking tissues, particularly for the noninvasive treatment of urinary incontinence and hernias, for cosmetic surgery, and the like.

Urinary incontinence arises in both women and men with varying degrees of severity, and from different causes. In men, the condition occurs most often as a result of prostatectomies which result in mechanical damage to the sphincter. In women, the condition typically arises after pregnancy where musculoskeletal damage has occurred as a result of inelastic stretching of the structures which support the genitourinary tract. Specifically, pregnancy can result in inelastic stretching of the pelvic floor, the external sphincter, and most often, to the tissue structures which support the bladder and bladder neck region. In each of these cases, urinary leakage typically occurs when a patient's intra-abdominal pressure increases as a result of stress, e.g. coughing, sneezing, laughing, exercise, or the like.

Treatment of urinary incontinence can take a variety of forms. Most simply, the patient can wear absorptive devices or clothing, which is often sufficient for minor leakage events. Alternatively or additionally, patients may undertake exercises intended to strengthen the muscles in the pelvic region, or may attempt behavior modification intended to reduce the incidence of urinary leakage.

In cases where such noninterventional approaches are inadequate or unacceptable, the patient may undergo surgery to correct the problem. A variety of procedures have been developed to correct urinary incontinence in women. Several of these procedures are specifically intended to support the bladder neck region. For example, sutures, straps, or other artificial structures are often looped around the bladder neck and affixed to the pelvis, the endopelvic fascia, the ligaments which support the bladder, or the like. Other procedures involve surgical injections of bulking agents, inflatable balloons, or other elements to mechanically support the bladder neck.

Each of these procedures has associated shortcomings. Surgical operations which involve suturing of the tissue structures supporting the urethra or bladder neck region require great skill and care to achieve the proper level of artificial support. In other words, it is necessary to occlude or support the tissues sufficiently to inhibit urinary leakage, but not so much that intentional voiding is made difficult or impossible. Balloons and other bulking agents which have been inserted can migrate or be absorbed by the body. The presence of such inserts can also be a source of urinary tract

**2**

infections. Therefore, it would be desirable to provide an improved therapy for urinary incontinence.

A variety of other problems can arise when the support tissues of the body have excessive length. Excessive length of the pelvic support tissues (particularly the ligaments and fascia of the pelvic area) can lead to a variety of ailments including, for example, cystocele, in which a portion of the bladder protrudes into the vagina. Excessive length of the tissues supporting the breast may cause the breasts to sag. Many hernias are the result of a strained, torn, and/or distended containing tissue, which allows some other tissue or organ to protrude beyond its contained position. Cosmetic surgeries are also often performed to decrease the length of support tissues. For example, abdominoplasty (often called a "tummy tuck") is often performed to decrease the circumference of the abdominal wall. The distortion of these support tissues may be due to strain, advanced age, congenital predisposition, or the like.

Unfortunately, many support tissues are difficult to access, and their tough, fibrous nature can complicate their repair. As a result, the therapies now used to improve or enhance the support provided by the ligaments and fascia of the body often involve quite invasive surgical procedures.

For these reasons, it would be desirable to provide improved devices, methods, and systems for treating fascia, tendons, and the other support tissues of the body. It would be particularly desirable to provide improved noninvasive or minimally invasive therapies for these support tissues, especially for the treatment of urinary incontinence in men and women. It would further be desirable to provide treatment methods which made use of the existing support structures of the body, rather than depending on the specific length of an artificial support structure.

2. Description of the Background Art

U.S. Pat. No. 5,423,811 describes a method for RF ablation using a cooled electrode. U.S. Pat. Nos. 5,458,596 and 5,569,242 describe methods and an apparatus for controlled contraction of soft tissue. An RF apparatus for controlled depth ablation of soft tissue is described in U.S. Pat. No. 5,514,130.

U.S. Pat. No. 4,679,561 describes an implantable apparatus for localized heating of tissue, while U.S. Pat. No. 4,765,331 describes an electrosurgical device with a treatment arc of less than 360 degrees. An impedance and temperature generator control is described in U.S. Pat. No. 5,496,312. Bipolar surgical devices are described in U.S. Pat. Nos. 5,282,799, 5,201,732, and 728,883.

### SUMMARY OF THE INVENTION

The present invention provides devices, methods, and systems for shrinking of collagenated tissues, particularly for treating urinary incontinence in a noninvasive manner. In contrast to prior art techniques, the present invention does not rely on implantation of balloons or other materials, nor does it rely on suturing, cutting, or other direct surgical modifications to the natural support tissues of the body. Instead, the present invention directs energy to a patient's own support tissues. This energy heats fascia and other collagenated support tissues, causing them to contract without substantial necrosis of adjacent tissues. The energy will preferably be applied through a large, cooled electrode having a substantially flat electrode surface. Such a cooled plate electrode is capable of directing electrical energy through an intermediate tissue and into fascia, while the cooled electrode surface prevents injury to the intermediate tissue. Ideally, the plate electrode comprises an electrode

US 6,216,704 B1

3

array which includes several discrete electrode surface segments so that the current flux can be varied to selectively target and evenly heat the fascia. In some embodiments, the tissue is heated between a pair of parallel cooled electrode surfaces, the parallel surfaces optionally being planar, cylindrical, spherical, or the like. Alternatively, the tissue may be treated with a bipolar probe, particularly after pre-cooling the intermediate tissue to selectively vary tissue impedance and thereby direct the heating current through the target tissue.

In a first aspect, the present invention provides a probe for therapeutically heating a target tissue of a patient body through an intermediate tissue. The probe comprises an electrode with an electrode surface which is engagable against the intermediate tissue. The electrode surface is substantially flat, and a cooling system is coupled to the electrode. The cooling system allows the electrode surface to cool the engaged intermediate tissue while an electrical current flux from the electrode surface therapeutically heats the target tissue.

The electrode surface will generally be sufficiently flat to direct the current flux through the cooled intermediate tissue and into the target tissue while the cooling system maintains the intermediate tissue at or below a maximum safe tissue temperature. To direct the current flux, heating may be provided between a pair of electrode surfaces, the electrode surfaces typically being separated by a distance from about ⅓ to about 5.0 times the least width of the electrodes, preferably being separated by a distance from about ½ to about 2.0 times the least electrode width. In many embodiments, a temperature sensor will monitor the temperature of the target tissue or the intermediate tissue. A control system will often selectively energize the electrode and/or cooling system in response to the monitored temperature.

In another aspect, the present invention provides a probe for applying energy to fascia from within the vagina of a patient body. The fascia is separated from the vagina by a vaginal wall. The probe comprises a probe body having a proximal end and a distal end, the probe having a length and a cross-section selected to permit introduction into the vagina. An energy transmitting element is mounted to the probe body. The transmitting element is capable of transmitting sufficient heating energy through the vaginal wall to heat and contract the fascia. A cooling system is disposed adjacent to the transmitting element. The cooling system is capable of maintaining the vaginal wall adjacent the probe below a maximum safe temperature when the fascia is heated by the transmitting element.

The present invention also provides a method for shrinking a target collagenated tissue within a patient body through an intermediate tissue. The method comprises directing energy from a probe, through the intermediate tissue, and into the target tissue. The energy heats the target tissue so that the target tissue contracts. The intermediate tissue is cooled with the probe to avoid injuring the intermediate tissue when the target tissue is heated by the probe.

In yet another aspect, the present invention provides a method for directing energy into a target tissue of a patient body through an intermediate tissue. The method comprises electrically coupling a first electrode to the patient body. A second electrode is electrically coupled to the intermediate tissue, the second electrode being mounted on a probe. The intermediate tissue is cooled by the probe, and an electrical potential is applied between the first and second electrodes. An electrode surface of the second electrode is sufficiently

4

large and flat to provide a current flux that extends through the cooled intermediate tissue so that the current flux heats the target tissue.

In yet another aspect, the present invention provides a method for therapeutically heating a target zone of a tissue within a patient body. The method comprises engaging a tissue adjacent to the target zone with a probe. The adjacent tissue is pre-cooled with the probe, and the target zone is heated by directing energy from the probe, through the pre-cooled adjacent tissue, and into the target zone.

In another aspect, the present invention provides a kit for shrinking a target collagenated tissue within a patient body through an intermediate tissue. The kit comprises a probe having an energy transmitting element adapted to direct an energy flux through the intermediate tissue and into the target tissue. A cooling system is adjacent to the transmitting element to cool the intermediate tissue. The kit also includes instructions for operating the probe. The instructions comprise the steps of directing energy from the energy transmitting element of the probe, through the intermediate tissue, and into the target tissue so as to heat and shrink the target tissue. The intermediate tissue is cooled with the cooling system of the probe to avoid injuring the intermediate tissue.

In a further aspect, the present invention further provides a method for teaching. The method comprises demonstrating cooling of a surface with a probe. Directing of energy from the probe is also demonstrated, the energy being directed through the surface and into the underlying structure to effect shrinkage of the structure.

In yet another aspect, the present invention provides a system for therapeutically heating a target zone within a tissue. The system comprises a first electrode having a first electrode surface which is engagable against the tissue. A second electrode has a second electrode surface which can be aligned substantially parallel to the first electrode surface, with the tissue positioned therebetween. An electrical current flux between these parallel electrodes can substantially evenly heat the target zone. A cooling system is coupled to at least one of the electrodes for cooling the electrode surface. Generally, radiofrequency current is used to avoid tissue stimulation.

In another aspect, the present invention provides a method for therapeutically heating a target zone of a patient body. The target zone is disposed within a tissue between first and second tissue surfaces. The method comprises engaging a first electrode surface against the first tissue surface. A second electrode surface is aligned substantially parallel with the first electrode surface and against the second surface. An electrical potential is applied between the first and second electrodes so as to produce an electrical current flux which heats the target zone. At least one of the first and second tissue surfaces is cooled by the engaged electrode.

The present invention also provides a probe for heating a target tissue of a patient body through an intermediate tissue. The probe comprises a probe body supporting an electrode array. The electrode array includes a plurality of electrode surface segments. The electrode surface segments are simultaneously engagable against the intermediate tissue, and a cooling system is coupled to the probe for cooling the electrode surface segments. A control system is also coupled to the electrode surface segments. The control system is adapted to selectively energize the electrode surface segments so as to heat the target tissue to a treatment temperature while the cooling system maintains the intermediate tissue (which is disposed between the electrode array and the target zone) at or below a maximum safe tissue temperature.

US 6,216,704 B1

**5**

In another aspect, the present invention provides a method for therapeutically heating a target zone of a tissue within a patient body. The method comprises engaging a probe against the tissue. The probe has a plurality of electrode surface segments, and the tissue is cooled adjacent the probe by the electrode surface segments. An electrical current flux is directed from the electrode surface segments, through the cooled tissue, and into the target zone by selectively energizing the electrode surface segments so that the current flux substantially evenly heats the target zone.

In some embodiments of the present invention, tissue contraction energy will preferably be in the form of a radiofrequency (RF) electrical current applied through an electrolytic solution. Often times, the electrolytic solution will be introduced into the patient's bladder through a transurethral probe, and will provide electrical coupling between an electrode of the probe and the bladder wall. To enhance control over the therapeutic heating and shrinking of tissues applied internally through an electrolytic solution, a controlled volume of both the electrolytic solution and an electrically and thermally insulating gas can be introduced into the patient's bladder (or some other hollow body organ). By orienting the patient so that the electrically conductive solution is positioned within the bladder adjacent the pelvic support tissues, the conductive solution can transmit electrical current over a relatively large and fairly well controlled interface between the conductive solution and the bladder wall, while the gas prevents transmission of the RF energy to the delicate abdominal tissues above the bladder.

The electrically conductive solution may also provide direct cooling of the bladder wall before, during, and/or after the therapeutically heating RF energy is transmitted. Such cooling may be enhanced by circulating chilled conductive solution through the bladder, optimizing the electrical properties of the solution to minimize heat generated within the solution, and the like. In the exemplary embodiment, the RF energy is transmitted between the electrolyte/bladder wall interface and a cooled, substantially flat electrode of a vaginal probe so as to shrink the endopelvic fascia therebetween and thereby inhibit incontinence.

In this aspect of the present invention, a method for heating a target tissue within a patient body heats tissue separated from a body cavity by an intermediate tissue. The method comprises introducing a conductive fluid into the cavity. An electrical current is passed from the conductive fluid, through the intermediate tissue, and into the target tissue to effect heating of the target tissue. The intermediate tissue is cooled by the conductive fluid. The conductive fluid will generally comprise an electrolytic solution such as saline, and the saline will preferably be chilled. Advantageously, by directing RF current between such a chilled electrolytic solution and a large cooled plate electrode, an intermediate collagenated tissue therebetween can be selectively raised above about 60 nC, thereby inducing shrinkage. The tissue which is engaged directly by the cooled electrode and chilled electrolytic solution (on either side of the collagenated tissue) is preferably maintained below a maximum safe temperature of about 45 nC.

In another aspect, the invention provides a method for shrinking a target tissue within a patient body. The target tissue is separated from a body cavity by an intermediate tissue. The method comprises introducing a conductive fluid and an insulating fluid into the cavity. These fluids are positioned within the cavity by orienting the patient. The conductive and insulating fluids will have differing densities, and the patient will be oriented so that the conductive fluid is disposed adjacent the target tissue, while the

**6**

insulating fluid is disposed away from the target tissue. The target tissue can then be heated by passing an electrical current from the conductive fluid, through the intermediate tissue, and into the target tissue. The intermediate tissue can also be cooled by the conductive fluid. The conductive fluid will often comprise an electrolytic liquid such as saline, while the insulating fluid will typically comprise a gas such as air, carbon dioxide, or the like. By carefully controlling the volumes of these fluids within the body cavity, and by properly orienting the patient, gravity and the differing electrical properties of these contained fluids can be used to selectively transfer RF current from an electrode to a relatively large, controlled surface area of the body cavity without requiring the introduction of a large or mechanically complex electrode structure.

In another aspect, the present invention provides a method for treating urinary incontinence. The method comprises introducing a fluid into the bladder, and transmitting electrical current from the fluid, through the bladder wall, and into a pelvic support tissue so that the current heats and shrinks the pelvic support tissue and inhibits urinary incontinence. The bladder wall is cooled with the conductive fluid.

In another aspect, the present invention provides a system for shrinking a pelvic support tissue of a patient body. The pelvic support tissue is separated from a urinary bladder by a bladder wall. The system comprises a first probe having a proximal end and a distal end adapted for transurethral insertion into the bladder. A first electrode is disposed near the distal end, as is a fluid in-flow port. A sealing member is proximal of the in-flow port for sealing a conductive fluid within the bladder such that the first electrode is electrically coupled to the bladder wall by the conductive fluid. A second electrode is adapted for transmitting current to a tissue surface of the patient body without heating the tissue surface. A power source is coupled to the first and second electrodes to heat and shrink the pelvic support tissue. In many embodiments, the second electrode will comprise a cooled plate electrode of a vaginal probe, so that the endopelvic fascia can be selectively heated between the vagina and the conductive fluid within the bladder.

In another aspect, the present invention provides a system for shrinking a pelvic support tissue of a patient body. The pelvic support tissue is separated from a urinary bladder by a bladder wall. The system comprises a first probe having a proximal end, a distal end adapted for transurethral insertion into the bladder, and a first electrode near the distal end. A second probe has a proximal end, a distal end adapted for insertion into the vagina, and a second electrode near the distal end. A power source is coupled to the first and second electrodes to heat and shrink the pelvic support tissue. Generally, the first probe will also include a tordial balloon or other member for sealing around the circumference of the probe, thereby allowing saline or some other conductive fluid to be captured within the bladder. In some embodiments, in-flow and out-flow ports distal of the balloon may allow circulation of chilled saline or the like, enhancing the direct cooling of the bladder wall. One or more gas ports may also be provided distal of the balloon for introducing and/or controlling a volume of air, $CO_2$ or some other insulating gas, or such gasses may alternatively pass through the conductive fluid ports. By carefully controlling the volumes of air and saline within the bladder, and by orienting the patient so that the saline is only in contact with the bladder wall adjacent the endopelvic fascia, such a structure can provide both selective electrical conduction and cooling over a large, controlled surface of the bladder wall with very little mechanical complexity or trauma.

US 6,216,704 B1

7

In general, the tissue contraction energy of the present invention can be applied as intermittent pulses of radiofrequency (RF) electrical current transmitted between cooled electrodes. The electrodes will ideally be large, relatively flat plates having rounded edges, but may alternatively comprise a curved conductive surface of an inflatable balloon, or the like. These electrodes will preferably be oriented toward each other, and will generally be actively cooled while electrodes are energized by a RF potential, and between RF pulses. Cooling will preferably also be provided both before and after the heating cycles, and needle mounted temperature sensors will ideally provide direct feedback of the tissue temperature so that selected treatment zone is heated to about 60 nC or more, while heating of the tissues adjacent the electrodes is limited to about 45 nC or less.

In one aspect, the present invention provides a method for heating and/or shrinking a target tissue within a patient body. The target tissue is separated from a tissue surface by an intermediate tissue. The method comprises coupling an electrode of a probe to the tissue surface and cooling the intermediate tissue with the probe. The electrode is intermittently energized to heat, and preferably to shrink, the target tissue through the cooled intermediate tissue. Typically, current is driven through the electrode for between about 10 and 50% of a heating session. For example, the electrode may be energized for 15 secs. and turned off for 15 secs. repeatedly during a heating session so that current is driven from the electrode for about 50% of the duty cycle.

In another aspect, the invention provides a system for shrinking a target tissue of a patient body. The system comprises a probe having a first electrode for electrically coupling the probe to the tissue surface. A second electrode can be coupled to the patient body, and a controller is coupled to the first and second electrodes. The controller is adapted to intermittently energize the electrodes with an RF current so that the electrodes heat and shrink the target tissue, often while minimizing collateral damage to tissues surrounding the target tissue. In many embodiments, The target tissue is separated from a tissue surface by an intermediate tissue. A cooling system may be disposed adjacent the electrode, so that the cooling system can maintain the intermediate tissue below a maximum safe temperature. Generally, the cooling system will cool both the first electrode and the intermediate tissue engaged by the electrode surface.

As described above, the energy to heat and selectively shrink the target collagenated support tissues will preferably be applied by conducting radiofrequency (RF) electrical current through tissue disposed between large, cooled plate electrodes. These electrodes will preferably be sufficiently parallel to each other and in alignment so as to direct the current flux evenly throughout a target region of the target tissue. To maintain this alignment, the electrodes will generally be mechanically coupled to each other, ideally using a clamp structure which allows the target tissue to be compressed between the electrode surfaces. Compressing the tissues can enhance the uniformity of the heating, particularly when the tissue is compressed between the electrode surfaces so that the surfaces are separated by less than their widths. Cooling of the electrodes can limit heating of tissues adjacent the electrode surfaces to about 45 nC or less, even when the treatment zone between the electrodes is heated to about 60 nC or more so as to effect shrinkage.

In this aspect, the present invention provides a device for therapeutically heating tissue. The device comprises a first electrode having an electrode surface. A cooling system is

8

thermally coupled to the first electrode. A second electrode is mechanically coupled to the first electrode. The second electrode has an electrode surface oriented toward the first electrode surface.

Generally, a clamp structure couples the electrodes and allows the tissues to be compressed between parallel electrode surfaces. The clamp structure will often be adapted to maintain the electrode surfaces in alignment to each other, and also to maintain the electrode surfaces sufficiently parallel so as to direct an even electrical current flux through a target region of the clamped tissue. At least one of the electrodes will preferably be mounted on a probe adapted for insertion into a patient body. The probe will ideally be adapted for noninvasive insertion into a body cavity through a body orifice. The clamp structure will preferably vary a separation distance between electrodes mounted on two such probes, and a temperature sensor will ideally be extendable into the target tissue to provide feedback on the heating process. The temperature sensor can be mounted on a needle which is retractably extendable from adjacent one of the electrodes toward the other, or the needle may protrude permanently so as to extend into the target tissue as the electrode surfaces are clamped together.

In another aspect, the present invention provides a method for selectively shrinking a target tissue. The method comprises clamping a target tissue between a plurality of electrode surfaces. The clamped target tissue is heated by transmitting a current flux between the electrode surfaces. At least one of the electrode surfaces is cooled to limit heating of intermediate tissue disposed between the at least one electrode and the target tissue.

According to another aspect of the invention, the energy can be in the form of focused ultrasound energy. Such ultrasound energy may be safely transmitted through an intermediate tissue at lower power densities so as to avoid and/or minimize collateral damage. By focusing the ultrasound energy at a target region which is smaller in cross section than the ultrasound energy transmitter, the power densities at the target region will be sufficiently high to increase the temperature of the target tissue. Preferably, the target tissue will be raised to a temperature of about 60 nC or more, while the intermediate tissue remains at or below a maximum safe temperature of about 45 nC. A cooling system may actively cool the intermediate tissue.

Targeting flexibility is enhanced by using a phased array ultrasound transmitter. Such phased array transmitters will be particularly beneficial for selectively shrinking fascia, ligaments, and other thin support tissues of the body, particularly where those tissues are disposed roughly parallel to an accessible tissue surface. Focused ultrasound energy is particularly well suited for heating and shrinking the pelvic support tissues from a vaginal probe.

In this aspect, the present invention provides a method for heating a target tissue within a patient body. The target tissue is separated from a tissue surface by an intermediate tissue. The method comprises acoustically coupling an ultrasound transmitter to the tissue surface. The ultrasound energy is focused from the transmitter, through the intermediate tissue, and onto the target tissue so that the target tissue is therapeutically heated. Preferably, the focused ultrasound energy heats and shrinks a collagenated tissue. In the exemplary embodiment of the present method, the ultrasound transmitter is inserted into a vagina of the patient body to shrink an endopelvic support tissue so that incontinence is inhibited.

In another aspect, the present invention provides a system for heating a target tissue. The system comprises a probe

US 6,216,704 B1

**9**                                                          **10**

having an ultrasound transmitter for focusing ultrasound energy through the intermediate tissue so as to heat the target tissue. Preferably, a temperature sensor is coupled to the probe and exposed to at least one of the intermediate tissue and the target tissue for sensing a tissue temperature. In many embodiments, a controller is coupled to the probe. The controller will generally be adapted to direct the ultrasound energy from the transmitter into the target tissue so as to heat the target tissue to about 60 nC or more. The controller will typically limit a temperature of the intermediate tissue to about 45 nC or less.

In yet another aspect, the present invention provides a method for selectively heating a predetermined target tissue. The target tissue is disposed adjacent another tissue, and the method comprises generating a temperature differential between the adjacent tissue and the target tissue. The target tissue is heated by conducting a heating electrical current into the target tissue after generating the temperature differential. The heating current is conducted so that the temperature differential urges the heating current from the adjacent tissue into the target tissue.

In a related aspect, the invention provides a system for selectively heating a predetermined target tissue. The target tissue is disposed adjacent another tissue, and the system comprises a probe having a surface oriented for engaging a tissue surface. A pre-cooler or a pre-heater is coupled to the probe surface so as to produce a temperature differential between the target tissue and the adjacent tissue. At least one tissue-heating electrode is couplable to the target tissue to conduct an electrical current into the tissues. The heating electrode defines a nominal current distribution when the current is conducted into the tissues and the tissues are at a uniform body temperature. The heating electrode produces a tailored current distribution when the current is conducted into the tissues and the tissues exhibit the temperature differential. The tailored current distribution results in less collateral damage to the adjacent tissue than the nominal current distribution when the target tissue is heated by the current to a treatment temperature.

In a final aspect, the invention provides a probe for selectively heating a target tissue. The target tissue is separated from a tissue surface by an intermediate tissue. The probe comprises a surface oriented for engaging the tissue surface. A pair of bi-polar electrodes are disposed along the probe surface. A cooling system is thermally coupled to the electrodes and to the probe surface, adjacent the electrodes, so as to cool the intermediate tissue.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of a system for heating and shrinking fascia disposed between adjacent tissue layers by heating the fascia between a pair of large, cooled, flat electrode arrays, according to the principles of the present invention.

FIG. 2 schematically illustrates the even heating provided by a current flux between the large, cooled, flat electrode surfaces of the system of FIG. 1.

FIGS. 2A–2F schematically illustrate structures and methods for selectively energizing the electrode surface segments of the large, flat electrode arrays of the system of FIG. 1 to tailor the current flux throughout a target zone.

FIGS. 3–3E graphically illustrate a method for heating a target tissue between cooled electrodes, wherein the electrode surfaces cool the tissue before, during, and after radiofrequency energy is applied.

FIG. 4 is a cut-away view illustrating pelvic support structures which can be targeted for non-invasive selective contraction using the methods of the present invention.

FIGS. 4A–4C illustrate contraction and reinforcing of the pelvic support tissues of FIG. 4 as a therapies for female urinary incontinence.

FIG. 5 is a perspective view of a system for treating female urinary incontinence by selectively shrinking the endopelvic fascia, according to the principles of the present invention.

FIG. 6 is a cross-sectional view illustrating a method for using the system of FIG. 5 to treat female urinary incontinence.

FIG. 7 illustrates an alternative bladder electrode structure for use in the method of FIG. 6.

FIGS. 8A and 8B illustrate an alternative vaginal probe having a balloon deployable electrode for use in the method of FIG. 6.

FIG. 9 is a cross-sectional view illustrating a structure and a method for ultrasonically positioning a temperature sensor within a target tissue.

FIG. 10 illustrates an alternative system for selectively shrinking fascia through intermediate tissues, according to the principles of the present invention.

FIG. 11 schematically illustrates an alternative method for selectively shrinking endopelvic fascia using a vaginal probe having a cooled electrode array and a return electrode.

FIG. 12 schematically illustrates cooled bipolar probe and a method for its use to selectively shrink endopelvic fascia by applying a bipolar potential between electrode segments of the probe, the method including electrically insulating a surface of the endopelvic fascia opposite the probe to limit the depth of heating.

FIGS. 12A–L illustrate a variety of cooled bi-polar probes and methods for their use to selectively heat tissues separated from the probe by an adjacent tissue.

FIG. 13 schematically illustrates a method for selectively shrinking endopelvic fascia by transmitting microwave or ultrasound energy from a cooled vaginal probe.

FIGS. 13A–M illustrate alternative focused ultrasound probes for remotely heating tissues, the probes having phased array ultrasound transmitters with either an annular or linear array geometry.

FIG. 14 is a cross-sectional view illustrating a method for selectively shrinking endopelvic fascia by grasping and folding the wall of the vagina or colon to facilitate focusing of heating upon the fascia, and to enhance shrinkage of the fascia by decreasing tension in the fascia while the fascia is heated, according to the principles of the present invention.

FIG. 15 is a schematic illustration of a kit including the vaginal probe of FIG. 5, together with instructions for its use to shrink tissues, according to the methods of the present invention.

FIGS. 16A–C illustrate structures and methods for selectively transmitting an RF current flux through a conductive fluid within the bladder while cooling the bladder wall with the fluid, according to the principles of the present invention.

FIGS. 17A and B illustrate an alternative probe for use with a conductive fluid, the probe having both a toroidal balloon for sealing the conductive fluid and an insulating gas within the bladder, and a spoon shaped balloon supporting an electrode surface, whereby the endopelvic fascia between the bladder electrode and a cooled plate electrode of a vaginal probe may be heated and shrunk.

FIGS. 18A–C illustrates a clamping structure having a transvaginal probe and a transrectal probe, in which each of the probes includes an electrode surface, and in which the

US 6,216,704 B1

**11**

probes are mechanically coupled by a clamping structure for compressing the targeted endopelvic fascia (together with intermediate tissues) between a pair of opposed, cooled plate electrodes.

## DETAILED DESCRIPTION OF THE SPECIFIC EMBODIMENTS

The present invention optionally relies on inducing controlled shrinkage or contraction of a support tissue of the body, typically being a collagenated tissue such as fascia, ligament, or the like. For treatment of urinary incontinence, the tissue structure will be one that is responsible in some manner for control of urination, or for supporting a such a tissue. Exemplary tissue structures include the urethral wall, the bladder neck, the bladder, the urethra, bladder suspension ligaments, the sphincter, pelvic ligaments, pelvic floor muscles, fascia, and the like. Treatment of other conditions may be effected by selective shrinking of a wide variety of other tissues, including (but not limited to) the diaphragm, the abdominal wall, the breast supporting ligaments, the fascia and ligaments of the joints, the collagenated tissues of the skin, and the like. Related devices, methods, and system are also described in co-pending U.S. patent application Ser. No. 08/910,370, filed Aug. 13, 1997.

Tissue contraction results from controlled heating of the tissue by affecting the collagen molecules of the tissue. Contraction occurs as a result of heat-induced uncoiling and repositioning of the collagen $\beta$-pleated structure. By maintaining the times and temperatures set forth below, significant tissue contraction can be achieved without substantial collateral tissue damage.

The temperature of the target tissue structure will generally be raised to a value in the range from about 60 nC to 110 nC, often being in the range from about 60 nC to 80 nC, and will generally effect a shrinkage of the target tissue in at least one dimension of between about 20 and 50 percent. In many embodiments, heating energy will be applied for a period of from 30 seconds to 5 minutes. These heating times will vary with separation between the parallel plate electrodes, with a heat time of about 5 minutes often being appropriate for an electrode separation of about 4 cm. Shorter heat times may be used with smaller electrode separation distances.

The rise in temperature may be quite fast, although there will often be advantages in heating tissues more slowly, as this will allow more heat to be removed from tissues which are not targeted for therapy, thereby minimizing collateral damage. However, if too little heating energy is absorbed by the tissue, blood perfusion will transfer the heat away from the targeted tissue, so that the temperature will not rise sufficiently to effect therapy. Fortunately, fascia and other support tissues often have less blood flow than adjacent tissues and organs; this may help enhance the heating of fascia and minimize damage to the surrounding structures.

The total amount of energy delivered will depend in part on which tissue structure is being treated, how much tissue is disposed between the target tissue and the heating element, and the specific temperature and time selected for the protocol. The power delivered will often be in the range from 10 W to 200 W, usually being about 75 W. The temperature will usually not drop instantaneously when the heating energy stops, so that the tissue may remain at or near the therapy temperature for a time from about 10 seconds to about 2 minutes, and will often cool gradually back to body temperature.

While the remaining description is generally directed at devices and methods for treatment of urinary stress incon-

**12**

tinence of a female patient, it will be appreciated that the present invention will find many other applications for selectively directing therapeutic heating energy into the tissues of a patient body for shrinking of tissues, for ablation of tissues and tumors, and the like.

FIG. 1 schematically illustrates a system **10** for shrinking a fascia F disposed between first and second adjacent tissues T1, T2. System **10** includes a pair of electrodes **12, 14** having large, substantially planar tissue engaging surfaces. Electrodes **12, 14** are aligned substantially parallel to each other with the fascia (and adjacent tissues) disposed therebetween.

The surfaces of electrodes **12, 14** which engage the tissue are cooled by a cooling system **16**. The cooling system will typically include a conduit through the electrode for the circulation of a cooling fluid, but may optionally rely on thermoelectric cooling or the like. The temperature of the electrode surface may be regulated by varying the temperature or flow rate of the cooling fluid. Cooling may be provided through the use of an ice bath, by endothermic chemical reactions, by standard surgical room refrigeration mechanisms, or the like. Ideally, the cooling system cools an area which extends beyond the energized electrode surfaces to prevent any hot spots adjacent the tissue surface, and to maximize the heat removal from the tissue without chilling it to or below temperatures that irreversibly damage the tissue, such as might occur when freezing the tissue.

Each of the electrodes is separated into a plurality of electrode segments. For example, the electrode includes electrode segments **12a, 12b, 12c, 12d**, and **12e**, each of which is electrically isolated from the others. This allows the electrode segments to be individually energized. Electrodes **12, 14** are energized by a radiofrequency (RF) power source **18**. Multiplexers **20** individually energize each electrode segment, typically varying the power or time each segment is energized to more nearly uniformly heat fascia F. A controller **22** will typically include a computer program which directs the application of cooling flow and RF power through electrodes **12, 14**, ideally based at least in part on a temperature signal sensed by a temperature sensor **24**. Temperature sensor **24** may sense the temperature of the electrode, the tissue at the tissue/electrode interface, the intermediate tissue, or may alternatively sense the temperature of the fascia itself. Alternatively, the controller may direct the cooling/heating therapy in an open loop manner using dosimetry.

The use of large cooled plate electrodes to direct an even electrical current flux can be understood with reference to the simplified cross-sectional illustration of FIG. **2**. In this example, RF power is applied uniformly across parallel plate electrodes **12, 14** to produce a current through tissue T. As the electrode surfaces are substantially planar, and as the length and width of the electrode surfaces are large compared to the separation between the electrodes, a current flux **26** is substantially uniform throughout that portion of the tissue which is disposed between the electrode surfaces. The flow of electrical current through the electrical resistance of the tissue causes the temperature of the tissue through which the current passes to rise. The use of a radiofrequency current of relatively low voltage, preferably in the range from 100 kHz to 1 MHz, helps to avoid arcing and damage to tissue in direct contact with the electrodes.

Preliminary work in connection with the present invention has shown that fascia and other collagenated tissues which are heated to a temperature range of between about 60 nC and 140 nC, often being in a range from about 60 nC to

US 6,216,704 B1

**13**

about 110 nC, and preferably between about 60 nC and 80 nC, will contract. In fact, unstressed fascia will shrink between about 30% and 50% when heated for a very short time, preferably from between about 0.5 seconds to 5 seconds. Such heating can easily be provided by conduction of RF currents through the tissue.

The uniform current flux provided by the large plate electrodes of the present invention will produce a substantially uniform heating of the tissue which passes that current. To selectively target a central portion of the tissue, in other words, to selectively heat a target portion of the tissue separated from electrodes 12, 14, the electrode surfaces are cooled. This cooling maintains a cooled tissue region 28 adjacent each electrode below a maximum safe tissue temperature, typically being below about 45 nC. Even though heat generation throughout the gap between the electrodes is uniform, the temperature profile of the tissue between the electrodes can be controlled by removing heat through the electrode surfaces during heating.

Generally, sufficient heating can be provided by a current of between about 0.2 and 2.0 amps, ideally about 1.0 amp, and a maximum voltage of between about 30 and 100 volts rms, ideally being about 60 volts rms. The electrodes will often have a surface area of between about 5.0 and 200 cm$^2$, and the current density in the target tissue will often be between about 1 mA/cm$^2$ and 400 mA/cm$^2$, preferably being between about 5 mA/cm$^2$ and 50 mA/cm$^2$. This will provide a maximum power in the range from about 10 W to about 200 W, often being about 20 watts. Using such low power settings, if either electrode is lifted away from the engaged tissue, there will be no arcing. Instead, the current will simply stop. This highlights the difference between the electrical tissue heating of the present invention and known electrosurgical techniques.

The ideal geometry to provide a true one-dimensional temperature distribution would include large parallel plate electrodes having relatively minimal spacing therebetween. As tissues which are easily accessible for such structures are fairly limited, the present invention can also make use of electrode geometries which vary somewhat from this ideal, particularly through the use of array electrodes. In fact, the use of a single array electrode, in combination with a much larger, uncooled electrode pad may heat tissues disposed near the array, as will be described hereinbelow. Nonetheless, uniform heating is generally enhanced by providing electrode structures having tissue engaging surfaces which are as flat and/or as parallel as practical. Preferably, the parallel electrode surfaces will be separated by between about 1/3 and 5.0 times the width of the electrode surfaces (or of the smaller surface, if they are different).

The use of an array electrode having multiple electrode segments can be understood with reference to FIGS. 2A–2D. FIG. 2A schematically illustrates the shape of a target zone which is heated by selectively energizing only electrode segments 12c and 14c of cooled electrodes 12 and 14. Once again, it should be understood that the temperature of target zone 32 (here illustrated schematically with isotemperature contour lines 30) is the result of uniform heating between the energized electrode segments, in combination with cooling of tissue T by the electrode surfaces. To expand the heated area laterally between the electrodes, electrode segments 12a, 12b, 12c . . . , and 14a, 14b, 14c . . . , can be energized, thereby heating an entire target zone 32 extending throughout tissue T between the electrodes.

The use of array electrodes provides still further flexibility regarding the selective targeting of tissues between elec-

**14**

trodes 12 and 14. As illustrated in FIG. 2C, selectively energizing a relatively large effective electrode surface by driving electrodes segments 12a, 12b, 12c, 12d, and 12e results in a low current flux which is widely disbursed throughout the tissue T engaged by electrode 12. By driving this same current through a relatively small effective electrode surface using only a single electrode surface segment 14c produces an offset target zone 34 which is laterally smaller than and much closer to electrode 14 than to electrode 12.

To compensate for electrode structures which are not exactly parallel, varying amounts of electrical current can be provided to the electrode segments. For example, a fairly uniform target zone 32 may be heated between angled electrodes by driving more current through relatively widely spaced electrode segments 12a, 14a, and driving less current through more tightly spaced electrode segments 12e, 14e, as illustrated in FIG. 2D. Alternatively, the same current may be driven between the segments, but for different intermittent duty cycles. It should be understood that these selective targeting mechanisms may be combined to target fascia and other tissues which are near one slanted electrode, or to selectively target only a portion of the tissues disposed between relatively large electrode arrays.

An exemplary structure for segmented, cooled electrode 12 is schematically illustrated in FIGS. 2E and F. Electrode 12 here comprises three electrode surface segments 12a, 12b, and 12c separated by insulating spaces 21. A plastic housing 23 defines a flow path between a cooling inflow port 25 and a cooling outflow port 27, while heat transfer between the cooling fluid and the electrode surface is enhanced by a thermally conductive front plate 29. Front plate 29 generally comprises a thermally conductive metal such as aluminum. Electrode surface segments 12a, 12b, and 12c may comprise surfaces of separated segments 31 of aluminum foil. Segments 31 may be electrically isolated and thermally coupled by a thin mylar insulation sheet 33 disposed between the segments and front plate 29.

The array electrode structures of the present invention will generally include a series of conductive surface segments which are aligned to define a substantially flat electrode surface. The electrode surface segments are separated by an electrically insulating material, with the insulation being much smaller in surface area than the conductive segments. Typically, there will be between 1.0 and 8.0 electrode segments, which are separated by a distance of between about 0.25 mm and 1.0 mm.

In some embodiments, the peripheral edges of the electrode segments may be rounded and/or covered by an insulating material to prevent concentrations of the electrical potential and injury to the engaged tissue surfaces.

It should also be understood that while the electrode arrays of the present invention are generally herein described with reference to a linear array geometry, the present invention also encompasses electrodes which are segmented into two-dimensional arrays. Where opposed sides of the tissue are accessible for relatively large array structures, such as along the exposed skin, or near the major cavities and orifices of the body, the electrode surfaces will preferably be separated by a gap which is less than a width (and length) of the electrodes.

In some embodiments, one electrode structure may be disposed within a large body cavity such as the rectum or vagina, while the other is placed in an adjacent cavity, or on the skin so that the region to be treated is between the electrode surfaces. In other embodiments, one or both elec-

US 6,216,704 B1

**15**

trodes may be inserted and positioned laparoscopically. It will often be desirable to clamp the tissue tightly between the electrodes to minimize the gap therebetween, and to promote efficient coupling of the electrode to the tissue.

As can be understood with reference to FIGS. 3–3E, the tissue will preferably be cooled before and after energizing of the electrodes. FIG. 3 illustrates three distinct regions of tissue T disposed between electrodes 12 and 14. Target zone 32 will typically comprise fascia or some other collagenated tissue, while the surfaces of the electrodes engage an intermediate tissue 36 disposed on either side of the fascia.

It will generally be desirable to maintain the temperature of intermediate tissue 36 below a maximum safe tissue temperature to prevent injury to this intermediate tissue, the maximum safe tissue temperature typically being about 45 nC. To effect shrinkage of fascia, target zone 32 will typically be heated to a temperature above about 60 nC, and often to a temperature at or above 70 nC.

There will often be a region of stunned tissue 38 disposed between the safely cooled intermediate tissue 36 and the target zone 32. This stunned tissue will typically be heated in the range from about 45 nC to about 60 nC, and may therefore undergo some limited injury during the treatment process. As a result, it is generally desirable to minimize the time this tissue is at an elevated temperature, as well as the amount of stunned tissue.

As illustrated in FIG. 3A, prior to application of cooling or heating energy, the temperature profile of tissue T along an axis X between electrodes 12 and 14 is substantially uniform at body temperature (approximately 37 nC). The tissue will preferably be pre-cooled by the surfaces of electrodes 12, 14, generally using an electrode surface temperature of at or above 0 nC. Pre-cooling will substantially decrease the temperature of intermediate tissues 36, and will preferably at least partially decrease the temperature of stunned tissue 38. At least a portion of the target zone remains at or near the initial body temperature, as illustrated in FIG. 3B. Pre-cooling time will often depend on electrode separation and tissue heat diffusivity.

As will be explained in more detail regarding FIGS. 12–12L, pre-cooling (and/or pre-heating) of selective portions of the tissue engaged by a cooled electrode can alter the electrical current densities within tissues so as to provide selective, localized heating. Referring to FIG. 3B, intermediate tissue 36 exhibits a substantial temperature differential as compared to target tissue 32. As a result of this temperature differential, the electrical impedance of an immediate tissue 36 has been enhanced relative to target tissue 32. This does not necessarily mean that the impedance of the intermediate tissue is now greater than that of the target tissue (although this will often be the case). Regardless, as compared to the tissues at uniform body temperature, the temperature differential between the target and intermediate tissues can now be used to help enhance selective heating of the target tissue while minimizing collateral damage to the adjacent tissue.

Once the tissue has been pre-cooled, the RF current is directed through the tissue between the electrodes to heat the tissue. A temperature sensor can be placed at the center of target zone 32 to help determine when the pre-cooling has been applied for the proper time to initiate RF heating. The current flux applies a fairly uniform heating throughout the tissue between the electrodes, and the electrode surfaces are often cooled throughout the heating process. As target zone 32 has the highest temperature upon initiation of the heating cycle, and as the target zone is farthest from the cooled

**16**

electrodes, a relatively small amount of heat flows from the target zone into the cooled electrodes, and the target zone is heated to a significantly higher temperature than intermediate tissue 36.

Heat is applied until the target zone is at or above a treatment temperature, typically resulting in a temperature distribution such as that illustrated in FIG. 3C. To minimize collateral damage to the adjacent tissues 36 and stunned tissue 38, the cooling system continues to circulate cold fluid through the electrode, and to remove heat from the tissue, after the heating radiofrequency energy is halted. When substantially the entire tissue is below the maximum safe tissue temperature (as in FIG. 3D), cooling can be halted, and the tissue can be allowed to return to standard body temperature, as illustrated in FIG. 3E.

Optionally, RF current may be driven between the two cooled plate electrodes using intermittent pulses of excitation. As used herein, intermittent or pulsed excitation encompasses cyclically increasing and decreasing delivered power, including cyclical variations in RMS power provided by amplitude modulation, waveform shape modulation, pulse width modulation, or the like. Such intermittent excitation will preferably provide no more than about 25% of the RMS power of the pulses during the intervals between pulses. Preferably, the electrodes will be energized for between about 10 and 50% of a total heating session. For example, electrodes 12 and 14 may be energized for 15 secs. and then turned off for 15 secs. and then cycled on and off again repeatedly until the target tissue has been heated sufficiently to effect the desired shrinkage. Preferably, the electrode surfaces (and the surrounding probe structure which engages the tissue) will be cooled throughout the on/off cycles of the heating sessions.

The therapeutic heating and cooling provided by the electrodes of the present invention will often be verified and/or controlled by sensing the temperature of the target tissue and the adjacent tissue directly. Such temperature sensing may be provided using a needle containing two temperature sensors: one at the tip to be positioned at the center of the treatment zone, and the second along the shaft of the needle so as to be positioned at the edge of the desired protection zone. In other words, the second sensor will be placed along the border between the intermediate tissue and the target tissue, typically somewhere along stunned tissue 38. The temperature sensors will preferably sense the tissue temperature during the intervals between pulses to minimize errors induced by the heating RF current flux in the surrounding tissue. The temperature sensors may comprise thermistors, thermocouples, or the like.

The temperature sensing needle may be affixed to or advanceable from a probe supporting the electrode adjacent to or between the electrode segments. Alternatively, two or more needles may be used. Typically, controller 22 will provide signals to cooling system 16 and the electrodes so that the electrodes chill the engaged tissue continually while the RF current is pulsed to increase the temperature of the treatment zone incrementally, ideally in a step-wise manner, until it reaches a temperature of 60 nC or more, while at the same time limiting heating of the intermediate tissue to 45 nC or less per the feedback from the needles.

In alternative embodiments, pre-chilling time, the duration of the heat, the lengths of the heating intervals (and the time between heating intervals) during intermittent heating, and the radiofrequency heating current may be controlled without having direct feedback by using dosimetry. Where the thermal properties of these tissues are sufficiently

US 6,216,704 B1

**17**

predictable, the effect of treatment can be estimated from previous measurements.

The pelvic support tissues which generally maintain the position of the urinary bladder B are illustrated in FIG. 4. Of particular importance for the method of the present invention, endopelvic fascia EF defines a hammock-like structure which extends between the arcus tendineus fascia pelvis ATFP. These latter structures extend between the anterior and posterior portions of the pelvic bone, so that the endopelvic fascia EF largely defines the pelvic floor.

In women with urinary stress incontinence due to bladder neck hypermobility, the bladder has typically dropped between about 1.0 cm and 1.5 cm (or more) below its nominal position. This condition is typically due to weakening of the pelvic support structures, including the endopelvic fascia, the arcus tendineus fascia pelvis, and the surrounding ligaments and muscles, often as the result of bearing children.

When a woman with urinary stress incontinence sneezes, coughs, laughs, or exercises, the abdominal pressure often increases momentarily. Such pressure pulses force the bladder to descend still further, shortening the urethra UR and momentarily opening the urinary sphincter.

As can be most clearly understood with reference to FIGS. 4A–4C, the present invention generally provides a therapy which applies gentle heating to shrink the length of the support tissues and return bladder B to its nominal position. Advantageously, the bladder is still supported by the fascia, muscles, ligaments, and tendons of the body. Using gentle resistive heating between bipolar electrodes, the endopelvic fascia EF and arcus tendineus fascia pelvis ATFP are controllably contracted to shrink them and re-elevate the bladder toward its original position.

Referring now to FIG. 4A, bladder B can be seen to have dropped from its nominal position (shown in phantom by outline 36). While endopelvic fascia EF still supports bladder B to maintain continence when the patient is at rest, a momentary pressure pulse P opens the bladder neck N, resulting in a release through urethra UR.

A known treatment for urinary stress incontinence relies on sutures S to hold bladder neck N closed so as to prevent inadvertent voiding, as seen in FIG. 4B. Sutures S may be attached to bone anchors affixed to the pubic bone, ligaments higher in the pelvic region, or the like. In any case, loose sutures provide insufficient support of the bladder neck N and fail to overcome urinary stress incontinence, while overtightening of sutures S may make normal urination difficult and/or impossible.

As shown in FIG. 4C, by selectively contracting the natural pelvic support tissues, bladder B can be elevated from its lowered position (shown by lowered outline 38). A pressure pulse P is resisted in part by endopelvic fascia EF, which supports the lower portion of the bladder and helps maintain the bladder neck in a closed configuration. In fact, fine tuning of the support provided by the endopelvic fascia is possible through selective contraction of the anterior portion of the endopelvic fascia to close the bladder neck and raise bladder B upward. Alternatively, lateral repositioning of bladder B to a more forward position may be affected by selectively contracting the dorsal portion of endopelvic fascia EF. Hence, the therapy of the present invention may be tailored to the particular elongation exhibited by a patient's pelvic support tissues.

As is more fully explained in published PCT Patent Application Publication No. WO 97/20191, a wide variety of alternative conditions may also be treated using the

**18**

methods of the present invention. In particular, selective shrinkage of fascia may effectively treat cystocele, hiatal, and inguinal hernias, and may even be used in cosmetic procedures such as abdominoplasty (through selectively shrinking of the abdominal wall), to remove wrinkles by shrinking the collagenated skin tissues, or to lift sagging breasts by shrinking their support ligaments.

A system for selectively shrinking the endopelvic fascia is illustrated in FIG. 5. System 40 includes a vaginal probe 42 and a bladder probe 44. Vaginal probe 42 has a proximal end 46 and a distal end 48. Electrode 12 (including segments 12a, 12b, 12c, and 12d) is mounted near the distal end of the probe. Vaginal probe 42 will typically have a diameter of between about 2 and 4 cm, and will often have a shaft length of between about 6 and 12 cm. An electrical coupling 50 is coupleable to an RF power supply, and optionally to an external control processor. Alternatively, a controller may be integrated into the probe itself. A fluid coupling 52 provides attachment to a cooling fluid system. Cooling fluid may be recycled through the probe, so that more than one fluid couplers may be provided.

The segments of electrode 12 are quite close to each other, and preferably define a substantially flat electrode surface 54. The cooling fluid flows immediately below this surface, the surface material preferably being both thermally and electrically conductive. Ideally, surface 54 is as large as the tissue region to be treated, and a thermocouple or other temperature sensor may be mounted adjacent the surface for engaging the tissue surface and measuring the temperature of the engaged tissue.

Urethral probe 44 includes a balloon 56 supporting a deployable electrode surface. This allows the use of a larger electrode surface than could normally be inserted through the urethra, by expanding the balloon structure within the bladder as illustrated in FIG. 6. Alternatively, a narrower cylindrical electrode might be used which engages the surrounding urethra, the urethral electrode optionally being separated into more than one segment along the length and/or around the circumference of the probe shaft. Radiofrequency current will divert from such a tightly curved surface and heat the nearby tissue. The electrode can again be chilled to protect the urethral lining from thermal damage. Probe 44 may include a temperature measuring device to ensure that the temperature of the intermediate tissue does not rise above 45 nC adjacent the electrode.

As illustrated in FIG. 6, the endopelvic fascia will preferably be disposed between the electrodes of the urethral probe 44 and vaginal probe 42 when the vaginal probe is levered to the right or the left side of the pelvis by the physician. Balloon 56 of urethral probe 44 is here illustrated in its expanded configuration, thereby maximizing a surface area of electrode 14, and also minimizing its curvature (or in other words, minimizing the radius of curvature of the electrode surface). Preferably, cooled fluid recirculating through balloon 56 will cool electrode 14, so that cooled electrodes 12, 14 will selectively heat the endopelvic fascia EF without damaging the delicate vaginal wall VW or the bladder wall.

Urethral probe 44 and vaginal probe 42 may optionally be coupleable to each other to facilitate aligning the probes on either side of the target tissue, either mechanically or by some remote sensing system. For example, one of the probes may include an ultrasound transducer, thereby facilitating alignment of the electrode surfaces and identification of the target tissue. Alternatively, the proximal ends of the probes may attach together to align the electrodes and/or clamp the target tissue between the probes.

US 6,216,704 B1

19

In some embodiments, cooled fluid may be recirculated through bladder B so as to cool the bladder wall without conducting electrical heating current from within the bladder. Optionally, such a cooling fluid flow may be provided within balloon 56. Alternatively, the cooling fluid flow could be recirculated within the bladder cavity in direct contact with the bladder wall. Such a cooling flow might be provided with a two lumen (an inflow lumen and an outflow lumen) catheter, the catheter optionally having a sealing member (such as a torroidal balloon around the catheter) to contain the cooling fluid within the bladder once the catheter is inserted through the urethra. Such a cooling flow can help limit the depth of tissue heating when using a monipolar transvaginal probe, or when using a bipolar probe such as those described in FIGS. 12–12L.

Referring now to FIG. 7, a mesh electrode 58 may be unfurled within the bladder in place of urethral probe 44. Mesh electrode 58 preferably comprises a highly flexible conductive element, optionally being formed of a shape memory alloy such as Nitinol". The bladder may be filled with an electrically non-conductive fluid such as distilled water during the therapy, so that little or no RF current would flow into the bladder wall beyond the contact region between the electrode and the bladder. To limit heating of tissues which are disposed above the bladder, an upper portion 58 of the mesh structure may be masked off electrically from the energized mesh surface of the lower portion.

FIGS. 8A and 8B illustrate an optional deployable electrode support structure for use with vaginal probe 42. Electrode 12 can be collapsed into a narrow configuration for insertion and positioning within the vaginal cavity, as illustrated in FIG. 8A. Once electrode 12 is positioned adjacent to the target tissue, electrode 12 can be expanded by inflating lateral balloon 60 so that the deployed electrode assumes a substantially planar configuration. A cooling fluid may be recirculated through lateral balloon 60 to cool the electrode 12, and a thermally insulating layer 62 can help to minimize heat transfer from the adjacent tissues.

Referring now to FIG. 9, the tissue shrinking system of the present invention may also include an ultrasonic transducer 64 for positioning one or both electrodes relative to fascia F. Transducer 64 will preferably include a plastic transducer material such as PVDF (polyvinyladine fluoride) or PZT-5A (lead zirconate titanate). Transducer 64 may be incorporated into the probes of the present invention, thereby allowing the relative positions and angle between the electrode surfaces to be measured directly. Alternatively, transducer 64 may be positioned adjacent to fascia F, and a mark may be drawn upon the exposed skin (or other tissue surface) adjacent the fascia for subsequent positioning of a probe.

Transducer 64 optionally includes a needle guide 66 for insertion of a biopsy needle 68 through the view of the transducer and into the fascia. A thermocouple or other temperature sensing element may then be deployed using or in place of the biopsy needle.

Referring now to FIG. 10, an alternative tissue shrinking system 70 includes an electrode 12 mounted on a speculum 72. Speculum 72 may be used to manually position electrode 12 within the vagina (or another body orifice), while an external applicator 74 is positioned against the skin to clamp the target tissue between electrode 14 and electrode 12. The speculum and external applicator 74 may be manually manipulated to clamp the target tissue between these structures, while electrical leads 76 and cooling fluid con-

20

duits 78 couple the probe and applicator to the remaining system components.

As described above regarding FIG. 2C, the use of bipolar electrodes of differing sizes allows the selective targeting of tissues. Specifically, heating will be concentrated near the smaller electrode surface. By using one electrode surface which is much larger than the other, the current density adjacent the large electrode will remain so low that little tissue heating is produced at that site, so that the very large electrode surface need not be cooled. FIG. 11 schematically illustrates a single probe heating system 80 which takes advantage of this mechanism to selectively heat fascia near a single probe.

In single probe system 80, offset target zone 34 is heated by RF energy selectively directed through the segments of electrode 12. The vaginal wall VW disposed between vaginal probe 42 and endopelvic fascia EF is protected by cooling the surface of electrode 12, as described above. Bladder B (and the other tissues opposite endopelvic fascia EF relative to vaginal probe 42) are heated significantly less than endopelvic fascia EF due to the divergence of the current as it travels away from electrode 12 and towards electrode pad 82, which may optionally be disposed on the abdomen, back, or thigh. Optionally, cooling water may be circulated through bladder B to further protect these tissues by direct cooling and by raising the impedance of the cooled tissue to lower heating (particularly when the bladder wall is pre-chilled prior to heating). Multiplexer 20 selectively energizes the electrode segments for differing amounts of time and/or with differing power to help tailor the temperature profile of offset target zone 34 about endopelvic fascia EF for selective uniform heating with minimal collateral damage. Various treatment regimes with alternating heating and cooling cycles can help to focus the heat therapy on the desired tissues. Multiplexer 20 may be disposed outside of the body in a proximal housing, in a separate control unit housing, or the like. The multiplexer can provide electrode segment drive control, optionally with switches for each electrode segment.

Referring now to FIG. 12, a cooled bipolar probe 84 includes many of the structures and features described above, but here includes a series of bipolar electrodes 86. Bi-polar electrodes 86 will preferably be cooled, and cooling surfaces may also be disposed between the separated electrodes. Bi-polar electrodes 86 may optionally be formed as parallel cylindrical structures separated by a predetermined spacing to help direct a bipolar current flux 88 through tissue which lies within a particular treatment distance of probe 84.

The depth of penetration of the bipolar energy can be controlled by the spacing, size, and shape (i.e., the radius of curvature) of the electrode structures. The tissues distant from the cooled electrodes can be heated to a greater extent than the tissues directly engaged by the electrodes, and will be cooled to a lesser extent by the cooled electrodes and other cooling surfaces of bipolar probe 84. The tissues close to the electrodes can be protected from burning to a greater extent, and will also be cooled directly and actively. Therefore, a controlled regimen of timed pre-cooling and then heating is used to selectively raise the temperature of endopelvic fascia EF (or any other target tissue), while the vaginal mucosa adjacent probe 84 is protected by the cooled probe. Tissues at depths greater than the endopelvic fascia will generally be protected by the dissipation of bipolar current 88.

Since radiofrequency heating generally relies on conduction of electricity through the tissue, one additional mecha-

US 6,216,704 B1

nism for protecting the tissues at depths greater than the target area would be to inject an insulating fluid **90** into the space surrounding the vaginal wall on the far side of endopelvic fascia EF. Insulating fluid **90** may optionally comprise a gas such as $CO_2$, or may alternatively comprise a liquid such as isotonic Dextran" in water. Insulating fluid **90** will electrically insulate the adjacent organs and prevent heating of tissues that might otherwise be in contact with the vaginal fascial outer lining. Insulating fluid **90** is here injected using a small needle incorporated into bipolar probe **84**, the needle preferably being 22 ga or smaller.

A variety of alternative cooled bipolar probe structures are illustrated in FIGS. **12A–L**. Referring first to FIGS. **12A–C**, a simple cooled bi-polar probe **84A** includes a pair of bi-polar electrodes **86A** which are insulated from a probe body by inserts **87**. The probe body includes a cooling channel system **89** which cools electrodes **86A** and at least a portion of the surrounding surface of the probe body. Surprisingly, by properly spacing electrodes **86A** (typically by a distance from about ⅓ to about 5 times the least width of the electrodes, and preferably by a distance from about ½ to about 2 times the least electrode width), and by properly cooling the tissue surface before initiating RF heating; arcing, charring and excessive collateral damage to the engaged tissue surface can be avoided even when using electrodes having substantially planer electrode surfaces without radiused edges. Rounding the corners of electrodes **86A** may optionally still further minimize concentrations of electrical current. In many embodiments, cooling channel system **89** will include channels adjacent to and/or between the electrodes. Optionally, tissue and/or probe temperature sensors may also be provided.

Typically, the probe body adjacent the electrodes will comprise a thermally conductive material to enhance heat conduction from the engaged tissue surface for pre-cooling of the tissue (and for cooling the tissue engaging and adjacent the electrodes during RF heating). The body may comprise any of a variety of alternative metals such as aluminum or the like, and may comprise a thermal insulation material on the back and side surfaces. Inserts **87** will ideally comprise thermally conductive and electrically insulating structures. Inserts **87** may optionally comprise a polymer such as Derlin® or the like. In some embodiments, the thickness of inserts **87** will be minimized to enhance thermal conduction while still maintaining sufficient electrical insulation. For such embodiments, inserts **87** may comprise films of a polymer such as Mylar® or the like, or may be formed in part from anodized aluminum. Electrodes **86A** will typically comprise a thermally conductive and electrically conductive metal.

In the embodiment illustrated in **12A–C**, the probe has an overall length of about 3" and a width of about 2". Electrodes **86A** have a length of just under an inch, a width in the range of ⅛" to ¼" and are separated by a distance in a range from about 0.2" to about ½".

Referring to FIGS. **12D** and E, another cooled bipolar probe **84B** includes a pair of heating electrodes **86B** mounted to a cooled probe body. Bi-polar probe **84B** also includes a tissue pre-heater in the form of pre-heat electrodes **91**. As can be understood with reference to FIG. **12E**, as the cooled probe body draws heat from the engaged tissue surface, conduction of a pre-heating radiofrequency current between pre-heat electrodes **91** in a bi-polar manner can enhance the temperature differential between the target tissue and the intermediate tissue. This allows a probe structure engaging a single tissue surface to approximate the tissue temperature profile which is desired at the time

heating is initiated (as described above regarding FIG. **3**). Additionally, this enhanced temperature differential may lower the impedance of the target tissue so as to increase the current density in that region. As the cooled intermediate tissue should have a higher impedance, and as current will generally seek the path of least impedance, the pre-warmed target tissue can be heated with less collateral damage to the adjacent tissues. Note that in some embodiments, pre-heating might be used without pre-cooling to provide at least a portion of this desired temperature differential. Regardless, the temperature differential urges the current from the adjacent tissue and into the target tissue. It should be noted that a careful monitoring of adjacent tissue and/or surface impedance can be beneficial. If the impedance of the cooled tissue is raised too much, the current may travel along the surface of the probe, rather than penetrating to the target tissue. The surface impedance can be monitored and/or controlled using the surface temperature.

This generation of a preferred current path by imposing a temperature differential on the tissue prior to RF heating may be used with pre-coolers, pre-heaters, and heating electrodes having a wide variety of differing geometries. In general, pre-heating can reduce an impedance of the target tissue sufficiently to locally enhance current density such that the eventual heating of the target tissue is significantly increased. As heating progresses, the temperature differential and difference in impedance may increase, further reinforcing the selective heating of the target tissue with a positive feedback type response. The pre-heating will often be controlled so as to align the temperature differential between the target tissue and the adjacent tissue.

Similarly, pre-cooling might be used with pre-heating or without pre-heating so as to generate the desired temperature differential. Pre-cooling should enhance an impedance of a tissue sufficiently to locally reduce current density within that tissue so that its heating is significantly diminished. Pre-cooling will often be controlled to align the temperature differential between the target tissue and the adjacent tissue.

In general, localized RF heating will often make use of electrical currents which are sufficiently parallel to a boundary region between the target tissue and the intermediate tissue so that the differential impedance urges current in the desired direction.

It should be understood that pre-heating might be provided by a wide variety of energy transmitting elements, including the energy transmitting elements described herein for selective shrinkage of tissues. As can be understood with reference to FIG. **1**, establishing the desired temperature differential can be aided using one or more temperature sensors coupled to the system processor. Such temperature sensors might sense the temperature of the adjacent tissue at the probe/tissue interface or within the adjacent tissue, or may alternatively sense the temperature of the target tissue using surface or needle mounted thermal couples, thermistors, diodes, or the like. Such temperature sensors will typically transmit signals of the measured target tissue temperatures to the processor, which will use these signals to determine whether the desired temperature differential has been provided. The processor may optionally vary electrical pre-heat current, a pre-heat duty cycle, a total pre-heat time, a total pre-cooling time, a probe surface temperature, a pre-cooling duty cycle, or the like.

Probe body **84B** will have a total length (and an electrode length) of about 3", and will have a width of about 5". The probe body will again ideally comprise aluminum or some other body thermally conductive material. Some form of

US 6,216,704 B1

electrical insulation will often be provided between electrodes **86B**, **91** and an electrically conductive probe body, as described above. The electrodes may comprise stainless steel, aluminum, or a wide variety of alternative conductive materials.

Probe **84B** may also be used in an alternative mode to selectively contract the target tissues. Pre-heat electrodes **91** have larger tissue engaging surfaces than the heating electrodes **86B**, and will distribute the current over a larger tissue volume. To selectively heat tissues above and/or between the heating electrodes, current may be driven between the large right electrode **91** and the small left heating electrode **84B**, and then between the large left electrode and the small right heating electrode. These overlapping currents may be driven in cycles, and should help avoid over-heating and unnecessary injury to the adjacent and target tissues. A tranvaginal probe **84BO** including preheat electrodes **91** and an alternating, interleaved electrode control arrangement is illustrated in FIG. **12D**. Preheat electrodes EA and ED provide an initial preheat zone PH, as schematically shown in FIG. **12D**. Current is then alternated between interleaved electrode pairs EA, EC and EB, ED (as shown) to selectively heat overlapping target zones **32A**, **32B**. The desired predetermined treatment temperature is achieved in a target tissue region **32C** which is separated form the electrode surfaces. A computer processor will generally control this heating process, as generally described above.

FIGS. **12F** and G illustrate a still further alternative bi-polar probe structure **84C** which will produce a heating pattern that is appropriate for tumors and other relatively thick localized target tissues **32O**. Once again, target tissues **32O** are separated from a tissue surface by an adjacent tissue AT. Probe **84C** includes concentric bi-polar electrodes **86C**, shown here with one of the electrodes having a circular shape and the other having an annular shape. As described above, the adjacent tissue will often be pre-cooled through the electrodes and/or the probe surface adjacent (and often between) the electrodes.

FIGS. **12H–L** illustrate a cooled bi-polar transvaginal probe with temperature sensing capabilities, and a method for its use to selectively heat and contract in a pelvic fascia. Probe **84D** include two needle mounted temperature sensors **95** extending from between electrodes **86D**. The needle mounted temperature sensors are protected by a retractable guard **97** which is withdrawn proximately after probe **84D** is inserted to the treatment location. The temperature sensors are then advanced into the tissue by moving the probe laterally as shown in FIG. **12K**.

Probe **84D** includes a cooling channel system **89** that cools the electrodes and the probe surface there between. The bladder wall B will preferably be cooled by circulating a chilled fluid within the bladder (as described above in FIG. **6**), and pre-cooling of vaginal wall VW will often be computer controlled using feedback from the temperature sensors. Optionally, computer control based on this feedback might also (or instead) be provided to control pre-heating where pre-heating capabilities are included in the probe. Temperature sensors **95** might be used to measures the temperature at the probe/interface, within the vaginal wall, within the endopelvic fascia, or the like. Regardless, pre-chilling of probe **84D** and within bladder B will often be timed and controlled so as to provide a temperature profile similar to that illustrated in FIG. **3B** upon the initiation of the heating current between electrodes **86D**.

Theoretically, if heating were initiated while the bladder wall, endopelvic fascia, and vaginal wall were at a uniform temperature, the current density produced by electrodes **86D** would result in considerable collateral damage when heating the endopelvic fascia to the desired contraction temperature range. This uniform temperature current density is schematically illustrated by dashed lines **99**. However, as the bladder wall and the vaginal wall have been cooled to enhance their impedance, the electrical current will tend to move the current into to the warm endopelvic fascia EF, thereby enhancing localized heating of this target structure. This tailored current density is schematically illustrated by solid lines **101** in FIG. **12L**. This tailored current density effects the desired contraction of the target endopelvic fascia while minimizing damage to both adjacent tissues.

Referring now to FIG. **13**, microwave probe **94** includes microwave antennas **96** which direct microwave heating energy **98** through the vaginal wall VW and onto endopelvic fascia EF. Microwave probe **94** will again typically include a cooled probe surface to minimize damage to vaginal wall VW. The microwave may optionally be produced by a phased array microwave antenna to decrease heating next to the cold probe relative to the heating of endopelvic fascia EF, or a more conventional microwave antenna may be used.

Microwave power having a frequency of about 2250 MHz is most often used for heating. However, the use of extremely high frequency microwaves would permit constructive interference at the intersection of microwave energy streams by control of the microwave frequency, phase, and electrode spacing. Such constructive interference of microwaves may be used to enhance the heating of the target tissue relative to the heat produced in the intermediate tissue between microwave probe **94** and endopelvic fascia EF (in this example). Injection of an electrically insulating fluid, such as Dextran", may be used to absorb microwave energy and protect tissues beyond the target zone. In some embodiments, injection of a liquid contrast medium might be used to enhance visualization of the treatment region, increasing the visibility and clarity of the vagina V, bladder B, the other adjacent organs, and the spaces therebetween. Such a contrast medium will typically be highly visible under ultrasonic or fluoroscopic imaging modalities.

An alternative form of energy which may be used in a probe schematically similar to that illustrated in FIG. **13** is ultrasonic heating. A cooled ultrasonic probe could be used to provide heating of the endopelvic fascia adjacent the vagina, preferably while protecting the adjacent tissues using a material which reflects ultrasound. Suitable protection materials include $CO_2$ or a liquid/foam emulsion material. High intensity ultrasound is able to heat tissues at a distance from the probe, and may be focused to apply the most intense heating at a particular treatment site. Concentration of ultrasound energy deep in the body may avoid heating of tissues at the entry site of the focused ultrasound beam, although gas pockets and bony structures may absorb and/or reflect the focused ultrasound energy, so that tissues may be damaged by both localized heating and cavitation. Once again, the surface of an ultrasound probe will typically be cooled to protect the tissues which are directly engaged by the probe.

The absorption of ultrasound energy is generally proportional to its frequency. A frequency on the order of about 10 MHz would be appropriate for penetration a distance on the order of about 1.0 cm into tissue. The focal accuracy is dependent on the wavelength, and at about 10 MHz the wavelength is about 0.15 mm. As a result, a very sharp focus is possible. Although the absorption coefficient will vary with the tissue type, this variation is relatively small. Hence, it is expected that the focusing of an ultrasound beam will

US 6,216,704 B1

25 26

have a greater influence on power dissipation in the intermediate tissue than will the variation in absorption coefficient due to differing tissue types.

As illustrated schematically in FIG. 13A, a focused ultrasound probe 300 having an elongate probe housing 302 is well adapted to accommodate axial translation 304 and rotation 306 of an ultrasound transducer 308. To treat arbitrary structures by selectively varying the focal depth of transducer 308, the transducer can optionally be in the form of an annular array.

It may be possible to make use of a fixed focal length transducer. Such a fixed transducer will preferably be adapted to focus at a depth appropriate for the desired therapy. In some embodiments, it may be possible to translate such a fixed focal length transducer relative to the fascial layer to treat tissues at differing depths. Alternatively, by making use of the multiple elements of a phased array, the transducer can be dynamically focused on the treatment region by phasing the excitation drive current to the array elements. Advantageously, treatment may be performed using a continuous wave excitation, significantly facilitating phasing of the drive currents to the individual array elements.

As illustrated in FIGS. 13B and C, annular arrays are particularly well adapted for focusing ultrasound energy at a focus point 310. By varying the electrical current supplied to the individual annular shaped elements 312a, 312b, . . . of annular array 308 using phase control 314, the focal depth of the annular array can be increased to 310' or decreased to 310".

While the ultrasound emitting structure is herein generally referred to as a transducer, ultrasound transmitters which do not also sense ultrasound energy might be used. Nonetheless, it may be advantageous to both image and heat the tissue using a single transducer structure. The transducer may be excited with an impulse, or with a continuous signal where a longer duty cycle is desired. By alternating imaging and heating, the changes in the thickness or ultrasonic appearance of the tissue may be monitored to determine when the tissue has completed its treatment.

The ability to measure the thickness of fascia and other collagenated tissues using ultrasound energy is particularly advantageous for judging the completeness and/or efficacy of the thermal shrinking treatment. Hence, heating may be controlled and terminated based on ultrasound feedback regarding the thickness and/or change in thickness of fascia or other collagenated tissues. The generation of harmonics or subharmonics of the fundamental carrier frequency is an indication of the production of cavitation in the tissue, and may be used as a feedback mechanism for adjusting ultrasound power or scanning speed. Ultrasound sensed target tissue thickness feedback and control may be incorporated into probes which heat the target tissue using ultrasound, RF energy, microwave, or any other energy transmitting mechanism, within the scope of the present invention.

To make use of ultrasound's thickness sensing capabilities, an initial target tissue thickness may be measured and stored. During the course of treatment, the thickness of the fascial layer (or other target tissue) can be remeasured, and the revised tissue depth may be compared to the initial tissue depth. Changes in a fascial layer tissue depth during treatment may then be used as a guide to the progress and completion of the tissue shrinkage operation. Depth determination may be made using an external imager, or might be provided by an imaging A-scan from the treatment transducer.

In some embodiments, computer feedback may be used to guide the user in the application of ultrasound energy using ultrasound probe 300. For example, a computer controller may display the location of fixed reference points (such as bony structures) together with a representation of the physical location of the probe. Such a display would help illustrate the location relative to the bony structures, which may help the user dynamically guide the probe to the desired treatment area. In some embodiments, such a relative location image may be provided using an external ultrasonic imager. In such embodiments, the bony structures, the treatment probe, any temperature sensing needles, and the fascia or other target tissues could all be visible within a single image. This would greatly facilitate guiding of the probe, and may be used to selectively activate the probe so as to treat the target tissues, either manually by the user or automatically under computer control.

The structure of ultrasound transducer 300 is illustrated in more detail in FIGS. 13D–G. As illustrated in FIG. 13D, coolant flow 316 will preferably be provided through a cooling lumen 318, with the cooling lumen distributing a cooling fluid adjacent annular transducer 308. In addition to the chilling of tissues provided by cooling flow 316 (which can protect intermediate tissues outside the treatment zone), it is highly beneficial to cool the transducer itself, as transducers typically have an efficiency of about 60% or less. For a delivered power of about 100 W, the input power would typically be about 167 W. As a result, 67 W of heat should be removed from the housing adjacent the transducer so as to prevent the surface of the transducer housing from rising above about 45 nC. As described above, it will often be desirable to chill the intermediate tissue engaged by the probes of the present invention to temperatures significantly lower than this. It should at least be possible to maintain the housing below a maximum safe tissue temperature by using an adequate flow a cooling liquid such as water, and still further cooling may be possible.

It will also be desirable to provide liquid surrounding the probe to acoustically couple the housing of the ultrasonic probe to the intermediate tissue. For example, providing a physiologically benign liquid, such as isotonic saline or Dextran®, between an ultrasonic vaginal probe and the vaginal wall will facilitate the transmission of ultrasonic power from transducer 308, through the cooling fluid and housing of the transducer, and into the vaginal wall. In some embodiments, the liquid between the probe and the intermediate tissue may also contain a bioactive and/or therapeutic agent, such as an anti-biotic drug to further lessen the chances of infection after the procedure.

In the exemplary embodiment illustrated in FIGS. 13D–G, the housing of the probe is defined by a thick lower wall 320 and a thin upper wall 322. The use of a thinner upper wall, which will generally be disposed between transducer 308 and the target tissue, will enhance the efficiency of acoustic coupling between the transducer and the target tissue.

An alternative ultrasound probe 330 having a linear array transducer 332 is illustrated in FIGS. 13H–M. This embodiment includes many of the features and advantages described above with reference to ultrasound transducer 300, but linear array transducer 332 includes a plurality of linear array elements 312a, 312b, . . . .

In general, ultrasonic probes having a fixed, radially symmetrical transducer can be focused to a point having a size on the order of 1 wavelength. Ultrasonic probes having transducers with cylindrically symmetrical designs will gen-

US 6,216,704 B1

erally focus to a line with a theoretical thickness on the order of 1 wavelength, and with a length similar to the length of the cylindrical transducer.

In the case of a fixed radially symmetrical transducer, the probe will preferably have an internal structure which permits the transducer to rotate about the axis of probe, and also to translate along this axis. In the case of a fixed cylindrically symmetrical transducer, the internal structure of the probe will preferably allow the transducer to rotate about the axis of the probe, and may also be used to dither the rotational position of the transducer about a nominal orientation. It may also be preferable to include at least some axial translation or scanning capabilities for fixed cylindrically symmetrical transducers.

If the transducer has a fixed focal length, it is generally advantageous to provide the transducer assembly with the ability to translate radially with respect to the axis of the probe, so that the fixed focus of the beam can be positioned at the correct depth within the tissue to be treated. The complexity of this radial translation capability is obviated by providing linear array transducer structures having dynamic depth focusing capabilities.

As illustrated in FIG. 13I, linear array transducer 332 will also generally focus the ultrasound energy on a line 336. Advantageously, the focal distance between the transducer and line 336 can be varied using phase control 314. In other words, changing the phase of the individual linear transducer elements allows the radial position of the focal line to be varied, from line 336' to line 336" as illustrated in FIG. 13H. Where linear elements 334 are oriented parallel to the axis of the probe, such a linear array is particularly well suited for treating tissue layers that are roughly parallel to the probe.

In general, a controller will coordinate the transducer drive current with the location, angle, and focusing depth of the transducer, so that the transducer is driven only while positioned such that the focus of the ultrasonic beam is within the target tissue. The controller and the associated positioning mechanism will generally keep the array oriented toward and focused on the target tissue throughout much or all of the scan so that the transducer can be providing heat energy most of the time.

Should it be desirable to combine a commercial ultrasonic imaging vaginal probe with an ultrasonic power treatment device, it will generally be preferable to position the two transducers adjacent to each other on a single internal transducer scanning assembly. This can facilitate rotating and translating the imaging and therapeutic ultrasonic transducers together, so that the structure to be treated is alternately viewed and heated. Ideally, these alternate viewing/therapy cycles will be coordinated so that one or the other is being performed substantially continually.

In some embodiments, it may be beneficial to update the target location of the fascia or other target tissue throughout the procedure. This will allow the therapy to remain focused upon a support tissue such as the endopelvic fascia, even when the support tissue is changing in shape and/or position, which will often occur during a successful treatment.

A cross-section of a grasping bipolar probe 100 is illustrated in FIG. 14. Grasping probe 100 grips and folds an anterior portion of the vaginal wall, together with the endopelvic fascia EF, as shown. It should be understood that the targeted fascia may be separated from the probe by muscle, vasculature, and the like, as well as by vaginal wall VW. Endopelvic fascia EF is typically about 1 mm thick, while the grasped, folded vaginal wall will typically be

between about 10 mm to 14 mm thick. The folded endopelvic fascia EF may thus be heated and contracted between cooled bipolar electrodes 102, as described above. Depending on the length of the fold, cooled bipolar electrodes 102 may optionally be formed as wide elongate plates. Grasping may be accomplished mechanically or by applying a vacuum to draw the vaginal wall into a cavity 104 of grasping probe 100. By drawing the endopelvic fascia into close proximity of both electrodes, a finer focusing of the heating may be accomplished, thereby minimizing the damage to adjacent tissues. Additionally, grasping probe 100 may draw the tissue inward to relieve any tension in the fascia, thereby enhancing the shrinkage. As described above regarding FIG. 12, $CO_2$ or some other insulating medium may be used for additional protection of adjacent tissues and organs.

A kit 110 includes vaginal probe 42 and instructions 112 for use of the probe to shrink tissues, the probe and instructions disposed in packaging 114. The instructions may set forth the method steps for using probe 42 described hereinabove for selectively shrinking pelvic support tissues as a therapy for urinary incontinence, or may alternatively recite any of the other described methods. Additional elements for system 10 (see FIG. 1) may also be included in kit 110, or may be packaged separately.

Instructions 112 will often comprise printed material, and may be found in whole or in part on packaging 114. Alternatively, instructions 112 may be in the form of a recording disk or other computer-readable data, a video tape, a sound recording, or the like.

Referring now to FIGS. 16A–C, a transurethral probe 150 may be used to shrink endopelvic fascia between bladder B and vagina V using a conductive fluid electrotherapy system 152. Transurethral probe 150 includes a shaft 154 having an electrode 156 near its distal end. A toroidal balloon 158 seals around the shaft to prevent fluid communication between bladder B and urethra UR. Fluid in-flow and out-flow ports 160, 162 allow both gas and liquid to be introduced into the bladder in controlled amounts, and also allow a conductive fluid 164 (typically an electrolytic liquid, and ideally comprising a chilled saline solution), to be circulated within the bladder.

An insulating fluid 166 having a density much less than that of conductive fluid 164 occupies a portion of bladder B away from the tissues targeted for treatment. As electrode 156 is within conductive fluid 164, the conductive fluid can transmit RF current between the electrode and a cooled plate electrode of a vaginal probe 168. The conductive properties of conductive fluid 164 may be optimized for both conduction of electricity (for example, by controlling the salinity of a saline solution), and for directly transferring heat from the bladder wall.

A cross-section of shaft 154 is illustrated in FIG. 16B. As described above, an in-flow lumen 176 allows the introduction of both insulating fluid 166 and conductive fluid 164 through in-flow port 160. An out-flow lumen 178 is similarly in fluid communication with out-flow port 162 to allow recirculation of chilled saline or the like, and also to facilitate removal of the fluids from the bladder after the procedure. RF energy is provided to electrode 156 through wire 180, and a balloon inflation lumen 182 allows transurethral probe to be inserted and removed with a minimum amount of trauma, while still ensuring an adequate seal of the body cavity. Electrode 156 may extend within the bladder (as shown in FIG. 16C) to increase the electrode surface area exposed to conductive fluid 164. This may help minimize

US 6,216,704 B1

29 30

localized heating at the electrode surface. Inadvertent contact between the bladder wall and electrode surface may be avoided by surrounding the electrode surface with a protective mesh.

In the embodiment of FIG. 16C, vaginal probe 168 includes a flexible shaft 170 and a distal balloon 172. Engagement between an electrode 174 and the vaginal wall is enhanced by inflating the balloon within vagina V, while cooling of the electrode surface may be provided by circulating fluid within the balloon. The electrode may have a flat electrode surface with rounded edges, as described above.

In use, the patient will be positioned on her back (so that the portion of the endopelvic fascia targeted for shrinkage is disposed vertically below the bladder), and transurethral probe 150 will be introduced through urethra UR to bladder B. Toroidal balloon 158 can then be inflated to seal around the transurethral probe, and the bladder can be partially filled with insulating fluid 166, typically using air or a gas such as carbon dioxide. The bladder is also partially filled with conductive fluid 164, typically in the form of a chilled electrolytic liquid such as saline. The bladder wall may be further cooled by cycling the chilled saline before, during, and/or after heating, as generally described above regarding FIGS. 2 and 3.

The volumes of the fluids introduced into the bladder will be selected to provide therapy over the target tissue, and to minimize heating beyond the target tissue. Preferably, the volumes and positions of conductive fluid 164 and insulating fluid 166 are maintained throughout the procedure. As electrode 156 is in contact with conductive fluid 164, the conductive fluid effectively forms a large area electrode at the floor of the bladder, while the gas provides an electrical (and thermal) insulator at the top of the bladder. Maintaining the relative volumes of fluid limits heating to below a gas/liquid interface 184.

Transvaginal probe 168 is introduced and positioned to the extreme right or left side of the pelvis so that electrode 174 is oriented towards the interface between conductive fluid 164 and the lower right side or lower left side of the bladder wall. Probe balloon 172 can then be inflated, and the bladder wall and vaginal mucosa can be pre-chilled by circulating fluid through the probes. Once these tissues are properly pre-cooled, heating can proceed as described above, with the conductive fluid/bladder wall interface acting as one plate electrode, and electrode 174 on balloon 172 of vaginal probe 168 acting as the other. As was also described above, the electrode of vaginal probe 168 may be segmented to target heating on the target tissue, and to minimize any unwanted concentrations of heating caused by the variations in total tissue depth, non-parallel tissue surface effects, and the like.

Referring now to FIGS. 17A and B, a similar method for shrinking endopelvic fascia to that described above regarding FIGS. 16A–C may be practiced using a transurethral probe having an inflatable spoon shaped balloon 200. Spoon shaped balloon 200 supports a deployable electrode 202, and can be used to orient the deployable electrode toward vaginal probe 168. This may enhance control over the heating current flux, and spoon shaped balloon 200 (as well as balloon 172 of vaginal probe 168) may be insulated away from the electrode surface to further limit injury to the bladder wall. Deployable electrode 202 may also be segmented as described above, and will provide a small cross-sectional profile prior to inflation so as to minimize trauma during insertion.

A two probe device 250 is illustrated in FIG. 18A. Two probe device 250 will be used in a method similar to that described above with reference to FIG. 6, but here includes both a transvaginal probe 252 and a transrectal probe 254. Each of these probes includes a proximal end 256 and a distal end 258. The distal ends are sized and shaped for insertion into their respective body cavities. Proximal ends 256 are mechanically coupled by a clamp structure 260. Rotating a handle 262 of clamp structure 260 changes a separation distance 264 between electrodes 266, 268 via threads 270. Hence, clamping structure 260 helps maintain the parallel alignment between the electrodes, and also helps to compress the tissue between the electrode surfaces.

It should be understood that a wide variety of mechanical actuators might be used in place of the threaded mechanism illustrated in FIG. 18A. Parallel bar linkages, ratcheted sliding joints, rack-and-pinion mechanisms, and recirculating ball linear actuators are just a few examples of alternative mechanisms which might be used. In some embodiments, the probes may be inserted independently, and then coupled together using a releasable clamping structure.

A wide variety of actuators may also be used in place of handle 262, including electromechanical actuator, pneumatic actuators, and the like. In some embodiments, the clamping structure may provide feedback on separation distance 264. More complex arrangements are also possible, in which the structure coupling the probes includes joints or flexible structures with position indicating capabilities. Such structures may provide feedback for driving segmented electrodes so as to selectively tailor the heat energy, often to evenly heat the desired target tissues by compensating for any misalignment between the electrodes, angularity between the electrode surfaces, and the like, was generally described with reference to FIGS. 2–2D.

Probes 252, 254 will also include many of the structures described above, including a cooling system having in-flow ports 272 and outflow ports 274 to cool electrodes 266, 268 through cooling system lumens 276. A needle mounted temperature sensor 278 may be advanced into the clamped tissue from adjacent one electrode to provide feedback on the heating/cooling of tissues. Such temperature information may be transmitted to a controller using temperature sensor wires 280. RF energy will be transmitted down the probes via electrode conductors 282.

In use, two probe clamp 250 will be positioned with one of the probes extending into the rectum, and the other probe extending into the vagina. Clamping structure 260 will be actuated using handle 262 to decrease the separation distance 264, and to clamp the target tissue between electrodes 266, 268. Needle mounted temperature sensor 278 will extend into the clamped tissue, ideally extending into the target tissue.

Clamping of the tissue will help ensure firm engagement between the electrodes and the tissue surfaces, and will also promote even heating by minimizing the ratio between separation distance 264 and electrode widths 284. The clamp structure is sufficiently stiff to maintain the electrode structures substantially in alignment, and also to maintain the electrode surfaces roughly parallel to each other, so as to be capable of providing sufficiently uniform current flux to shrink the target tissue. Where the electrodes are segmented (as described above), the clamping structure may accommodate significant angularity between the electrode surfaces, as well as some axial and lateral misalignment, while still effectively heating and shrinking the target tissue with minimal collateral damage. In the exemplary embodiment, electrodes 266, 268 are positioned at closer

US 6,216,704 B1

**31**

proximity to each other than probes **252, 254** proximal of the electrodes. This avoids injury to tissues proximal of the electrodes, particularly to the rectal and vaginal sphincters, when the clamping mechanism brings the probes together.

While two probe device **250** is illustrated having two separate probes which are both adapted for insertion into the body, it should be understood that a similar clamping structure may make use of a single insertable probe carrying an electrode, and a second electrode support structure adapted for use on the exposed skin. In some embodiments, it may be preferable to limit heating of the skin engaged by using an external electrode having a surface which is significantly larger than that of the internal electrode. This may reduce and/or eliminate the need for active cooling of the external electrode, and will concentrate heating closer to the smaller, cooled internal electrode surface.

The transvaginal/transrectal two probe device of FIG. **18A** is particularly suitable for use as a therapy for rectocele. Similar probe structures will find use in a wide variety of applications, including many of those described above, as well as those described in U.S. patent application Ser. No. 08/910,370, filed Aug. 13, 1997, previously incorporated by reference. For example, the vaginal wall (including the endopelvic fascia) may be drawn downward between a pair of electrodes for selectively shrinking of the pelvic support tissues as a therapy for incontinence. Similar therapies may be possible for the colon.

In some embodiments, a vaginal probe similar to those described above may be mechanically coupled to a rectal probe for stabilizing the position of the vaginal probe. The rectal probe may optionally include a balloon to apply pressure to the vaginal probe, thus squeezing the two probes together. This may help to stabilize the location and direction of the vaginal probe so that it can provide heating to the deep tissues above and to the sides of the vagina. Such a stabilized vaginal probe may be used with many of the energy transmitting structures described above, including focused ultrasound transducers.

Still further alternative structures may be used to enhance positional accuracy of the probes of the present invention within body cavities such as the vagina. For example, an O ring may be sized to fittingly engage the surrounding vaginal wall so as to provide mechanical stabilization. Such an O ring may be variable in size, or may be available in a variety of selectable sizes. In some embodiments, mechanical stabilization may be provided using an inflatable cuff disposed around the shaft of the probe. Such a cuff could be inflated after the probe is positioned to engage the surrounding tissue to provide mechanical stabilization.

A fixed reference marker might also be used for positioning and/or position verification. A reference marker might be attached to the pubic symphysis, or to some other convenient bony structure. Such a marker may be used to position the probe, to measure the relative position of one or more probes, or to correct the calculated position of the probe relative to the target tissue, relative to a second electrode, or the like.

An adhesive surface or sticky pad on the probe may allow the probe to adhere to the inner vaginal surface. It may be preferable to adhesively affix only a portion of the probe, particularly where an alternate portion can translate and/or rotate with respect to the fixed portion. This might permit the treatment region to be conveniently controlled with reference to the fixed portion. A similar (and more readily releasable) result may be provided by using a vacuum attachment mechanism.

**32**

Still further mechanical mechanisms are possible. In some embodiments, it may be desirable to provide an external fixture to hold an energy applying probe with reference to bony structures of the body. Such an external fixture may provide a mechanism for translating the treatment probe along a trajectory which optimally treat the targeted fascia.

Two-probe devices may also be used in a minimally invasive, or even in a standard open procedure. For example, a pair of substantially parallel needles may be inserted on either side of a target tissue. The needles will preferably be insulated along a proximal portion and electrically and thermally conductive adjacent a distal region. RF energy may be driven between the conductive distal regions of the needles to heat the tissue therebetween. Such needle electrodes will preferably include radially expandable structures such as balloons supporting the conductive distal regions. This allows a radius of curvature of the conductive distal regions to be increased by inflating the balloons once the needles are in position. By increasing the radius of curvature sufficiently relative to the separation between electrodes, the spatial uniformity of the heating can be enhanced. Chilled balloon inflation fluid can limit heating of the tissue adjacent the balloon.

The present invention further encompasses methods for teaching the above-described methods by demonstrating the methods of the present invention on patients, animals, physical or computer models, and the like.

While the exemplary embodiments have been described in some detail, by way of example and for clarity of understanding, a variety of modifications, adaptations, and changes will be obvious to those who skill in the art. For example, substantially coaxial cylindrical electrode surfaces may clamp tubular tissues (such as the cervix) between cooled parallel surfaces for treatment and/or shrinkage. Alternatively, a conductive liquid and an insulating liquid having differing densities may be used to selectively couple an electrode to a portion of a tissue surface within a body cavity, or substantially coaxial cylindrical electrode surfaces might clamp tubular tissues (such as the cervix) between cooled parallel surfaces for treatment and/or shrinkage. Therefore, the scope of the present invention is limited solely by the appended claims.

What is claimed is:

1. A method for shrinking a target collagenous endopelvic support tissue within a patient body through an intermediate tissue, the method comprising:

positioning a probe within a vagina of the patient;

directing energy from the probe, through a vaginal wall, and into the target tissue, wherein the energy heats the target tissue so that the target tissue contracts and the contracted target tissue inhibits incontinence; and

cooling the vaginal wall with the probe to avoid injuring the vaginal wall when the target tissue is heated by the probe.

2. A method for directing energy into a target collagenous endopelvic support tissue of a patient body through an intermediate tissue, the intermediate tissue comprising a vaginal wall, the method comprising:

electrically coupling a first electrode to the patient body;

electrically coupling a second electrode to the intermediate tissue, the second electrode mounted on a vaginal probe;

cooling the intermediate tissue with the probe; and

applying an electrical potential between the first and second electrodes, wherein an electrode surface of the

US 6,216,704 B1

**33**

second electrode is sufficiently large and flat to provide a current flux that extends through the cooled intermediate tissue and into the target tissue so that the current flux heats the target tissue without ablating the target tissue while the cooling of the intermediate tissue inhibits necrosis of the vaginal wall.

3. A method for therapeutically heating a target zone within a patient body so as to inhibit incontinence, a collagenous pelvic support structure being disposed within the target zone the method comprising:

engaging a probe against a tissue surface separated from the target zone the probe having a plurality of electrodes;

cooling the tissue surface adjacent the probe with the electrodes; and

intermittently directing an electrical current flux from the electrodes, through the cooled tissue, and into the target zone by intermittently energizing the electrodes so that the current flux heats the target zone and the pelvic support structure inhibits incontinence, the electrodes cooling the engaged tissue surface while directing flux and between flux directing cycles.

4. A method for selectively heating a predetermined target tissue, the target tissue adjacent another tissue, the method comprising:

generating a temperature differential between the adjacent tissue and the target tissue by pre-heating the target tissue to reduce an impedance of the target tissue sufficiently to locally enhance current density within the target tissue; and

heating the target tissue by conducting a heating electrical current into the target tissue after generating the temperature differential so that the temperature differential urges the heating current from the adjacent tissue into the target tissue, and such that heating of the target tissue by the heating electrical current is significantly increased.

5. The method of claim 4, further comprising controlling the pre-heating step so as to align the temperature differential between the target tissue and the adjacent tissue.

6. A method for selectively heating a predetermined target tissue, the target tissue adjacent another tissue, the method comprising:

**34**

generating a temperature differential between the adjacent tissue and the target tissue by pre-cooling of the adjacent tissue and pre-heating the target tissue so as to produce sufficient temperature differential between the adjacent tissue and the target tissue to enhance an impedance of the adjacent tissue relative to an impedance of the target tissue; and

heating the target tissue by conducting a heating electrical current into the target tissue after generating the temperature differential so that the temperature differential urges the heating current from the adjacent tissue into the target tissue.

7. The method of claim 6, wherein the target tissue is pre-cooled by a cooled surface of a probe.

8. The method of claim 7, wherein the adjacent tissue is disposed between the probe surface and the target tissue, wherein the electrical currents are transmitted through the probe surface, and further comprising controlling the pre-cooling to align the temperature differential between the adjacent tissue and the target tissue.

9. A method for selectively heating a predetermined target tissue, the target tissue comprising an endopelvic support tissue and including collagen, the target tissue adjacent another tissue, the method comprising:

generating a temperature differential between the adjacent tissue and the target tissue;

heating the target tissue by conducting a heating electrical current into the target tissue after generating the temperature differential so that the temperature differential urges the heating current from the adjacent tissue into the target tissue, the heating step effecting shrinkage of the target tissue, the shrinkage of the target tissue inhibiting incontinence, wherein the temperature differential generating step and the heating step are performed using a transvaginal probe so as to shrink endopelvic fascia disposed between a vagina and a bladder; and

circulating a cooling fluid within the bladder.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,216,704 B1                                   Page 1 of 1
DATED          : April 17, 2001
INVENTOR(S)  : Frank Ingle et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Drawings,
Fig. 4, Sheet 4 of 24, please delete the term "(PRIOR ART)".
Fig. 4A, Sheet 4 of 24, please delete the term "(PRIOR ART)".
Fig. 4C, Sheet 5 of 24, please delete the term "(PRIOR ART)".

Signed and Sealed this

Thirteenth Day of August, 2002

Attest:

JAMES E. ROGAN
Attesting Officer        Director of the United States Patent and Trademark Office

Appx1179





click here!

To print this page, select "Print" from the File menu of your browser

# Designer vaginas

Gynecological surgery isn't just for medical reasons anymore; some women say it enhances sexual pleasure.

- - - - - - - - - - - -

**By Debra Ollivier**

Nov. 14, 2000 | For as long as she can remember, Jill wanted a different vagina. Not only was her labia minora slightly larger than her labia majora ("I'd see women in locker rooms and in magazines and be jealous," she says); after two children she also had serious incontinence problems.

"My vagina had that 'flippy-floppy' feeling. I could barely feel anything. Sex was just not the same." Then a friend of hers saw an ad for Dr. David Matlock and his Laser Vaginal Rejuvenation clinic in Los Angeles. "My friend said, 'Hey Jill, you could do this!' It was meant as a joke. I found Matlock's number on the Net and was in his office within a week."

Jill, a Manhattan lawyer, had two of Matlock's trademark surgeries: Laser Vaginal Rejuvenation (LVR) to tighten her vagina and "enhance sexual gratification" and Designer Laser Vaginoplasty (DLV) to "aesthetically modify" her labia.

She calls her transformation "a miracle," and she is not alone in her enthusiasm. High above Sunset Boulevard, in Matlock's plush, 5,000-square-foot office, vaginas are being redesigned, labia modified, vulvae reconfigured. The women spreading their legs, exposing their personal secrets to the antiseptic trimmings and surgical prunings of a trusty laser are ad hoc pioneers in a rapidly growing industry. But is LVR truly a way of enhancing sexual gratification or simply a way of selling gynecological surgery while pushing the perfect vagina? With the reasons for LVR and DLV as diverse as the vaginas themselves, the answers are not so cut-and-dried.

Laser Vaginal Rejuvenation began as a modification of a traditional gynecological vaginal surgery for stress urinary incontinence. The procedure, which has been a standard gynecological surgery for decades, involves the tightening of the vaginal muscles and support tissues, as well as the reduction of redundant vaginal mucosa (relaxed vaginal lining). By reconstructing the "optimum structural architecture" of the vagina -- namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body -- Matlock claims that women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification.

The connection between vaginal tightness and sexual gratification allegedly became apparent to Matlock 12 years ago when a woman came into his office with extreme stress urinary incontinence after the birth of four children. Matlock recalls her phone call weeks after the surgery. "She called back and said, 'Doctor, guess what? Since I've had the procedure sex is great. My husband says he has the same wife, but a new woman.' And I said, 'OK.' I just put that in the back of my mind."

Later, word of mouth spread, bringing more women to Matlock's office in search of a tighter vagina not just to end incontinence, but for better sex. Some requested that, once on the surgery table, Matlock do a little cosmetic surgery as well -- a plumping up of a flaccid vulva here, a trimming back of a labium there. "I hesitated at first," says Matlock of those fledgling days, when a growing interest in sexual gratification and designer vaginas slowly brought women flocking to his office. "Then I modified my thoughts. I thought, OK."

BTL EX1008
IPR2024-00703
U.S. Patent No. 8,961,511

https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html[3/4/2024 4:53:49 PM]

Matlock ran his first ad in the L.A. Weekly two years ago. Amid the clutter of ads for big breasts, tight butts, large penises and iron shins, the Laser Vaginal Rejuvenation ad featured a bikini-clad woman writhing in orgasmic delight. The headline read: "You Won't Believe How Good Sex Can Be!" Matlock's phones haven't stopped ringing since.

Speaking with the gusto of a moral crusader, Matlock sits in his office with a panoramic view of L.A. looming behind him. On his large, shiny desk stands a transparent plastic model of a vagina and its reproductive system. "Gynecology is a supersurgical subspecialty," he says. "We dedicate our entire professional careers to the reproductive tract. But do we ever go back and look at the things that result from labor, delivery, childbirth? There can be relaxation of that structure and thus a diminishment or a decrease in sexual gratification. Do we concern ourselves with that? No. Not at all. We only concern ourselves with obstetrics. I think there needs to be research in this area, and I'll tell you why: Women *do* [his emphasis] enjoy sex. Women want to enjoy sex. Women want to be able to enhance their sexuality if they can."

By marrying this type of sexual marketing rhetoric with gynecological science and cosmetic surgery, Matlock unwittingly formed a new and lucrative alliance. Today women from all over the world come to Matlock's office seeking a rehauled, resexed vagina. Like Jill, they claim phenomenal and life-changing results -- two adjectives that could very well describe what LVR and DLV have done for Matlock. Poised to launch an international franchising and licensing network, Matlock stands on the edge of a cresting wave that has already made him a millionaire several times over, generated media attention (Howard Stern has praised the man) and provoked the wrath of many in the ob/gyn community.

"I think this is a way of preying on vulnerable women," says Dr. Linda Brubaker, fellowship director of Female Pelvic Medicine & Reconstructive Surgery at Loyola University Medical Center. "I reconstruct vaginas all the time. I agree that the field of women's sexual functioning is a poorly studied area. But I don't buy any of what Matlock is saying. There are standard pre- and post-operative intervention tests and tools that could be applied here to substantiate his claims. Curious that Matlock has not applied any of them to his own work, nor published any scientific material relating to his work, nor subjected anything to peer review. The longer this is untested, the better for him."

Matlock makes no apologies in response to his critics. "I didn't create the market. The need was there. The market was there. I saw it. I'm serving that market." He looks out the window, a bit circumspect. "Doctors can be very vicious. They can be very, very jealous."

Brubaker brushes aside his indictment of the ob/gyn community. To those considering LVR or DLV -- two procedures that are not without their risks, among them hemorrhage, infection, loss of sensitivity, lingering pain from nerve damage -- Brubaker says simply: "Run away, run away, run away."

Apparently, a growing number of women are doing just the opposite. Consider Sherry. A 33-year-old financial consultant, Sherry went to "thousands" of gynecologists to discuss the problems with her "relaxed vagina" before going to Matlock. "Dr. Matlock was the first person who even remotely understood the situation." She describes the result of her surgery as "overwhelming -- psychologically, physically, it was just night and day. It's like being flat-chested your whole life and then finally having breasts." Here she pauses, then adds: "This is L.A. Everybody wants to be beautiful. Everybody wants to be 22 years old with big boobs. Everything can be bought and sold."

Jill also went to "a gazillion gynecologists" who dismissed her problem. Then she met Matlock. "It's a personal preference. Life is short. For women who are severely damaged, sex should still be intense and passionate." And herein lies the crux of the problem. No one would disagree that "severely damaged" women are entitled to great sex. To drive this point home, Matlock lifts up a large alarm clock from his desk. "I don't want to be gross," he says, "but I could easily put this in the vaginas of some of the women coming in here. Do you understand what I'm saying? And that's just not right." But while a staggering 30 percent of women will develop some form of pelvic floor disorder resulting in incontinence or compromise of vaginal integrity after birth, only 5 to 10 percent will be so damaged that they can easily fit a household appliance in their vaginas.

By obscuring the lines between the severely damaged and the naturally relaxed vagina, Matlock has leveled the playing fields among all women and widened the market potential for his genital landscaping. His tight-vagina hype also flagrantly misses the point. With sexual ground zero located in the clitoris, one can only wonder for whom the tight vagina truly tolls -- men or women?

Says Sherry, "You give more pleasure to a man, which affects your own sense of sexual gratification. It's not necessarily about having better orgasms. It's the way you feel as a woman." In a moment of unguarded candor, Matlock himself suggests that a tight vagina might help you keep your man from running after younger women when he leans forward and asks, "Why not have the best sex you can at home? Why not? You tell me why these 40-, 50-, 60-year-old men are running after younger women? They want these women with these nice, hot, tight --" he puts his hands out here emphatically for me to finish the sentence. "Why is that?" he persists. (Which begs another question: Is surgically modifying your vagina the answer?)

Giving a 40- or 50-year-old woman a 20-year-old vagina is not all that Matlock has in his bag of genital tricks. He can also restore her virginity through a technique called hymenalplasty. Essentially the reconstruction of the hymen, this procedure has brought to Matlock's office a steady clientele of Middle Eastern women. "You can't believe how hysterical some of these women are. They come in here and say they're going to get killed unless they get this done. They're telling us that back home their brother will kill them, that their father will kill them. It's terrible. The majority of these Middle Eastern women are coming in to have hymenalplasty because they're getting ready to get married in their home country. All of them tell me that the groom's side of the family can pick whatever doctor they want to determine whether or not she's a virgin, to determine whether she's worth it or not to be married to their son. So there are religious implications, there are social implications."

That Matlock could become the Salman Rushdie of the Islamic vagina doesn't seem to unhinge him. On the contrary. "If I can help a woman in this unfair world," he says with a certain characteristic zeal, "then I'm going to go ahead and do it. I have no problems about doing it whatsoever. The man, he gets to do whatever he wants to do. Is he held accountable for anything? Absolutely not. But the woman is held accountable like this [he brings his hand to his throat like a knife]. It's serious."

Serious perhaps, but not always a question of life or death. Matlock cites the occasional flurry of Japanese women who come in for hymenalplasty. "At one point it became a regular thing. They'd come to the States, do a little school, go on vacation, then come here, have hymenalplasty and go home."

As for Americans, while Matlock concedes that virginity before marriage is essentially a nonissue, a growing population of American women is seeking the "virgin experience" to share with their husbands. "I'm seeing quite a bit more of that happening," says Matlock. "Women coming in because they want the experience."

Take Helena. A financial analyst, Helena first went to Matlock for Laser Vaginal Rejuvenation. "It was the best thing I ever did. My husband was ecstatic," she said. With her new vagina in place, Helena was drawn to the option of getting a new hymen. "My husband and I would have loved it if he had been my first. Our anniversary is coming up; we're renewing our wedding vows. We want to have the virgin experience."

Helena paid for her new hymen with a credit card. When we spoke she was still waiting for the healing process to end (a process she described as "full of lots of pain and crying, but that I'd go through again if I had to") before setting up the special one-time conjugal event with her new vestal vagina.

Hymenalplasty and its bizarre implications aside, there is nothing new about LVR and DLV. Vaginal tightening has been done for decades to help women with extremely compromised vaginal integrity. For the even fewer women out there with true genital "deformities" -- extraordinarily long or protruding labia, for example, or excessive vaginal flesh -- surgery has also been an option for years. "Labial surgery?" says ob/gyn Dr. Cornelia Daly. "There's nothing to it. It's been around for 30 years. Lasers have even fallen out of favor. We have more sophisticated tools that do the same thing these days." According to the ob/gyn community, Matlock has simply put a new spin (sex sells) on an old procedure.

And yet in his hype he offers an appealing line. "There are over 25 medications for male impotence," he says. "It takes $500 to $600 million to bring one drug into research and development. Those are facts. Is there anything remotely similar there for women? No. Not at all. There are over 200 prosthetic devices for men on the market. Anything similar for women? Not at all. If men had problems like that -- if men had babies, and we had certain body parts stretched out as a result -- they would have been looked at, researched and solved a long time ago." And who would disagree? Adds Lucy, "If men had these problems they would have been solved in a petri dish long ago."

Appx1182

https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html[3/4/2024 4:53:49 PM]

The irony here (which seems lost to the doctor himself) is that Matlock wants to liberate women from the shackles of a man's world while selling them what could be the ultimate and most oppressive form of sex/beauty fascism. And as cosmetic surgery becomes more widespread, designer vaginas may become as common as the silicon breast -- a sinister prospect that has many women's advocates up in arms. "Women's genitals are fascinating, unique and beautiful," says pioneering sex therapist Betty Dodson, whose Web site includes a "genital forum" featuring a panoply of different vaginas in all their diversity. Dodson -- who for decades has helped women discover their genitals, and particularly their clitoris, which she describes as women's "little phallic symbol that terrifies the status quo" -- considers LVR and DVR as truly odious procedures except for very extreme cases.

"Now we want little doll-like genitals and vaginal orgasms and Viagra for women!" she laments, reemphasizing the need for women to assert their "clit power" as the only true road to enhanced sexual gratification. "If men can get close enough to lick and diddle, they don't give a rat's ass about the size of your genitals or the shape of your labias," she says. Dismissing the link between vaginal tightness and sexual gratification as a way for men to cash in on women's insecurities and for women to appease the male ego, she practically yells into the phone: "We have catered to men's desires forever! We have lied to them and fooled them for centuries! Enough!"

- - - - - - - - - - - -

**About the writer**
Debra Ollivier is a frequent
contributor to Salon and Le Monde.
She divides her time between Los
Angeles and Paris.

**Sound Off**
Send us a Letter to the Editor

 Salon.com >> Sex

Salon  Search  About Salon  Table Talk  Newsletters  Advertise in Salon  Investor Relations

Arts & Entertainment | Books | Comics | Mothers Who Think | News
People | Politics | Sex | Tech & Business and The Free Software Project
Letters | Columnists | Salon Plus | Salon Shop

Reproduction of material from any Salon pages without written permission is strictly prohibited
Copyright 2001 Salon.com
Salon, 22 4th Street, 16th Floor, San Francisco, CA 94103
Telephone 415 645-9200 | Fax 415 645-9204
E-mail | Salon.com Privacy Policy

# 5 Pelvic Viscera and Perineum: Female

**Paramedian (sagittal) dissection**



Ureter
Uterine (fallopian) tube
Ovary
Ligament of ovary
Round ligament of uterus
Broad ligament (*cut*)
Superior pubic ramus (*cut*)
Inferior pubic ramus (*cut*)
Ischiocavernosus muscle
Body of clitoris
Labia minora
Labium majus

Rectouterine pouch (of Douglas)
Peritoneum (*cut edge*)
Vesicouterine pouch
Rectum
Ureter
Urinary bladder
Vagina
Pelvic diaphragm (levator ani muscle)
Deep transverse perineal muscle (*cut*)
External anal sphincter muscle

**Median (sagittal) section**



Sacral promontory
Ureter
Suspensory ligament of ovary
Uterine (fallopian) tube
Ovary
External iliac vessels
Ligament of ovary
Body of uterus
Round ligament of uterus (ligamentum teres)
Fundus of uterus
Urinary bladder
Pubic symphysis
Urethra
Sphincter urethrae
Deep transverse perineal muscle
Deep dorsal vein of clitoris
Crus of clitoris
External urethral orifice
Superficial transverse perineal muscle
Labium minus
Labium majus

Uterosacral ligament
Vesicouterine pouch
Rectouterine pouch (of Douglas)
Cervix of uterus
Posterior part of vaginal fornix
Anterior part of vaginal fornix
Rectum
Vagina
Perineal membrane
Levator ani muscle
Anal canal
External anal sphincter muscle
Anus
Vaginal orifice

*F. Netter M.D.*
*C. Machado M.D.*

**Plate 360**    Appx1467    **Pelvic Floor and Contents**

The Wayback Machine - https://web.archive.org/web/20010401003237/http://www.salon.com:80/adsales/index2.html



## salon.com

| A&E | BOOKS | COMICS | LIFE | NEWS | PEOPLE | POLITICS | SEX | TECH & BUSINESS | AUDIO |

**ARTICLE FINDER**     Adsales

Advertise in Salon
Main menu
Intro to Salon
Traffic & audience
Ad opportunities
Ad specifications

**SALON.COM SITES**

Arts & Entertainment
- The Movie Page
Books
Comics
Life
News
People
Politics
Sex
Tech & Business
- Free Software Project
Audio
- Salon Radio

Letters
Columnists
Corrections

Salon Plus
Salon Gear
Personals

**WAYS TO GET SALON**

**Downloads**
• Get Salon.com on your PDA
• Salon.com headlines from My Netscape
• More ways to get Salon

# Salon Traffic & Audience Profile

### Page Views

In December 2000 Salon delivered 46 million page views.

### Unique Visitors

In December 2000 Salon registered 2.60 million unique visitors.

### Salon Audience Demographics

**58%** male
**42%** female

**34%** 18-29 years old
**54%** 30-49 years old

**88%** US readers
**12%** foreign readers

**79%** college graduates
**37%** completed post graduate education
**70%** professional or managerial

**37%** married
**24%** have children under 18 at home

**63%** own their own residence

Average household income: **$71,300**

### Salon Audience Online Activities

**91%** online everyday or more often
Average time per Salon visit: **26.3** minutes
**27%** read 5+ articles per visit
**74%** 3+ years' online experience
**95%** shopped online in the last 6 months

SALON GEAR→
Our California energy crisis T-shirts are here!

Extra goodies and great services in Salon Plus

**BUSINESS2.0**

Five Questions With...The Father of the Internet

Sprint Banks on New Color Display Phone

Daily Insight: Packing After the Sacking, Part Deux

IBM Holocaust Suit Over

Feeling Palm's Pain

Salon Personals
Catch of the Day

secretdemand

"Tall, pale, dorky drummer seeks adventure in a dress."

BTL EX1023
IPR2024-00703
U.S. Patent No. 8,961,511

Appx1547

**53%** visit Salon to stimulate new ideas
**75%** visit Salon for entertainment
**47%** use Internet for researching stocks
**98%** use e-mail

**67%** access Salon from home
**75%** access Salon from work
**11%** access Salon from college/university

**67%** listen to audio on the Web
**61%** watch video on the Web

### Salon Audience Shopping Interests

| Purchased online in last 6 months | Salon @plan index |
|---|---|
| Airline ticket/reservation | 137 |
| Books | 182 |
| Car rental | 143 |
| Clothes/Accessories/Shoes | 155 |
| Computer hardware | 184 |
| Computer software for the Web | 289 |
| Home electronics | 202 |
| Hotel/motel reservations | 135 |
| Magazine/newspaper subscriptions | 227 |
| Movie tapes/DVDs | 231 |
| Music CDs/tapes | 204 |
| Stock | 142 |
| Toys/non-computer games | 142 |

**Sources:**
Cyber Dialogue 2000
@plan spring 2001 profiling report

Visit Salon's newest site Salon Audio for free spoken word recordings from your favorite authors

Salon   Search   About Salon   Table Talk   Newsletters   Advertise in Salon   Investor Relations

Arts & Entertainment | Books | Comics | Mothers Who Think | News
People | Politics | Sex | Tech & Business and The Free Software Project
Letters | Columnists | Salon Plus | Salon Shop

Reproduction of material from any Salon pages without written permission is strictly prohibited
Copyright 2001 Salon.com
Salon, 22 4th Street, 16th Floor, San Francisco, CA 94103

Appx1548

# TEMPERATURE CONTROLLED RADIOFREQUENCY FOR VULVOVAGINAL LAXITY

**Red M. Alinsod** evaluates the results of his study on the effectiveness of non-invasive transcutaneous temperature controlled radiofrequency for vulvovaginal rejuvenation

## ABSTRACT

Objective: To evaluate the safety, tolerability, and clinical efficacy of non-invasive transcutaneous temperature controlled radiofrequency (TTCRF) for vulvovaginal rejuvenation and document ancillary beneficial effects of treatment.

Patients and methods: subjects (n=23; age range 26–58 years, mean 43.6; 5 menopausal, 6 perimenopausal) presented with mild to moderate primary or secondary vulvovaginal laxity. Associated conditions (orgasmic dysfunction, stress incontinence, atrophic vaginitis) were present in most subjects. Exclusion criteria included pelvic surgery within 5 years, pregnancy or planned pregnancy within the study period, recent abnormal Papanicolaou test result, and presence of vulvar lesions or any condition that may potentially interfere with the safe treatment. Informed consent was obtained from all subjects. Patients were treated up to three times at an interval of 4 to 6 weeks.

Outcome measures: subject assessment via vaginal laxity questionnaire (VLQ) rating on a 7 point scale where 1=very loose and 7=very tight, and sexual satisfaction questionnaire (SSQ) rating on a six point scale where 1=none and 6=excellent, as well as observations of associated conditions such as incontinence, atrophic vaginitis, and orgasmic dysfunction.

Results: median improvement of 5 points on the VLQ scale and 2.5 points on the SSQ scale were noted; results were statistically significant (p<0.05). The most pronounced outcomes manifested after initial treatment with additional improvement after each of the second and third treatments. Patients with orgasmic dysfunction, stress incontinence, and/or atrophic vaginitis noted substantial improvement regardless of number of treatments. Menopausal subjects were able to cease usage of vaginal estrogens.

Conclusion: TTCRF is safe, tolerable, and effective for vulvovaginal rejuvenation. Evidence suggests applications in the treatment of atrophic vaginitis, orgasmic dysfunction, and stress incontinence

**T**HE VAGINAL WALL PREDOMINANTLY consists of dense connective tissue that is heavily vascularized and through which many nerves pass, lined by a slightly keratinized, stratified squamous epithelium. The vulva, particularly the labia majora, is even more skin-like although generally more heavily vascularized and innervated than skin in most bodily regions. During vaginal delivery, stretching causes damage to the connective tissue that heals in a varying state of laxity that increases with each successive birth; the vulva is similarly affected. In addition, reductions in the quality of connective tissue due to neuroendocrine changes and age serve as contributing factors. This condition is rarely discussed in a clinical setting[1-3]. Other conditions such as stress incontinence and atrophic vaginitis arise in conjunction with vulvovaginal laxity, as well as natural results of delivery trauma and advancing age. An additional consequence to vulvovaginal laxity is reduced sensation during coitus, with a potential negative effect on sexual satisfaction and quality of life[4-7].

The term 'vulvovaginal laxity', encompasses laxity of both the vaginal introitus and labia majora. Given that most people refer to the entire compound structure as 'the vagina' it stands to reason that 'vaginal laxity' and



**RED M. ALINSOD, M.D., FACOG, FACS, ACGE,** South Coast Urogynecology, 31852 Coast Highway, Laguna Beach, CA 92651

**email:** red@urogyn.org

**KEYWORDS**
Vulvovaginal laxity, temperature-controlled radiofrequency, non-surgical vaginal rejuvenation

'vulvovaginal laxity' will be used synonymously by some but it is important to note that, technically, 'vaginal laxity' does not involve the vulva specifically. Laxity of the vagina, specifically, is often referred to as pelvic organ prolapse but that term is also inaccurate because it refers to a more severe condition possibly involving vaginal and other genitopelvic structures bulging into the vaginal canal and introitus, rather than laxity of the introitus itself[8].

To the patient, there are other notable characteristics of vulvovaginal laxity and the aesthetic appearance of the vagina may be perceived as significantly compromised, leading to self-consciousness. Laxity of the labia majora may be associated with discomfort and irritation when tight clothing is worn, as well as discomfort during intercourse. Orgasmic dysfunction, reduced friction during sex due to 'looseness', and other aspects of laxity-related changes are perceived to negatively impact the sexual experience in a variety of ways. So vaginal laxity or 'looseness' as a medical or aesthetic concern is not new; it is, however, only recently becoming socially acceptable as a topic of consideration. References to the vagina—structure, function, and associated problems—are now less taboo. Gynecological and urological issues that women may have been reluctant to address directly with physicians or even friends in the ▷

Appx1596

BTL EX1025
IPR2024-00703
U.S. Patent No. 8,961,511



| MILLHEISER VAGINAL LAXITY SCALE | MILLHEISER SEXUAL SATISFACTION SCALE |
|---|---|
| **Table 1** Assessment scales for vulvovaginal laxity and sexual satisfaction | |
| 1 = Very loose | 1 = None |
| 2 = Moderately loose | 2 = Poor |
| 3 = Slightly loose | 3 = Fair |
| 4 = Neither tight nor loose | 4 = Good |
| 5 = Slightly tight | 5 = Very good |
| 6 = Moderately tight | 6 = Excellent |
| 7 = Very tight | |

▷ past are somewhat out in the open and, as such, more comfortably discussed in a clinical setting.

In the past, treatment of vulvovaginal laxity and related aspects lay within a short spectrum heavily weighted at the ends, with non-invasive (but minimally effective) Kegel exercises to strengthen the pelvic floor versus costly, invasive surgery at the other end. A 2012 physician member survey conducted by the International Urogynecological Association (IUGA) assessed the attitudes and practices regarding vaginal laxity[6]; of the 563 respondents, 84% stated belief that vaginal laxity was underreported, 95% believed vaginal laxity impacted patient sexual function, and 57% considered it to greatly affect quality of life. All respondents felt vaginal laxity was the dominant physical change experienced by subjects after vaginal delivery. As for treatment, all surveyed physicians recommended Kegel exercises along with physical therapy, with approximately 54% offering or recommending surgical intervention, although 83% of respondents were concerned about dyspareunia (painful sexual intercourse) as an associated risk of surgery.

Only recently have alternatives appeared to fill the wide gulf between the two ends of the spectrum. The term 'vaginal rejuvenation' has arisen, and received a lot of attention and scrutiny within the emergence of novel modalities. Vulvovaginal rejuvenation with devices harnessing laser or radiofrequency (RF) energy (among others), as in aesthetic dermatology and plastic surgery on

> *Vulvovaginal rejuvenation with devices harnessing laser or radiofrequency energy (among others), is a fairly new concept with real potential for success.*

the face, neck, and décolleté[9,10], is a fairly new concept with real potential for success. Numerous studies in aesthetic medicine have demonstrated tissue contraction and determined a therapeutically ideal temperature range (40°C to 45°C) in which neocollagenesis (via the healing cascade) is stimulated without causing unnecessary damage to the skin or integral tissue structures.

A landmark study by Millheiser and colleagues in 2010[11] investigated transurethral monopolar RF for vaginal laxity after vaginal childbirth. Subjects (n=24, age range 25 to 44) were premenopausal women and had at least one full term vaginal delivery. Investigators used a seven point vaginal laxity scale (vaginal laxity questionnaire, or VLQ) to assess subjective patient perception of laxity and improvement (with ratings of 1=very loose, 2=moderately loose, 3=slightly loose, 4=neither loose nor tight, 5=slightly tight, 6=moderately tight, and 7=very tight). A six point sexual satisfaction questionnaire (SSQ) was also administered to help evaluate perceived improvement in sexual satisfaction (rated as 1=none, 2=poor, 3=fair, 4=good, 5=very good, and 6=excellent). Cryogen cooling was used concurrently with the RF probe inside the vagina to manage potential unwanted thermal damage due to overtreatment. At 1 month post-treatment 67% of patients reported improvements of 2 to 4 points on the VLQ and all patients reported at least one point of improvement. By follow-up at 6 months, approximately 87% of subjects reported improvements of 2 to 4 points. Of the 12 subjects who had reported diminished sexual function following delivery, all reported notable improvement to sexual function as well.

Sekiguchi et al.[8] more recently reported on a prospective study of low-energy RF for vaginal introital laxity of 30 premenopausal women (age range 21 to 52 years), each receiving a 30-minute treatment with evaluations at 6 and 12 months post-treatment. Statistically significant improvements in sexual function, vaginal laxity, and reductions in distress during sexual activity were noted at 6 months and maintained through the 12-month endpoint, with no adverse events reported. RF has also been employed successfully to treat stress incontinence[12,13].

Transcutaneous temperature controlled radiofrequency (TTCRF) brings with it numerous advantages for the treatment of skin laxity[14]. RF is an established modality for tissue tightening via stimulation of neocollagenesis, denaturation of collagen, contraction, and activation of the healing cascade. This was shown in a histological study of RF in animal studies[15]. Thus, tissue temperature is modulated by controlling the power (the electrical voltage delivered to the RF electrode) in relation to tissue impedance, which raises tissue temperature in the proximity of the RF electrode. Thermistors and thermocouples within the treatment probe provide feedback to the device, which controls power to modulate energy deposition and maximize therapeutic relevancy without causing damage and minimizing the potential for patient discomfort. Unlike laser-based treatments, skin type (color or pigmentation)



**Figure 2** (A) Before and (B) after images of a multiparous woman, age 58 years, with prior vaginoplasty presenting with severe laxity of the vagina and labia majora, and atrophic vaginitis. Outcome after one treatment with TTCRF included statistically significant improvement in laxity with visible aesthetic improvement and complete resolution of atrophic vaginitis. This patient also no longer uses vaginal estrogens

Appx1598

is not an issue with RF energy; and while it is proven effective on surface skin of the face and other body regions, RF is even more effective in tissue that is naturally moist and well hydrated, as is the vaginal and ancillary structures. Treatment is non-invasive and there is no downtime.

The treatment probe is of a proprietary design developed with expert physician input. During TTCRF treatment, the probe tip is passed back and forth slowly and with wide sweeps over the desired zone of treatment for 3 to 5 minutes, until the tissue is gradually heated to the therapeutically relevant level to induce tightening of the skin, mucosa, and fascia as well as stimulate neocollagenesis. This also promotes patient comfort and assures that the practitioner does not over-treat.

The purpose of the study is to evaluate the safety, tolerability, and clinical efficacy of TTCRF as well as anecdotally document possible ancillary beneficial effects of treatment, to promote further study.

## Patients and methods

In this prospective study, 23 subjects (age range 26–58 years, mean 43.6; median vaginal births=2, mean parity 1.7; 5 menopausal, 6 perimenopausal) presented with self-described mild to moderate primary or secondary vulvovaginal laxity. Associated secondary conditions (orgasmic dysfunction, stress incontinence, atrophic vaginitis) were present in most subjects. Those who presented with mild to moderate stress urinary incontinence (n=6) were evaluated by examination showing urethral hyper-mobility, positive Valsalva, and recording incontinence episodes per day along with pad counts. Severe incontinence patients with suspected ISD and positive empty bladder stress tests were excluded. Patients who complained of clinical significant atrophic vulvovaginitis (n=8) were evaluated with symptoms of vaginal and vulvar dryness as well as painful intercourse and discomfort with their clothing.

Exclusion criteria included pelvic surgery within 5 years of study commencement, presence of major psychiatric conditions or related need for medication, chronic use of anti-inflammatory agents (including steroids) and immunosuppressants, pregnancy or planned pregnancy within the study period, recent abnormal Papnicolaou test result, presence of vulvar lesions or disease (dermatitis, human papillomavirus, herpes simplex, vulvar dystrophy), or the presence of any condition or circumstance that, in the opinion of the investigating physician, may be unsafe or otherwise interfere with the study. Informed consent was obtained from all subjects prior to commencement of the study.

Pre-treatment digital photography was performed at baseline along with physician evaluation of patients. Treatment was performed in a clinical office setting without anesthesia. During treatment, subjects were placed on a treatment table in the dorsal lithotomy position. A neutral return pad was placed underneath the buttocks of the subject, and a coupling gel was used as a lubricant for treatment with the TTCFR device. Once patients were settled and comfortable they were treated

| | BASELINE | 10 DAYS POST TX1 | | TX2 (BEFORE TREATMENT) | | TX3 (BEFORE TREATMENT) | | 30 DAYS POST TX3 | |
|---|---|---|---|---|---|---|---|---|---|
| | SCORE | SCORE | IMPROVEMENT | SCORE | IMPROVEMENT | SCORE | IMPROVEMENT | SCORE | IMPROVEMENT |
| VLQ† | 2 | 5 | 2 | 5 | 3 | 6 | 4.5 | 6 | 5 |
| SSQ‡ | 3 | 4 | 1.5 | 4 | 1.5 | 5 | 2.0 | 6 | 2.5 |

**Table 2** Median score and improvement from baseline in vulvovaginal laxity and sexual satisfaction after TTCRF*

*Values expressed as median because data were not continuous and not normally distributed; median raw score and median improvement from baseline, thus, may not appear to agree.
†Vaginal Laxity Questionnaire [Millheiser 2010] rating vulvovaginal laxity on a seven point scale where 1=very loose and 7=very tight.
‡Sexual Satisfaction Questionnaire [Millheiser 2010] rating sexual satisfaction on a six-point scale where 1=none and 6=excellent.

using the TTCRF device (ThermiVa, ThermiAesthetics, Inc., Southlake, TX) for approximately 5 minutes per zone (left and right labia majora; and the ventral, dorsal, left and right surfaces of the vaginal wall). The labia majora were treated first; the treatment tip was applied to each labial surface bilaterally from the lowest edge of the mons pubis to the perineal body and laterally to the crural folds. The clinical endpoint was achievement of the target temperature range of 40°C to 45°C for approximately 3-5 minutes per zone (or longer, depending on heat tolerance). This was followed by treatment of the mucosal surface of the vaginal introitus starting at the hymenal ring and advancing to approximately 4 to 9 cm into the cavity for each zone of the vaginal wall (ventral, dorsal, left and right). For each zone the treatment tip is inserted into the vagina with the emitter surface facing the desired direction, and energy is applied with the treatment cannula using an in-and-out motion. The clinical endpoint was achievement of the target temperature in the range of 40°C to 45°C for approximately 3-5 minutes per zone (or longer, depending on heat tolerance); treatment was repeated identically for each of the four vaginal surfaces. Total treatment time was less than 30 minutes. A complete course of therapy consisted of three treatments with the TTCRF device, at an interval of approximately 4-6 weeks. Patients were offered up to three treatments but not ▷

> ❝ Treatment was performed in a clinical office setting without anesthesia. ❞

 

**Figure 3** (A) Before and (B) after images of nulliparous woman, age 52 years, presenting with severe laxity of the vagina and labia majora resulting in chronic irritation of the left majora, severe atrophic vaginitis, and anorgasmia. Outcome after two treatments with TTCRF included statistically significant improvement in laxity with visible aesthetic improvement and complete resolution of irritation, atrophic vaginitis, and anorgasmia

Appx1599






▷ required to undergo all three.

Evaluation of vulvovaginal laxity was made on a 7 point scale by both the investigating physician and patient self-assessment via VLQ[n]; the patient assessment data was used for analysis. A 6 point sexual satisfaction scale[n] was also used by patients to rate sexual satisfaction. *Table 1* delineates these scales.

Assessment occurred at baseline, at 10 days after first treatment, before second treatment, before third treatment, and 30 days after the third treatment session. In addition, patients were asked to give a global assessment asking if they would recommend the procedure to a friend or family member (a 5 point scale where 1=strongly agree and 5=strongly disagree) and to rate overall satisfaction with the procedure (a 5 point scale where 1=very unsatisfied and 5=very satisfied).

**Figure 3** (A) Before (baseline) and (B), (C), and (D) after (treatments 1, 2, and 3) images of nulliparous woman, age 52 years, presenting with laxity of the vagina and labia majora, atrophic vaginitis, incontinence, and orgasmic dysfunction. Outcome after three treatments with TTCRF included statistically significant improvement in laxity with visible aesthetic improvement, significant reduction of orgasmic dysfunction, and complete resolution of incontinence and atrophic vaginitis

## Results

Of the original 23 subjects 6 were lost to follow-up before each of the second and third treatments, reportedly due to high satisfaction with results not necessitating further treatment in the opinion of the patient. There were no burns, blisters or major complications during or after treatments, which were described as pleasant and very comfortable. All patients (n=23) received at least one treatment, with 17 undergoing a second treatment and 11 opting for a third. Average treatment time was approximately 10 minutes for the labia and 15 minutes for

**Figure 4** (A) Before and (B) after images of nulliparous woman, age 52 years, presenting with laxity of the vagina and labia majora, atrophic vaginitis, and orgasmic dysfunction; outcome after three treatments with TTCRF included statistically significant improvement in laxity with resolution of atrophic vaginitis and orgasmic dysfunction




the vagina, totaling about 25 minutes. Patients were able to resume all activity as normal, including sexual intercourse, immediately after each treatment.

The nature of the data (discrete, not continuous), necessitated the use of non-parametric statistical methods overall because data are not normally distributed with the traditional cut-off of p<0.05 for measure of statistical significance via Wilcoxon test; the Bonferroni correction was employed where appropriate, making the cut-off value for some data groups p<0.0125.

Statistically significant improvement in VLQ and SSQ scores from baseline were noted in all cases. Notably, while the patient VLQ assessment data was used for analysis, differences between patient and physician evaluation of vulvovaginal laxity were rare and overall found to be statistically insignificant (p=0.0001). *Table 2* shows the median scores and level of improvement from baseline for the sake of comparison.

As seen in *Table 2*, the most pronounced improvement in VLQ is seen 10 days after the first treatment, with little difference noted before treatment 2, suggesting that much of the result manifests rapidly. There is immediate visible correction after treatment with additional effect over time. There is some additional improvement with a second treatment, and minimal improvement with a third treatment. A similar trend can be seen for the SSQ results. It should be noted that improvement in VLQ score between sessions 2 and 3 was also statistically significant, if modest.

The overall results also correlate with patient behavior. Six patients did not return for a second treatment, and 6 opted out after two treatments, happy with results and seeing no need for further treatment.

All patients finishing a full course of treatment reported that they were very satisfied and strongly agreed that they'd recommend the procedure (scores of 5 on both global assessments).

## Discussion

The tightening result is visible immediately after the first treatment and the full outcome takes a few months to fully manifest regardless of the number of sessions, but after even a single treatment the median change in the VLQ score was 3 points on a 7 point scale at the treatment 2 visit. Median change in SSQ score during that time was more modest but still notable (1.5). As demonstrated in those patients (n=17) electing to undergo at least one more treatment, median change in VLQ score showed that the strongest improvement occurred after the first treatment but additional, statistically significant improvement was available with a second and third session. Improvement measured by self-reported SSQ improved similarly but much less dramatically after the first session. It may be that after the first treatment pronounced improvement is perceived, with any additional improvement in sexual satisfaction appearing minimal with additional treatment, likely due to the challenge associated with self-assessment of sexual satisfaction. Small, incremental rises are less noticeable but were still reported by some patients. Overall this

Appx1600

suggests that while one or two sessions may be satisfactory, a second session may still offer some benefit. A third may not be necessary but continued improvement may be expected. An additional study with larger populations examining protocol refinements may reveal more ideal treatment parameters and further delineate persistence of outcomes.

In addition to offering some confirmation of the results shared in the studies by Millheiser[11] and Sekoguchi[8], this investigation of TTCRF brings two additional factors into light: the treatment of the labia majora, and the use of temperature control feedback to maximize delivered energy safely. Tightening of the labia majora contributes to the positive perception of aesthetic improvement, as demonstrated by before and after photography (*Figures 1, 2, and 3*). Real time feedback by which the device modulates power, and thus maintains safe temperatures without cooling or anesthesia, is a boon to successful treatment and may represent a key advance in the emerging field of vulvovaginal rejuvenation. Users can rapidly treat patients with little preparation. Office time for clinician and patient is minimal, and there is no downtime or risk. Patients need not abstain from sex, nor must they interrupt normal daily activity.

Although not a specific study endpoint, anecdotal notation of improvement in related conditions such as incontinence, atrophic vaginitis, and orgasmic dysfunction was also conducted via questionnaire. Almost all patients reported marked improvement in whatever conditions they presented with regardless of number of treatments, suggesting potential significant global improvement for vulvovaginal laxity and all ancillary conditions with TTCRF treatment. All patients with incontinence (n=6) reported notable improvement (reduced or eliminated leakage or 'dribbling'). Before treatment, these patients would suffer from 1–5 incontinence episodes per day, requiring the use of 1–5 pads each day. After treatment, five of the six patients did not require pads anymore and the incontinence episodes were zero. One patient continued to use pads even though the incontinence episodes were reduced by half.

All patients complaining of any level of orgasmic dysfunction, including clitorial orgasmic dysfunction (n=17, including 3 anorgasmic subjects), reported dramatic improvement (e.g. stronger, multiple, and/or more rapid achievement of orgasms with coordinated vaginal contracture during coitus). Patients who complained of lack of clitoral sensitivity and unusually long time to achieve orgasms were treated both externally on the labia/clitoral complex plus internally on the G-Spot region and entire vulvovaginal structures. This resulted in increased sensitivity of both the clitoris and vulva itself with 14 of 15 patients who complained of taking too long to achieve orgasms and a lack of clitoral sensitivity able to achieve orgasms in a third to a fifth of the time.

Additionally, all patients (n=8) with atrophic vaginitis reported resolution of symptoms (improved moisture/no more need for lubricants), and all menopausal women (n=5) no longer needed vaginal estrogens or lubricants. An example of a patient exhibiting successful resolution of atrophic vaginitis is seen in *Figure 4*. In addition, one of two

---

### Key points

- TTCRF is safe and comfortable with superior tightening effects for vulvar and vaginal laxity that can approach pre-pregnancy and pre-menopausal levels
- TTCRF is effective for both external and internal atrophic vulvovaginitis
- TTCRF is effective in reducing both SUI and OAB symptoms
- TTCRF is effective for orgasmic dysfunction in selective patients
- Clinical effectiveness with no downtime is seen after 1 treatment and improves over 3 months
- Yearly to bi-yearly maintenance treatment is effective in maintaining achieved RF effects

---

" Based on the data, TTCRF is safe, tolerable and effective for vulvovaginal rejuvenation. "

---

patients presenting with rectocele, and both patients with cystocele, reported reduction in symptoms as well as noticeable improvement via visual pelvic examination by the investigating physician. The mechanism of action for these results is unclear but may be related to increased tightness leading to improved fascial support (pubocervical and rectovaginal fascia). This suggests the necessity of larger future studies addressing these specific issues.

While the variety of possible medical and aesthetic concerns associated with the vagina and related structures are not novel to gynecologists and urologists, increasing social acceptance of the vagina and reference to it have not only shed additional light on the prevalence, but will continue to boost demand for therapies addressing those issues. This is a boon to patients otherwise left to choose between low-efficacy pelvic floor exercises, invasive surgery, and simply not seeking treatment. Given the safety, simplicity and ease of treatment associated with TTCRF as well as the remarkable results and high patient satisfaction with virtually no risk, downtime, or discomfort, this novel therapy shows much promise in both the medical and aesthetic arenas in an increasingly accepting social climate.

### Conclusion

Based on the data, TTCRF is safe, tolerable and effective for vulvovaginal rejuvenation. Evidence strongly suggests applications in the treatment of atrophic vaginitis, orgasmic dysfunction, and stress incontinence. Further investigation via randomized, controlled trials isolating and exploring various potential indications with larger subject populations is strongly suggested.

▶ *Declaration of interest* *This study and preparation of this research article was funded in part by ThermiAesthetics, Inc., manufacturer of the TTCRF technology used during the investigation.*

### References

1. Kingsberg SA, Millheiser LS. Vaginal laxity after childbirth: Qualitative surveys of women's perceptions, effect on changes in self-image and sexual relationships. J Sex Med 2010;7(Supplement 3):127–8
2. Millheiser LS, Kingsberg SA, Lukes A, Chen B, Pauls RN. Cross-sectional survey of consumers and professionals to assess the consequences of vaginal deliveries and introital laxity on sexual function and satisfaction. J Sex Med 2011;6:1645
3. Pauls R, Fellner A, Davila G. Vaginal laxity: a poorly understood quality of life problem; a survey of physician members of the International Urogynecological Association (IUGA). Int Urogynecol J 2012;23(10):1435-48
4. Klein MC, Kaczorowski J, Firoz T, Hubinette M, Jorgensen S, Gauthier R. A comparison of urinary and sexual outcomes in women experiencing vaginal and Caesarean births. J Obstet Gynaecol Can 2005;27:332–9
5. Griffiths A, Watermeyer S, Sidhu K, Amso N, Nix B. Female genital tract morbidity and sexual function following vaginal delivery or lower segment caesarian section. J Obstet Gynaecol 2006;26:645–9

6. Pauls RN, Occhino JA, Dryfhout VL. Effects of pregnancy on female sexual function and body image: A prospective study. J Sex Med 2008;5:1915–22
7. Zielinski R, Miller J, Low LK, Sampselle C, Delancey JO. The relationship between pelvic organ prolapse, genital body image, and sexual health. Neurourol Urodyn 2012;31:1145–8
8. Sekiguchi Y, Utsugisawa Y, Azekosi Y, et al. Laxity of the vaginal introitus after childbirth: nonsurgical outpatient procedure for vaginal tissue restoration and improved sexual satisfaction using low-energy radiofrequency thermal therapy. J Womens Health (Larchmt) 2013;23(9):775-81
9. Preissig J, Hamilton K, Markus R. Current Laser Resurfacing Technologies: A Review that Delves Beneath the Surface. Semin Plast Surg 2012; 26(3): 109-16
10. Mulholland RS. Radio frequency energy for non-invasive and minimally invasive skin tightening. Clin Plast Surg.2011 Jul;38(3):437-48
11. Millheiser LS, Pauls RN, Herbst SJ, Chen BH. Radiofrequency treatment of vaginal laxity after vaginal delivery:

nonsurgical vaginal tightening. J Sex Med 2010;7(9):3088-95
12. Dillon B, Dmochowski R. Radiofrequency for the treatment of stress urinary incontinence in women. Curr Urol Rep 2009;10:369-74
13. Elser DM, Mitchell GK, Milks JR, et al. Nonsurgical transurethral collagen denaturation for stress urinary incontinence in women: 18-month results from a prospective long-term study. Neurourol Urodyn 2010;29:1424-8
14. Key DJ. Integration of thermal imaging with subsurface radiofrequency thermistor heating for the purpose of skin tightening and contour improvement: a retrospective review of clinical efficacy. J Drugs Dermatol 2014;13(12):1485-9
15. Coad JE, Vos JA, Curtis A, Krychman M. Safety and mechanisms of action supporting nonablative radiofrequency thermal therapy for vaginal introitus laxity occurring in women after childbirth: Histological study in the sheep vaginal model. J Sex Med 2013;10(Supplement 2):175

Appx1601

McK
GT
497
.U6E63
2003

3 1430 05186979 2



Heinz Tschachler,
Maureen Devine, Michael Draxlbauer (Eds.)

# The EmBodyment of American Culture

AAAS Austrian Association for American Studies
Österreichische Gesellschaft für Amerikastudien

American Studies in Austria

LIT

BTL EX1027
IPR2024-00703
U.S. Patent No. 8,961,511

Heinz Tschachler, Maureen Devine,
Michael Draxlbauer (Eds.)

# The EmBodyment
# of American Culture

**LIT**

Appx1608

Umschlagbild: Anna Schober

**Bibliographic information published by Die Deutsche Bibliothek**
Die Deutsche Bibliothek lists this publication in the Deutsche
Nationalbibliografie; detailed bibliographic data are available in the
Internet at http://dnb.ddb.de.

ISBN 3-8258-6762-5

© LIT VERLAG Münster   2003
Grevener Str./Fresnostr. 2   48159 Münster
Tel. 0251-23 50 91          Fax 0251-23 19 72
e-Mail: lit@lit-verlag.de   http://www.lit-verlag.de

Distributed in North America by:



**Transaction Publishers**
New Brunswick (U.S.A.) and London (U.K.)

Transaction Publishers          Tel.: (732) 445 - 2280
Rutgers University              Fax: (732) 445 - 3138
35 Berrue Circle                for orders (U. S. only):
Piscataway, NJ 08854            toll free (888) 999 - 6778

# Table of Contents

List of Illustrations                                                              7

Acknowledgments                                                                    9

*Heinz Tschachler*
Introduction                                                                      11

## Part 1: Cultural Studies

*Jessica Johnston*
Normalizing Disciplines: Overweight Subjectivities
and Resistances                                                                   25

*Louis J. Kern*
Venus Envy – Penis Envy: Aesthetic Autoplasty,
Genital Reconstruction, and Erotic Embodiment                                     43

*Sarah Hildebrandt*
The Last Frontier: Body Norms and Hair Removal
Practices in Contemporary American Culture                                        59

*jan jagodzinski*
The Pierced and Tattooed Body:
The Branded Skin-ego of Post-Oedipalization                                       73

*Anna Schober*
Blue Jeans. Alterations of a Thing, a Body, a Nation.                             87

*Klaus D. Heissenberger*
An All-American Body? Bruce Springsteen's
Working-Class Masculinity in the 1980s                                           101

Appx1610

*Greta Olson*
The Monster Within: Demonic Images of Food, Bodies
and the Desire to Eat in Recent American Literature on
Eating Disorders                                                    111


**Part 2: Textual Studies**

*Monika Seidl*
"Framing Isabel": About Some *fin-de-siècle* Portraits
of Ladies                                                          129

*Astrid M. Fellner*
"body for body": The Repulsive and Eroticized Bodies of
Djuna Barnes                                                       141

*Piotr Zazula*
The Woman and the City: The "Feminine" Body in
Modern American Poetry                                             155

*Martina Antretter*
The Surrender of the Body in Mary Oliver and Amy
Clampitt's Ecopoetry                                               175

*Klaus-Dieter Gross*
Violence in American Opera from the 1900s through
the 1950s                                                          187

*Bernd Herzogenrath*
Tod Browning's *Freaks* and the Fraternity
of the Fragmented                                                  203

Contributors                                                      217

48                                                                    Louis J. Kern

Something was missing, and I know it. I had no way of knowing what was missing."[18]

And despite two generations of American women who had been culturally conditioned to recognize the circumcised penis as the norm and to prefer the appearance of a trimmed organ, some circumcised men felt sexually inadequate. One man spoke openly of his sexual dysfunction. As a young man, in 30-40 sex acts he reached orgasm only four or five times; in a more permanent relationship his average improved to one in four. While this man's experience may have had physical, neurological, or psychological causes unrelated to his circumcision, it is certainly possible that psychological trauma related to loss of the foreskin was the strongest etiological influence at work here. And the perception of sexual inadequacy acutely felt by some circumcised men is echoed by some women as well. It may not only be that full orgasmic pleasure is denied the circumcised male, but that he is also unable to fully satisfy his sex partner. Consider, for example, the testimony of a registered nurse:

> I have found that it is easier to bring a man with a natural, intact penis to full erection and to maintain that erection during the course of an evening, and to do so with less effort, than it is to accomplish the same objective with a man with a circumcised penis. Furthermore, a natural penis provides me with a much more enjoyable rainbow of vaginal sensations, and provides a much more exciting object to fellate.[19]

Seeking to overcome the effects of what it perceives as imposed genital deformity and psycho-sexual maiming, the goal of the (re)intact male genital movement is neatly summed up in the name adopted by one of its activist organizations—RECAP (Recover a Penis). Recovery and (re)covering of the penis can be achieved through simple techniques of skin-stretching that require no medical intervention, but for those who have insufficient penile shaft skin remaining after circumcision or who lack the patience for long-term, gradual reconstruction, the surgical option becomes attractive. Commonly referred to as "uncircumcision" or "surgical reconstruction," it is a form of genital cosmetic surgery. One doctor, in fact, bills his procedures as "male cosmetic surgery," and in a rare instance of honesty in advertising, admits that "with any method the penis rarely looks the same as it would if it were not circumcised."[20] More typical is the hyperbolic claim that uncircumcision is the embodiment of "penile reform."[21]

For women, too, contemporary plastic surgery offers salvation from the torment of bodily disgust and distaste. Elective surgery offers a postmodern "genital aesthetics" that promises reformed, rejuvenated, and reformatted "designer vulvas," resculpted genitals. Essentially the response to the relaxation or damage of vaginal muscles, fascia, ligaments, and supporting tissues resulting from parturition and aging, as well as to cultural standards of genital aesthetics for the female, this surgery addresses a similar level of feminine gender discontent as foreskin reconstruction does to male genital malaise. The goals of female genital reconstruction parallel those of penile reform—genital beautification, restoration of the pristine condition of the sexual organs, and intensification of sexual pleasure. The primary procedures undertaken on the female genitals are designer vaginoplasty (the aesthetic enhancement of the labia majora, labia minora, mons pubis, introitus, and perineum) and laser vaginal rejuvenation designed to tighten the vagina and thus enhance sexual gratification (including reduction and augmentation labioplasty, vulvar labioplasty [on the mons pubis]), and hymenoplasty (reconstruction of the hymen).[22]

Testimonials from women who have undergone DV and LVR are homologous to those of men who have undertaken foreskin restoration. Like their male counterparts, lack of self-esteem and sexual dysfunction bring women to subject their genitals to surgical intervention. Peer pressure and cultural norms of genital appearance play a prominent role; if it can be said that discontented circumcised men suffer from a kind of penis envy, the candidate for LVR suffers from labia envy.[23] As one woman described her experience of bodily identity, shaped by comparative genital experiences, " . . . when we were changing [during gym class] I could tell what was normal and what was not. I knew that something wasn't right." Her perception of abnormality resided in her conviction that her labia minora were too large. Other women testified that "I felt plagued by the size of my labia ever since I was a little girl," or "I'd see women in locker rooms and magazines and be jealous . . . [after two childbirths] my vagina had that 'flippy-floppy' feeling. I could barely feel anything. Sex was just not the same." Still others confessed to "having always felt inhibited when I was involved in a relationship and my sexuality was suppressed for as long as I can remember. I wasn't completely proud of my body and felt different from other women"; and trying to reach climax was all but impossible. I felt very uncomfortable having sex."[24]

Enhancement of sexual pleasure is often prioritized in testimonials from LVR patients, but it is difficult to tell whether the perception of improved sexual function is real or is primarily a psychological response to the promise of an ameliorated sex life prominently displayed in typical advertisements for LVR procedures. In any case, candidates for this type of cosmetic surgery, like those for surgical reconstruction of the foreskin, are those who have experienced little success or who have become impatient with non-surgical remedies (Kegel exercises). Whether the benefits are real or imagined, women who have undergone LVR give witness of improved sexual functioning. As one woman claimed, "now [sex] is magnificently great. Everything's so much tighter. I can really feel the difference. It's like I'm starting all over again." A female plastic surgeon, Dr. Jane E. Norton, provides physiological support for reports of enhanced sexual pleasure: While the postpartum vagina may have become stretched and relaxed, "men get smaller as they age due to less testosterone in their systems, which can affect the size of their erections and their stamina as well. By tightening the vagina, this can enhance the pleasure for both the woman and the man."[25]

But the terrain of the female sexual body is more contested than that of the male and consequently there is more interrogation of the claims for surgical enhancement of sexual pleasure through LVR than there is of those made for surgical foreskin restoration. On one side stand the practitioners of redesigned vaginas—the genital plastic surgeons—and their self-selected, emotionally satisfied patients; on the other stand feminist critics and advocates of genital naturalism.

Julia Scheeres, a free-lance writer, clearly laid out the sexual politics of LVR surgery. "All of these genital procedures," she wrote, "are deeply rooted in misogynist notions of the female genitalia as ugly, dirty and shameful." "Just when it seemed," she continued,

> that cosmetic surgeons had run out of body parts to plunder, they discovered a new area: the female genitalia. Suddenly, there's a beauty standard for the vulva and the vagina: smooth, small and hairless. The prepubescent look is in; natural, normal genitalia are out.[26]

Ultimately, the new model pudenda have not realized the promise of greater sexual fulfillment for women, but have simply imposed "creepy new beauty standards" that have only meant for women that

in our quest to mimic that most American icon of beauty, Barbie, we've stuffed silicone bags into our chests, paralyzed our expressions with bacteria injections, and died vacuuming fat from our hips and thighs. Now we can have Barbie's smooth synthetic crotch as well.[27]

Scheeres' Barbie connection brings us to the heart of the cultural controversy over female genital cosmetic surgery. Mary F. Rogers has teased out the implications of Barbie Culture for the deconstruction of the feminine from the perspective of contemporary cultural theory. "Barbie," she writes,

> is an icon whose "perfect" body is more attainable than ever before. She exists most widely as an icon in those cultures where women cannot escape endless messages about how to improve, enhance, rework, and even perfect their deficient, flawed bodies. She has iconic force in cultures where one is never too young nor too old to make use of the artifices marketed as instruments of feminine success. Barbie is iconic, then, of a somatics as mind boggling in its reach as her accessories are. . . . Overall, Barbie's is a body signaling the emergence of the technobody in commodity cultures.[28]

The commodification of the female sexual body has been reinforced, too, by paradigmatic popular cultural images ranging from the idealized centerfolds of glossy pictorial publications like *Playboy* to the up-close and personal images of hard-core porno videos. As Elizabeth Haiken observed, "before crotch shots were published nobody was interested in this, but now everyone knows what labia are supposed to look like."[29] Lest one think that the Bunny connection is simply a sign of feminist disgruntlement with a male-oriented plastic body, cosmetic genital surgeons themselves have acknowledged its effect. Dr. Gary Alter has described it as the "*Penthouse* effect." Dr. David Matlock claims that "women of the world inspired all of the surgical designs." He cites the airbrushed Bunnies of *Playboy* as the *belle ideale* of female genitalia. "Honestly," he says,

> if you look at *Playboy*, those women, on the outer vagina area, the vulva is very aesthetically appealing, the vulva is rounded. It's full, it's not flat. . . . Women were coming in saying, 'I want something different, I want to change things.' Then look at *Playboy, the ideal woman per se,* for the body and the shape and so on. You don't see women in there with excessively long labia minora.[30]

52                                                                  Louis J. Kern

Idealization of female genitalia according to a sanitized standard of perfection may be the immediate result of popular erotic culture, but hymenoplasty implies a genital retrogression to a prepubescent stage when the connection with Barbie was more immediate, a mode of body reshaping that suggests a closer connection with anorexia than it does with sexual desire. Dr. Matlock's hymenoplasty clientele has typically been Islamic and Japanese women preparing for pre-nuptial examinations to establish their maidenhood. Increasingly, however, a growing number of American women are seeking the "virgin experience." Matlock simply "works with what's already there and then stitches up the area to bring it to the state before virginity was lost."[31] The operation is often undertaken for romantic reasons—to have the "first time experience" with a new sex partner, or to reclaim a lost sense of innocence. A Texas woman described her sense of sexual renewal in ecstatic terms—"I feel the excitement—like I'm a virgin again!" Less enthusiastic critics describe the newly-minted, re-virgined body in less flattering terms as that of a woman with "little doll-like genitals," perhaps hermetically resealed like the smooth pubis of the plastic Barbie body.[32]

At the epicenter of the controversy over female cosmetic reconstructive genital surgery is the developer of LVR, the dean of the "Born-Again Virgins," Dr. David Matlock. Matlock claims to have averaged some 500 vaginoplasties annually since he pioneered his laser technique in 1996.[33] Among his patients, he has the reputation of being a "woman's doctor," and he stresses that his LVR procedure "is driven by women, and it's for women. . . . The woman is the artist, and we are the instrument she uses to express herself in her image."[34] Matlock casts himself as the paladin of the pudenda, providing the medical intervention to facilitate female sexual liberation and erotic equality. "There are over 25 medications," he points out,

> for male impotence. . . . Is there anything remotely similar for women? No. Not at all. There are 200 prosthetic devices for men on the market. Anything similar for women? Not at all. If men had problems like that—if men had babies, and we had certain body parts stretched out as a result—they would have been looked at, researched and solved a long time ago.[35]

Yet, what Matlock offers women is the reconstructed body as commodity. His ads play on bodily fear and shame and promise an erotic utopia through vaginal rejuvenation.

"Ladies," a come-on ad sets up its pitch, "if you are self-conscious about showing 'The Full Monty' there is a solution. . . . You won't believe how good sex can be!"[36] Matlock has also appeared on the talk radio circuit—he was lauded by Howard Stern—is scheduled to publish an article in *Marie Claire* and has a pop self-promotional book in the works entitled "What the Gynecologist Didn't Tell You." He is reported to be "poised to launch an international franchising and licensing network [riding] on the edge of a cresting wave that has already made him a millionaire several times over."[37] Though some critics argue that mainline ob/gyn professionals oppose Matlock's procedures, the relevant professional organizations seem to have taken a neutral stance. Neither the American College of Obstetricians and Gynecologists nor the American Medical Women's Association nor the American Association of Sex Educators, Counselors, and Therapists has taken an official position on either cosmetic reconstructive or erotic enhancement surgery.[38]

Despite the gushing enthusiasm of a well-satisfied customer with a resculpted vulva and rejuvenated vagina attached to her otherwise chronologically aged flesh, who swore that "this man is like the creator of women. They call him the Picasso of woman's vagina. It's true, he does make you totally new,"[39] the nagging question remains: new for whom? The tighter, young vagina is an aesthetic product designed for display and use, but who is the end-use consumer? When pushed, women who have undergone Matlock's procedures seem to know. As one woman put it, "my husband says he has the same wife, but a new woman." Another woman was even more direct about the enhanced erotic pleasure of her reconstructed vagina. "You give more pleasure to a man," she says, "which affects your own sense of sexual gratification. It's not necessarily about having better orgasms. It's the way you feel as a woman."[40] When Matlock lets his guard down, he can be brutally frank on the benefits of LVR. He told a female interviewer that the procedure could prevent husbands from running after younger women. "Why not have the best sex you can at home?," he asked. "You tell me why these 40,50,60-year-old men are running after younger women? They want these women with these nice, hot, tight _____."[41]

LVR, then, is not so much a procedure to liberate female eroticism where women can reclaim their desire, but merely a new weapon in the war against aging, an embodied product to cater to male sexual fantasies and pleasure and thus forestall the abandonment of aging wives. The promise of the perfected female sexual body, marketed as a means to the enhancement of female sexual pleasure only serves to reinforce the subordination of female desire to the needs of the male in the traditional patriarchal order. The *Playboy* Bunny body and the Barbie body remain the subordinated signs of an unreconstructed female desire in a cosmetically reconstituted body.

In the scopophilic theology of the sexual body, a secularized, pop evangelism of desire is incorporated in the exploitative culture of the flesh. The final phase of the cycle of bodily redemption is plastic surgery, which provides transcendence of the abjected body through its perfection. The sanctification that comes with grace, mediated by the concentrated light of the surgical laser, offers social redemption and bodily resurrection. The cycle of embodied grace has moved the spectator from deprivation, bodily disgust and discontent to body-ego reconciliation, and finally to the promise of the elimination of bodily imperfection altogether.

Yet, as we have seen, the ideal postmodern body, the body beyond the abjected flesh, remains a contested site for continuing struggles over gender, power, and personal identity. The artificial perfection of the flesh deconstructs the earth-bound, natural body, idealizing a mimetic, immortal, plastic body as the ideal form of embodiment in its place. As Mary F. Rogers has observed,

> the modern body is far from "natural" . . . and the post-modern body extends that development along the pathway toward technoselfhood. . . That means . . . that dominant norms about appearance will shape a greater number of bodies, especially as body-altering techniques become more affordable. Rather than customizing their bodies, then, many people will be standardizing them along lines paralleling the imagery promoted by icons like Barbie.[42]

Now, more than ever, the contemned body of our discontent and alienated desire has been internalized and reabsorbed under the sign of transcendence of the flesh, transformation of desire in an artificially reproduced, retrogressive simulacrum of prelapsarian grace. The postmodern body has been detached from its materiality, surgical body

sculpting has become the vehicle for the technological transformation of the "sin ego," and the flesh has been transubstantiated into plastic. Plasticity has become the "postmodern paradigm";[43] for both male and female body-image Barbie malleability and genitally smooth perfection has become the ideal, and cosmetic surgery has rendered the erotically and aesthetically undesired and the natural body alike obsolete.

**Notes**

[1] The phrase is Aaron Beck's, quoted in Jean Goodwin and Reina Attias, *Splintered Reflections: Images of the Body in Trauma* (New York: Basic Books, 1999) 168.

[2] American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders (DSMM-IV)*, 4th ed. (Washington, DC, 1994) 467.

[3] Sigmund Freud. *The Ego and the Id* (1923), rpt. in J. Strachey, ed. *The Standard Edition of the Complete Psychological Works of Sigmund Freud*, vol. 19 (London: Hogarth P, 1961) 17. In Fn.2 on this page Freud further elaborates, ". . . the ego is ultimately derived from bodily sensations, chiefly from those springing from the surface of the body. It may thus be regarded as a mental projection of the surfaces of the body . . ."

[4] Goodwin and Attias, *Splintered Reflections* 168.

[5] The quoted phrases are from Didier Anzieu, *The Skin Ego* (New Haven: Yale UP, 1989) 6.

[6] One of the more recent innovations in male enhancement surgery redoubles its resurrectional qualities. Surgeons have pioneered the use of alloderm (cadaver skin) in place of the traditional homoderm and fat grafts to increase penile circumference, thus accomplishing a double "raising of the dead."

[7] *DSMM-IV*, 467; and Kathy Davis, *Reshaping the Female Body: The Dilemma of Cosmetic Surgery* (New York: Routledge, 1995) 21. Roughly 80% of aesthetic operations are performed on white women.

[8] See Dick Schultheiss, Michael C. Truss et al., "Uncircumcision: A Historical Review of Preputial Restoration," *Plastic Reconstruction Surgery* 101 (1998), rpt. at <http://www.infocirc.org,uncirc.html>. In *Circumcision Exposed: Rethinking a Medical and Cultural Tradition* (Freedom, CA: Crossing P, 1998) 138-39, Billy Ray Boyd cites an estimate from *Sex Life* of 7-10,000 men currently undergoing foreskin reconstruction in the U.S.

[9] Jim Bigelow, *The Joy of Uncircumcising* (Aptos, CA: Hourglass Book Pub., 1995), 27-29. The first foreskin restoration organization seems to have been Jeffrey R. Wood's INTACT, established in 1976. Currently, NORM has 27 U.S. chapters and five abroad.

[10] Bigelow 112. See also Barry Newman, "Restoration Campaign—Intactivists Seek to Undo a Long-Practiced Ritual," *Wall Street Journal* 28 Dec. 2000, A1, and Donald M. Grier, Paul C. Mohl, and Kathy A. Shelly, "A Technique for Foreskin Reconstruction and Some Preliminary Results," *Journal of Sex Research* 18.4 (November 1982): 324-30, p. 330. In this sample, then, 82% of the restorationists were gay.

56                                                                                         Louis J. Kern

[11] Newman, "Restoration Campaign," and Bigelow 128. In pop culture, an episode of *St. Elsewhere* (16 Dec. 1987) followed Victor Bevine, who entered the hospital for foreskin restoration.

[12] Paul M. Fleiss, "The Foreskin is Necessary," originally published as "The Case Against Circumcision in *Mothering* (Winter 1997): 36-45. On amputation, see Bigelow 37. On male genital mutilation, see the extensive comparison of male to female genital mutilation in the respective policy statements of the American Academy of Pediatricians' Task Force on Circumcision and Committee on bioethics, <http://www.circumstitions.com/AAP.html>, and "MGM: Male Circumcision: A Gender Perspective," *Journal of Men's Studies* VI.2 (1998): 198-208 (found on the internet at <http://www.mensstudies.com> or <http://www.noharm.org>).

[13] "The Foreskin Advantage," <http://www.noharm.org/advantage.html>, 1; "Circumcision in America," <http://www.salon.com/mwt/feature/1998/10/26/feature.html>, 4; and Fleiss 2.

[14] For figures on the annual incidence of and profits from circumcision, see Thomas J. Ritter and George C. Dennison, *Say No to Circumcision: 40 Compelling Reasons*, 2nd ed. (Aptos, CA: Hourglass Book P, 1996) 29.1. On the APA's shifting position, see John Sedgwick, "The Foreskin Saga," <http://www.infocirc.org/GQ0200.htm>; on comparative figures for the 1980s and 1990s, see Bigelow 19.

[15] Billy Ray Boyd, Circumcision Exposed: Rethinking a Medical and Cultural *Tradition* (Freedom, CA: Crossing P, 1998) 53; and Fleiss 3.

[16] Bigelow 25, 27, 28. My emphasis.

[17] Bigelow 90, 100, 102, 108, and 123.

[18] Bigelow 96-97, and 21.

[19] Bigelow 104 and 10. See Dr. Patrick Hudson's cosmetic plastic surgery homepage, <http://www.phudson.com/Genital/uncircumcision.html>.

[20] On circumcision in the U.S., see Ritter and Dennison, *Say No to Circumcision* 29.1. The term "penile reform" is the title of an article by J. Penn in the *British Journal of Plastic Surgery* 16 (1963): 287-88. The most popular sources for self-restoration are the materials distributed by BUFF, NORM, UNCIRC, and Jim Bigelow's inspirational and instructional manual, *The Joy of Uncircumcising*, with its intentional refraction of Alex Comfort's *The Joy of Sex*. See Dr. David Matlock's web page for the Laser Vaginal Rejuvenation Institute of Los Angeles that he directs, <http://www.drmatlock.com/laserVR.htm>, and "Vaginal Rejuvenation," by Dr. B. Kashanchi, <http://www.obgyn911.com/vaginal2.html>.

[21] See Bigelow 133, and Nicholas Regush, "Genital Redesign," 11 May 2000 <http://www.abcnews.go.com/sections/living/Second Opinion/html>.

[22] See "The Facts of Life, and Vaginal Tightening," <http://www.my.webmd.com/content/article/html> 3, "Testimonials" from the LVR Institute, L.A., <http://www.drmatlock.com/testimonials.htm> 2, and Debra Ollivier, "Designer Vaginas," <http:www.salon.com/sex/feature/2000/11/14/vagina.html>, 1.

[23] "Facts of Life, and Vaginal Tightening" 1.

[24] Scheeres, "Sexpressions: Vaginal Cosmetic Surgery," <http://thriveonline.oxygen_xpressionsvaginal_cosmetic_surgery.html>, 1-2.

[25] Scheeres 1-2. See also Carol Queen, "Meanwhile, in L.A. Plastic Surgeon's Offices," <http://www.spectator.net/EDPAGES/1137_cq.html>, Lynda Gorov', "The Latest Fad From LA-LA Land: A 'Designer Vagina', and Jen Loy (of *Fabula* magazine), "Pushing the Perfect Pussy," both at <http://www/jendajournal.com/jenda/Vol1.1/Dvagina.html> –this is the on-line version of *Jenda: A Journal of Culture and African Women's Studies* (2001).

[26] Mary F. Rogers, *Barbie Culture* (London: Sage Pubs., 1999) 122-23. See pp. 120-21 for her connection of Barbie to cosmetic surgery.

[27] Quoted from a *Salon* magazine interview in Loy, "Pushing the Perfect Pussy, 3. See also "Facts of Life, and Vaginal Tightening," 3.

[28] For the Alter quote, see Loy, "Pushing the Perfect Pussy," 3. Matlock's quoted remarks appear in Lisa Derrick, "Dr. Tight," 30 April 1998, <http://www.newtimesla.com/issues/1998-04-30/columns2.html> 2 (my emphasis). See also Debra Ollivier, "Female Genital surgery Goes Public," *USA Today*, 14 Nov. 2000, rpt. at <http://www.jendajournal.com/jenda/vol1.1/Dvagina.html> 17, and Richard Connelly, "Like a Virgin: KPRC Kicks Off Another Mind-Boggling Sweeps Month," 9 Nov. 2000 <http://www.houstonpress.com>. See also the advertisement for Virgin Me Inc. (Miami, FL) at http://www.virginme.com: "Doctor-Approved Scientific Breakthrough that will transform a Non-Virgin girl into a complete virgin! Experience the pain and bleeding on the first night as if you were a real virgin!"

[29] Connelly, "Like a Virgin," 1; See also Michael Learmouth, "Virgin Surgeon," <http://www.metroactive.com/papers/metro/12.24.98/virgin2-9851.html>, 2, Mike Falon, "Female Gender Surgery Goes Public," <http://www.jendajournal.com/jenda/vol1.1/Dvagina.html>, 12, and "Testimonials," web page of the LVI of L.A., 3.

[30] Ollivier, "Designer Vaginas," 17.

[31] Gorov 1. The phrase "Laser Vaginal Rejuvenation" is trademarked, as it its acronym, "LVR."

[32] Ollivier, "Designer Vaginas," 15. See also Derrick, "Dr. Tight," 3.

[33] "Facts of Life , and Vaginal Tightening," 2.

[34] Stephanie Ramp, "Plastic Surgery Moves South," *Fairfield County Weekly* 4 Aug. 2000, 7.

[35] Ollivier, "Designer Vaginas," 2, 16.

[36] Ollivier, "Designer Vaginas," 16.

[37] Rogers 124.

[38] See Susan Bordo, *Unbearable Weight: Feminism, Western Culture, and the Body* (Berkeley: U of California P, 1993) 245-46.

Robert Rawdon Wilson



# "The Hydra's Tale"

## Imagining Disgust


BATA LIBRARY
TRENT UNIVERSITY
PETERBOROUGH, ONTARIO

THE UNIVERSITY OF ALBERTA PRESS

BTL EX1028
IPR2024-00703
U.S. Patent No. 8,961,511

Case: 26-1223    Document: 24    Page: 483    Filed: 08/12/2026

Published by
The University of Alberta Press
Ring House 2
Edmonton, Alberta T6G 2E1

Printed in Canada  5  4  3  2  1
Copyright © The University of Alberta 2002
A volume in (cuRRents), an interdisciplinary series. Jonathan Hart, series editor.

NATIONAL LIBRARY OF CANADA CATALOGUING IN PUBLICATION DATA

Wilson, R. Rawdon.
  The hydra's tale

  Includes bibliographical references and index.
  ISBN 0-88864-368-3

  1. Aversion.  I. Title.
BF575.A886W54 2002    152.4        C2001-910101-5

All rights reserved. No part of this publication may be produced, stored in a retrieval
system, or transmitted in any form or by any means—electronic, photocopying, recording, or other-
wise—without the prior permission of the copyright owner.

Printed and bound in Canada by Houghton Boston, Saskatoon, Saskatchewan.
Book design by Lara Minja.
Index prepared by Western Indexing.
Proofreading by Jill Fallis.
∞ Printed on acid-free paper.

Cover and frontispiece: Gustave Moreau, French 1826–1898, *Hercules and the Lernaean Hydra* (ca. 1876);
oil on canvas, 175.3 x 154 cm. Gift of Mrs. Eugene A. Davidson, 1964.231. Reproduction © The Art
Institute of Chicago. All rights reserved; used by permission.

The University of Alberta Press is committed to protecting our natural environment. As part of our
efforts, this book is printed on stock produced by New Leaf Paper: it contains 100% post-consumer
recycled fibres and is acid- and chlorine-free.

The University of Alberta Press acknowledges the financial support of the Government of Canada
through the Book Publishing Industry Development Program for its publishing activities. The
Press also gratefully acknowledges the support received for its program from the Canada Council
for the Arts.





The Canada Council | Le Conseil des Arts
for the Arts | du Canada
Since 1957 | Depuis 1957

Appx1629

# Contents

Introduction, xi

✿

Chapter 1
The Hydra's Spoor
Loathsomeness, 1

Chapter 2
Its Stench
Conceiving Disgust, 43

Chapter 7
Its Venom
Feeling Abject, 241



Chapter 3
Its Lair
The Representation of Filth, 83

Chapter 6
Its Heads
Perverse Geometries, 189

Chapter 4
Its Body
Parts and Machines, 131

Chapter 5
Its Many Eyes
Imagining Disgust, 159

✿

Conclusion • The Hydra on a Pin, 289
Recognitions, 299
Notes, 303
Bibliography, 407
Index, 425

Appx1630

# V Its Venom



## *Feeling Abject*

The most unhappy man I ever knew was a brilliant student of philosophy. When I first met him, we were both in a tavern near the University. He was alone at the bar, but a mutual friend introduced us and

we ended up spending a late evening talking through an endless series of ancient difficulties. He smoked constantly, a habit that even then I found repulsive, but it seemed so much a part of his character that I barely noticed. Sometime before midnight, I was astounded to see him take a lit cigarette and grind it out against the back of his left hand. As I got to know him better, I learned that he had scars from cigarette burns up and down both arms. The inside of his mouth was often cut from broken glass. He would bite the rim off a beer glass and hold the jagged shards in his mouth as blood pooled behind his tightly squeezed lips. Then he might spit it out on the floor, blood and glass together. He said, and I believed him, that he really wanted to swallow the glass and that he did, against bodily habit and disposition, sometimes succeed. I never knew another man so sad.

It didn't take me long to understand that he felt a deep uncertainty and a lack of confidence about many things, including existence and himself. Today, it would probably be easier to smoke out the root of the problem: abuse, sexual trauma and perhaps a failed repression of tormenting memories. At that time, although I certainly knew that many people had been sexually abused in their childhood, I assumed that everyone could bear up

the testicles, the prostheses are only cosmetic. Undoubtedly, this situation will change.) Even on the threshold of a full-scale Cyber Age, the multiplicity of the human body seems astounding. Stephen Hawking is a good example of that multiplicity. Because he uses a voice prosthesis, his vocal presence would be electronic whether you were standing next to him or on Mars. His voice in China or Australia, on Mars or in a space station, would remain what it is. You could never be certain where his edges were. Multiplicity is another way of not being sure where people's edges are, where their identity begins and ends.[24] My prostheses elevate me to a higher plane of fulfillment, or a more ideal conception of myself, but they also remind me of how I have slipped from the plane that I have previously occupied. They attribute to me a multiplicity that I had not planned. They blur edges even while refining capacity.

Your body seems always to be dissolving, failing in one way or another, needing supplements. You feed it vitamins and healthy food and, as one part after another begins to fail, you discuss with various doctors the possibilities of replacement. For instance, the knee that I injured at seventeen in a motorcycle accident has been replaced by one made from hard acrylic and held to the bone by a titanium stud. I will someday have other parts replaced with either artificial parts or with transplanted body parts from someone else (but which someday may be grown in incubator animals, such as pigs). If my kidneys begin to fail, I can make use of a collective prosthetic kidney, called a dialysis machine, that I will share with other people in a similar condition. When my penis begins to dysfunction, if it does (and common male experience assures me that, most predictably, it will sadly do just that), my personal physician will refer me to a urologist who will recommend a penile implant which will actually improve my normal performance by making me permanently virile.

Always a "phantasmatic" body part, my penis will have been modified towards enhanced performance.[25] The implant may simply extend my penis so that it will never be entirely flaccid, always sufficiently turgid for action, or it may involve a small hydraulic mechanism that will permit me to pump my penis into tumescence simply by squeezing a tiny plastic reservoir that the urologist will have tucked away within my scrotum, like a third testicle. The bio-mechanical expansions of my natural potential may so please me that I might return to the urologist and ask for a cosmetic phalloplasty in order to have my penis sculpted into a more attractive shape. Once I have had that operation, my penis will have been lengthened (by cutting the suspensory ligaments that join it to the pubic bone) and thickened (by the

liposuction of fat from my buttocks or abdomen) and I will seem, to my own mind at least, irresistibly bionic. (A person might also undergo neovaginoplasty, for cosmetic or transsexual purposes. I do not know if such a procedure would be experienced as bionic.[26]) If I do not like these possibilities (a permanently semi-erect penis will be conspicuous, especially when swimming, and the hydraulic mechanism may break, probably will in fact, leaving me with a piece of ruined machinery in my scrotum, a tiny replica of an abandoned industrial site), then the doctor can prescribe injections of prostaglandin, Phentolamine, papaverine or some other chemical or hormonal fluid.[27] I will then prick a syringe into the corpora cavernosa (left or right, depending upon the hand I use) and inject myself. This will leave me with a magnificent erection that will last for two or three hours, or (I would hope) long after ejaculation. It may also leave me with an embarrassing case of priapism, but, always optimistic in these matters, I will hope not. It may even be that something as apparently simple as Viagra will do the trick. Viagra acts like a chemical prothesis just as surely as does prostaglandin. The simplicity of its delivery (swallowing) masks its genuine prosthetic nature. In all of these instances, I will have been improved. In each, I will also have been diminished. Each prosthetic modification also marks the distance I will have travelled from my original physical condition.[28] Even as I approach a new ideal, bionic standard, I will be slipping below the natural bodily standard that I inherited and watched develop during its social formation.

The human body interacts with machines in many ways. Many of these ways are obvious, but none are ever simple. Some kind of system will always be presupposed. The simplest machine floats on the surface of numerous hidden systems, networks of connections and conceptual overlap. A machine that no longer functions or that has either lost or never had a purpose will seem, as Heidegger expresses it, "conspicuous." It will become equipment that is in "un-readiness-to-hand."[29] I draw from Heidegger's proposition the corollary that machines are only seen "fully" when, no longer in use, they cannot be seen fully. It may well be the case that machines are so omnipresent in the western technological environment that they are also invisible in the sense that they seldom attract attention, becoming visible, as David Porush argues, "only when resurrected by fear" or by metaphor in the abrupt shock of defamiliarization.[30] However, this seems far less important than the invisibility of their hidden systems. While they are still functioning, the extended systems that make machines possible are largely out of sight, too complex to be seen easily. Still func-

25  "Phantasmatic" is Judith Butler's term (*Bodies That Matter*, pp. 88–9). The penis is "phantasmatic" because it bears a vast weight of mythological associations. Using William Ian Miller's more direct term, you could simply say that it is, like the mouth (but unlike, in Miller's view, the anus), mythological. So much has been said about the penis in myth and legend, so much has been expected of it (in myth, in legend, in ordinary life) that it can hardly be reduced to mere nature, to a wrinkled fleshy appendage with a bio-hydraulic pumping mechanism to effect tumescence. It exists in a zone created by the intersection of memory and anticipation. Hence the distinction between penis and phallus, like that between nature and culture (or between history and legend), seems important. Writing of the opposition between phallus and castration (the male/female polarity in, she claims, Freud's view), Elizabeth Grosz remarks that there is no natural body to return to, no pure sexual difference one could gain access if only the distortions and deformations of patriarchy could be removed or transformed. The phallus "binarizes the differences between sexes, dividing up a sexual-corporeal continuum into two mutually exclusive categories which in fact belie the multiplicity of bodies and body types" (*Volatile Bodies*, p. 58). If the penis is as phantasmatic as Butler argues (and it probably is), the hardships that it effects fall upon men as well as upon women. (It is hard, indeed, to live up to a standard set by Zeus.) My argument is that all prostheses have a double impact upon consciousness, as well as upon the body, in that they both enhance performance but remain mere machines designed to supplement failing performance (of eye, or knee, or penis), reminders of a personal Fall. This is especially the case when the cyber(body)part replaces, or supplements, a phantasmatic part such as the penis.

26  A "neovagina" is also possible, both in transsexual surgery and in reconstructive plastic surgery after disease or mutilation, but neovaginoplasty does not involve the use of prostheses as does neophalloplasty. (In some cases, it appears that a mould is used as an aid in constructing the vaginal cavity. However, it would be removed in a postoperative procedure. This may, or may not, constitute a prosthesis.) Since stenosis is a possible complication in neovaginoplasty, it may eventually call for a prosthetic solution (see Martine-Mora et al.; Eldh; and van Noort). I write as a male, and the split consciousness that I invoke in this chapter is a personalized (but hardly universalized) male consciousness. I would not wish even to suppose how the possession of a neovagina might play out in a female consciousness. Nonetheless, there is evidence to indicate that many women, possessing healthy and fully functional genitalia, do seek to have their vaginas modified and surgically enhanced. See Debra Ollivier's on "Designer Vaginas."

27  Govier et al.

28  A large body of material exists concerning penile implants. Medical journals publish dozens of articles each year on reconstructive phalloplasty in which the surgeon builds a "neophallus" to replace a penis that has been lost because of accident, gunshot wound or disease. The same surgical techniques are used to construct a neophallus where, in the case of transsexuals, it had never existed. Much less is written with respect to cosmetic phalloplasty. For articles on penile implants see Irwin Goldstein et al. and Levine et al (see also Francesco Montrosi et al.). Considerable information, as well as a discussion of problems inherent in implant therapy, can be found in Findlay.

Nietzsche, Friedrich. *On the Genealogy of Morals*. Trans. Walter Kaufmann and R.J. Hollingdale. New York: Vintage, 1967.

Obeyesekere, Gananath. *Medusa's Hair: An Essay on Personal Symbols and Religious Experience*. Chicago: University of Chicago Press, 1981.

O'Connor, Flannery. *The Complete Stories*. New York: Farrer, Strauss and Giroux, 1979.

Olchowy, James Richard. "Eluding 'Mind-forg'd Manacles': Revisiting Oppression in the Fiction of Angela Carter." Unpublished Dissertation. Dalhousie University. 1994.

Ollivier, Debra. "Designer Vaginas." *Salon.com*, 14 November 2000.

Otto, Rudolf. *The Idea of the Holy: An Inquiry into the Non- Rational Factor in the Idea of the Divine and Its Relation to the Rational*. Trans. John W. Harvey. London: Oxford University Press, 1925.

Ozick, Cynthia. "Rushdie in the Louvre." *New Yorker*, 13 December 1993.

Paglia, Camille. *Sexual Personae: Art and Decadence from Nefertiti to Emily Dickinson*. New York: Vintage, 1990.

——. *Sex, Art, and American Culture*. New York: Vintage, 1992.

Parfrey, Adam, ed. *Apocalypse Culture*. Rev. ed. New York: Feral House, 1990 [1987].

——. "G.G. Allin: Portrait of the Enemy." In *Apocalypse Culture*.

Parsons, Terence. *Nonexistent Objects*. New Haven: Yale University Press, 1980.

Pavel, Thomas. *Fictional Worlds*. Cambridge: Harvard University Press, 1986.

Perniola, Mario. *Disgusti: Le nouve tendenze estetiche*. Milano: Costa & Nolan, 1998.

Peto, Peter. *Modern Satire: Four Studies*. Berlin: Mouton, 1982.

"Photograph of Young Man Outside San Quentin Prison." *New York Times*. 22 April 1992, A22.

Pierpont, Claudia Roth. *Passionate Minds: Women Rewriting the World*. New York: Albert A. Knopf, 2000.

Platzner, Robert L. "The Metamorphic Vision of J.G. Ballard." *Essays in Literature* 10 (1983).

Plotinsky, Arkady. *Reconfigurations: Critical Theory and General Economy*. Gainsville: University Press of Florida, 1993.

Pops, Martin. "The Metamorphosis of Shit." *Salmagundi* 56 (Spring 1982): 26–61.

Porush, David. *The Soft Machine: Cybernetic Fiction*. New York and London: Methuen, 1985.

Potter, John Deanne. *The Fatal Gallows Tree*. London: Elek Books, 1965.

Pressley, Sue Anne. "New Debate About an Old Killer." *Washington Post*, 26 August 1999, A3.

Price, Greg. "Interview with Isabel Allende." In *Latin America: The Writer's Journey*. London: Hamish Hamilton, 1990.

Probyn, Clive. "Surfacing and Falling into Matter: Johnson, Swift, Disgust, and Beyond." *Mattoid* 48 (1994): 37–43.

Pynchon, Thomas. *V*. New York: Modern Library, 1966 [1961].

——. *Gravity's Rainbow*. New York: Viking, 1973.

Rabinowitz, Peter J. *Before Reading: Narrative Conventions and the Politics of Interpretation*. Ithaca: Cornell University Press, 1987.

Radford, Fred. "'Cloacal Obsession': Hugo, Joyce and the Sewer Museum of Paris." *Mattoid* 48 (1994): 66–85.

Rice, Boyd. "Mondo Films." In *Incredibly Strange Films*.

Richie, Donald and Ian Buruma. *The Japanese Tattoo*. New York: Weatherhill, 1980.

Ritchin, Fred. *In Our Own Image: The Coming Revolution in Photography*. New York: Aperture, 1990.

Appx1704

The Wayback Machine - https://web.archive.org/web/20010331124153/http://search.salon.com:80/



Search  Directory  Contact Us  Table Talk  Newsletter  Ad Info  Investors



Webwide Answers at:



**SALON.COM SITES**

Arts & Entertainment
Books
Business
Comics
Health
Mothers Who Think
News
People
Politics
Sex
Technology
- Free Software Project

Letters
Columnists
Table Talk
Salon Plus
Salon Shop
Directory

**Search for pages containing the words**

- ● All of Salon.com
- ○ Only A&E;
- ○ Only Books
- ○ Only Business
- ○ Only Comics
- ○ Only Health
- ○ Only Mothers
- ○ Only News
- ○ Only People
- ○ Only Politics
- ○ Only Sex
- ○ Only Tech
- ○ Only Audio

- ○ The web with Ask Jeeves

[ OK ]

Advanced search　|　Help

Please report any problems to search@salon.com

https://web.archive.org/web/20010331124153/http://search.salon.com/

BTL EX1029
IPR2024-00703
U.S. Patent No. 8,961,511

1/1

The Wayback Machine - https://web.archive.org/web/20001117105100/http://search.salon.com:80/query.html…



Search   Directory   Contact Us   Table Talk   Newsletter   Ad Info   Investors



Webwide Answers at:



SALON.COM SITES

Arts & Entertainment
Books
Business
Comics
Health
Mothers Who Think
News
People
Politics
Sex
Technology
- Free Software Project
————
Letters
Columnists
Table Talk
Salon Plus
Salon Shop
Directory

## New Advanced Search:

(select this link for a Simple Search)

### Search for pages that:

| should contain ⌄ | in the body ⌄ | the name ⌄ |

[ ]

**and**

| should contain ⌄ | in the URL ⌄ | the words ⌄ |

[ ]

**and**

| must not contain ⌄ | in the body ⌄ | the words ⌄ |

[ ]

| 25 hits ⌄ | sort by relevance ⌄ | show summaries ⌄ |

☐ Show individual word scores

[GO]

**Advanced Search** | **Help** | **New Search**

0 results for
**No documents.**

**No results found for your search. Tips for better results:**

- Check your syntax.

- Make sure to use the correct spelling.

- Use the correct case (uppercase for capitalized names, lowercase for common words and phrases).

- Use a comma to separate capitalized names or phrases.
  For example: **Bill Clinton, Boris Yeltsin**

- Try synonyms and variations of words.
  For example: **CDROM, CD-ROM**

Please report any problems to search@salon.com

BTL EX1030
IPR2024-00703
U.S. Patent No. 8,961,511

Appx1710

Appx1711



archive.org

# AFFIDAVIT OF NATHANIEL E FRANK-WHITE

1. I am a Records Request Processor at the Internet Archive. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive has partnered with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to browse more than 450 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can search archives by URL (i.e., a website address).  If archived records for a URL are available, the visitor will be presented with a display of available dates.  The visitor may select one of those dates, and begin browsing an archived version of the Web. Links on archived files in the Wayback Machine point to other archived files (whether HTML pages or other file types), if any are found for the URL indicated by a given link. For instance, the Wayback Machine is designed such that when a visitor clicks on a hyperlink on an archived page that points to another URL, the visitor will be served the archived file found for the hyperlink's URL with the closest available date to the initial file containing the hyperlink.

4. The archived data made viewable and browsable by the Wayback Machine is obtained by use of web archiving software that automatically stores copies of files available via the Internet, each file preserved as it existed at a particular point in time.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL] aka an "extended URL".  Thus, the extended URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). The date indicated by an extended URL applies to a preserved instance of a file for a given URL, but not necessarily to any other files linked therein. Thus, in the case of a page constituted by a primary HTML file and other separate files (e.g., files with images, audio, multimedia, design elements, or other embedded content) linked within that primary HTML file, the primary HTML file and the other files will each have their own respective extended URLs and may not have been archived on the same dates.

6. Attached hereto as Exhibit A are true and accurate copies of browser screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified in the attached coversheet of each printout.

BTL EX1031

IPR2024-00703

U.S. Patent No. 8,961,511

Document Id: B1876290-F12F-11EE-8FEB-B7E980892CDD
OnlineNotary.net



archive.org

7.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATE: _____04/02/2024_____

*Nathaniel Frank-White*
_____
Nathaniel E Frank-White

**Please see attached
All Purpose
Jurat form
for additional
Notary Events**

Appx1713

Document Id: B1876290-F12F-11EE-8FEB-B7E980892CDD
OnlineNotary.net

# EXHIBIT A

Document Id: B1876290-F12F-11EE-8FEB-B7E980892CDD
OnlineNotary.net

https://web.archive.org/web/20010401003237/http://www.salon.com/adsales/index2.html

Appx1715



INTERNET ARCHIVE WayBackMachine — http://www.salon.com/adsales/index2.html — 243 captures — 5 Jun 2000 - 4 Jan 2019 — DEC APR JUN — 01 — 2000 2001 2002 — About this capture

Search  About Salon  Table Talk  Newsletters  Advertise in Salon  Investor Relations

**salon.com**

ASE | BOOKS | COMICS | LIFE | NEWS | PEOPLE | POLITICS | SEX | TECH & BUSINESS | AUDIO

**ARTICLE FINDER**

Advertise in Salon
Main menu
Intro to Salon
Traffic & audience
Ad opportunities
Ad specifications

**SALON.COM SITES**

Arts & Entertainment
- The Movie Page
Books
Comics
Life
News
People
Politics
Sex
Tech & Business
- Free Software Project
Audio
- Salon Radio

Letters
Columnists
Corrections

Salon Plus
Salon Gear
Personals

**WAYS TO GET SALON**

**Downloads**
• Get Salon.com on your PDA
• Salon.com headlines from My Netscape
• More ways to get Salon

 Adsales

## Salon Traffic & Audience Profile

### Page Views

In December 2000 Salon delivered 46 million page views.

### Unique Visitors

In December 2000 Salon registered 2.60 million unique visitors.

### Salon Audience Demographics

**58%** male
**42%** female

**34%** 18-29 years old
**54%** 30-49 years old

**88%** US readers
**12%** foreign readers

**79%** college graduates
**37%** completed post graduate education
**70%** professional or managerial

**37%** married
**24%** have children under 18 at home

**63%** own their own residence

Average household income: **$71,300**

### Salon Audience Online Activities

**91%** online everyday or more often
Average time per Salon visit: **26.3** minutes
**27%** read 5+ articles per visit
**74%** 3+ years' online experience
**95%** shopped online in the last 6 months

**53%** visit Salon to stimulate new ideas
**75%** visit Salon for entertainment
**47%** use Internet for researching stocks
**98%** use e-mail

**67%** access Salon from home
**75%** access Salon from work
**11%** access Salon from college/university

**67%** listen to audio on the Web
**61%** watch video on the Web

### Salon Audience Shopping Interests

| Purchased online in last 6 months | Salon @plan index |
|---|---|
| Airline ticket/reservation | 137 |
| Books | 182 |
| Car rental | 143 |

**SALON GEAR →**
Our California energy crisis T-shirts are here!

Extra goodies and great services in Salon Plus

**BUSINESS 2.0**

Five Questions With...The Father of the Internet

Sprint Banks on New Color Display Phone

Daily Insight: Packing After the Sacking, Part Deux

IBM Holocaust Suit Over Feeling Palm's Pain

**Salon Personals**
Catch of the Day

secretdemand

"Tall, pale, dorky drummer seeks adventure in a dress."

Appx1716

| | |
|---|---|
| Clothes/Accessories/Shoes | 155 |
| Computer hardware | 184 |
| Computer software for the Web | 289 |
| Home electronics | 202 |
| Hotel/motel reservations | 135 |
| Magazine/newspaper subscriptions | 227 |
| Movie tapes/DVDs | 231 |
| Music CDs/tapes | 204 |
| Stock | 142 |
| Toys/non-computer games | 142 |

**Sources:**
Cyber Dialogue 2000
@plan spring 2001 profiling report

Visit Salon's newest site Salon Audio for free spoken word recordings from your favorite authors

Salon  Search  About Salon  Table Talk  Newsletters  Advertise in Salon  Investor Relations

Arts & Entertainment | Books | Comics | Mothers Who Think | News
People | Politics | Sex | Tech & Business and The Free Software Project
Letters | Columnists | Salon Plus | Salon Shop

Reproduction of material from any Salon pages without written permission is strictly prohibited
Copyright 2001 Salon.com
Salon, 22 4th Street, 16th Floor, San Francisco, CA 94103
Telephone 415 645-9200 | Fax 415 645-9204
E-mail | Salon.com Privacy Policy

Appx1717

https://web.archive.org/web/20010124063400/http://www.salon.com/sex/feature/2000/11/14/vagina/print.html

Appx1718

Document Id: B1876290-F12F-11EE-8FEB-B7E980892CDD
OnlineNotary.net

INTERNET ARCHIVE
WayBackMachine    http://www.salon.com/sex/feature/2000/11/14/vagina/print.html    Go    DEC    JAN    APR    2002
23 captures
24 Jan 2001 - 28 Nov 20    2000    24    About this capture
2001


amazon.com.
DVDs
shop here!

  click here!

Search  About Salon  Table Talk  Newsletters  Advertise in Salon  Investor Relations

To print this page, select "Print" from the File menu of your browser

## Designer vaginas

Gynecological surgery isn't just for medical reasons anymore; some women say it enhances sexual pleasure.

- - - - - - - - - - - -
**By Debra Ollivier**

Nov. 14, 2000 | For as long as she can remember, Jill wanted a different vagina. Not only was her labia minora slightly larger than her labia majora ("I'd see women in locker rooms and in magazines and be jealous," she says); after two children she also had serious incontinence problems.

"My vagina had that 'flippy-floppy' feeling. I could barely feel anything. Sex was just not the same." Then a friend of hers saw an ad for Dr. David Matlock and his Laser Vaginal Rejuvenation clinic in Los Angeles. "My friend said, 'Hey Jill, you could do this!' It was meant as a joke. I found Matlock's number on the Net and was in his office within a week."

Jill, a Manhattan lawyer, had two of Matlock's trademark surgeries: Laser Vaginal Rejuvenation (LVR) to tighten her vagina and "enhance sexual gratification" and Designer Laser Vaginoplasty (DLV) to "aesthetically modify" her labia.

She calls her transformation "a miracle," and she is not alone in her enthusiasm. High above Sunset Boulevard, in Matlock's plush, 5,000-square-foot office, vaginas are being redesigned, labia modified, vulvae reconfigured. The women spreading their legs, exposing their personal secrets to the antiseptic trimmings and surgical prunings of a trusty laser are ad hoc pioneers in a rapidly growing industry. But is LVR truly a way of enhancing sexual gratification or simply a way of selling gynecological surgery while pushing the perfect vagina? With the reasons for LVR and DLV as diverse as the vaginas themselves, the answers are not so cut-and-dried.

Laser Vaginal Rejuvenation began as a modification of a traditional gynecological vaginal surgery for stress urinary incontinence. The procedure, which has been a standard gynecological surgery for decades, involves the tightening of the vaginal muscles and support tissues, as well as the reduction of redundant vaginal mucosa (relaxed vaginal lining). By reconstructing the "optimum structural architecture" of the vagina -- namely, by reconstructing the outer third of the vagina: the orgasmic platform, internal and external vaginal diameter (introitus) and the perineal body -- Matlock claims that women not only are relieved of incontinence, but they also enjoy increased levels of sexual gratification.

The connection between vaginal tightness and sexual gratification allegedly became apparent to Matlock 12 years ago when a woman came into his office with extreme stress urinary incontinence after the birth of four children. Matlock recalls her phone call weeks after the surgery. "She called back and said, 'Doctor, guess what? Since I've had the procedure sex is great. My husband says he has the same wife, but a new woman.' And I said, 'OK.' I just put that in the back of my mind."

Later, word of mouth spread, bringing more women to Matlock's office in search of a tighter vagina not just to end incontinence, but for better sex. Some requested that, once on the surgery table, Matlock do a little cosmetic surgery as well -- a plumping up of a flaccid vulva here, a trimming back of a labium there. "I hesitated at first," says Matlock of those fledgling days, when a growing interest in sexual gratification and designer vaginas slowly brought women flocking to his office. "Then I modified my thoughts. I thought, OK."

Matlock ran his first ad in the L.A. Weekly two years ago. Amid the clutter of ads for big breasts, tight butts, large penises and iron shins, the Laser Vaginal Rejuvenation ad featured a bikini-clad woman writhing in orgasmic delight. The headline read: "You Won't Believe How Good Sex Can Be!" Matlock's phones haven't stopped ringing since.

Speaking with the gusto of a moral crusader, Matlock sits in his office with a panoramic view of L.A. looming behind him. On his large, shiny desk stands a transparent plastic model of a vagina and its reproductive system. "Gynecology is a supersurgical subspecialty," he says. "We dedicate our entire professional careers to the reproductive tract. But do we ever go back and look at the things that result from labor, delivery, childbirth? There can be relaxation of that structure and thus a diminishment or a decrease in sexual gratification. Do we concern ourselves with that? No. Not at all. We only concern ourselves with obstetrics. I think there needs to be research in this area, and I'll tell you why: Women *do* [his emphasis] enjoy sex. Women want to enjoy sex. Women want to be able to enhance their sexuality if they can."

By marrying this type of sexual marketing rhetoric with gynecological science and cosmetic surgery, Matlock unwittingly formed a new and lucrative alliance. Today women from all over the world come to Matlock's office seeking a rehauled, resexed vagina. Like Jill, they claim phenomenal and life-changing results -- two adjectives that could very well describe what LVR and DLV have done for Matlock. Poised to launch an international franchising and licensing network, Matlock stands on the edge of a cresting wave that has already made him a millionaire several times over, generated media attention (Howard Stern has praised the man) and provoked the wrath of many in the ob/gyn community.

"I think this is a way of preying on vulnerable women," says Dr. Linda Brubaker, fellowship director of Female Pelvic Medicine & Reconstructive Surgery at Loyola University Medical Center. "I reconstruct vaginas all the time. I agree that the field of women's sexual functioning is a poorly studied area. But I don't buy any of what Matlock is saying. There are standard pre- and post-operative intervention tests and tools that could be applied here to substantiate his claims. Curious that Matlock has not applied any of them to his own work, nor published any scientific material relating to his work, nor subjected anything to peer review. The longer this is untested, the better for him."

Matlock makes no apologies in response to his critics. "I didn't create the market. The need was there. The market was there. I saw it. I'm serving that market." He looks out the window, a bit circumspect. "Doctors can be very vicious. They can be very, very jealous."

Brubaker brushes aside his indictment of the ob/gyn community. To those considering LVR or DLV -- two procedures that are not without their risks, among them hemorrhage, infection, loss of sensitivity, lingering pain from nerve damage -- Brubaker says simply: "Run away, run away, run away."

Apparently, a growing number of women are doing just the opposite. Consider Sherry. A 33-year-old financial consultant, Sherry went to "thousands" of gynecologists to discuss the problems with her "relaxed vagina" before going to Matlock. "Dr. Matlock was the first person who even remotely understood the situation." She describes the result of her surgery as "overwhelming -- psychologically, physically, it was just night and day. It's like being flat-chested your whole life and then finally having breasts." Here she pauses, then adds: "This is L.A. Everybody wants to be beautiful. Everybody wants to be 22 years old with big boobs. Everything can be bought and sold."

Jill also went to "a gazillion gynecologists" who dismissed her problem. Then she met Matlock. "It's a personal preference. Life is short. For women who are severely damaged, sex should still be intense and passionate." And herein lies the crux of the problem. No one would disagree that "severely damaged" women are entitled to great sex. To drive this point home, Matlock lifts up a large alarm clock from his desk. "I don't want to be gross," he says, "but I could easily put this in the vaginas of some of the women coming in here. Do you understand what I'm saying? And that's just not right." But while a staggering 30 percent of women will develop some form of pelvic floor disorder resulting in incontinence or compromise of vaginal integrity after birth, only 5 to 10 percent will be so damaged that they can easily fit a household appliance in their vaginas.

By obscuring the lines between the severely damaged and the naturally relaxed vagina, Matlock has leveled the playing fields among all women and widened the market potential for his genital landscaping. His tight-vagina hype also flagrantly misses the point. With sexual ground zero located in the clitoris, one can only wonder for whom the tight vagina truly tolls -- men or women?

Appx1719



Says Sherry, "You give more pleasure in a way when it affects your own sexual gratification into (necessarily not negative) it's the way you feel as a woman." In a moment of unguarded candor, Matlock himself suggests that a tight vagina might help you keep your man from running after younger women when he leans forward and asks, "Why not have the best sex you can at home? Why not? You tell me why these 40-, 50-, 60-year-old men are running after younger women? They want these women with these nice, hot, tight --" he puts his hands out here emphatically for me to finish the sentence. "Why is that?" he persists. (Which begs another question: Is surgically modifying your vagina the answer?)

Giving a 40- or 50-year-old woman a 20-year-old vagina is not all that Matlock has in his bag of genital tricks. He can also restore her virginity through a technique called hymenalplasty. Essentially the reconstruction of the hymen, this procedure has brought to Matlock's office a steady clientele of Middle Eastern women. "You can't believe how hysterical some of these women are. They come in here and say they're going to get killed unless they get this done. They're telling us that back home their brother will kill them, that their father will kill them. It's terrible. The majority of these Middle Eastern women are coming in to have hymenalplasty because they're getting ready to get married in their home country. All of them tell me that the groom's side of the family can pick whatever doctor they want to determine whether or not she's a virgin, to determine whether she's worth it or not to be married to their son. So there are religious implications, there are social implications."

That Matlock could become the Salman Rushdie of the Islamic vagina doesn't seem to unhinge him. On the contrary. "If I can help a woman in this unfair world," he says with a certain characteristic zeal, "then I'm going to go ahead and do it. I have no problems about doing it whatsoever. The man, he gets to do whatever he wants to do. Is he held accountable for anything? Absolutely not. But the woman is held accountable like this [he brings his hand to his throat like a knife]. It's serious."

Serious perhaps, but not always a question of life or death. Matlock cites the occasional flurry of Japanese women who come in for hymenalplasty. "At one point it became a regular thing. They'd come to the States, do a little school, go on vacation, then come here, have hymenalplasty and go home."

As for Americans, while Matlock concedes that virginity before marriage is essentially a nonissue, a growing population of American women is seeking the "virgin experience" to share with their husbands. "I'm seeing quite a bit more of that happening," says Matlock. "Women coming in because they want the experience."

Take Helena. A financial analyst, Helena first went to Matlock for Laser Vaginal Rejuvenation. "It was the best thing I ever did. My husband was ecstatic," she said. With her new vagina in place, Helena was drawn to the option of getting a new hymen. "My husband and I would have loved it if he had been my first. Our anniversary is coming up; we're renewing our wedding vows. We want to have the virgin experience."

Helena paid for her new hymen with a credit card. When we spoke she was still waiting for the healing process to end (a process she described as "full of lots of pain and crying, but that I'd go through again if I had to") before setting up the special one-time conjugal event with her new vestal vagina.

Hymenalplasty and its bizarre implications aside, there is nothing new about LVR and DLV. Vaginal tightening has been done for decades to help women with extremely compromised vaginal integrity. For the even fewer women out there with true genital "deformities" -- extraordinarily long or protruding labia, for example, or excessive vaginal flesh -- surgery has also been an option for years. "Labial surgery?" says ob/gyn Dr. Cornelia Daly. "There's nothing to it. It's been around for 30 years. Lasers have even fallen out of favor. We have more sophisticated tools that do the same thing these days." According to the ob/gyn community, Matlock has simply put a new spin (sex sells) on an old procedure.

And yet in his hype he offers an appealing line. "There are over 25 medications for male impotence," he says. "It takes $500 to $600 million to bring one drug into research and development. Those are facts. Is there anything remotely similar there for women? No. Not at all. There are over 200 prosthetic devices for men on the market. Anything similar for women? Not at all. If men had problems like that -- if men had babies, and we had certain body parts stretched out as a result -- they would have been looked at, researched and solved a long time ago." And who would disagree? Adds Lucy, "If men had these problems they would have been solved in a petri dish long ago."

The irony here (which seems lost to the doctor himself) is that Matlock wants to liberate women from the shackles of a man's world while selling them what could be the ultimate and most oppressive form of sex/beauty fascism. And as cosmetic surgery becomes more widespread, designer vaginas may become as common as the silicon breast -- a sinister prospect that has many women's advocates up in arms. "Women's genitals are fascinating, unique and beautiful," says pioneering sex therapist Betty Dodson, whose Web site includes a "genital forum" featuring a panoply of different vaginas in all their diversity. Dodson -- who for decades has helped women discover their genitals, and particularly their clitoris, which she describes as women's "little phallic symbol that terrifies the status quo" -- considers LVR and DVR as truly odious procedures except for very extreme cases.

"Now we want little doll-like genitals and vaginal orgasms and Viagra for women!" she laments, reemphasizing the need for women to assert their "clit power" as the only true road to enhanced sexual gratification. "If men can get close enough to lick and diddle, they don't give a rat's ass about the size of your genitals or the shape of your labias," she says. Dismissing the link between vaginal tightness and sexual gratification as a way for men to cash in on women's insecurities and for women to appease the male ego, she practically yells into the phone: "We have catered to men's desires forever! We have lied to them and fooled them for centuries! Enough!"

- - - - - - - - - - - -

**About the writer**
Debra Ollivier is a frequent
contributor to Salon and Le Monde.
She divides her time between Los
Angeles and Paris.

**Sound Off**
Send us a Letter to the Editor

GO TO: Salon.com >> Sex

Salon  Search  About Salon  Table Talk  Newsletters  Advertise in Salon  Investor Relations

Arts & Entertainment | Books | Comics | Mothers Who Think | News
People | Politics | Sex | Tech & Business and The Free Software Project
Letters | Columnists | Salon Plus | Salon Shop

Reproduction of material from any Salon pages without written permission is strictly prohibited
Copyright 2001 Salon.com
Salon, 22 4th Street, 16th Floor, San Francisco, CA 94103
Telephone 415 645-9200 | Fax 415 645-9204
E-mail | Salon.com Privacy Policy

Appx1720



and through the retropubic area with two small incisions just above the pubic bone on the abdomen, and that was placed to treat stress incontinence.

Q   Is the TVT used to treat incontinence in women?

A   Yes.

Q   Is it used to treat incontinence in men?

A   No.

Q   Can you look at paragraph 13, you mentioned the SURx transvaginal system.

A   Yes.

Q   What types of procedures are performed using the SURx transvaginal system?

A   Stress incontinence.

Q   You see in paragraph 15 you mention your standard hourly rate?

A   Yes.

Q   What is your standard hourly rate?

A   For review of cases and meetings, it is 750 per hour.  And for depositions, 850.

Q   You know what a vaginal speculum is, right?

A   Yes.

Q   So if I say "speculum" during today's

U.S. LEGAL SUPPORT, INC
713-653-7100

deposition, will you understand that I mean a vaginal speculum as opposed to other types of speculums?

A   **Could I clarify that we'll be talking about a bivalve speculum?**

Q   Explain to me what a bivalve speculum is.

A   **It is a speculum that has two blades which is inserted into the vagina and then spread to allow visualization of the deeper vagina.**

Q   Are there other types of speculums besides bivalve speculums?

A   **Yes.**

Q   What other types?

A   **There can be a single-bladed speculum and a weighted speculum.**

Q   Can you generally describe a single-bladed speculum?

MR. HECTOR:  Objection.  Calls for narrative.

A   **When we look at the bivalve speculum, if we took the top part off and used the lower blade, this is used to examine for prolapse so that the speculum isn't holding the top wall of the vagina up.**

Q   The top wall of the vagina, is that also

Dr. Denise Poulos
April 08, 2025                                    27

known as the anterior wall of the vagina?

A  Yes.

Q  Can you describe a weighted speculum?

A  A weighted speculum has a single blade with a weight that hangs on the outside of the vagina to put extra pressure.

Q  And what is a weighted speculum used for?

A  It may be used for surgery on the anterior vaginal wall or the cervix.

Q  Which portion of the anterior vaginal wall?

A  The part that you couldn't see without pressing down on it with a speculum to reach it. Typically it's for something that involves the proximal vagina, the cervix, such as a procedure on the cervix or a hysterectomy.

Q  And you mentioned that the weighted speculum has a single blade; is that correct?

A  Yes.

Q  Where is that blade when inserted in the vagina?

MR. HECTOR:  Objection.  Vague.

A  I'm sorry.  I didn't hear.  You cut out a little.  I didn't hear the whole thing.

Q  No problem.

U.S. LEGAL SUPPORT, INC
713-653-7100

Dr. Denise Poulos
April 08, 2025                                    30

A   If I'm placing a pessary for prolapse, I would not use a speculum to place the pessary.

Q   What's a pessary?

A   It's a device that women wear in the vagina to hold their prolapse up in a nonsurgical manner.

Q   Okay.  Do you ever inspect or treat a vagina without using a tool such as a speculum?

MR. HECTOR:  Objection.  Vague.

A   Yes.  If I'm assessing pelvic muscle tone or strength or feeling the size of the uterus, such as a bimanual exam, then I'm not using a speculum during that portion of the exam.

Q   So depending on what you're doing, you're exercising your judgment as to whether you use a speculum or not; is that correct?

MR. HECTOR:  Objection.  Calls for speculation.

A   In that situation, yes.

Q   And you use speculums in your practice, right?

A   Yes, I do.

Q   Can you explain how a speculum is used in your practice?

MR. HECTOR:  Objection.  Scope.

**A   I don't understand exactly what you're asking, how do I insert the speculum?**

Q   Just generally, yes, how is it inserted and used?

MR. HECTOR:  Same objection.  Scope.

**A   A speculum is inserted usually with some gel on the posterior blade, and then it's closed. Both blades are touching.  It's inserted into the vagina.  And then there's a valve that lets you put pressure to open the blades that are deeper in the vagina to let you spread the anterior from posterior wall and visualize the upper vagina and/or cervix.**

Q   You mentioned "blade" several times during this discussion.  Is that the portion that's inserted into the vagina?

MR. HECTOR:  Objection. Vague.

**A   Yes, we insert the blades of the speculum.**

Q   And the portion of the speculum that is not inserted in the vagina, what is that part called?

**A   The handle.  The handle.**

Q   And the handle is the portion that the physician would manipulate to open the speculum; is that correct?

U.S. LEGAL SUPPORT, INC
713-653-7100

A   Yes.

Q   Are there different size speculums?

A   Yes, there are.

Q   And was that true before February of 2006?

A   Yes.

Q   Why are there different size speculums?

A   There are different sizes so if a young lady is coming into the office who needs, say, a Pap smear and she's not had intercourse and/or not delivered a child, she may need a narrow speculum.

There are times when children need to be examined for a GYN exam and may need a pediatric speculum, which is very small.

And women who have prolapse and the organs are falling into the vagina may need the larger speculum to be able to visualize the upper vagina.

Q   So you mentioned a pediatric speculum.  Is that only used on children?

MR. HECTOR:  Objection.  Misstates testimony.

A   No, rarely would we use it on an adult.

Q   But just answer my question.

It's not -- a pediatric speculum is not only used on children, correct?

MR. HECTOR:  Objection.  Misstates

testimony.

A  Yes.

Q  And are the blades of a pediatric speculum shorter than other types of speculums?

MR. HECTOR:  Objection.  Misstates testimony.

A  Yes.

Q  How long are the blades of a pediatric speculum in general?

A  I don't know the measurement.

Q  Do the different size speculums allow physicians to view different portions of the patient's vaginal canal?

MR. HECTOR:  Objection.  Vague.

A  Can you rephrase that, please?

Q  There are different size speculums, correct?

A  Yes.

Q  And do those different size speculums allow a physician to view different parts of the vaginal canal?

A  Not really.

Q  What do you mean by "not really"?

A  I -- when evaluating a patient, we use a standard speculum unless there is some reason that

I decided she needed a more narrow speculum. It's not that I bring multiple speculums to examine the same patient to look at different parts of the vagina.

Q If you wanted to view a portion of a patient's vagina that was on the proximal end, would you use a larger speculum?

MR. HECTOR: Objection. Vague.

A Can you clarify what you're referring to as "proximal end"?

Q I believe we mentioned that earlier. It's the end that's opposite of the entrance.

MR. HECTOR: Objection. Vague.

A Can you repeat the question, please?

Q If you wanted to view the proximal end of a patient's vagina, what type of speculum would you use?

A A standard speculum.

Q What is a standard speculum?

A The regular bivalve speculum.

Q How long are the blades on a standard speculum?

A I haven't measured them in a long time. But since the vagina is on average 9 centimeters, I believe they're around 9 centimeters.

Q   When you use a speculum, do you insert the entire blade into the vaginal canal?

**A   Until I hit the patient's top of the vagina or cervix.**

Q   I'm sorry.  Can you clarify your answer? Is that yes, you do insert the entire blade into the vaginal canal?

**A   We insert the blades into the end of the vaginal canal.**

Q   Okay.  So you just testified that a standard speculum, the blade is around 9 centimeters, correct?

**A   I said I didn't recall the measurement, but the average vagina is 9 centimeters.  So it would be around there.  Maybe a little shorter. Maybe a little longer.**

Q   Okay.  And so would you insert all 9 centimeters of the blade of the speculum into the vaginal canal?

MR. HECTOR:  Objection.  Vague.

**A   I would insert it until I reached the top of that lady's vagina.**

Q   And what do you mean by "the top of that lady's vagina"?

**A   To either the vaginal cuff or the**

Dr. Denise Poulos
April 08, 2025                                          36

posterior -- the posterior cul-de-sac, the sulcus.

Q  Is your answer because you treat incontinence?

MR. HECTOR:  Objection.  Vague.  Misstates the record.

A  No.  Typically I'm not inserting a speculum in the office for patients with incontinence.

Q  Okay.  So going back to your answer that you would insert the blades until you reached the top of that lady's vagina, why are you inserting the blades to that location within the vagina?

A  So that I can open the blades to visualize the cervix or the top of the vagina.

Q  Okay.  And if you wanted to view a portion of the vagina that was closer to the entrance, would you insert the blades of the speculum to a shallower portion?

MR. HECTOR:  Objection.  Vague.

A  It really depends what the patient's anatomy is.

Q  But you could do that?

MR. HECTOR:  Objection.  Calls for speculation.

A  I could do that.

Q  And do physicians view different portions of the female vagina using a speculum at different locations?

MR. HECTOR:  Objection.  Speculation.

**A  I can't speak to all physicians.  But as a gynecologist, I could inspect -- insert the speculum partway in the vagina to look at a different portion of the vagina, depending on the patient's anatomy.**

Q  What is the smallest speculum that you're familiar with?

MR. HECTOR:  Objection.  Vague.

**A  A pediatric speculum.**

Q  If a person skilled in the art wanted to treat the opening of the vagina, which I believe is called the introitus, would they use a speculum?

MR. HECTOR:  Objection.  Vague.

**A  Again, it depends on the patient's anatomy, but usually no.**

Q  If a person of skill in the art wanted to treat the first inch of the vaginal canal, starting at the introitus, would they typically use a speculum?

MR. HECTOR:  Objection.  Vague.

U.S. LEGAL SUPPORT, INC
713-653-7100

Dr. Denise Poulos
April 08, 2025                                38

A   It depends what the treatment is.

Q   Can you elaborate on that answer?

MR. HECTOR:  Objection.  Same objection.

A   I don't know what you want me to elaborate.

Q   Well, you said it depends on what the treatment is.  So under what treatments would you not use a speculum to treat the first inch of the vagina starting at the introitus?

MR. HECTOR:  Same objection.  Vague.

A   I'm going to repeat it to make sure I understood you.  So in what condition would I not use a speculum to treat the first inch of the vagina?

Q   Yes.

MR. HECTOR:  Same objection.

A   And we're talking about the proximal end, to be clear, closest of the opening?  Am I correct?

Q   So my understanding is the proximal end was furthest from the opening.

A   Okay.  So you would want to know when I would not use a speculum to treat the proximal end of the vagina?

Q   No.  I want to know -- so the opposite end

of the proximal end is the distal end, correct?

A  Yes.

Q  Okay.  And the distal end is where the introitus is, correct?

A  Yes.

Q  Okay.  And so I want to know when you would not use a speculum to treat the introitus?

MR. HECTOR:  Objection.  Vague.

**A  Since many of the women in my office have had children and have a lax vaginal opening and have some prolapse, I may be able to see it or reach it without needing a blade, the blades of a speculum to visualize that.**

Q  And I'm assuming this is true, but I'd ask a question.  Is a speculum a tool a person of skill in the art would typically own and use in their practice?

**A  They would use it in their practice.  I don't know if they would own it.**

Q  Do you own speculums?

**A  I own speculums, yes.**

Q  Are speculums a common tool in your practice?

**A  Yes.**

Q  Are you aware of any commercial vaginal

U.S. LEGAL SUPPORT, INC
713-653-7100

treatment devices that are shipped with a speculum?

MR. HECTOR:  Objection.  Vague.

A  I don't -- I can't think of any right now.

Q  Okay.  Since we were just talking about the distal and proximal end of the vaginal canal, can you turn to paragraph 41 of your declaration?  You can take a minute to review that, if you'd like.

MR. HECTOR:  You said 41?

MR. BEMBEN:  41.

MR. HECTOR:  Four one.

A  Page or paragraph?

Q  Paragraph 41, page 17.

A  Yes.

Q  Okay.  So you see about halfway into that paragraph, you state:  The introitus is the entrance to the vagina, open paren, or the distal-most portion of the vagina, close end -- I'm sorry, close paren.

Do you see that?

A  Yes.

Q  And then in two sentences later you say:  In other words, the introitus is around 9 centimeters on average from the distal end of

Dr. Denise Poulos
April 08, 2025                                          85

testimony in paragraph 32?

    A  Yes.

    Q  Do you agree with Dr. Berenholz's testimony in paragraph 33?

        MR. HECTOR:  Objection.  Foundation.

    A  Yes.

    Q  Do you agree with Dr. Berenholz's testimony in paragraph 34 of his declaration?

    A  Yes.

    Q  Do you agree with Dr. Berenholz in paragraph 35 of his declaration?

    A  Yes.

    Q  Do you agree with Dr. Berenholz in paragraph 36 of his declaration?

    A  Yes.

    Q  Do you agree with Dr. Berenholz in paragraph 37 of his declaration?

    A  Yes.

        MR. HECTOR:  Objection.  Foundation.

    Q  I'm sorry.  Can you repeat your answer, Doctor?

    A  Yes.

        MR. HECTOR:  Same objection.

        THE WITNESS:  Sorry.

    Q  Sorry.  Your answer was yes, Dr. Poulos?

U.S. LEGAL SUPPORT, INC
713-653-7100

Dr. Denise Poulos
April 08, 2025                                    90

Q  Do you agree that by February 2006, based on the modification of a decades-old traditional gynecological surgery for stress urinary incontinence, clinicians also performed laser vaginal rejuvination to tighten vaginal support tissue in the outer third of the vagina, including the introitus, vulva, and the perineal body, both for cosmetic purposes and to improve sexual function?

MR. HECTOR:  Objection.  Foundation.  The document speaks for itself.

**A  Yes.**

Q  Do you agree with the second-to-last sentence that begins:  And even as early as November 2000?

MR. HECTOR:  Objection.  Foundation.

**A  No.**

Q  What do you disagree with in the second-to-last sentence of paragraph 49 of Dr. Berenholz's declaration?

**A  I don't know which laser was being used in a laser vaginal rejuvination or do I know what more sophisticated tools were being compared because I don't know what it's being compared to.**

Q  Okay.  Do you agree with the last sentence

U.S. LEGAL SUPPORT, INC
713-653-7100

Dr. Denise Poulos
April 08, 2025                                                99

minora prior to this transition because the claim requires heating a mucosal surface?

MR. HECTOR: Objection. Misstates the document.

A No.

Q What do you disagree with in the last sentence of paragraph 145 of Dr. Berenholz's declaration?

**A Mucosal surface of labia minora, being the outermost edge of the vulva or vestibule and/or inner surfaces of the labia minora because the claim requires heating a mucosal surface. The claim includes heating a mucosal surface. It does not require it.**

Q Is there anything else that you disagree with in the last sentence of paragraph 145 of Dr. Berenholz's declaration?

MR. HECTOR: Objection. Vague.

**A No.**

Q Okay. You can put Dr. Berenholz's declaration aside, please, and take out the '511 patent, which is --

**A I'm there.**

Q If you open to the first page of text after the figures, there's a background section.

Let me know when you're there.

A   I'm there.

Q   Do you understand that the background section of a patent describes what was known prior to the invention?

MR. HECTOR:  Objection.  Misstates the record.  Foundation.

A   I don't know exactly what it's made up of.

Q   What is your understanding of the background section of a patent?

A   It is a description of some technologies that were known but may not be all the technologies that were known.  I don't know what's missing.

Q   But it does describe some of what was known before the invention, correct?

A   Yes.

Q   Have you read the background section of the '511 patent?

A   I have.

Q   Do you agree with the statements in the background section of the '511 patent?

MR. HECTOR:  Objection.  Vague.

A   I would need to read it again.

Q   Okay.  Please do.

Dr. Denise Poulos
April 08, 2025                                           101

A   All right.  I've read it.

Q   Okay.  So do you agree with the statements in the background of the '511 patent?

MR. HECTOR:  Objection.  Vague.

A   For the most part, although I have not read all of the patents and articles that are being referred to.

Q   Let's take a look at the second paragraph that discusses collagen denaturation.  Do you see that?  Begins column 1, line 35.

A   Yes.

Q   Are you familiar with collagen denaturation?

A   Yes.

Q   Can you explain to me how collagen denaturation works?

A   When collagen is heated to an adequate temperature, the collagen crosslinking bonds break, the collagen becomes more gel-like, and then new crosslinks are formed making a less loose tissue.

Q   And at what temperature does collagen denaturation begin?

MR. HECTOR:  Objection.  Vague.

A   I don't know when it begins.

Dr. Denise Poulos
April 08, 2025                                                    102

Q  Can you take a look further down in column 1, starting around line 1 -- I'm sorry, starting around line 62 where it starts:  The vaginal tissue.

Do you see that?

A  I see that.

Q  It states:  The vaginal tissue of women is stretched during vaginal childbirth.

Do you see that?

A  Yes, I see that.

Q  Okay.  Do you agree with that statement?

A  Yes.

Q  Okay.  If we go to column 2, it explains the first sentence at the end of the first line:  Some consequences may include sexual aspects, as may following from loosening of the vagina and its opening, the introitus.

Do you see that?

A  Yes.

Q  Do you agree with that?

A  Yes.

Q  It goes on to state that:  Such loosening typically occurs with the first vaginal delivery, and the loosening tends to increase with subsequent vaginal deliveries.

Dr. Denise Poulos
April 08, 2025                                            103

Do you see that?

A  Yes.

Q  Do you agree with that?

A  Yes.

Q  It goes on to state:  This effective of looseness in this region may include decreased pressure and friction during intercourse and, as a consequence, decreased sexual pleasure for women and their conjugal partners.

Do you see that?

A  I see that.

Q  Do you agree with that?

A  I think the word should be "this effect," but otherwise I agree with it.

Q  And so it was known to a person of skill in the art that a loose vagina introitus may lead to decreased sexual pleasure, correct?

MR. HECTOR:  Objection.  Foundation.

A  Correct.

Q  Is it fair to say that the person of skill in the art would have understood that tightening a vagina introitus may lead to enhanced sexual pleasure?

MR. HECTOR:  Objection.  Foundation.

A  Yes.

U.S. LEGAL SUPPORT, INC
713-653-7100

embodiments of Edwards are for treating conditions such as menorrhagia and different forms of incontinence?

A  Yes.

Q  Can you turn to column 13, line 12, please?

A  I'm there.

Q  Okay.  Do you see that Edwards states:

Figure 9 is a process flow diagram showing a method for using a fourth embodiment for vaginal remodeling.

Do you see that?

A  Yes.

Q  So a person skilled in the art would have understood Figure 9 shows a method of vaginal remodeling using the device in Figure 4; is that right?

MR. HECTOR:  Objection.  Speculation.

A  Yeah, it describes using this device for vaginal remodeling.  Then it goes on to say for treating -- treat stress incontinence -- or treats incontinence, I should say.

Q  Where does it go on to say "treats incontinence"?

A  The last --

U.S. LEGAL SUPPORT, INC
713-653-7100

Dr. Denise Poulos
April 08, 2025                                                     141

Q   Specifically with respect to Figure 9.

A   Line 16.

Q   And then it also states:  Remodeling both the anterior and posterior wall provide circumferential vaginal wall tightening resulting in physical and physiological improvement in the area of sexual function, correct?

MR. HECTOR:  Objection.  Foundation.

A   It states that, but I disagree with it.

Q   You disagree with the plain language of the Edwards patent?

A   Yes.

Q   On what basis do you disagree with the Edwards patent?

A   Well, it's for modeling of the anterior wall, treats incontinence, targeting bladder outlet hypermobility, by providing increasing support for the bladder outlet.  And it describes treating at the bladder neck, which may provide support at different parts of the vagina.  And as it describes remodeling anterior, posterior walls, I don't believe it's causing circumferential vaginal wall tightening.

Q   That's what Edwards states, correct.  If you look at column 13, line 19, he states, quote:

Remodeling both the anterior and posterior wall

provides circumferential vaginal wall tightening

resulting in physical and physiological

improvement in the area sexual function, correct?

MR. HECTOR:  Objection.  The document

speaks for itself.

A  Yes, that's what it says.

Q  Let's turn back to the description of

Figure 4, which is on column 7, line 14.

A  Okay.

Q  And the description of Figure 4, if you go

to column 7, line 14, and it continues to 8,

line 5, do you see that?

A  Yes.

Q  Can you review that portion of Edwards,

please?

A  I've read it.

Q  Just to confirm, you just read column 7,

line 14 through column 8, line 5; is that correct?

A  Yes.

Q  With respect to Figure 4, Edwards

describes a treatment element that he labels 110

that can be inserted into the vagina using a

speculum, correct?

A  I don't know where you're looking at 110.

Q   I'm sorry.  Element 410.  Let me restate that question.

With respect to Figure 4, Edwards describes a treatment element 410 that can be inserted into the vagina using a speculum, correct?

A   Yes.

Q   Does Edwards disclose the size of the speculum?

MR. HECTOR:  Objection.  The document speaks for itself.

A   No, it states a speculum.

Q   So Edwards doesn't disclose any dimensions of the speculum?

MR. HECTOR:  Objection.  The document speaks for itself.

A   No.  By not describing a size, I took this to be a regular speculum.

Q   But Edwards doesn't say that the speculum is a regular speculum, correct?

MR. HECTOR:  Same objection.

A   I don't see it specifically written out.

Q   And Edwards doesn't describe any dimensions of the speculum, correct?

MR. HECTOR:  Objection.  Asked and

answered.

A  Correct.

Q  Does Edwards explain that the treatment element of Figure 4 cannot be used without a speculum?

MR. HECTOR:  Objection.  Foundation.  The document speaks for itself.

**A  It only describes using it with the speculum and attaching it to the speculum.**

Q  That was my question.  Does it explain the treatment element of Figure 4 cannot used without a speculum?

MR. HECTOR:  Same objections.  Asked and answered.

**A  It only describes using it with a speculum, not without.**

Q  That's not answering my question, though. I'm asking does Edwards explain that the treatment element cannot be used without a speculum?

MR. HECTOR:  Objection.  Asked and answered.

**A  It does not.  It only explains using it with a speculum.**

Q  Would a person of ordinary skill in the art have understood the Edwards treatment element

could be used without a speculum?

MR. HECTOR: Objection. Asked and answered.

A No. When using a device and having radio frequency and applying energy to a vagina, I would want to follow the description as described by the manufacturer and would use it the way it's indicated in the description of attaching the blade to the speculum.

Q Who is the manufacturer?

MR. HECTOR: Objection. Vague.

A That would -- sorry, that would be once it was commercially available. From reading this document in the patent, I would understand that it's intended to be used with a speculum as described.

Q Does Edwards explain that the treatment element of Figure 4 cannot deliver RF energy without first being positioned in the speculum?

MR. HECTOR: Objection. Vague.

A It only describes applying energy once the device is secured to the spectrum.

Q But Edwards does not explain that the treatment element of Figure 4 cannot deliver RF energy without first being positioned in the

4/29/25, 1:42 PM                                                                 erythema | Taber's Medical Dictionary

Search Taber's Online

Home    ☆ Favorites    📄 Notes    📱 Mobile    🔍 Browse                    **Pricing**    🔒 Log in



**T Taber's Medical Dictionary**

erysipelas
erysipelatous
erysipeloid
**Erysipelothrix rhusiopathiae**
erysipelotoxin
erysiphake
erythema
erythema ab igne
erythema annulare
erythema chronicum migrans
erythema dose
erythema dyschromicum perstans
erythema elevatum diutinum

# erythema

(er″ĭ-thē′mă )

🔊 To hear audio pronunciation of this topic, purchase a subscription or log in.

[Gr. *erythēma*, redness] Reddening of the skin. Erythema is a common but nonspecific sign of skin irritation, injury, or inflammation. It is caused by dilation of superficial blood vessels in the skin. erythematicerythematous (er″ĭ-thĕ-mat′ĭk) (er″ĭ-them′ăt-ŭs), adj. **Erythema of the flank**

👓 There's more to see -- the rest of this topic is available only to subscribers.

🔎 Search PRIME PubMed

**Related Topics**

T necrolytic migratory erythema
T threshold
T dose
T ray
T EM
T T.E.D.
T ECM
T S.E.D.
T fifth disease
more...

## Want to read the entire topic?

Access up-to-date medical information for less than $1 a week

Purchase a subscription

I'm already a subscriber

Browse sample topics

Home                    Privacy / Disclaimer            Log in
Contact Us            Terms of Service

© 2000–2025 Unbound Medicine, Inc. All rights reserved

**CONNECT WITH US**

   

**unbound®**
MEDICINE

https://www.tabers.com/tabersonline/view/Tabers-Dictionary/740539/all/erythema                    1/1

BTL EX1034
IPR2024-00703
U.S. Patent No. 8,961,511

Appx1921



## V.    TECHNICAL BACKGROUND OF THE '511 PATENT

### A. Anatomy of The Female Genitourinary System

40.    At its most basic, the female genitourinary system includes the female genitals, the reproductive system, and the urinary system. The reproductive system includes the vulva, the vagina, and the uterus, among other organs. The urinary system includes, the urethra and the bladder, among other organs. These organs are located within the female pelvis. The organs can generally be seen in the below figures:



EX1015, Plate 377.



EX1015, Plate 360 (annotated).



EX1015, Plate 365 (annotated).

41.    Starting with the female reproductive system, the vulva is the external female genitalia. The external female genitalia consists of the labia majora, labia minora, vaginal orifice (or introitus), urethral orifice, and clitoris. The vulva also includes the vulva vestibule, which is a surface of the vulva that begins superiorly just below the clitoris and ends inferiorly at the posterior commissure of the labia minora, with its borders formed from the edge of the labia minora. This border, or outer edge of the vestibule, is also known as Hart's line. Within the vulva vestibule is the introitus and the urethral orifice. The introitus is the entrance to the vagina (or the distal most portion of the vagina). Immediately within the introitus is the vaginal canal, which is around 9 cm on average. *See* EX2009. In other words, the introitus is around 9 cm on average from the distal end of the vaginal canal. The tissue lining the vaginal canal is generally known as the vaginal wall. When stretched, the vaginal canal becomes tube-like, but the circumferential wall is still described as having an anterior wall, posterior wall, and two lateral walls.

42.    Turning next to the urinary system, as described above, within the vulva vestibule, and adjacent to the introitus is the urethral orifice. Immediately within the urethral orifice is the urethra, which is about 4 cm in length on average. EX2003, 2072 ("about 4 cm long passing from the bladder . . . opening in the vestibule of the vagina."); EX2004, 1672. On the other, proximal, end of the urethra is the bladder. Acting as a valve that controls the flow of urine from the

bladder into the urethra is the bladder neck. The bladder neck is a group of muscles opening at the base of the bladder where it connects to the urethra. The bladder neck holds urine in place and controls release of urine from the bladder. The bladder neck extends for roughly 1-1.5 cm. The urethra runs roughly in the same sagittal plane as the vagina, but diverges from the vagina in a curving manner. EX2003, 2072; EX2004, 1672.

## B.    '511 Patent Background and Disclosure

43.    The '511 patent claims recite methods of remodeling tissue immediately underlying a surface layer of female genital tissue, by heating specific areas of tissue around the vulva, the vagina, and the introitus (the opening of the vagina), to a therapeutic temperature. EX1001, claims 1, 35, 43, and 51. In most of the claims of the '511 patent, the claimed treatment locations are close to or outside the introitus (or opening of the vagina). The '511 patent's methods restore vaginal tissue, which often becomes stretched during childbirth and stretches increasingly over time (and also occurs in women who have not delivered a child), resulting in decreased sexual pleasure. EX1001, 2:4-9. Prior to the '511 patent, doctors relied on invasive techniques, such as surgery, to treat these conditions, but these approaches often caused scarring, resulted in damage, and required prolonged recovery. EX1001, 2:9-12. The inventive techniques claimed in the '511 patent overcame the problems of the prior art by providing a non-invasive

procedure for restorative treatment and remodeling of certain female genital tissue that did not require surgical incisions, that did not require surgical incisions, did not cause thermal damage to the epithelium, and did not result in patient down time.

44.    The '511 patent uses a treatment tip to make optimal contact with the genital epithelial surface for delivery of radiofrequency (RF) energy. EX1001, 2:53-55. The target tissues of the embodiments of the '511 patent are the tissues that lie immediately beneath the mucosal epithelium of genital tissues, the lamina propria and muscularis. EX1001, 3:41-45. RF energy heats and denatures collagen located in the collagen-rich lamina propria, resulting in a contraction of the collagen spaces thereby creating a tightening effect. See EX1001, 1:19-20, 35-39. The '511 patent explicitly states that its embodiments exclude deeper tissue, such as endopelvic fascia. EX1001, 3:47-48.

45.    Some invasive surgical techniques, including those using lasers, ablative RF, and scalpels, were used to treat conditions in the female genital region prior to the invention of the '511 patent; however, there were adverse effects. For example, these procedures would ablate and destroy the epithelium, often required significant recovery time, requiring time off work, bleeding, scarring, and increased pain.

46.　　Unlike the prior invasive surgical techniques, the claimed treatment of the '511 patent uses heating without ablation to remodel the female genitalia. Applying such treatments to the anatomical areas at issue in the present claims was not known prior to the '511 patent.

**C. Prosecution History of the '511 Patent**

47.　　I understand that during prosecution of the application eventually granting as the '511 patent, the claims were rejected in view of U.S. Patent No. 6,350,276 to Knowlton et al. ("Knowlton"). EX1002, 82. However, the prosecution history explains that Knowlton's treatments specifically related to "modifying skin surfaces and underlying tissue" including the cervix (among other parts of the body) rather than the claimed female genital tissue. EX1013, 1:16-29, 6:49-57, 13:35-37.

48.　　The independent claims were amended to specify heating of specific areas of female genital tissue, including introitus (claims 1 and 43), vagina (claim 35), and vulva (claim 51). EX1002, 234-244. In the Notice of Allowance, the Examiner explained "Knowlton fails to contemplate the specific areas of treatment set forth in independent claims [1, 35, 42, and 51]. No other reference has been found which discloses, fairly suggests, or makes obvious this area of treatment whether taken alone or in combination with the Knowlton reference." EX1002, 317.

example, as shown in Figure 6, "the endopelvic fascia will preferably be disposed between the electrodes of the urethral probe 44 and the vaginal probe 42." *Id.* , 18:46-50, 29:66-67, 30:1-2.

90.　　A POSA would understand that Ingle's embodiments differ from the '511 patent and the other references in that they require a parallel electrode on the opposite side of the vaginal wall, inserted into another orifice or on the abdomen. This configuration limits the regions of the vaginal wall available for treatment.

### 2. Independent Claims

a. **Claim 1: The Combination of Edwards, Ingle, and Mosher does not render obvious "wherein the heating includes heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"**

91.　　While Ground 1 relies on to combination of Edwards, Ingle, and Mosher to allegedly render claim 1 obvious, the Petition relies only on Edwards and Mosher for this particular element of claim 1. Pet., 35-36. Dr. Berenholz (along with Petitioner) essentially argues that because Edwards and Mosher teach treating *a* portion of the vagina, they must teach treating *the* portion of the vagina most distal to the introitus. EX1003, ¶¶120-25. I disagree. Not only do Edwards and Mosher not teach treating the portion of the vagina most distal to the introitus, but both references specifically target the opposite end of the vagina and the device in Edwards is unable to treat the introitus. EX2005, 126:2-23. Therefore, in my

opinion, the combination of Edwards, Mosher, and Ingle does not teach treating the portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.

92.    As an initial matter, Dr. Berenholz's (and Petitioner's) arguments seem to be based on a misunderstanding of the claim language. Dr. Berenholz (and Petitioner) states that "A POSA would have understood this treatment area includes heating a portion of the vagina starting 1 cm from the opening and extending a further 2.5 cm back towards the cervix (i.e., 3.5 cm from the introitus)." EX1003, 120; Petition, 35.  I disagree—this reading of the claim language is flawed. A POSA would understand that the plain reading of this limitation requires the treating of at least the introitus and the first 1 cm of the vaginal (up to 3.5 cm in from the introitus).

93.    As explained above, the introitus is the external opening of the vagina at the distal end. *Supra* Section V.A. A POSA would understand that the primary structures targeted to treat SUI, as in Edwards and Mosher, are the bladder neck and supportive tissues, which are located at the proximal end of the urethra. *Supra* Section V.A; EX1005, 2:1-5 ("bladder[]neck"); EX1006, [0006], [0046]. Dr. Berenholz appears to agree by stating that expert agreed Edwards and Mosher address stress urinary incontinence by "strengthening the tissues surrounding . . . [the bladder] neck." EX2005, 126:2-23.  When treating a patient for SUI, using

Edwards and Mosher's techniques, a POSA would understand that one would treat the portion of the vaginal canal proximal to the target structure—the bladder neck— which is not near the introitus. *Supra* V.A.

94.    The bladder neck—the focal treatment location for the type of RF-based stress urinary incontinence treatments described in Edwards and Mosher—*starts* at the proximal end of the urethra, which extends about 4 cm into the body. EX2003, 2072 ("about 4 cm long passing from the bladder . . . opening in the vestibule of the vagina."); EX2004, 1672.  A POSA would also understand that the bladder neck treatment is provided through the vaginal wall, which does not run perfectly parallel to the urethra, given that it diverges from the urethra, as can be seen below.



EX1015, Plate 360 (annotated).



EX2009.

95.     Thus, to treat the bladder neck through the vaginal wall, a POSA would have understood that the treatment position would be approximately 4 cm, or more, into the vagina, given the vaginal canal's curvature away from the urethra, to affect the bladder neck (particularly given Edward's electrode arrangement).

96.     Accordingly, Edwards does not suggest treating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus. Specifically, Edwards is treating the posterior and anterior vaginal walls opposite the bladder outlet: "A method 900 is performed to create a series of lesions in either the anterior vaginal wall, the posterior vaginal wall or both." EX1005, Fig. 8A ("proximate to the bladder outlet"), 3:9-11, 6:20, 11:48-53.

97.     A POSA would not understand these treatment areas to be at the introitus. Further, as explained above, the introitus is the external opening of the vagina (i.e., at the distal end of the vaginal canal). The primary structure targeted to treat SUI is the bladder neck. Supra Section V.A. Therefore, when treating a patient for SUI, a POSA would understand that one would treat the proximal end of the vaginal canal—opposite the introitus.

98.     The Edwards device includes a speculum and a blade:

> In a step 904, a speculum is inserted in the patient's vagina. The blades of the speculum are placed in an open position. The physician determines optimal areas of treatment. These may include the anterior wall, the posterior wall or both.

> In a step 905, the blade 420 of the system 400 is inserted into the vagina through the speculum. The handle 430 is manipulated so as to cause the mating features 421 to engaged with the speculum.

EX1005, 13:23-46.

99.     The speculum and blade are depicted in Figure 4:



FIG. 4

EX1005, Fig. 4

100.   Thus, a POSA would understand that because the blade 420 is passed through the speculum, the blade treats the anterior or posterior vaginal walls deeper into the vagina (i.e., away from the vaginal opening). A speculum is a well-known device that dilates a vagina. A POSA would understand that in Edwards, the blade is not used until it has been mounted on the speculum which has already been inserted into a vagina. *See, e.g.*, EX1005, Fig. 9A. As shown in Figure 4, "[t]he blade 420 includes mating features 421, a spring-loaded pin detail 422, a plurality of relatively flat electrodes 423 and a plurality of irrigating fluid delivery pores 425. The mating features 421 are constructed to engage with features in the speculum following simple positioning of the speculum within the vagina. The spring-loaded pin detail 422 *locks the blade 420 into the correct position in the*

*inserted speculum.*" EX1005, 7:26-33 (emphasis added). Edwards only ever suggests that the blade 420 is locked into position with the speculum during delivery of RF energy to the vaginal wall. *See* EX1005, 13:43-62.

101. Thus, Edwards makes clear that the blade 420 of the treatment element mates with the speculum, with the spring-loaded pin detail locking the blade 420 into position relative to the speculum, and thereby restricting the treatable area along the posterior and anterior vaginal walls. And in a female patient with stress urinary incontinence (SUI), who would have looser tissue structure relative to a patient without SUI, at least two inches of the speculum bills must be in contact with the vaginal wall (i.e., the anterior and posterior walls) to maintain the speculum in place during treatment. When engaged with the speculum, the blade 420 appears to extend at least an inch forward (into the vagina) from the end of the speculum bill. The electrodes would contact the vaginal wall at least an inch forward (into the vagina) from the end of the speculum bill.

102. The positioning of the blade 420 into the speculum inhibits treatment of the area from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus. Indeed, the speculum dilates the introitus and moves the introitus out of the way so that deeper structures of the vagina can be treated.

103.    As shown in Figures 9A and 9B, Edwards confirms that before treating the anterior and/or posterior wall of the vagina, "the blade 420 of the system 400 is inserted into the vagina *through the speculum*. The handle 430 is manipulated so as to cause the mating features 421 to engage with the speculum." EX1005, 13:43-46 (emphasis added).



FIG. 9A                    FIG. 9B

*Id.*, Figs. 9A-9B.

104.    Thus, Edwards device would not provide for treatment of the area from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus.

In fact, a POSA would understand that the speculum dilates the introitus and moves it out of the way so that deeper structures of the vagina can be treated.

105.   It is my opinion that Mosher does not remedy the deficiencies of Edwards. Mosher is directed to treating the endopelvic fascia, which supports and is located adjacent to the bladder. Mosher explains injury to the nerves in the bladder neck should be avoided:

> To avoid injury to nerves in the bladder neck region while providing sufficient treatment volume along the endopelvic fascia, it may be advantageous to distribute the treatment volume along the patient's lateral orientation while *limiting the length of treatment along the axis of the patient's urethra*. This may minimize exposure of the bladder neck and antero-lateral vaginal wall nerves to RF energy. Such a laterally elongate treatment region of the endopelvic fascia will preferably be significantly wider (along the medial-lateral orientation) than its urethral length, ideally having a width of about 25mm and a length of about 15 mm. Treatment depths will preferably be at least about 2mm, optionally being as much as 6 mm.

EX1006, ¶[0074] (emphasis added).

106.   Contrary to Dr. Berenholz's opinion, a POSA would not understand this disclosure to reference the region from vagina from the introitus to 3.5 cm inward.  A POSA would understand that while Mosher merely suggests a rectangular treatment *area* of 25 mm by 15 mm, Mosher does not explicitly state where the rectangular treatment area is located within the vagina.  Also, Mosher would not suggest treating the first 2.5 cm of the vagina in from the introitus

inasmuch as a POSA would understand that treating this region does not help the conditions Mosher looks to treat.

107. Moreover, Mosher teaches a treatment area having a width of about 25 mm and a length of about 15 mm, to avoid treating laterally down the urethral length (i.e., towards the introitus) in order to limit the exposure to the bladder neck and the urethra. EX1006, [0074]. The region of the anterior vaginal wall that is adjacent to the endopelvic fascia at the bladder neck is beyond the region extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus, therefore Mosher does not suggest a shallow treatment area. Indeed, with Mosher's limited treatment length, a POSA would understand that the introitus— which is spaced more than about 4 cm from the bladder neck—would not be treated.

108. While Dr. Berenholz (and Petitioner) do not rely upon Ingle for this claim element, it is my opinion that Ingle suffers from the same deficiencies. Ingle is directed to treating incontinence at the bladder neck, as opposed to treating the introitus. EX1007, 17:30-34, Figs. 6, 11, 12, 12K, and 13.

109. Further, while Dr. Berenholz (and Petitioner) provides a general discussion regarding why a POSA would have been motivated to combine Edwards, Mosher, and Ingle (*see* EX1003, ¶¶84-90), these arguments do not explain how the references would be combined to read on this limitation. In fact, as

explained above, Dr. Berenholz's statement that "Mosher further confirms that a POSA would have been motivated to focus treatment nearer the opening of the vagina, in order to avoid damage to nerve in the bladder neck region and in the antero-lateral vaginal wall" (*id.*, ¶123) is incorrect.

110. Therefore, in my opinion, a POSA would not understand Edwards, Mosher, and Ingle as suggesting the features of claims 1-34.

> **b.    Claim 35: The Combination of Edwards, Ingle, and Mosher Does Not Render Obvious "wherein the heating includes heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock"**

111. In my opinion, the combination of Edwards, Mosher, and Ingle does not teach treating the portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock.

112. As shown in FIG. 7 of the '511 patent below, the vaginal wall is oval-shaped. EX1001, FIG. 7. As shown in the '511 patent (Fig. 7), the anterior and posterior vaginal walls are smaller compared to the lateral vaginal walls.



EX1001, FIG. 7 (annotated).

113.   A POSA would understand that nothing in Edwards suggests that its treatment of the anterior wall would be in the claimed region of 1 o'clock to 11 o'clock. And a POSA would understand that Edwards' potential treatment of the posterior vaginal wall does not extend circumferentially for several reasons.

114.   First, Edwards does not suggest to a POSA that the speculum and treatment blade would be rotated within the patient. A POSA would understand that as discussed above with reference to Edwards' Figs. 4 and 9, the "speculum is inserted in the patient's vagina" to treat "the posterior wall."  EX1005, 13:38-44. A POSA would further understand that Blade 420, which has the treatment electrodes, is positioned only after the speculum is in place and is locked in place on the speculum. EX1005, 13:43-49. Nothing in Edwards suggests the speculum

being rotated or moved once engaged in place. Moreover, a POSA would understand that conventional positioning of the speculum is to place the bills against the anterior and posterior vaginal walls. The conventional position of a speculum can be seen in the diagram below:



EX2010, 2.

115. Further, the patient's leg would be in the way of the speculum's rotation, and it would not make sense to rotate the speculum when using irrigation fluids like those described in the Edwards treatment.

116. Second, Edwards does not disclose treatments extending in any circumferential direction along the posterior wall. While the Petition refers to a "series of lesions," those lesions are caused by the electrodes 423 extending along the *length* of the device, as can be seen on blade 420 itself. Petition, 37 (quoting

EX1005, 13:14-16); EX1005, Fig. 4 (electrodes 423). A POSA would understand that this suggests a series of point treatments along the length of the bladder neck, at least because that is the distribution of electrodes and there is no realistic option to rotate the speculum laterally.



FIG. 4

EX1005, Fig. 4 (annotated).

117.   Thus, Edwards' description of treating the posterior wall suggests treatment of a point on the vagina wall and does not suggest heating "circumferentially … from 1 o'clock to 11 o'clock," as required by claim 35.

118.   In my opinion, Mosher does not remedy the deficiencies of Edwards. Mosher fails to suggest heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock. Like Edwards, Mosher describes treatment

56
Appx2049

directed towards the endopelvic fascia, i.e., the anterior vaginal wall corresponding to the region between 11 o'clock and 1 o'clock. *See* EX1006, Abstract, ¶[0009]. Petitioner reasons that because Mosher discloses "distribut[ing] the treatment volume along the patient's lateral orientation," a POSA would be motivated to treat around the circumference of the vagina. Pet., 38 (citing EX1006, ¶74). I disagree.

119. A POSA would understand that Mosher is clear on its meaning of lateral treatment—namely that the lateral dimension of the treatment area is greater than the length of the treatment area. EX1006, ¶[0074]. However, Mosher makes clear that this arrangement is achieved through treatment of an area up to 2.5 cm wide and 1.5 cm long. EX1006, ¶[0074].

120. However, Mosher's limited anterior treatment does not suggest a circumferential treatment in the 1 o'clock to 11 o'clock span. Petition, 67. At best, a POSA would understand Mosher to potentially hit an insignificant spot inside of the claimed range (e.g., an insignificant spot at 11 o'clock or 1 o'clock), which would not qualify as a *circumferential* portion. Thus, Mosher does not suggest "heating a portion of the vagina circumferentially" from 1 o'clock and 11 o'clock, as required by claim 35 and Petitioner offers no argument as to why Mosher would be modified in this respect.

121. Moreover, Mosher does not "provide an express suggestion to avoid treatment in the 60 degree arc between 11 o'clock and 1 o'clock," as Petitioner

suggests. Pet., 39. Petitioner cites to paragraph [0011] of Mosher describing a "probe body directly access[ing] the treatment volume . . . by using tissue-penetrating electrodes." EX1006 ¶[0011]. A POSA would understand that this disclosure of Mosher describes an embodiment where a needle penetrates tissue to directly heat the fascia, and in that case, the "treatment volume will preferably be separated from a urethra of a patient by at least about 1 cm to inhibit injury to nerves along the urethra" that is from being punctured by the tissue penetrating electrode. *Id*. But Mosher does not suggest avoiding the bladder neck when applying RF through the vaginal wall. Indeed, the bladder neck is the target.

122. While Petitioner does not rely upon Ingle for this claim element (Pet., 36-39), Ingle fails for similar reasons as Mosher. A POSA would understand that like Mosher, Ingle teaches treatment directed toward the endopelvic fascia between the urethra and the vagina, i.e., the region of the vaginal wall falling within 1 o'clock to 11 o'clock. EX1007, 18:46-50.

123. Further, a POSA would not be motivated to combine Edwards, Mosher, and Ingle to arrive at the specific limitations of claims 35. Dr. Berenholz (and Petitioner) relies on Mosher's statement of a treatment volume "offset laterally from the urethra to a right side of the patient" and "another treatment volume [is] similarly offset laterally from the urethra to a left side of the patient." EX1003, ¶133 (citing EX1006, ¶[0011]). However, as confirmed by the same

paragraph, the offset is needed because the embodiment "us[es] tissue penetrating electrodes having active electrode surfaces that extend from the tissue engaging surface by a distance within a range of about 0 to about 8 mm." EX1006, ¶[0011]. A POSA would understand that the embodiment of Edwards Petitioner relies upon has no "tissue penetrating electrodes" so there would be no need to consider such an offset.

124.    Therefore, in my opinion, the combination of Edwards, Mosher, and Ingle does not suggest the features of claims 35-42.

> **c.    Claim 43: The Combination of Edwards, Ingle, and Mosher Does Not Render Obvious "wherein the heating includes heating a portion radiating outward from the introitus to Hart's line"**

125.    In my opinion, the combination of Edwards, Mosher, and Ingle does not suggest treating the portion radiating outward from the introitus to Hart's line.

126.    A POSA would understand that the Hart's line is exterior to the introitus and the opening of the urethra. A POSA would also readily understand that Edwards, Mosher, and Ingle are all directed to treating female stress urinary incontinence. As Dr. Berenholz (and Petitioner) admits, Edwards describes ablation of the uterus, bladder, and vaginal wall. Pet. 40; EX1005, 2:34-3:13. Likewise, Mosher and Ingle teach heating the anterior vaginal wall adjacent to the bladder to strength and stiffen the endopelvic fascia.  EX1006, Abstract, ¶¶[0009], [0058]; EX1007, 2:51-53, 2:59-60.  Contrary to the external, vulvar target tissue

claimed by claim 35, these are internal tissues; indeed, deeper tissue than the target tissue in the '511 patent.

127. Only one of Edwards, Mosher, and Ingle mentions external tissue. However, Ingle's passing reference to "cosmetic procedures" and treatment of "sagging breasts" (EX1007, 18:1-7, 1:18-23) would not motivate a POSA treat a "portion radiating outward from the introitus to Hart's line." Indeed, a POSA would understand that there is significant difference between the dense innervation and vasculature of the tissue of the breast, abdominal wall, and face described in Ingle compared to that of the vaginal, vulvar, and introital tissue. Therefore, a POSA would not make the jump to use RF energy to treat these latter tissues cosmetically. In my opinion, Dr. Berenholz oversimplifies the issue and applies hindsight bias by asserting that "a POSA would have been motivated to apply the RF treatments described in Edwards, Mosher, and Ingle to the vulval vestibule region described in [this limitation]." EX1003, ¶142. However, the fact that RF treatments were used for certain other cosmetic applications would not mean that a POSA would have been motivated to apply RF heating to the claimed region.

128. Therefore, a POSA would simply not be motivated to heat from the introitus to Hart's line, based on the teachings of Edwards, Mosher, and Ingle. Further, I understand that it is improper to focus on what a skilled artisan would have been *able* to do, rather than what a skilled artisan would have been *motivated*

to do at the time of the invention.. In my opinion it is unquestionable that a POSA would not have been motivated to use the treatments described in Edwards, Mosher, and Ingle to cosmetically enhance the genital region radiating outward from the introitus to Hart's line. First, that region is irrelevant to the common problem that these references were trying to solve: urinary incontinence. Second, a POSA would understand that heating the region radiating outward from the introitus to Hart's line would provide no additional support to the bladder or bladder neck, and would not result in improvement of stress urinary incontinence since Hart's line is even beyond the opening of the urethra.

129.   Additionally, it is not clear how treating the region radiating outward from the introitus to Hart's line would be accomplished.  Edwards teaches an applicator that mates with a speculum.  A POSA would undoubtedly understand that by definition, this procedure must take place *interior* to the vagina, not *external* to the vagina, extending from the introitus to the Hart's line.  EX1005, 13:43-46.  In my opinion, Dr. Berenholz (and Petitioner) has not adequately explained a motivation or a modification to Edwards to accomplish the claimed method it physically cannot accomplish.  Notably, the only recitation of Hart's line in the relevant portion of Dr. Berenholz's declaration is his quotation of the claims and specification of the '511 patent. EX1003, ¶¶136-142.

130. Futher, I agree with Dr. Berenholz that there would different RF settings, differing times, different uses in treating vaginal canal structure versus "external structures" because "tissue response is different externally and in terms of tolerability versus vaginal heating." EX2005, 34:22-35:12.

131. Therefore, in my opinion, the combination of Edwards, Mosher, and Ingle does not suggest the features of claims 43-50.

> **d.    Claim 51: The Combination of Edwards, Ingle, and Mosher Does Not Render Obvious "wherein the heating includes heating a mucosal surface of the labia minora"**

132. In my opinion, the combination of Edwards, Ingle, and Mosher does not render obvious "wherein the heating includes heating a mucosal surface of the labia minora."

133. As discussed above with respect to the portion from the introitus to the Hart's line, none of these references suggest heating a mucosal surface of the labia minora. Further, a POSA would not be motivated to heat the mucosal surface of the labia minora (outside the vaginal canal), based on the teachings of Edwards, Mosher, and Ingle.

134. Therefore, in my opinion, the combination of Edwards, Mosher, and Ingle does not render obvious the features of claims 51-58.

risks associated with an invasive procedure, in a sensitive area, especially when such procedures are considered medically optional.")

## 2. Ollivier Does Not Enable a POSA to Implement the Described Procedures

162.    Salon.com is described as a "politically progressive and liberal news and opinion website" that provides "provocative (if predictably liberal) political commentary and lots of sex."  EX2015.  A POSA would understand that Salon.com is not a medical or technical publication.  The author does not have a medical or technical background.  EX1008, 1; EX2011.  I was not aware of Salon.com before this case.

163.    A POSA would understand that Ollivier does not provide any specifics regarding the procedure or laser being used because  Ollivier is an article that merely indicates that there was a single doctor—Dr. Matlock—performing an invasive procedure using laser to cut away tissue, with no real description of the actual procedure. EX1008. The article does not appear to be directed to the medical community.

164.    As to the actual treatment mentioned in Ollivier, it was known in the field that, for training, Dr. Matlock required participating doctors to sign a non-disclosure agreement, as the procedure was kept secret. *See* EX2005, 162:3-6 (agreeing that Dr. Matlock "keeps the specifics ... of the treatment confidential"), 162:23-163: 4 (describing Dr. Matlock's "contract about … not divulging

treatment, surgical techniques, et cetera. ... it was confidential."), 165:23-166:1

(Dr. Matlock's procedures still confidential). I understand that Dr. Matlock still

requires a non-disclosure agreement to explain the procedure.

165.   Ollivier makes reference to Dr. Matlock's "antiseptic trimmings and

surgical prunings of a trusty laser" to remove tissues. However, Ollivier does not

provide any details on the procedure. EX1008, 1. Ollivier's reference to

"trimmings" and "surgical pruning" would suggest to a POSA only that Matlock is

using a surgical laser instead of a scalpel to surgically remove tissue. Indeed,

Ollivier identifies the risks associated with laser vaginal surgery, including

"hemorrhage, infection, loss of sensitivity, lingering pain from nerve damage,"

which are associated with invasive procedures. EX1008, 2. As discussed above, the

remodeling techniques of the '511 patent are non-invasive procedures intended to

avoid these effects. EX1001, 2:9-16 ("surgical approaches are not highly popular

because of the risks associated with an invasive procedure, in a sensitive area,

especially when such procedures are considered medically optional."). Therefore,

given the invasive procedure suggested by Ollivier and the lack of details, because

the treatment was maintained as a secret, a POSA would understand that there is no

disclosure that would allow a POSA to understand the specifics of the treatment so

as to be able to perform the same, or to combine aspects of the treatment with the

other teachings (such as Edwards, Mosher, and Ingle).

166.    Further, because Ollivier merely generally discusses Dr. Matlock's use of lasers, a POSA who is seeking to use non-ablative techniques that do not damage the surface of the treatment area would not look to ablative laser-related teachings, because the entire process by which these techniques work is by complete destruction of the surface layer of the treatment area. Ablative laser treatments are at the opposite end of the energy application spectrum of the non-ablative techniques of the '511 patent.

### 3. Claims 43 and 51 Are Not Obvious in View of Edwards, Mosher, Ingle, and Ollivier

#### a. Edwards, Mosher, Ingle, and Ollivier Do Not Render Obvious "heating a portion radiating outward from the introitus to Hart's line"

167.    Ollivier does not suggest heating between the introitus and Hart's line. Ollivier vaguely describes invasive surgical techniques where "labia [are] modified, vulvae reconfigured," and labium are "trim[ed] back." EX1008, 1.  But Ollivier does not teach or suggest treatment of the portion of the vagina from introitus to the Hart's line, nor does Ollivier disclose treating in an area "radiating outward" from the introitus.  Treatment of these specific portions are integral to the goal of the '511 patented method: "treating a loose vagina and introitus with a non-invasive procedure . . . for corrective or restorative remodeling." EX1001, 2:17-21. Rather, in the treatment described by Ollivier, portions of the external vaginal tissue are removed entirely which may even remove the Hart's line. EX1008, 1.

2), prior to the '511 patent, no one suggested the specific non-invasive procedures, on specific anatomical structures, claimed in the '511 patent.

### 5. Dependent Claims

**c.    The Combination of Edwards, Ingle, Mosher and Ollivier Does Not Render Obvious Claims 44-50 and 52-58 of the '511 Patent**

176.    I understand that because claims 44-50 and 52-58 ultimately depend from independent claims 43 and 51, they cannot be rendered obvious by the combination of Edwards, Ingle, Mosher, and Ollivier for at least the same reasons discussed above for the independent claims.

## VIII.  <u>OBJECTIVE INDICIA</u>

177.    I understand that Dr. Berenholz's former employer, Thermi, and mentor, Dr. Alinsod—who's opinions Dr. Berenholz "respect[s]"—recently praised the '511 patent treatments as "landmark." EX1025, 18; EX1004, 2; EX2005, 44:12-20. Specifically, Dr. Alinsod and Thermi published a paper in which Dr. Alinsod describes a study of Viveve's (which I understand is the original assignee of the '511 patent) treatment as a "landmark study" that reported "notable improvement to sexual function."  EX1025, 18, 21.  This "landmark study" describes treatments corresponding to claims 1, 26, and 35, as discussed below.  *See* EX2018.  Dr. Alinsod's paper also praises a second study of Viveve's device and treatment, which also corresponds to claims 1, 26, and 35.  EX1025, 18, 21; EX2017.

178.   I understand that industry praise provides probative and cogent evidence that one of ordinary skill in the art would not have reasonably expected the claimed invention. I also understand that the praise should be directed to novel elements of the claims (including of the product/treatment that meets/performs such elements).

179.   Here, claim 1 recites "heating a portion of the vagina extending from the introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus." EX1001, claim 1. Claim 26 further recites "tightening the introitus." EX1001, claim 26. Claim 35 recites "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." EX1001, claim 35. Both of the studies praised by Dr. Alinsod describe heating and remodeling vaginal tissue by applying an RF "treatment tip . . . to the mucosal surface of the vaginal *introitus* starting at the hymenal ring and [treating] the entire area *from the 1:00 o'clock to 11:00 o'clock position* . . . with RF energy pulses."  EX2018, 3; EX2017, 777. A POSA would understand that this described treatment corresponds to the limitations of claims 1, 26, and 35.  Moreover, the specific device being used was the Viveve device. EX2018, 3 (left column); EX2017, 776-77. The treatment was further performed to heat tissue "beneath the surface" and while using cryogen so as not to affect the surface tissue. EX2018, 3 (right column), EX2017, 779, 780 ("nonablative"). Also, a POSA would understand that the treatment area extended

from the hymenal ring (which forms a portion of circumference of the introitus) to about 1.6 cm from the introitus. EX2018, 3 (describing a 20 cm² treatment area over a 12 cm circumference (left column)). This treatment is commensurate with the treatments of claim 1—"introitus inwardly to a location from 1 cm to 3.5 cm in from the introitus"—and claim 26—"tightening the introitus."  EX1001, claims 1, 26.  Also treating the area from "the 1:00 o'clock to 11:00 o'clock position . . . moving the tip in a clockwise direction" is commensurate in scope with claim 35's treatment of "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock." EX2018, 3 (right column); EX2017, 777; EX1001, claim 35.

180.   Dr. Berenholz's mentor, Dr. Alinsod, even performed his own study that provided "confirmation" of the studies of the Viveve treatment and concluded that such evidence "is a boon to successful treatment and may represent a key advance in the emerging field of vulvovaginal rejuvenation." EX1025, 21 (also praising the lack of "downtime" or "risks" to the patients). Dr. Alinsod contrasted this benefit to prior treatments that resulted in significant patient downtime. EX2013, 3, 5, 6.

## IX.    CONCLUSION

181.   In conclusion, it is my opinion that a POSA would not have understood any of claims 1 through 58 of the '511 Patent to be obvious based on

the combination of references from the grounds set forth in the Petition and Dr. Berenholz's declaration.

182.    I hereby declare that all statements made herein of my own knowledge are true, and all statements made on information and belief are believed to be true. Further, these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and may jeopardize the validity of the application or any patent issuing thereon. I declare under penalty of perjury that the foregoing is true and correct.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

A.   Predominantly lamina propria.  Could involve muscularis as well.

Q.   And I assume there's a -- if I understand the way the EMFEMME 360 device works, there's kind of a bay station that powers the whole operation, and then there would be a hand piece.

Is it the same hand piece for all of those treatment areas that you listed?  I think is it entryway to the vagina, the labia minora, the labia majora?

MR. HECTOR:  Objection to form.

THE WITNESS:  The vaginal probe is a probe, a rounded lengthy probe, which has a transducer around the tip that delivers energy in a 360-degree manner.  The device handle for the entrance to the vagina is a shorter device that is used, hand held, again delivering RF energy, and another short device to be used for labia minora as well as labia majora.

Q.   BY MR. HECTOR:  So there are three different hand pieces?

A.   The short ones are very similar in appearance. So yes.

Q.   And are the RF settings the same for all -- used for all three devices?

MR. BEMBEN:  Objection to scope and form.

THE WITNESS:  There are different temperature

Page 34

InMode EX2005
BTL v. InMode
IPR2024-00703

settings for the vaginal probe versus the external structures as well as differences in time and use.

Q.  BY MR. HECTOR:  How do those different -- how do those differ?

MR. BEMBEN:  Objection to scope and form.    11:06:06

THE WITNESS:  We spend shorter time on the external structures versus the interior of the vagina.

Q.  BY MR. HECTOR:  And why is that?

MR. BEMBEN:  Objection to scope and form.

THE WITNESS:  Just tissue response is different    11:06:36 externally and in terms of tolerability versus vaginal heating.

Q.  BY MR. HECTOR:  How do you know that the tissue response is different externally?

A.  When I meant tolerability.  The patient has less    11:07:08 or almost no discomfort with internal, whereas external, there seems to be more sensitivity to it.

Q.  And by "internal," you mean in the vaginal canal?

A.  Yes.    11:07:28

Q.  And by "external," you mean the labia minora and labia majora?

A.  As well as the entrance to the vagina.

Q.  Okay.  The external portion of the entrance to the vagina?    11:07:47

Page 35

InMode EX2005
BTL v. InMode
IPR2024-00703

A.   Correct.

Q.   Does that have a name medically?

A.   Well, it's the introitus and vestibule of the vagina.

Q.   So the vestibule is the external mucosal tissue --                                                    11:08:04

A.   Yes.  You could --

Q.   -- of the vagina?

A.   -- call it that.

Q.   Okay.  And the external vestibule is more        11:08:15
sensitive to heating than the internal vaginal canal; is that correct?

A.   Seems to be, yes.

Q.   And you said there are different temperature settings --                                              11:08:39

A.   Yes.

Q.   -- for the vaginal -- internal vaginal treatment versus the external treatment.

          MR. BEMBEN:  Just objection to scope and form.

          THE WITNESS:  Yes, there is different         11:08:52
temperature settings.

Q.   BY MR. HECTOR:  And how do those differ?

          MR. BEMBEN:  Objection to scope.

          THE WITNESS:  Higher temp intravaginally,
slightly lower temp externally.                         11:09:05

Page 36

InMode EX2005
BTL v. InMode
IPR2024-00703

Q. Do you know Dr. Alinsod?

A. I do.

Q. How long have you known Dr. Alinsod?

A. Oh, I think I've known of Red Alinsod at least a decade or so and had an opportunity to start working with    11:18:21 him about seven years ago.

Q. What was that opportunity, to with work with the --

A. The EMSELLA Chair.

Q. The EMSELLA Chair?    11:18:44

A. Right.

Q. Did you work with Dr. Alinsod on the EMFEMME 360?

A. No.

Q. How about the Ultra Femme 360?    11:18:55

A. No.

Q. Any BTL products other than the EMSELLA Chair?

A. No.

Q. What do you think of Dr. Alinsod?

MR. BEMBEN: Objection to form and scope.    11:19:15

THE WITNESS: Could -- what do I think of him professionally, personally? Could you clarify?

Q. BY MR. HECTOR: Yeah. What do you think of him professionally?

MR. BEMBEN: So objection to scope and form.    11:19:30

Page 42

InMode EX2005
BTL v. InMode
IPR2024-00703

THE WITNESS:  He is a very good physician.

Q.  BY MR. HECTOR:  Do you trust his opinion?

MR. BEMBEN:  Objection to scope and form.

MR. HECTOR:  On medical?  Yeah.  I'll clean that up.                                                        11:19:55

Q.  Do you trust his opinion on -- on medical procedures?

A.  Regarding --

MR. BEMBEN:  Objection to scope and form.

THE WITNESS:  I don't know what subject you mean    11:20:07 about trusting.

Q.  BY MR. HECTOR:  Well, you said he's a very good physician.  Do you trust Dr. Alinsod's expertise in use of RF technologies?

MR. BEMBEN:  Objection to scope and form.          11:20:34

THE WITNESS:  I don't have an opinion about that.  He's a urogynecologist, trained urogynecologist, in cosmetic gynecology.

Q.  BY MR. HECTOR:  Do you trust his expertise in -- as a urogynecologist?                                    11:21:00

MR. BEMBEN:  Objection to scope and form.

THE WITNESS:  I believe he's a competent -- very competent physician in that arena.

Q.  BY MR. HECTOR:  How about the arena of cosmetic gynecology?                                                11:21:13

Page 43

InMode EX2005
BTL v. InMode
IPR2024-00703

MR. BEMBEN:  Objection to scope.

THE WITNESS:  I believe he's a very competent physician in that arena.

MR. BEMBEN:  Counsel, we've been going for a little over an hour.  If you -- if this is a good place     11:21:30 to break, let us know, or if you want to finish this line of questioning.

MR. HECTOR:  Yeah, maybe just like a few more minutes.  Would that work?

MR. BEMBEN:  Sure.                                 11:21:49

MR. HECTOR:  Great.

Q.  I think I've read somewhere that you've said that Dr. -- or Dr. Alinsod is a mentor -- is your mentor -- is a mentor of yours.

MR. BEMBEN:  Objection to scope.  Form.         11:21:59

Q.  BY MR. HECTOR:  Is that correct?

A.  In the field of cosmetic gynecology, I respect his opinions.

Q.  Have you done any training with Dr. Alinsod?

A.  I did.                                          11:22:19

Q.  And what did those trainings regard?

MR. BEMBEN:  Objection to scope and form.

THE WITNESS:  It involved cosmetic gynecology, surgical -- surgical cosmetic gynecology.

Q.  BY MR. HECTOR:  What do you mean by "surgical     11:22:40

Page 44

InMode EX2005
BTL v. InMode
IPR2024-00703

Q. But -- so turning back to Figure 4 and the description thereof, it speaks about, you know, the handle/blade engaging the speculum. What's your understanding of how that works?

A. It's -- it has, I guess, an ability to lock in   15:15:40
with the speculum.

Q. And how would that work?

MR. BEMBEN: Objection to form.

THE WITNESS: They have some type of mating feature that's engaged with the speculum, and that's what   15:16:10
locks it into position. They refer to it as a lock pin, but then they can go forward and treat the patient.

Q. BY MR. HECTOR: The speculum has those, like, rectangular shapes in -- does the retractable lock pin, like, slide into those rectangular shapes?   15:16:40

A. The openings, you mean? Those --

Q. Yeah. On the speculum there's those rectangular openings; right?

A. Yeah. I believe those are the -- where you would insert and lock in.   15:16:54

Q. Okay. So then the blade would extend into the vagina from the end of the speculum once it's locked in; right?

A. Well, it first -- yeah. The duckbill speculum has to be closed before you insert it.   15:17:21

Page 131

InMode EX2005
BTL v. InMode
IPR2024-00703

Q.   Yeah.  So I guess so what's -- yeah, what's your understanding of the order of how this would be done?

MR. BEMBEN:  Objection to form.

THE WITNESS:  I visualize it and understood it to mean that it is introduced into the vagina and they    15:17:45 try to mate up the tip -- the treatment tip to the speculum, and that way they can deliver both heat and cooling fluid to whatever area they want to treat.

Q.   BY MR. HECTOR:  But how is -- how is the blade mated up with the speculum?    15:18:21

A.   It's lock pinned through the number 431 to the speculum.  I've never used the device myself, so I'm -- I'm understanding it two dimensionally instead of how I -- I've never used it.

Q.   Yeah.  So I'm asking from -- yeah, from your    15:18:48 understanding of this reference as a -- you know, an expert in this case as to how -- how that handle would be mated to the speculum.  It seems like that retractable lock pin portion would engage with the rectangular portion of the speculum?    15:19:11

A.   Right.  And that lock pin was on top of a handle.

Q.   Yeah.

A.   Handle 430.

Q.   So, yeah, with -- with reference to that and    15:19:30

Page 132

InMode EX2005
BTL v. InMode
IPR2024-00703

then Figure 9, which talks about -- so, I think, you know, step 904, you would insert the duckbills of the speculum into the vagina.  The speculum was placed in an open position, and then the -- and then the blade is inserted into the vagina through the speculum.                    15:19:57

A.  Correct.

Q.  So from your understanding, would the -- would the portion like 420, like, stick out from the front into the vagina from the speculum?

A.  It would go further past it, I think, is what        15:20:20
they're saying.

Q.  Yeah.  Further -- by further past, you mean further into the vagina?

A.  Further into the vagina, yeah.

Q.  Than the end of the duckbill?                         15:20:36

A.  Yes.

Q.  Okay.  And then just understanding what the -- when you place the speculum into the vagina, typically how far into the vagina is the end of those duckbills, the speculum?                                              15:20:59

MR. BEMBEN:  Just objection.

THE WITNESS:  I can't tell you because of the variable sizes of the speculum, so I don't know the dimensions in terms of length of the duckbill.

Q.  BY MR. HECTOR:  But from, you know, looking at    15:21:21

Page 133

InMode EX2005
BTL v. InMode
IPR2024-00703

Figure 4, how would you think that speculum would be placed in terms of the length into the vagina of those duckbills?

A. I would have to match them up on the drawing and measure if these are true to form, which I don't think they are actual measurements, but it looks like it takes up half the length of the both handle and tip, allowing the tip to proceed further.

Q. So which -- I'm sorry. What takes up half the length --

A. You asked me --

Q. -- of the handle?

A. -- how much of the duckbill speculum would take up the length of the device, is what I understood your question.

I don't have an exact measurement. I'm just eyeballing the diagram that looks as though the treatment probe is twice the length of the duckbill speculum.

Q. So then how far would you typically insert the speculum into the vagina?

A. It depends where you want to treat. If you want to go more deeply, you would go deeper. More shallow, you would proceed more shallow.

Q. But you would need -- you need to be at least some portion into the vagina, right, to have tissue to

15:21:45

15:22:10

15:22:17

15:22:48

15:23:09

Page 134

InMode EX2005
BTL v. InMode
IPR2024-00703

push it on?

A.  Sure.

Q.  Okay.  The speculum has to be at least some portion into the vagina; is that correct?

A.  Yes.                                          15:23:26

Q.  Okay.  And this figure doesn't make clear in terms of what those dimensions would be --

A.  Not to me.

Q.  -- is that correct?

It doesn't provide dimensions for the speculum;     15:23:46
correct?

A.  I don't see that in Figure 4.

Q.  And it doesn't provide dimensions for the blade/hand piece?

I think I asked you -- it may not have come         15:24:29
across -- it doesn't provide dimensions for the blade/hand piece; correct?

A.  Not what I'm looking at, no.  Sorry.

Q.  How far would you need to insert the speculum in to engage tissue?                                    15:24:48

A.  What tissue are we aiming for, Mr. Hector?

Q.  Like vaginal wall tissue.  Like I'm talking about -- you could push the speculum all the way in and maybe you're, you know, in contact with tissues that are deeper into the vaginal canal, is one end of the       15:25:13

Page 135

InMode EX2005
BTL v. InMode
IPR2024-00703

spectrum.  Now I'm asking you about the other end of the spectrum.

Like how far in would you -- is the furthest, I guess, interior that you could place the speculum such that you would make contact with tissue in --                    15:25:30

MR. BEMBEN:  Objection --

Q.  BY MR. HECTOR:  -- a manner to be able to hold the vagina open --

MR. BEMBEN:  Objection to form.

THE WITNESS:  I'm just reading your question.      15:25:43
I'm sorry.

Q.  BY MR. HECTOR:  Like what's the minimum insertion depth of a speculum that you could use where you engage tissue?

A.  You'd want to go at least a centimeter in.      15:26:03

Q.  But probably more than that to be able to meaningfully engage tissue?

MR. BEMBEN:  Objection to form.

THE WITNESS:  I don't -- I don't know what you mean by meaningful.  You engage the tissue of the vagina      15:26:20
whether you're shallow, slightly more than shallow, deeper.  You're engaging the vagina at various lengths, depending on what you're trying to accomplish.

Q.  BY MR. HECTOR:  Okay.  But the most shallow would be, you said, one centimeter?                    15:26:45

Page 136

InMode EX2005
BTL v. InMode
IPR2024-00703

A.    If you don't want the speculum to pop out, yeah.

Q.    It seems like -- I mean, like, one centimeter is pretty small, even there --

A.    One --

Q.    -- you have a risk of -- I'm sorry.

15:27:00

Go ahead.

A.    No.   One centimeter's not even a half inch.

Q.    Yeah, so if the ends of the duckbills were only one centimeter in, it seems like it would even pop out at that depth; right?

15:27:18

A.    That's what I said, yes.

Q.    Okay.   So what's the -- like what's the minimum depth, like, where the speculum would not pop out?

A.    Yeah.   I've never researched that question before, so I don't know.   I mean, common sense is you want to be in far enough to support the tissue so that it opens without losing it.

15:27:33

Q.    So maybe like an inch, based on your practice as a medical doctor?

A.    I don't think I've ever gone that shallow.   But probably a little further than that.

15:27:52

Q.    What's the most shallow you think you've gone?

A.    I don't know, Mr. Hector.   I really don't.

Q.    Okay.   But beyond -- beyond an inch, maybe two inches?

15:28:12

Page 137

InMode EX2005
BTL v. InMode
IPR2024-00703

A.   Perhaps.

Q.   Okay.   Taking a look at this hand piece a little bit further, the electrodes 423 are like lined up in a row.   I guess that'd be, I don't know, longitudinally on that device.   Why would you have, like, those electrodes   15:28:45 lined up in a row like that?

A.   Well, I think those -- you called them electrodes?   You're referring to, what, 423?

Q.   423, yeah.

Yeah.   Let me just clarify, too, that --   15:29:29 speaking clearly about the geometry here.   You know, you have the length of the, you know, handle and blade.   It's longer in one direction than it is wide.   When I speak along the length, I mean along the, you know, long length.   15:29:45

Those electrodes 423, there's two of them kind of lined up along the length of the blade, and I'm wondering, you know, from your perspective as an expert in this case, why those would be lined up next to each other along the length like that?   15:30:03

MR. BEMBEN:   Objection to form.

THE WITNESS:   I would guess it has to do with showing a plurality of areas to treat or cool.

Q.   BY MR. HECTOR:   But would those -- I don't think those electrodes would cool, though; right?   15:30:36

Page 138

InMode EX2005
BTL v. InMode
IPR2024-00703

A.   No, but rather than -- you want to cover some areas so you have a plurality of electrodes setting there.  It just covers more treatment area if you have two or three electrodes in a row.

Q.   Okay.  And why would you -- why would you want to do that --      15:31:02

MR. BEMBEN:  Objection to form.

Q.   BY MR. HECTOR:   -- in terms of the procedures described in the Edwards patent?

A.   I think to be efficient in terms of manipulating and treating the area, covering surface area.      15:31:14

Q.   Okay.  And how big would you estimate those electrodes to be, based on your experience as an expert in this field?

A.   I have no experience with the sizing of these electrodes, so I can't answer that accurately.      15:32:04

Q.   Like how big are electrodes, you know, for -- I realize you don't have experience with this device, but for other devices, like how big are the electrodes typically?  By other devices, I mean devices similar to this.      15:32:26

MR. BEMBEN:  Objection to form.

THE WITNESS:  Just there is quite a range in size, so very hard to -- there are pluralities, and then there's contiguous electrodes in a circular      15:32:46

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Appx2241

InMode EX2005
BTL v. InMode
IPR2024-00703

circumferential manner, so I -- it varies from a single electrode to multiple electrodes to a continuous line of electrodes, so there's just no way for me to answer your question intelligently.

Q.   BY MR. HECTOR:  Okay.  Do you have a feel for, like, the smallest size of an electrode that you've encountered in your years of experience with similar devices?

15:33:07

A.   I couldn't give you a measurement.  I never bothered to measure.

15:33:27

Q.   Like would they be as small as a centimeter?

MR. BEMBEN:  Objection.  Asked and answered.

THE WITNESS:  It could be.  I'm speculating.

Q.   BY MR. HECTOR:  When the handle is -- is engaged with the speculum, do you have any feel from this picture how far that blade would stick out into the vagina?

15:34:03

A.   I would be willing to guess several centimeters.

Q.   Okay.  Like two or three centimeters?

A.   Possibly.  But, again, I have no experience with this device.

15:34:31

Q.   And with regard to Figure 9 -- or 9A, in the first step it talks about, you know, placing the patient on the treatment table and then cleansing the external genitalia and surrounding anatomy with Betadine and benzalkonium chloride.  Do you see that language?

15:35:16

Page 140

InMode EX2005
BTL v. InMode
IPR2024-00703

A.   I'm not sure what you would try to accomplish by doing that.

Q.   Do you ever use RF to heat the cervix in your practice?

A.   No.                                                16:30:22

Q.   Are you aware of any doctors who would use RF to heat the cervix for any reason?

A.   There may be some doctors who use it as an ablative modality.  I've just never used it.

Q.   Why would they use it as an ablative modality?   16:30:40

A.   Somebody had a high-grade lesion of the cervix, meaning an abnormal Pap smear, pre-cancerous, you'd want to destroyed that part of the cervix.

Q.   If you would open Ollivier.

MR. HECTOR:  Add that to the marked exhibits.        16:31:28

(Exhibit 9, Designer Vaginas by Debra Ollivier, was marked for identification by counsel electronically.)

Q.   BY MR. HECTOR:  Are you familiar with this document, Dr. Berenholz?                                16:32:05

A.   I -- I am.

Q.   And on the cover, it says this article is -- or strike that.

On the first page, it appears this article is from a website called Salon.com.                          16:32:29

Page 157

InMode EX2005
BTL v. InMode
IPR2024-00703

Do you see that?

A. Salon -- where is that, Mr. Hector?

Q. Upper left corner.

A. Ah, Salon.com Sex, yeah.

Q. Are you -- are you aware of the Salon.com          16:32:50
website?

A. Not at all.

Q. Not at all?

A. No.

Q. You've never visited the Salon.com website?          16:33:01

A. No.  I'm happily married.  That was an attempt
at humor.  Nothing else.

Q. Okay.  Is it -- I'm not sure it's a dating
website.  You may know more than I do.

A. I'm married.  Thank you.          16:33:17

Q. Did you find this article, the Ollivier article?

A. Did I find it?  No, it was given to me.

Q. Okay.  So, yeah, I take it you were not aware of
Salon.com until two minutes ago?

A. That is correct.          16:33:43

Q. Okay.  And you --

A. I read -- excuse me.  I read the article.  I
just never bothered to look in the upper left-hand
corner.

Q. Okay.  Are you aware of any other doctors that          16:33:58

Page 158

InMode EX2005
BTL v. InMode
IPR2024-00703

read Salon.com?

A. I don't know of any, no.

Q. And is it -- is Salon.com directed to the medical community?

A. I don't know.                                          16:34:22

Q. Do you know who Debra Ollivier is?

A. Dr. Ollivier?

Q. Is she a doctor?

A. Debra? No, I don't know her personally.

Q. Who do you understand that Debra Ollivier is?    16:34:51

A. I just know that she contributed this article to this site.

Q. Okay. You don't know -- does Debra Ollivier write technical medical literature?

A. I don't know.                                         16:35:15

Q. So this article references laser vaginal rejuvenation. I think we discussed that earlier. But kind of from a layman's terms -- I'm not a doctor -- what is this article saying about laser vaginal rejuvenation?

A. It addresses modality for tightening vagina     16:36:09 and vulvar structures, sculpting vulvar structures, et cetera.

Q. Does the article, like, discuss -- strike that.

So laser vaginal rejuvenation is, I think we discussed earlier, using a laser as a scalpel; is that    16:36:37

Page 159

InMode EX2005
BTL v. InMode
IPR2024-00703

correct?

A. Yes.

Q. And they used another term, "designer laser vaginoplasty."  Is that also using a laser as a scalpel?

A. Yes.                                              16:36:53

Q. And does this article discuss, like, what lasers to use?

A. It doesn't discuss it, but it's a diode laser.

Q. How do you know that?

A. I was trained by Dr. Matlock.                    16:37:26

Q. So you know that based on your personal experience?

A. Correct.

Q. But from reading the article, you couldn't determine what type of laser is being used?          16:37:39

A. No.  She didn't get into that.

Q. Does the article instruct you how to perform either of the procedures, laser vaginal rejuvenation or designer laser vaginoplasty?

A. I see no mention of it.                           16:38:35

Q. So the specifics of the treatment are not provided?

A. No, it's not.

Q. Does the article discuss treating the mucosal surface of the labia minora?                        16:39:07

Page 160

InMode EX2005
BTL v. InMode
IPR2024-00703

A.   It doesn't mention the mucosal surface of the labial minora.

Q.   Does it mention the heart line?

A.   Heart line?  No, I didn't see that.

Q.   This article says that, "Curious that Matlock    16:40:38 has not applied" -- sorry.  Strike that.

The sentence before starting there.  This is on page 2, the fourth paragraph.

It says, "There are standard pre- and post-operative intervention tests and tools that could be    16:41:02 applied here to substantiate his claims.  It's curious that Matlock has not applied any of them to his own work, nor published any scientific material relating to his work."

Are you aware --                                    16:41:18

A.   You're on page 2, Mr. Hector?

Q.   That's right.

A.   How many paragraphs down?

Q.   I guess it's the fourth down.  The first one might be a partial paragraph, but...                    16:41:26

A.   Oh, so one, two, three -- four?  "I think this is the way"?

Q.   Yeah.  And I was focused on the last two sentences of that paragraph.

A.   All right.                                      16:41:39

Page 161

InMode EX2005
BTL v. InMode
IPR2024-00703

Q.   Feel free to read that.

A.   Yes, I see that sentence.

Q.   So she's talking about that Dr. Matlock has not published any scientific material related to -- to his work.  Is that your understanding?                    16:42:02

A.   Yes.

Q.   So it seems like he keeps the specifics -- "he" being Dr. Matlock -- the specifics of the treatment confidential; is that correct?

MR. BEMBEN:  Objection to form, calls for       16:42:18 speculation.

THE WITNESS:  I -- I don't know what his motivation is.

Q.   BY MR. HECTOR:  You -- you studied under Dr. Matlock; correct?                                  16:42:34

A.   Yes.

Q.   And did you pay Dr. Matlock for that training?

A.   Yes, I did.

Q.   How much?

MR. BEMBEN:  Objection to scope.                16:42:50

THE WITNESS:  This was nearly 30 years ago.  I think it was $10,000.

Q.   BY MR. HECTOR:  And did you -- were there any requirements that you keep the details of the treatment confidential?                                          16:43:08

Page 162

InMode EX2005
BTL v. InMode
IPR2024-00703

MR. BEMBEN:  Objection to scope.

THE WITNESS:  I -- I can't answer that. Specifically there was a contract about not training, not divulging treatment, surgical techniques, et cetera.  So in that regard, I guess it was confidential.          16:43:34

Q.  BY MR. HECTOR:  And you were required to sign that before being trained?

A.  Yes, I was.

Q.  And these procedures cut and coagulate tissue; correct?          16:43:58

A.  Yes, it does.

Q.  So you're effectively cutting away portions of vaginal tissue?

A.  Yes.

Q.  So two paragraphs down from the one we were just          16:44:21 reading on page 2, it talks about -- well, I'll let you read that first.  It starts with "Brubaker."

A.  I read it.

Q.  And she says that there are risks associated with laser vaginal rejuvenation and -- and designer laser          16:44:54 vaginoplasty, including hemorrhage, infection, loss of sensitivity, lingering pain and nerve damage.  Is that a correct statement?

A.  Yes, that's what I'm reading here.

Q.  But do you agree with that statement, from your          16:45:18

Page 163

InMode EX2005
BTL v. InMode
IPR2024-00703

experience --

A. No.

Q. -- as a medical --

A. No. This article was written 24 years ago, and those complications just so rarely, if ever, arise.

Q. But they do arise? You said rarely, but they do --

A. It's possible. It's possible.

Q. There's a risk of those complications?

I think I asked: There is a risk of those complications; correct?

A. There is a possibility of a complication. I said yes.

Q. And for when you use a -- a diode laser, as described -- or strike that.

When you use a laser to perform laser vaginal rejuvenation or designer laser vaginoplasty, are there other precautions that you have to take when performing the procedure as a doctor?

A. What are you referring to as reference to precautions?

Q. I think I've read that you have to have a special laser room with signage, wear glasses, smoke evacuators; is that correct?

A. That is correct. That is correct.

Page 164

InMode EX2005
BTL v. InMode
IPR2024-00703

Q.   Do you have -- do you need those precautions when using RF devices?

A.   No.

Q.   I've heard another precaution is you need to wear a mask to prevent against venereal wart viruses that   16:47:42 may slough off from the tissue.  Is that your understanding?

A.   That's general protocol.  And every OR, if you're doing gynecologic surgery and you're using any coagulation device, monopolar, bipolar.  The fumes is   16:48:01 what they're referring to.  And we have smoke evacuators now.

Q.   When did you first meet Dr. Matlock?

A.   Twenty-nine years ago.

Q.   And are you still in contact with Dr. Matlock?   16:48:34

A.   Once a year we wish each other a Merry Christmas.

Q.   I think I asked you before.  You're not sure how many people he's trained to do these procedures, LVR or DLV?   16:49:03

A.   I would just venture a guess to answer that question.

Q.   And do you still -- if -- if a doctor wanted to learn these procedures from Dr. Matlock today, would they have to pay a fee and sign a confidentiality agreement?   16:49:29

Page 165

InMode EX2005
BTL v. InMode
IPR2024-00703

A.  I assume so.

Q.  Do you know if Dr. Matlock has ever faced malpractice claims for LVR surgical procedures?

MR. BEMBEN:  Objection to scope.

THE WITNESS:  I have no way of knowing that.          16:50:03

MR. HECTOR:  Can we take a short break?  Does that work for you?  Like 5, 10 minutes.

MR. BEMBEN:  Are we wrapping up?  Is that what you're looking at?

MR. HECTOR:  In the near term.  I think I just          16:50:56 want to look over my notes.  But, yeah, not too much longer.

MR. BEMBEN:  Okay.

(Recess.)

(Exhibit 10, Administrative Complaint against Joseph Berenholz, M.D., was marked for identification by counsel electronically.)

(Exhibit 11, Consent Order and Stipulation against Joseph Berenholz, M.D., was marked for identification by counsel electronically.)          17:03:18

(Recess.)

THE REPORTER:  Back on the record at 5:03 p.m.

MR. HECTOR:  Great.  Thank you.

Q.  Dr. Berenholz, with regard to your declaration that we've looked at a bit today, could you describe          17:03:39

Page 166

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127
Appx2268

InMode EX2005
BTL v. InMode
IPR2024-00703



A speculum widens your vaginal walls, allowing your provider to check for abnormalities during a pelvic exam.

# What is a speculum?

A speculum is a device a healthcare provider uses to examine hollow openings in your body, like your vagina, anus, ears or nostrils. The vaginal

Ad

Appx2350

InMode EX2010
BTL v. InMode
IPR2024-00703

Case: 26-1223 Document: 24 Page: 591 Filed: 08/12/2026

your provider to see your vaginal canal and your [cervix](). Your cervix is the opening between your vagina and your uterus.

ADVERTISEMENT

Cleveland Clinic is a non-profit academic medical center. Advertising on our site helps support our mission. We do not endorse non-Cleveland Clinic products or services. [Policy]()

A speculum allows your provider to check abnormal growths, take fluid samples for testing, and even perform surgeries through your vagina.

## What does a speculum look like?

Speculums come in different designs, depending on their purpose. During a gynecologist visit, the speculum you'll most likely see has two arms that meet at a hinge. The arms resemble a duck's bill. They're the part of the speculum that goes inside your vagina. When the arms open, your vagina widens. When they close, your vagina returns to its regular size.

Ad

Appx2351

InMode EX2010
BTL v. InMode
IPR2024-00703

and cervix.

# What are the different types of vaginal speculums?

Just like vaginas, speculums come in different sizes. Factors like genetics, age, health and sexual activity determine your vagina's size and how stretchy or elastic your vaginal walls are. It's important for your comfort that your provider chooses a speculum that fits your vagina.

During an exam, your provider will use the smallest speculum that allows them to visualize your vagina and cervix. Some of the most common types of vaginal speculums include the following.

- A **pediatric speculum** is the smallest speculum. It's narrower and shorter than other speculums. The name can be confusing, but a pediatric speculum isn't commonly used on children. Instead, your provider may use it if you've never had sexual intercourse. Pediatric speculums are also widely used with people who are postmenopausal. Changes to your vaginal walls after menopause may make it difficult to tolerate a larger speculum.

- The **Huffman speculum** is bigger than a pediatric one but smaller than the commonly used Pederson one. It's also designed for individuals who haven't had penetrative sex.

- The **Pederson speculum** is one of the most commonly used speculums. Your provider may use this speculum if you've had intercourse or are sexually active but haven't given birth. Pederson

Ad

Appx2352

InMode EX2010
BTL v. InMode
IPR2024-00703

Case: 26-1223    Document 24    Page: 593    Filed: 08/12/2026

- The **Graves speculum** is also commonly used. It's larger than the Pederson speculum, making it a good choice if you have a longer vaginal canal or vaginal walls with more elasticity. Your provider may use a Graves speculum if you've given birth vaginally. This type of speculum is also commonly used during procedures like colposcopy and biopsy. Graves speculums also come in a range of sizes.

ADVERTISEMENT



# What is a vaginal speculum used for?

You'll most likely encounter a speculum during a pelvic exam or Pap smear. During a pelvic exam, your provider gently inserts the duck-billed part of the speculum into your vagina and opens the speculum to widen your vaginal walls. The widening makes it easier view your cervix and check for abnormal growths or other irregularities. During a Pap smear, your provider collects cells from your cervix that are later tested for signs of cervical cancer.

Ad

Appx2353

InMode EX2010
BTL v. InMode
IPR2024-00703



**Red Alinsod, MD, FACOG, F**ACS

South Coast Urogynecology

Alinsod Institute for Aesthetic Vulvovaginal Surgery

I am writing this piece to an audience of both lay person (or potential patient) as well as clinician (MD, RN, PA) to give my personal views on the new ThermiVa technology and how it stacks up to the numerous laser devices for the purpose of feminine rejuvenation.  These are my views and do not necessarily reflect the views and opinions of Thermi, the company.  This was written as response to an article Dr. Steven Gitt wrote on September 28, 2015 and published on LinkedIn Pulse. (https://www.linkedin.com/pulse/what-differences-between-femilift-thermiva-steven-gitt-md-facs).  I believe it best to review Dr. Gitt's written opinion and compare and contrast it with mine to get a balanced take on this important emerging topic.

There has been an amazing and rapid growth in the field of non-surgical feminine rejuvenation.  In 2005 we were perhaps the first center to provide non-surgical tightening of the vulvar structures using CO2 lasers and later on Erbium 2940 lasers.  We used ablative settings and progressed to fractional ablative and non-ablative methods.  We were able to get tightening of the labial and internal vaginal skin but at quite a cost in terms of pain and recovery and skin discoloration.  The tightening obtained with the most effective CO2 lasers on external vulva were impressive for a short period of time until gravity and aging effects wore out the effects in a few

Appx2365

InMode EX2013
BTL v. InMode
IPR2024-00703

months.  Using the highest powered CO2 lasers intravaginal, tightening effects were obtained but the downtimes were many many weeks to months.  Depending on where you focused the lasers and what tissue you shrunk down you would get some improvement in continence in some patients.  But these ablative lasers were not known to improve vaginal moisture or help atrophic vulvovaginitis.  Todays lasers, both CO2 and Erbium, are used with less power and with less to no ablative effects but are better in improving vaginal moisture with very little downtime.  They give enough tissue tightening effects to help reduce incontinence also when the pubocervical fascia are treated.  This is the case with FemiLift or MonaLisa, both fractional CO2 lasers.  This is also the case for IntimaLase using 2940 Yag lasers.  These three systems, released in the US within the past year or so, are the state-of-the-art for the laser arm of feminine rejuvenation.  They will battle for laser supremacy in the market filled with over a dozen laser copycats.  However, when looking objectively at choices, ThermiVa radiofrequency technology is rapidly becoming the standard by which all feminine rejuvenation devices are being compared to and judged by.  Why such a little company is making huge headways in the industry dominated by laser titans?  There are many reasons why Thermi is the fastest growing small company in the industry.  As the director of the team that put ThermiVa together I would like to share my views that will be based on my personal clinical use of ThermiVa since its inception as an idea in 2009.

https://www.linkedin.com/pulse/what-differences-between-thermiva-radiofrequency-use-alinsod-m-d-

InMode EX2013
BTL v. InMode
IPR2024-00703



Laser companies have known for some time now that the tightening effects of lasers on skin were not satisfactory and not impressive. They have focused their energies on skin smoothing, skin texture, wrinkling, treating sun damage, and blood vessels. Since the advent of Thermage RF treatments and less so infrared devices, the swing for skin tightening has convincingly swung away from lasers. Clinical research and experience has proven radiofrequency to be the winner at this point in time when it comes to consistent and non-surgical/non-ablative treatments for skin tightening not just in the face and body but in the feminine regions. There is a reason large laser companies like Cynosure have purchased RF companies like Ellman. To obtain RF technology for tissue shrinkage.

Enter ThermiVa, a unipolar radiofrequency device with FDA clearance for dermatologic use. It has a broad FDA clearance purposely obtained because of the wide spectrum of clinical effects it is able to bring to treated skin. This is not the radiofrequency system that "many feel that their effectiveness remains unsatisfactory." Early RF systems were known to cause lots of pain with little consistent clinical effects. Those systems blasted

InMode EX2013
BTL v. InMode
IPR2024-00703

RF heat and used cooling measures to reduce the pain. There was not sustained heat given to tissues. They were "blast and cool" devices. In contrast, ThermiVa applies heat (40-45 Celsius) that is sustained and comfortable because it is "Temperature Controlled." ThermiVa uses very smart software and technology that is able to slowly heat tissues to targeted temperatures and then maintain the temperatures there to obtain the tissue contraction "blast and cool" methods could not achieve consistently. RF science and use on vulvovaginal tissues started around 2009 in our office, years before any vulvovaginal laser technology was used in the U.S. to treat vulvovaginal issues. It is not accurate to say that there is little research regarding long term results of RF devices. I have reported on the results of RF use on vulvovaginal tissue and its safety and excellent efficacy almost every year since 2009 at my yearly CAVS meetings (Congress on Aesthetic Vulvovaginal Surgery). Every year I showed dozens of photos and clinical studies. More recently my Pilot Study has been published and the ThermiVa multi-site IRB has been completed. Safety has been established clearly as no blisters or burns or adverse events have occurred since 2009. Blister and burn temperatures at 55 Celsius are not reached by ThermiVa.



InMode EX2013
BTL v. InMode
IPR2024-00703

So what can ThermiVa do?  It can do two things well.  First, it can tighten vulvovaginal tissues uncontestably better than any laser system on the market.  Hands down.  No contest.  It can tighten the labia majora sagging dramatically to levels not seen by laser systems both CO2 and Erbium, both ablative and non-ablative, both fractional and non-fractional.  There are dozens of photos on www.thermiva.org and other websites showing the amazing tightening effects externally with the use of ThermiVa.  Go try to find a single set of photos showing the Before and After tightening effects of any laser system and compare them to ThermiVa.  They will be hard to find because the laser systems, like FemiLift or MonaLisa or IntimaLase, are not routinely used to shrink the labia majora.  In fact, you need a separate hand piece and anesthesia if you choose to use it for the labia majora.  There is significant downtime with that ablative treatment.  Common sense dictates that laser companies with good results of their tightening would be proud of their outcomes and show them off on their websites and brochures.  Common sense would also find owners of laser systems proudly displaying the results of FemiLift or MonaLisa or IntimaLase.  Good luck finding those photos of their results.  Here is the kicker, RF is known to shrink moist mucosal tissues even better than external dry skin and that is exactly what we find.  ThermiVa's internal treatments of the vagina are superior in tightness than any currently available laser system geared for vaginal rejuvenation.  This is from my personal examination of hundreds and hundreds of women who have received ThermiVa treatments and comparing them to my years of laser use.  This has been clinically confirmed by dozens of ThermiVa users.  One more thing, with the tightening of vaginal tissues, you can target the tightening effects to the area of the urethra called "pubocervical fascia."  This results in the amazing reduction in leaky bladder.  Both stress incontinence (leaking from increased pressure such as a cough, sneeze, jump) and overactive bladder are relieved consistently.  The tightening is immediate and many are dry after just one treatment.  Dribbling goes away, urge symptoms subside.  In fact, the effects of radiofrequency on the bladder are just about as good as any of the anticholinergics drugs available without the dry mouth and constipation.  Urogynecologist who have ThermiVa have reported dramatic reduction in number of slings needing to be placed and number of prescriptions written for overactive bladder.  No mesh, no drugs.  I have not seen this type of dramatic effects with laser based systems though some do claim to be able to help.

Secondly, Thermiva increases blood flow.  This is perhaps the "Biggest Deal."  It is true that vaginal and vulvar biopsies have not been published to show the microscopic effects and those studies are not quite complete yet.  But on visual exam, a macro exam, you can see vessels forming on labial and vaginal tissues.  The increased blood flow is real as evidence by the increased transudate from arterioles going into the vaginal canal and resolution of the dry vagina.  This effect is one of the few things in my practice that I can say is 100% since not a single patient has failed treatment for atrophic vulvovaginitis (dry vulva and vagina).  Along with the increased blood flow also comes the improvement in the sensitivity of the vulvar structures, the clitoral region, and internal vagina.  Akin to "Female Viagra" due to the increase in blood flow to the

Appx2369

InMode EX2013
BTL v. InMode
IPR2024-00703

genital structures treated.  Treatment of the G-Spot areas have increased sensitivity there and have improved orgasmic response consistently.  Because of this increased blood flow there is increased production of collagen.  Tighter new collagen that is more pliable and soft.  This is both from patient report and physical exam.  For example, even the most atrophic vagina with a pinpoint hole for entry (not at all amenable to the large FemiLift or MonaLisa laser hand pieces) will get softer, more pliable, and moist that will even allow for comfortable sex after 3 treatments!  ThermiVa's thin and gently curved hand piece allows for such delicate treatments.  Because of blood flow ThermiVa does result in collagen regeneration that is needed for thickening of the vaginal lining and resolution of painful intercourse.  Again, for clinical proof, look at the photos on www.thermiva.org.  Lots of photos on the improved blood flow resulting in increased moisture.

What about the comment that ThermiVa is not able to get hot enough and "heats tissue to 50 Celsius, which may be too hot for a Jacuzzi but quite insufficient to cause collagen generation."  This lacks clinical truth.  There are many studies that show that tissue tightening occurs at around 42 Celsius and that it is both temperature plus time of exposure to heat that matters.  ThermiVa can comfortably bring vulvovaginal tissues to 40-45 Celsius for 3-5 minutes and cause immediate tissue contraction you can see during the treatment then tighten even more over the next 3 months.  Again, look at the pictures.  There is significant collagen regeneration.

Appx2370

InMode EX2013
BTL v. InMode
IPR2024-00703



WIKIPEDIA
The Free Encyclopedia

# WIKIPEDIA

# *Salon.com*

**Salon** is an American politically progressive and liberal news and opinion website created in 1995. It publishes articles on U.S. politics, culture, and current events.[3][4][5][6]

## Content and coverage

*Salon* covers a variety of topics, including reviews and articles about books, films, and music;[1] articles about "modern life", including friendships, human sexual behavior, and relationships; and reviews and articles about technology, with a particular focus on the free and open-source software (FOSS) movement.

According to the senior contributing writer for the *American Journalism Review*, Paul Farhi, *Salon* offers "provocative (if predictably liberal) political commentary and lots of sex."[7]

In 2008, *Salon* launched the interactive initiative *Open Salon*, a social content site/blog network for its readers. Originally a curated site with some of its content being featured on *Salon*, it fell into editorial neglect and was closed in March 2015.[8]

Responding to the question, "How far do you go with the tabloid sensibility to get readers?," former Salon.com editor-in-chief David Talbot said:

> Is *Salon* more tabloid-like? Yeah, we've made no secret of that. I've said all along that our formula here is that we're a smart tabloid. If by tabloid what you mean is you're trying to reach a popular audience, trying to write topics that are viscerally important to a readership, whether it's the story about the

**Salon**



| | |
|---|---|
| **Type of site** | News website |
| **Available in** | English |
| **Owner** | Find.co[1] |
| **Created by** | David Talbot |
| | Gary Kamiya |
| | Andrew Ross |
| | Mignon Khargie |
| | Scott Rosenberg |
| | Laura Miller |
| **Editor** | Erin Keane (Editor in Chief) |
| **Key people** | Drew Schoentrup (CEO) |
| **URL** | salon.com (http://salon.com) |
| **Commercial** | Yes |
| **Registration** | Optional |
| **Launched** | April 18, 1995[2] |
| **Current status** | Online |

OCLC 43916723 (https://www.worldcat.org/oclc/43916723)

InMode EX2015
BTL v. InMode
IPR2024-00703

JOURNAL OF WOMEN'S HEALTH
Volume 22, Number 9, 2013
© Mary Ann Liebert, Inc.
DOI: 10.1089/jwh.2012.4123

# Laxity of the Vaginal Introitus After Childbirth: Nonsurgical Outpatient Procedure for Vaginal Tissue Restoration and Improved Sexual Satisfaction Using Low-Energy Radiofrequency Thermal Therapy

Yuki Sekiguchi, MD, PhD,[1] Yukari Utsugisawa, MD, PhD,[2] Yoko Azekosi, MD, PhD,[1] Manami Kinjo, MD, PhD,[1] Mihyon Song, MD,[2] Yodhinobu Kubota, MD, PhD,[3] Sheryl A. Kingsberg, PhD,[4] and Michael L. Krychman, MD[5]

## Abstract

*Introduction:* Vaginal childbirth may result in vaginal introital laxity, altered genital sensation during sexual intercourse, and reduced sexual satisfaction. We report the long-term effectiveness of a single nonsurgical procedure with radiofrequency (RF) energy for laxity at the vaginal introitus.

*Materials and Methods:* Prospective single-arm study of 30 premenopausal women (21–52 year) with one 30-minute office procedure using RF applied to the vaginal introitus; 12-month outcome assessments included the linguistic validated Japanese versions of the Female Sexual Function Index (FSFI) and Female Sexual Distress Scale-Revised (FSDS-R) and the Vaginal Laxity and Sexual Satisfaction Questionnaires.

*Results:* Sexual function improved significantly throughout 6 months (30 subjects); mean FSFI total score was $22.4 \pm 6.7$ before treatment and then improved to mean $26.0 \pm 5.8$ at month 6 ($P = 0.002$), inclusive of improved scores in five of six FSFI domains except desire ($P < 0.001 - <0.01$). In the 22 of 30 subjects remaining evaluable at 12 months, the mean was $26.0 \pm 5.2$ ($P = 0.08$). Distress related to sexual activity decreased significantly; baseline FSDS-R mean score of $15.8 \pm 11.7$ improved to $9.8 \pm 8.0$ at one month and was sustained throughout 12 months ($P < 0.001 - 0.002$). Subjects reported decreased vaginal laxity within the first month after the procedure ($P < 0.001$); responses peaked, and effectiveness was sustained through 12 months ($P < 0.001$).

*Conclusions:* A single nonsurgical office-based RF procedure for vaginal introital laxity achieved significant and sustainable 12-month effectiveness with respect to improved integrity at the vaginal introitus and improved sexual satisfaction. Treatment was well-tolerated with no adverse events.

## Introduction

ONE OF THE MOST COMMON PHYSICAL CONSEQUENCES of vaginal deliveries is laxity of the vaginal introitus, a physical change that is rarely discussed between women and their healthcare professionals (HCP).[1–3] Pregnancy and vaginal childbirth may result in trauma to the genito-pelvic floor musculature and vagina, with stretching of the vaginal introitus. Vaginal introital laxity is distinguished from prolapse, which involves the "falling" out of vaginal and other genito-pelvic structures. Prolapse can involve the bladder falling out, vaginal tissue bulging into and through the introitus, and/or the rectal tissue prolapsing into the vaginal area. Thus prolapse involves other structures, not just the vaginal introitus. A frequent consequence of this physical stretching is decreased genito-pelvic sensation during sexual intercourse, which may impact sexual quality of life.[4–7] Other common patient complaints after a normal vaginal delivery are pelvic organ prolapse, stress urinary incontinence, bowel incontinence, altered sexual function, dyspareunia, and chronic pelvic pain.[5,7–11] Changes in body image also impact sexual function and sexual health in the postpartum period.[6,7] In an

---

[1]Yokohama Motomachi Women's Clinic LUNA, Yokohoma, Japan.
[2]Women's Clinic LUNA ANNEX, Yokohoma, Japan.
[3]Department of Urology, Yokohama City University Graduate School of Medicine, Yokohama, Kanagawa, Japan.
[4]Case Western Reserve University School of Medicine, Cleveland, Ohio.
[5]Southern California Center for Sexual Health and Survivorship Medicine, Newport Beach, California.

Appx2396

InMode EX2017
BTL v. InMode
IPR2024-00703

international survey of urogynecologists, 83% of the 563 respondents described vaginal laxity as underreported by their patients, and the majority considered it a self-reported bothersome condition that impacts sexual function and relationships.[3] The incidence of this phenomenon remains undetermined, but HCP surveys have indicated that many practitioners do not have enough time to screen for potential sexual concerns in an office visit, are unsure of therapeutic opportunities, or have had unsatisfactory training to deal with female sexual dysfunction (FSD).[3,5]

In this study we evaluated treatment with a low-dose, radiofrequency (RF) energy as a nonsurgical outpatient approach to the vaginal introitus tissue in women who experienced vaginal introital laxity after vaginal childbirth. The first human study explored the tolerability and safety of variable RF energy doses to discern the optimal energy level for this study.[12] Treatment with RF has shown long-term safety and effectiveness for stress urinary incontinence.[13,15] Low-dose RF continues to be used in other areas of medicine for the treatment of facial and neck skin laxity[16,17] as well as periorbital rhytides.[18]

The primary aim of this study was to test the hypothesis that monopolar RF thermal therapy applied to the mucosal surface of the vaginal introitus can improve the integrity of the vaginal introitus and enhance sexual satisfaction, specifically determined by subject self-reports. Additional aims were to examine the long-term safety profile of the procedure and determine the magnitude of changes in sexual function and distress associated with sexual satisfaction assessed with both validated and patient-reported outcome (PRO) questionnaires.

**Patients and Methods**

This prospective, open label study was conducted between January and December 2011 at the Yokohama Motomachi Women's Clinic LUNA in Yokohoma, Japan. The protocol was reviewed and approved by the ethics committee (Medical Corporation LEADING GIRLS Women's Clinic LUNA). This single-site sample recruited women attending the gynecology and female urology clinic. They were given a survey about vaginal introital laxity; those that met the inclusion criteria were invited to receive a single treatment with RF energy to the vaginal introitus.

Subjects were required to be between the ages of 21 and 55 and premenopausal. They were to have had at least one full-term vaginal delivery (>36 weeks completed gestation), the last of which was at least 12 months prior to study enrollment. Participants were eligible if they self-reported a perception of vaginal introital laxity defined as "very loose," "moderately loose," or "slightly loose" on a seven-point Likert scale, the Vaginal Laxity Questionnaire (VLQ). Other major inclusion criteria included a normal Papanicolaou smear cytology and negative pregnancy test within 2 months prior to treatment; no breastfeeding for 3 months prior to enrollment; in a stable monogamous heterosexual relationship for at least 3 months prior to screening; willingness to participate in vaginal intercourse at least once per week; and be either surgically sterilized or willing to use an acceptable method of birth control at least one month prior to screening and/or will continue for duration of study. Exclusion criteria included: evidence of a thin recto-vaginal septum as assessed by the experienced clinical operator (approximately 1 cm in length or one finger's

breadth); pelvic organ prolapse beyond the hymenal ring; an active sexually transmitted disease; acute or chronic vulvar pain syndrome; vulvar dystrophy; taking over-the-counter or prescription medications known to directly affect sexual function (e.g., antihypertensive, psychotropic, or chemotherapeutic agents); daily use of anti-inflammatory drugs that can affect collagen or healing (e.g., ibuprofen, aspirin, and steroids) or failure to fulfill a 30-day washout prior to treatment; clinically significant anxiety or depression; current treatment for hypoactive sexual desire disorder (HSDD) or orgasmic disorder; a current chronic skin condition involving the vulva; dyspareunia; irritable bowel syndrome; or a medical problem that might interfere with wound healing response as deemed by the investigator. All participants provided written informed consent before treatment. They were paid a nominal fee to cover travel expenses.

Screening evaluations included a detailed medical history, physical and pelvic examination, urine pregnancy test, patient demographics, and an obstetrics and gynecology history. PRO questionnaires were completed to characterize the subjects' sexual health and discern the outcomes following treatment. These instruments were administered before the treatment and at months 1, 3, 6, and 12 (post-treatment). PRO questionnaires were confidentially answered in the clinical setting; responses remained anonymous.

Primary outcome measures were determined with the Viveve System (VS) Questionnaire, with two Likert-type scale questions to assess the participant's perception of vaginal laxity (VLQ) and sexual satisfaction (SSQ) specifically from vaginal intercourse. The VLQ has seven-level ordered responses (*very loose, moderately loose, slightly loose, neither loose nor tight, slightly tight, moderately tight, or very tight*). The SSQ levels of response were *none* (no satisfaction), *poor, fair, good, very good, or excellent*. The questionnaire was administered prior to the RF treatment to assess current status; this is used as the baseline for comparison of therapeutic responses to treatment. The VS Questionnaire was translated into Japanese by a certified professional translation service and approved by the senior author (YS).

Additional outcome measures included the Female Sexual Function Index (FSFI)[19] and the Female Sexual Distress Scale Revised (FSDS-R).[20] We used the linguistic validated Japanese translations of the English versions of the FSFI and FSDS-R, both available from the MAPI Institute.[21] The FSFI is a 19-item questionnaire divided into six content domains: desire, arousal, lubrication, orgasm, satisfaction, and pain. The FSFI total score (sum of the six domains) as well as each domain score was analyzed. The FSFI has been found to be sensitive for detecting outcomes after treatment.[22] We defined a clinically significant change for a FSFI post-treatment total score of at least 2 points regardless of the participant's score at study entry. We based this on a similar calculation and methodology previously reported.[23,24] The FSDS measures sexually related personal distress in women. The questionnaire is scored by summing the responses to a list of 12 items asking the respondent to indicate how a problem or feeling caused distress in the last 30 days; responses are scaled from "never" (0) to "always" (4).

A single RF treatment was performed on each subject as an in-office procedure; no prior sedation or analgesics was required. The RF device (Viveve® Vaginal Laxity RF Therapy System, Viveve, Inc. Sunnyvale, California USA) provides a

InMode EX2017
BTL v. InMode
IPR2024-00703



**FIG. 1.** The in-office procedure, table top radiofrequency (RF) system comprising a RF console with an integrated cooling module, a horizontal handpiece, and disposable, single-use treatment tip.

nonablative approach to creating heat within the submucosal layer of vaginal tissue while keeping the surface cooled. The system consists of a RF console, a cooling module, a horizontal handpiece, and a treatment tip (Fig. 1). It uses reverse thermal gradient RF technology. The monopolar RF pulse is generated to selectively heat a given volume of tissue beneath the surface, while the integrated cryogen is delivered to the inside of the treatment tip to cool and protect the surface tissue—the vaginal mucosa. RF energy pulses delivered at each dose are electronically monitored by the system to operate within the specifications for the RF device within the expected range of total pulses. Each of the three obstetricians/gynecologists operators who performed the procedures was trained by a board-certified U.S. gynecologist who had been involved in the prior U.S. study. They received on-site didactic learning and supervision. The procedure was standardized and performed in the same manner by the HCPs.

Participants were treated in the dorsal lithotomy position; a return pad was attached on the subject's upper thigh. In brief, the procedures included a confirmatory pelvic examination to assess an adequate thickness of the recto-vaginal septum (approximately 1 cm or 1 finger's breadth, as measured by the operating clinician) and cleansing of the vagina, perineum, and perianal area using a nonalcohol-based cleanser. RF treatments were delivered at $90\,J/cm^2$, a dose previously determined to be safe and tolerable in a RF energy dose escalation study, as documented elsewhere.[12] A coupling fluid was used to ensure full contact. The active RF treatment tip was applied to the mucosal surface of the vaginal introitus behind the hymenal ring. Starting at the 1 o'clock position and moving circumferentially around the introitus, the treatment tip is passed over the entire area of 1 to 11 o'clock while avoiding the urethra. The area is treated with RF energy pulses at 0.5 cm overlapping intervals by moving the tip in a clockwise direction. The duration of each pulse is 7.5 seconds. The process is repeated until the entire area is treated five times each with 21 overlapping pulses or up to a maximum total of 105 pulses. The duration of the treatment averaged 26 minutes (range 20–30 minutes).

Subjects' experiences of discomfort or pain were documented during and after the procedure. Telephone interviews were conducted within 72 hours of the procedure. Follow-up clinic visits occurred at 10 days 1, 3, and 6 months postprocedure and included a pelvic examination, collection of adverse events if any, concomitant medication use and completion of the FSFI, FSDS-R, VLQ/SSQ, and the Global Response Assessment (GRA), responding to the question of "How are you now compared to before treatment?" Only questionnaires were provided to the participants for the 12-month post-procedure assessment.

Descriptive statistics were applied to obtain the means and frequencies of patient demographics. The Kolmogorov-Smirnov test was used to check for normality of distribution of data on the sexual function questionnaires (FSFI and FSDS-R) and the vaginal laxity and sexual satisfaction questionnaires (VLQ and SSQ). It was found that most of the data was not normally distributed. Thus the nonparametric test, the Wilcoxon signed rank test for paired samples, was used for comparative statistics of each time point evaluation score relative to pretreatment score. $P < 0.05$ was designated as significant. Statistical analysis of data was performed using Microsoft Excel 2010 programs.

## Results

Thirty premenopausal Japanese subjects each received one RF treatment. The mean age was 42.9 years (range 30–52 years). All had at least one full-term spontaneous vaginal delivery, and the average was 2.2 per patient; 40% had two and 30% had three or four vaginal deliveries. In the total of 65 full-term vaginal deliveries, only one delivery was forceps-assisted and 25 (38%) involved an episiotomy or laceration intervention. No subject had urinary or rectal symptoms or coexisting pelvic floor defects. Participants associated their laxity with a feeling of "vaginal emptiness," as if water could flow in and out of the vaginal vault when bathing or swimming; they also described a loss of physical/sexual sensation during vaginal intercourse and decreased satisfaction with intercourse. The participants' descriptions of vaginal laxity and its consequences are similar to opinions collected from 421 women in an online survey.[2] At screening, 17 of 30

InMode EX2017

BTL v. InMode

IPR2024-00703

**778**                                                                                                              **SEKIGUCHI ET AL.**



**FIG. 2.** Vaginal Laxity Questionnaire (VLQ) scores throughout 12 months of follow-up after a single RF procedure. The recall of vaginal tightness prior to vaginal deliveries is for point of reference of subjects' perceptions. P values, Wilcoxon signed rank test.

subjects reported a decrease in sexual satisfaction (on the SSQ survey); 13 of 30 reported no change or decrease in sexual satisfaction since their last vaginal delivery.

The RF procedure was well tolerated at $90\,J/cm^2$; a total of 105 pulses were delivered to each participant. No treatment-related adverse events occurred during or after the treatment. All subjects reported a sensation of slight or moderate warmth during delivery of the RF pulses. The pain visual analog (VAS) scores averaged 1.5 out of a maximum of 10 during treatment, and seven subjects (23%) reported sporadic discomfort/pain with a VAS range of 3 to 5. One subject reported excessive but sporadic pain (VAS 7.7) but completed the treatment procedure without incident or requiring a topical anesthetic. When subjects were questioned at the 72-hour post-procedure evaluation, all reported a return to their normal routine activities of daily living. One case each of vaginal leukorrhea and lower abdominal pain occurred; both were reported as mild, and both resolved spontaneously within 10 days. Subjects resumed vaginal intercourse 10 days after treatment, and there were no reports of vaginal, vulvar, or abdominal pain. Pelvic examinations at day 10 and throughout the 6 months of follow-up were unremarkable.

Beginning at the first month after treatment and throughout 12 months, subjects reported improvements in vaginal laxity integrity (P < 0.001) as reported on the VLQ (Fig. 2). The pretreatment mean score (±SEM) of 2.43±0.16 increased to 4.2±0.18 at 6 months; the 23 evaluable patients at month 12 scored 4.0±0.45. Regardless of the number of vaginal deliv-

eries (ranging from 1 to 4), the RF procedure resulted in decreased vaginal laxity scores in most patients (Table 1).

Significant improvements in sexual satisfaction as reported on the SSQ were perceived at each follow-up assessment relative to pretreatment in 13 of the 17 (76.5%) subjects who expressed decreased satisfaction at study entry (Fig. 3A). The pretreatment mean score (±SEM) of 1.29±0.17 improved to 2.71±0.66 at month 6 (P < 0.01). At 12 months, only 12 of the original 17 subjects remained evaluable for assessment of sexual satisfaction. The SSQ outcomes for 13 of 30 subjects who reported no change or decrease in sexual satisfaction since vaginal deliveries are reported separately in Fig. 3B. The pretreatment mean score of 2.42±0.18 remained similar and without any significant changes throughout the study.

The FSFI and FSDS-R revealed no detrimental effects on any domains of sexual function related to the RF procedure. At screening, the individual subjects' FSFI total scores ranged from 3.6 to 31.2, mean (±SD) 22.4±6.7. After treatment, the total FSFI scores ranged from 19.0 to 33.4, mean 26.0±5.8 at month 6 (P = 0.002) (Table 2); 19 of 30 (63%) subjects met the definition of experiencing a clinically significant change (≥2 point increase in total score) with a median increase of 3.6 points (range 2–22.7) compared with pretreatment. In 22 of 30 subjects evaluable at 12 months, the mean FSFI total score was 26.0±5.2 (P = 0.08). Eleven of 22 (50%) were considered to have a clinically significant change, a median increase of 4.7 points (range 2.3–12.4). Distress related to sexual activity reported on the FSDS-R significantly decreased from a mean score of 15.8±11.7 at baseline to a mean of 9.0±8.0 at one month (P < 0.001) and was sustained through 12 months (P < 0.001–0.002).

Participants' impressions of changes in their decreased vaginal laxity/improved tautness as recorded on the GRA were characterized as "moderately or markedly improved" by 9 of 29 (33%) subjects at month 3, 12 of 29 (41%) at month 6, and 7 of 22 (32%) at month 12, compared to pretreatment and considered clinically significant. These GRA scores were associated with a median 2-point improvement (range 1–5) in level of vaginal laxity scores on the VLQ. The GRA for sexual satisfaction showed a similar pattern: "moderately or markedly improved" in 24% of subjects at month 3, 38% at month 6, and 27% at month 12. This level of improvement was associated with a median 2-point improvement (range 1–4) in

**TABLE 1. NUMBER OF VAGINAL DELIVERIES AND DECREASED VAGINAL LAXITY SCORES AT MONTH 6 AFTER RF THERAPY**

| Subjects | | Improved VLQ score | |
|---|---|---|---|
| | | ≥1 level (1–5) | ≥2 levels (2–5) |
| Deliveries (n) | N | % | % |
| 1 | 8 | 75 | 50 |
| 2 | 12 | 83 | 67 |
| 3 | 7 | 86 | 57 |
| 4 | 3 | 66 | 66 |

RF, radiofrequency.

InMode EX2017
BTL v. InMode
IPR2024-00703



**FIG. 3.** Sexual Satisfaction Questionnaire (SSQ) scores throughout 12 months of follow-up after a single RF procedure. **(A)** Subjects (17/30) who at screening expressed diminished sexual satisfaction from vaginal intercourse since deliveries. **(B)** Subjects (13/30) who at screening expressed either no change or improved sexual satisfaction since deliveries. The recall of sexual satisfaction prior to vaginal deliveries is for point of reference of subjects' perceptions. P values, Wilcoxon signed rank test.

level of sexual satisfaction on the SSQ. No participant reported a decrease in sexual satisfaction on the GRA or excessive changes in vaginal tightness to uncomfortable levels.

### Discussion

This proof-of-concept study is the second report of nonablative RF thermal therapy for amelioration of vaginal laxity after vaginal childbirth. It reaffirms the tolerability and 12-month safety profile of this nonsurgical, minimally invasive RF treatment delivered at $90 J/cm^2$, when limited to the vaginal introitus. The treatment relies on the concept that carefully controlled RF energy can be used to heat deeper submucosal tissue in conjunction with concomitant cryogen cooling to prevent superficial heat injury. The therapeutic goal is to stimulate connective tissue activation with subsequent tissue revitalization. This process is similar to other medical procedures that are

approved for the treatment of lax human skin[16,17] in which increased collagen formation appears to contribute to the mechanism of action.[25,26] It is hypothesized that a similar process of fibroblastic activation with new collagen formation after exposure to RF energy might occur in the vaginal introitus. Support for this putative mechanism of action of RF thermal therapy has been explored in a sheep vagina model (with histological similarity to the human vagina) evaluated with the same device and procedure to emulate treatment in human clinical studies.[27] Histological examination of sheep vaginal introitus biopsies after a single RF procedure supports an acceptable safety profile for continued clinical study and mechanism of action of the RF energy involving thermal fibroblast activation leading to collagen regeneration. This is consistent with a reparative pathway of changes to produce improved overall integrity of the genito-pelvic matrix tissues, which may subsequently enhance sexual responsiveness and satisfaction. Heating of the deeper

TABLE 2. CHANGES IN SEXUAL FUNCTION (FSFI) AND SEXUALLY-RELATED PERSONAL DISTRESS (FSDS-R) SCORES AFTER RF THERAPY FOR VAGINAL INTROITAL LAXITY

| | Possible Score (Range) | Baseline N = 30 | 1 M N = 30 | P | 3 M N = 30 | P | 6 M N = 30 | P | 12 M N = 22 | P |
|---|---|---|---|---|---|---|---|---|---|---|
| **FSFI** | | | | | | | | | | |
| Desire | (1.2–6) | 3.3±0.8 | 3.0±0.8 | 0.043 | 3.1±0.9 | 0.190 | 3.2±1.0 | 0.310 | 3.25±1.0 | 0.741 |
| Arousal | (0–6) | 3.2±1.3 | 3.2±1.2 | 0.873 | 3.7±1.0 | 0.023 | 3.7±0.5 | <0.01 | 3.6±1.6 | 0.363 |
| Lubrication | (0–6) | 4.5±1.5 | 4.7±1.5 | 0.219 | 5.0±1.1 | 0.089 | 5.1±1.3 | <0.01 | 4.6±1.5 | 0.271 |
| Orgasm | (0–6) | 3.4±1.5 | 3.8±1.5 | 0.082 | 4.4±1.1 | <0.002 | 4.2±1.4 | <0.002 | 4.2±1.2 | 0.080 |
| Satisfaction | (0.8–6) | 3.6±1.5 | 4.1±1.2 | 0.052 | 4.5±1.1 | <0.001 | 4.4±1.1 | 0.001 | 4.2±1.3 | 0.119 |
| Pain | (0–6) | 4.5±1.7 | 5.1±1.8 | <0.01 | 5.3±1.3 | <0.02 | 5.3±0.9 | 0.005 | 4.8±1.8 | 0.503 |
| Total Score | (2–36) | 22.4±6.7 | 23.9±6.7 | 0.038 | 26.0±5.1 | 0.002 | 26.0±5.8 | 0.002 | 26.0±5.2 | 0.080 |
| **FSDS-R** | | | | | | | | | | |
| Total Score | (0–52) | 15.8±11.7 | 9.8±8.0 | <0.001 | 8.9±7.4 | <0.001 | 9.9±8.2 | 0.002 | 10.3±8.7 | <0.005 |

Data are mean±SD.

P value determined by Wilcoxon signed rank test for paired samples, months 1, 3, 6, and 12 compared to pretreatment.

N, number of subjects.

InMode EX2017
BTL v. InMode
IPR2024-00703

fibro-connective tissue and epithelial protection with cryogen cooling appears safe and produced no mucosal ulceration, regional necrosis, or reparative scarring. A subsequent sheep histology study utilizing a sham treatment or cryogen cooling only without RF energy has provided confirmation of the effectiveness of RF energy $(90 \, J/cm^2)$.[35]

The subjective improvements in vaginal integrity as well as increased sexual satisfaction were similar temporally and in magnitude in the Japanese participants in this study compared to non-Asians in a previous U.S. study.[12] This confirmatory data further supports the effectiveness of this procedure.[28]

Female sexual dysfunction is common in otherwise healthy Japanese women.[29–32] Noteworthy in this study is that 22 of 30 (63%) subjects had total FSFI scores ≤26.55 before the RF treatment; the mean was 20 (range 3.6–25.5). A score ≤26.55 is the suggested cut-off for designating women at risk for FSD as established in U.S. subjects.[33] However, the scores of 8 of these 22 subjects improved to levels without FSD after treatment; screening mean total score of 24 (range 19.9– 25.5) increased to a mean of 29.3 (range 27.7–32.3) at 6 months post-treatment. Also of interest are 21 of 30 (70%) subjects (not necessarily the same with lower FSFI scores) with FSDS-R scores ≥11 (mean of 21.6, range 11–43) at screening, a score reported to effectively discriminate between women with FSD and no FSD.[20] In contrast, the percentage of subjects with distress scores ≥11 fell from 70% to around 40% by months 1 and 3 after the RF procedure. Favorable sexual function is essential for a woman's satisfactory sexual life.

Although this study intentionally did not evaluate male sexual partner aspects of the sexual relationship with regard to partners' functionality, sexual interest and involvement in the women's participation in the study, the patients were required to have and be assessed for relationship stability. The importance of the woman herself complaining of changes at the vaginal introitus was paramount. The woman's willingness to come forward without coercion from an intimate partner or without relationship pressure was an important concept when assessing inclusion into the study.

The Global Study of Sexual Attitudes and Behaviors, a large multicountry survey of 27,500 participants aged 40 to 80 years, reported that only 9% of both women and men were asked about their sexual health during a routine office visit with a HCP.[31] The frequency of help-seeking for sexual problems in Asian countries is noted to be exceptionally low.[29] As vaginal introital laxity is a neglected topic of discussion especially after vaginal childbirth, this medical concern should be added to the list of biopsychosocial factors that affect sexual function. Healthcare professionals should question their patients concerning vaginal introital laxity. In addition, the impact or perception of laxity in Japanese women may be different than in U.S. women due to differences in socioculture-specific attitudes, family and partner relationships, and other ethnicity concerns or Japanese values.

The present study design has limitations that might impact the conclusions. The major limitation is the lack of a sham treatment arm for comparison of patient outcomes attributable to the effects of the RF energy. A clinical study with a sham treatment control arm will be important to examine a potential placebo response after RF treatment of vaginal introital laxity. Evidence from animal model studies indicates that controls could include a sham procedure without heating or with cryogen cooling alone.

A linguistically validated Japanese translation of the U.S. version of the FSFI was utilized in this study, which preceded the recent publication of a validated FSFI for Japan.[34] The Japanese version evaluates the previous three months of sexual function rather than one month as in the U.S. version and may result in different outcomes. It is not possible to determine the duration of effectiveness of the improvements at the vaginal introitus.

Several potential methods to objectively quantify vaginal introital laxity, including caliper measurements, a balloon device (such as a barostat for measuring esophageal strictures), and comparative photos, have been evaluated, but all have been found to be unreliable for a variety of medical and anatomical reasons. There are no validated instruments currently available for reliably measuring the vaginal introitus with a high index of reproducibility. Therefore, at the present time the assessment of laxity cannot be objectively defined. Subjective determinations of outcomes may be biased; however, PROs are rapidly becoming the gold standard for primary endpoints for clinical studies evaluating treatments for female sexual problems. Subjective evaluation has been the standard for determining the success of RF-induced facial skin laxity.[17,18]

This single-arm study involved a small sample size as is appropriate for a proof-of-concept study. A larger randomized, controlled, multicenter study will be important to examine a potential placebo effect after RF treatment of vaginal introital laxity.

## Conclusions

This study confirms that a nonsurgical, nonablative RF treatment is a well-tolerated and safe procedure shown to produce subjective improvements in vaginal introital laxity and improved sexual satisfaction in women after vaginal deliveries. The profile of effectiveness in subjects from Japan is in agreement with earlier observations in a cohort of U.S. patients with vaginal laxity; this is indicative of a cross-cultural similarity of perceptions of this medical concern and impact on sexual health after vaginal childbirth.

## Acknowledgments

This clinical study was supported by Viveve, Inc., Sunnyvale, California, USA.

Technical writing support was provided by Elaine K. Orenberg, PhD.

## Author Disclosure Statement

Drs. Kingsberg and Krychman are members of the Scientific Advisory Board, Viveve Inc. The other authors have no existing competing financial interests.

## References

1. Kingsberg SA, Millheiser LS. Vaginal laxity after childbirth: Qualitative surveys of women's perceptions, effect on changes in self-image and sexual relationships. J Sex Med 2010;7(Supplement 3):127–128.

2. Millheiser LS, Kingsberg SA, Lukes A, Chen B, Pauls RN. Cross-sectional survey of consumers and professionals to assess the consequences of vaginal deliveries and introital laxity on sexual function and satisfaction. J Sex Med 2011;6:1645.

InMode EX2017
BTL v. InMode
IPR2024-00703

3. Pauls RN, Fellner AN, Davila GW. Vaginal laxity; a poorly understood quality of life problem. Survey of physician members of the International Urogynecological Association (IUGA). Int Urogynecol J 2012;23:1435–1448.

4. Klein MC, Kaczorowski J, Firoz T, Hubinette M, Jorgensen S, Gauthier R. A comparison of urinary and sexual outcomes in women experiencing vaginal and Caesarean births. J Obstet Gynaecol Can 2005;27:332–339.

5. Griffiths A, Watermeyer S, Sidhu K, Amso N, Nix B. Female genital tract morbidity and sexual function following vaginal delivery or lower segment caesarian section. J Obstet Gynaecol 2006;26:645–649.

6. Pauls RN, Occhino JA, Dryfhout VL. Effects of pregnancy on female sexual function and body image: A prospective study. J Sex Med 2008;5:1915–1922.

7. Zielinski R, Miller J, Low LK, Sampselle C, Delancey JO. The relationship between pelvic organ prolapse, genital body image, and sexual health. Neurourol Urodyn 2012;31:1145–1148.

8. Safarinejad MR, Kolahi AA, Hosseini L. The effect of the mode of delivery on the quality of life, sexual function and sexual satisfaction in primiparous women and their husbands. J Sex Med 2009;6:1645–1667.

9. Barrett G, Pendry E, Peacock J, Victor C, Thakar R, Manyonda I. Women's sexual health after childbirth. Br J Obstet Gynaecol 2000;107:186–195.

10. Aslan E, Fynes M. Female sexual dysfunction. Int Urogynecol J 2008;19:293–305.

11. Yang SH, Yang JM, Wang KH, Huang WC. Biologic correlates of sexual function in women with stress urinary incontinence. J Sex Med 2008;5:2871–2879.

12. Millheiser LS, Pauls RN, Herbst SJ, Chen BH. Radiofrequency treatment of vaginal laxity after vaginal delivery: Nonsurgical vaginal tightening. J Sex Med 2010;7:3088–3095.

13. Sotomayor M, Bernal GF. Twelve-month results of nonsurgical radiofrequency energy microremodeling for stress incontinence. Int Urogynecol J Pelvic Floor Dysfunct 2005;16:192–196.

14. Dillon B, Dmochowski R. Radiofrequency for the treatment of stress urinary incontinence in women. Curr Urol Rep 2009;10:369–374.

15. Elser DM, Mitchell GK, Milks JR, et al. Nonsurgical transurethral collagen denaturation for stress urinary incontinence in women: 18-month results from a prospective long-term study. Neurourol Urodyn 2010;29:1424–1428.

16. Weiss RA, Weiss MA, Munavalli G, Beasley KL. Monopolar radiofrequency facial tightening: A retrospective analysis of efficacy and safety in over 600 treatments. J Drugs Dermatol 2006;5:707–712.

17. Dover J, Zelickson B and the 14-Physician Multispecialty Consensus Panel. Results of a survey of 5,700 patient monopolar radiofrequency facial skin tightening treatments: Assessment of a low-energy multiple-pass technique leading to a clinical end point algorithm. Dermatol Surg 2007;33:900–907.

18. Fitzpatrick R, Geronemus R, Goldberg D, Kaminer M, Kilmer S, Ruiz-Esparza J. Multicenter study of noninvasive radiofrequency for periorbital tissue tightening. Lasers Surg Med 2003;33:232–242.

19. Rosen R, Brown C, Heiman J, et al. The Female Sexual Function Index (FSFI): A multidimensional self-report instrument for the assessment of female sexual function. J Sex Marital Ther 2000;26:191–208.

20. Derogatis L, Clayton A, Lewis-D'Agostino D, Wunderlich G, Fu Y. Validation of the female sexual distress scale—revised for assessing distress in women with hypoactive sexual desire disorder. J Sex Med 2008;5:357–364.

21. Patient-Reported Outcome and Quality of Life Instruments Database (PROQOLID). http://www.proqolid.org/instruments or www.mapi-institute.org.

22. Reline A, Meson C. The sensitivity of events logs, self-administered questionnaires and photoplethysmography to detect treatment-induced changes in female sexual arousal disorder (FSAD) diagnosis. J Sex Med 2006;3:283–291.

23. Bradford A, Meston CM. Behavior and symptom change among women treated with placebo for sexual dysfunction. J Sex Med 2011;8:191–201.

24. Jacobson NS, Truax P. Clinical significance: A statistical approach to determining meaningful change in psychotherapy research. J Consult Clin Psychol 1991;59:12–19.

25. Zelickson BD, Kist D, Bernstein E, et al. Histological and ultrastructural evaluation of the effects of a radiofrequency-based nonablative dermal remodeling device: a pilot study. Arch Dermatol 2004;140:204–209.

26. Hantash BM, Ubeid AA, Chang H, Kafi R, Renton B. Bipolar fractional radiofrequency treatment induces neoelastogenesis and neocollagenesis. Lasers Surg Med 2009;41:1–9.

27. Vos JA, Livengood RH, Jessop M, Coad JE. Non-ablative hyperthermic mesenchymal regeneration: A proposed mechanism of action based on the Viveve™ model. In: Energy-based Treatment of Tissue and Assessment VI. TP Ryan, ed. Proc SPIE 2011;7901:1–8.

28. Brotto LA, Chik HM, Andrew G. Ryder AG, Gorzalka, Seal BN. Acculturation and sexual function in Asian women. Arch Sex Behavior 2005;34:613–626.

29. Nicolosi A, Glasser DB, Kim SC, Marumo K, Laumann EO. Sexual behaviour and dysfunction and help-seeking patterns in adults aged 40–80 years in the urban population of Asian countries. BJU Int 2005;95:609–614.

30. Hisasue S, Kumamoto Y, Sato Y, et al. Prevalence of female sexual dysfunction symptoms and its relationship to quality of life: A Japanese female cohort study. Urology 2005;65:143–148.

31. Moreira ED, Brock G, Glasser DB, et al. Help-seeking behaviour for sexual problems: The Global Study of Sexual Attitudes and Behaviors. Int J Clin Pract 2005;59:6–16.

32. Tan HM, Marumo K, Yang DY, Hwang TI, Ong ML. Sex among Asian men and women: The Global Better Sex Survey in Asia. Int J Urol. 2009;16:507–514.

33. Wiegel M, Meston C, Rosen R. The Female Sexual Function Index (FSFI): Cross-validation and development of clinical cutoff scores. J Sex Mar Ther 2005;31:1–20.

34. Takahashi M, Inokuchi T, Watanabe C, Saito T, Kai I. The Female Sexual Function Index (FSFI): Development of a Japanese version. J Sex Med 2011;8:2246–2254.

35. Coad JE, Vos JA, Curtis A, Krychman M. Safety and mechanisms of action supporting nonablative radiofrequency thermal therapy for vaginal introitus laxity occurring in women after childbirth: Histological study in the sheep vaginal model. J Sex Med 2013;10(Supplement 2):175.

Addresss correspondence to:
Michael L. Krychman, MD
Southern California Center for Sexual Health
and Survivorship Medicine
1501 Superior Avenue, Suite 201
Newport Beach, CA 92633

E-mail: mkrychman@aol.com

InMode EX2017
BTL v. InMode
IPR2024-00703

# Radiofrequency Treatment of Vaginal Laxity after Vaginal Delivery: Nonsurgical Vaginal Tightening

Leah S. Millheiser, MD,* Rachel N. Pauls, MD,† Seth Jordan Herbst, MD,‡ and Bertha H. Chen, MD*

*Department of Obstetrics and Gynecology, Stanford University School of Medicine, Stanford, CA, USA; †Department of Obstetrics and Gynecology, Division of Urogynecology and Reconstructive Pelvic Surgery, Good Samaritan Hospital, Cincinnati, OH, USA; ‡Institute for Women's Health, West Palm Beach, FL, USA

DOI: 10.1111/j.1743-6109.2010.01910.x

**ABSTRACT**

*Introduction.* All women who have given birth vaginally experience stretching of their vaginal tissue. Long-term physical and psychological consequences may occur, including loss of sensation and sexual dissatisfaction. One significant issue is the laxity of the vaginal introitus.

*Aim.* To evaluate safety and tolerability of nonsurgical radiofrequency (RF) thermal therapy for treatment of laxity of the vaginal introitus after vaginal delivery. We also explored the utility of self-report questionnaires in assessing subjective effectiveness of this device.

*Methods.* Pilot study to treat 24 women (25–44 years) once using reverse gradient RF energy (75–90 joules/cm$^2$), delivered through the vaginal mucosa. Post-treatment assessments were at 10 days, 1, 3, and 6 months.

*Main Outcome Measures.* Pelvic examinations and adverse event reports to assess safety. The author modified Female Sexual Function Index (mv-FSFI) and Female Sexual Distress Scale-Revised (FSDS-R), Vaginal Laxity and Sexual Satisfaction Questionnaires (designed for this study) to evaluate both safety and effectiveness, and the Global Response Assessment to assess treatment responses.

*Results.* No adverse events were reported; no topical anesthetics were required. Self-reported vaginal tightness improved in 67% of subjects at one month post-treatment; in 87% at 6 months ($P < 0.001$). Mean sexual function scores improved: mv-FSFI total score before treatment was $27.6 \pm 3.6$, increasing to $32.0 \pm 3.0$ at 6 months ($P < 0.001$); FSDS-R score before treatment was $13.6 \pm 8.7$, declining to $4.3 \pm 5.0$ at month 6 post-treatment ($P < 0.001$). Twelve of 24 women who expressed diminished sexual satisfaction following their delivery; all reported sustained improvements on SSQ at 6 months after treatment ($P = 0.002$).

*Conclusion.* The RF treatment was well tolerated and showed an excellent 6-month safety profile in this pilot study. Responses to the questionnaires suggest subjective improvement in self-reported vaginal tightness, sexual function and decreased sexual distress. These findings warrant further study. **Millheiser LS, Pauls RN, Herbst SJ, and Chen BH. Radiofrequency treatment of vaginal laxity after vaginal delivery: Nonsurgical vaginal tightening. J Sex Med \*\*;\*\*:\*\*–\*\*.**

*Key Words.* Radiofrequency Energy; Vaginal Laxity; Nonsurgical Vaginal Tightening; Sexual Dysfunction after Childbirth

## Introduction

Some of the potential medical consequences associated with vaginal childbirth that extend beyond the postpartum period include stress urinary incontinence, bowel incontinence, pelvic organ prolapse, dyspareunia, chronic pelvic pain, and altered sexual function [1–4]. Trauma to the pelvic floor and vagina during pregnancy and vaginal childbirth including stretching of the vaginal introitus may lead to permanent changes resulting in loss of physical and sexual sensation during intercourse, and a reduced sexual quality of life [2,5–7]. Vaginal laxity may occur after the first delivery and worsen with multiparity, delivery of a large fetus, application of forceps, as well as

© 2010 International Society for Sexual Medicine

InMode EX2018
BTL v. InMode
IPR2024-00703

2                                                                                          *Millheiser et al.*

changes in connective tissue associated with the normal aging process. This condition is rarely discussed between women and their physicians possibly because of the lack of evidence-based treatments, embarrassment, and lack of recognition of the condition. Traditional nonsurgical treatments for relaxation of the vaginal opening have included Kegel exercises or pelvic floor therapy with electrical stimulation of the vaginal musculature to promote perineal muscle strength; these are recommended primarily for stress urinary incontinence. While surgery can be performed to tighten the introitus, pain at incision site can lead to dyspareunia months following the procedure. In this trial we explored the use of nonablative radiofrequency (RF) energy as a non-surgical approach to modify tissue compliance in the vaginal introitus. Transurethral monopolar RF induced collagen denaturation has been used to treat stress urinary incontinence with minimal risk for adverse events [8,9]. RF energy also has a substantial safe history of use for noninvasive treatment of lax skin of the face and neck [10,11] and for rhytides in the delicate tissue of the periorbital area [12] based on the premise of thermal tissue remodeling rather than ablation.

**Aim**

The primary aim of this study was to assess the short-term safety and tolerability of monopolar RF thermal therapy. Because there are no appropriate questionnaires to assess subjective improvement, we also explored the utility of our newly designed questionnaires to assess participants' perceptions of the effectiveness of the procedure to improve tightness of the vaginal introitus and to improve sexual satisfaction.

**Patients and Methods**

This was a prospective, open label, single-center, pilot study conducted between November 2008 and September 2009 at the Institute for Women's Health and Body, Wellington, Florida. The protocol was reviewed and approved by the local ethics committee (Independent Investigational Review Board, Inc, Plantation, FL, USA). Women recruited from a private practice obstetrics and gynecology clinic were invited to receive a single treatment of RF energy to the vaginal introitus if they were aged between 25 and 44 years and pre-menopausal, had at least one full term vaginal delivery (>36 completed weeks of

gestation) and delivered at least 12 months prior to enrollment. Inclusion criteria consisted of self-reported perceptions of vaginal laxity defined as "very loose," "moderately loose," or "slightly loose" on the Vaginal Laxity Questionnaire (VLQ) designed for this study, no breastfeeding for 3 months prior to enrollment, sexual activity (vaginal intercourse ≥ once per month), in a monogamous, heterosexual relationship, and normal Papanicolou smear cytology and negative pregnancy test within 2 months prior to treatment. Excluded were women with evidence of a thin rectovaginal septum, pelvic organ prolapse beyond the hymenal ring, an active sexually transmitted disease (e.g., genital condylomata, herpes), chronic vulvar pain or vulvar dystrophy, those taking medications known to affect sexual function (e.g., antihypertensive, psychotropic, chemotherapeutic agents), unless dosage was to be stable for at least 1 month prior to treatment and no change in regimen was planned during duration of study, they were using use anti-inflammatory drugs on a chronic basis (e.g., ibuprofen, aspirin and steroids) that can affect collagen or healing, or willingly fulfilled a 30 day washout period of such drugs prior to treatment, those with clinically significant anxiety or depression, or a medical problem that might interfere with wound healing. However, those subjects who were on oral contraceptives prior to enrollment continued to take these throughout the study. All patients provided written informed consent before treatment.

The screening assessments included a physical and pelvic examination, patient demographics, and medical and obstetric/gynecological (OB/GYN) history. Prior to treatment and at the 1, 3, and 6 months follow-up visits, participants completed self-report questionnaires to characterize, and follow effects of treatment on sexual function. We utilized the Female Sexual Function Index (FSFI), modified unintentionally as a result of a transcription error (mv-FSFI). This questionnaire comprised the same questions as the original validated instrument [13], but had slight alterations in the wording of certain possible responses to several questions. The ordinal/interval scale of responses from highest to lowest frequency or highest to lowest degree was similar and there was no change in scoring algorithm. The Female Sexual Distress Scale-Revised (FSDS-R) was used to measure sexually related personal distress [14]. These mv-FSFI and FSDS questionnaires had a dual purpose of evaluating both the impact of the pro-

Appx2404

InMode EX2018
BTL v. InMode
IPR2024-00703

cedure on sexual function as a safety consideration and for evidence of effectiveness.

This study evaluated subjects' perceptions of vaginal laxity/tightness and subsequent sexual satisfaction specifically from vaginal intercourse as unique aspects of sexual function. Because no objective measure or patient self-report instruments are currently available to address these factors, we designed new questionnaires using Likert items to acquire participants' responses [15]. The Vaginal Laxity Questionnaire (VLQ) obtains perceptions on level of vaginal laxity/tightness assessed with 7-level ordered responses (*very loose, moderately loose, slightly loose, neither loose nor tight, slightly tight, moderately tight, or very tight*). The Sexual Satisfaction Questionnaire (SSQ) obtains information on level of sexual satisfaction from vaginal intercourse assessed with 6-level ordered responses (*none, poor, fair, good, very good, or excellent*). When The VLQ and SSQ were administered at the screening visit, the questions assessed participants' recall of status prior to their first vaginal deliveries. When administered prior to the RF treatment they assessed current status; this was used as the baseline for comparison of therapeutic responses to treatment. For the global index of change, the subjects completed the Global Response Assessment (GRA), a 7-level scale with response to the statement: "How are you now (levels of vaginal laxity/tightness and sexual satisfaction) compared to before treatment" (*markedly improved, moderately improved, slightly improved, no change, slightly worse, moderately worse, markedly worse?*). This Likert item questionnaire was not unique for this study but has been frequently used in clinical trials to determine a patient's subjective response to treatment outcome [16,17].

Self-report questionnaires were anonymous and answered in a private setting in the clinic offices. With exception of the VLQ (pretreatment) used to confirm study eligibility related to vaginal laxity, the study instruments were not scored by the investigators or clinic staff. All were forwarded to an independent center for scoring and data entry.

Treatments were performed as a clinic office procedure using a RF system (Viveve, Inc, Palo Alto, CA, USA) comprised of a RF generator, a cooling module, a horizontal handpiece, and a treatment tip. The system uses reverse thermal gradient RF technology. The monopolar RF pulse is generated to selectively heat a given volume of tissue beneath the surface, while the integrated cryogen is delivered to the inside of the treatment tip to cool and protect the surface tissue—the vaginal mucosa. RF energy pulses delivered at each dose are electronically monitored by the system to operate within the specifications for the RF device within the expected range of total pulses. The RF treatment was administered only once to each subject. According to the study design, the first three subjects were treated at an energy level of 60 joules per $cm^2$, and in the absence of adverse events, the next three subjects were progressed to 75 joules per $cm^2$, followed by 90 joules per $cm^2$ for the remaining 18 subjects. Duration of the treatment was approximately 30 minutes. The treatment protocol was developed following preliminary research utilizing sheep vagina as an animal model [18].

The subject was placed on an examining table in the dorsal lithotomy position. A return pad was attached to the subject and RF generator. The vagina, perineum, and perianal area were cleansed using a nonalcohol based cleanser. A self-retaining retractor designed for use with the RF generator was inserted into the vagina and repositioned or removed as necessary during the procedure. Coupling fluid was used as a lubricant and reapplied throughout the treatment procedure as needed. The treatment area for the procedure was approximately 20 $cm^2$ based on a vaginal circumference at the hymenal ring of approximately 12 cm. The treatment tip was applied to the mucosal surface of the vaginal introitus starting at the hymenal ring and the entire area from the 1:00 o'clock to 11:00 o'clock position was treated with RF energy pulses at 0.5 cm overlapping intervals, moving the tip in a clockwise direction, then again in a counterclockwise direction. Treatment to the urethral area was avoided. The self-retaining retractor was removed after the treatment.

Safety was assessed by monitoring of vital signs, documentation of adverse events including patient's experience of pain or discomfort during and after the procedure and concomitant medications. Post-treatment assessments were carried out by telephone interviews at 48 hours and 2 months and at clinic visits at 10 days, 1, 3, and 6 months post-treatment. Pelvic examinations were repeated at months 1 and 3 after treatment. The mv-FSFI and FSDS were administered to capture evidence of any adverse effects on sexual function and health.

Descriptive statistics were generated on all demographic, medical history, and physical examination findings including means and standard deviations, for continuous variables, and frequencies and percentages for categorical variables. The

InMode EX2018
BTL v. InMode
IPR2024-00703

4

Wilcoxon signed rank test was used as a nonparametric test for repeated measures of ordinal data from the VLQ and SSQ, and the paired *t*-test was used to evaluate changes in the mv-FSFI and FSDS-R scores. Two-sided 95% confidence levels were used, $P < 0.05$ was significant. Statistical analysis was performed using Stata version 9.2 (StataCorp LP, College Station, TX, USA).

**Main Outcome Measures**

Assessments of safety and tolerability included pelvic examinations and documentation of adverse events. The mv-FSFI and FSDS-R were used both as safety questionnaires to discern any potential deleterious changes in sexual function and as measures of effectiveness to observe any positive changes in sexual health. The VLQ and SSQ, designed for this study, and the Global Response Assessment were criteria to assess the participants' perceptions of the effectiveness of the RF procedure.

**Results**

Twenty-four subjects received one RF treatment. The mean age was 37 years (range 27–44 years), most (83%) were white, and 92% had education beyond high school (Table 1). All had at least one full term vaginal birth, 63% had two and 21% had

**Table 1** Demographic and clinical characteristics of study participants

| Personal and OB/GYN History | N | Mean ± SD or % |
|---|---|---|
| Age (year) | 24 | 37 ± 5.1 |
| Body mass index | 24 | 25.6 ± 4.9 |
| Ethnicity/Race | | |
| White | 20 | 83 |
| Hispanic or Latino | 4 | 17 |
| Years of education | 24 | 14.1 ± 1.4 |
| Gravidity | | |
| 1 | 3/24 | 13 |
| 2 | 9/24 | 38 |
| 3 | 6/24 | 25 |
| 4+ | 6/24 | 25 |
| Full term deliveries | | |
| 1 | 4/24 | 17 |
| 2 | 15/24 | 63 |
| 3 | 5/24 | 21 |
| 4+ | 0 | 0 |
| Delivery type | | |
| Vaginal | 45/49 | 92 |
| Caesarean | 4/49 | 8 |
| Interval from first vaginal delivery to study entry (year) | 24/24 | 13.9 ± 6.6 |
| Breastfeeding history | | |
| No | 8/24 | 33 |
| Yes | 16/24 | 67 |



**Figure 1** Vaginal Laxity Questionnaire (VLQ) scores throughout the 6 months of follow-up after a single RF treatment. Descriptions of ordered response categories on VLQ and corresponding numbers: very tight (7), moderately tight (6), slightly tight (5), not tight or loose (4), slightly loose (3), moderately loose (2), very loose (1). Data are mean with 95% confidence intervals (error bars). *P* values, Wilcoxon signed rank test.

three. The interval between subjects' first vaginal delivery and screening visit was a mean 13.9 years (range 1–24 years). One subject moved out of state and was lost to follow up after the month 2 evaluation.

The RF treatment procedures were well tolerated. Subjects experienced a sensation of warmth during delivery of the RF energy pulses, but no reports of pain necessitated the use of topical anesthetics or analgesics. The delivery of incremental doses of RF energy beginning at 60 joules/cm² in the first three subjects, then up to 90 joules/cm² was completed successfully. Eighteen of 18 procedures were conducted at the highest energy level per protocol design. No treatment-related adverse events occurred. All subjects had normal pelvic examinations with no clinical evidence of gross tissue changes resulting from the treatment. No subjects reported pain during vaginal intercourse in the 6-month evaluation period.

As early as 1 month after treatment, all subjects showed increased VLQ scores of at least one category compared to pretreatment ($P < 0.001$), indicative of perceived improved vaginal tightness; 67% had VLQ scores that were 2–4 levels higher (Figure 1). The VLQ scores remained significantly improved throughout the 6 months of post-treatment follow-up, mean score (95% confidence interval, CI) of 5.0 (4.8–5.9) compared with 2.6 (2.3–2.9) pretreatment ($P < 0.001$). Eighty-seven percent of subjects reported 2–4 levels of improved

InMode EX2018
BTL v. InMode
IPR2024-00703

*RF Treatment for Vaginal Introital Laxity*                                                          5

**Table 2** Changes in sexual function (mv-FSFI) and sexually related personal distress (FSDS-R) scores before and after RF treatment

| Questionnaire | Possible score (range) | Pre-treatment N = 24 | Month 1 N = 24 | P value | Month 3 N = 23 | P value | Month 6 N = 23 | P value |
|---|---|---|---|---|---|---|---|---|
| mv-FSFI | | | | | | | | |
| Desire | (1.2–6) | 4.1 ± 0.9 | 4.7 ± 0.9 | 0.008 | 4.8 ± 0.8 | 0.002 | 4.8 ± 0.8 | 0.002 |
| Arousal | (0–6) | 4.5 ± 0.9 | 5.2 ± 0.8 | <0.001 | 5.5 ± 0.5 | <0.001 | 5.5 ± 0.5 | <0.001 |
| Lubrication | (0–6) | 4.6 ± 1.1 | 5.3 ± 0.8 | <0.001 | 5.3 ± 0.9 | 0.010 | 5.5 ± 0.8 | 0.001 |
| Orgasm | (0–6) | 4.1 ± 1.2 | 5.0 ± 1.2 | 0.001 | 5.4 ± 0.9 | <0.001 | 5.3 ± 1.1 | <0.001 |
| Satisfaction | (0.8–6) | 4.4 ± 1.0 | 5.1 ± 1.0 | 0.002 | 5.3 ± 0.7 | <0.001 | 5.3 ± 0.7 | <0.001 |
| Pain | (0–6) | 5.9 ± 0.5 | 5.8 ± 0.5 | 0.354 | 5.8 ± 0.4 | 0.732 | 5.6 ± 0.9 | 0.255 |
| Total score | (2–36) | 27.4 ± 3.6 | 31.1 ± 3.0 | <0.001 | 32.2 ± 2.7 | <0.001 | 32.0 ± 3.1 | <0.001 |
| FSDS-R | | | | | | | | |
| Total score | (0–52) | 13.6 ± 8.7 | 7.0 ± 6.5 | 0.001 | 4.4 ± 5.9 | <0.001 | 4.3 ± 5.0 | <0.001 |

Data are mean ± SD.
*P* value determined by paired *t*-test at months 1, 3, and 6 compared with pretreatment.
N = number of subjects; mv-FSFI = modified Female Sexual Function Index; FSDS-R = Female Sexual Distress Scale-Revised; RF = radiofrequency.

tightness scores at month 6. The subjects' impressions of their improvements after treatment as recorded on the GRA correlated with the increases in VLQ score increases at months 3 ($r = 0.79$, $P = 0.0027$) and month 6 ($r = 0.77$, $P < 0.001$). Vaginal tightness after treatment was characterized as "moderately to markedly improved" by 52% of subjects at both months 3 and 6. For the remaining subjects at month 6, a slight improvement was reported on the GRA by 26% and no change from pretreatment in 22%. No subject indicated a worsening or deterioration of tightness at any assessment. The "moderately improved" status on the GRA was associated with a median of 3 levels of score increase and a "markedly improved" with a median of 4 levels of score increase on the VLQ. There was no correlation between the dose level and number of pulses of RF treatment and VLQ score improvements.

While the degree of sexual satisfaction from vaginal intercourse was not a discriminate criterion for inclusion in the clinical study, two distinct cohorts were identified with the SSQ at screening; 12 of 24 subjects expressed a diminished level of sexual satisfaction after their vaginal deliveries (cohort A) and the remaining 12 reported either no change or an increase in sexual satisfaction after vaginal births (cohort B) (Figure 2). The SSQ scores improved significantly throughout the 6 months after treatment in all of the subjects in cohort A. The mean SSQ score (95% CI) prior to treatment was 2.5 (2.1–2.9) compared with 4.1 (3.8–4.6) at month 6 ($P = 0.002$). The changes in scores in the other cohort were not statistically significantly. For all subjects treated, the levels of sexual satisfaction on the GRA were characterized as "moderately to markedly improved" by 48% at month 3 and by 61% at month 6.



**Figure 2** Sexual Satisfaction Questionnaire (SSQ) scores throughout the 6 months of follow-up after a single RF treatment. (A) Subjects (12/24) who at screening expressed diminished sexual satisfaction from vaginal intercourse since deliveries. (B) Subjects (12/24) who at screening expressed either no change or improved sexual satisfaction since deliveries. Descriptions of ordered response categories on SSQ and corresponding numbers: excellent (5), very good (4), good (3), fair (2), poor (1), none (0). Data are mean with 95% confidence intervals (error bars). *P* values, Wilcoxon signed rank test.

*J Sex Med* **\*\*;\*\*:\*\*–\*\***

InMode EX2018
BTL v. InMode
IPR2024-00703

6                                                                                                                    *Millheiser et al.*

**Table 3** Subjects with sexual function scores above and below the optimal cutoff mv-FSFI total score for sexual dysfunction [19]

| Questionnaire (N) | Possible score (range) | Pretreatment | Month 1 | P value | Month 3 | P value | Month 6 | P value |
|---|---|---|---|---|---|---|---|---|
| mv-FSFI total score ≤ 26.55 indicative of risk for sexual dysfunction | | | | | | | | |
| mv-FSFI total (10) | (2–36) | 24.1 ± 2.4* | 29.9 ± 2.9 | 0.001 | 31.7 ± 3.2 | <0.001 | 31.7 ± 3.2 | 0.001 |
| FSDS-R (10) | (0–52) | 19.7 ± 5.8† | 8.5 ± 5.5 | 0.002 | 4.8 ± 5.1 | <0.001 | 6.6 ± 5.4 | 0.001 |
| mv-FSFI total score > 26.55 indicative of normal sexual function | | | | | | | | |
| mvFSFI total (14) | (2–36) | 29.7 ± 2.0 | 32.0 ± 2.9 | 0.001 | 32.5 ± 2.3 | 0.005 | 32.3 ± 3.0 | 0.028 |
| FSDS-R (14) | (0–52) | 8.9 ± 7.1 | 5.9 ± 7.0 | 0.086 | 4.0 ± 6.6 | 0.013 | 2.3 ± 4.1 | 0.003 |

Data are mean ± SD
P values determined with paired t-test at months 1, 3 and 6 compared with pretreatment.
*Mean pretreatment mv-FSFI total scores for these subjects with SD were significantly less than for "normal" subjects, $P < 0.001$ (Student's t-test).
†Mean pretreatment FSDS-R scores for these subjects with SD were significantly greater than for "normal" subjects, $P < 0.001$ (Student's t-test).
FSDS-R = Female Sexual Distress Scale-Revised.

The mv-FSFI and FSDS-R scores revealed no deleterious effects on sexual function related to RF treatment or a specific RF energy dose. Throughout 6 months of post-treatment evaluations, mv-FSFI total and domains scores with exception of pain (chronic vulvar pain was an exclusion criterion) improved significantly ($P < 0.001$), and personal distress from sexual activity decreased significantly ($P < 0.001$) for all 24 treated subjects (Table 2). Based on the suggested criterion designated by Wiegel et al. for the clinical cutoff FSFI score for subjects at risk for sexual dysfunction [17], the study participants were divided into two groups (Table 3). The first group included 10 of the 24 (42%) subjects with mv-FSFI total scores ≤ 26.55, a level at which they might be considered at risk for sexual dysfunction. The mean mv-FSFI total score (±SD) of 24.1 ± 2.4 in this group was significantly lower ($P < 0.001$, t-test) than for the mean of 29.7 ± 2.0 for the 14 subjects in the second group with mv-FSFI total scores >26.55. After treatment, the mv-FSFI total and FSDS-R scores improved significantly ($P ≤ 0.001$ at month 3, $P = 0.001$ at month 6) (Table 3).

**Discussion**

Sexual health is an integral part of general health. The context in which women experience their sexuality may be equally or more important than the physiologic outcomes that she experiences. Women have concerns about the potential negative effects of vaginal childbirth on their sexual health and sex lives [2,3]. Among the very few reported studies of postnatal sexual health only one addresses vaginal looseness/lack of muscle tone reported by approximately 20% at 3 months after births and 12% (49 of 403) at 6 months [1].

Others have reported improved sexual satisfaction following colpoperineoplasty procedures for a wide vagina [20,21]. The incidence of vaginal laxity is unknown; contributing to this lack of information is the limited dialog about postnatal sexual problems with healthcare providers and few seeking help for a sexual concern [1,22,23].

Use of the VLQ and SSQ questionnaires developed for the study and the sexual function instruments allowed us to make several interesting observations. The participants in this clinical trial reported a significant change in their perceptions of vaginal laxity as compared with recollection of their vaginal tone prior to having vaginal births. For half of these women this was accompanied by decreased sexual satisfaction during vaginal coitus. In addition, the mv-FSFI scores for 10 (42%) of the women in our study were below the optimum cutoff level at which they might be considered at risk for sexual dysfunction [19]. However, over the period of 6 months following RF treatment, sexual function scores improved in our study sample of women, and levels of personal distress decreased significantly in those women with scores greater than 15.

This study represents the first application of monopolar RF thermal therapy for vaginal laxity after childbirth. The procedure is minimally invasive and limited to treatment of the vaginal introitus. It relies on the concept that carefully controlled RF energy can be used to heat deeper submucosal tissue in conjunction with concomitant cryogen cooling to prevent superficial heat injury. The therapeutic goal is to stimulate connective tissue restoration with subsequent tissue tightening. RF energy has been extensively used for tissue tightening of human skin [10,11]. Increased collagen formation appears to contribute to the mechanism of skin tightening over time

J Sex Med **;**:**–**

InMode EX2018
BTL v. InMode
IPR2024-00703

[24–27]. We hypothesize that a similar process of neocollagenesis and neoelastogenesis with dermal collagen remodeling as a restorative process after exposure to RF thermal energy also might also occur in vaginal tissue.

Using the sheep vagina as a animal model system with histological similarity to the human vagina, tissue changes associated with an RF treatment procedure identical to that used in this human report were evaluated in serial tissue biopsies taken immediately, 1 week, and 1, 3, and 6 months after a single treatment [18]. Focal underlying soft tissue stromal remodeling with fibroblast activation was primarily identified between 1 week and 1 month after treatment and variably increased submucosal and/or muscularis collagen was focally present over the 6-month post-treatment period. The findings support a putative mechanism of action for this RF-based therapy that involves connective tissue remodeling with fibroblast activation and new collagen production. The absence of ulceration, regional necrosis, and effacing dense collagen scarring over the 6-month follow-up period support an acceptable safety profile for this treatment regimen. The temporal changes of collagen tissue remodeling in the sheep vagina reflect a possible mechanism to explain the subjects' perceptions of increased vaginal tightness in the 1–6-month period after RF treatment as reported in the our clinical study.

We are aware of limitations of our study. It is not currently possible to predict how long the participants' perceptions of improved vaginal tightening will last, as the tissue changes from RF energy may be vulnerable to natural tissue changes with aging or further childbearing. We did not objectively quantify girth of the vaginal introitus pre- and post-treatment; however, there are no currently available devices to easily standardize this assessment. To our knowledge this is the first study to address the concern of vaginal laxity after childbirth and to determine the feasibility of conducting a trial to evaluate a nonsurgical procedure with thermal energy as a therapeutic option. As such it was necessary to create new questionnaires to document subjects' perception of vaginal laxity and sexual satisfaction from vaginal intercourse. These are unique to this study and are not validated instruments for assessment. The mv-FSFI questionnaire was unintentionally modified during the transcription process and therefore is not the exact instrument validated by Rosen et al. [13] although it was found to be useful to evaluate subject self-reports of sexual function before and after treatment. The number of subjects was small and longer term follow-up for assessment of safety will be required for adequate evaluation of this modality. The potential for a placebo response does exist; a randomized, sham-treatment control is necessary to examine this effect. Subject selection for the study was based on women's perceptions and experiences of her sexuality and quality of vaginal intercourse after vaginal deliveries; however the study could not examine the psychosocial or personal-partner relationship issues that may impact the response outcomes over time.

## Conclusion

Our pilot data suggest that this nonsurgical RF treatment is well tolerated, 6-month safety is excellent, and there is subjective improvement of vaginal tightness. These objective and subjective data will guide us in our design of a full-scale randomized, controlled clinical trial to examine the effectiveness, and assess long-term safety of RF treatment for vaginal laxity after vaginal deliveries.

## Acknowledgments

We thank Elaine K. Orenberg, PhD for assistance with data and statistical analysis and preparation of the manuscript and Buddy Hutchins PhD for data compilation. This study was presented in part at the Annual Meeting of the American Urogynecology Society, September 2009, Hollywood, Florida and at the Annual Meeting of the American Association of Gynecologic Laparoscopists, November 2009, Orlando, Florida. Clinical study supported by Viveve, Inc, Palo Alto, California.

**Corresponding Author:** Leah S. Millheiser, MD, Female Sexual Medicine Program, Division of Gynecologic Specialties, Department of Obstetrics and Gynecology, Stanford University School of Medicine, 300 Pasteur Drive, Room HH333, Stanford, CA 94305, USA. Tel: +650-725-9447; Fax: +650-723-7737; E-mail: sempre@stanford.edu

*Conflict of Interest:* Drs. Leah Millheiser, Rachel Pauls and Bertha Chen: Members of Scientific Advisory Board and stock options, Viveve, Inc. Dr. Seth Herbst: No conflicts of interest.

## Statement of Authorship

*Category 1*

(a) Conception and Design
Leah S. Millheiser; Rachel N. Pauls; Seth Jordan Herbst; Bertha H. Chen

Appx2409

InMode EX2018
BTL v. InMode
IPR2024-00703

8    *Millheiser et al.*

**(b) Acquisition of Data**
Seth Jordan Herbst
**(c) Analysis and Interpretation of Data**
Leah S. Millheiser; Rachel N. Pauls; Seth Jordan Herbst; Bertha H. Chen

*Category 2*
**(a) Drafting the Article**
Leah S. Millheiser; Rachel N. Pauls; Seth Jordan Herbst; Bertha H. Chen
**(b) Revising It for Intellectual Content**
Leah S. Millheiser; Rachel N. Pauls; Seth Jordan Herbst; Bertha H. Chen

*Category 3*
**(a) Final Approval of the Completed Article**
Leah S. Millheiser; Rachel N. Pauls; Seth Jordan Herbst; Bertha H. Chen

**References**

1  Barrett G, Pendry E, Peacock J, Victor C, Thakar R, Manyonda I. Women's sexual health after childbirth. Br J Obstet Gynaecol 2000;107:186–95.
2  Griffiths A, Watermeyer S, Sidhu K, Amso N, Nix B. Female genital tract morbidity and sexual function following vaginal delivery or lower segment caesarian section. J Obstet Gynaecol 2006;26:645–9.
3  Aslan E, Fynes M. Female sexual dysfunction. Int Urogynecol J 2008;19:293–305.
4  Yang SH, Yang JM, Wang KH, Huang WC. Biologic correlates of sexual function in women with stress urinary incontinence. J Sex Med 2008;5:2871–9.
5  Klein MC, Kaczorowski J, Firoz T, Hubinette M, Jorgensen S, Gauthier R. A comparison of urinary and sexual outcomes in women experiencing vaginal and Caesarean births. J Obstet Gynaecol Can 2005;27:332–9.
6  Pauls RN, Occhino JA, Dryfhout VL. Effects of pregnancy on female sexual function and body image: A prospective study. J Sex Med 2008;5:1915–22.
7  Safarinejad MR, Kolahi AA, Hosseini L. The effect of the mode of delivery on the quality of life, sexual function, and sexual satisfaction in primiparous women and their husbands. J Sex Med 2009;6:1645–67.
8  Dillon B, Dmochowski R. Radiofrequency for the treatment of stress urinary incontinence in women. Curr Urol Rep 2009;10:369–74.
9  Elser DM, Mitchell GK, Miklos JR, Nickell KG, Cline K, Winkler H, Wells G. Nonsurgical transurethral collagen denaturation for stress urinary incontinence in women: 12-month results from a prospective long-term study. J Min Invasive Gynecol 2009;16:56–62.
10 Weiss RA, Weiss MA, Munavalli G, Beasley KL. Monopolar radiofrequency facial tightening: A retrospective analysis of efficacy and safety in over 600 treatments. J Drugs Dermatol 2006;5:707–12.
11 Dover J, Zelickson B, the 14-Physician Multispecialty Consensus Panel. Results of a survey of 5,700 patient monopolar radiofrequency facial skin tightening treatments: Assessment of a low-energy multiple-pass technique leading to a clinical end point algorithm. Dermatol Surg 2007;33:900–7.
12 Fitzpatrick R, Geronemus R, Goldberg D, Kaminer M, Kilmer S, Ruiz-Esparza J. Multicenter study of noninvasive radiofrequency for periorbital tissue tightening. Lasers Surg Med 2003;33:232–42.
13 Rosen R, Brown C, Heiman J, Leiblum S, Meston C, Shabsigh R, Ferguson D, D'Agostino R Jr. The Female Sexual Function Index (FSFI): A multidimensional self-report instrument for the assessment of female sexual function. J Sex Marital Ther 2000;26:191–208.
14 Derogatis L, Clayton A, Lewis-D'Agostino D, Wunderlich G, Fu Y. Validation of the female sexual distress scale-revised for assessing distress in women with hypoactive sexual desire disorder. J Sex Med 2008;5:357–64.
15 Herbst SJ, Pauls R, Millheiser L, Carson S, Parmer J, Willson C, Stern R, Chen B. Radiofrequency treatment of vaginal laxity-nonsurgical vaginal tightening. J Min Invasive Gynecol 2009;16:S90.
16 Propert KJ, Mayer RD, Wang Y, Sant GR, Hanno PM, Peters KM, Kusek JW, Interstitial Cystitis Clinical Trials Group. Responsiveness of symptom scales for interstitial cystitis. Urology 2006;67:55–9.
17 FitzGerald MP, Anderson RU, Potts J, Payne CK, Peters KM, Clemens JQ, Kotarinos R, Fraser L, Cosby A, Fortman C, Neville C, Badillo S, Odabachian L, Sanfield A, O'Dougherty B, Halle-Podell R, Cen L, Chuai S, Landis JR, Mickelberg K, Barrell T, Kusek JW, Nyberg LM, Urological Pelvic Pain Collaborative Research Network. Randomized multicenter feasibility trial of myofascial physical therapy for the treatment of urological chronic pelvic pain syndromes. J Urol 2009;182:570–80.
18 Coad JE, Vos JA. Non-invasive radiofrequency tightening of the vagina in a sheep model. J Sex Med 2010;7(suppl 3):131.
19 Wiegel M, Meston C, Rosen R. The Female Sexual Function Index (FSFI): Cross-validation and development of clinical cutoff scores. J Sex Mar Ther 2005;31:1–20.
20 Pardo JS, Sola VD, Ricci PA, Guiloff EF, Freundlich OK. Colpoperineoplasty in women with a sensation of a wide vagina. Acta Obstet Gynecol Scand 2006;85:1125–7.
21 Adamo C, Corvi M. Cosmetic mucosal vaginal tightening (lateral colporrhaphy): Improving sexual sensitivity in women with a sensation of wide vagina. Plast Reconstr Surg 2009;123:212–3.
22 Glazener CM. Sexual function after childbirth: Women's experiences, persistent morbidity and lack of professional recognition. Br J Obstet Gynaecol 1997;104:330–5.
23 Lukes A, Kingsberg S. OB/GYNs attitudes and perceptions regarding sexual health of patients after delivery. J Sex Med 2010;7(suppl 3):129.
24 Zelickson BD, Kist D, Bernstein E, Brown DB, Ksenzenko S, Burns J, Kilmer S, Mehregan D, Pope K. Histological and ultrastructural evaluation of the effects of a radiofrequency-based nonablative dermal remodeling device: A pilot study. Arch Dermatol 2004;140:204–9.
25 Alster TS, Lupton JR. Nonablatve cutaneous remodeling using radiofrequency devices. Clin Dermatol 2007;25:487–91.
26 Hantash BM, Ubeid AA, Chang H, Kafi R, Renton B. Bipolar fractional radiofrequency treatment induces neoelastogenesis and neocollagenesis. Lasers Surg Med 2009;41:1–9.
27 Hodgkinson DJ. Clinical applications of radiofrequency: Nonsurgical skin tightening (Thermage). Clin Plast Surg 2009;36:261–8.

InMode EX2018
BTL v. InMode
IPR2024-00703
Appx2410